# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

CASE NO. 00-6107-CIV-FERGUSON/SNOW



STEVE HARRIS,

    Plaintiff,

v.

DAYTON HUDSON CORPORATION
d/b/a TARGET STORES,

    Defendant.
_____/

## JOINT PRETRIAL REPORT

Defendant, **TARGET CORPORATION** ("Target" or "Defendant"), and Plaintiff **STEVE HARRIS** ("Plaintiff"), pursuant to Local Rule 16.1, file their Joint Pretrial Report.

### I.   CONCISE STATEMENT OF THE CASE BY EACH PARTY IN THE ACTION

#### A.   Nature of the Case

Plaintiff filed the instant lawsuit alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII") (Count I) and 42 U.S.C. § 1981 ("Section 1981") (Count II). Plaintiff alleges that Target discriminated against him as a result of his race. Plaintiff also alleges a claim for libel and slander (Count III).

#### B.   Plaintiff's Statement of the Case

1.    The Plaintiff was at the time of his dismissal hired by TARGET as the ONLY African-American acting as a General Store Manager in the South Florida TARGET STORES.

2.    Plaintiff was, and had been evaluated as a competent and valuable employee of Defendant until certain "new" superiors were installed. Those "new" superiors "trumped" up complaints to create a "smokescreen" to enable Defendant to fire HARRIS. The way HARRIS was



treated was substantially different from the way non-African-American Managers were treated.

3. Plaintiff's firing was based, in whole, or in significant part by racial discrimination. This termination was irrational and based substantially on race, and was, therefore, arbitrary and capricious as a matter of law.

4. In so doing, the employer discriminated in an unlawful fashion against the Plaintiff.

5. The conduct of the Defendant interfered with the Plaintiff's right to continued employment, a right pertinent to Plaintiff's reputation.

6. By terminating Plaintiff, in the fashion done, Defendant maliciously libeled him by going beyond the qualified privilege, as a former employer regarding comments made to potential future employers.

7. Defendant's claimed reasons for termination were untrue and a pretext for his dismissal.

8. Plaintiff was treated in a disparate fashion than "white" employees resulting in his pretextural termination, which was in fact illegally influenced by his race."

### C. **Defendant's Statement of the Case**

In June 1994, Plaintiff, an African-American, applied for a position at Target. Terry Gillespie, Target's Regional Human Resource Manager, who is white, was one of the Target managers who interviewed Plaintiff. Upon completing the interview process, Gillespie offered Plaintiff an Assistant Store Team Leader position (Assistant Store Manager) at Target. Plaintiff accepted Gillespie's offer of employment.

On June 9, 1994, Plaintiff commenced his employment at Target store T638, located in Boca Raton, Florida, as an Assistant Store Team Leader-in-Training (Assistant Store Manager in Training). After completing the initial training, Plaintiff was promoted to Assistant Store Team Leader (Assistant Store Manager) on August 1, 1994. On December 28, 1997, Plaintiff was

promoted to Store Team Leader (Store Manager) and transferred to Target Store T392, located in Greenacres, Florida. On April 1, 1998, Target transferred Plaintiff to Target Store T393, located in Deerfield Beach, Florida, as the Store Team Leader (Store Manager). Plaintiff worked at Target Store T393 until his termination date, March 5, 1999.

As Store Team Leader, Plaintiff was responsible for a multi-million dollar business. Plaintiff oversaw all store funds and budgets. Plaintiff was required to demonstrate exemplary conduct and leadership within the store. Plaintiff was required to direct the merchandising, operation, and personnel functions of the store toward attaining maximum profits, sales, and return on investment.

In January 1999, Plaintiff contacted Mark Hastings, Target's District Manager, so that he could authorize a going-away dinner party for Evan Feldman, an Executive Team Leader, who had resigned. After Hastings approved the dinner party, Plaintiff obtained $500.00 from Don Fankhauser, the Security Manager at Target Store T393, to cover the cost of Feldman's going-away dinner party.

Feldman's going-away dinner party was held on January 29, 1999, at Shooter's, a Fort Lauderdale restaurant. Four individuals attended Feldman's going-away dinner party: Shannon Tetrault, Don Fankhauser, Plaintiff, and Evan Feldman. According to Plaintiff, he paid $135.87 for the dinner party and left approximately a $25 tip; thus, Plaintiff testified that he paid a total of $160 for Feldman's dinner party. However, on the Shooter's receipt submitted to Target, Plaintiff handwrote and added $135.87 (the dinner's cost) and $160.00 to equal $295.87. Pursuant to the receipt, Plaintiff made it appear that he had paid $295.87 for the dinner party.

Plaintiff took the Shooter's receipt (which reflected a $295.87 total) to Target's service desk so as to return the remaining funds. The service desk supervisor retained the difference between $500 and $295.87 (the amount Plaintiff wrote on the receipt) which was $205.

3

Soon thereafter, it was brought to Gillespie's attention that Plaintiff had received $500 for Feldman's dinner party and had spent $295.87. Pursuant to the Shooter's receipt, it appeared that Plaintiff had spent $135.87 in the dinner and had left a gratuity of $160. Target viewed a $160 gratuity on a $135.87 dinner as an exorbitant tip.

Target commenced an investigation involving the Shooter's receipt. Fankhauser telephoned the Shooter's waiter who stated that Plaintiff had not given a $160 tip, but rather a $25 tip. Since Plaintiff supposedly incurred costs of $160 (in dinner and gratuity) and only returned $205 to Target, the investigation revealed that there was approximately a $135 discrepancy ($500 - $160 - $205). Consequently, Target decided to conduct a thorough investigation on Plaintiff. The investigation revealed that Plaintiff committed numerous improprieties and violations of Target policies.

In February 1999, Plaintiff attended a meeting in which Mark Hastings, Doug Barth (Target's District Asset Protection Team Leader), and Gillespie were present. The meeting was held to discuss the Shooter's Receipt discrepancy and the other improprieties that the investigation had uncovered.

First, Gillespie questioned Plaintiff about the Shooter's Receipt discrepancy. Plaintiff stated that he did not know how much money he had returned to Target; he simply took out all the money that was in his pocket and gave it to the service desk employee so that she could determine the correct change. Plaintiff admitted that he added $135.87 (the dinner's cost) and $160.00 to equal $295.87. He admitted that the receipt reflected $295.87. When asked why he added $135.87 and $160 on the Shooter's receipt, Plaintiff had the following nonsensical explanation. "I was trying to figure out what amount of money should go back to the store so I was calculating." Pursuant to Target's policies, Plaintiff could be terminated for being a security risk and falsifying receipts.

Second, Gillespie questioned Plaintiff about his company-issued American Express corporate charge card. Target provides American Express corporate charge cards for business

4

purposes only. However, Plaintiff was using his company-issued American Express corporate charge card exclusively for personal purposes. Excluding only one entry, Plaintiff solely and improperly used his company-issued American Express corporate charge card for personal purchases. Plaintiff admitted that the company-issued American Express corporate charge card account was in arrears. Plaintiff was required to pay all outstanding amounts on his company-issued American Express corporate charge card on a monthly basis. However, Plaintiff failed to pay his balance on a monthly basis as required and had an outstanding balance of $777.50. Gillespie also questioned Plaintiff about his personal Target credit card. On August 28, 1996, Plaintiff's personal Target credit card account was closed earlier due to his failure to pay the outstanding amount due. Pursuant to Target's policies, Plaintiff could be terminated for improperly using his company-issued American Express corporate charge card and for not keeping his Target credit card in good standing.

Third, Gillespie questioned Plaintiff about a personal check that Plaintiff had given to Target from his personal bank account which had insufficient funds. Plaintiff admitted that he had bounced a personal check made payable as "cash" which he had cashed at Target, but claimed that it was the bank's mistake. Pursuant to Target's policies, Plaintiff could be terminated for providing a bounced check to Target.

Fourth, Gillespie questioned Plaintiff about several employees' complaints that Plaintiff was forcing them to lend him money and having them drive him around to do personal errands.

At the end of the meeting, Plaintiff was placed on a leave of absence pending a further investigation on the above referenced discrepancies. On Friday, March 5, 1999, Plaintiff met with Gillespie (appearing by telephone), Hastings, and Barth. During the second meeting, Plaintiff was again asked about the Shooter's Receipt discrepancy. Plaintiff had no explanation or justification for his actions. Consequently, Plaintiff was terminated because he posed a security risk and for violating numerous Target policies.

## II.  BASIS OF FEDERAL JURISDICTION

Federal jurisdiction is based on 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1367 (supplemental jurisdiction).

## III.  THE PLEADINGS RAISING THE ISSUES

A.  Plaintiff's Complaint.

B.  Answer and Affirmative Defenses to Complaint.

## IV.  UNDISPOSED MOTIONS OR OTHER MATTERS REQUIRING ACTION BY THE COURT

A.  Defendant will be filing a Motion for Summary Judgment.

## V.  A CONCISE STATEMENT OF UNCONTESTED FACTS

1.  In June 1994, Plaintiff, an African-American, applied for a position at Target.

2.  Terry Gillespie, Target's Regional Human Resource Manager, who is white, was one of the Target managers who interviewed Plaintiff.

3.  Upon completing the interview process, Gillespie offered Plaintiff an Assistant Store Team Leader position (Assistant Store Manager) at Target, and Plaintiff accepted Gillespie's offer of employment.

4.  On June 9, 1994, Plaintiff commenced his employment at Target store T638, located in Boca Raton, Florida, as an Assistant Store Team Leader-in-Training (Assistant Store Manager in Training). After completing the initial training, Plaintiff was promoted to Assistant Store Team Leader (Assistant Store Manager) on August 1, 1994.

5.  On December 28, 1997, Plaintiff was promoted to Store Team Leader (Store

6

Manager) and transferred to Target Store T392, located in Greenacres, Florida. The transfer was for a short-term period because Target Store T392 was closing.

      6.    On April 1, 1998, Target transferred Plaintiff to Target Store T393, located in Deerfield Beach, Florida, as the Store Team Leader (Store Manager).

      7.    Plaintiff was terminated on March 5, 1999.

### VI. ISSUES OF FACT WHICH REMAIN TO BE LITIGATED AT TRIAL

    A.    Whether Plaintiff was terminated because of his race.

    B.    Whether Defendant libeled or slandered Plaintiff.

    C.    Whether the action of Defendant gives rise to punitive damages.

    D.    Whether the actions of Defendant were pretextual in firing Plaintiff.

    E.    The extent of Plaintiff's damages, if any.

### VII. CONCISE STATEMENT OF AGREED ISSUES OF LAW

The Parties agree that Title VII and § 1981 apply.

### VIII. ISSUES OF LAW WHICH REMAIN TO BE LITIGATED AT TRIAL

    A.    Whether Plaintiff was terminated because of his race.

    B.    If Plaintiff was discriminated against, whether Defendant is liable.

    C.    Whether Defendant slandered or libeled Plaintiff.

    D.    Whether Plaintiff mitigated his damages.

### IX. EXHIBIT LISTS

    A.    Plaintiff's Exhibit List is attached at Tab A

B.  Defendant's Exhibit List is attached at Tab B.

X. **WITNESS LISTS**

A.  Plaintiff's Witness List is attached at Tab C

B.  Defendant's Witness List is attached at Tab D.

XI. **ESTIMATED TRIAL TIME**

The parties estimate that the trial will take 4-5 days.

Dated: January 30, 2001

Respectfully submitted,

RICHARD BURTON & ASSOC., P.A.  
Attorneys for Plaintiff  
18305 Biscayne Boulevard  
Suite 300  
Miami, Florida 33160  
(305) 705-0888  
(305) 935-9542 (facsimile)

SHUTTS & BOWEN, LLP  
Attorneys for Defendant  
201 South Biscayne Blvd.  
1500 Miami Center  
Miami, Florida 33131  
(305) 358-6300  
(305) 347-7386 (facsimile)

By:_____  
Richard J. Burton  
Florida Bar No. 179337

By:_____  
Sheila M. Cesarano  
Florida Bar No. 708364  
Rene Gonzalez-LLorens  
Florida Bar No. 0053790

B. Defendant's Exhibit List is attached at Tab B.

## X. WITNESS LISTS

A. Plaintiff's Witness List is attached at Tab C

B. Defendant's Witness List is attached at Tab D.

## XI. ESTIMATED TRIAL TIME

The parties estimate that the trial will take 4-5 days.

Dated: January 30, 2001

Respectfully submitted,

RICHARD BURTON & ASSOC., P.A.
Attorneys for Plaintiff
18305 Biscayne Boulevard
Suite 300
Miami, Florida 33160
(305) 705-0888
(305) 935-9542 (facsimile)

By: _____
Richard J. Burton
Florida Bar No. 179337

SHUTTS & BOWEN, LLP
Attorneys for Defendant
201 South Biscayne Blvd.
1500 Miami Center
Miami, Florida 33131
(305) 358-6300
(305) 347-7386 (facsimile)

By: _____
Sheila M. Cesarano
Florida Bar No. 708364
Rene Gonzalez-LLorens
Florida Bar No. 0053790

MIADOCS 384162.1 LHD