1

2                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
3                      FT. LAUDERDALE DIVISION

4
                              CASE NO. 00-6107-CIV-FERGUSON
5                             MAGISTRATE JUDGE SNOW

6

7    STEVE HARRIS,
                                        ORIGINAL
8              Plaintiff,

9    vs.

10   DAYTON HUDSON CORPORATION
     d/b/a TARGET STORES,

11
               Defendant.
12   _____/

13
                              Suite 1500
14                            210 S. Biscayne Blvd.
                              Miami, Florida
15                            June 5, 2000.
                              11:07 A.M. - 4:40 P.M.
16

17

18              DEPOSITION OF STEVE HARRIS

19

20

21        Taken before Joanne DeVito, Shorthand Reporter

22   and Notary Public for the State of Florida at Large,

23   pursuant to Notice of Taking Deposition filed in the

24   above cause.

25

```
 1                     APPEARANCES

 2          RICHARD J. BURTON, ESQ., of the firm
            of Richard J. Burton & Associates,
 3          on behalf of the Plaintiff.

 4          SHEILA M. CESARANO, ESQ., of the
            firm of Shutts & Bowen LLP,
 5          on behalf of the Defendant.

 6   ALSO PRESENT:

 7          Terry Gillespie

 8          _____

 9                    I N D E X

10     Witness         Dir.    Cr.    Red.    Rec.

11   STEVE HARRIS        3      --     --      --

12

13                  E X H I B I T S

14     Defendant's                  For Ident.

15          1                           53
            2                           59
16          3                           74
            4                           78
17          5                           84
            6                          131
18          7                          215
            8                          218
19          9                          220
           10                          224
20         11                          232
           12                          234
21         13                          235

22

23     Plaintiff's                  For Ident.

24          A                          120
            B                          120
25
```

```
 1   Thereupon,
 2                       STEVE HARRIS,
 3   was called as a witness by the Defendant, and having
 4   been first duly sworn, testified as follows:
 5                    DIRECT EXAMINATION
 6   BY MS. CESARANO:
 7       Q.   Mr. Harris, I would like to know, have you
 8   ever had a deposition like this taken before?
 9       A.   No.
10       Q.   Okay.  I just want you to know that if you
11   don't understand my question, you're not sure what
12   I'm asking, please ask me to rephrase it or repeat
13   it.  That's your right.
14       A.   Okay.
15       Q.   It's important that you understand the
16   question before you have to answer it.  If you want
17   to take a break, just ask me; no problem.
18       A.   Okay.  If I'm not sure, I say I'm not sure
19   or --
20            MR. BURTON:  Well, to make -- answer her
21       question.  If you're not sure of the answer
22       because you don't understand it, say it, I
23       don't know what the question is.  If you don't
24       know an answer, say I don't know the answer to
25       that or I don't understand what it is you're
```

1          asking.

2                    THE WITNESS:   Okay.

3                    MR. BURTON:   But to say I'm not sure of an

4          answer that you don't understand, it would be

5          confusing for her and for me.

6                    THE WITNESS:   Okay.   I'll do my best.

7     BY MS. CESARANO:

8          Q.   I first want to just get down some basic

9     information about yourself.   If you would give me,

10    please, your date of birth.

11         A.   Yeah.   10/15/62.

12         Q.   And your Social Security number?

13         A.   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.

14         Q.   And your current address?

15         A.   18303 Clearbrook, one word, Circle, Boca

16    Raton, Florida.

17         Q.   The zip?

18         A.   33498.

19         Q.   Your home phone?

20         A.   Area code 561-218-0115.

21         Q.   And how long have you lived at that

22    address?

23         A.   It's on three years now.

24         Q.   Prior to that, what address did you live

25    at?

```
 1        A.   9664 Tavenier Drive, Boca Raton.  I think
 2    it's 334 -- 33496.
 3        Q.   And how long did you live at that address?
 4        A.   Five and a half years.
 5        Q.   How long have you lived in the state of
 6    Florida?
 7        A.   Fourteen years.  If I'm correct.
 8        Q.   And before that, where did you live, what
 9    state?
10        A.   Oh, I was in Canada.
11        Q.   How long did you live in Canada?
12        A.   Eighteen years.  Seventeen, eighteen
13    years.
14        Q.   Where were you born?
15        A.   I was born on the island of Grenada.
16        Q.   How long did you live in Grenada?
17        A.   Until I was six years old, if I remember
18    correctly.
19        Q.   Then where did you move?
20        A.   To Canada.
21        Q.   And then to the United States?
22        A.   Yeah.
23        Q.   You haven't lived anywhere else?
24        A.   No.
25        Q.   Are you married?
```

1        A.    Yes, I am.

2        Q.    Your wife's name?

3        A.    Is Janice Harris.

4        Q.    How long have you been married to her?

5        A.    This will be four years.

6        Q.    And do you have any children?

7        A.    Yes, I do.

8        Q.    How many?

9        A.    I have one by her.

10       Q.    How old is your child?

11       A.    He's four years old.

12       Q.    And his name?

13       A.    Steve, also.   Jonathon Harris.

14       Q.    Do you have any other children?

15       A.    Yes, I do.

16       Q.    How many?

17       A.    Two.

18       Q.    Their ages?

19       A.    One is twelve and one is thirteen.

20       Q.    Their names?

21       A.    Twelve year old is Brittany Harris, and

22    the thirteen year old is Raven Harris.

23       Q.    Are you currently working?

24       A.    Yes.

25       Q.    Where are you working?

```
 1        A.   Actually, doing odd jobs for myself.

 2   Rescreening.

 3        Q.   Do you have a company that you work for?

 4        A.   No.  Just for myself.

 5        Q.   You don't -- you didn't form a corporation

 6   or do something like that for your own jobs?

 7        A.   No.  I didn't form any corporation.

 8        Q.   Did you file an income tax return for 1999

 9   yet?

10        A.   Yes, I did.  For 19 -- yes, I did.

11        Q.   The most recent year?

12        A.   Yes, I did.

13        Q.   And can I get a copy of that, Mr. Burton?

14             MR. BURTON:  Should be no problem.

15             THE WITNESS:  Yeah.

16             MR. BURTON:  Obviously, we'll keep it

17        confidential under the terms of the

18        confidentiality agreement.

19             MS. CESARANO:  Yes, definitely.

20   BY MS. CESARANO:

21        Q.   Okay.  That would reflect some income from

22   these odd jobs you're talking about?

23        A.   No, because this was last year's.  This

24   was last year's income tax, and I just started

25   working, I want to say, back on, from November of
```

H. Allen Benowitz & Associates, A Veritext Company
(305) 373-9997

1    '99.

2         Q.    At these odd jobs?

3         A.    Yeah.  When I say odd jobs, I mean

4    screening.  Not jobs, just screening.

5         Q.    Tell me a little bit what you mean by

6    "screening".

7         A.    For example, you have a screened-in patio

8    and a rock may have gone through it or someone may

9    have torn it or a child may have busted through the

10   screen.  The person gives me a call and I come out

11   there and replace the screen for them.

12        Q.    How do the customers know how to get a

13   hold of you?  Or are you in the business of doing

14   that?

15        A.    I made little pamphlets that I would go

16   put in the neighborhoods.

17        Q.    Now, you say you've been doing that type

18   of job since about November of '99?

19        A.    Yes.

20        Q.    Prior to that, what --

21        A.    I was trying to seek employment.  That was

22   through Murphy Retail -- Murphy --

23        Q.    Are they a search firm?

24        A.    Yes.

25        Q.    Do they also do temporary help jobs?

```
 1          A.   Not to my knowledge that I'm aware of.

 2          Q.   So they help you find regular employment?

 3          A.   Right.

 4          Q.   And place you.  Do you know where that

 5    company is located?

 6          A.   Yes.  They're in Boca, also.

 7          Q.   And the proper name is Murphy Executives?

 8          A.   Yeah.  Murphy Executive Retail.

 9               MR. BURTON:  That's fine.

10    BY MS. CESARANO:

11          Q.   I mean, if you have a card on you or

12    something --

13          A.   I thought I did.

14          Q.   If you know their exact name, that would

15    be better or if you could look it up.

16          A.   Do you know who would know?

17               MR. BURTON:  No.  If you don't have it,

18          say -- that's all you have to say.  Don't --

19    BY MS. CESARANO:

20          Q.   To follow up with that question, how would

21    I find out what the correct name is?

22          A.   They would be in the phone book.

23          Q.   Okay.  They're in Boca?

24          A.   Yes.

25          Q.   When did you first go to them for help in
```

```
 1    finding employment?
 2         A.   After losing my job with Target.
 3         Q.   So that would have been --
 4         A.   I'm going to say -- well, I was fired in
 5    March, March 3rd, and I would say maybe about a
 6    month after that.
 7         Q.   Have you gone to any other companies or
 8    persons that help you find jobs since you left
 9    Target?
10         A.   No, I haven't.
11         Q.   This Murphy whatever company would be the
12    only one?
13         A.   Yes.
14         Q.   And, again, during this time period from
15    the time you left Target in approximately March of
16    '99, have you had any other employment where you've
17    actually earned some money or worked --
18         A.   No.
19         Q.   -- other than the odd jobs that you've
20    told me about?
21         A.   No, I have not.
22         Q.   In doing the screening jobs, how much
23    money or income have you received from these
24    screening jobs?
25              MR. BURTON:   Are you talking about net
```

1       income after his expenses or --

2    BY MS. CESARANO:

3       Q.    Gross income first.  How much do you

4    charge for a job?

5       A.    It would depend.  However -- let's say,

6    the smallest would be like $15, a medium screen

7    would be $30, and then 40 for a larger one.

8       Q.    Approximately -- and, of course, I'm just

9    asking you to estimate -- what income per month have

10   you been able to earn?

11      A.    I didn't keep track, but if I give you a

12   guess, that's really just a good guess because some

13   weeks I can earn some more money and other weeks I

14   earn nothing, but I would say two to $500.

15      Q.    Per week or per month?  Per week?

16      A.    Well, okay.  Month you said.  That's

17   correct.

18      Q.    It is per month?

19      A.    Yeah, per month.

20      Q.    The number you gave me.

21      A.    Yes.  Let's say $1,000.

22      Q.    How do you keep track of the income that

23   you earn from these screening jobs?

24      A.    Well, I actually have been -- sometimes I

25   write it on a piece of paper, other times --

1    actually, all the times they pay me cash because

2    it's so small, the job, that I would write it down

3    or I would record it.

4         Q.   But you have a means of recording when you

5    get cash?

6         A.   Yes.

7         Q.   Tell me what means --

8         A.   I have a notepad.

9         Q.   Do you date the date you got the cash?

10        A.   In some cases, yes.

11        Q.   Do you keep track of who you got the cash

12   from?

13        A.   Well, yes.  Yeah.

14        Q.   Mrs. so and so?

15        A.   Right.

16        Q.   So if you were to add all your notations

17   in your notebook, then you would be able to

18   determine how much income you got from the screening

19   jobs?

20        A.   I could.

21        Q.   That would be possible the way you have it

22   set up?

23        A.   Yes.  With my scribbling that I do.

24        Q.   But you can read your scribbling?

25        A.   I can read my scribbling.

1        Q.    Good.  I just want to real briefly go over

2    your educational history.  Where did you go to high

3    school?  Let's start there.

4        A.    La Salle Catholic High.

5        Q.    Spell that first name.

6        A.    L-A, then capital S-A-L-L-E, Catholic High

7    School.  That's in Canada.

8        Q.    What city in Canada?

9        A.    That's in Montreal.  Sorry.

10       Q.    Did you attend it for four years?

11       A.    Right.  And then I finished that.

12       Q.    Got your diploma?

13       A.    Yes.  Then I went to Dawson College.

14       Q.    D-A-W-S-O-N?

15       A.    Right.  That's also in Montreal, Canada.

16   I went two years there, but I did not complete.

17       Q.    What did you study?

18       A.    I took business courses, business

19   management, math, science -- political science,

20   excuse me.  I actually took some typing.

21       Q.    Did you declare a major?

22       A.    No.

23       Q.    What caused you to leave Dawson College?

24       A.    I just -- let me see.  Basically, I was

25   tired of school.

1          Q.    Did you have any formal schooling after

2    Dawson College?

3          A.    No.

4          Q.    Now, did you work during college?

5          A.    Yes.

6          Q.    Where did you work?

7          A.    At Montreal General Hospital.

8          Q.    What did you do at the hospital?

9          A.    I was a housekeeper.

10         Q.    How long did you work for the hospital?

11         A.    I want to say maybe three years, four

12    years.

13         Q.    What city is that in?

14         A.    That's also in Montreal.

15         Q.    I assumed that, but I wanted to ask you

16    anyway.  What years would that have been in?  You

17    said about three years at Montreal General Hospital.

18         A.    I couldn't tell you off the top of my

19    head, but I can get you that information, if you

20    would like.

21              MR. BURTON:  No, no.  If you don't know,

22         just say I don't know or I don't remember.

23         Don't volunteer.

24    BY MS. CESARANO:

25         Q.    And then I'm going to ask you some

1    follow-up questions just to see if I can jog your

2    memory.

3        A.    Okay.

4        Q.    Dawson College.  Do you remember the last

5    year that, you know, the year you left Dawson

6    College?

7        A.    I need to think for a moment.  I would say

8    the hospital would be from '76, approximately,

9    around '76 or '77 to '82, '83.  Because I came to

10   the United States in '84, '83, '84.

11       Q.    Was the Montreal General Hospital the last

12   job you had in Canada?

13       A.    Yes.

14       Q.    So if you came to the United States in

15   1984, was there a break between the time you worked

16   at the hospital and the time you arrived in the

17   United States?

18       A.    The break was only that in preparation of

19   coming down to Florida.

20       Q.    Okay.  Do you remember what month of the

21   year in '84 you arrived in the United States?

22       A.    Not offhand, no.

23       Q.    Now, you told me you worked at the

24   hospital between approximately '77 and '82.  Would

25   it have been later than that?  Because you said you

1    came to the United States in '84.

2         A.    Yeah.   '83, '84 is when I said I came to

3    the United States.  So in between there would be the

4    time frame, my three to four years at the hospital.

5         Q.    Okay.

6         A.    You know, prior to '83.

7         Q.    Immediately prior to coming to the US?

8         A.    Right.

9         Q.    Now, when you first came to the United

10   States, what city did you go to?

11        A.    Fort Lauderdale.

12        Q.    And why did you come to the United States?

13        A.    As I said, I didn't finish off my

14   schooling, and I didn't know what I was doing with

15   my life.  So my father had suggested to me maybe go

16   to the States and maybe you can meet up with your

17   uncle who lives in Florida, and you can start

18   working down there and figure out what you're doing

19   with your life.

20        Q.    Did your uncle live in Fort Lauderdale?

21        A.    Yes.   He lived in Lauderdale Lakes.

22   Lauderdale Lakes, I think it was called.   North

23   Lauderdale, excuse me.

24        Q.    Did you move in with him?

25        A.    Yes, I did.

1        Q.    How long did you live with your uncle?

2        A.    It's a good six months.

3        Q.    What was your uncle's name?  Or what is

4    your uncle's name?

5        A.    Freddie Harris.

6        Q.    Is he still alive?

7        A.    Yes, he is.

8        Q.    Does he still live in the Fort Lauderdale

9    area?

10       A.    No.  He's living in, I think, the Coconut

11   Creek area, but I can get that for you.

12       Q.    It's okay.  You're doing good.  These are

13   not important questions.

14             MR. BURTON:  I doubt very much she'll ever

15       come back to it.  She's just curious if you say

16       yes.

17   BY MS. CESARANO:

18       Q.    So after you lived with your uncle for six

19   months, what did you do next?

20       A.    Actually, I got a job, construction site,

21   while living at his house.

22       Q.    Who was the company?

23       A.    I don't know.  It was real brief, the work

24   I did there, because I wasn't liking it.  I then

25   went to Zayre's Company.

 1        Q.    That's Z-A-Y-R-E-S?

 2        A.    That's correct.  Apostrophe S.  I applied

 3    for a job there which was in Lauderhill.

 4        Q.    Did you get that job?

 5        A.    Yes, I did.

 6        Q.    What was your job at Zayre's?

 7        A.    I was a morning stock person.

 8        Q.    What year did you start with Zayre's?

 9        A.    That would be, if my numbers are correct,

10    would be in '84.  '83, '84.

11        Q.    Do you remember what you were making as

12    earnings?

13        A.    No, I don't know.

14        Q.    Hourly wage?

15        A.    Yes.  It was an hourly wage.

16        Q.    Was it approximately minimum wage,

17    somewhere around there?

18        A.    Yes.  I would say yes to that.

19        Q.    How long did you work for Zayre's?

20        A.    Two years.

21        Q.    When you left there, what was your title

22    or position?

23        A.    I had gotten promoted as the manager for

24    the shoe department.

25        Q.    What caused you to leave Zayre's?

1           A.    Well, that's a good question.  A lady came

2    into the store, and I was helping her with shoes.

3    However, she suggested to me that you could do

4    something better and asked me if I would like to

5    work for Saks Fifth Avenue.

6           Q.    Did she work for Saks?

7           A.    No.

8           Q.    She just thought that was a great store?

9           A.    She thought it was a great store and

10   suggested that.

11          Q.    So then you quit Zayre's?

12          A.    I went and applied at Saks Fifth Avenue.

13          Q.    Did you get a job there?

14          A.    Yes, I did.

15          Q.    What year would that have been?

16          A.    Let's see.  If my numbers are correct,

17   like I said --

18                MR. BURTON:  You have a copy of his --

19                THE WITNESS:  I think --

20                MR. BURTON:  Be quiet.  You have a copy of

21        all of that material that you supplied to me

22        which has his backup.  I mean, rather than

23        guesstimating, you have every one of those

24        details at this point forward because you

25        handed it to me in your production.

1    BY MS. CESARANO:

2        Q.    Right.  Your resume is in your personnel

3    file, right?

4        A.    Exactly.

5        Q.    I won't worry about the years.  We won't

6    have to worry about that.  At Saks, what was your

7    job?

8        A.    I got hired there as an assistant shoe

9    department manager.

10        Q.    How long did you hold that position,

11    approximately?

12        A.    Two years and a half.

13        Q.    And then what happened after that?

14        A.    I went to Marshall's department store.

15        Q.    Now, did you leave Saks voluntarily?

16        A.    Yes.  I also left Zayre's voluntarily.

17    Good terms.

18        Q.    So next you applied to Marshall's.  What

19    made you go there or apply there?

20        A.    There was a headhunter that came through

21    Saks Fifth Avenue and gave you a business card and

22    had said they were looking to expand, and if I would

23    be interested, he saw me as a candidate for a good

24    potential store manager.

25        Q.    And did you go to work for Marshall's?

```
 1        A.    Yes, I did.
 2        Q.    How long did you work for Marshall's,
 3    approximately?
 4        A.    Six years.
 5        Q.    When you left, what was your title?
 6        A.    Assistant -- senior assistant store team
 7    leader.
 8        Q.    Let me find your resume here and see what
 9    year that takes us up here.  Okay.  I've got on your
10    resume that you were 1988 to present, I guess, when
11    you were applying to Target, at Marshall's at
12    Sawgrass Mills?
13        A.    Yes.  Right.
14        Q.    I guess approximately 1994 that you went
15    to work for Target?  Was that your next job?
16        A.    June of '94.
17        Q.    And the dates set forth on your resume
18    that you gave to Target would be correct?
19        A.    To my knowledge.
20        Q.    And also, the job descriptions, et cetera,
21    as to what you did in the different stores?
22        A.    I would say yes.
23        Q.    So then that takes us up to Target?
24        A.    Yes.
25        Q.    Tell me how you came to look for a
```

1  position at Target.

2       A.    I actually was not looking for a position

3  at Target.  A retail recruiter, which was Murphy

4  Retail, had called me and solicited me over the

5  phone.  I said at that point there that I was not

6  interested in Marshall's.

7       Q.    And then what happened next?

8       A.    I got another call again, and was asked if

9  I would reconsider and listen for a little bit

10  because Target was expanding down in South Florida

11  and looking for young, aggressive managers to start

12  running -- start developing them to run buildings.

13      Q.    Now, up until that time, as far as you

14  understood, was Target in an expansion phase in

15  Florida at that time?

16      A.    I actually did not know anything about

17  Target and what they were doing until I got the

18  phone call from Murphy Retail, and that's how I

19  gained knowledge as to what they were doing.

20      Q.    So then what did you do after you got that

21  second phone call?

22      A.    I told them I would think about it, and

23  that I did.  Then I agreed to go to a meeting with

24  Murphy Retail.

25      Q.    Where was the meeting?

1        A.    It was at their office in Boca Raton.

2        Q.    Who attended the meeting?

3        A.    Joe Murphy -- sorry.  Wayne Murphy, the

4    person I first spoke to.

5        Q.    Who --

6        A.    Scratch that.  I'm sorry.  His name is

7    Wayne, but I don't know his last name.  His

8    assistant.  Wayne Duval.  Thank you.  Wayne Duval.

9        Q.    He worked for Murphy Recruiting?

10       A.    Right.

11       Q.    Who else was at the meeting?

12       A.    That was it.

13       Q.    Okay.  So you had a meeting with the

14   recruiters?

15       A.    Right.  With the recruiter.

16       Q.    What happened?

17       A.    He asked me about my background.  Same

18   questions you're asking me; where I worked, what I'd

19   like.  He asked me about myself and where I thought

20   I would be in five years.  I explained all of that

21   to him, and he started describing Target and all the

22   benefits they have and how they were expanding and

23   what they were looking for.

24       Q.    What was the next step in the process?

25       A.    I didn't hear anything after that for

Page 24

1    about a good, I'd say, maybe about a month.  I

2    didn't hear back from Murphy.  Then I got a call and

3    I was asked if I would be interested in going on an

4    interview.  I said I will call you back.  So I did

5    call back, and I agreed to the interview.

6        Q.    The interview took place, right?

7        A.    Yes, it did.

8        Q.    Where did it take place?

9        A.    Terry Hargrove's office in Boynton Beach.

10   Terry Hargrove is the district manager at that time

11   for Target.

12       Q.    Boynton Beach?

13       A.    Yes.

14       Q.    Do you want to correct anything?

15       A.    Yes.  I would like to correct something

16   because I jumped ahead.  I apologize.  My first

17   meeting was with Robert Van Savage at the Boca Raton

18   Target store.

19       Q.    Who is Robert Savage?

20       A.    Van, V-A-N, and Savage.  He was the store

21   manager at the time of that store.

22       Q.    And what happened as a result of that

23   meeting?

24       A.    He did not tell me anything after that

25   meeting.  I felt the meeting went well.  However,

H. Allen Benowitz & Associates, A Veritext Company
(305) 373-9997

1    about a week later, that's when I had the second --

2    approximately, about a week or two later, that's

3    when I was asked to go to a second interview, and

4    that was with Terry Hargrove, the district manager

5    for D310.

6         Q.    That was the Boynton Beach meeting?

7         A.    That was the Boynton Beach meeting.

8         Q.    Was anybody else there besides you and

9    Terry?

10        A.    Not the first one, no.

11        Q.    And what happened as a result of that

12   meeting?

13        A.    He told me he would get back to me.

14        Q.    Did he?

15        A.    Yes, he did.

16        Q.    When did that happen?

17        A.    I would say maybe about -- I'm just

18   guessing off the top of my head.  Maybe three weeks,

19   four weeks.

20        Q.    And when he contacted you, what did he

21   say?

22        A.    He would like me to meet with Terry

23   Gillespie.

24        Q.    Did you in fact meet with Terry Gillespie?

25        A.    Yes.

1          Q.    At the time, what position did Terry

2    Gillespie hold?

3          A.    I -- I don't know what he held, but I was

4    told that he was the regional human resources

5    person.

6          Q.    Okay.

7          A.    And Terry Hargrove was present at that

8    time, too.

9          Q.    Where did you meet?

10         A.    At the Boynton office again.

11         Q.    Now, is that a district office?

12         A.    That's a district office, yes.

13         Q.    Was it just the three of you?

14         A.    Yes.   If I can remember.

15         Q.    About how long did that meeting last?

16         A.    I'd say a good hour.

17         Q.    When the meeting ended, what was the

18    upshot of the meeting?

19         A.    Nothing was told to me.  They were still

20    reviewing other applicants, and that they would get

21    back to me.

22         Q.    Did any of them get back to you?

23         A.    Yes.

24         Q.    When was what?

25         A.    Again, I'm guessing here, maybe two, three

1    weeks again.  And that was -- I received a letter,

2    actually.

3         Q.    That was your next contact?

4         A.    I got a letter from Terry Gillespie

5    stating that I was accepted for -- the position that

6    I was accepted for was assistant store team leader,

7    and that my salary would be starting at 45,500.

8         Q.    Was that more than you were making before

9    that?

10        A.    Yes.

11        Q.    What were you making at Marshall's?

12        A.    Again, I'm going back just trying to

13   think, I think between 36 and $38,000.

14        Q.    Did you accept the offer from Target?

15        A.    Yes, I did.

16        Q.    How did you accept?

17        A.    I said yeah.

18        Q.    Telephone?

19        A.    Yeah.  I called and said I have a job,

20   okay, great.

21        Q.    Your first position then as assistant

22   store team leader, were you in a training mode?

23        A.    They put me in a training mode for ninety

24   days.  I was told it was a probational period, and

25   that's all I was told.

```
 1         Q.   I have your start date as June 9th, 1984.

 2    Does that sound correct?

 3         A.   That sounds correct.

 4         Q.   After that -- now, that was what is known

 5    as store 638?

 6         A.   That's correct.

 7         Q.   That's where you started.  Then you were

 8    promoted August 1st, 1984 to assistant store team

 9    leader at T638, correct?

10         A.   To --

11         Q.   I guess this was after your probationary

12    period was expired.  So you officially became --

13         A.   That's correct, yes.

14         Q.   In other words, you --

15         A.   I got through my ninety days, and got the

16    stamp of approval.

17         Q.   Okay.  Now, just focussing on that first

18    store, T638?

19         A.   Yes.

20         Q.   Did you have any problems or issues at

21    that store at all --

22              MR. BURTON:   Object to the form of the

23         question.

24              MS. CESARANO:   I'm going to rephrase it.

25              MR. BURTON:   I figured you would.
```

1   BY MS. CESARANO:

2        Q.   At store T, which is 638, your first

3   store, did you receive any adverse actions of any

4   kind, such as discipline?

5        A.   No.  I did not receive any disciplinary

6   action.

7        Q.   Did any members of management at that

8   store bring any problems to your attention?

9             MR. BURTON:  Object to the form of the

10            question.

11            THE WITNESS:  Could you repeat that,

12            please, or a different form?

13  BY MS. CESARANO:

14       Q.   Yes.  I'm going to stick to that form

15  because I can't think of a better way to do it.

16            Did any of the management at T638 during

17  the time you worked there come to you and bring any

18  problems to your attention?  Problems with you.

19       A.   With me personally?

20       Q.   You personally.

21       A.   No.

22       Q.   Go ahead.

23       A.   I say no because I can't think of anything

24  as far as disciplinary action, no.

25       Q.   Anything more verbal or informal level

H. Allen Benowitz & Associates, A Veritext Company
(305) 373-9997

1    that --

2            MR. BURTON:  Object to the form of the

3        question.  I don't know what verbal or informal

4        is.  If there's a procedure, especially Target

5        has a very detailed procedure, anything

6        specific, but I just don't want him to guess

7        about someone, if they asked him to move a

8        store sign over, I don't know if that fits and

9        I don't want him to guess.

10   BY MS. CESARANO:

11       Q.   I'll rephrase it.  You said nothing in

12   writing?

13       A.   No.

14       Q.   Now, you're familiar with something called

15   an oral warning, correct?

16       A.   Yes, I am.

17       Q.   Were you given any oral warnings by any --

18       A.   No.

19       Q.   -- management at Target at that time?

20       A.   From Robert Van Savage, no.

21       Q.   From any other management person?

22       A.   He would be the only one.

23       Q.   So no?

24       A.   No.  The answer is no.

25       Q.   So it's fair to say that your tenure at

1    that first store, T638, was very normal and

2    uneventful?

3        A.    The answer would be yes.  I had events.

4            MR. BURTON:  Please, just -- can I

5        interrupt and talk to him off the record a

6        second?

7            MS. CESARANO:  Sure.

8        (Informal discussion off the record.)

9    BY MS. CESARANO:

10       Q.    So now we're going to go to the next store

11   which I have down as T391 in West Palm Beach,

12   correct?

13       A.    That's correct.

14       Q.    I have that you were transferred there on

15   approximately September 15th, 1996?

16       A.    I'll say best to my recollection that

17   sounds like a correct date.

18       Q.    Who was the manager of the store when you

19   arrived?

20       A.    Pam Burnstein.

21       Q.    How long did you stay at T391?

22       A.    I want to say, again, best of my

23   recollection, nine months.

24       Q.    And did that same manager remain the

25   manager during that time period?

1         A.    No.    She had left the same time I had

2    left.    She got promoted.

3         Q.    When you say you had left, do you mean

4    when you arrived at the store?

5         A.    Sorry.    I misunderstood the question.

6         Q.    Tell me her name again.

7         A.    Pam Burnstein.

8         Q.    Was Pam Burnstein the store team leader

9    while you were there?

10        A.    Yes.

11        Q.    Did you ever work for any other store team

12   leader?

13        A.    No.

14        Q.    Again, at T391.

15        A.    Yes.    I understand.

16        Q.    Now, you received a promotion while you

17   were at store T391; is that right?

18        A.    I was told that -- I was asked if I would

19   go close, I think the store was T393, which is the

20   West Palm Beach store in Greenacres.    The store was

21   being closed down, and I was asked to be the manager

22   to close the store.

23        Q.    And just for the record, I'm asking you a

24   question.    I think you had said that was T393.

25        Wasn't it in fact 392?

```
 1        A.    That's correct.  Thank you for correcting
 2   me.
 3        Q.    That's the Greenacres store?
 4        A.    That's the Greenacres store.  That is
 5   correct.
 6        Q.    Prior to doing that, were you promoted to
 7   executive team leader in logistics in approximately
 8   July '97?
 9        A.    I was given that title because the --
10              MR. BURTON:  The answer is yes?
11              THE WITNESS:  Yes.
12              MR. BURTON:  Thank you.
13   BY MS. CESARANO:
14        Q.    Did that involve an increase in salary or
15   wages?
16        A.    Yes.
17        Q.    Why were you given that promotion, if you
18   know?
19        A.    The structure had changed as to who
20   reported to who at Target.  Prior to that promotion,
21   I was considered assistant store team leader, and I
22   report to the store manager, and everyone under me
23   reported to me.  Target came up with a whole new
24   structure and made everyone report to the store
25   manager.  They had given me a new title, which I was
```

1    called logistics team leader.

2        Q.    But the new title did have some more money

3    attached to it?

4        A.    Yes, it did.

5        Q.    And that would have been what happened in

6    July '97, correct?

7        A.    Yes.

8        Q.    And then later, still while you were at

9    the Green -- excuse me, at T391, then you were

10   telling me you were transferred to T392, correct?

11       A.    Right.

12       Q.    Later?

13       A.    Right.

14       Q.    That transfer was at the end of December

15   of '97?

16       A.    That sounds correct, yes.

17       Q.    Tell me again why you were transferred to

18   the Greenacres store.

19       A.    I was asked to close down the store.

20       Q.    How long did it take you to close the

21   store, approximately?

22       A.    Two and a half months, three months.

23       Q.    At the time you were asked to close the

24   green acres store, did anyone in management of

25   Target tell you what would happen after that two and

H. Allen Benowitz & Associates, A Veritext Company
(305) 373-9997

1    a half months was up?

2         A.    No.

3         Q.    So you went to Greenacres; you did your

4    job?

5         A.    Yes.

6         Q.    And when did you finally find out that you

7    were being transferred again?

8         A.    I found out from Mark Hastings who was the

9    new district manager, came to the store and took me

10   outside and had told me that I would be promoted as

11   store team leader title to T393.

12        Q.    And, now, at -- just so I'm clear, where

13   you were, at T392 in Greenacres, you had the title

14   of store team leader when you were there?

15        A.    No.

16        Q.    You did not have that title?

17        A.    What I was told was I was the person in

18   charge.

19        Q.    The store manager?

20        A.    Yes.    But I did not have any type of funds

21   or anything like that that goes with the store team

22   leader title.

23        Q.    Because you had limited responsibilities?

24        A.    Right.    It was just to close the store

25   down.

```
 1        Q.    But you were the highest person in charge
 2   of that store?
 3        A.    That is correct, yes.
 4        Q.    Then Mark Hastings spoke with you about
 5   being the store team leader of the Deerfield Beach
 6   store which is T393, correct?
 7        A.    Yes.
 8        Q.    You accepted that position?
 9        A.    Yes.
10        Q.    Did that involve more money when you went
11   to Deerfield Beach?
12        A.    Yes.
13        Q.    If you'd just approximate for my
14   benefit -- obviously, it's in the records -- what
15   were you making at that time in Deerfield Beach when
16   you were promoted?
17        A.    I would say 60,000.  I'm guessing again.
18        Q.    Again, I just --
19        A.    It's in the books.
20        Q.    I just want to see the progression.  It
21   will be in the records.
22        A.    Right.
23        Q.    And does it sound about right that on
24   April 1998 you started as the store team leader for
25   Deerfield Beach?
```

1        A.    That's correct.

2        Q.    And you worked at Deerfield Beach until

3    you were terminated in -- I have March 5th, '99; is

4    that right?

5        A.    Yes.

6        Q.    That whole time you held the top position

7    as store team leader, correct?

8        A.    Yes.

9        Q.    Now, there came a time when you were

10   claimed to have been engaged in sexual harassment.

11   Do you remember that?

12       A.    Yes, I do.

13       Q.    Do you remember who first brought that to

14   your attention?

15       A.    Yes.

16       Q.    Who was that?

17       A.    Pam Burnstein.

18       Q.    So this happened at T391?

19       A.    Yes.

20       Q.    And you spent just approximately nine

21   months at that store.  Do you remember when during

22   your tenure there it was brought to your attention

23   by Pam Burnstein?

24       A.    Uh-huh.  It was approximately four days

25   after I transferred from store 638.

```
 1          Q.   So right at the beginning?
 2          A.   As soon as I got to that store, I was
 3    called to the office and was informed that there was
 4    a -- nothing to worry about, but there was a
 5    harassment claim against you.
 6          Q.   And did Pam tell you that the claim was
 7    being made by employees at that store 391?
 8          A.   At the time, no.  No.  She said it was
 9    the -- from the store 638.
10          Q.   The prior store?
11          A.   The prior store.  That "a" employee, not
12    employees, but "a" employee had made a claim against
13    me.
14          Q.   Okay.  So that had to do with T638?
15          A.   That's correct.
16          Q.   And at the time when she first spoke to
17    you about -- this is Pam -- She told you an
18    employee, one?
19          A.   Yes.
20          Q.   Did she tell you what the nature of the
21    complaint was by that employee?
22          A.   Yes.  She said that I have called her at
23    home and woke her up to get her to come to work, and
24    that she felt that was a form of harassment.
25          Q.   What, if anything, did you tell Pam at
```

1    that time?

2         A.    I said to Pam that this employee had

3    been -- had did job abandonment one month, two

4    months ago and had not been employed with Target,

5    and my question to her was:  Is she employed with

6    Target at this time?

7         Q.    What did Pam say?

8         A.    She said yes.

9         Q.    Was she back at the same store?

10        A.    At the same store, yes.

11        Q.    What was the name of that employee?

12        A.    I can't remember.

13        Q.    When I go back through the records I can

14   ask you a few names and if it --

15        A.    Rings a bell that --

16        Q.    Right.  If it helps you, fine.  What

17   happened next that you know about in that sexual

18   harassment?

19             MR. BURTON:  Object to the form of the

20        question.  I don't understand it.

21   BY MS. CESARANO:

22        Q.    Do you understand?

23        A.    Rephrase it.  What happened next meaning

24   what?

25             MR. BURTON:  If you don't know, that's the

```
 1        thing.
 2    BY MS. CESARANO:
 3        Q.    You told me that Pam Burnstein -- I'm not
 4    pronouncing her name very well.
 5        A.    Burnstein.
 6        Q.    -- brought this claim to your attention
 7    about four days after you transferred to T391?
 8        A.    Right.
 9        Q.    Did she tell you at that time what was
10    going to happen next?
11        A.    No.
12        Q.    When is the next time you heard anything
13    about this sexual harassment claim?
14            MR. BURTON:  Objection.  No predicate.
15    BY MS. CESARANO:
16        Q.    When, if at all, did you hear anything
17    next about the sexual harassment claim?
18        A.    Pam brought me up to the office, I would
19    say, maybe best of my recollection, two to three
20    weeks after I was told the first time about the
21    incident.  And said that the investigation was still
22    going on and that to continue doing your work as
23    usual, and that she would get back to me.
24        Q.    Did she tell you who was conducting this
25    investigation?
```

1        A.    At that time, no.

2        Q.    Did she tell you anything further about

3    it?

4        A.    No.   Just the first initial one she told

5    me about the reason for the harassment was for me

6    calling the girl at home and waking her up to come

7    to work.

8        Q.    Now, at that time --

9        A.    Right.

10       Q.    -- which is, again, during the first few

11   weeks of your employment at T391 --

12       A.    Right.

13       Q.    -- did you have any other -- well, did

14   anybody inform you of anything besides this one

15   employee that you supposedly called at home?

16       A.    No.   But now that you're asking that

17   particular question, Pam made it clear to me not to

18   contact the store.

19       Q.    Okay.

20       A.    Not to contact the old store 638.

21       Q.    So, now, Pam has spoken to you twice at

22   this point?

23       A.    Yeah.

24       Q.    Did she or anyone else in management speak

25   to you again about the sexual harassment complaint?

```
 1              MR. BURTON:  I'm going to object to

 2         relevancy.  We're not here on that, but it's

 3         certainly discoverable.

 4              MS. CESARANO:  Well, it's in his

 5         background, his personnel background.

 6    BY MS. CESARANO:

 7         Q.   So then what happened next?

 8         A.   I then received a phone call from Terry

 9    Gillespie, if I can remember correctly.

10         Q.   Okay.  Where did he call you?

11         A.   At the store.

12         Q.   What did he tell you?

13         A.   He asked me to explain what happened.

14         Q.   Did he tell you what he had learned in his

15    investigation?

16              MR. BURTON:  Object to the term "learned".

17    BY MS. CESARANO:

18         Q.   Did he tell you anything in this phone

19    call?

20         A.   What he asked me is what took place at the

21    store, what happened.  I explained to him that I did

22    not know anything that happened until Pam Burnstein

23    brought to my attention there was a harassment

24    filed.

25              He asked me about the young lady in
```

1   question, which I don't have the name off the top of

2   my head.  I explained, as I did to Pam, that all I

3   can remember is calling her at home because she was

4   the person that was consistently late, and then

5   he -- that's all I got at that point.

6       Q.    Did you or Terry say anything else in that

7   phone call?

8       A.    I can't remember right at this time.

9       Q.    And then did you ever speak with Terry

10  Gillespie or any other member of management from

11  Target again about this claim for sexual harassment?

12      A.    Yes.

13      Q.    When was that?

14      A.    I don't know the exact time frame.

15      Q.    Just approximate.

16      A.    But Sheila Roach who was the -- they call

17  TRL, team relations leader for the store who works

18  for Terry Gillespie.

19      Q.    Now, would she be considered in human

20  resources?

21      A.    That's correct.

22      Q.    And she called you?

23      A.    Well, she actually worked at store 391.

24      Q.    And you spoke with her?

25      A.    Yeah.  She had asked me -- I can't

1   remember exactly how she got involved with this;

2   however, what comes to my mind right now is there

3   was a question, a fax, that Terry Gillespie was

4   sending of a review that I had given this particular

5   girl.  A ninety-day review.  He wanted me to verify

6   that I had given her that review, the ninety-day

7   review.  That's how Sheila got involved, and she

8   gave me the review to look over.  I then said, "Yes,

9   that's my signature on the bottom; however, that's

10   not my handwriting on the top."

11         I then called Mr. Gillespie, Terry

12   Gillespie back, and I offered to him other -- which

13   I did fax to him -- other reviews that I did at the

14   store with my handwriting, and explained to him that

15   this is not matching, and I never gave this girl a

16   review.

17         Q.   Had anybody else besides you signed the

18   bottom of the review?

19         A.   I didn't sign the bottom, but it was my

20   signature.  It looked like my signature on the

21   bottom.

22         Q.   I know what you're saying about the text

23   at the top --

24         A.   Right.

25         Q.   -- had nothing to do with you, correct?

    1           A.    That's correct.

    2           Q.    But was it, in fact, your signature?

    3           A.    No, it was not my signature.  That's what

    4    I was explaining to Terry.

    5           Q.    Did it look like your signature?

    6           A.    Yes.  It did look like my signature.

    7           Q.    Your position was, "It looks like somebody

    8    forged my signature"?

    9           A.    Is what I said to Terry.

   10           Q.    Did Terry say anything or -- excuse me.

   11    Sheila Roach, did she say anything else to you in

   12    this phone call?

   13           A.    No.  Now, this wasn't a phone call; we're

   14    at the store.

   15           Q.    Right.

   16           A.    So no.  She was staying very neutral about

   17    what was going on.

   18           Q.    Then was it ever determined what in fact

   19    had happened with that appraisal that you were

   20    questioned about?

   21           A.    Yeah.  I didn't hear anything to say

   22    whether it was authentic or not.  However, I did

   23    inquire again and asked Terry, you know, that's not

   24    my signature.  And on top of that, it's a ninety-day

   25    form which I had to give as a supervisor at the

1    time, and she had already abandoned her job prior to

2    the ninety days.

3           So I said to Terry, "I don't understand.

4    She abandoned her job and left.  Why would there be

5    a ninety-day review given to her with no signature?"

6       Q.    Right.  What --

7       A.    He didn't have an answer for me.  He said

8    that they're still looking into it, and he'd get

9    back to me.

10      Q.    Did you ever find out what happened?

11      A.    Not at that time, no.

12      Q.    Later?

13      A.    Yes.

14      Q.    What happened?

15      A.    I was told that, again, Terry spoke to me

16   and told me that there were other -- to put it

17   correctly -- there were other employees that had

18   said that I was making innuendos or touching them

19   inappropriately.

20          So I asked, "What do you mean by

21   touching?"  And he said, "Like on the arm."  I

22   answered, "Well, that is correct.  There are times

23   that I have said to the person, look, you need to,"

24   and put my hand on the person's shoulder.  I said,

25   "You need to make sure you get this done."  In that

1    appropriate fashion.

2         And then I said, "What do you mean by

3    innuendos?" He then said to me, "Well, slurs.

4    You're saying one thing, but really mean another."

5    I said to Terry, "I can't think of any time.  I'm

6    very professional with all the people in the

7    building.  I can't think of any time." Terry said

8    to me that, "Well, I have statements here that" --

9    and I said okay.

10        I said, "Again, I'm just telling you the

11   truth, that I can't remember any time that I had

12   spoken to anyone in a derogatory way or touched

13   anyone in a derogatory way." He said, "We'll

14   continue looking into this and get back to you."

15        Q.   When he said he had statements, did he

16   tell you who the statements were from?

17        A.   No.  As a matter of fact, I asked, "Can

18   you tell me who made the statements?" He said he

19   had to keep it personal and confidential.

20        Q.   So he told you these were private; you

21   couldn't see them?

22        A.   I couldn't see them.  However, if I can

23   add?

24        Q.   Sure.

25        A.   I did volunteer names that he could speak

```
 1     to on my behalf as far as people that were in the
 2     presence of that same girl, and he just told me that
 3     he'd get back to me.
 4          Q.   What was the upshot after all of this?
 5               MR. BURTON:  By the way, I never got back
 6          the material I gave you initially for copying.
 7               MS. CESARANO:  Yeah.
 8               MR. BURTON:  Can I have it back?
 9               MS. CESARANO:  Yeah.  You know what?  I
10          thought that was my copy.
11               MR. BURTON:  No.  That's why I wanted you
12          to have copies.  If you want to --
13               THE WITNESS:  Well --
14               MR. BURTON:  Why don't we go off the
15          record right now.  Please, do not say a word.
16          Thank you.
17          (Informal discussion off the record.)
18     BY MS. CESARANO:
19          Q.   I think I had asked you a question.  Go
20     ahead.
21          A.   I don't remember.  Can you repeat the
22     question?
23          Q.   That's all right.  I can ask it again.  So
24     you've had all these conversations with Terry.  What
25     was --
```

```
 1        A.    The upshot.

 2        Q.    Yeah.  What happened at the end as far as

 3   you were concerned?  What did Terry Gillespie tell

 4   you?

 5             MR. BURTON:  Objection.  No predicate.

 6   BY MS. CESARANO:

 7        Q.    He told you something, correct?

 8        A.    Yes.

 9        Q.    What did he tell you?

10        A.    That I would not get any type of

11   counselling; that there was nothing found to justify

12   what the claim was on myself.

13        Q.    So just so I'm clear, you were never given

14   anything in writing to --

15             MR. BURTON:  Objection.  He answered the

16        question.  He was not given any type of

17        counselling whatsoever, oral or otherwise.

18             MS. CESARANO:  I want to make sure that we

19        are on the same page here.

20             MR. BURTON:  He said in writing.  I

21        thought that was self-limiting.

22             MS. CESARANO:  I want to make sure that I

23        understand exactly what the answer was.  I'm

24        going to start my question over.

25   BY MS. CESARANO:
```

1       Q.    If I understand correctly, Terry

2  Gillespie, or anyone else in management of Target,

3  never gave you anything to document it or in writing

4  that there was any merit found to this sexual

5  harassment claim?

6       A.    That's correct.  Nothing was given to me

7  in writing, the form of counselling, or a corrective

8  action, or anything of that matter.

9       Q.    Now, did Terry Gillespie in this

10  conversation with you -- and I'm assuming it was a

11  conversation?

12      A.    Yes.

13      Q.    Was it in person?

14      A.    No.  It was on the phone.

15      Q.    So in this phone call, did Terry Gillespie

16  tell you that you were being given an oral

17  reprimand?

18      A.    No.

19      Q.    Besides what you've already told me, and I

20  don't want you to have to repeat yourself, did Terry

21  Gillespie or anyone else in management ever give you

22  any more details about what kinds of claims or

23  accusations were being made against you?

24      A.    To my knowledge at this time, no.

25      Q.    Just what you've already told me?

1       A.    Yeah.   The best I can remember at this

2    time.

3       Q.    And following -- well, let me back up.

4    Can we get an approximate date on the last

5    conversation with Terry Gillespie where he kind of

6    culminated the investigation?

7       A.    I couldn't -- I wouldn't want to guess.   I

8    wouldn't know.

9       Q.    Fine.   Let me ask you a couple of

10   questions to follow up to see.

11          Would you say that this investigation by

12   Terry Gillespie ended within approximately three

13   months after you started at T391?

14       A.    You mean before it -- it stopped before

15   three months or --

16       Q.    From the time you started --

17       A.    Oh, yes.   Way before that.

18       Q.    -- T391.   I gather that's when it started,

19   the investigation?

20       A.    It was the fourth day after arriving at

21   the store that it started.

22       Q.    I'm trying to put an end date on it.

23   About three months later it was over?

24       A.    No.   It was sooner than that.   Much sooner

25   than that.

```
 1          Q.   Two months, approximately?

 2          A.   I'm going to guess at five, I don't know.

 3     I'm trying to think back as to --

 4               MR. BURTON:  Just give your best estimate

 5          as to how many weeks maximum it would have

 6          been.

 7     BY MS. CESARANO:

 8          Q.   Right.

 9          A.   I'm going to say about a week to two

10     weeks.

11          Q.   After your beginning employment at T391,

12     correct?

13          A.   Yeah.

14          Q.   I know it's an estimate.

15          A.   Yeah.

16               MR. BURTON:  Fine.  Next question.

17     BY MS. CESARANO:

18          Q.   After that --

19          A.   Yes.

20          Q.   -- did you ever again talk to Terry

21     Gillespie about this sexual harassment claim?

22          A.   No.

23               MS. CESARANO:  I suggest -- we'll just

24          take a break.

25          (Thereupon, a break was taken, after which the
```

1       following proceedings were had:)

2       (Terry Gillespie enters the room.)

3    BY MS. CESARANO:

4       Q.   One last question to follow up on our last

5    subject.  In connection with that sexual harassment

6    investigation, were you ever put on what's called a

7    final warning?

8       A.   No.

9       Q.   I have some documents to show you.

10       MS. CESARANO:  I would like these marked.

11       (The document referred to was thereupon marked

12       Defendant's Exhibit No. 1 for Identification, a

13       copy of which is attached hereto.)

14       MR. BURTON:  On the record for a second.

15       This document you're showing, has this

16       previously been exhibited to me?  Because its

17       fax date is May 28th, '99 which would have been

18       after the time that you responded and after

19       Mr. Gillespie's deposition.  If this is a new

20       document, we're going to stop the deposition

21       right now.

22       MS. CESARANO:  '99.  This is --

23       MR. BURTON:  If it was just sent to me as

24       part of the package, it doesn't bear any of the

25       numbers that we've had on those.

1        MS. CESARANO:  Richard, I don't think you

2    even asked for this.  This is the job

3    description.  This is an innocuous document.

4        MR. BURTON:  I'm just asking you:  Are

5    there going to be any documents here that

6    you'll be showing him which I have not had a

7    chance to review?

8        MS. CESARANO:  Possibly.

9        MR. BURTON:  I'd rather then that we

10   suspend the deposition, see the documents, and

11   then take it so that I don't get surprised

12   because I do know that we've been numbering

13   documents.

14       MS. CESARANO:  Right.  I agree with you.

15   You haven't got this.

16       MR. BURTON:  And that's why I say, before

17   we get into a situation where we're going to be

18   showing documents -- some of which may be

19   innocuous, some which may not be innocuous -- I

20   would rather not have that problem since we've

21   had, as you know, I've given you a fairly

22   extensive production.  And you've been very,

23   very kind enough to send me most of them.  I

24   don't want to be surprised.

25       So why don't you review the documents

1    you're going to show him, and if there are any

2    of them that are new, I would like to see it

3    well in advance which is the one reason why we

4    didn't take Mr. Gillespie, providing you that

5    same courtesy.

6         MS. CESARANO:  I have no problem with

7    that, Richard, honestly.  I do have some

8    documents.

9         Where are the documents Margaret was going

10   to produce today?  Can you get them in here?

11        You're not saying I have to use them

12   today.  I just want you to be sure to get them.

13        MR. BURTON:  I understand.  I was

14   concerned about if there are documents here,

15   are they then perhaps the most innocuous

16   documents that will be new to him, I would not

17   want him or me to be unfamiliar with a document

18   that is demonstrated to him, as I'm sure you

19   would give me the same courtesy as to your

20   witness.

21        MS. CESARANO:  Richard, I agree with you.

22   This particular one that I have is pretty --

23   nothing.

24        MR. BURTON:  This one doesn't appear to be

25   a problem, but that's what I was saying.  You

1    may want to review what you're going to show to

2    him, and if there are, I need it in the form of

3    a category. We'll just deal with it before we

4    start asking questions and have to interrupt

5    ourselves.

6        MS. CESARANO: Actually, I have given you

7    this and I'll tell you why. I think I gave you

8    a copy of our position statement that we filed.

9    You know, this booklet here.

10        MR. BURTON: I believe that you gave me a

11    copy of the position statement.

12        MS. CESARANO: They have tabs attached.

13        MR. BURTON: As I said, that would not be

14    an issue. But I'm asking you if there are any

15    other documents that would be shown to him

16    which have not been previously marked because

17    we had the courtesy of giving each other copies

18    of all our respective documents.

19        MS. CESARANO: Right. I think all the

20    ones I have in this pile A goes with tab A.

21        MR. BURTON: Okay.

22        MS. CESARANO: -- position statement. I

23    think I gave you --

24        MR. BURTON: Fine.

25        MS. CESARANO: -- if you recollect that.

 1              MR. BURTON:  I have no problem with that.

 2              MS. CESARANO:  All of these, I think, are

 3         in the position statement.  So I'll just --

 4              MR. BURTON:  If they are, that's fine.

 5              MS. CESARANO:  Yes.  But you're right to

 6         remind me.  I did have some more documents for

 7         you that we'll ask to go back to if you object

 8         to.

 9              MR. BURTON:  If I look at them now and I

10         find that they're not going to be a problem, I

11         might have a problem, but I just don't want to

12         be shown for the first time in the middle of a

13         question.

14              MS. CESARANO:  Sure.

15    BY MS. CESARANO:

16         Q.   Mr. Harris, I want to show you what's been

17    marked for identification as Plaintiff's Exhibit 1

18    to your deposition.  If you would --

19              MR. BURTON:  It would be Defendant's 1.

20              MS. CESARANO:  I meant plaintiff's

21         deposition.  Harris 1 we'll call it.

22              MR. BURTON:  Harris 1 is fine.

23    BY MS. CESARANO:

24         Q.   And just take a minute to review it.

25         A.   You want me to --

1    Q.   Just to yourself.

2         MR. BURTON:   Review it to yourself.

3    BY MS. CESARANO:

4    Q.   My question is just simply:  Have you seen

5    that job description before?

6    A.   No.   Not until I got my copy of your

7    exhibit that Richard had given you.

8    Q.   The position statement?

9    A.   Yeah.   The position statement.

10   Q.   You hadn't seen it before then?

11   A.   No.   Now, no.

12   Q.   And I understand that.   Is that a job

13   description that describes the job of store team

14   leader that you held prior to your termination?

15        MR. BURTON:   Object to the form of the

16        question.

17        MS. CESARANO:   Well, let me rephrase it.

18        MR. BURTON:   I have two problems with it.

19        This job description is dated, in other words,

20        its issue date from, presumably wherever Target

21        is based, sometime in late July from the

22        Midwest '98.   He would have only been -- he was

23        selected for team leader approximately a year

24        before then.   I don't know whether it was

25        redistributed.

         1          MS. CESARANO:  That was my question.  He

         2      can say yes or no.

         3          MR. BURTON:  He said he hasn't seen it

         4      which is why I'm asking you --

         5          MS. CESARANO:  Fine.

         6          MR. BURTON:  I don't want him to try to

         7      figure out -- if it's different verbiage, I

         8      don't want him to try to conclude if it is or

         9      it isn't.

        10          MS. CESARANO:  And I don't want him to do

        11      that, either.

        12   BY MS. CESARANO:

        13      Q.   Here's my question Mr. Harris.  After

        14   you've read this, my question to you is:  At the

        15   time of your termination which was March of '99,

        16   does this job description describe the types of job

        17   duties that you had as store team leader?

        18      A.   To the best of my recollection, yes.

        19      Q.   Okay.  Fine.

        20          MR. BURTON:  Just leave it here so that

        21      she'll find them later.  Otherwise, we'll run

        22      into a paper problem which we always do.

        23          MS. CESARANO:  I'd like this marked as 2.

        24      (The document referred to was thereupon marked

        25       Defendant's Exhibit No. 2 for Identification, a

1          copy of which is attached hereto.)

2     BY MS. CESARANO:

3          Q.    Mr. Harris, I want you to review what's

4     been marked as Harris Exhibit 2.  I want to ask you

5     if you have read this description of gross

6     misconduct from the Target manual?

7          A.    No.  Not to my best recollection.

8          Q.    You've -- now, you know you were

9     terminated, according to Target, for detrimental

10    behavior?

11         A.    That's not what I was told by Mark

12    Hastings.

13              MR. BURTON:  For the record, the first

14         time that we were advised as to your issue was

15         at the EEOC conference at which time you did

16         not hand to us a copy of your submission.

17              MS. CESARANO:  Right.  I understand that.

18         I'm just asking him.  Don't help him out too

19         much.

20              MR. BURTON:  No, no.  When you said you

21         know he has been, you're probably asking what

22         he was told.  But I can't agree -- or he didn't

23         agree with your characterization that he had

24         been advised that.

25              MS. CESARANO:  That's fine.  He has a

1          right to say on the record.  I have no problem

2          with his answer.

3     BY MS. CESARANO:

4          Q.   Again, so we're clear, you were not told

5     at the time of your termination that your

6     termination had anything to do with the kind of

7     language on Harris Exhibit 2 --

8          MR. BURTON:  Object to the form of that

9          question.

10    BY MS. CESARANO:

11         Q.   -- talking about detrimental behavior?

12         MR. BURTON:  Object to the form of the

13         question.

14    BY MS. CESARANO:

15         Q.   I'm just letting the question stand.  He's

16    objected.  You can still answer it.  He's objected

17    to the form.

18         MR. BURTON:  If you can answer it.  If you

19         understand the question.

20         THE WITNESS:  I understand the question

21         you asked me, and I said that I was not told I

22         was terminated for detrimental behavior.  I was

23         told something different by Mark Hastings.

24    BY MS. CESARANO:

25         Q.   Now, just for my understanding, when you

1    were terminated, did someone besides Mark Hastings

2    talk with you about the termination?

3        A.    Mark Hastings was in the room, and Doug

4    Barth was in the room.  He left, and then Mark

5    Hastings told me what I was being terminated for.

6        Q.    What did he tell you you were being

7    terminated for?

8        A.    I was being terminated for security risk.

9        Q.    Fair enough.  Now, in connection with your

10   termination, did Terry Gillespie ever talk with you

11   directly about your termination?

12       A.    Terry Gillespie talked to me a lot of

13   times.

14       Q.    But specifically at the time you were

15   terminated?

16       A.    No.  Mark Hastings told me that Friday why

17   I was being terminated after -- yes.

18       Q.    Was that the first time you knew you were

19   being terminated when you talked with Mark Hastings?

20       A.    That day, yes.

21       Q.    And during that day, you didn't have any

22   discussions with Terry Gillespie, correct?

23       A.    Before that, there was a conference call

24   that Terry Gillespie was on.  Yes.

25       Q.    You had some discussions with Terry

```
 1   Gillespie?

 2         A.    Terry Gillespie was on the conference call

 3   in the room, and he had said that if I had thought

 4   about resigning with the company, and I answered no,

 5   that I felt that I didn't do anything wrong.  Then

 6   he had said that, well, we've talked about this over

 7   a long period of time; gone back and forth, which is

 8   a two-week period of time, and that, basically, he

 9   told me that Mark would be speaking to me.

10         Q.    Now, during that telephone call where

11   Terry Gillespie was talking --

12         A.    Right.

13         Q.    -- did he give you -- well, did he tell

14   you you were going to be terminated?

15         A.    No.  He didn't tell me that.  Mark

16   Hastings was the one that fired me, that told me I

17   was fired.  I was fired that day.

18         Q.    I understand that.  Did Terry Gillespie

19   tell you ahead of time?

20         A.    No.  He didn't tell me that I was fired,

21   no.

22         Q.    Okay.  So until you talked to Mark

23   Hastings --

24         A.    Until Terry got off the phone, and then

25   Mark and Doug were in the room.  Doug left the room,
```

1    Doug Barth, and then Mark told me that I was going

2    to be terminated today.

3           First, he asked me if I had thought about

4    resigning from the company, and let me ponder that

5    for a few minutes.  And then he said to me, "Did you

6    think about it?"  And I said, "Yes."  I said, "I

7    would like to stay with the company."  And he said,

8    "Well, I have no choice but to terminate you for

9    security risk."  I then asked him for a copy of the

10   document.

11       Q.   Did he give you anything?

12       A.   No.

13       Q.   So security risk was the reason you were

14   given?

15       A.   Yeah.

16           MR. BURTON:  Please shorten your answers.

17       We spent ten minutes going over something that

18       probably could have been a lot quicker.

19           MS. CESARANO:  That's all right.  I would

20       have just asked you five more questions anyway.

21   BY MS. CESARANO:

22       Q.   Let's kind of go back to this whole issue

23   with Terry Gillespie and about the time of your

24   termination.

25           MR. BURTON:  For the record, Terry

1    Gillespie is going to be your person at trial

2    sitting at the defense table and will be your

3    company representative?

4         MS. CESARANO:  Correct.

5         MR. BURTON:  I have no problem with his

6    participation then.

7         MS. CESARANO:  That's true.  You're it,

8    Terry.

9         MR. BURTON:  So if you get fired, they

10   don't have one, in other words.  I'm very

11   serious.

12        MS. CESARANO:  I wouldn't go that far.

13   Terry doesn't have any plans of being fired.

14        MR. BURTON:  Nor did my client.  I've had

15   defense lawyers that had five and six different

16   people switching which I always found to be

17   wrong.

18        MS. CESARANO:  Yes.  No, I agree with

19   that.  Plus, you've done eighty percent of his

20   deposition anyway, Mr. Gillespie.

21        MR. BURTON:  No, no, I'm not concerned.

22   As the company representative, you have the

23   right to sit in anyway so I don't care.

24   BY MS. CESARANO:

25        Q.   Now, I want to just kind of skip ahead and

1    take you to the time of your termination which would

2    have been sometime before March of '99 when these

3    events started to unfold.  Okay?

4        A.    Wait.  Re-ask the question again.

5        Q.    I want to take you to the events leading

6    up to your termination.

7        A.    I understand that.

8        Q.    And it would be fair to say that Terry

9    Gillespie was conducting some sort of investigation

10   that eventually led to your termination, correct?

11       A.    I would assume so.  I don't know.

12       Q.    Do you know that to be the case today?

13       A.    Now I know that.

14       Q.    When did it first come to your attention

15   that there were any issues to do with your being a

16   security risk?  When did that first come to your

17   attention --

18           MR. BURTON:  Object to the form of the

19       question.  You can answer.

20           THE WITNESS:  I didn't know I was a

21       security risk.

22   BY MS. CESARANO:

23       Q.    Well, you know that's the reason the

24   company gave?

25       A.    Yes.

1    Q.    Whether you agree with it or not.

2    A.    Right.  I understand that.

3    Q.    When did it first come to your attention

4    that you were being investigated by anyone in

5    management?

6    A.    I was shopping with my family on a

7    Saturday at the store, and I received a -- I told

8    the store I was in the building.  I received a

9    personal phone call -- a phone call, personal phone

10   call.  That call turned out to be an employee that

11   didn't want -- an employee's friend that didn't want

12   to give their name, but advised me that Don

13   Fankhouser and Target personnel was looking for a

14   reason to terminate me, and that they were

15   investigating a voucher procedure.

16   Q.    Now, who was the person who you spoke with

17   on the phone?

18   A.    I wish I could get that person.  I don't

19   know.  The person would not -- apparently, the

20   person was a friend of the employee that was talking

21   for that person, but said that they didn't want to

22   get involved with the situation.  That was what I

23   was told.

24   Q.    The person you were speaking with, when

25   she named an employee, which employee did she name?

1      A.    I don't know if it was a she or he.

2      Q.    No, no.  You were speaking with a person

3  on the phone.  Was that a she?

4      A.    That was a she.

5      Q.    Did she name the employee of Target that

6  she had learned this information from?

7      A.    No.

8      Q.    Did she name any names at all to you?

9      A.    The only name that was given to me, as I

10  said earlier, was Don Fankhouser and Target staff --

11  executives, excuse me, were looking for reasons to

12  have me terminated, and they were investigating a

13  voucher.

14      Q.    She didn't give you the names of how she

15  had learned this?

16      A.    I tried to get that, but couldn't.

17      Q.    The voucher, which voucher?

18      A.    The $500 voucher missing $135.

19      Q.    What did that voucher have to do with it?

20      A.    At that time, I didn't know.

21      Q.    She didn't name a store or --

22      A.    All she said that they were investigating

23  a voucher done for a party which immediately in my

24  head I knew what that party was.

25      Q.    Which party was that?

```
 1        A.    Evan Feldman.  It was his going away

 2   party.

 3        Q.    Give me the first name again.

 4        A.    First name is Evan.

 5        Q.    Evan Feldman?

 6        A.    Yeah.

 7        Q.    And Evan Feldman was an employee at the

 8   store?

 9        A.    Yeah.  Executive.

10        Q.    What was his title?

11        A.    He was the hard lines ETL.

12              MS. CESARANO:  We'll take a short break.

13        The lunch is here.

14        (Thereupon, a break was taken, after which the

15        following proceedings were had:)

16   BY MS. CESARANO:

17        Q.    Mr. Harris, I think we left off with the

18   telephone call that you received from some

19   unidentified person?

20        A.    Yes.

21        Q.    And you were shopping in the store that

22   day with your family, correct?

23        A.    Yes.

24        Q.    When, if at all, did anybody from Target

25   management meet with you to discuss -- or telephone
```

1   you to discuss this voucher?

2       A.   No one did.  I had called my boss and

3   brought it to his attention and requested a meeting

4   that Monday.

5       Q.   Because of this rumor you heard?

6       A.   Yes.

7       Q.   You wanted to confront the situation?

8       A.   Yes.

9       Q.   Who was your boss?

10      A.   Mark Hastings.

11      Q.   When did you call Mark?

12      A.   That same day, that Saturday.

13      Q.   And you called him at the store?

14      A.   At home.

15      Q.   At home.  And what did Mark tell you?

16      A.   He said he would meet -- we can discuss it

17  on Monday, that Monday coming up.

18      Q.   Did you in fact do that?

19      A.   Yes.

20      Q.   Did you meet at the store?

21      A.   No.  I met at his office.

22      Q.   Is that -- where was that located?

23      A.   Boynton Beach, District 310's office.

24      Q.   And who else was at the meeting, if

25  anybody?

1    A.    At that time, I believe Mark.  And on my

2    way to the meeting, I asked for Doug Barth to be

3    there who is a district asset protection team

4    leader.

5        Q.    Did he attend?

6        A.    Yes.  When I got there, I didn't know

7    Terry Gillespie was coming.  He was there, also.

8        Q.    Terry was also there?

9        A.    Yes.

10       Q.    So there were three members of management

11   at that meeting besides you?

12       A.    Yes.

13       Q.    As much as you can, tell me what you

14   remember about who said what to whom.  In other

15   words, what was the conversation that happened at

16   that meeting?

17       A.    Okay.  I opened the conversation by saying

18   why I wanted to speak to Mark, and I was cut off by

19   Terry Gillespie.  And at that point, he told me that

20   he had requested the meeting for me to be there.  I

21   corrected him at that point, and said, no, I

22   requested the meeting for myself to be there.  He

23   went to the point of there's a discrepancy at the

24   store.

25       Q.    This is Terry talking?

1    A.    This is Terry speaking.  That he would

2    like to discuss it with me.

3    Q.    Did he say what the discrepancy was?

4    A.    He said it was a voucher issue.

5    Q.    Did he tell you what the voucher had to do

6    with?

7    A.    He asked me first if I knew of any

8    discrepancy, and I said no.  And he explained about

9    the voucher that took place with the Evan Feldman

10   party and wanted an explanation as to what happened

11   that day.

12   Q.    Did he show you the voucher he was talking

13   about?

14   A.    No.  I didn't get to see that at that

15   time.

16   Q.    So no documents were put in front of you

17   at that time?

18   A.    At that moment, no.

19   Q.    And Evan Feldman, again, was -- that

20   involved a going away part for the executive?

21   A.    Yes.  He was leaving the company.

22   Q.    Tell me what happened with reference to

23   Evan Feldman, what that was about.

24   A.    He had handed in his notice to leave the

25   company.  He had been with the company for, I think,

1    seven years.  I called Mark Hastings to ask if we

2    should give a going away party since he had been at

3    the company so long, and he authorized me to go

4    ahead and do that.

5         Q.    Tell me what you did with respect to this

6    going away party.  What steps did you take?

7         A.    I spoke to the members of management

8    and -- I spoke to them all, agreed we would find a

9    time to go out which was that Friday, and that was

10   it.  We talked -- I also spoke to a couple of other

11   members of management who used to work at the

12   store -- I can't remember the names right now -- to

13   tell them they were invited.  Basically, that was

14   it.

15        Q.    Did you get some money to pay for this

16   party?

17        A.    Yes.

18        Q.    Who did you get the money from?

19        A.    I got it from Don Fankhouser who went to

20   the service desk to get it.

21        Q.    Did you sign a voucher in connection with

22   this money?

23        A.    Yes.

24             MR. BURTON:  Before you came back from

25        lunch, I thought you would have those other

1      documents with you.

2            MS. CESARANO:  I'm still waiting for my

3      paralegal to come back.  In all fairness to

4      her, she may be doing another case for somebody

5      else in the conference room.  You'll get them

6      before you leave today.

7            MR. BURTON:  I just don't want to go into

8      questioning of him on documents unless you're

9      going to allow me to see them in advance.

10           MS. CESARANO:  I won't.

11           MR. BURTON:  And I'd also like to be able

12     to let him see them to see what you may have.

13           MS. CESARANO:  I understand perfectly.

14   BY MS. CESARANO:

15     Q.    Were you eventually shown a voucher having

16   to do with Mr. Feldman's going away party?

17     A.    Yes.

18           MS. CESARANO:  I want this marked for

19     identification as 3.

20     (The document referred to was thereupon marked

21     Defendant's Exhibit No. 3 for Identification, a

22     copy of which is attached hereto.)

23   BY MS. CESARANO:

24     Q.    Is that your signature on --

25           MR. BURTON:  Is there a copy for me?

1    BY MS. CESARANO:

2      Q.   -- on Exhibit 3?

3      MS. CESARANO:   That matches up with "I" in

4      the position statement -- or "H," excuse me.

5    BY MS. CESARANO:

6      Q.   Now, Mr. Harris, is that your signature

7    where it says "payee signature"?

8      A.   On the bottom, yes.

9      Q.   Okay. And does this voucher indicate that

10    you received $500 on the date of the voucher?

11      A.   Yes.

12      Q.   And can you tell from looking at the

13    voucher what the date of the voucher is? I know we

14    don't have the most wonderful copy.

15      A.   It would normally be on the very, very top

16    here, but . . .

17      Q.   It's cut off?

18      A.   Yes. It's cut off.

19      Q.   But this is the voucher that you were

20    asked about having to do with the going away party

21    for Evan Feldman?

22      A.   Yes.

23      MR. BURTON:   Object to the form of the

24      question.

25    BY MS. CESARANO:

1       Q.   Did you understand the question?

2            MR. BURTON:   I'm saying he said the

3       portion of the voucher is incomplete is my

4       problem.

5  BY MS. CESARANO:

6       Q.   Right.   But you recognize this voucher,

7  correct?

8       A.   I recognize it, yes.

9       Q.   You recognize it as the one that had to do

10  with Mr. Feldman's going away party?

11      A.   Yes.

12           MR. BURTON:   Same objection.

13  BY MS. CESARANO:

14      Q.   Did Mr. Fankhouser go to the going away

15  party?

16      A.   Yes.

17      Q.   Who else went with management, that was

18  with management?

19      A.   Shannon Tetrault, myself, Don Fankhouser,

20  and Evan Feldman.

21      Q.   You got this voucher money from Ms.

22  McKenna?

23      A.   No.   As I said, when you asked me the

24  question, Don Fankhouser went to get the money.

25      Q.   You didn't have any personal conversation

```
 1    with Ms. McKenna at the time about that voucher?

 2         A.    At that time?

 3         Q.    Yes.

 4         A.    Yes.

 5         Q.    You did.  What was that conversation?

 6         A.    She was just stating she had brought me

 7    this -- the book to sign.

 8         Q.    The voucher?

 9         A.    The voucher book to sign.

10         Q.    And you signed it?

11         A.    And I signed it.

12         Q.    Did she have any conversation with you

13    though about the voucher?

14         A.    Not that I can remember at that time.

15         Q.    She didn't question the amount of the

16    voucher?

17         A.    At the time?

18         Q.    Yeah.

19         A.    Not that I can remember right now.

20         Q.    Okay.  Now, how did you account for the

21    $500 later?  Did you return the receipt for the

22    restaurant?

23         A.    Right.  We went out, did what we had to

24    do, and then I came back to the store which was the

25    Saturday, gave the receipt to Karen Napp who is the
```

1    service desk supervisor, and Don Fankhouser was

2    there standing with me, and I think Shannon was

3    there at the time, but I can't remember.

4        Q.    When you returned, basically, the remains

5    of the $500, did you also fill out some paperwork in

6    connection with that?

7        A.    No.

8             MS. CESARANO:    Was there a -- I'm going to

9        have this marked.    This coincides with "J" in

10       the position statement.

11       (The document referred to was thereupon marked

12       Defendant's Exhibit No. 4 for Identification, a

13       copy of which is attached hereto.)

14   BY MS. CESARANO:

15       Q.    Where did you go for Mr. Feldman's going

16   away party?

17       A.    Shooters.

18       Q.    I want to show you what's been marked for

19   identification as Exhibit 4.    There's some

20   handwriting on that particular document?

21       A.    Yes.

22       Q.    Is that your handwriting?

23       A.    Yes, it is.

24       Q.    And then that handwriting shows that $160

25   was added to the total of 135.87, correct?

1          MR. BURTON: Object to the form of the

2      question.

3   BY MS. CESARANO:

4      Q.   Is that correct?

5      A.   No.  It's showing $160, but not the way

6   you're asking the question.

7      Q.   Okay.  What are you telling me in your

8   view that shows?

9      A.   That was the tip.  That was including the

10  tip on here.  $135 plus $25 would equal 160.

11     Q.   How much tip did you leave?

12     A.   Twenty-five dollars.

13     Q.   What does the total of $295.87 represent?

14     A.   Those are two numbers, when you put them

15  together, total 295.

16     Q.   Right.  And that is the total that the

17  party came to; is that correct?

18     A.   No.

19     Q.   Why is that not the total?

20     A.   The $160 is the total.

21     Q.   Why did you write 295.87 down here?

22          MR. BURTON:  Object to the form of the

23      question.

24  BY MS. CESARANO:

25     Q.   I'm going to ask the same form again.  Why

1    would you write dollar sign, 295.87 on the receipt?

2         A.    I was trying to figure out what amount of

3    money should go back to the store so I was

4    calculating.

5         Q.    That's why you wrote it?

6         A.    Yeah.  Yes, sorry.

7         Q.    When did you write -- put the handwriting

8    on the voucher?

9         A.    What voucher?

10        Q.    Excuse me.  You're right.  The Shooters'

11   receipt, this Exhibit Number 4.  That's all my

12   questions have to do with, this particular Number 4.

13             My question to you is:  You said that was

14   your handwriting on Number 4?

15        A.    Yes.

16        Q.    My question is:  When did you put that

17   handwriting on it?

18        A.    I can't remember if I did it before the

19   waiter came back to the table, but as I was doing

20   it, Don Fankhouser was with me watching me do it.

21        Q.    At the restaurant?

22        A.    It was at the restaurant, yes.

23        Q.    Fine.  Now, Mr. Gillespie asked you some

24   questions about this Shooters' receipt, correct?

25        A.    Yes.

1        Q.    Which we labeled Number 4.  Do you

2    remember what he asked you and what you told him?

3        A.    I can't remember verbatim, but

4    Mr. Gillespie was trying to find out how we had

5    found a shortage.  There was a shortage found, and

6    he wanted to know, basically, where the shortage was

7    and how it occurred.

8        Q.    Did he tell you how -- first of all, did

9    he tell you the amount of the shortage?

10       A.    At the time when he asked me the question,

11   no.

12       Q.    Did he tell you there was a shortage?

13       A.    After asking me the questions about the

14   160, that's when he told me there was a shortage.

15       Q.    Now, did you tell him that $160

16   represented the amount that you left as a tip?

17       A.    No.

18       Q.    You never told him that?

19       A.    No.  I said $25 was the tip.

20       Q.    You would agree that between the money

21   that you spent at this Shooters' dinner which was

22   $135.87, plus whatever the tip was, plus whatever

23   change you gave back to Target, should equal the

24   $500?

25            MR. BURTON:  Object to the form of the

1        question because it started and stopped five or

2        seven times.

3            MS. CESARANO:  I'm saying it slowly so he

4        knows what I'm asking him, but I'll ask it

5        again.

6   BY MS. CESARANO:

7        Q.    You received $500, correct, for the

8   Shooters' party?

9        A.    Yes.

10       Q.    You would agree with me that between the

11   amount of the bill which was $135.87, plus whatever

12   tip you left, plus whatever money you gave back to

13   Target at the end of the day, the whole thing should

14   equal $500.  You would agree with that, correct?

15       A.    I would have to say no.  At the time I

16   gave back the difference with the receipt, I had

17   told Karen Napp that the amount I'm giving her, I'm

18   not sure if that's the correct amount because I just

19   happened to change my check at that time and I gave

20   her what was in my pocket.  So I asked her to give

21   me back the difference from the bill.  I indicated

22   to her that the $160 is what the bill was.

23       Q.    You told Karen Napp this?

24       A.    Yes.  At the same time, Don Fankhouser was

25   there, and I asked Don to go over there and to

1    double check to make sure there wasn't an error with

2    it.

3        Q.    How much money did you return to Karen

4    Napp?

5        A.    I don't know because I just went in my

6    pocket and gave her back the receipt and the change,

7    and I opened up the receipt which had the same type

8    of writing on it, and I said the bill is $160.

9        Q.    Then how much money did you give her back

10    out of your pocket?

11        A.    I don't know.

12        Q.    Didn't she give you a receipt for that

13    money?

14        A.    No.  You don't get back a receipt.

15        Q.    Did she give you anything to say how much

16    you had given her?

17        A.    No.  She didn't give me back anything.

18        Q.    Nothing?

19        A.    No.  There's a form that she has to fill

20    out to show what she had received back in.

21            MR. BURTON:  Counsel, you have that

22        receipt.  Are you aware of that?

23            MS. CESARANO:  Yeah.  That's what I'm

24        looking for.

25            (The document referred to was thereupon marked

Page 84

```
 1        Defendant's Exhibit No. 5 for Identification, a

 2        copy of which is attached hereto.)

 3   BY MS. CESARANO:

 4        Q.   Mr. Harris, I'm showing another document

 5   marked -- a new one marked for identification as

 6   Exhibit 5.

 7             Is that showing the amount of money, $205

 8   that you gave back to Miss Napp?

 9        A.   No.

10             MR. BURTON:  Object to the form of the

11        question.

12   BY MS. CESARANO:

13        Q.   It's not.  Fine.  Tell me what this

14   document signifies to you.

15        A.   This is showing that Karen entered into

16   the system that she had received $205.

17        Q.   Okay.  And her job is to make these kind

18   of entries?

19             MR. BURTON:  Object to the form of the

20        function of what her job is.

21             MS. CESARANO:  Well, he's the store

22        manager.  He would know.

23   BY MS. CESARANO:

24        Q.   Is that her job?

25        A.   Her job is to do that, process the
```

1    voucher.

2        Q.    Basically, she's accountable for the $500

3    by some sort of paperwork; is that right?

4        A.    Yes.

5        Q.    And it says here "receive money," correct?

6    There's a box checked "receive money".

7        A.    Yes.

8        Q.    I take it that money was received from

9    you?

10       A.    As I said earlier, I don't know what

11   amount I gave her.  She's indicating on here that

12   there was $205 entered into the system.  That's what

13   she's putting on here.

14       Q.    You're saying, from your point of view,

15   you don't know what you gave her?

16       A.    No.

17       Q.    You can't say whether it was 205 or 407?

18       A.    Right.  That's correct.

19       Q.    So Exhibit 5 simply shows that Ms. Napp

20   filled out this form to indicate what she thought

21   you had given her back, correct?  In cash.

22       A.    I don't know what Miss Napp was thinking

23   when she wrote that.

24       Q.    But you're familiar with the form --

25           MR. BURTON:  Object to the argumentative

1          nature.  He's answered it three times.

2               MS. CESARANO:  I'm asking him a new

3          question.

4     BY MS. CESARANO:

5          Q.   As store team leader, you're familiar with

6     the forms that are used in the store?

7          A.   Yes, I am.

8          Q.   Again, not saying this is true or false,

9     my question is:  As store team leader, if you had

10    seen this form, it would reflect that Karen Napp

11    filled out a form indicating she had received $205

12    in cash, correct?

13         A.   Yes.

14         Q.   Right or wrong, she may be mistaken, and

15    we can agree on that.  That's what the form would

16    indicate?

17         A.   That's what the form would indicate.

18         Q.   Now, did Terry Gillespie, in his

19    questioning of you regarding Shooters, did he

20    indicate to you that there, in fact, was money

21    missing; that he was trying to figure out what had

22    happened to the money?

23         A.   Actually, before Terry Gillespie got to

24    that question, I had said to the three people that

25    were in the room that there's an overture report

1    that comes out that shows you whether there's a

2    discrepancy with vouchers the next day.

3         I then said that Don Fankhouser, being in

4    charge of security, and also received a copy of that

5    document as well. My question then to the three of

6    them was: If there was an overture on this part, a

7    discrepancy, what was done about it; how come it was

8    not brought to anyone's attention?

9         The reason I indicated that before he told

10   me about the 135 was only because we didn't discover

11   this or it wasn't brought to my attention until four

12   weeks later or three weeks later until the date the

13   shortage took place, apparently.

14        So that's the only time I learned about

15   the $135 missing was when Terry told me.

16   Q.   That was the first time you heard?

17   A.   Right.

18   Q.   This occurred several weeks --

19   A.   After, yeah.

20   Q.   The shortage that Terry Gillespie and the

21   other management we're talking about, according to

22   them, they were saying it was $135; is that right?

23   A.   From what I can remember. There were a

24   lot of numbers being thrown at me, but from what I

25   can remember, yes.

1          Q.   In this conversation, did they bring up

2     any other topics?  We've covered the Shooters'

3     incident.

4               Did they discuss any other shortages or

5     discrepancies with you during your conversation?

6          A.   Yes.

7          Q.   What other things did they bring up?

8          A.   Terry brought up -- sorry.  I'm not sure

9     if it was Terry.  However, I was asked about

10    markdowns, markdown procedure.

11         Q.   What were you asked about that?

12         A.   To tell me what the markdown procedures

13    are.

14         Q.   What did you tell them?

15         A.   I explained about the system and how the

16    markdowns get --

17              MR. BURTON:  Objection.  Tell them what

18         you told them, not the procedure.  Tell them

19         what words you spoke or not.

20              THE WITNESS:  I explained the procedure.

21              MR. BURTON:  Tell me what you said.

22              THE WITNESS:  I said that the --

23    BY MS. CESARANO:

24         Q.   Not to help you anymore, but, I know, more

25    help than you want.  But my question is -- just so

1    you know how it works, it would be really helpful to

2    me if you said, "I said to them A, B, C," and they

3    said to me, "something, something."

4              MR. BURTON:  Or words to the effect that

5         if you don't know the exact words, "I said

6         words similar to . . ."  But the

7         conversation --

8              THE WITNESS:  I said to --

9              MR. BURTON:  Please, Mr. Harris, let me

10        finish.  The conversation versus the generality

11        because all you're going to do is have it said

12        five times versus saying, "I recall

13        Mr. Gillespie saying blah, blah, blah, blah,"

14        to which I answered, "Blah, blah, blah, blah."

15        As opposed to generalities because then she's

16        going to go around again asking you what was

17        said.

18             So to cut out the middleman; just use the

19        terms that you recall, words you don't recall,

20        and just simply give the conversation as good

21        as you can putting in the mouth of the person

22        who said it what you recall being said.  Is

23        that a fair enough characterization?

24             MS. CESARANO:  That's it.  Do your best to

25        identify --

1          THE WITNESS:  I remember every step --

2          MR. BURTON:  You don't have to do every

3      step, please.  I'm saying, when he says every

4      step, he's liable to say I walked to the back

5      of the table.

6  BY MS. CESARANO:

7      Q.   Tell me about the markdown.

8      A.   Mr. Gillespie asked me about markdown

9  procedures, and I then explained to the three of

10 them what the markdown procedures were in the

11 building.

12     Q.   You told them what about the markdowns?

13     A.   I told them the markdowns were generated

14 from the headquarters, and that they were activated

15 at the store.

16     Q.   Did you say anything else about what you

17 knew about the procedures?

18     A.   I may have, but I can't remember at this

19 time.

20     Q.   That's fine.  What did they say to you

21 about the markdown?

22     A.   Then at that point, I don't know which

23 person asked me the question, but I was then asked

24 about a markdown on towels.

25     Q.   What was the question put to you?

```
 1        A.    "Do you" -- from what I remember -- "do
 2   you remember purchasing towels?"
 3        Q.    What did you say?
 4        A.    Yes.
 5        Q.    Then what did they ask you about the
 6   towels?
 7        A.    At that point, Mr. Gillespie asked me, "Do
 8   you remember taking" -- sorry, "purchasing the
 9   towels at the wrong price?"
10        Q.    What did you tell him?
11        A.    I said, "No."
12        Q.    Did Mr. Gillespie explain why he thought
13   the towels were at the wrong price?
14        A.    No.  But he then asked me to explain if I
15   knew anything about these markdown towels.
16        Q.    What did you tell him?
17        A.    I explained that I did.
18        Q.    What did you tell him?
19        A.    That the markdown towels were in the back
20   room; I discovered them with Sandy Grisbeth.
21        Q.    What else?
22        A.    I explained to Mr. Gillespie that the
23   towels were incorrectly marked according to what
24   Sandy Grisbeth had said.  At that point -- sorry.
25   That same moment, there was a markdown clerk present
```

1    back there -- but I don't have her name off the top

2    of my head -- involved in the conversation.

3             I then instructed to leave the towels in

4    the back until they got properly marked down which I

5    told Sue Grisbeth.

6        Q.    Then in describing the incident back to

7    Terry Gillespie, what else did you tell him

8    happened?

9        A.    Then I said about maybe -- I want to say a

10   week to two, maybe a week and a half later I was at

11   the service desk, and I noticed that one of the

12   clerks was purchasing these beach towels.  And I

13   asked where she had gotten them, and she said

14   there's only two remaining.  I said to her, "Can you

15   go get me two, if those are the markdown towels that

16   were in the back?"  She said, "Yes."

17       Q.    Who is the person who was there purchasing

18   these towels?

19       A.    Claresa Howard which is the one I spoke to

20   who went and got me the towels.

21       Q.    She was purchasing these towels for

22   herself?

23       A.    No.  At the time, I was at the service

24   desk, that's where I saw them.  She was there and

25   she had told me that everyone was purchasing them.

1    She said that Sandy Grisbeth had bought towels;

2    Shannon Tetrault had bought the towels, and some of

3    the markdown crew people bought the towels.

4        Q.    These were the same towels you were

5    purchasing?

6        A.    Yes.    So I explained to Mr. Gillespie that

7    that's why I had asked her to go get me the last

8    two.

9        Q.    Had Claresa herself purchased any towels?

10   Did she tell you?

11       A.    I didn't ask her.

12       Q.    She was, as I understand it, Claresa was

13   mainly talking about other employees besides herself

14   who purchased some of these towels; is that right?

15       A.    She gave me the two names I mentioned.

16       Q.    Sandy and Shannon?

17       A.    Yeah.

18       Q.    Now, did Claresa go get you the towels she

19   purchased?

20       A.    Yes, she did.

21       Q.    Who rung the towels up?

22       A.    I don't remember.

23       Q.    Was it Claresa?

24       A.    No, no.    Another team member, but I

25   couldn't remember.    It would be on my receipt.

1    There's a copy of my receipt.  I couldn't tell you

2    who.

3        Q.    But it would be apparent from the receipt,

4    correct?

5        A.    Yes.  It would give a cashier ID number.

6        Q.    Now, had you known that the towels were

7    mismarked when you purchased them?

8        A.    No.

9        Q.    And you told Terry Gillespie that?

10       A.    Yes.

11       Q.    Did this involve just two towels?

12       A.    Two towels, yes.

13       Q.    And if I'm clear, there was no question

14    that you had purchased the towels?

15       A.    No.  I purchased the towels.

16       Q.    The only question was at what price and

17    whether they were marked down, et cetera?

18             MR. BURTON:  Objection.  And also whether

19        he knew they were marked down.  I don't care

20        what they had done if he didn't know.

21             THE WITNESS:  I didn't know.

22    BY MS. CESARANO:

23       Q.    And that seemed to be the whole issue here

24    on whether you knew, correct?

25             MR. BURTON:  Object to the form of the

```
 1          question.  I don't know what's in
 2          Mr. Gillespie's mind.
 3              MS. CESARANO:  I'm asking --
 4              MR. BURTON:  Unless Mr. Gillespie
 5          expressed what was in his mind, which I have no
 6          problem with you asking.  We have no way of
 7          speculating what Mr. Gillespie's intent was.
 8      BY MS. CESARANO:
 9          Q.   Did Mr. Gillespie indicate that he thought
10      that you knew the towels were mismarked when you
11      purchased them?
12          A.   He didn't indicate that to me.
13          Q.   Did anyone else at the meeting indicate
14      that to you?
15          A.   No.
16          Q.   Once you explained what had happened with
17      the towels, were any other questions asked by
18      anybody --
19          A.   Yes.
20          Q.   -- at the meeting?
21          A.   Yes.
22          Q.   What were those questions?
23          A.   I didn't get -- the next question, there
24      was no answer to that particular markdown, but then
25      I was asked about a markdown on a -- I think it was
```

1   at that meeting -- a toy, a bike riding toy.

2       Q.   And describe this toy we're talking about.

3       A.   It's a remote control.  It's four wheels

4   like a little Jeep that a young kid would drive.

5   It's battery operated.

6       Q.   Had you bought this toy?

7       A.   Yes, I did.

8       Q.   What was -- what did Terry Gillespie or

9   anyone else in management discuss with you about

10  this toy?

11      A.   He just asked me to tell him about what

12  took place with this purchase of this toy.  What

13  happened, what events took place.

14      Q.   What did you say?

15      A.   I explained to him that I was walking in

16  the back room with Donna Kyle, my logistics team

17  leader, and that we had stumbled onto this

18  particular toy that was in the back stock room.

19           I then said to her, "Could you follow up

20  and see if that's a display model, and if it is, I

21  wouldn't mind purchasing it for my son."

22      Q.   Then what did she do?

23      A.   She researched it and got back to me about

24  a day or two later.

25      Q.   What did she tell you?

1       A.    She told me it was a discontinued product,

2    and she couldn't find a proper SKU for it so she had

3    to find a SKU for it.  And I said, "Well, just make

4    sure you follow the markdown procedures, and don't

5    take a markdown just because I'm the store manager."

6       Q.    Do you know what the full retail price

7    originally had been on the toy?

8       A.    At the time, I didn't know.  But they go

9    anywhere from $80 all the way up to $299.

10      Q.    How much did you purchase it for?

11      A.    I can't remember the exact amount, but

12   there's a copy in there.  I think it was like --

13      Q.    While we're finding that, describe what a

14   SKU is?  What does that word mean?

15      A.    S-K-U is a -- it's something that

16   identifies that particular product.  In other words,

17   a description of a particular item so that in case

18   you have a red item, you have a SKU number, and

19   maybe 06 to identify it as a red item.  And you have

20   the same identical item, but because it's blue, it

21   may end in 03.

22      Q.    What does red mean and what does blue

23   mean?

24      A.    That's just a color I'm giving you as an

25   example.

1              MR. BURTON:  Unique identifiable labels

2          identifying products specifically.  It's a

3          retail term.

4     BY MS. CESARANO:

5          Q.   Pursuing the word "red," does that mean

6     anything in particular about the item itself?

7          A.   Not in this particular -- no.  I'm just

8     giving you that as an example to explain what a SKU

9     is.

10             MR. BURTON:  Two identical items, two

11         different colors --

12    BY MS. CESARANO:

13         Q.   Okay.  Red doesn't mean it's a markdown

14    item and blue doesn't mean full price?

15         A.   No.

16             MR. BURTON:  You know you sold fifteen red

17         ones and to buy fifteen more red ones if you're

18         going to have the same amount of stuff in the

19         store.

20             MS. CESARANO:  Now I understand.  I want

21         to ask the witness something.  I don't know.

22         That's why I'm asking the witness.  He picked

23         the colors.  I don't know.

24             MR. BURTON:  I did.

25             THE WITNESS:  That's why I --

```
 1   BY MS. CESARANO:

 2        Q.   Did you actually purchase that toy

 3   yourself.

 4        A.   No, I did not.

 5        Q.   Who did?

 6        A.   His name -- a security officer did.

 7        Q.   Do you remember his name?

 8        A.   I'm trying to right now.

 9        Q.   Was it Tim?

10        A.   Tim.  Thank you.

11        Q.   Do you remember his last name?

12        A.   No, but I'm sure we can get that.

13        Q.   Why would Tim have purchased the toy?

14        A.   I was explaining that to Mr. Gillespie at

15   the time that the registers had gotten backed up and

16   no one was responding to the backup call to come and

17   ring to help the guests get out of the building.

18             So I was about to go home at that time.

19   Rather than let the customers hold up in line, I

20   turned to Tim and I said, "Tim, here is the cash to

21   purchase this item for me.  I'm going to go open the

22   register so the lines can come down."

23        Q.   How much cash did you give him?

24        A.   I can't remember the amount.  I think it's

25   like $45 or $50 I paid for it.  It's in that book
```

1  there.

2      Q.   If the discounted price was $50, that

3  sounds right to you?

4      A.   Not knowing and not looking in there, but

5  the receipt is accurate that's in that book.

6  Whatever receipt that Target has is accurate.

7      Q.   This was a Power Wheel display toy?

8      A.   Yeah.

9      Q.   Did you later find out that this was not a

10  discontinued item?

11     A.   Mr. Gillespie, after I explained what had

12  taken place, had asked me that same question.  I

13  said no.  He then told me that Donna Kyle apparently

14  said that she informed me about that which was not

15  true.

16     Q.   So you're aware of the fact that Donna

17  Kyle said she had told you --

18         MR. BURTON:  Object to the form of the

19         question as stated.

20  BY MS. CESARANO:

21     Q.   I'll rephrase it.  Did Terry Gillespie

22  tell you that Donna Kyle's position was that she had

23  told you that it was a brand new display item?

24     A.   At that time -- he told me afterwards, but

25  not at the time when he was asking me to explain

1    everything.

2         Q.   So when did you first learn that it was a

3    brand new display item?

4              MR. BURTON:  Object to the form of the

5         question.  No predicate.  We don't know --

6              MS. CESARANO:  He just said --

7              MR. BURTON:  -- told him.  I don't know if

8         it's true, what she told him, is my problem.

9    BY MS. CESARANO:

10        Q.   Did you, yourself, determine at some point

11   that it, in fact, happened to be a brand new item?

12        A.   No.  I did not know that.

13             MR. BURTON:  That was the reason for my

14        objection.

15   BY MS. CESARANO:

16        Q.   Now, when display items come in, how do

17   they come into the store?

18        A.   Well --

19        Q.   An item like this toy.

20        A.   For example -- it's very short.  We were

21   setting a new planagram, and part of that planagram

22   may require that we put up display items.

23             MR. BURTON:  Slow down.  You're talking

24        too rapidly.

25             THE WITNESS:  May require us putting up a

1         display item.  At that point, the manager for

2         that particular area would have the display

3         built and put up for display.  When the

4         planagram is completed, the displays usually

5         come down, and we normally take a markdown or

6         if there's any type of disposition on them, we

7         would follow those guidelines.

8    BY MS. CESARANO:

9         Q.   Now, when Tim purchased this toy, did he

10   use his own discount number?

11        A.   That I cannot remember right now if he did

12   or didn't.

13        Q.   Would he have been able to use your

14   discount number?

15        A.   If I gave it to him he could.

16        Q.   Did you give it to him?

17        A.   I can't remember because when I looked at

18   that receipt, I didn't see if my number was on there

19   or not.  It's in there.

20             MR. BURTON:  Slow down.

21             MS. CESARANO:  Just give us a minute to

22        find it.

23        (Informal discussion off the record.)

24   BY MS. CESARANO:

25        Q.   I think we covered the toy.  So was

1   there -- and just to be sure -- was there anything

2   else that you said about the toy on this Power

3   Wheels toy or that Mr. Gillespie or any other Target

4   person said to you at this meeting about the toy?

5       A.   The only thing -- one thing I can remember

6   specifically is that I was asked if I made the

7   comment to Donna Kyle, "Don't take a markdown or a

8   generous markdown just because I'm the store

9   manager."

10      Q.   What did you say?

11      A.   I answered that I did make a comment, not

12  in that fashion, but I did make a comment to that

13  statement.

14      Q.   So you did say that?

15      A.   Yes.   To treat me just like anybody else

16  and don't take a generous markdown just because I'm

17  the store manager.  I did say that.

18      Q.   Is it against store policy for you to have

19  another employee purchase something for you?

20      A.   Not that I'm aware of.

21      Q.   Okay.  Did they, meaning Terry Gillespie

22  and the other Target people, any of the other Target

23  people at the meeting, tell you that it was against

24  store policy to have this Tim purchase the toy using

25  his discount card?

1          A.    No.   It went to another question after

2     that.

3          Q.    So they didn't tell you that?

4          A.    No.   Not at that time.

5          Q.    What was the other question they went to?

6          A.    Mr. Gillespie then asked me -- and, again,

7     I'm trying to remember in this particular first

8     meeting -- about getting an executive to drop me to

9     pick up my car, to pick up my Mercedes.

10         Q.    Tell me about that.   What was said about

11    that?

12         A.    He asked me to tell him the situation with

13    that, and I said I can't remember.   The only thing

14    that came to my mind was my car was in the shop, and

15    that I asked an executive around lunchtime to go to

16    take me to go pick up my car.   It wasn't being

17    detailed which is what Mr. Gillespie said that the

18    person said it was.   It was being fixed for air

19    conditioning problems.

20             Then Mr. Gillespie said, well, was there

21    anything else that -- did you ask for any money or

22    borrow any money at that time.   I said no, and then

23    I changed my mind.   I said, "Yes, there was

24    something that had to be picked up for the store."

25    I asked an executive because I didn't have any money

1   on me, if she would give me the money to pick up an

2   item for the store.

3       Q.    What item was that?

4       A.    I don't remember.  She picked it up, and

5   she got reimbursed.

6       Q.    Who is the executive you're talking about?

7       A.    Paula -- I don't remember her last name.

8       Q.    Was it Lane?

9       A.    Yes.

10      Q.    L-A-N-E?

11            MR. GILLESPIE:   L-A-Y-N-E.

12  BY MS. CESARANO:

13      Q.    L-A-Y-N-E, that sounds correct?

14      A.    Yes.

15      Q.    What was her job there at the store?

16      A.    She was the executive team leader for the

17  soft lines department.

18      Q.    And you're saying she used this money to

19  pay for something that was used at the store?

20      A.    Yes.  I just can't remember what it is,

21  but I've been trying to jog my mind to think what it

22  is she had gotten.

23      Q.    She didn't lend you money to have your car

24  repaired?

25      A.    No, no.

1      Q.    And you're telling me that whatever money

2    she spent, this Paula, it was not to benefit you

3    personally?

4      A.    Not that I can remember on that particular

5    day.

6      Q.    You don't remember what she purchased?

7      A.    No.

8      Q.    Do you remember where she purchased?

9      A.    No.

10     Q.    Was it -- was the purchase made at the car

11   shop?

12     A.    No.

13     Q.    You stopped somewhere after you picked up

14   the car or before?

15     A.    Before I could get further with that

16   conversation, with the management staff there, I was

17   asked another question.

18     Q.    Before we go on to that --

19     A.    I couldn't remember at that point.

20     Q.    You two were in the car together when she

21   purchased this item for the store; is that right?

22     A.    No.  She had dropped me to pick up my

23   vehicle, then we parted ways, and I asked her to

24   pick up the item.  So she had her car; I had my

25   vehicle.

1      Q.   Whatever money she spent was after you

2   left her?

3      A.   After I left her, right.

4      Q.   And you say she got reimbursed for

5   whatever she spent by Target?

6      A.   I'm assuming that because I did not follow

7   up behind her to make sure she got a voucher.  So I

8   don't know if she actually did it.

9      Q.   Did they tell you what Paula Layne's

10   position was on this?

11      A.   (Shakes head.)

12      Q.   Then you said they went on to the next

13   topic during the questioning?

14      A.   Yes.

15      Q.   What was the next topic?

16      A.   Mr. Gillespie asked me if I had borrowed

17   any money from another team member.

18      Q.   Who was that?

19      A.   Renee.  She changed her last name, but I

20   think it was Wasco.

21      Q.   That was her prior name?

22      A.   Yeah.

23      Q.   What did you say?

24      A.   I had said, "No.  I did not borrow any

25   money from her."

1        Q.    Did they tell you or Terry or anyone else

2    tell you why they thought you had borrowed money

3    from Terry Wasco?

4        A.    At that point, that was basically the last

5    question, and Mr. Gillespie went on to say that,

6    "There seems to be a lot of things going on here,

7    and that you may want to consider another form

8    of" -- I can't remember exactly how he put it, but

9    to resign.

10            At that point I said, "Resign?  Resign for

11    what?"  And no answer was given, but I was told

12    that, "Well, do you want us to continue this

13    investigation?"  And I said, "I didn't realize there

14    was an investigation going on, but if you want to

15    look into any other matters, that's fine.  I have

16    nothing to hide."

17            Mr. Gillespie said, "Then, give me your

18    keys and your American Express card and don't return

19    to the store or call the store, and we'll get back

20    to you."

21        Q.    The meeting you just described, that was

22    the first time you had met with Terry Gillespie

23    about the toy, and, you know, the borrowing the

24    money from other employees, and all these questions

25    he asked you?

1        A.    Yeah.  Yes.

2        Q.    And I know you probably don't remember the

3    exact date of the meeting, but in terms of if you

4    start from the date of your termination and work

5    backwards --

6        A.    I can tell you that.

7        Q.    How much before your termination was it?

8        A.    Thinking back, I think the 29th of

9    February was the date that -- sorry.  It was a

10   Saturday.  I think it was -- the 29th was the date

11   of the party.  The 1st would have been the next day.

12       Q.    Which party?

13       A.    The Evan Feldman party.  I went to the

14   meeting.  I requested the meeting to be that

15   following Monday.  So it would be February, March.

16   I don't remember the exact date.  It was only a

17   couple of days after when I requested the meeting

18   that Monday that Terry was present and started

19   asking me the questions.

20       Q.    I have your termination date as March 5th,

21   1999.

22       A.    We have to go backwards.  It would be

23   February.

24       Q.    Sometime between 2/29/99 and 3/5/99?

25       A.    You know, I have the dates at home.  I can

1    get that to you.  I did some tracking to try and --

2    I don't have it with me.

3         Q.   Let me ask you a question about Evan

4    Feldman's party.  2/29, is that a leap year date?

5    Does that stick in your mind?

6         A.   1/29.

7         Q.   1/29?

8         A.   1/29.

9              MR. BURTON:  2/29 was in the year 2000.

10             There was not a 2/29 in the year 1999.

11   BY MS. CESARANO:

12        Q.   I'm just asking.

13        A.   That's fine.

14        Q.   That's why I thought that would be an odd

15   date.

16             MR. BURTON:  I'm just telling you

17             statistically it could not have been.

18             MS. CESARANO:  I know.  That's why I'm

19             asking him.

20   BY MS. CESARANO:

21        Q.   We think it's 1/29, and sometime between

22   the party and your termination all these meetings or

23   whatever meetings happened with management happened

24   between the two events?

25        A.   Yes.  After that Monday, I was told not to

1    go back to the store, not to phone the store, and to

2    await a phone call from the district office.

3        Q.   Any other items that were discussed with

4    you at that meeting that you haven't already thought

5    about or told me about?

6        A.   I can't remember off the top of my head.

7        Q.   Everything you remembered you've told me

8    about with --

9        A.   I told you.

10       Q.   Was there a follow-up meeting --

11       A.   Yes.

12       Q.   -- with Terry Gillespie?

13       A.   Yes.   Excuse me.

14       Q.   When was that held?

15       A.   That would be about two -- I'm guessing

16   again -- two days later.

17       Q.   Fine.   It doesn't need to be exact.   About

18   two days later?

19       A.   I would say two to three days later.

20       Q.   You had a second meeting with Terry

21   Gillespie.   Who was present at that meeting?

22       A.   Mark Hastings, Doug Barth.

23       Q.   Anybody else?

24       A.   No.

25       Q.   Where was the meeting?

1      A.    At the district office.

2      Q.    Same place?

3      A.    Same place.

4      Q.    How long did that meeting last?

5      A.    Well, I think about an hour and a half.

6    Just guessing.

7      Q.    And the prior meeting lasted about how

8    long?

9      A.    My appointment was at 9:00 o'clock, and I

10   left there, if I can remember correctly, around

11   12:00, 1:00 o'clock.

12     Q.    So about three hours for the first

13   meeting?

14     A.    Yeah.

15     Q.    Going to the second meeting again, how did

16   that meeting get arranged?

17     A.    Mark Hastings' secretary called me at

18   home.

19     Q.    And then just said come to the meeting?

20     A.    She said come to the meeting.  The time

21   she gave me, I think, was 9:00 o'clock.

22     Q.    Tell me what happened at the second

23   meeting.

24     A.    I was -- the first question I was asked

25   was if I had thought about what took place at the

1   first meeting, and I indicated yes.  Then from there

2   I was being -- I was asked if I was considering any

3   other type of form of resigning from the company.

4   That wasn't asked by Terry Gillespie.  That was

5   asked by Mark Hastings, if I remember correctly.

6   One of them asked me that question.  And I said no.

7   That was it.  Terry asked me questions again.

8       Q.   Who started asking you questions?

9       A.   Terry did.

10       Q.   What was the first question he asked you?

11       A.   Sorry.  Retract that.  Doug Barth asked me

12  a question first.

13       Q.   What did Doug ask?

14       A.   That's when he told me about the $135, if

15  I'm not mistaken, that was missing.  Did I know that

16  there was $135 missing, and was I aware of that.

17       Q.   What did you say?

18       A.   I said no.

19       Q.   Did he say what that $135 that was missing

20  was in connection with?

21       A.   Yes.  That's when he described that it was

22  in connection with the Evan Feldman party.

23       Q.   Tell me what your discussion was about

24  that missing money.  What did he say, what did you

25  say, what did anybody else say?

```
 1        A.    From what I -- he asked me the question
 2   again about the 135.  I went over and explained it
 3   one more time.  At that time, I think in this
 4   meeting --
 5        Q.    What exactly did you tell him?
 6        A.    Sorry.
 7        Q.    Tell me what you told him.
 8             MR. BURTON:  I think he just did.
 9             THE WITNESS:  I went over the process.  He
10        asked me about the $135.  He said that --
11        explain to me again about the $160 you wrote on
12        here.  I explained to him again.  He stopped me
13        and said, "Well, we had called the Shooters and
14        spoke to the waiter; and we have a copy of that
15        receipt, and the waiter says that you only gave
16        a $25 tip," and said that there's a discrepancy
17        of $135.
18             I said I did not know -- I could not
19        explain how there was $135 missing.  So then I
20        said -- that's all I said.
21   BY MS. CESARANO:
22        Q.    Then what was the next topic?
23        A.    Okay.  And before I say anything more, I
24   may be jumping around with all the issues.
25             MR. BURTON:  Please answer the question.
```

1              THE WITNESS:  Okay.  The next one was a

2         check, a bounced check, from Target.

3         Mr. Gillespie asked me about that bounced check

4         from Target.  He asked me if I bounced a check

5         at Target, and I replied yes.

6    BY MS. CESARANO:

7         Q.    Did he indicate what the amount was?

8         A.    He asked me then -- no -- to explain.

9         Q.    Just for my benefit, what was the amount

10   of the check we're talking about?

11        A.    Thirty dollars, I think, was the amount.

12        Q.    What was the check for?

13        A.    It was made out to cash.

14        Q.    And you got cash at the store?

15        A.    Yes.

16        Q.    So then tell me the discussion about the

17   check.

18        A.    I explained to him that there was a check

19   that had bounced, and Janet Sobie, who was the

20   district secretary for Doug Barth, had brought it to

21   my attention.  I told her that it was a banking

22   error.  It was the bank's fault the check had

23   bounced.  She said she would get a copy from the

24   bank to her because she would need it.  I said okay,

25   and I went ahead and they got that, and I explained

H. Allen Benowitz & Associates, A Veritext Company
(305) 373-9997

 1    to Mr. Gillespie that I had given her that copy.

 2         Terry showed me the copy and said, "Well,

 3    there's no heading on here as to where this fax came

 4    from, and that the fax could have come from your

 5    house.  We don't know that."  They wanted me to

 6    explain further.  So then I did.

 7         MR. BURTON:  Please.  Just what's been

 8      said.  There's no question pending.

 9    BY MS. CESARANO:

10       Q.   No.  Actually, he's following up from what

11    I said.  I want the whole conversation.

12         MR. BURTON:  He said then I did, not what

13      I said.  He was straying into areas.

14    BY MS. CESARANO:

15       Q.   Tell me what you had told them you did.

16    Did you tell them you did something?

17       A.   Yes.  I told them that -- at that point, I

18    told Terry that "If you would like me to, I would

19    call the bank right now and have them fax a copy

20    here showing that I did not have -- it was not my

21    fault the check had bounced."

22       Q.   What did he say?

23       A.   He said to do it.

24       Q.   Did you call the bank?

25       A.   Yes, I did.

1      Q.   What bank was it?

2      A.   First Union.

3           MR. BURTON:  Counselor, I gave you a copy

4      of the letter where they apologized to him

5      approximately two weeks before for the banking

6      error.

7           MS. CESARANO:  Right.  I understand.  I'm

8      getting the whole story, good and bad.  All

9      right?

10          MR. BURTON:  Yeah.  Just want to make sure

11     you knew you had been given that document or

12     those documents.

13  BY MS. CESARANO:

14     Q.   And you called the bank while you were

15  there?  I mean, you said something about he said

16  phone the bank?

17     A.   Yes.  I called the bank.

18     Q.   And?

19     A.   And the bank said they would -- they were

20  apologizing, and they said they would fax it.  And

21  Terry said to have the fax sent to his Orlando

22  office because he was heading back home.

23     Q.   And later First Union sent a new letter, a

24  new fax?

25     A.   Yes.

1          Q.    That's the one that your counsel just

2     referred to?

3              MR. BURTON:  If you want to have it marked

4          because it was referred to, it is a fax

5          transmission --

6              MS. CESARANO:  I don't need it marked.

7              MR. BURTON:  I would like it marked

8          because it was referred to, if you don't mind,

9          as Plaintiff's 1 and 2; first being the fax,

10         the second being the apology letter.  Do you

11         have any objections?

12             MS. CESARANO:  No, I don't.  I don't

13         think -- I mean, I think it's enough.  I don't

14         want to clutter the record.

15             MR. BURTON:  Well, let me waste two pages

16         of copies just so that we shouldn't be

17         referring in a vacuum.

18             MS. CESARANO:  Okay.  That's fine.

19    BY MS. CESARANO:

20         Q.    February 25th, '99 then, First Union sent

21    a follow-up letter saying that, basically, that --

22    well, the letter speaks for itself.  I'll put it

23    into evidence.  That was the follow-up.

24             That letter was sent after your meeting

25    here at your request?  In other words, First Union

1   sent --

2       A.   Mr. Gillespie did not believe the first

3   document that they had sent.

4       Q.   I understand.  But this letter that we're

5   putting into evidence is dated February 25th, 1999

6   was sent to Mr. Gillespie as promised, but after the

7   second meeting?

8       A.   No.  During that particular meeting or --

9   and, again, as I said before, I'm not sure if it's

10  the first, second, or third.  There's four meetings

11  altogether.

12           However, during that time frame, he wanted

13  it now.  So whatever date that was that he requested

14  it, whichever meeting it was, I did the best I could

15  to get that faxed now.

16      Q.   That same day?

17      A.   That same day.  I made the call in the

18  office that day.

19      Q.   So I'm clear, the letter came that same

20  day?

21      A.   The fax was sent to Mr. Gillespie.

22      Q.   That same day?

23      A.   To my knowledge, I think so.  Yes.  I

24  wasn't asked about it again.

25      Q.   First Union acts a lot faster than they do

1 for me.

2         A.    I told them my job was on the line.

3         (The documents referred to were thereupon

4         marked Plaintiff's Exhibit Nos. A and B for

5         Identification, a copy of which is attached

6         hereto.)

7 BY MS. CESARANO:

8         Q.    Now, was there any other items or issues

9 discussed at this second meeting?

10        A.    Yes.  I was then asked about my charge

11 card for Target.  What was my standing with that

12 charge card for Target.

13        Q.    Was that card supposed to be current?

14        A.    No.  I don't know at that point when he

15 asked me that question.

16        Q.    You didn't know one way or the other?

17        A.    No.  He just asked me, "Tell me about your

18 Target charge card."

19        Q.    So the record is clear, you're issued a

20 Target charge card as a manager?

21        A.    No.  There's two separate ones.  You can

22 apply for a Target charge card just like a regular

23 person or employee.  Anyone can apply for it.  The

24 one maybe they're referring to -- I'm not

25 assuming -- is the American Express Card which is a

1    separate issue.

2         Q.   Was he asking you about the American

3    Express Card?

4         A.   No.   He asked me about my Target charge

5    card at that time.

6         Q.   What did you tell him?

7         A.   I explained to him that the account was

8    closed.

9         Q.   And was there any other discussion about

10   that?

11        A.   Yes.   He asked me if it was in arrears or

12   what had happened.   I explained we had gotten into

13   arrears with it and we closed the account, but we

14   had paid it off.   At that time he asked me to

15   produce something to show it was paid off.

16        Q.   Was there any discussion at all about the

17   American Express Card?

18        A.   Here.   That's what he asked me for.   I had

19   to give this to him at that time.

20        Q.   Was there any discussion about the other

21   card?

22        A.   Not at that second.

23             MR. BURTON:   When he said "here," he was

24        referring to a letter from '97 showing a closed

25        Target card paid off in '97.   So you might as

1          well mark it "C" because he referred to it as

2          "this".  I had to show him so we know what

3          "this" is.

4                  MS. CESARANO:  What are you talking about?

5                  MR. BURTON:  He's referring to that piece

6          of paper and he handed it to you.

7                  MS. CESARANO:  This is one that I got

8          today.  Right?

9                  MR. BURTON:  I know.  That's what I'm

10         saying.  He's referring to that's what he

11         showed Terry Gillespie as "this".

12                 MS. CESARANO:  I don't want to enter it.

13         He's told me it was paid off.

14                 MR. BURTON:  I'm going to have it marked

15         as "C" though.

16                 MS. CESARANO:  That's fine.  Again, I

17         haven't studied that or seen that, and you gave

18         me that document today like I gave you --

19                 MR. BURTON:  By the way, the documents

20         that you promised me, none of them are here

21         since you're making the comment.  And the stamp

22         for confidential, the EEO public disclosure,

23         among other things, I'm amazed that the public

24         notices that are practically in every store by

25         law --

Page 123

1          MS. CESARANO:  My paralegal made a mistake

2      on that.

3          MR. BURTON:  There's a lot of them like

4      that, you'll notice.

5          MS. CESARANO:  For the record, the only

6      thing that should be stamped are employee

7      statements that they signed for privacy reasons

8      that you have --

9          MR. BURTON:  Those are stamped, but so was

10     the training manual.

11         MS. CESARANO:  No.  Some of it should --

12     some of it is competitive stuff that we

13     wouldn't want our competition to necessarily

14     have.  But, yes, I agree, probably not some of

15     it.  I'll correct it after we stop.  The main

16     thing is you got it.

17         MR. BURTON:  I didn't get any statistical

18     data that I was expecting.

19         MS. CESARANO:  I told you she has more

20     documents that she's stamping.

21         MR. BURTON:  That's why I have not said

22     anything until this break.  Go ahead.

23     BY MS. CESARANO:

24         Q.   Okay.  Where were we?  We covered the two

25     cards.  What other items were discussed at that

1    meeting?  Anything else that was brought to your

2    attention?

3         A.    After that, Terry said to me that -- well,

4    he had asked me to produce something to show that

5    the document was paid off.

6         Q.    And you did?

7         A.    And I did.

8         Q.    Later.  Okay.

9         A.    Yes.

10        Q.    After that, was anything else discussed?

11        A.    Yes.  That's when he asked me about my

12   American Express Corporate Card.

13        Q.    He did ask you about your American

14   Express?

15        A.    Yeah.

16        Q.    I thought he didn't.

17        A.    Yeah.

18        Q.    What did he ask you?

19        A.    He asked me what were the current

20   standings with it.

21        Q.    What did you tell him?

22        A.    I told him it was in arrears.

23        Q.    Was that an open account?  In other words,

24   you told him the other account was closed.  Was this

25   one closed?

1          A.    No.    It was open.

2          Q.    What was the discussion about the American

3     Express Card?  What did he say, what did you say?

4          A.    He asked me the same thing.  He asked me

5     the question as to what my current standings were

6     with my American Express Card.  I then said it was

7     in arrears; I couldn't remember the amount; however,

8     it was in arrears.

9          Q.    Did he say anything else to you about it?

10         A.    He asked me the amount, and I didn't know

11    the amount.  And then Terry said to me --

12    Mr. Gillespie said to me that, "Did you know that

13    you should not have that in arrears; it should be

14    always current?"  I said I didn't know that.

15         Q.    Was there any more discussion about that?

16         A.    No.  Not then.

17         Q.    Now, did Terry Gillespie indicate there

18    was some store policy that required you to have the

19    American Express Card up to date in payment?

20         A.    He did a second time.  There was a meeting

21    that we had.  Again, I'm jumping back and forth.

22    That your corporate card should be current, and that

23    it could be grounds for termination with your card.

24    I then said to him that I wasn't aware of that

25    because I was paying the card off as I had gotten

1    payments done.

2    Q.   Now, as to the American Express Card,

3    that's a card that's issued to you by Target for

4    business purposes; is that right?

5    A.   I did not know that until Terry Gillespie

6    had told me that.

7    Q.   Well, now you had a regular Target card in

8    the past, right?

9    A.   That's correct.

10   Q.   For your personal use?

11   A.   Right.

12   Q.   That regular Target card you could use for

13   anything?

14   A.   That's correct.

15   Q.   When -- did every single employee at the

16   store have an American Express Card?

17   A.   I don't know that.

18   Q.   Well, to put it another way:  Was the

19   American Express Card only issued to executives at

20   the store?

21   A.   I wouldn't know.  I was given -- I was

22   offered the American Express Card as a store team

23   leader.

24   Q.   Was that the first time?

25   A.   Yes.  That I'm aware.  So I don't know if

1    any employees or any executives in my building had

2    American Express Cards, also.

3        Q.   You would agree with me it wasn't a card

4    that was issued to just a crew member?

5        A.   I don't know.

6            MR. BURTON:  Objection.  He said it twice;

7        he doesn't know.

8            MS. CESARANO:  Let me ask him some

9        questions to why he might know.

10   BY MS. CESARANO:

11       Q.   Prior to the time that you were promoted

12   to store team leader, had you ever had an American

13   Express Card?

14       A.   No.

15       Q.   Okay.  Now, do you have the Target Policy

16   Manual, you know, in your store as a store team

17   leader?

18       A.   Yes.

19       Q.   There is a Target Policy Manual?

20       A.   Yes.  It's in all stores.

21       Q.   As store team leader, you're responsible

22   to know Target's policies, right?

23       A.   I should know all of them.

24       Q.   Did Terry ever bring to your attention a

25   policy that states that company-issued credit cards

```
 1   are for business purposes only?
 2        A.   Yes.
 3        Q.   He told you that?
 4        A.   He brought it to my attention.
 5             MS. CESARANO:  Can I take just a
 6        two-minute break?
 7             MR. BURTON:  Sure.
 8        (Thereupon, a break was taken, after which the
 9        following proceedings were had:)
10   BY MS. CESARANO:
11        Q.   Finishing up that second meeting, anything
12   else that you can remember that was discussed?
13        A.   Not at this time.
14        Q.   If you think of something later, you can
15   always tell me.  You can always correct --
16             MR. BURTON:  He's instructed not to.  Next
17        question.
18             MS. CESARANO:  Instructed not to correct
19        an answer?
20             MR. BURTON:  Absolutely.  If there's no
21        question pending, I'm instructing to move this
22        along.  Next question.
23             MS. CESARANO:  That's fine.  If --
24             MR. BURTON:  You understand that I've --
25        next question.
```

1          MS. CESARANO:  Yeah.

2          MR. BURTON:  I don't want him to come up

3      with any new stuff.  Next question.  We can be

4      here for four hours.

5          MS. CESARANO:  I disagree.  If he thinks

6      of it during the deposition --

7          MR. BURTON:  You can disagree, but please

8      ask the next question.

9          MS. CESARANO:  -- then he's required to

10     tell me.

11         MR. BURTON:  He's not required to tell

12     you.  Next question.

13         MS. CESARANO:  I disagree.

14  BY MS. CESARANO:

15     Q.   You said there were more meetings than

16  just this one with Mr. Gillespie?

17     A.   Yes.  The last meeting which was that

18  Friday, I was asked --

19     Q.   Do you remember the date?

20     A.   No.

21     Q.   Would it have been in March if you were

22  terminated on March 5th?

23     A.   It would be March, yes.  March 3rd.  I

24  think it was on a Friday.

25     Q.   Where was the meeting?

1          A.    At district office in Boynton.

2          Q.    Who was there?

3          A.    At that time, Doug Barth and Terry -- I'm

4    sorry, Mark Hastings.

5          Q.    Did Terry Gillespie attend by telephone?

6          A.    Yes.

7          Q.    Anybody else attend either in person or by

8    telephone?

9          A.    Not that I was aware of.

10          Q.    How were you instructed -- who initiated

11    the meeting?

12          A.    Oh, again, I was given a call by Barbara

13    Clancey to come in for the meeting that day.

14          Q.    Now, since the time of the first meeting,

15    had you been on a leave of absence from the store?

16          A.    I wasn't told I was on a leave of absence;

17    I was told to go home until I get a phone call.

18          Q.    You weren't working at the store during

19    this --

20          A.    No, I wasn't at the store.  I was at home.

21          MR. BURTON:  For the record, March 3rd was

22          a Wednesday; March 5th was a Friday.

23    BY MS. CESARANO:

24          Q.    So --

25          A.    That's the day then.

1        Q.    March 5th?

2        A.    It was a Friday.

3        Q.    Fine.    What happened at this meeting?    Who

4    said what?

5        A.    From my recollection, Terry had asked me

6    if I considered resigning from the company, and I

7    said no.    Then he explained as to all the events

8    that took place, if I had considered resigning, and

9    I said no.    There was a moment of silence, and I was

10    asked to leave the room.    I left the room, came

11    back; Terry wasn't on the phone; Mark and Doug were

12    in the room, and then I was asked again about

13    resigning, and I said no.    Doug left the room, and

14    then Mark had said, "Well, we have no choice but to

15    terminate you for security risk."

16        Q.    Were you shown any piece of paper at this

17    time?

18        A.    Yeah.    I was asked to sign a piece of

19    paper at that time.

20        Q.    Let me show that to you.

21        (The document referred to was thereupon marked

22        Defendant's Exhibit No. 6 for Identification, a

23        copy of which is attached hereto.)

24    BY MS. CESARANO:

25        Q.    Showing you what's been marked as Exhibit

1    6 to your deposition, is this the piece of paper

2    that you were shown at your last meeting with Target

3    management?

4        A.    No.    It did not say gross

5    misconduct/detrimental behavior, becoming a security

6    risk.  All it said on the piece of paper was

7    security risk, and there were no signatures on the

8    paper, and Mark had asked me to sign it.

9        Q.    Let's go through from top to bottom what

10   you say was on the paper when it was placed in front

11   of you.  Was the top handwritten line on the piece

12   of paper that starts with payroll location?

13       A.    No.

14       Q.    What about your last name and first name?

15       A.    No.

16       Q.    What about your Social Security number?

17       A.    No.

18       Q.    You're saying it was totally blank?

19       A.    It was blank until this spot here, and

20   that's why I asked for a copy.

21       Q.    Because this is a verbal record.  When you

22   say "this spot here," are you referring to the

23   comment section at the bottom of the page?

24       A.    Yes.

25       Q.    And you're saying on the comment section

1    it said exactly what?

2         A.    It was not this particular document you're

3    showing me today.

4         Q.    Right.

5         A.    But it said security risk.

6         Q.    That was it?

7         A.    That was it.

8         Q.    You see that there's what looks like

9    different handwriting, involuntary resignation?

10        A.    I see that.

11        Q.    Was that there at the time you were shown

12   this document?

13        A.    No.

14              MR. BURTON:  It also appears that gross

15        misconduct is a separate handwriting.

16              MS. CESARANO:  No.  To me that all looks

17        like the same handwriting, but I'm not -- none

18        of us are handwriting experts.

19              MR. BURTON:  I'll guarantee you -- I'll

20        bet you 1,000, look at the "S" in misconduct

21        and the "S" in security.  You got a dollar to

22        $1,000 bet there.

23              MS. CESARANO:  Well, I'm not betting.

24   BY MS. CESARANO:

25        Q.    So we can move right along as we all want

Page 134

```
 1   to, Mark Hastings' signature is at the bottom of

 2   this form, correct?

 3        A.   If that's his signature, yes.

 4        Q.   It purports to be, right?  Did you see him

 5   sign this in front of you?

 6        A.   No.

 7        Q.   There's a date at the bottom, 3/5/99.

 8        A.   No.  Mark -- no.

 9        Q.   Now, there's some handwriting on the form

10   you're looking at, Exhibit 6.  It says, "Refused to

11   sign."  Do you know whose handwriting that is?

12        A.   No.

13        Q.   It's not your handwriting?

14        A.   No.

15        Q.   And that's it for the form, that's

16   everything you just told me, that was it, that was

17   all that was on the form?

18        A.   What I described, yes.

19        Q.   Now, did Mark Hastings or anybody else ask

20   you to sign a form saying security risk?

21        A.   Yes.

22        Q.   And did you refuse to sign it?

23        A.   Yes.

24        Q.   Was there any other documents or pieces of

25   paper given to you at this meeting?
```

```
 1          A.   No.  Although I asked, but no.

 2          Q.   What did you ask for?

 3          A.   A copy of this.

 4          Q.   This what?

 5          A.   A copy of --

 6          Q.   What you stated was on --

 7          A.   -- what I saw.

 8          Q.   -- your exit form?

 9          A.   I was refused to be given a copy.

10          Q.   Anything else happen at this particular

11     meeting?

12          A.   Not that I can remember right now.

13          Q.   Now, as store team leader when you get out

14     money -- when you take out money from the store such

15     as the $500, isn't it your responsibility to make

16     sure that the money is accounted for when the end of

17     the day comes?

18               MR. BURTON:  Objection.  Asked and

19          answered.  If you recall.

20     BY MS. CESARANO:

21          Q.   I'd ask that you please answer.  He's

22     objecting, but --

23          A.   When I am requesting money, I become -- I

24     am not the one responsible for the money coming

25     back.  I am now a team member because I'm holding it
```

1    in my hand.  I'm responsible for the money in my

2    hand, and I hand it back over to the person that is

3    responsible for keying it in correctly.

4         Q.   But my very question is:  As store team

5    leader, you would agree you have more responsibility

6    than people under you?

7              MR. BURTON:  Object to the form of the

8         question.  Improper predicate.

9              MS. CESARANO:  He can agree or disagree.

10             MR. BURTON:  I'm just stating my objection

11        for the record.  That's an improper predicate.

12        I did it in the proper way.

13   BY MS. CESARANO:

14        Q.   With the understanding your attorney is

15   objecting, I'm asking:  As store team leader, is it

16   true that you have a higher degree of responsibility

17   than, say, someone who is a brand new employee?

18             MR. BURTON:  Objection.  Form of the

19        question.

20   BY MS. CESARANO:

21        Q.   You can still answer.

22        A.   Can you reform the question?

23        Q.   Yes.  As a store team leader, would you

24   agree that you have a higher degree of

25   responsibility to Target for what happens at the

1    store than someone who is not in management?

2         A.   Is that in reference to the question you

3    asked me?

4         Q.   Just whatever I just asked you.  Yes or

5    no?

6              MR. BURTON:  Unrelated to anything else.

7    BY MS. CESARANO:

8         Q.   Just yes or no.

9         A.   It's not related to this question?

10             MR. BURTON:  Unrelated.

11             THE WITNESS:  Okay.  Yes.

12   BY MS. CESARANO:

13        Q.   Now, when it comes to cash handling at the

14   store, isn't it true that you're ultimately going to

15   be held accountable for the cash at the store?

16        A.   Yes.

17        Q.   As the store team leader?

18        A.   Yes.

19        Q.   And isn't it also true that as store team

20   leader and the highest person in charge, if someone

21   subordinate is doing something improper with regard

22   to cash or counting for cash, it's up to you to

23   correct it?

24        A.   I would not know that unless it was

25   brought to my attention.

1    Q.    But if it was brought to your attention,

2    would it be your responsibility to correct the

3    situation?

4    A.    Yes.    It was brought to my attention.

5    Q.    Now, I know that you raised some names in

6    the course of this case, and I want to talk about

7    those various people with you.    Okay?

8    A.    Okay.

9    Q.    You raise the name of Joe Toscano, I

10    believe, as someone you believe may have been

11    someone treated differently than you, correct?

12    A.    Yes.

13    Q.    Would you describe in your view what facts

14    support that Joe Toscano was treated differently by

15    Target?

16    A.    In one of the meetings, I was asked about

17    the question regarding scanning SKUs for markdowns

18    at the register so they would not pick up the

19    markdown.    And at that time, Mr. Gillespie -- Mark

20    had asked me -- at that time, I explained that Joe

21    Toscano was doing the same procedure, and I had

22    asked if he had gotten the same treatment for doing

23    the same procedure that I did in my store, and I got

24    no response.

25    Q.    Now, let me back up a little bit so I know

1     what the same procedure is you're talking about.  Am

2     I right that in the course of all these meetings

3     surrounding your termination --

4          A.   Right.

5          Q.   -- you were asked about procedures you

6     used scanning SKUs?

7          A.   Yes.  At the register.

8          Q.   And since I don't think I heard exactly

9     this before, what was Terry Gillespie and the Target

10    management talking to you about about the SKUs?

11         A.   At that time, I had brought that issue up,

12    and I had said that Joe -- the issue was about

13    scanning at the register.  For example, an item

14    would come to the front of the store versus the

15    cashier calling back for a price check.  She would

16    take the customer's word, scan it, and key it in.

17              After that procedure was done, the cashier

18    would then research it and find out what the correct

19    price was.  Target allows their employees up to $20

20    that they can let go through the register as an

21    error.  When Doug Barth or Mr. Gillespie -- I don't

22    know which one -- brought it to my attention, I had

23    mentioned that Joe Toscano had done the same

24    procedure; however, that his cashiers were scanning

25    what's called a Qualex.  It's what they use to put

1    the film in the package, and they were scanning that

2    instead of the particular ticket we were using to

3    benefit us as far as the customer goes, and that

4    created a large shortage in his store.

5         This information was told to my by Don

6    Fankhouser.  So I brought that up because no

7    reprimand, no investigation was done to him about

8    that, but yet it was brought up to me.  That

9    situation didn't happen until back in, I want to

10   say, June, July.  I'm not sure.

11        Q.   The incident with Mr. Toscano was in June

12   or July?

13        A.   I use that as a reference as to another

14   store doing the same procedure, another store team

15   leader, white, and not anything happening to him.

16        Q.   Now, do you know for a fact that nothing

17   happened to him?

18        A.   According to when Don Fankhouser spoke to

19   me about it, he had said that he was the golden

20   child and nothing had happened to him.

21        Q.   So you got this second hand from

22   Mr. Fankhouser?

23        A.   Yes.

24        Q.   You don't know what's in Mr. Toscano's

25   file or --

1       A.    No idea.

2       Q.    You also don't know whether the assets

3    protection team talked to him about not doing this?

4       A.    According to Don Fankhouser, he did speak

5    to him about not doing it, and he spoke to me about

6    it because Don Fankhouser at that time was a

7    regional person and he spoke to me.

8       Q.    When Don Fankhouser spoke to Joe Toscano,

9    did Don tell you that he discontinued the practice?

10      A.    He didn't indicate that, yes or no.

11      Q.    You don't know what happened?

12            MR. BURTON:  He didn't get fired.

13            THE WITNESS:  My point -- thank you.

14            MS. CESARANO:  Please, counsel, you're not

15       supposed to be testifying for him.

16            MR. BURTON:  Come on.  You can move this,

17       both of you, a lot quicker.

18            MS. CESARANO:  No, I can't.  Actually, I'm

19       going way faster than I'd like to.

20            THE WITNESS:  At the time that Don told me

21       that, he had brought up the store as an example

22       of not following the procedure.  That's when I

23       asked the question.  Of course, not what was

24       going to be taking place in the future;

25       however, I brought that up as a reason to show

1            there was a policy that was not followed, and

2            to my knowledge he did not get fired for it.

3            That's why I brought it up.

4       BY MS. CESARANO:

5            Q.   Was he at the same store as you?

6            A.   He was running that store before I got

7       there.

8            Q.   This is Joe Toscano?

9            A.   Yes.

10           Q.   He was not there while you were there?

11           A.   No.

12           Q.   Joe was not there at the same time you

13      were there, correct, at the store?

14           A.   No.  He went to another store, 642.

15           Q.   So you didn't personally observe any of

16      this, correct?

17           A.   The answer is yes.

18           Q.   What did you personally observe?

19           A.   I went to the store and spoke to his GSTL,

20      and --

21           Q.   But my point is, did you see this

22      occurring at the store?

23           A.   No.

24           Q.   That's all I wanted to know.  And isn't it

25      true that this particular incident we're talking

1   about with this SKU codes was just one of many

2   things they brought to your attention in conjunction

3   with your termination?

4        A.   That's correct.

5        Q.   Now, there was also the name of Shannon

6   Tetrault, T-E-T-R-A-U-L-T, raised?

7        A.   Yes.

8        Q.   She's a white female, correct?

9        A.   That's correct.

10       Q.   Isn't it true that in approximately

11  November of 1998 Don Fankhouser spoke to you and

12  Miss Tetrault, whatever the name is, and, let's see,

13  and the store's service desk team about an IOU

14  system that was being used at store 393?  Do you

15  remember --

16       A.   That's not what he brought up to my

17  attention with regards to why I brought up her name.

18       Q.   Do you remember him speaking to you about

19  an IOU system?

20       A.   Yes.

21       Q.   What did Mr. Fankhouser say to you about

22  the IOU system?

23       A.   He didn't know anything about an IOU until

24  someone brought it to his attention, and he asked me

25  what was it all about.  I quickly explained to him

1    that Johnny Travalo, a previous in-store

2    investigator, was using that with Joe Toscano as a

3    form of accounting for the vouchers that were

4    outstanding.

5        Q.    And were you using it also at your store?

6        A.    When I first got there, it was still in

7    use because I was not aware of that.  There were so

8    many things that were not being done correctly, but

9    it was not brought to my attention until maybe three

10    months into my tenure there, or four months.

11        Q.    But you agree that this IOU system was

12    wrong?

13        A.    Yes.

14        Q.    Now, after Mr. Fankhouser talked to the

15    team about let's discontinue the use, did you in

16    fact discontinue the use?

17        A.    I -- yes.  I told everyone to stop using

18    it.  Shannon Tetrault in particular.

19        Q.    And you told everybody stop using this IOU

20    system?

21        A.    I had an executive meeting and I told the

22    executive staff we cannot do that, and to stop using

23    the IOU procedure.  Although that is not why --

24            MR. BURTON:  That is not the question.

25    BY MS. CESARANO:

1          Q.   Fine.  So we --

2               MR. BURTON:  It's not funny.

3     BY MS. CESARANO:

4          Q.   But, in fact, the system had been used at

5     least initially during your original tenure at the

6     store, correct?

7          A.   Yes.  It was used prior to me coming to

8     the store.

9          Q.   Right.  And when you took over the store,

10    it was continued in use as an IOU system.  You knew

11    it was being used, correct?

12         A.   I didn't know until it was brought to my

13    attention.

14         Q.   But you agree it was wrong?

15              MR. BURTON:  Object to the form of the

16         question.

17    BY MS. CESARANO:

18         Q.   You agree it was outside proper

19    guidelines, correct, that kind of an IOU system?

20         A.   At that time, I did not know if there was

21    a guideline for that, but from knowing what

22    procedures, there's a form to fill out, turn in the

23    receipt, and that's it.  I didn't know you could do

24    an IOU.

25         Q.   This system was doing an IOU instead,

1   correct?

2        A.    Prior to me coming to the store, yes.

3        Q.    But Mr. Fankhouser did speak with you

4   about meeting to discontinue use of the system?

5             MR. BURTON:   Object to the form of the

6        question.

7   BY MS. CESARANO:

8        Q.    Is that right?  Go ahead and answer.

9        A.    He brought it to all of our attention.

10       Q.    And the reason he did so was because he

11  thought it was improper?  I'm not asking you if you

12  knew about it, I'm asking:  Mr. Fankhouser asked

13  you --

14            MR. BURTON:   Objection to what Mr.

15       Fankhouser thought.

16            MS. CESARANO:   No.   This was a meeting.

17  BY MS. CESARANO:

18       Q.    Isn't it true that Mr. Fankhouser had a

19  meeting with you where he brought it to your

20  attention and asked you to discontinue it as an

21  improper, outside-the-guidelines system?

22            MR. BURTON:   Object to the form of the

23       question.  Asked and answered.

24            THE WITNESS:   He did not have a meeting in

25       particular -- no, he did not have a meeting.

1    BY MS. CESARANO:

2         Q.    Take the word meeting out of it.  Did he

3    tell you to discontinue the system?

4              MR. BURTON:  Object to the form of the

5         question.

6              THE WITNESS:  He spoke to Shannon Tetrault

7         about the IOU system.

8    BY MS. CESARANO:

9         Q.    Didn't he also speak to you personally at

10   some point about it?

11        A.    Yes.  At some point he did speak to me.

12        Q.    The question was:  Did he speak to you

13   about it?

14        A.    Yes.  I said yes.

15        Q.    Well, it took a long time to get that.

16             MR. BURTON:  You're getting frustrated,

17        Miss Cesarano, because we -- I'm not going to

18        restate his testimony.

19             MS. CESARANO:  That's fine.  I just want

20        to make sure the record is clear.

21             MR. BURTON:  The record has been very

22        clear.  Go to the next area.

23             MS. CESARANO:  Don't order me about.  I'm

24        going to do my thing as best as I can, you

25        know, as much as I can.

1           MR. BURTON: We're not going to stipulate

2       to go past six hours for any purpose.

3           MS. CESARANO: Fine. Did I ask you to?

4           MR. BURTON: You're approaching it

5       rapidly.

6           MS. CESARANO: No. Half hour lunch sure

7       doesn't count toward it.

8           MR. BURTON: We were ready in five

9       minutes.

10          MS. CESARANO: It started when it started.

11      We're minus a half hour lunch, and I have

12      plenty of time left of the six hours. I'm not

13      up at six hours.

14          MR. BURTON: I didn't say you were. I

15      said we're not going to waive it.

16          MS. CESARANO: He has a new claim that

17      you're telling me he's adding. I don't have to

18      ask him about a new claim I've not seen.

19          MR. BURTON: We haven't yet filed it, have

20      we?

21          MS. CESARANO: Fine.

22          MR. BURTON: I may not file it until the

23      deposition is complete, and then let you go for

24      a half hour on a new claim or whatever you

25      need.

1          MS. CESARANO:  Fine.

2          MR. BURTON:  Please proceed.

3   BY MS. CESARANO:

4      Q.    Any other persons whose names you can tell

5   me today as we sit here that you believe were

6   treated differently than you based on race?

7      A.    Not off the top of my head at this moment.

8      Q.    You mentioned that my example on Shannon

9   Tetrault was not the example you had in mind.  When

10  I mention her name, what if anything do you have as

11  fact showing that Target treated Shannon Tetrault

12  differently than you?

13     A.    I don't have anything.

14     Q.    She's not somebody you would raise as a

15  comparative --

16          MR. BURTON:  Object to the form of the

17       question.  You're asking for a legal conclusion

18       that he's not capable of making.  I may choose

19       to name a hundred people.

20          MS. CESARANO:  Thank you for the comment.

21       I'm asking him a question.

22          MR. BURTON:  You're asking for a legal

23       conclusion.

24          MS. CESARANO:  No, I'm not asking for a

25       legal conclusion.

1          THE WITNESS: Ask me again.

2     BY MS. CESARANO:

3          Q.   Yes.   I'm asking you as support for your

4     case if you have any employee names who work for

5     Target either now or in the past --

6          A.   Okay.

7          Q.   -- who you believe were treated

8     differently than you based on race.

9          A.   Well, I gave names when I was in the --

10    for the EEOC.

11         Q.   Right.   But we're not in front of the

12    EEOC.   We're in front of the court now.

13         A.   I can't remember all the names, but if I

14    do I'll --

15         Q.   Which names can you remember, if any?

16         A.   Joe Toscano, Shannon Tetrault.   I can't

17    remember if there are more than that.

18         Q.   Back to Shannon because you just told me

19    there wasn't anything with regard to Shannon.   So

20    you just raised Shannon's name.   What if anything do

21    you know about Shannon that would lead you to make

22    that statement?

23         A.   That's why I said it wasn't in regard to

24    what you asked me.

25         Q.   Exactly.   Now I'm asking --

1          A.    Apparently, she had broken a policy.  The

2     policy was re-ringing returns at the service desk in

3     order for them not to show up on the risk report.

4     Don Fankhouser brought that to my attention and told

5     me that there was clearly a violation of policy.  I

6     then called Mark Hastings and told him about the

7     policy and asked if I should put her on counselling

8     or corrective action.  He said just to talk with her

9     and don't give her any type of verbal warning.  I

10    then said to Mark -- yeah.

11         Q.    So did you do that?  Did you give her an

12    oral warning?

13         A.    I didn't give her any type of warning.  He

14    would not let me give her a warning.  He just said

15    to speak to her.  I said do you want me to give her

16    an oral warning -- verbal, we don't say oral -- and

17    he said no.

18         Q.    Did you speak with her about this

19    re-ringing returns being improper?

20         A.    Yes, I did.

21         Q.    Did she agree to do as you said?

22         A.    Yes.

23         Q.    Isn't it true that Shannon Tetrault at the

24    time had only recently been employed?

25         A.    I don't know her exact date of employment.

1       Q.    Would you agree with me that she was a

2    relatively new employee?

3       A.    No.  At that point, she had to have been

4    with the company a year and maybe four months.  So

5    she was very versed.  She was also the captain of

6    the district for guest service card applications.

7    She was actually -- Mr. Gillespie even talked to her

8    one time about being promoted to DTL according to

9    what she told me.  So she was highly regarded and

10   she knew her job well.

11      Q.    Now, with respect to any other -- I asked

12   you already the question about employees, and we

13   went through Joe Toscano and Shannon.  This other

14   question I'm going to ask you is a little broader

15   than that.

16          What if any names can you give me of

17   persons who would have some information or facts

18   about your case?

19          MR. BURTON:  Object to the form of the

20       question because that denotes that he would

21       understand how a presentation of a case occurs

22       in federal court.

23          MS. CESARANO:  No.  There's no other way

24       to ask that question, and I very carefully

25       asked it because that is the proper way.  I'm

1          not asking who his witnesses are or anything of

2          the sort.

3     BY MS. CESARANO:

4          Q.   I'm asking:  What persons do you know of

5     today as we're sitting here that may have some facts

6     or information that pertain to your case?

7          MR. BURTON:  Object to the form of the

8          question as phrased.  You can answer to the

9          extent if you understand it.

10         THE WITNESS:  Again, I gave names.  I

11         think I've already given names, if I'm not

12         mistaken, but I don't know them off the top of

13         my head as to which one is to which issue.

14    BY MS. CESARANO:

15         Q.   No.  You don't have to tell me which

16    issue.  Any issue.

17         A.   I don't know the names.  To answer your

18    question, there are names.  I don't know the names

19    just right now.

20         MR. BURTON:  We've answered

21         interrogatories which contain that material.

22         MS. CESARANO:  I understand.  I'm entitled

23         to ask him deposition questions in addition to

24         the interrogatories.

25         MR. BURTON:  I'm just pointing that out.

1           MS. CESARANO:  If he doesn't remember, he

2       doesn't remember.

3   BY MS. CESARANO:

4       Q.   Just so I want to make sure you understand

5   my question when you say you don't remember.  I'm

6   going to ask it a little bit different way.

7           We've talked about many different things

8   that have happened during the course of your

9   employment.

10      A.   Right.

11      Q.   And I'll just take an example.  The

12  Shooters' receipt.

13      A.   Right.

14      Q.   What I'm asking you to do is name me the

15  names of any persons that you know of who may or may

16  not know about the Shooters incident that based

17  on -- I'm not done yet -- based on what you know

18  about your case may have either been at a place or

19  seen something that would lead you to believe they

20  may know something about the case?

21          MR. BURTON:  Mrs. Cesarano, you've spent

22      about forty-five minutes on Shooters.  You

23      mentioned a series of names of people who were

24      involved.  Other than those people he has

25      already named?

1              MS. CESARANO:  Yes.

2              THE WITNESS:  No.  I don't have any names

3         that I can remember right now.

4    BY MS. CESARANO:

5         Q.   You understand this is important from my

6    point of the case because if you tell me Joe Shmo

7    knows that case, obviously I want to talk to Joe

8    Shmo at a deposition like this one.

9         A.   I understand.

10        Q.   Just so you understand the purpose of my

11   question.

12             MR. BURTON:  I think that in light of the

13        fact you're saying other than the people who he

14        has specifically named, and various aspects so

15        far, he does not know any more as he sits here

16        today; and if he does, we will be happy to

17        supplement the interrogatories or anything else

18        required.

19             MS. CESARANO:  Fine.  You named lots of

20        names and that's fine.

21             MR. BURTON:  And those persons will or

22        might be called as witnesses for all or

23        portions of the case.

24             MS. CESARANO:  Right.  I'm just again

25        asking you -- for example, I may not have asked

```
 1          you a question about something where you know

 2          that it supports your case.  Maybe I didn't ask

 3          you about it.  In that point, you may say but

 4          there was this time . . .

 5               MR. BURTON:  I would instruct him not to

 6          answer as such.

 7     BY MS. CESARANO:

 8          Q.   Now, I will ask you --

 9               MR. BURTON:  And I won't allow him to

10          answer it because it's overbroad.

11               MS. CESARANO:  You can ask the most

12          completely -- it doesn't even have to be

13          relevant directly.

14               MR. BURTON:  I know.  But it's so

15          overbroad as to who may conceive of knowing

16          about your case.

17               MS. CESARANO:  No.  I don't ask that broad

18          of a question.

19     BY MS. CESARANO:

20          Q.   What I am asking is:  I've asked you

21     specific questions about incidents, and I've named

22     them, the Shooters, the Denny's, whatever --

23          A.   I agree.

24          Q.   Besides those things that I think I may

25     know about, I'm asking you:  Do you know of any
```

1   other facts or incidents that support your race

2   discrimination charge, things that Target has done

3   to you?

4       A.   Only what I gave as far as names that

5   would help me in this case.

6       Q.   Not necessarily names, but things that

7   have happened to you.

8           MR. BURTON:   It's so overbroad that it's

9           absurd.

10          THE WITNESS:   No.   Only names.

11          MS. CESARANO:   I need to be broad because

12          he needs to give me information.   If he

13          withholds it, then it's your problem.

14          MR. BURTON:   Ms. Cesarano, we gave you a

15          detailed list of interrogatories with a

16          detailed list of people to the extent that all

17          of those people may be called for all or a

18          portion in presentation of his case.   And

19          without going through what every one of them

20          may or may not know, other than those persons

21          and the persons he named in deposition, if we

22          discover any other names, we'll be happy to

23          bring them before yourself.   We do not wish to

24          inhibit you, but I don't want him to guess

25          about some person in the back he doesn't recall

1    now.

2            MS. CESARANO:  No.  In fact, I want to ask

3    him about the interrogatory responses just to

4    go through.

5            MR. BURTON:  Well, it's 3:00 o'clock, and

6    I'm trying for your own witness's courtesy,

7    he's got to be in Orlando today.

8            MS. CESARANO:  I understand.  I'm going to

9    take my six hours.

10           MR. BURTON:  You don't have to.

11           MS. CESARANO:  I understand.  I don't

12    really want to either, but I do want to ask him

13    about the witnesses listed on the

14    interrogatories to the extent that we haven't

15    covered them.  That's important for me to do.

16           MR. BURTON:  There's a lot of things that

17    are important in life.

18           MS. CESARANO:  Right.  And that's why I

19    want to move on and not be arguing with you

20    wasting my time.  I'm just going to get the

21    interrogatories.  Do you want to take a break?

22           MR. BURTON:  Fine.  We're taking a break

23    for five minutes or less than five.

24           MS. CESARANO:  I'll be back in five.

25           (Thereupon, a break was taken, after which the

1        following proceedings were had:)

2   BY MS. CESARANO:

3        Q.   I think, Mr. Harris, we did not cover the

4   Denny's incident with the missing $300.  I'm not

5   sure if we covered that portion.  But let me ask you

6   if Mr. Gillespie asked you about a $300 having to do

7   with purchasing breakfast for the crew at Denny's?

8        A.   Yes, he did.

9        Q.   We talked about that before?

10       MR. BURTON:  Objection to what you may or

11       may not have talked about.

12   BY MS. CESARANO:

13       Q.   I don't think we covered the Denny's

14   incident, correct?

15       A.   No.

16       Q.   That was one of the things that was

17   brought up in one of these meetings?

18       A.   Right.  But you didn't ask me about that.

19       Q.   Well, I asked you at each meeting what was

20   brought up, correct?

21       A.   Right.

22       Q.   This was something we hadn't talked about.

23   Did there come a time in late 1998, December, that

24   you purchased some food for breakfast for people at

25   the store at Denny's?

Page 160

```
 1        A.    Yes.
 2        Q.    And did you take $300 out in cash to do
 3   that?
 4        A.    Yes.
 5        Q.    Did you sign a voucher for the $300?
 6        A.    I think so, yes.
 7        Q.    And were you ever approached by one of the
 8   Target personnel who was responsible for the money
 9   to ask about the receipt back from Denny's to settle
10   the account?
11        A.    Which Target personnel?
12        Q.    By anyone.  Did anyone at Target ever ask
13   you, "Can I get that receipt back from Denny's?"
14        A.    No.  I went to a person and said I had the
15   receipt in my office, and that I would bring it down
16   for it to be cashed out that following day.   The
17   person --
18        Q.    Was that involving Donna Kyle?
19        A.    No.
20        Q.    Who did it involve?
21        A.    Betty -- I don't remember her last name.
22   But she's one of the supervisors up front.
23        Q.    Did Donna Kyle come with you to purchase
24   the food?
25        A.    Yes, she did.
```

1        Q.   Did you pay for the food?

2        A.   Yes, I did.

3        Q.   When did you give the receipt from Denny's

4   to Target?

5        A.   It was about a day later, day and a half

6   later, if I can remember correctly. I'm not sure.

7        Q.   So if Miss Kyle or anyone else says that

8   you never turned in the Denny's receipt, that would

9   be wrong?

10        MR. BURTON:   Objection to the form of the

11        question.

12   BY MS. CESARANO:

13        Q.   You can go ahead and answer it.

14        A.   Can you go ahead and rephrase it?

15        Q.   If Donna Kyle or anyone else at Target is

16   saying that you didn't ever turn in the Denny's

17   receipt after purchasing the Denny's food, that

18   would be incorrect?

19        MR. BURTON:   Object to the form of that

20        question as to saying did she receive it or

21        saying that it was received by no one?

22   BY MS. CESARANO:

23        Q.   I'll rephrase the question.

24        A.   The person that I spoke to about the issue

25   that I gave the receipt to is Betty. I don't

1  remember her last name, but she's a front-end

2  supervisor.

3      Q.   When did you give it to her?

4      A.   I think it was two days -- I'm not sure of

5  the days lapsing because the breakfast was in the

6  early morning at 3:00 o'clock a.m. so we're already

7  into one day.  It may have been two or three days

8  later.

9      Q.   What was the receipt for, what amount?

10      A.   I don't know.  It was $200 something

11  dollars for the dinner -- or breakfast.

12      Q.   Did you turn in the extra cash?

13      A.   I gave it to Betty.

14      Q.   Betty's last name again?

15          MR. BURTON:  He said four times he didn't

16      recall, if you listened to his answer.

17  BY MS. CESARANO:

18      Q.   What was Betty's --

19      A.   She's a level two, front-end supervisor.

20      Q.   Did Terry Gillespie tell you at the time

21  of your termination that he had never located a

22  Denny's receipt?

23      A.   Yes.  He said that.  Wait.  I don't know

24  if it's the time of my termination, but he said that

25  sometime.

1    Q.    Sometime prior to your termination?

2    A.    Uh-huh.

3    Q.    Did he tell you that the $300 voucher had

4    never been reconciled?

5    A.    He did say that, yes.

6    Q.    Did he ask you to help him try to

7    reconcile the situation?

8    A.    To explain, yes, and I did.

9    Q.    And tell me what explanation you gave to

10   Terry Gillespie.

11   A.    I told him that we had went out for

12   breakfast, we had the breakfast; came back; and I,

13   at that time, I thought I had given the receipt to

14   Donna Kyle.  So I then went along and told him that

15   particular -- what happened at that time.  He then

16   told me there was money missing, that there was $20

17   missing from when the voucher got turned in or

18   reconciled.  There was a $20 variance.

19   Q.    And did you account for that?

20   A.    At that -- I did not even know at that

21   time that there was a variance of $20 for the

22   Denny's incident.

23   Q.    Did you get the, as before, the Shooters'

24   receipt, when you turned in the cash?

25   A.    I did not get a copy, no.  I didn't sign

1    anything.

2         Q.    You didn't sign anything indicating you

3    had given cash to someone at Target?

4         A.    No.

5         Q.    Would it be the general policy to try to

6    get a cash voucher receipt to prove that you had

7    turned in the cash?

8              MR. BURTON:    Objection.    Asked and

9         answered in the last series of questions.

10              THE WITNESS:    You don't get any type of

11         receipt back when you --

12    BY MS. CESARANO:

13         Q.    Did you sign for a receipt or --

14         A.    I don't recall signing anything for a

15    receipt.    There's no type of receipt that you get.

16    You don't get anything back.

17         Q.    Isn't it true with regard to Shooters that

18    you did get some kind of receipt that we've seen

19    before that has to do with the person signing that

20    you gave her cash back, in that case 200 some

21    dollars?

22              MR. BURTON:    Object to the form of the

23         question.    Improper predicate.

24              THE WITNESS:    You're asking the question

25         incorrectly.

1    BY MS. CESARANO:

2         Q.   Go ahead and answer.

3              MR. BURTON:   Objection.  He said it can't

4         be answered as phrased.

5    BY MS. CESARANO:

6         Q.   We saw a document before showing a receipt

7    by Target for 200 and some dollars, correct, in cash

8    from you, correct?  Right.  It's one of the

9    documents.  We saw that.

10             MR. BURTON:   Objection.  You asked the

11        question and he said no; he shook his head no,

12        and you say right.

13   BY MS. CESARANO:

14        Q.   That's not what he did.  He was trying to

15   show me it, right?

16             MR. BURTON:   Look at the document you're

17        referring to.

18             MS. CESARANO:   You're wasting my time.

19             MR. BURTON:   You're wasting my time when

20        you ask a question versus --

21             MS. CESARANO:   No.  It's not contrary --

22             MR. BURTON:   Look at the document and

23        you'll see --

24             MS. CESARANO:   I disagree.

25             MR. BURTON:   Let him show it to you and

1            he'll tell you why it's an incorrect question

2            answered, as if you haven't heard the

3            deposition for five hours.

4                    MS. CESARANO:  Ridiculous.

5        BY MS. CESARANO:

6            Q.    Isn't it true that Exhibit 3 is a receipt

7        that someone at Target gave to you?

8            A.    Exhibit 3 is showing --

9            Q.    That's not the one I wanted.  It's the one

10       that says $202.

11                   MR. BURTON:  It's signed by Target, not by

12              him.

13                   MS. CESARANO:  I never said it was signed

14              by him.

15                   MR. BURTON:  And it's not given to him

16              either.

17                   MS. CESARANO:  I didn't ask that either.

18                   MR. BURTON:  Yes, you did.  You said given

19              back to him.

20                   MS. CESARANO:  Please, be quiet or I'll

21              start over.

22                   MR. BURTON:  Please.

23                   MS. CESARANO:  So we won't have to argue

24              what I asked.

25                   MR. BURTON:  Good.

 1    BY MS. CESARANO:

 2         Q.   Isn't it true that there is a form that

 3    Target fills out to show that they have received

 4    money back from you in connection with vouchers

 5    where you take out money?

 6         A.   Yes.

 7         Q.   And, in fact, we have an example as

 8    Exhibit 5 in this case, is that right, on a

 9    different matter?

10         A.   On a different matter.

11         Q.   What I'm asking is:   Did someone from

12    Target ever give you a similar receipt to Exhibit 5

13    in connection with the Denny's money?

14              MR. BURTON:   Objection to the form of the

15         question.

16              THE WITNESS:   I'm not clear on that

17         because -- meaning the receipt from Denny's or

18         a receipt from Target?

19    BY MS. CESARANO:

20         Q.   Let me start over.   Did anyone from Target

21    give you a -- not give.   I should say --

22         A.   Have me sign.

23         Q.   Yeah.   They filled out.   Did they fill out

24    something showing that they received some cash back

25    from you in connection with the Denny's incident?

1          A.    No.   I don't have the answer to that.

2          Q.    Maybe; maybe not?

3          A.    Right.

4          Q.    When you give the receipt, when you buy

5     something like Denny's or like anything else and you

6     turn it in, who do you turn it in to?

7          A.    You can give that to the front end --

8     anybody that has a supervisory title or executive in

9     charge of the front end.

10         Q.    It's not one particular person?

11         A.    No.

12         Q.    With regard to Denny's, who would you have

13    turned in the receipt to under proper procedures?

14         A.    That I can remember, it would be any of

15    the front-end supervisors.

16         Q.    Those would have been who?

17         A.    Shannon Tetrault, Betty, which I don't

18    have her last name, Sele (phonetic), Karen Napp.   I

19    think that's it that I can remember right now of

20    names.

21         Q.    Okay.   It could have been any of those

22    five people.  And you're aware of Miss Kyle's

23    statement that she was present when you bought the

24    food, et cetera?

25         A.    Yes.

1          Q.    And you're also aware of the fact that

2    Target did not have any record of the receipt from

3    Denny's?

4              MR. BURTON:    Object to the form of the

5          question.

6    BY MS. CESARANO:

7          Q.    Are you aware that that's their position?

8          A.    You're telling me now.    Now, I'm aware of

9    it.

10         Q.    Did Terry Gillespie tell you that they

11   were missing the Denny's receipt?

12         A.    Yes.    He did tell me that.

13         Q.    Did you ever locate that receipt to show

14   Terry, to show there's the receipt?

15         A.    At that time, I could not do that because

16   of the date.    That was back in '98, and at the time

17   I was being questioned, it was '99.    So it was --

18         Q.    Too late?

19         A.    -- months back.    I wasn't allowed in the

20   store.

21         Q.    Do you have a specific recollection of

22   giving someone that receipt from Denny's in your own

23   head?

24         A.    No.    Not that I can --

25              MR. BURTON:    Asked and answered.

1           THE WITNESS:  The only person that comes

2       to my mind is Betty.

3   BY MS. CESARANO:

4       Q.   Do you remember Sharon Tetrault asking you

5   on one or two occasions to give her the receipt?  Do

6   you remember her coming to you?

7       A.   No.

8       Q.   Now, with respect to your claim of race

9   discrimination, did anyone in management from Target

10  ever say anything to you that would indicate race

11  discrimination?

12      A.   Example?  What I would consider race?

13      Q.   Right.

14      A.   For example, a good old boy.

15           MR. BURTON:  Please, tell her.

16           THE WITNESS:  A good old boy.

17  BY MS. CESARANO:

18      Q.   Go more slowly.  I want each and every

19  statement that you remember being made to you.

20  Let's start with this first one.

21      A.   Robert Van Savage, store manager, 638.

22      Q.   When would that have been?  An approximate

23  date.

24      A.   I can't give you that date.

25      Q.   How do you spell the last name?

1         A.    V-A-N, and then the separate Savage.

2         Q.    Okay.  You worked with him?

3         A.    Yes.  He was my store manager.

4         Q.    And so this would be approximately what

5    dates then?

6         A.    That was the store I began at, 6/94.  I

7    don't remember my dates of hire.  Six of '94, and I

8    worked with him for approximately two years or a

9    year and a half.

10        Q.    So I think you told us before, September

11   '96 you were transferred out of 638?

12        A.    Yes.

13        Q.    So he would have said this sometime prior

14   to that date, correct?

15        A.    Yes.

16        Q.    Tell me what he said.

17        A.    He explained to me after I had gone to a

18   particular, what they call round-robin meeting.

19   That was to see if I was able to be promotable to

20   store manager.  When I came back from that meeting,

21   he had spoken to me about it and said it wasn't

22   looking like it was in my favor; that you did not

23   have somebody on your side, and you need to be part

24   of the good old boy team in order to be successful

25   with Target.

1        I then asked him who that person was that

2    wasn't on my side, and why do I have to be a good

3    old boy to be with Target. And that's when he

4    indicated that Terry Gillespie was one of the ones

5    that disagreed for me to be on it.

6        Q.   So he told you Terry did not want you to

7    be promoted?

8        A.   He had said that he was the only one

9    objecting in my promotion.

10        Q.   Do you know what persons would be involved

11    in this round robin that would be analyzing whether

12    you would be promoted?

13        A.   They were all district team leaders from

14    the South -- I think all of the South Florida

15    stores.

16        Q.   Approximately how many people?

17        A.   Maybe ten. I'm just guessing.

18        Q.   Now, in fact, you were promoted, though,

19    despite this; is that right?

20        A.   Yes.

21        Q.   And approximately -- let's see. When you

22    were promoted, what store were you at at the time?

23            MR. BURTON: This is all repetitive to a

24        huge amount of time earlier this morning.

25            THE WITNESS: That's when I was

1          transferred to store 391.

2     BY MS. CESARANO:

3          Q.   That was your promotion?

4          A.   No.   That was just a transfer.

5          Q.   When was your promotion then?

6          A.   My promotion was maybe, like I said, nine

7     to ten months -- no, sorry.   I'd say twelve months

8     afterwards.

9          Q.   Now, in terms of promotions, while we're

10    on that topic --

11         A.   Right.

12         Q.   -- isn't it true that it's Target's policy

13    that if you're involved in a sexual harassment

14    investigation like you were, that that would have

15    held up your promotion for one year?

16         A.   I don't know.   I couldn't answer that.

17         Q.   Did anybody tell you that at the time?

18         A.   No.

19         Q.   But it's possible that's their policy?

20              MR. BURTON:   Objection to possibility.

21              THE WITNESS:   I don't know that at all.

22    BY MS. CESARANO:

23         Q.   You were giving me examples of different

24    statements that you recall having to do with race

25    discrimination.

1              Were there any other statements that

2       anybody at Target in management made to you?

3              A.    Don Fankhouser.

4              Q.    When did that happen?

5              A.    When I was the store manager at store 393.

6              Q.    And was anybody else present during that

7       conversation?

8              A.    No.

9              Q.    What did he say?

10             A.    He followed me -- he walked me out to my

11      car, which was a Viper, and made the comment, "How

12      does a black man afford to drive a Viper working at

13      Target?"

14             Q.    What did you say to him?

15             A.    I asked him what he meant by, "a black man

16      affording a Viper."  He made the statement that,

17      "It's a $70,000 vehicle, and I'm sure that's not

18      what you make.  How do you afford to drive a vehicle

19      like that?"  I then said to him, "How do you afford

20      to drive a Corvette?"  None of my business.

21             Q.    Did he drive a Corvette?

22             A.    At the time, no.  But I heard that he had

23      a Corvette.

24             Q.    Okay.  Did he say anything else to you?

25             A.    No, because I was -- that pissed me off.

1    Excuse my language. And I got in my vehicle and I

2    left.

3         Q.   Sometime when you were at store 393 that

4    happened?

5         A.   Yes.

6         Q.   So that would be sometime after April '98,

7    correct, because that's when you started there?

8         A.   Yes.

9         Q.   Can you put it in terms of time that you

10   spent there which was about a year? Can you put

11   this particular statement somewhere in that time

12   frame?

13        A.   Don Fankhouser did not come to that

14   particular store until around November so it had to

15   be in the November time frame.

16        Q.   November '98?

17        A.   '98.

18        Q.   Anything else that Don Fankhouser said to

19   you that you considered racial based or racist?

20        A.   That was the only thing that continued to

21   stick in my brain.

22        Q.   Any other manager that you can name me

23   that made similar statements?

24        A.   No. Not at this time. I can't remember.

25        Q.   No other statements that in your view were

```
 1   racist?

 2          MR. BURTON:  You're saying to him or he

 3      heard?

 4   BY MS. CESARANO:

 5      Q.   To you.  First, to you directly.

 6      A.   No.

 7      Q.   That's it on the "to"?

 8      A.   That I can think of right now.

 9      Q.   Then going further, that you've been

10   present and heard that you know about.

11      A.   Yes.

12      Q.   That you consider racially based.

13      A.   Mark Hastings.

14      Q.   And when was that?

15      A.   I was driving.  I can't -- it was within a

16   time frame that I was at store 393.

17      Q.   Wait.  393?

18      A.   Deerfield store.

19      Q.   I didn't hear.

20      A.   Sorry.

21      Q.   Sometime during that time period?

22      A.   And we were going to a meeting together in

23   my car.

24      Q.   Do you remember what meeting or where you

25   were going?
```

1          A.    Yes.   We went to a -- I think it was a

2     diversity meeting on top of that.  It was in a new

3     district office in Miami -- in Miramar.

4          Q.    Was he driving?

5          A.    No.  I was driving.

6          Q.    What happened?

7          A.    Again, just talking, and he had asked me

8     the question if I run into any difficulties being

9     I'm married to a white woman, blond at that; did I

10    have any problems with that.  And I said, "No.  My

11    father happens to be white and my mother black.  Why

12    do you ask?"

13               And he indicated, well, he noticed in

14    South Florida that there was -- there was a pressure

15    about black and whites.  And I said that I felt that

16    too when I was down here; that the southern states,

17    it seems like there's an issue about mixed race.

18         Q.    Did he say anything else to you or did you

19    say anything else to him?

20         A.    No.  At that time I didn't.  I thought it

21    was an issue.  Then he said to me, he asked me,

22    because, again, we were driving -- he wanted to

23    drive my Viper that I had at the time.  And he asked

24    me what type of stocks I had or how do I afford to

25    run a vehicle like this.  And I explained to him

1    that I had stocks with Merrill Lynch.  I didn't

2    think I had to say anything because it was my

3    district manager sitting in the car, a two-seater,

4    and that we move money around and I used that as a

5    deposit for my car.

6         Q.   Anything else said during that car ride or

7    is that -- was that everything?

8         A.   That was the, just, as far as I remember,

9    anything to do with racism that I can think that I

10   didn't understand why I was being asked that

11   question.

12        Q.   Had Mark Hastings met your wife?

13        A.   Yeah.  My wife works for Target, and still

14   does.

15        Q.   So he knew her?

16        A.   He knew her.

17        Q.   And where does your wife work?  What

18   store?

19        A.   Delray store, store 642.

20        Q.   She still works there?

21        A.   She still works there.

22        Q.   What's her position?

23        A.   She's part time there now as operator.

24   And sometimes they put her into different --

25   wherever they need her.

1     Q.    Phone operator?

2     A.    She answers the phone.

3     Q.    How long has she worked for Target?

4     A.    I think it's at least seven years.

5     Q.    Was that all for Mark Hastings that you

6   remember, not just this car incident but any other

7   times Mark Hastings made any other remarks to you?

8     A.    No.   That's the one that continues to

9   stick out in my brain.

10     Q.    Any other managers at Target that have

11   said anything to you?

12     A.    Terry Hargrove.

13     Q.    Terry Hargrove?

14     A.    Yeah.

15     Q.    What was said by Terry?

16     A.    I'm not sure if this is a racist comment,

17   but I'll tell you what he said to me.   This is

18   before me getting -- I'm still at store 638.   I had

19   just been hired so that was within the ninety days

20   that I was on probation.

21     Q.    This is really early in your career?

22     A.    Yeah.   He had said to me that during my

23   interview process with Terry Gillespie, that after

24   the interview process he found that I was too good

25   to be true.

1        Q.    Who had said that?

2        A.    Terry had said to Terry Hargrove that he

3    found that I was too good to be true.  And I asked

4    him what he meant by "too good to be true," and he

5    didn't have an answer.  He said but, you know, you

6    need to follow the rules and make sure everybody is

7    on your side to be on the fast track with Target.

8    And I said okay, and left it at that.

9        Q.    And Terry Hargrove is again?

10       A.    He was the district manager at the time.

11   He's no longer with the company.

12       Q.    Any other statements that you can think

13   of?

14       A.    No.  Not Target managers, no.

15       Q.    Or that you overheard Target managers say

16   to someone else.

17       A.    No.

18       Q.    Do you have any other -- any documents

19   that you have kept from your employment that --

20   other than what you've given your attorney and he's

21   given me, whatever?  Do you have any documents that

22   would support your case?

23            MR. BURTON:  Object to the form of the

24            question.

25   BY MS. CESARANO:

1          Q.    Go ahead and answer.

2          A.    I don't have any documents other than what

3     I was -- I had with me at the time I was told not to

4     go back to the store.

5          Q.    Did you keep copies of any documents given

6     to you in connection with your performance such as

7     your appraisals?

8          A.    My performance, yes.  I have copies.  Same

9     copies that you have.

10         Q.    But you kept those?

11         A.    I kept those, yes.

12         Q.    And in conjunction with the sexual

13    harassment investigation to the extent you were

14    given any documents, would you have kept those?

15         A.    If I was given a document?

16         Q.    Right.

17         A.    Yes.  I would have kept it.

18         Q.    Were you given any documents whatsoever in

19    conjunction with that investigation?

20         A.    No.

21              MR. BURTON:  He already testified to that.

22         You asked that earlier.

23              MS. CESARANO:  Right.  I asked him about

24         adverse actions.  This is broader.

25              MR. BURTON:  You said involved or in any

1       way related to it.

2               MS. CESARANO:  No.  I think I asked --

3               MR. BURTON:  Fine.  But we have it twice.

4       Can't hurt.

5       BY MS. CESARANO:

6           Q.   You agree there were no scraps of paper

7       saying a statement by this employee, nothing like

8       that?

9           A.   Your question was:  Was I given any copies

10      to keep?  No, not that I can remember.

11          Q.   Or shown any?

12          A.   I'm trying to think back.  I can't think

13      at this point.  If something were shown to me, it

14      was a matter of asking me a question; I can't just

15      think off the top of my head.

16          Q.   What about any diaries that you kept,

17      calendars that you kept to record, I went to a

18      meeting on this date, that kind of thing?

19          A.   No.  I didn't do anything like that.  On

20      my desk I had a calendar, and as events came up that

21      I had to attend I would write on the calendar.  Or

22      district office actually sent you out a memo to

23      remind you.

24          Q.   Did you take any of those documents with

25      you?

1      A.    No.   Nothing at all.

2      Q.    Any tape recordings?

3      A.    No tape recordings.

4      Q.    Any other possible kind of document of any

5   kind that you can think of that would be potentially

6   relevant to this case?

7           MR. BURTON:   Objection to the form of the

8           question as to relevance.

9   BY MS. CESARANO:

10     Q.    You can answer.

11     A.    The only documents that I had is what I

12  gave that I thought would help in the case.

13          MR. BURTON:   Those, way before, have been

14          turned over in accordance with your request.

15  BY MS. CESARANO:

16     Q.    Those documents were what?   Just so I can

17  know that I got what you're saying I got.

18     A.    I can't remember everything, but I gave

19  them to Richard, and I filled out the same form.   I

20  didn't have any documents.   I couldn't get any

21  documents.

22          MR. BURTON:   We gave you 100 percent of

23          what was not attorney/client privilege that he

24          had.

25  BY MS. CESARANO:

Page 184

```
 1        Q.   As store team leader, I know you're
 2   familiar with most of the procedures.  Don't you
 3   normally give somebody a copy of the exit report
 4   when they leave?
 5        A.   Normally, you're allowed to give a person
 6   a copy of that, yes.
 7             MR. BURTON:  He indicated he wasn't given
 8        one already.  We've gone through that.
 9             MS. CESARANO:  I asked him if it was the
10        policy.  That has nothing to do with the prior
11        question I'm asking.
12   BY MS. CESARANO:
13        Q.   You say normally the policy was to give
14   somebody a document?
15        A.   An example was -- I can't remember the
16   person's name.  Yes, I do remember his name, Collin;
17   he was an executive, a black executive, and he
18   apparently had gotten in trouble for stealing, and
19   he -- I had to terminate him.  He worked for me.
20   And he had asked me for a copy of this document when
21   I terminated him.  So I asked my TRL, human
22   resources person, "Am I allowed to give out a copy
23   of that?"  And she said, "Yes," and I did.
24        Q.   That person was terminated for what kind
25   of theft?
```

1     A.    Stealing.

2     Q.    What did they steal?

3     A.    The report that was given, he took -- he

4     was passing merchandise.  I don't know the exact

5     items that were, but he was passing merchandise.

6     Q.    You agreed with that termination?

7     A.    Yes.

8     Q.    Now, there's some witnesses here that are

9     listed, and some of the names I know, and maybe some

10    of the others I don't know.  I think you covered Joe

11    Murphy?

12    A.    Yes.

13    Q.    Betty Gadson, Target?

14    A.    That's the lady that processed -- that's

15    the lady that processed the Denny's receipt.

16    Q.    You're saying you gave the receipt to

17    Betty Gadson?

18    A.    She's the one that processed it, and she

19    can verify that -- you would have to speak to her.

20    There was no money missing.

21    Q.    And Annette -- anything else Betty Gadson

22    would have to testify on?

23    A.    No.  That's it.

24    Q.    Annette Sternberg, I haven't heard her

25    name.

1        MR. BURTON:  We mentioned her earlier.

2    BY MS. CESARANO:

3        Q.    I don't remember.

4        A.    She was asked to falsify documents by

5    Shannon and Don Fankhouser.

6        Q.    I don't remember this so refresh my

7    memory.  Asked to falsify?

8        A.    Yeah.  She called me after she found out I

9    was terminated, and wanted to let me know that in

10   the process of being interviewed by Shannon --

11   sorry, not Shannon.  Excuse me.  Sandy Grisbeth and

12   Don Fankhouser.

13       Q.    During her termination?

14       A.    During the investigation of me.  I was not

15   present, but during the investigation of me, that

16   she was asked to write a statement saying that I

17   asked her to back stock merchandise.  She refused to

18   write that statement, but wanted me to know that.

19       Q.    When did she tell you this?

20       A.    I'm guessing maybe two months after.

21       Q.    Two months after what?

22       A.    My termination.

23       Q.    Anything else she would know about?

24       A.    That's all she told me.

25       Q.    Matt Ashenbrenner?

1    A.    Matt Ashenbrenner worked at store 391, and

2    I was involved with him.  The reason he's on that is

3    because he had started dating a black person.  He's

4    white.  He started dating a black employee.  He was

5    basically -- he basically lost his job.  He was

6    given an ultimatum to get fired or resign, and he

7    resigned.

8        Q.    Do you know why he was terminated?

9        A.    He called me and told me he felt he was

10   being discriminated against because he was dating a

11   black person at Target.

12       Q.    What are the dating rules about -- was he

13   a supervisor?

14       A.    He was an executive, and she was a level

15   one.

16       Q.    What are the rules about executives dating

17   level one employees?

18       A.    Well, they shouldn't be, first of all.  If

19   they do, he should bring it to someone's attention.

20   He did.  He brought it to my attention.  At the

21   time, I was leaving the store to go to store 392,

22   Greenacres, and I advised him that he needed to see

23   the new store manager which was Joy Manasay

24   (phonetic), and he called Terry Gillespie and let

25   them know that he's dating an employee or else he

1    would get terminated.

2         Q.    Unless you had permission, you had to not

3    date an employee if you were a supervisor and they

4    were your subordinate?

5         A.    The truth of the matter is, I don't know

6    exactly how the policy is with that.  But just from

7    hearsay, if you are dating, you're supposed to bring

8    it to your supervisor's attention and Target will

9    separate you two.  They will not condone that.

10        Q.    As long as the subordinate doesn't report

11   to the supervisor?

12        A.    That's correct.

13        Q.    So in this case, he would have had to done

14   that in order to get approval?

15        A.    I would assume, yes.  I just gave him the

16   advice as to what steps to take.

17        Q.    What about Karen Napp?

18        A.    Karen Napp, she's the person that

19   processed the voucher for the Shooters.

20        Q.    And other than that that you already told

21   me, anything else that she would know about?

22        A.    No.

23        Q.    Lisa Leffew?

24        A.    Lisa Leffew is the young lady that brought

25   to my attention the scanning of the tickets at the

1  register in reference to the Joe Toscano issue.  She

2  told me that they were already doing this process

3  down at the Sawgrass store, and that the GSTL and

4  the store manager were aware of it, and she was not

5  aware there was a policy.

6        Q.    Was she doing that kind of scanning

7  herself?

8        A.    She was present working at the store at

9  the time, yes.  She brought it to my attention and

10  she wanted to let me know that there were other

11  stores in the district that were doing it that she

12  was aware of and that were not questioned about it.

13       Q.    But she wouldn't tell us that it was a

14  correct procedure, just that other people were doing

15  it, too?

16             MR. BURTON:  Object to the form of the

17        question.

18             THE WITNESS:  I wouldn't know what she

19        would tell you.

20  BY MS. CESARANO:

21       Q.    What did she tell you, though?

22       A.    Exactly what I told you.

23       Q.    Just other people did it, too?

24       A.    Other executives and other store managers

25  were aware they were doing it down at the Sawgrass

1   store; in particular, the Sawgrass store that she

2   mentioned.

3        Q.   Claresa Howard?

4        A.   Yeah.

5        Q.   What --

6        A.   She is involved in -- she had told me that

7   Diane Vas who used to be the PPTO, which is a price

8   change accuracy manager, she told me that -- let me

9   back up.  Diane had left the company prior to the

10  investigation of Steve Harris.  She had let me know

11  that Diane came to her and told her that the reason

12  she had gotten her job back was that Sandy Grisbeth

13  had called her home and asked her for any

14  information that she could give in helping to get

15  Steve Harris terminated and that she would get her

16  job back.  She did get her job back, but not as

17  level three which was agreed by Sandy.  She got it

18  back as a level two; and, subsequently, she was

19  upset about it.

20       Q.   I take it level two is worse than --

21       A.   Lower.

22       Q.   Diane, last name again?

23       A.   Diane Vas.

24       Q.   V-A-S?

25       A.   I think so.

1        Q.    But this is what Claresa told you about

2     what Diane told her?

3        A.    She wanted to let me know that --

4        Q.    But, I mean, you didn't talk to Diane

5     yourself?

6        A.    No, no, I did not.

7        Q.    Patricia Howard?

8        A.    I forget what I put for her.  She, I

9     think, is on the markdown team as well.  She was the

10    one that was present for the markdown towels.

11       Q.    She marked them down herself?

12       A.    She was the one who took the markdowns.

13    She was there when I made the statement to leave

14    them in the back to make sure that they all got

15    corrected properly because some were wrong, some

16    were right.  She's also aware of who purchased all

17    of the towels, including the executives.

18       Q.    Was she at the register?

19       A.    No.

20       Q.    How would she know who purchased the

21    towels?

22       A.    She just made that statement to me.

23       Q.    Kerry Murphy, Athletic Sports?

24       A.    She was my TRL.  I put her there for just

25    the person to -- I forgot.  She understood what the

1    store was going through at the time, and how many

2    difficulties we were having at the store, and

3    basically a character witness as to how I handled

4    myself in the building.

5        Q.   Athletic Sports?

6        A.   That's where she's working now.  She was

7    the TRL at the store at the time.

8        Q.   Where is that located?

9        A.   I don't know.

10       Q.   Do you know what city?

11       A.   I think it's in Boca.  She's teaching, if

12   I'm not mistaken, and the last thing she told me was

13   she was teaching at Athletic Sports.  I can get that

14   information.

15       Q.   Again, she would know about -- a character

16   witness you were saying?

17       A.   Yeah.

18       Q.   Anything more specific than that?  Any

19   particular incidents that we talked about or events?

20       A.   Not anything we covered, no.

21       Q.   Jonnie, is that a man or a woman?

22       A.   That's a guy.

23       Q.   Kianka?

24       A.   Yes.  He was the previous asset protection

25   team before Don Fankhouser.  He's aware of the IOU

1   process going on in the store prior to me, and he's

2   also aware of the activation of markdown procedures

3   prior to me.

4       Q.   What about these markdown procedures?  How

5   were they the same or different?

6       A.   He's just aware that the store apparently

7   had been very high on their percentage as far as

8   doing a good job on taking accurate markdowns.  But,

9   in fact, that was not the case.  The store was

10   apparently activating them and not working them.

11   But he's aware of that.

12       Q.   The store had some problems with these

13   markdowns?

14       A.   Yeah.  This was prior to me coming to the

15   store.  But the main issue that he's for is voucher

16   procedures and the IOU process at that store before

17   I came.

18       Q.   Sandy Rosenberg?

19       A.   Sandy Rosenberg was the -- she was a

20   clerical and then was the acting TRL.  She basically

21   is a character witness.

22       Q.   Ericka L-Y-D-A-Y?

23       A.   Ericka Lyday.  She's aware of, as far as,

24   this can go back to the difference between being

25   treated right.  Steve Clemente is her boss, store

1    638.

2        Q.    Who is he?

3        A.    The store manager for that store.

4        Q.    What does that have to do with --

5        A.    The only way I can describe what I'm

6    saying is that at one time we were having a lot of

7    problems hiring people at my store.  And one

8    indication was the overnight flow team; we weren't

9    paying enough.  I had asked Terry Murphy to E-mail

10   so we can get the differential pay upped.  We were

11   getting fifty cents if you worked overnight, and we

12   wanted it upped to a dollar to help out so we can

13   get more people to apply.

14              While doing that, we found out that a lot

15   of people were going to the Boca store because they

16   were paying $1.50 overnight.  I sent Terry an E-mail

17   because I think he's the person to approve those.

18   We did that numerous times and got no approvals.

19   However, the Boca store got approved for the

20   overnight pay, and we did not get approved until

21   maybe a month before I was terminated.

22       Q.    Just briefly, what does that go to?  Why

23   would you bring that up?

24              MR. BURTON:  Why are you asking him?  I'm

25              the person to ask on that one.

```
 1              MS. CESARANO:  I'm asking him why --
 2              THE WITNESS:  I thought there was a
 3         difference between Steve Clemente being white
 4         and me being black.
 5              MR. BURTON:  That's the answer.  Right.
 6              MS. CESARANO:  Right.  I'm asking him
 7         that.
 8    BY MS. CESARANO:
 9         Q.   We haven't identified that there was any
10    difference for that reason other than maybe
11    negligence.
12         A.   I agree.
13         Q.   Jackie Scott?
14         A.   That was the name I was trying to give you
15    that I spoke to in regard to the scanning of the
16    Qualex film at the front register; and if, in fact,
17    there was actually a shortage and what happened.
18         Q.   Qualex?  I don't remember qualex as a
19    word.
20              MR. BURTON:  I do.
21              THE WITNESS:  Qualex is a company that --
22    BY MS. CESARANO:
23         Q.   How do you spell it?
24              MR. BURTON:  Q-U-A-L-E-X.
25    BY MS. CESARANO:
```

1   Q. Is that how you think it's spelled?  I

2 would like your testimony.

3   A. To the best of my knowledge.

4   Q. This has to do with --

5   A. The issue of Joe Toscano as far as how he

6 was treated differently in the same regards as

7 following procedure as I was.

8   Q. How is Jackie a witness to that?

9   A. Jackie is actually the GSTL that ran the

10 front end, and she told me herself that we were

11 doing the wrong thing up front, and that she brought

12 it to Joe's attention, but was told to continue

13 doing it.

14   Q. This was at which store?

15   A. 642.

16   Q. Just so I have this clear in my head,

17 Jackie tells you that Joe Toscano was doing the

18 scanning the wrong way --

19   A. Correct.

20   Q. -- at store 642?

21   A. Right.

22   Q. But what, it was let go?

23   A. She was not told to stop it or continue

24 it.  She was also aware of the Qualex shortages that

25 were happening.  They were scanning the wrong film

1    envelope.

2         Q.    Were they told to stop doing that?

3         A.    I don't know.

4         Q.    They were having some issues with that?

5         A.    Yes.

6         Q.    This is the longest witness list I've ever

7    seen.

8         A.    Sorry.

9         Q.    Trying to go as fast as I can.   Simone

10   Tripp?

11        A.    Simone --

12             MR. BURTON:   You won't accuse us of not

13        doing our best to answer it then.

14             THE WITNESS:   Simone Tripp worked at the

15        Boca store, and she actually has a -- she was

16        to verify about how voucher procedures work at

17        the store, how they are executed.   She also is

18        aware of an issue that happened at the store

19        with her GSTL.   There was a shortage of

20        vouchers.

21   BY MS. CESARANO:

22        Q.    What was that shortage about?

23        A.    He apparently was not ringing in the

24   vouchers correctly.

25        Q.    Who wasn't again?   The store team leader?

1        A.    No.    This was the GSTL that ran the front

2    end that she worked under.    She told me she filed an

3    actual complaint on him, and I can't get the name

4    right now.    I'm sure it will come back to me.    He

5    had gotten transferred out of the store and sent to

6    another store.

7        Q.    When she complained, he was transferred?

8        A.    He was transferred out.    I don't know if

9    anything else happened.

10        Q.    Assuming all of that is true, tell me how

11    this is related to race discrimination.

12        A.    Then she indicated to me that there was a

13    procedure going on right now with herself that

14    involved discrimination where she felt that she was

15    not being promoted because of her weight.    She's

16    fat.    She felt that she was being held down.

17        Q.    She's not black?

18        A.    She's white.

19        Q.    But overweight?

20        A.    Yeah.    But I only wanted her not for that,

21    but what took place with the voucher and how it was

22    handled and how many errors happened in that store.

23        Q.    Was the GSTL black?

24        A.    No.    He was white.

25        Q.    I think that does your witness list.    Now,

1   you have some doctors -- a doctor listed in this.

2   Dr. Levy?

3       A.   Yeah.   That's my doctor.   I gave documents

4   on that.   I went to him.

5       Q.   When did you start going to him?

6       A.   I'd say maybe a month after.

7       Q.   After your termination?

8       A.   Yeah.

9       Q.   And it lists here anxiety, high blood

10  pressure, depression, and stress.   Were those the

11  things you were seeing him about?

12      A.   I told him what was wrong, and I gave,

13  also, the records that he has from when I visited.

14  He told me that -- I explained my situation with

15  Target, and that he said to me that, you know, the

16  best thing for you to do is get exercise, relax, and

17  that's what I did.   I actually joined a gym.

18      Q.   Did he prescribe any medicine?

19      A.   Yes, he did.

20      Q.   What?

21      A.   I can't remember the name, but it's for

22  anxiety attacks.   Whenever I get that funny feeling,

23  your heart feels like it's racing out of control,

24  and you take the pill and it would stop.

25      Q.   You take it as needed?

1          A.    Right.

2          Q.    Not where you take it once a day?

3          A.    No.  Well, sorry.  In the beginning I had

4     to take it once a day.

5          Q.    For how long?

6          A.    Until the pills ran out.  I think it was

7     thirty days.

8          Q.    Thereafter?

9          A.    He asked me how I was feeling and I said

10    it comes and goes, and sometimes I think about all

11    the things I go through and I start to feel pressure

12    in my chest and he said take a pill.

13         Q.    Since the first thirty days, how often

14    have you been taking the pills?

15         A.    I stopped taking them, I would say, about

16    June.

17         Q.    June of?

18         A.    Of '98 -- '99.  Sorry.

19         Q.    June of '99 you stopped taking those

20    pills?

21         A.    Yeah.  I joined the gym in May.

22         Q.    You haven't taken any medication since

23    then for anxiety?

24         A.    I take it every so often when I feel it

25    after June, but it's been very sporadic.

1    Q.    Approximately how many times after June

2    '99 have you taken --

3    A.    Ten to twenty times.

4    Q.    That would just be --

5    A.    A guess.

6    Q.    That would be as needed you would take one

7    pill?

8    A.    Right.

9    Q.    That's ten to twenty pills until now,

10   approximately?

11   A.    Right.  I haven't taken one in months.

12   Q.    When would you say the last time you took

13   a pill was?

14   A.    Maybe about five months ago.  Actually, I

15   can tell you when.  It was in November when I was

16   told the EEOC dismissed my case.  I remember

17   specifically taking one.

18   Q.    That's the last time you took any pill for

19   anxiety?

20   A.    Yeah.

21   Q.    Do you know the name of the pill?

22   A.    No, but I can get that for you.  That's

23   not a problem.

24   Q.    It's an antidepressant type of pill?

25   A.    He told me it was for anxiety.

1    Q.    Would you recognize the name if you heard

2    it?

3    A.    Yeah.

4    Q.    Xanax?

5    A.    I think that's it.

6    Q.    You think that's it?  All right.  Any

7    other medication that the doctor prescribed for you?

8    A.    No.

9    Q.    Any other doctors you've seen besides

10    Dr. Levy?

11    A.    No.  Just him.

12    Q.    And I've got his address here.  He's still

13    at the Boca Raton Central Park Boulevard address I

14    have here?

15    A.    Yes.

16    Q.    Do you know if he is a psychiatrist or a

17    psychologist?

18    A.    No.  I wouldn't know that.

19    Q.    That's fine.  You've given those medical

20    records?

21    A.    Yes.

22    Q.    Fine.  Ned Jones, as you've listed, is the

23    district manager for Marshall's.  What if anything

24    would he have to say?

25    A.    I don't know.  I was asked who my last

1    supervisor was in your questioning.

2         Q.   So he doesn't necessarily know anything

3    about this case?

4         A.   No.

5         Q.   Now, on some of the documents that are

6    listed, first meeting notes, what does that

7    reference?

8         A.   When you asked me earlier the time frame

9    and what was asked in each question, I had written

10   down just on a little piece of paper as to what date

11   I had gone to speak with Mr. Gillespie and Doug

12   Barth and all of them.  I was trying to keep track

13   of what day they called me back and what time they

14   called me back.

15        Q.   When did you start keeping those notes?

16        A.   The same day that I left the office.

17        Q.   As your termination?

18        A.   No.

19        Q.   As what?

20        A.   While I was being -- while I was being

21   investigated.

22        Q.   So the first meeting you had with Terry

23   Gillespie?

24        A.   Yes.

25        Q.   You started keeping some --

1      A.    I recorded that I went there for three

2    hours, and the date I went there.

3         Q.    Were any of these notes taken actually

4    during the meetings?

5         A.    No.   I took no notes during the meeting.

6         Q.    Just afterwards you took down some notes?

7         A.    Well, I wrote that I went to the meeting

8    on whatever date it was, and the time it was, and

9    the time I was there.   I was just kind of keeping a

10   record as to --

11        Q.    Time, but not so much the content of the

12   meeting?

13        A.    Not so much the content.

14        Q.    The next one.   Conversation with Terry

15   Gillespie is listed.

16        A.    Yeah.

17             MS. CESARANO:   Do you have these

18        documents?

19             MR. BURTON:   I don't believe I do.

20             THE WITNESS:   I can get it for you.

21             MR. BURTON:   Please.

22             MS. CESARANO:   My question is --

23             MR. BURTON:   There may be documents that

24        he prepared at my request, and that's why I'll

25        look at them before I agree to give them to you

1      because they may, in fact, be privileged at my

2      request.

3          MS. CESARANO:  Because a lot of them I'm

4      not really recognizing.

5          MR. BURTON:  I will go over it with him.

6          MS. CESARANO:  So I'm not going to try to

7      ask him --

8          MR. BURTON:  The ones you don't have I

9      will go over with him because the rest of the

10     material, as I say, everything that wasn't

11     privileged I believe I gave you, but I will

12     check.

13         THE WITNESS:  Yes.

14         MR. BURTON:  Please, don't chime in,

15     please, on the record.  I'll go over it, and

16     I'll respond properly to you.  But anything

17     that is not a question of privilege you will

18     get, and I will not hold on relevancy because I

19     don't think that's a proper ground for

20     objection to anything in this world anymore.

21     Ask Mr. Clinton.

22         MS. CESARANO:  So with that, I'm not going

23     to waste our time.

24         MR. BURTON:  Don't waste our time.

25         MS. CESARANO:  Without them in front of

```
 1          me, it's impossible.  There may be something to

 2          ask you once I've seen them.

 3               MR. BURTON:  Well, you've already gone

 4          over all the areas that would have been in them

 5          which is what did they say at the first

 6          meeting, second meeting, et cetera, at nausea.

 7               MS. CESARANO:  I'm just going to reserve

 8          my right to ask about these documents listed

 9          upon review of these documents.

10               MR. BURTON:  Anything further?

11               MS. CESARANO:  Let me review my notes.

12          (Informal discussion off the record.)

13     BY MS. CESARANO:

14          Q.   When Mr. Gillespie talked to you, did he

15     talk about some incident involving price changes at

16     the store where apparently something called eaches

17     (phonetic) per hours for store team 393 were two or

18     three times higher than the district?  Do you know

19     what I'm talking about?

20          A.   Yes.

21          Q.   Did he raise that to you in one of these

22     meetings?

23          A.   Yes.

24          Q.   Tell me.  I know there were so many

25     things.  Some of them we've forgotten.
```

1           MR. BURTON:  Object to the form of the

2       question.  Go ahead.

3   BY MS. CESARANO:

4       Q.   That was one of the things that he did

5   discuss with you that you haven't mentioned,

6   correct?

7           MR. BURTON:  Object to form.

8           THE WITNESS:  I did mention it.

9   BY MS. CESARANO:

10      Q.   Maybe I didn't understand it.

11      A.   I was trying to explain that to you about

12  Johnny Travalo when you were asking about my

13  witnesses.

14      Q.   But back to the conversation with Terry

15  Gillespie --

16      A.   Right.  No, I didn't mention that.  I

17  didn't remember that.

18      Q.   When he talked to you, what did he tell

19  you about that?

20      A.   He asked me what the procedure was for

21  activating markdowns.

22      Q.   What did you tell him?

23      A.   I explained -- yes, you did ask me this

24  question.  I explained that they get marked -- the

25  activation comes from home office, and then we

1    activate it at the store.  However, our percent

2    number at the store was much higher than everybody

3    else.  I explained that it was that way for a time

4    before I came to the building.  However, I

5    discovered that -- I don't know her name.  I can't

6    remember her name.  She works for Diane.  She was

7    one of Diane's Vas's employees.

8        Q.   Not Donna Kyle?

9        A.   No.  But Donna Kyle was responsible for

10   her.  That's her title.  But at the time, Donna Kyle

11   was not there.  It was Sandy Grisbeth that was there

12   when this was discovered.  I found a bag of markdown

13   tickets in a file cabinet.  I brought it to Sandy's

14   attention and I told her that -- which I was

15   explaining to Mr. Gillespie -- I think this is what

16   they were doing.  They've been activating the

17   markdowns and running the tapes, and we were not

18   aware of it.  I asked her to look into it.  Come to

19   find out, that's what they had been doing in that

20   store prior to me.

21       Q.   Now, again, this is what I'm asking:

22   Terry Gillespie told you that the supervisor of the

23   pricing team was printing new tickets and placing

24   them in the bag?  Did he tell you that?

25       A.   He had made that statement.  And I

1    corrected him and said no, that was the not the

2    case; that I had found the bag in the office, and I

3    brought it to Sandy Grisbeth's attention and told

4    her to look into it.  I said I think this is why

5    we're having problems with the markdowns.

6       Q.    Did you instruct the supervisor of the

7    pricing team to print out the tickets and put them

8    in the bags so the price changes would not show up

9    late?

10      A.    No.  I also said no to that question.

11      Q.    You would agree that what was being done

12   was not a proper procedure?

13      A.    That was not a proper procedure.

14      Q.    What was the end result of this improper

15   procedure?  Why was it not okay?

16      A.    Well, I never had a chance to follow up on

17   that because Sandy Grisbeth came to the store in

18   January, and I would say maybe a week after that

19   conversation or maybe days, I was being investigated

20   that following week.  So I never had a chance to

21   really follow up to find out what was being done to

22   correct that.

23      Q.    Do you know how long that had been done at

24   your store before it was brought to your attention?

25      A.    No.

1        Q.    But it's fair to say it was being done for

2    several months?

3        A.    Again, this is just hearsay, and I was

4    told by Diane Vas that this was being done prior to

5    me coming to the store when Joe Toscano was in

6    charge of the building.

7        Q.    Is it your duty as store team leader to

8    investigate how these pricing changes are being done

9    by the store?

10            MR. BURTON:    Object to the form of the

11        question.    Point in time.

12            THE WITNESS:    Just ask it a different way.

13    BY MS. CESARANO:

14        Q.    As long as you understand the question, it

15    doesn't matter if it's objected to.    My question is:

16    As store team leader, isn't it part of your job to

17    make sure that these pricing changes are being done

18    properly?

19        A.    I rely on the logistics team, my assistant

20    who is in charge of the area, to let me know if

21    there are problems with that.    And if there are,

22    they, yes, we would look into them together to fix

23    the problem if there was one.    She would know, in

24    this particular case it was a she, would know --

25        Q.    Who was that?

1      A.    Sandy Grisbeth would know quicker; and

2    Donna Kyle, who was the previous assistant to me,

3    would know quicker if there was a problem with that

4    than I would.

5      Q.    You did not instruct anybody to do it this

6    way?

7      A.    No, I did not.

8          MR. BURTON:  For the record, he already

9        explained this, but I think you were -- you had

10      seen it in there and didn't know that that

11      applied to that question.

12  BY MS. CESARANO:

13      Q.    And then, I think, I want to make sure,

14    this is something we had in through Terry Gillespie,

15    but since it's your personnel file, I don't want the

16    medical one mixed up with the regular.

17      A.    Okay.

18          MR. BURTON:  I don't think I put the

19        medical in to Terry Gillespie. My best

20      understanding is I didn't show him anything

21      related to the medical file. I had the

22      documents, but I didn't ask they would be

23      identified because I would hope that Terry

24      wouldn't be rummaging through his medical file.

25      Although, you never know.

1        MS. CESARANO:  We agree these are all the

2    new documents we gave you.

3        MR. BURTON:  The new documents you gave

4    me, I looked at them completely and there are

5    very few.  I can read them out --

6        MS. CESARANO:  Should I go ahead and ask

7    him or save them for when I do get the

8    documents?

9        MR. BURTON:  Ask him right now.

10       MS. CESARANO:  As long as you don't

11   object.

12       MR. BURTON:  There's absolutely nothing in

13   there that is useful to me or to you.

14   (Informal discussion off the record.)

15       MR. BURTON:  For the record -- go ahead,

16   put them on the record because I'm going to

17   object right now.  For one thing, you stamped

18   each of these documents as confidential,

19   including the cover documents.

20       MS. CESARANO:  I told you we can delve

21   into that.

22       MR. BURTON:  Why don't you take it off

23   while we're doing it?

24       MS. CESARANO:  No.  Go ahead and object.

25   Did you get his objection?

1          MR. BURTON:  Do you wish to remove the

2      confidentiality position on any of these

3      documents before I file a motion with the

4      court?

5          MS. CESARANO:  I'm going to review them,

6      but I think that, for example, their policy and

7      procedural manual is definitely confidential.

8      That's something the store publishes internally

9      and would not want their competitors to have.

10          MR. BURTON:  You're suggesting the Target

11      Executive Team Member Handbook would be falling

12      into the nature of a competitor advantage to

13      the level requiring confidentiality, and not

14      otherwise available?

15          MS. CESARANO:  If you'd listen, Mr.

16      Burton, what I specifically said is the policy

17      and procedure manual which is Number 8 and

18      Number 10, those are internal and not public

19      and not published for executives.

20          MR. BURTON:  Not published and

21      confidential in the nature of client --

22          MS. CESARANO:  I would suggest they are,

23      yes.  8 and 10 fall into the category of

24      confidential.

25          MR. BURTON:  So 7 and 9 are not.

1          MS. CESARANO:  7 and 9 I have -- 7 and

2     9 -- let me ask --

3          MR. GILLESPIE:  I want those to be

4     confidential.

5          MS. CESARANO:  Let me finish because I

6     want to say my statement on the record.  Also 9

7     we say is confidential; 7 I say is not

8     confidential.

9          MR. GILLESPIE:  We pass that out.

10          MS. CESARANO:  Not 7.  I'm happy to take

11     the confidential stamp off of 7.  Again, I

12     don't want --

13          MR. BURTON:  -- obverse which is a reprint

14     of the EEOC law.

15          MS. CESARANO:  But it's not the poster

16     that's confidential; it's the policy.

17          MR. BURTON:  Requiring the poster to be

18     put on in accordance with government

19     regulation?

20          MS. CESARANO:  The poster is incorporated

21     as one line of this policy.

22          MR. BURTON:  I hear you, and I'm not

23     responding now.  We'll do it later.  Please

24     proceed.

25          MS. CESARANO:  I do agree that the poster

1           itself which is a government poster is not

2           confidential.  It's just attached to a

3           confidential policy which is Number 8.

4                MR. BURTON:  The nondiscrimination policy

5           which is required by federal law to be filed by

6           each statement you're claiming is.  That's

7           fine.

8                MS. CESARANO:  No, I'm not.

9                MR. BURTON:  You'd better look at what the

10          policy says.

11               MS. CESARANO:  I'll stand on what I said.

12     BY MS. CESARANO:

13          Q.   Number 7.  You want to take a quick look

14     at Number 7 which is -- I'll get these in order.

15     This is Number 7.  This is the first one.

16               This purports to be Target's diversity

17     policy.  Take a look through it.  Now, it's -- this

18     is a Xerox copy so the original looks more --

19               MR. BURTON:  Just ask the question.

20     BY MS. CESARANO:

21          Q.   Have you seen that Target diversity policy

22     before at some point?

23          A.   No.  What I remember --

24               MR. BURTON:  Just answer the question.

25     BY MS. CESARANO:

 1          Q.    Would you like to add something?

 2               MR. BURTON:  No.  Next question.

 3               MS. CESARANO:  Come on.  That's

 4          ridiculous.

 5               MR. BURTON:  I would like to finish.

 6               MS. CESARANO:  Right.  But, obviously, he

 7          has something to say.

 8               MR. BURTON:  No, he doesn't.  Next

 9          question.

10               THE WITNESS:  Go on.

11     BY MS. CESARANO:

12          Q.    Isn't it true that that is the poster that

13     you have seen at job fairs for recruiting purposes?

14          A.    No.  This is the first time seeing this.

15               MR. BURTON:  Fine.  Answered.  Next

16          question.

17     BY MS. CESARANO:

18          Q.    Have you seen a prior diversity brochure

19     or handout?

20          A.    Not a brochure, but I saw a poster.

21          Q.    Where did you see the poster?

22          A.    I saw the poster in a meeting.

23          Q.    What meeting?

24          A.    A diversity meeting.

25          Q.    When was that diversity meeting?

```
 1        A.    As I explained to you, I think it was the
 2   time I was going down there with Mark Hastings.
 3        Q.    The Viper car incident?
 4        A.    Yes.
 5        Q.    Have you attended more than one diversity
 6   meeting?
 7        A.    Yes.
 8        Q.    How many?
 9        A.    Two, that I can remember.
10        Q.    When was the other one?
11        A.    I don't remember off the top of my head.
12        Q.    How many months apart from the one you
13   already described was it?
14        A.    I couldn't tell you.  I'll try and --
15              MR. BURTON:  Don't guess.
16   BY MS. CESARANO:
17        Q.    At these diversity meetings, diversity
18   information was passed out?
19        A.    Yes.
20        Q.    Written diversity information?
21        A.    Yes.
22        Q.    But you haven't seen this particular
23   diversity policy?
24        A.    No.
25        Q.    Have you seen ones similar to it?
```

1              MR. BURTON:  Objection.  Form of the

2         question.  Come on.

3    BY MS. CESARANO:

4         Q.   Yes or no?

5         A.   No.  Not similar to this one.

6         Q.   I'd like you to look at Number 8.  It

7    purports to be from a policy and procedure manual.

8    Are you familiar with Target's policy and procedure

9    manual?  In general.

10        A.   In general, yes; I know we have one.

11        Q.   Is the policy and procedural manual

12   available to store team leaders?

13        A.   Yes, it is.

14        Q.   Is it maintained at the store?

15        A.   Yes, it is.

16        Q.   This states it was effective August 18,

17   1996.  Now, I understand you didn't memorize every

18   single policy of the store, but are you familiar

19   with this particular policy on equal employment

20   opportunity?

21        A.   I've never read this until now.

22        Q.   Are you familiar that it's part of the

23   policy and procedural manual?

24        A.   No.  I wasn't aware of it until now.  I

25   wasn't aware it was in the policy and procedural

1  manual.

2      Q.  How long is the policy and procedure

3  manual?  Approximately how many pages?

4      A.  Goodness.  There's -- I don't know how

5  many.  There's a lot in there.

6      Q.  So there's a lot in there that you

7  wouldn't necessarily remember every page, correct?

8      A.  Correct.

9      Q.  But as a store team leader, you were

10  responsible for enforcing the policy and procedural

11  manual, correct?

12      A.  Yes.  Enforcing policy.

13      Q.  And that policy of Target's was found in

14  the policy and procedural manual to look it up?

15          MR. BURTON:  Objection.  You're asking him

16      to speculate.

17          MS. CESARANO:  Fine.  You've objected.

18  BY MS. CESARANO:

19      Q.  Isn't it true that the policies of Target

20  to the extent they exist were found in the policy

21  and procedural manual?

22      A.  In reference to what particular policy?

23      Q.  Anything.  A policy and procedure on --

24      A.  The manual is always there.  If an

25  occurrence happens where we need to look it up, I

1    myself or TRL generally would go look it up in the

2    policy and procedure book.  If we weren't sure, we

3    would then call Terry Gillespie and ask, if it

4    sounded like a gray area.

5        Q.    But you would agree that having equal

6    employment policy -- you knew Target had an equal

7    employment policy?

8        A.    I answered that.  No, I did not see this

9    policy until today.

10        Q.    Not this particular policy, not this in

11    writing verbatim, but were you aware of the fact

12    that it was Target's policy to employ people using

13    equal opportunity?

14        A.    Yes.  They make that statement on the

15    bottom of their brochures.

16        Q.    They also make it in their applications

17    and other documents?

18        A.    It says equal opportunity, yes.

19        Q.    Exhibit 9 with the people on the cover,

20    this purports to be Target's Executive Team Member

21    Handbook.  Why don't you take a look through that.

22            My question will be:  Have you seen this

23    document before your course of employment with

24    Target?

25        A.    Not in this format, no.

1      Q.   This is a Xerox copy, again.  So you have

2   seen this in booklet form?

3      A.   There's a booklet that was out -- this

4   looks like an updated version of the booklet.

5      Q.   Let me get the original because --

6           MR. BURTON:  Is there any particular

7      reason we're going over this?  You have his

8      signature on it, fine.  It appears they had you

9      sign for it.  There may or may not be --

10          MS. CESARANO:  That's a nice argument.

11          MR. BURTON:  Why are we wasting our time?

12          MS. CESARANO:  Because I want them

13      identified for the record.

14          MR. BURTON:  Terry can put them in.  The

15      man said he hasn't seen this one before.

16          MS. CESARANO:  No, he didn't.  He said it

17      comes in a booklet.

18          MR. BURTON:  And he said it doesn't look

19      like this is the one.  It was an updated

20      version.  I can have it read back.

21          MS. CESARANO:  I'm entitled to ask him

22      more questions.

23          MR. BURTON:  You're entitled to spend as

24      much time and paper as you can, but that has

25      nothing to do with his answer which is I don't

```
 1          recall seeing it.  Since you can't find it, do
 2          you want to go to the next question?
 3               MS. CESARANO:  No.  I'm going to go get
 4          it.
 5               MR. BURTON:  I'm sure you are.  God forbid
 6          you do something helpful.  The reason I say
 7          that is because it's about to be rush hour and
 8          your client is going to Orlando, and I hope
 9          that you don't interfere with his traffic or my
10          client going back to Boca.
11               (Informal discussion off the record.)
12     BY MS. CESARANO:
13          Q.   While off the record, I went to get the
14     original of Exhibit 9 which is the Executive Team
15     Member Handbook instead of the Xerox copy.  I'm
16     going to show you the original of the booklet marked
17     Exhibit 9.  If you'll look through that booklet for
18     me.  Have you seen Exhibit 9 before?
19          A.   I can't remember, but I do remember this,
20     this being the last -- the acknowledgement page.
21          Q.   Did you sign the acknowledgement page?
22          A.   When I was hired, this paper was given to
23     me within all the hiring forms I had to sign, and I
24     signed it.
25          Q.   Okay.  And, in fact, if you recall, when
```

1    you were hired in '94, you signed a booklet which

2    you just testified to?

3        A.    No.   I said they gave me --

4        Q.    The form.

5        A.    The form was given to me with other forms

6    to sign, and I signed it.

7        Q.    Right.   At the time, was there an

8    Executive Team Member Handbook in place?   The

9    time -- originally, when you were first hired.

10   Obviously, you signed a form saying you received it

11   so was there one?

12       A.    I don't know because they gave me the

13   paper with all the other papers to sign.

14       Q.    You see that's a tear-out page.

15       A.    Right.   That was given to me.

16       Q.    So you signed for the Team Member

17   Handbook, correct?

18       A.    I signed for the Team Member Handbook.

19       Q.    At the store, was there this little

20   colored booklet?

21       A.    Yes.   There are booklets at the store to

22   hand out to team members.

23       Q.    You're familiar with the booklet, correct?

24       A.    Yes.

25       Q.    It was available at the store?

1        A.   Yes.  It's available at all stores.

2        Q.   It was part of your job as store team

3  leader to follow the policies set forth in the

4  Executive Team Member Handbook?

5        A.   Yes.  And part of the staff, yes.

6        Q.   I'm going to keep the Xerox copy in

7  evidence.  Again, just going back because I'm asking

8  you to identify things which you might not recognize

9  in Xerox form.  I just want to make sure.  I'm going

10  to Number 7.  I'm going to show you the original of

11  Number 7.  See if that looks familiar.  It may or

12  may not.

13        A.   Right now I don't remember this one.

14        MR. BURTON:  No further questions until

15    she puts paper in.  Let's wait for a second.

16  BY MS. CESARANO:

17        Q.   Then Number 10, I want to ask you about

18  Number 10.  It should be in your pile.  It's just

19  a -- Number 10.  Again, this purports to be a policy

20  on counselling corrective action termination from

21  the policy and procedure manual.

22        Are you familiar with that policy and

23  procedure?

24        A.   We have a -- there's a policy in place for

25  corrective action, yes.

1      Q.    And it shows the effective date was

2    6/1/96.  So is this the policy that was in place on

3    or around that date?

4          MR. BURTON:  Object to the form.

5          THE WITNESS:  I don't know about that.

6      This is saying page 5 of 15, and this is page 6

7      of 15 so . . .

8    BY MS. CESARANO:

9      Q.    Right.  Again, to avoid putting an entire

10   policy and procedure manual, I'm just showing you an

11   excerpt to do with this subject which is counselling

12   corrective action and termination.  I'm just asking

13   if you're familiar with this policy.  Read it.  Read

14   it.

15     A.    No.  I have not read this one.

16     Q.    But you wouldn't disagree it's part of the

17   policy --

18          MR. BURTON:  Object to the form of the

19     question.  Improper predicate.

20          MS. CESARANO:  I haven't even asked the

21     question.

22          MR. BURTON:  Well, you can't ask a

23     question that starts with, "You wouldn't

24     disagree" . . .

25          MS. CESARANO:  I sure can ask that.

1           MR. BURTON:  I'll instruct him not to

2      answer and make it quicker.  Certify it.  Next

3      question.

4           MS. CESARANO:  Certify my two-word

5      question that I didn't finish?

6           MR. BURTON:  You got it.  Ask a question

7      that he knows the answer to and doesn't have to

8      speculate on, please.  Just don't kill time.

9   BY MS. CESARANO:

10       Q.   Mr. Harris, was there a policy and

11   procedure manual --

12            MR. BURTON:  He said there wasn't.  We

13       stipulate.

14   BY MS. CESARANO:

15       Q.   -- the entire time you were working there?

16       A.   There's always been a policy and procedure

17   manual at each store.

18       Q.   And did each of the policy procedure

19   manuals contain a policy covering corrective action

20   and terminations?

21       A.   I couldn't tell you that, but I have used

22   the book on occasion for counselling, yes.

23       Q.   And, in fact, you said you terminated

24   somebody, correct?

25       A.   That's correct.

1      Q.    When you terminated someone, did the

2   person that you talked about or disciplined that was

3   employed under you, did you make every effort to

4   follow the Target policy and procedure?

5      A.    That particular termination was done

6   through Don Fankhouser, but I didn't read his notes.

7   I was just told to terminate.

8      Q.    That's not the question.  When you

9   yourself were responsible for disciplining or

10   terminating anybody, did you attempt to follow

11   Target's policies and procedures on that subject?

12      A.    Yes.

13      Q.    Now, you attended Mr. Gillespie's

14   deposition, correct?

15      A.    Yes, I did.

16      Q.    And a copy of your personnel file was

17   entered during that deposition, correct?  Did you

18   have a chance to look through it after that?

19      A.    No.

20      Q.    You didn't review it?  I thought I would

21   save some time.

22      A.    I don't -- didn't know I was supposed to

23   review it.

24           MR. BURTON:  You're not supposed to.  Just

25      let her ask the next question that may have

```
 1        some relevance to this particular proceeding.

 2             MS. CESARANO:  His personnel file, I think

 3        most employees would think would be relevant to

 4        their employment.

 5             MR. BURTON:  That doesn't mean that it's

 6        relevant to anything you've said so please ask

 7        your next question while we're here.

 8   BY MS. CESARANO:

 9        Q.   I'll just wait and ask it when we go back

10   on documents then so we don't waste a lot of time.

11             MR. BURTON:  Are you done asking

12        questions?

13             MS. CESARANO:  I'll save it for the

14        documents, when we do the rest of the

15        documents.

16             MR. BURTON:  There are no further -- do

17        you have any further questions today?

18             MS. CESARANO:  I have more further

19        questions that are not document related.  So

20        I'll save those --

21             MR. BURTON:  No.  We're not coming back.

22             MS. CESARANO:  Of course we are.

23             MR. BURTON:  We're at five and a half

24        hours.

25             MS. CESARANO:  I have time left on this.
```

```
 1            MR. BURTON:  So please continue.
 2    BY MS. CESARANO:
 3        Q.   Have you filed any other complaints
 4    against any other employer or anyone else?
 5        A.   No.
 6        Q.   No civil actions?
 7        A.   No.
 8        Q.   Have you ever been a witness in any civil
 9    case?
10            MR. BURTON:  You've asked him that
11        already.
12            THE WITNESS:  No.
13            MS. CESARANO:  I have not asked him any of
14        these questions.  I asked him if he was
15        deposed.  That's the only question I asked him.
16        You're wrong, Mr. Burton.
17            I'm not going to rush through this just
18        because you're anxious to leave.  I get my
19        hours and I'm going to ask my questions.
20            MR. BURTON:  Ma'am, I don't expect you to
21        do anything less.  Please don't over talk me.
22        She can't get both of us.
23            MS. CESARANO:  I think she got what I
24        said.
25    BY MS. CESARANO:
```

1   Q. Have you ever been a witness in any case?

2   A. No.

3   Q. Have you ever gone to the EEOC or any

4 similar government investigatory agency with a

5 claim?

6   A. No, I have not.

7   Q. Have you ever sent a demand letter to any

8 of your prior employers stating that there was a

9 discrimination or that you had any employment claim?

10   A. No, I have not.

11   Q. Have you ever been sued yourself as a

12 defendant?

13   A. No.

14   Q. Mr. Harris, have you ever been disciplined

15 prior to your termination?

16   A. No.

17   Q. And, of course, I'm going to skip the

18 whole sexual harassment. Any other incidents come

19 to your attention?

20   A. No.

21   Q. Has any Target manager ever come to you

22 with an oral complaint of any kind prior to your

23 termination?

24   MR. BURTON: Asked and answered.

25 BY MS. CESARANO:

H. Allen Benowitz & Associates, A Veritext Company
(305) 373-9997

1          Q.    Any of the stores come to you with an oral

2      complaint about job performance or other issues?

3          A.    No.   I haven't had anything like that.

4      Nothing that would go on corrective action, just

5      items like make sure you get your team to fix this,

6      did you get this planagram done.

7          Q.    But nothing had to do with a question

8      involving honesty?   Wasn't there a prior

9      disciplinary notice about that?

10         A.    Refresh my memory.   I don't know anything

11     about that.

12         Q.    I thought there was.

13               MS. CESARANO:   Terry, I'm going to put you

14          to it so we save whatever time we can.

15               MR. BURTON:   The only one you're

16          inconveniencing is Terry Gillespie.

17               MS. CESARANO:   He's not the one

18          complaining.

19               MR. BURTON:   I'm complaining because I

20          don't wish you to put anyone through rush hour,

21          including the court reporter.

22               MS. CESARANO:   I'm glad you're so

23          altruistic.

24               MR. BURTON:   I always have been.

25               MS. CESARANO:   That's not the rumor.

```
 1              MR. BURTON:  Ma'am, I wouldn't do this to
 2        any court reporter of mine.
 3              MS. CESARANO:  I don't think getting out
 4        at 4:30 is particularly --
 5              MR. BURTON:  If we get out at 4:30.  It's
 6        now 4:30.
 7              MS. CESARANO:  You're wasting my time.
 8        I'm trying to read.
 9   BY MS. CESARANO:
10        Q.   I'd like to show you another document and
11   mark it for identification as 11.
12           (The document referred to was thereupon marked
13           Defendant's Exhibit No. 11 for Identification,
14           a copy of which is attached hereto.)
15              MR. BURTON:  For the record, this does not
16        appear to have any type of stamp of Target.  It
17        appears to be dated 2/23/99, and unless you can
18        demonstrate that I've seen this before --
19              MS. CESARANO:  It's attached to the
20        position statement.
21              MR. BURTON:  If it is, that's fine.  If
22        you're making that representation --
23              MS. CESARANO:  Yes.
24   BY MS. CESARANO:
25        Q.   Mr. Harris, have you seen this document
```

1    before?

2         A.    I haven't seen this particular document,

3    but I've seen forms like this.

4         Q.    Have you seen over-and-short reports?

5         A.    Yes.

6         Q.    What does an over and short report mean?

7         A.    That's letting the supervisor up front

8    know if she had any problems prior to the day before

9    so she can go look into them to reconcile them.

10        Q.    Have you seen this at any time prior to

11   your termination, this particular over and short

12   report?

13        A.    Yes.  Shannon Tetrault would bring -- it

14   would have to be brought to my attention.  She would

15   bring it to my attention and show me.

16             MR. BURTON:  Not this one.

17             THE WITNESS:  This one.

18   BY MS. CESARANO:

19        Q.    There's some writing on it.  It says

20   voucher for Steve waiting for receipt.  Do you know

21   whose writing that is?

22        A.    No, I don't.

23        Q.    This has to do with the $300 business, but

24   you never -- you never had this brought to your

25   attention, correct?

1        A.    No.

2              MS. CESARANO:    One more document and

3        attachment which I think you got.

4        (The document referred to was thereupon marked

5        Defendant's Exhibit No. 12 for Identification,

6        a copy of which is attached hereto.)

7    BY MS. CESARANO:

8        Q.    Mr. Harris, I would like to show you

9    what's been marked as Exhibit 12, and it purports to

10   be having to do with your credit card.    Is that your

11   employer ID number 9612813 in the left-hand corner?

12       A.    Yes.

13       Q.    Do you recognize this as a list of some of

14   your charges on your credit card for Target?

15       A.    I'm going to say yes.

16       Q.    This report is dated 2/23/99 so,

17   obviously, these would be prior to that date.    Now,

18   were only charges on this particular credit card

19   business related?

20       A.    No.

21       Q.    Some were personal?

22       A.    Yes.

23       Q.    Now, did Terry Gillespie tell you that the

24   charges that were personal were not ones you should

25   have used the credit card for?

1            MR. BURTON:  Objection.  This has been

2        going on into great length.  He can try to

3        answer it again.  I know you're trying to kill

4        time, but go ahead.

5            THE WITNESS:  He told me that at the

6        meeting as they were investigating me.

7        (The document referred to was thereupon marked

8        Defendant's Exhibit No. 13 for Identification,

9        a copy of which is attached hereto.)

10           MS. CESARANO:  This is another document

11       attached to the position statement.

12   BY MS. CESARANO:

13       Q.   Mr. Harris, I'm handing you what's been

14   marked as Exhibit 13 purported to be the receipt for

15   beach towels.  Have you seen that before, that

16   document?

17       A.   Yes.  Terry Gillespie showed it to me.

18       Q.   Was that during one of the different

19   interviews you mentioned in your deposition?

20       A.   Yes.

21       Q.   Surrounding your termination?

22       A.   Yes.

23       Q.   Now, did Mr. Gillespie tell you that the

24   beach towel should have indicated the clearance

25   price?

1          A.    No.   He asked -- as a matter of fact --

2          Q.    Tell me --

3          A.    He asked if I purchased it at this price

4    and I said yes.

5          Q.    There's a circle on the number 9612813.

6    Is that your Target discount number?

7          A.    Yes, it is.

8          Q.    Your Target discount number was used even

9    though another employee made the purchase; is that

10   correct?

11         A.    Yes.

12         Q.    And there's another item circled, if you

13   could explain it to me, down below.  The 1/26/99.

14   Was that the date of the purchase?

15         A.    I'm going to say yes.  I'm not sure here.

16   What am I looking at?

17         Q.    Do your receipts normally have on them the

18   date of the purchase?

19         A.    Yeah.  1/2/99.  Yes.

20              MR. BURTON:  Original sales 1/2/99.  If

21         you look at the line below.

22   BY MS. CESARANO:

23         Q.    I also see the date 1/26/99 on there.

24         A.    I see 1/26/99.

25         Q.    And you say you see two dates?

1          A.    I see two dates, yes.

2          Q.    Tell me why it would have two dates.  The

3     original sale meaning what exactly?

4          A.    I don't know because this was taken off of

5     a -- this looks like it was taken off of a read.  In

6     other words, they took the receipt from the register

7     and made a photocopy of my purchase.  So this could

8     have been the next customer in line that made this

9     purchase.

10          Q.    Are you saying that you didn't purchase

11     the beach towels?

12          MR. BURTON:  Objection.  Form of the

13          question.

14          THE WITNESS:  No.  I purchased the beach

15          towels.  I didn't purchase the radio -- the

16          little car.

17     BY MS. CESARANO:

18          Q.    All right.  But Terry showed you this

19     receipt, correct, at the time of the investigation?

20          A.    Yes, he did.

21          Q.    What did he say about it?

22          MR. BURTON:  Asked and answered.

23          THE WITNESS:  He asked me if this was a

24          receipt, and if I had purchased the towels, and

25          I said yes.  He asked me -- and I don't think

1          Terry asked me -- excuse me, Mr. Gillespie

2          asked me that.  I think Doug Barth did.  "Is

3          that line a discount number?"  And I said,

4          "Yes."

5     BY MS. CESARANO:

6          Q.   Again, they told you in an interview

7     another employee shouldn't have used your discount

8     number?

9          A.   No.  In this case, I had purchased the

10    towels, and -- I have to scratch that.  I did not

11    purchase the radio -- the vehicle, the little car,

12    RTV car.

13         Q.   I understand.  He did show you this and

14    ask you questions about it at the time of the

15    investigation?

16         A.   Yes.

17         Q.   What did you tell him about the receipt

18    itself?  Anything?

19         A.   I said that that was my Target discount;

20    and, yes, I did purchase the towels and that was

21    after I explained the towel mark-up.

22              MS. CESARANO:  Okay.  Since Mr. Burton is

23         so anxious to leave, we'll end the deposition

24         subject to my right to ask him about a lot of

25         documents that I have not seen yet.

Page 239

1          MR. BURTON:  We do not concur, and there

2     aren't a lot of documents you haven't seen.

3     Have a good day.  Let's go.

4          (Thereupon, the taking of the deposition was

5     concluded.)

6

7                    _____

                     Deponent

8

9          Sworn to and subscribed before me this

10    ___ day of _____ 200_.

11

12                    _____

                     Notary Public

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 240

1                    CERTIFICATE OF OATH

2       STATE OF FLORIDA
        COUNTY OF DADE

3
                I, the undersigned authority, certify that
4       Steve Harris personally appeared before me and was
        duly sworn.

5
                WITNESS my hand and official seal this 5th
6       day of June, 2000.

7

8       _____
        Joanne DeVito
9       Notary Public - State of Florida
        My Commission No. CC-832663
10      Expires:  July 23, 2003

11

12              REPORTER'S DEPOSITION CERTIFICATE

13      STATE OF FLORIDA
        COUNTY OF DADE

14
                I, JOANNE DEVITO, a Shorthand Reporter,
15      certify that I was authorized to and did
        stenographically report the deposition of Steve
16      Harris; that a review of the transcript was
        requested; and that the transcript is a true and
17      complete record of my stenographic notes.

18              I further certify that I am not a
        relative, employee, attorney, or counsel of any of
19      the parties, nor am I a relative or employee of any
        of the parties' attorney or counsel connected with
20      the action, nor am I financially interested in the
        action.

21
                DATED this 5th day of June, 2000.

22

23      _____

24      Joanne DeVito
        Shorthand Reporter

25

H. Allen Benowitz & Associates, A Veritext Company
(305) 373-9997

1    CORRECTIONS TO THE DEPOSITION OF

2    STEVE HARRIS

3

     LINE    READS       SHOULD READ      REASON FOR CHANGE
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23                        _____
                          (signature of witness)

24        Sworn to and subscribed before me this ____ day

25    of _____, 199_.    _____

# FAX TRANSMISSION

First Union National Bank of North Carolina
Charlotte CRC-Retail
1525 West W T Harris Blvd.
Charlotte, NC 28262
Fax#: 590-3418

To: _Steven Harris_ Date: _2-25-99_

Fax#: _561-218-3211_ Pages: _2_, including this cover sheet

From: _Sharon Cook_

Subject: _____

COMMENTS:
_The interim statement did not show_
_check #__ but I did note on this_
_fax to Jerry that it was returned_
_cause of bank error._



Customer Direct Access Division
Charlotte, North Carolina 28262-8533

February 25, 1999

**FIRST UNION**®

Steven L Harris
18303 Clearbrook Circle
Boca Raton, FL 33498

RE: 1090013000019

Dear Steven L Harris:

Please accept our apologies for the inconvenience you recently experienced
when calling First Union Direct.

We strive to provide our customers with accurate transactional information. We
would like the opportunity to regain your confidence in First Union Direct by
asking that you utilize our 800 service for your future banking needs.

We sincerely appreciate your business and are committed to providing you with
quality customer service. Our Personal Service Representatives are available
24 hours a day, seven days a week at 800-359-3862 to assist you with almost
any transaction performed in the Financial Center.

First Union Direct

CHB2 C111675



# ⊙ TARGET
## EXEMPT JOB DESCRIPTION

**Date:** July 22, 1998                                                                 **Page:** 1

| | |
|---|---|
| **Job Title:** Store Team Leader | **Position Code:** |
| **Pyramid:** Stores | **Department:** Stores |
| **Pyramid/Dept. Approval:** *Martyn Bickel* | **Date:** 7/27/98 |

### PRIMARY FUNCTION

Effectively executes the highest level of authority and leadership within the store. Directs the merchandising, operation and personnel functions of the store toward attaining maximum profit, sales, return on investment, productivity, market share, guest goodwill, and team member satisfaction. Assumes Leader On Duty responsibilities on a rotating basis.

### PRINCIPAL DUTIES AND RESPONSIBILITIES

1. Guest Service -Ensures guest service is number one priority within the store. Leads by example. Personally takes action to satisfy guests. Empowers team members to resolve problems and handle guest concerns and requests.

2. Team Relations - Works closely with all ETL's and ETL-TR to plan work force needs. Ensures implementation of wage guidelines, performance evaluation, promotions, disciplinary action, and terminations. Continually strives for high level of team member morale, communication, and mutual respect, maintaining a Fast, Fun and Friendly environment. Ensures team members receive proper training. Provides an open door for all team members to voice their concerns.

3. Sales and Profit - Runs a profitable store following company guidelines for merchandising, expense controls, pricing strategies, productivity standards and sales promotions. Uses creativity and decision making to improve and customize company directions to meet individual store needs and increase profits. Ensures merchandise is available to the guest by reviewing stocking, displaying, reordering, and inventory allocation procedures.

4. Leadership and Development - Provides positive atmosphere and environment for team members and guests. Leads and monitors work team in the direction that leads to greater achievements, service, profits and sales. Develops other members of management, focusing on long term succession personnel planning.

5. Community Relations - Supports and contributes to the community following Target guidelines. Ensures the store projects the image of being an exemplary part of the community.

6. Safety - Directs awareness of safety in the store for guests and team members. Ensures guidelines are followed for all safety measures. Works with Risk Management and APTLs to minimize store losses due to accidents or theft

Δ π EXHIBIT __1__
Deponent __Harris__
Date __6·5·00__ Rptr. __JD__
WWW.DEPOBOOK.COM

---

*This description is intended as a guide only. The listed duties may be changed at the discretion of the incumbent's supervisor.*

**EXEMPT JOB DESCRIPTION**

**Date:** July 22, 1998                                                                                 **Page:** 2

**Job Title:** Store Team Leader

7. Leader On Duty - Assumes Leader On Duty responsibilities as assigned on a rotating basis. Responds to guest and team member concerns. Opens and closes the store, securing all Target property. Performs any LOD function according to policy and procedure.

## REPORTING/WORKING RELATIONSHIPS

Reports to the District Team Leader. Close working relationship with Regional staff, District staff, Assets Protection, and community leaders. Supervises Exec ETLs and Team Relations Leader.

## JOB REQUIREMENTS

### MINIMUM REQUIREMENTS:
- College degree or equivalent work experience
- Five or more years retail merchandising and operations management
- Strong interpersonal skills
- Strong organizational and administration skills
- Flexible work schedule (nights, weekends, holidays, long hours)
- Leadership skills including IP, communication and conflict management
- Strong cognitive skills, including problem analysis, decision making, financial and quantitative analysis
- Able to operate store computer and electronic systems
- Able to frequently move around all areas of the store on a daily basis
- Read labels, instructions, reports, policies and procedures

### DESIRED REQUIREMENTS:
- Target experience
- Supervisory experience
- Four year college degree

Date: 6/1/96?                                                                 Page. 12 of 12

| GROSS MISCONDUCT | TYPICAL STEPS |
|---|---|
| | T |

| | | | |
|---|---|---|---|
| 5. | **Detrimental Behavior**<br>Personal conduct which substantially impairs the team member's ability to function effectively as a Target team member by reason of its detrimental effect either on the team member's relationship with other team members or on the business or reputation of the company, whether or not it occurs on company premises**. It also includes such conduct as: | | T |
| | a. | Being convicted of, or pleading guilty or no contest to, a crime which impairs the desirability of continued employment (for example: theft, fraud, sexual assault, etc..) | T |
| | b. | Becoming a security risk. | T |
| | c. | Engaging in conduct that is a Conflict of Interest pursuant to the individual company's conflict of interest policy, including but not limited to Diverter Activity. Refer to Policy and Procedure 03-01-22 Statement of Ethics (Conflict of Interest.) | T |
| | d. | Disclosing confidential or proprietary information without specific authorization. Such information includes, but is not limited to, financial records, sales information or events, confidential products or promotional lines, guest account information, vendor pricing agreement, marketing or forecasting information, team member information such as discipline, phone number, addresses and Social Security Number. | T |

Δ vt EXHIBIT 2
Deponent Harris
Date 6-5-01 Rptr. JD
WWW.DEPOBOOK.COM

scription.

U.S. Signature

**If Over Dollar Limit (District Team Leader)**

MUST BE APPROVED PRIOR TO AND HAVE BACKUP ATTACHED — Is backup attached? ☑ Yes ☐ No

each must be completed _____

| REG. HRS. | $ | Record payroll vouchers |
| O.T. HRS. | | and repayments in Payroll |
| VAC. HRS. | | Voucher Log. |
| HRS. | | |

_____ Payroll Deduction
_____ Manual Repayment
_____ Journal Entry (PR Dept)

| | $ |
| | $ |
| WH | $ |
| EWH | $ |

| GROSS | $ |
| | X | 70% |
| $ | NET | $ |

**X ONE:**

☒ PAYOUT MONEY   ☐ RECEIVE MONEY

**INSTRUCTIONS**

Paid out

Insert Cashier Team Lead Key
Cashier #, press ADMIN FUNC
Press ENTER
Payout: Key 1, Press ENTER or
money received: Key 0, Press ENTER
Amount [ ] 50000, Press ENTER
code Below, Press ENTER

| ACCT. | STORE/LOC. | EXP. CTR. | PROJECT CODE | |
|---|---|---|---|---|
| 00UC | B3B261U | | | CHARGES TO CONTROLLABLES |
| 00 | | 3 1 | | FIELD DISCRETIONARY FUNDS ARTS |
| 00 | | 3 2 | | FIELD DISCRETIONARY FUNDS SOCIAL |
| 00 | | 3 3 | | FIELD DISCRETIONARY FUNDS MISC |
| 00 | | 3 | | GOOD NEIGHBOR CONTRIBUTIONS |
| 00 | | 4 0 0 0 0 | | MISCELLANEOUS INCOME/EXPENSE |
| 3 | 0 5 0 1 | 0 0 0 0 | | REPAIR FOR RESALE |
| 0 | | 0 0 0 0 | | GUEST - MINOR CLAIM |
| 0 | | 2 6 1 0 | | PAYROLL CASH VOUCHER |

**TURN OVER AND VALIDATE BACK OF FORM**

overpayment from this voucher I authorize Target amount from a future paycheck.

Payee's Signature and Phone Number

_____ Street

**STORE COPY**



△ π EXHIBIT 3
Deponent Harris
Date 6·5·00 Rptr. JD
WWW.DEPOBOOK.COM



327089

**SHOOTERS**
ON THE INTRACOASTAL
3033 N.E. 32ND AVE.
FT. LAUDERDALE, FL 33308
(954) 566 - 2855

30660
BILL S                    Table 231
Date 01/29/99 at  6:52pm      Gst      5

| | | |
|---|---|---|
| 4 BUDWEISER | 11.12 |
| 11 FL BEER TAX #1 | 0.55 |
| 1 POTATO SKINS | 5.99 |
| 3 SHR COCKTAIL | 25.50 |
| 7 BUD LITE | 19.46 |
| 1 PRIME/SCAMPI | 15.99 |
| 3 MYSTIC CAB. SAU | 14.25 |
| 3 FL LIQ TAX #3 | 0.60 |
| c   MARGHERITA | NEG KITCH |
| 1 SODA | 1.75 |
| 1 PRIME/SCAMPI | 15.99 |
| 1 9 OZ FILET | 16.99 |

SubTotal  128.19

Taxes...     7.68

Total.  135.87
140 00
29587

NOTE:
COMPS: 7.99
******** Gratuity not included**********

*        Return this receipt for 10%       *
*        discount on your next             *
*        purchase at the boutique          *
********************************************

MINOR CLAIM
PAYROLL CASH VOUCHER
TURN OVER AND VALIDATE BACK OF FORM



DT EXHIBIT 4
Deponent   Harris

Recevie for Sale

)VAL

TLOD Signature                Second Signature

If Over Dollar Limit (District Team Leader)

R MUST BE APPROVED PRIOR TO
T AND HAVE BACKUP ATTACHED.    Is backup attached? ☑ Yes ☐ No

eason must be completed

| | |
|---|---|
| _ REG. HRS. $ | Record payroll vouchers and repayments in Payroll Voucher Log. |
| _ O.T. HRS. $ | |
| _ VAC. HRS. $ | |
| ___ HRS. $ | ___ Payroll Deduction |
| SS   $ | ___ Manual Repayment |
| | ___ Journal Entry (PR Dept) |
| WH   $ | |
| TE WH   $ | GROSS   $ |
| | X        70% |
| $ | NET /     $ |

CK ONE:
AYOUT MONEY            ☑ RECEIVE MONEY

N INSTRUCTIONS
Cashier Team Lead Key
Cashier #, press ADMIN FUNC
50, Press ENTER
payout: Key 1, Press ENTER or
oney received: Key 0, Press ENTER
Amount ☐ ☐ |2|0|5|0|0| , Press ENTER
P.O. # Below, Press ENTER

| ACCT. | STORE/LOC. | EXP. CTR. | PROJECT CODE | |
|---|---|---|---|---|
| | | | | CHARGES TO CONTROLLABLES |
| 0 0 0 | | | 3 1 | FIELD DISCRETIONARY FUNDS ARTS |
| 0 0 0 | | | 3 2 | FIELD DISCRETIONARY FUNDS SOCIAL |
| 0 0 0 | | | 3 3 | FIELD DISCRETIONARY FUNDS MISC. |
| 0 0 0 | | | 3 7 0 | GOOD NEIGHBOR CONTRIBUTIONS |
| 0 0 0 | | | 4 0 0 0 0 | MISCELLANEOUS INCOME/EXPENSE |
| 0 3 0 5 0 1 0 0 0 0 | | | | REPAIR FOR RESALE |
| 0 0 0 | | 0 0 0 0 | | GUEST - MINOR CLAIM |
| 0 0 0 | | 2 6 1 0 | | PAYROLL CASH VOUCHER |
| TOTAL | | TURN OVER AND VALIDATE BACK OF FORM | | |

an overpayment from this voucher I authorize Target
amount from a future paycheck.

Payee's Signature and Phone Number

Street

STORE COPY



π EXHIBIT 5
Deponent Harris
Date 5-00  Rptr. JD
WWW.DEPOBOOK.COM

# TARGET EMPLOYEE STATUS AND CHANGE NOTICE

INSTRUCTIONS: DO NOT WRITE IN SHADED AREAS.

DATE ENTERED

NETWORK ENTRY REFERENCE NO.

SOCIAL SECURITY NUMBER

HOME PHONE NUMBER

EMPLOYEE NUMBER    ACTION TYPE    EFFECTIVE DATE    LAST NAME    FIRST NAME

STREET ADDRESS OR P.O. BOX    CITY    STATE    ZIP CODE    BIRTHDATE

**FEDERAL TAX WITHHOLDING** — EXEMPT STATUS / TAX TYPE    AMOUNT

**STATE TAX WITHHOLDING** — STATE    LOCAL #    LOCAL TAX WITHHOLDING    AMOUNT

**COMPENSATION/REVIEWS** — ANNUAL RATE    HOURLY RATE    RATING    NEXT REVIEW DATE    DATE OF LAST INCREASE    AMOUNT OF LAST INCREASE

LEAVE OF ABSENCE — TYPE CODE / # DAYS

BANK DEPOSIT — BANK NUMBER    EMPLOYEE BANK ACCOUNT NUMBER

TRANSFER TO LOC    WORK CENTER    JOB CODE    POSITION NO.

PAYROLL ACCOUNT CHANGES — LOCATION    WORK CENTER

**BENEFITS** — LIFE / LTD    VAC. PLAN    MEDICAL CARR. / PLAN    DENTAL CARR. / PLAN    STD    FSA    FLEX DAYS

TARGET DATE    WORK CENTER    CORPORATE DATE

LOCATION    WORK CENTER

EMPLOYEE SIGNATURE: _Richard Hatch_

The foregoing conforms to my understanding:

PERSONNEL REPRESENTATIVE

COMMENTS: Gross-Misconduct / Detrimental Behavior Becoming a Security Risk

Terminating Resignation

RECEIVED BY: _____    DATE: 3/5/99

APPROVED BY: _____    DATE: 3/5/99

π EXHIBIT _6_
Deponent _Harris_
Date _6-5-00_ Rpt: _JD_
WWW.DEPOBOOK.COM

**TARGET** Diversity

Our Differences are Our
Strengths

TARGET/HARRIS151





CONFIDENTIAL

TARGET/HARRIS152



"Walk into any one of our stores and you wi
of backgrounds, origins, experiences and abili
strong and successful, both as a retailer and

## Our goals include:

- Increase the diversity of our team members at all levels.

- Create a climate at Target that nurtures and uses the rich array of talent and perspectives that diversity can offer.

- Coach, develop and promote people from diverse backgrounds.

- Provide objective performance feedback.

Our Diversity Task Force guide diversity efforts at Target by making recommendations about programs, policies and needs. These teams are made up of team members from different levels, ages, cultures and ethnic backgrounds.

TARGET/HARRIS153

see exactly what makes Target great: people with a wide variety
ies. It is this diversity among our team members that makes us
is a corporate citizen." Larry Gilpin, Executive Vice President of Guest, Team and Community Relations



## It's Official

Target's employment practices will
be implemented without regard
to race, color, national origin, sex
(including pregnancy), religious
beliefs, age, disability, sexual orien-
tation, citizenship status, military
status, or any other basis protected
by federal, state or local fair
employment practice laws.

## Diversity Training

Training our team members on
diversity is a high priority for Target.
Our programs build awareness and
teach people to capitalize on the
rich talents and perspectives of
their diverse teams.

"In a world where environment is constantly changing,
those teams and organizations that tap the resources
and thoughts of diverse backgrounds and cultures
will be the most successful in the future."

Darrell L. Parker
Divisional Merchandise Manager, Men's Shoes and Boots

"At Target, individuals with diverse backgrounds can
advance to their full potential without having to
overcome unfair bias from discrimination. What a
winning combination."

Susan Stephenson
Senior Vice President, Chief Information Officer, Dayton Hudson Corporation

"I can't believe over 15 years at Target have passed so
quickly. The people at Target and the creative, open
atmosphere have impressed me the most. Our diverse
opinions and talents are respected and encouraged
when decisions are made."

Lou Padilla, Senior Vice President, Merchandising Softlines

"I am always encouraged and excited when I think of our
Target team. The opportunity to learn something from
each other and the ability to celebrate together will be
the driving force of our future."

Helen Simmons, Regional Spoke Director, Southern Spoke



TARGET/HARRIS154

It's people who make Target successful.
An amazing group of individuals with a
wide range of ages, interests, beliefs and
backgrounds. At Target, "valuing diversity"
is more than a slogan, it's our mission.


⊙ TARGET

TARGET/HARRIS155

**TARGET**

Target is the largest division of the Dayton Hudson Corporation, the nation's fifth largest general merchandise retailer. To date, Target operates nearly 800 stores in 39 states with $18 billion in revenues and operating profits of over $1 billion. With approximately 65–70 new stores opening each year, Target projects a store count of nearly 1100 stores by the year 2000.

Visit us on our web site:
http://www.target.com

If you're interested in becoming part of the Target team, forward your resume to one of the regional offices below:

*For opportunities at Target Headquarters in Minneapolis:*

Target Headquarters
33 South 6th Street, CC-09M
P.O. Box 1392
Minneapolis, MN 55440-1392
Attn: Team Human Resources

*For opportunities at Target stores on the West Coast including California, Nevada, Oregon and Washington:*

Target
14750 Miller Avenue
Fontana, CA 92336
Attn: Regional Personnel

*For opportunities at Target stores in the South and Southeast including Arizona, Florida, Georgia, Louisiana, Mississippi, New Mexico, North Carolina (Charlotte area), Oklahoma, South Carolina and Texas:*

Target
555 Republic Drive-Suite 500
Plano, TX 75074
Attn: Regional Personnel

*For opportunities at Target stores in the Upper Midwest and Mountain Region including Colorado, Idaho, Illinois, Iowa, Kansas, Minnesota, Missouri, Montana, Nebraska, North Dakota, South Dakota, Utah, Wisconsin and Wyoming:*

Target
1090-73rd Avenue Northeast
Fridley, MN 55432
Attn: Regional Personnel

*For opportunities at Target stores in the Central Midwest and East Coast including Arkansas, Indiana, Kentucky, Maryland, Michigan, New Jersey, New York, North Carolina (Northern regions), Ohio, Tennessee, Virginia and Washington, D.C.:*

Target
4805 Lake Brook Drive
Glen Allen, VA 23060
Attn: Regional Personnel

*For opportunities at one of our Distribution Centers:*

Target Headquarters
33 South 6th Street, CC-09C
Distribution Centers
P.O. Box 1392
Minneapolis, MN 55440-1392
Attn: Team Human Resources

*Target is an equal opportunity employer by choice.*

F-30603

TARGET/HARRiS156

| | Subject: | Equal Employment Opportunity | | |
|---|---|---|---|---|
| **POLICY and PROCEDURE MANUAL** | Chapter: | Employment and Placement | Number: | 03-05-02 |
| | Section: | Personnel | Page: | 1 of 2 |
| | Supersedes: | 5/8/94    Issued: 8/15/96 | Effective: | 8/18/96 |

Sponsor:    Team Relations/Employee Relations

### POLICY

Target's employment practices will be implemented without regard to race, color, national origin, sex (including pregnancy), religious beliefs, age, disability, sexual orientation, citizenship status, military status or any other basis protected by federal, state or local fair employment practice laws.

### PROCEDURE

A.   All supervisory team members must read, understand, and actively support the various provisions of this policy.

B.   The federal government poster "Equal Opportunity is the Law", Exhibit 1, must be permanently displayed in areas visible to applicants and common areas frequented by all team members.

Supplies of this poster are available from the Equal Employment Opportunity Commission or can be ordered in a 5-in-1 poster (which contains other legally required posters) from Central Purchasing, item numbers P0069 (English) or P0095 (Spanish).

C.   All "help wanted" advertising (newspapers, store posters, etc.) must be consistent with our Equal Employment Opportunity policy and federal, state and local fair employment practice laws, and must include the statement "Equal Opportunity Employer" at the bottom of each advertising.

D.   Participation in special Equal Employment Opportunity programs (i.e., minority recruiting centers, minority/female campus recruiting, large advertising expenditures in minority or female publications, minority gifts in support of minority or female recruiting efforts) must be approved by the Vice President of Stores and Distribution Personnel, the Vice President of Human Resources or the Executive Vice President of Team, Guest and Community Relations.

E.   Provide reasonable accommodation to qualified applicants and team members with disabilities, provided that accommodation does not result in undue hardship to Target.

F.   Provide reasonable accommodation to an applicant or team member's sincerely held religious beliefs, provided that accommodation does not result in undue hardship to Target.

G.   Do not retaliate against an applicant or team member who files a discrimination charge with a federal, state or local Fair Employment Practice agency, participates in an investigation of such a charge or opposes an unlawful employment practice.

### EXHIBIT USED

Equal Opportunity is the Law Poster, Exhibit 1

APPROVED _____    DATE 8/15/96
Larry V. Gilpin
Executive Vice President - Team, Guest and Community Relations

**◉ TARGET**

EXHIBIT 8
Deponent Harris
Date 6-5-00 Rptr. JD
WWW.DEPOBOOK.COM



# TARGET
## *Executive*
### TEAM
### MEMBER
### HANDBOOK
◎

TARGET/HARRIS161

π EXHIBIT 9
Deponent Harris
Date 6-5-00 Rptr. JD
WWW.DEPOBOOK.COM

**Target is tremendously proud of its executive workforce. Our executives are talented, hard-working and productive leaders — the best, we believe, in the industry.**

# About This Guide

This handbook is designed to give you, as an executive, some of the tools you'll need to do your job. It has some basic information about working for Target — pay, benefits, reviews. More important, it outlines the important role executives play in our organization.

**Executives are our most important role models ; we count on every executive to "walk the talk."** We highlight here some of the ways you can make Target's vision come to life for other team members. Target has high expectations of its executives, but provides plenty of resources to meet those responsibilities.

# Target = Change

The only thing constant at Target is *change*. We have become successful by anticipating and reacting to the changing needs of our team members, business markets, guests and communities. For that reason this guide, and the topics covered in it, can change too — often more quickly than we can reprint it. **That's why we emphasize that this pamphlet is a guide, but it isn't a contract. It doesn't guarantee employment, or limit how that employment may end.**

**This guide is for Target executive team members. It supersedes any prior guides or handbook.**

## What Is Target?

Our History....................4
Our Organization..............6
Our Vision....................9

## Working at Target: The Basics

Compensation,
Recognition, Reward...........12
Reviews.......................12
Pay...........................13
Dress.........................13
Traveling.....................14
Benefits......................15
Communications................17

## Personal and Career Development

Future Growth and
Development...................22
Target's Leadership
Dimensions....................22
Business Ethics...............24
Conflict of Interest..........25
Inside Information............26
Confidentiality...............26
Insider Trading...............27
Inventions, Patents, Etc......27
Using Target's Information
Sources & Resources...........28
Vendors.......................29

## Representing Target

Dealing With The Media........32
Reference Requests............33
Community Involvement.........34
Team Member
Representatives...............35
Handbilling/Picketing.........36
Solicitation/Distribution
Policies......................37

## Your Role As A Target Executive

Equal Employment Policy.......39
Harassment....................40
Relatives.....................44
Dating Other
Team Members..................44
Off-The-Clock/Child Labor.....45
Shopping At Target............46
Drug-Free Workplace...........47
Tobacco-Free..................47
Leaving Target................48
Corrective Action.............48
Safety........................49
Shortage......................50

TARGET/HARRIS162

# What is Target?

Target is a group of upscale discount stores that deliver exceptional value to shoppers from coast to coast. That means we offer quality brand-name products, low prices and great customer service — including the best money-back guarantee around.

We're the largest division of the Dayton Hudson Corporation, which also owns and operates Mervyn's, a group of moderately-priced apparel and department stores, and Dayton's, Hudson's and Marshall Field's, which are more "traditional" department stores.

At Target, we pride ourselves on having the best service in the industry. In fact, we don't think of our customers as customers — we call them guests. And that's the way we want shoppers to feel when they enter our stores — as if they were guests in our home. The term guest also applies to the relationship we want to have with our shoppers. We want them to feel at home in our stores, and if something is wrong, we always strive to make it right. We want our guests to keep coming back again and again.

Even more than that, one of the main reasons we're so successful at Target is because we're a great team. Our success depends on every one of us, working together with everyone in every area and at every level of Target.

TARGET/HARRIS163

TARGET EXECUTIVE TEAM MEMBER HANDBOOK PAGE 3

## What is Target?

**Our History**

**Our Organization**

**Our Vision**

TARGET EXECUTIVE TEAM MEMBER HANDBOOK PAGE 2

# OUR HISTORY



We've been around for a long time now. We started as a one-store innovation by Doug Dayton, one of the founders of Dayton's Department Stores, in 1962. Since then, we have taken off like a rocket and spread like wildfire. Our Headquarters is located in Minneapolis, Minnesota. We now have more than 650 stores in 34 states — which makes us the third largest of our kind of stores. Here's a little timeline of some of the highlights of our history:

• 1962 - First Target store opens in Roseville, Minnesota.

• 1966 - Target opens two stores in Denver, Colorado.

• 1969 - First Distribution Center (DC) opens in Fridley, Minnesota: we're now 11 stores and one DC.

— Woodstock (the original one) takes place in upstate New York.

• 1971 - Target buys 16 store units from Arlan's.

•··· - Target establishes a toy safety campaign and laboratory safety testing program for merchandise.
— President Richard Nixon resigns

• 1974 - The Holiday Shopping Event for seniors and people with disabilities is held in all stores for the first time.

• 1975 - Target becomes the top revenue producer for Dayton Hudson Corporation.

• 1980 - Target buys 40 Ayr-Way stores; we're 137 stores and two DCs.
— The US Olympic Hockey Team defeats the Soviets at the Lake Placid Winter Olympics.

• 1981 - The Little Rock DC in Maumelle, AR opens in January

• 1983 - Target leases Fed-Mart stores and enters California and Arizona markets; the Los Angeles DC opens in Rancho Cucamonga, CA. We're 205 stores and four DCs in 22 states.

• 1982 - The Pueblo, CO, DC opens. Target buys 78 Gemco stores, we're 246 stores and four DCs.

•··· - Target brings electronic scanning to all store checkout lanes.

• 1982 - We're 344 stores and six DCs, with the opening of our Indianapolis and Sacramento DCs.

• 1989 - Target buys 31 Gold Circle and Richway stores in the Southeast.

• 1990 - Target opens the first Target Greatland store in Apple Valley, Minnesota; the Tifton DC opens in Tifton, GA. We're 421 stores and seven DCs.

• 1993 - Target enters the Chicago, Illinois market.

• 1994 - Target opens its eighth DC in Oconomowoc, WI.
— Woodstock (the second one) takes place in upstate New York

• 1995 - The first SuperTarget opens in Omaha, NE.

• 1996 - We enter New York, Virginia and Maryland, and our ninth DC opens in Albany, Oregon

TARGET/HARRIS164

# OUR ORGANIZATION

Target Stores has specialized functions which work together to create the best shopping experience for our guests. These organizational areas are called "pyramids." Here is a brief description of each:

## ADVERTISING

The Advertising pyramid is responsible for promoting our merchandise and increasing sales by creatively and effectively presenting merchandise through television, radio, newspaper, as well as signing in the stores and the actual presentation of merchandise in the stores.

## ADMINISTRATION

The Administration pyramid, one of our largest areas, includes all of our technologies and systems, new development, production, technical services and telecommunications. Administration also includes financial planning and reporting, accounting, and accounts payable. Loss prevention, whose primary responsibilities are security and stock shortage, also reports into Administration.

- MIS (Management Information Systems)
- Finance
- Assets Protection
- Audit

## DISTRIBUTION

Distribution is responsible for the physical movement of merchandise from our vendors to the receiving area in each store. Since Target's goal is to have the merchandise that guests want, when they want it, the role of Distribution is crucial to getting the merchandise to the stores on time. Target's Distribution pyramid is organized into the following operational units:

- Operations Administration
- Planning and Engineering
- Transportation
- Distribution Centers
- Vendor Logistics (EDI)

## LEGAL

The Legal department is responsible for all legal matters involving the company, including subjects such as real estate, litigation, general business law as well as advertising, trademark and vendor-related legal matters.

## MERCHANDISING

The three major areas of the Merchandising pyramid work closely together to achieve sales, inventory turnover, return on investment and profit goals. These goals are reached by the proper planning, selecting, purchasing and advertising of merchandise in conjunction with the implementation and control of effective inventory programs to ensure balanced store inventories.

- Merchandising
- Marketing Operations
  - Merchandise Planning
  - Trend Merchandising
  - Pharmacy





TARGET/HARRIS165

## OUR VISION

Target is different from other discount retailers because we put service where it belongs – **first**... At every location, Target team members share one ultimate goal — serving the guest. At our stores, distribution centers, field offices and at Headquarters. In order to do that better than any other retailer, we treat our team members well and build the strongest retail team around. We also give back to the neighborhoods in which we do business, to strengthen and serve our communities.

How do we turn that mission into action? By implementing fourteen key strategies.

These strategies serve as our corporate guides, and we call them our Guides for Growth.

Listed below are these guides. Understanding these guides will help you to understand our business — and to think about the specific and vital part you play in carrying out Target's mission. After all, you're a member of a unique and highly successful team. Read on to find out how we work together to achieve our mission.

## OUR GUIDES FOR GROWTH

1. We use our Fast, Fun & Friendly culture to create and maintain strong, positive relationships with our guests, our team members, our communities and our vendors.

2. Our ability to attract, hire and develop a strong, talented and diverse team gives us a competitive edge.

TARGET/HARRIS166

TARGET EXECUTIVE TEAM MEMBER HANDBOOK PAGE 3

---

## PROPERTY DEVELOPMENT

This area is responsible for everything from finding future Target store sites and purchasing the land, to designing the store structure and interior, and overseeing all aspects of construction down to the very last fixture.

- Store Planning
- Architecture
- Construction
- Real Estate

## STORE OPERATIONS

This area is responsible for operating our stores efficiently.

- Building Services
- Environmental
- Food Operations
- Stores, Districts and Regions

## TEAM, GUEST AND COMMUNITY RELATIONS

This pyramid's mission is to attract and retain high-quality team members through competitive pay and benefits, personnel planning, career development, training and communications.

- Headquarters Team Human Resources
- Compensation & Benefits
- Leadership & Team Development
- Training
- Employee Relations
- Stores & Distribution Team Resources
- Communications & Community Relations
- HRIS

TARGET EXECUTIVE TEAM MEMBER HANDBOOK PAGE 8

# Working at Target: The Basics

**Compensation, Recognition, Reward**

**Reviews**

**Pay**

**Dress**

**Traveling**

**Benefits**

**Communications**

TARGET/HARRIS167

3  We create a Guest Culture that makes guests feel at home, and brings them back again and again.

4  We offer prices as low as any competitor in the market.

5  Our promotions are the best anyone offers on an absolute price basis. Our advertising reinforces our image as the quality discount store with the best value, trend-forward merchandise, outstanding community commitment and unsurpassed guest service.

6  We lead the industry in community involvement at both local and national levels.

7  We offer our guests the best in "the basics," as well as trend-right, fashion-first merchandise with exciting, eye-catching presentation.

8  We use micro-marketing to cater to the needs and desires of each store's unique guest population.

9  We continually improve the speed of the supply chain to give us the best overall inventory position, inventory turns and just-in-time efficiency.

10  We use state-of-the-art technology to improve our efficiency and speed.

11  Our Total Quality process improves the way we do things.

12  We continually look for ways to reduce expenses. This allows us to reduce prices even lower, which leads to increased sales and profits.

13  We perform to very high financial goals in terms of mature sales growth, gross margin, expenses, inventory turn and EVA (Economic Value Added), which measures the volume of wealth Target creates.

14  We pursue growth in markets where we can make the most positive impact on our business.

# COMPENSATION, RECOGNITION, REWARD

We believe in hiring "Stars," so Target's compensation program is designed to attract, retain, motivate and reward its executive team members based on performance.

More specifically, Target's compensation philosophy is to provide a salary program which:

- meets or leads our competition.

- rewards individual performance and achievement.

- helps develop the fullest work potential of team members.

- is flexible and responsive to changing conditions which affect strategies and financial goals.



# REVIEWS

The annual review process for executives takes place in April of each year. It starts with a "pre-review," which is a self-evaluation of your yearly performance. This will take place several weeks prior to receiving your final evaluation and provides your supervisor with valuable input needed to evaluate your overall performance. Your annual review typically has salary action attached. In addition, all executives receive a non-monetary mid-year review in September to discuss and evaluate their performance.

As these processes occur during the year, you will receive specific information to assist you in more thoroughly understanding Target's compensation program.

## PAY

Executives are paid on the 15th and last day of every month Direct deposit is available and its use is encouraged.

## DRESS

Long lists of "do's and don'ts," or formal dress codes, aren't Target's style. Instead, we ask you to use common sense and good judgment, recognizing that as an executive, how you dress may influence others. Dress appropriately and **safely** for your work environment.

And always make sure to wear your ID or name badge at your location at all times

## • HEADQUARTERS

Please dress appropriately for an office environment. Mondays and Fridays are casual days — business casual. Executives set the tone for their department, so please make sure you are setting the right tone. If your team is dressing too casually, please address this with them.



TARGET/HARRIS168







## BENEFITS

As an executive at Target, you are entitled to the following benefits. In order to enroll or participate in the various benefits options, please contact Team Relations.

As of your hire date, these benefits are available:

- 10% Discount - For the team member and his/her eligible dependents. The discount is not to be used to purchase merchandise for resale or reimbursement — doing so can mean termination.

- National Holidays - Target observes the following six national holidays each year: New Year's Day, Memorial Day, Independence Day, Labor Day, Thanksgiving Day and Christmas Day.

- Vacation - A chance to get away from the routine and relax. You build up vacation based on your length of employment:

- After 6 full months –
  1 week vacation

- After 1 full year –
  2 weeks vacation

- After 5 full years –
  3 weeks vacation

- After 15 full years –
  4 weeks vacation

- After 25 full years –
  5 weeks vacation

- Medical Plan - You decide whether to participate in one of the medical plans and what kind of coverage you want (i.e., single vs. family coverage, etc.).

## • STORES

Red tops and khaki bottoms, or business dress, is preferred.

## • DISTRIBUTION CENTERS

Business casual with extra focus on safety. Any T-shirts must be Target logo T-shirts. Any other tops without collars must look professional. Walking/dress shorts of appropriate length (to the top of the knee) are acceptable, as are jeans in good condition. Sweatshirts and sweaters in good condition are also appropriate. **It is important for executives on the floor in our DCs to look professional.**

## TRAVELING

Target executives can travel frequently. If you travel for business, be sure to read and follow Target's travel policy (02-06-06). Also, please keep in mind a few basic ground rules.

- If you rent a car on company business, don't drink and drive.

- Expense reimbursements must be completed accurately and submitted promptly.

- Make sure that any "entertainment" is reasonable. Treat Target's money as you would your own.

- And, remember that vendors **cannot** reimburse **any** expenses whatsoever without prior approval by a Senior Vice President.



- Dental Plan - Although it does not cover all kinds of dental services, the plan can help pay a significant number of routine preventative and restorative expenses.

- Credit Union - Dayton's Target Employee Credit Union. They offer saving accounts, low interest loans, IRA's, certificates of deposit plus payroll deductions.

- Direct Deposit - A quick and easy way to get your paycheck to the bank — Target does it automatically! It's a great service, and one we encourage team members to take advantage of.

- Travel Accident Insurance - If you should die as a result of an accident during travel on company business, travel accident insurance will pay your beneficiary $50,000.

- Life Insurance - As an executive you are covered by no-cost life insurance equal to your annual pay. If you wish, you may enroll for optional low-cost life insurance, in addition to your no-cost coverage.

- Disability Benefits - You are automatically covered by short-term disability as of your date of hire. You are also eligible to enroll in the Long-Term Disability. The premium amount is determined by your salary and your current age

- Tuition Refund Program - Target will reimburse tuition cost for business-related classes.

After a year of full time employment, you can participate in:

- SRSP - Dayton Hudson Supplemental Retirement and Savings Plan gives you an opportunity to build long term financial security. You can elect to deposit 1% to 15% of your pay. The company will match dollar for dollar up to 5%.

- Retirement Plan - It is designed to provide a foundation for your retirement income, along with SRSP and Social Security. It is completely company-paid. The benefit amount you receive at retirement depends on two elements: your final average pay, and your years of credited service.

## COMMUNICATIONS

At Target, we pride ourselves on trying to keep you informed about what's going on in the company and in the industry. Across all areas of Target, we have several ways of keeping you informed.

### T-MAIL

T-Mail is a great tool for quick communication. You can receive and send letters to other locations instantly. And, special company broadcasts are almost always sent out over T-Mail for you and other team members at your location.

### ON TARGET/TARGET MARKET

*ON TARGET/TARGET MARKET* is our lively team member magazine. It contains information about Target, a special marketing section (*Target Market*), and news about what your co-workers are doing around the country. *On Target* comes to every location every other month.

### TARGET TV

Another way to let you know what is going on is through Target TV. These live satellite broadcasts happen once or twice a week, and give you the most up-to-date information available from Target Headquarters on topics like mer.

TARGET/HARRIS170

# Personal and Career Development

**Future Growth and Development**

**Target's Leadership Dimensions**

**Business Ethics**

**Conflict of Interest**

**Inside Information**

**Confidentiality**

**Insider Trading**

**Inventions, Patents, Etc.**

**Using Target's Information Sources & Resources**

**Vendors**

TARGET/HARRIS171

TARGET EXECUTIVE TEAM MEMBER HANDBOOK PAGE 18

---

chandising, benefits, upcoming events, etc. And, at the end of most shows, there's even a call-in segment for you to ask questions live on the air! Some broadcasts are specific to one audience, but some are for all team members across the company.

### OPINION SURVEY

This is a periodic, totally confidential survey to see how you and every team member feels about working at Target. It's a great chance for Target to hear how everything is going, so be honest! Your manager/supervisor will share these results with you, so you can see how you and the rest of your teammates feel about the same questions. It also allows you to receive feedback from those team members that work for you.

### OPEN-DOOR POLICY

Target believes in two-way communication and fair dealing. If you have any questions or difficulties with your job, ask your supervisor. His or her door is always open to you and what you have to say.

As an executive, it is important that you never discourage the use of our open-door policy in

dealing with team members.

This open-door policy also applies to you. If you have an issue to discuss, and have difficulty talking to your supervisor, talk to someone in Team Relations.

Remember, We want to know if you have a problem or concern, and you can always share it with us.

### LET ME KNOW PROGRAM

The Target Let Me Know program gives you an easy way to ask a question or tell us about your ideas, comments or concerns. Here's how to use it:

• Get a Let Me Know card from your lounge

• Write your question, idea, comment or concern on the card and mail it to Target Headquarters

The Target Senior Vice President of Team, Guest, and Community Relations reads every card. He'll make sure someone writes back to you with an answer or a response. The program is highly confidential — your name won't be revealed unless you want it to be. He wants you to "let him know" what you're thinking.

◉    Target Executive Team Member Handbook Page 19

on making a contribution. Be able to answer the question: How is your area different because you were there?

3    Avoid focusing solely on upward mobility. Sometimes the best growth happens in a lateral move to another area or pyramid. We call this concept the "Talent Pool." "Talent pool" is a flexible process of aligning individuals with developmental assignments and experiences that allow them to continue to grow and develop. Focus on developing your skill portfolio.

4    Your next promotional opportunity is planned through a process involving your current performance, your developmental readiness, your district, division or departmental Directors' plans for change, and the guidance of your Team Resources area. Target uses a variety of processes to assess readiness for promotion. Your immediate supervisor can familiarize you with some of these steps

• Find out what you need to do if you are interested in growing at Target. If you don't know, you probably won't be ready when the opportunity arises.

• Target Leadership Academy - an assessment center process providing participants with feedback from simulations and questionnaires on Target's key leadership dimensions.

• Performance Review - your performance will be reviewed at the end of a 90-day learning period. And after that, performance is reviewed twice a year - at mid-year, and annually. Reviews are a great time to develop Individual Development Plans

For a full description of these resources, please refer to the *Team Leader Development Handbook.*

## "KNOW THE ROPES" FOR CAREER DEVELOPMENT AT TARGET

1    Take personal responsibility for your development and your career. Ask for feedback from your team leader and peers. Initiate an Individual Development Plan. Take charge of your own career growth and make sure that you communicate your desire to grow to your supervisor.

2    Career development starts with your current job. Give everything you've got to your current position. Concentrate



## PERSONAL AND CAREER DEVELOPMENT

At Target, we're committed to providing you an organizational environment which fosters your personal and career development. We do this by providing the resources and tools to assist our team members who are interested in growth.

Some of the great resources available include:

• Individual Development Plans (IDPs) - a planning tool used by the individual and his/her team leader to focus development efforts.

• The Developmental Activities Guide - a book of ideas for Individual Development Plans, specific suggestions on how to improve in key areas.

• Training Programs - a wide array of training programs are available, including Business College for newly hired/promoted Stores and Distribution executives, and "In-Training," where Target prepares you for success by offering formalized training in the major business sectors: Stores, DCs, and Merchandising.

• Tuition Refund - a program designed to facilitate continuing education in related business courses.

# FUTURE GROWTH AND DEVELOPMENT

Target is a growing company. By the year 2000, we plan to have over 1,000 stores. To support this kind of growth, we are looking for individuals who show talent and promise as leaders.

This means there are many opportunities, particularly in our Stores and Distribution Pyramids for promotions. Often promotional opportunities will require openness to relocation.

If you know talented people who might enjoy a career with a fast growing retail company, please refer them. Referral forms are available in Team Relations/Human Resources.

# TARGET'S LEADERSHIP DIMENSIONS

It takes a lot to be a good leader at Target. Target values certain skills and characteristics of its leaders. These are summarized in Target's Leadership Dimensions.

First and foremost, Target leaders **get results**. They achieve extraordinary results because they have these skills.

**Planning Strategically**  Sets appropriate priorities for self and work team; focuses on key priorities; pays attention to important details; structures activities and resources for self and work team to maximize speed and results, plans proactively to avoid crises; handles the unavoidable crises effectively.

**Openness to Learning**  Thrives on change; seeks new ideas and experiences; learns from mistakes of self and teammates; knows personal strengths and weaknesses, solicits and utilizes performance feedback; reacts to challenges in a "can do" manner; open to tough assignments; situationally adapts behavior and approaches; learns quickly; commits to continuous improvement; invests in self renewal and maintains life balance.

**Being Proactive**. Questions the status quo; "fixes" things that aren't broken; constantly works to improve processes; takes personal responsibility; anticipates problems; sets challenging goals and does whatever it takes to meet or exceed those goals; shows initiative; tackles difficult challenges; assumes the risk; breaks through constraining paradigms; shows passion.

**Inspiring Others to Act**. Has a vision, a blueprint of the future; has a clear picture of what matters for Target, teammates, and guests; easily and convincingly expresses these goals to teammates; able to pull people together and get things done; enables teams to accomplish goals by providing direction

and resources, and eliminating obstacles, enlists others, obtains commitment not compliance, and builds cross-functional alliances.

**Decision Making.**  Bases decisions on relevant financial, quantitative and qualitative information, not opinions; considers the impact of decisions on others; identifies underlying causes of problems; involves others appropriately; thinks total Target; makes timely decisions; tackles problems creatively.

**Communicating:**  "Seeks first to understand then to be understood," practices open and continuous communication; values keeping others well informed, presents ideas in a logical, easily understandable way both orally and in writing, delivers convincing presentations; conducts effective meetings

**Relating to People**  Shows respect for all people: values and promotes diversity (race, gender, physical ability, age, sexual orientation and other differences), listens with empathy; recognizes and gives credit to teammates; is generous with praise; strives for team

TARGET/HARRIS173

wins, builds alliances and gains consensus; responds quickly to others' requests; sets an example of outstanding guest service; is approachable, sensitive, and considerate, collaborates and insists on win-win solutions; builds team spirits and relationships; resolves conflict while preserving relationships.

**Developing People**
Astutely assesses others' skills; identifies high potentials at entry levels; personally mentors a number of high potentials; delegates well to stimulate growth— gives important work on critical issues and coaches to ensure learning; gives responsibility, authority and autonomy in the right amount to match peoples' developmental readiness; builds relationships for others by connecting them with powerful

people, by sponsoring them; nurtures and grows people's self-esteem and self-confidence, gives visibility and recognition to people helping them get noticed, trains people well; enjoys others' success.

**Trustworthiness** Always tells the truth and encourages candidness in others; states disagreement even when it takes courage; actions consistently match words; follows through on commitments, shares personal values; has the respect of teammates; is fair; does the right thing; shows integrity; is credible.



**BUSINESS ETHICS**
Target and Dayton Hudson Corporation are guided by the highest of ethical and legal

standards. It's a commitment to our guests, to our communities, and to each other.

**Every Target team member should conduct all business** activity in compliance with the highest ethical standards and the law. Integrity and common sense should be a part of every Target transaction, whether with our guests, vendors, suppliers or fellow team members.

More detailed information about ethical standards and expectations are available in Dayton Hudson Corporation's *Business Conduct Guide.*

**CONFLICT OF INTEREST**
Target's Conflict of Interest policy highlights a number of ways and situations in which a conflict could develop between Target/DHC and a team member. In essence, the policy means that Target executives can't put their own interests (or those of a family/household member) ahead of Target/DHC interests.

Some examples of such a conflict include:
• Working for a business that competes with Target
• Steering Target's business to a family member
• Disclosing confidential or "inside" information to unauthorized individuals
• Soliciting or accepting gifts or favors with someone who does business, or wants to do business, with Target.

For more complete information on Target's Conflict of Interest Policy, please read and review Policy and Procedure 03-01-22. In addition, every executive must complete a Conflict of Interest disclosure form annually.

TARGET/HARRIS174

Because of the serious conse-quences when this policy is vio-lated, executives should ask for and complete a new Conflict of Interest form as soon as a poten-tial or real conflict develops — don't wait until the next year's form is distributed.

## INSIDE INFORMATION

If you are ever asked by an outsider about Target's future plans, unless they have been relayed to the press by our official company spokesperson, you should answer, "I cannot say."

If you are asked about specific sales, margin, or expense data, or about particulars of a team members position, or his/her beliefs or decisions regarding Target, you should answer, "I cannot say."

If you take another assignment within Target, please do not take any company manuals, training materials or documents with you. You can always order new materials for your new position.

If you should leave Target, either voluntarily or involuntarily, you may take only those items of a personal nature, performance reviews, and this handbook with-out fear of prosecution.

## CONFIDENTIALITY

As a Target executive, you are trusted with a lot of confidential information about Target's busi-ness and that of our business partners. Target's ideas and strategies are among its most important assets. Your obliga-tion is to respect the confidential and proprietary nature of this information by not sharing it with anyone outside Target, or with any business partners unless there is a compelling business need to know.

Target frequently exchanges confidential, proprietary busi-ness information with its vendors, suppliers, consultants, developers, and other business partners. While it is not always apparent whether such informa-tion is confidential, the safest thing to do is to treat all infor-mation (both Target's and our business partners') as if it were confidential, unless you are cer-tain that it is public knowledge At a minimum, this means you should only share confidential information on a need-to-know basis within Target, and never with a business partner or anyone outside Target without authorization.

Failure to respect this confiden-tiality is not only a violation of Target's policy, in certain cir-cumstances, it may be a violation of the law.

## INSIDER TRADING

It is illegal and against Target's policy for any team member to trade in Dayton Hudson Corporation securities while in possession of material non-pub-lic information This restriction applies to all team members, as well as all members of their immediate families living in the same household The purchase or sale of securities of any other company, including our cus-tomers and suppliers, is also prohibited if you possess mater-ial non-public information regarding that company. There are no exceptions to this policy, and its violation may result in serious criminal and civil penal-ties, in addition to disciplinary action by the com-pany. For further detailed information, see the Securities Law section of your Business Conduct Guide.

## INVENTIONS, PATENTS

Inventions, discoveries, ideas, concepts, works of authorship and trade secrets created during the employment relationship — or which arise out of the team member's work or are created using Target time, materials or assets — are owned by Target. Target team members will coop-erate with Target in documenting Target's owner-ship of all such intellec-tual property.





## USING TARGET'S INFORMATION SOURCES AND RESOURCES

Target is committed to providing its team members with the best tools possible to accomplish their goals.

Target executives have an ever-increasing range of information sources, and the company's commitment to technology means that trend will continue. E-mail has already altered and accelerated the way team members communicate, and Target is constantly improving the systems and information it provides its team members to do their jobs. Target TV, videoconferencing,

voice messaging, satellite communications — the list of technological improvements just continues to grow.

Executives who have access to and use these company-owned systems, software and hardware need to be aware of the responsibilities that accompany such use. For example, unauthorized use, reproduction or removing any information sources and/or company equipment is prohibited, as is installing or copying unauthorized software. Company-owned equipment and systems shouldn't be used for your personal benefit. Those who use these systems or information in a way that breaks the law may be prosecuted.

If you have a password to gain access to any of these systems or equipment, be sure to read Target's Privacy policy (O3-01-38) to understand the use and limits of those passwords.

Please don't install any of your own software on Target's PCs. Games and other personal programs use up time and space we count on for business use. Installing outside programs could also introduce a virus into Target's system.

Also, don't make copies of Target software without approval from IS Client Support. They can tell you if we have the right to make copies, and if so, how many. They can also tell you if you can install the software on your own computer so you can work from home.

**Never, ever** give Target-owned software to anyone outside Target. Using software owned or licensed by Target for personal use is not only against Target's policy, but pirating software is also a crime and could get you in serious trouble with companies who

sell the software. Misuse of Target's software could lead to termination and/or prosecution.

## VENDORS

Vendors are a critical ingredient to Target's success, and it's important that our transactions with vendors meet the highest ethical and legal standards. A few policies every executive should be aware of regarding vendors:



TARGET/HARRIS176

## Who is a Vendor?

We typically think of our merchandise suppliers as "vendors" because of the large volume of business they may do with Target. But the definition is actually much broader. Everyone who supplies a product or service to Target is a vendor.

This includes the companies that cut our lawns, restock the beverage and snack machines, supply us with office equipment and other fixtures and fill million-dollar orders for merchandise. The policies outlined below apply to anyone or any company that supplies a service or product to Target.

## Gifts

Target's Conflict of Interest policy (03-01-22) strictly prohibits you, your relatives, and members of your household from asking for or accepting personal gifts or favors from vendors. If you have contact with vendors, please familiarize yourself with this important policy.

## Samples

Target's Vendor Sample policy (05-02-07) details how to dispose of samples provided by vendors. Most importantly, it emphasizes that Target team members cannot accept or purchase samples.

## WORKING FOR A VENDOR

Working for a vendor while employed at Target is, of course, prohibited. If your employment with Target ends, please be aware that company policy prohibits us from doing business with former team members for one year following the end of that employment. Exceptions are sometimes granted. For more details, see Policy and Procedure (03-01-33).

# Representing Target

**Dealing With The Media**

**Reference Requests**

**Community Involvement**

**Team Member Representatives**

**Handbilling/Picketing**

**Solicitation/Distribution Policies**

TARGET/HARRIS177

## REPRESENTING TARGET

Every Target executive is an ambassador to the guests and community in which we do business. Your actions, while at work or not, can directly impact the public's perception of Target's commitment to the values expressed in its vision, Guides for Growth, policies and reputation. Target's strong quality and family-oriented image has been greatly enhanced and reinforced by the excellent quality and strong impact of our workforce.

Every contact outside of Target is an opportunity to "walk the talk," especially when that contact relates to Target's business.

## DEALING WITH THE MEDIA

### Stores

Target's policy on the media and reporters is simple.

• Media reporters and photographers are always welcome at any Target store.

Why? This "immediate access" policy allows the media to showcase Target in stories on retail trends and developments. It also allows our own retail experts — our store team leaders — to



share their expertise with the community. Reporters come to Target because we are a leading retailer.

Of course, some subjects are off-limits. We can't grant interviews on the following subjects:

• Matters under police investigation or in litigation. (It is appropriate to express compassion and concern for our guests and team members.)

• Matters involving sensitive employee relations issues.

• Sales figures or plans, including profits, operating costs, sales per square foot.

• When asked to comment on a competitor

• Information regarding team members (dates of employment can be verified).

• Store security procedures or systems.

Target's Communications Department has a full Media Guide and training available for those whose positions may bring them into frequent contact with the media. Please seek out that training if appropriate.

### Headquarters and Distribution Centers

Target maintains a spirit of friendly cooperation with the media. For subject matters that involve Headquarters or distribution centers, please refer media calls to Media Relations at 612-304-6557 or to our company spokesperson at 612-304-8888. The Media Relations department will work with you to ensure that the reporter receives the information he/she needs from the appropriate person at Target.

### For More Information

If you have any questions or concerns about dealing with the media, please call Media Relations at 612-304-6557 or our company spokesperson at 612-304-8888. Good relations with the news media are important to good relations with our team members, guests and the communities where Target operates.

## REFERENCE REQUESTS

You may be asked by a current or former team member, or their prospective employers, to provide an employment reference. Target doesn't provide

**TARGET/HARRIS178**

references, even when the team member puts the request in writing, provides a release, etc. We can verify dates of employment and last position held. Refer all calls requesting information on current or former team members to your Team Relations department.

Sometimes the person requesting information is particularly insistent, or even official (a law enforcement or other governmental agency). It is especially important that the Team Relations department, which has

been trained to deal with such matters, handles the request. Regional Personnel and Employee Relations can be contacted for help with problematic cases.

## COMMUNITY INVOLVEMENT

Target and its team members are an active, vital part of the communities in which we live and do business. Our goal is to be the best neighbor anyone could have, and our executives help fulfill that goal every day.

Many executives take on leadership roles in community projects, and their participation in Good Neighbor events helps raise Target's profile and enhance its image in the community.

## TEAM MEMBER REPRESENTATIVES

Target wants to create the kind of work place where team members don't want or need an outsider to represent them on workplace issues. We want to do such a good job satisfying the legitimate needs and concerns of our team members that they don't need to turn to a third party — whether it be a union, a lawyer, a community organization or government agency — to ensure their concerns are heard.

How do we make this happen? By providing team members with good working conditions, competitive wages and benefits, open communication channels, good treatment and the respect they deserve.

Target executives help achieve this goal, day in and day out, by doing the following:

- Treating team members respectfully and decently

- Demonstrating leadership

- Helping team members identify with Target

- Using firm, but fair discipline

- Recognizing a job well done

- Job growth and opportunity for advancement

- Giving team members adequate training

- Maintaining consistency with company team relations policies

- Living the "Open Door" pledge

- Creating and maintaining pleasant, safe, comfortable working conditions

Target strongly believes that working one-on-one with our team members, without third party interference, provides the best climate for teamwork, team development and achieving both company and personal goals.

If you become aware that any of your team members may be looking to a third party, such as a union, for help, bring it to the attention of Team Relations immediately.

**TARGET/HARRIS179**

# HANDBILLING / PICKETING

In recent years, handbilling (passing out literature) and picketing have become an increasingly popular way for individuals and groups to communicate concerns to the public regarding a variety of issues and messages — which may or may not have anything to do with Target. Retail facilities are a particularly popular spot for these activities because they offer a constant flow of people going in and out of a store, which facilities the handbiller's job.

Target believes handbilling and picketing activity on our premises is an unwelcome distraction to our guests. Under certain circumstances, it can be legally limited or halted. Doing so effectively requires two things: strict adherence to Target's solicitation policies, day-in and day-out, and following Target's handbilling action plan when the activity occurs.

The solicitation policy can be found on the next page. Exceptions can't be made, or it can hinder Target's ability to remove unwelcome distractions from our locations.

Contact Regional Personnel and/or Employee Relations **immediately** if you become aware of handbilling or picketing on Target premises. You'll be guided through what steps to take next. Do not call law enforcement officials to remove the handbiller's unless there is

an **immediate** threat of imminent harm or injury to a team member or guest. Otherwise, wait for an okay from Team Relations and Employee Relations before getting outside help.

# SOLICITATION / DISTRIBUTION POLICIES

Please follow and help enforce Target's solicitation/distribution policy, which states:

Target wants to make sure all team members can work free of the distraction and uncomfortable pressure that can be created by solicitation and distribution. That's why Target maintains a "No Solicitation/No Distribution" policy for all team members.

The policy is simple: During working time (yours or your fellow team members'), and in work areas, you can not "solicit" team members. "Soliciting" includes things like asking co-workers to join organizations or pools, to buy memberships or subscriptions, or to make pledges or gifts to charities. "Working time" does not include meal and break periods.

The "No Distribution" part of the policy requires that team members not distribute literature during working time or in work areas.

Certain activities are prohibited at all times on Target premises. Soliciting, distributing literature, selling merchandise or conducting monetary transactions are always off-limits (even during meal and break periods) if they are:

• For personal profit

• For commercial purposes

• For a charitable organization that isn't a part of Target's Community Affairs program or otherwise authorized by Target

Because Target is a United Way sponsor, work connected with its annual drive does not violate the No Solicitation/No Distribution policy.

TARGET/HARRIS180

# Your Role As A Target Executive

Equal Employment Policy

Harassment

Relatives

Dating Other Team Members

Off-The-Clock/Child Labor

Shopping At Target

Drug-Free Workplace

Tobacco-Free

Leaving Target

Corrective Action

Safety

Shortage

## YOUR ROLE AS A TARGET EXECUTIVE

As a Target executive, you'll have enormous opportunities to grow, both personally and in your career. With those incredible opportunities come some important responsibilities, however.

The outlined policies that follow were developed for the benefit of all Target team members — including you. As an executive, however, you also have the unique ability to put these words into action for the benefit of other team members. By reading, understanding and following these policies, you'll help Target fulfill some of its most important commitments

## EQUAL EMPLOYMENT POLICY

Target's Equal Employment Opportunity policy states:

- Target's employment practices will be implemented without regard to race, creed, color, national origin, sex, religion, age, disability, sexual orientation or citizenship status.

This policy is an essential part of Target's overall commitment to attract, hire and develop a strong, talented and diverse work force. Please review the EEO policy (03-05-02) annually, and live it **daily**.

TARGET/HARRIS181

# HARASSMENT

Because of the importance of this topic, Target's entire Harassment policy (O3.01-.36) is repeated here. Please be aware that the law can provide greater penalties when an executive or supervisor is involved in harassment. As a result, Target holds its executives to a higher standard of conduct.

Pay close attention to the part of the policy that spells out what to do if you receive a complaint of harassment. It is essential that you take the appropriate partners when dealing with harassment issues.

Two important points about which executives should be aware concerning Target's

Harassment policy. First, courts have held that supervisors can be personally liable if they harass others. This means the individual, not Target, may have to pay money damages to the victim of the harassment. Second, and relatedly, Target may not provide or pay for a legal defense to a team member accused of harassment, especially if it appears the team member acted outside the policy.

It's clear that when it comes to harassment, the stakes are quite high. Please read and follow the policy, attend Target's Sexual Harassment training program, and use common sense and good judgment in all your interactions with fellow team members and guests.

## POLICY

Just as Target strives to provide a distraction-free shopping experience for its guests, we want a distraction-free working environment for our team members. That's why Target strictly prohibits unlawful harassment on the basis of race, color, sex, gender, national origin, citizenship status, religion, age, disability, or sexual orientation.

## Types of Harassment Prohibited

- Harassment based on someone's race, color, sex, gender, national origin, citizenship status, religion, age, disability, or sexual orientation.

- Harassment by anyone, including a team leader, manager, co-worker, vendor or guest.

## Examples

Here is a list of some of the types of behaviors that may be considered sexual harassment:

- Making sexual advances, asking for sexual favors, or making sexually suggestive comments, offering employment benefits in exchange for sexual favors.

- Making sexual comments or jokes, or using graphic or sexually degrading language to describe someone.

- Using foul or obscene gestures.

- Passing around or displaying sexually suggestive or obscene printed materials, pictures or objects.

- Making unwanted physical contact, like patting, pinching, grabbing or fondling.

- Sexual harassment can also occur if someone threatens or suggests that part of your job

(like work assignments, promotions, review scores or wages) will suffer if you object to advances or behavior. Likewise, harassment may occur if the conduct unreasonably interferes with your work or makes your work environment intimidating, hostile or offensive.

## Other Types of Harassment

Harassment based on race, color, sex, national origin, citizenship status, gender, religion, age, disability, or sexual orientation also has no place at Target. Examples of behavior that could be included:

- Using derogatory "slang" names to refer to members of an entire group or race.

- Teasing, jokes or derogatory remarks about another's age, race, sexual orientation, or any of the other protected classes.

- Imitating or making fun of the physical or mental limits imposed upon another team member by a disability.

- Contributing to an atmosphere that makes the workplace intimidating, hostile or offensive to another team member due to that team member's race, sex, gender or one of the

TARGET/HARRIS182

other factors listed above.

## Reporting Harassment

All Target team members are responsible for helping us to prevent and respond to harassment. If you believe you have been harassed, it is important to speak out right away.
Here are the steps to take:

1. First, if you are comfortable doing so, talk to the person whose behavior is bothering you and ask them to stop.

2. If you are not comfortable talking to that person or if it doesn't work, talk to one of the following:

• If you work in a store, you can talk to the Store Team Leader, Team Relations Leader or any Team Leader.

• If you work in a Distribution Center, the General Manager and/or Team Resources and Development Managers are good places to start. Otherwise, report your concerns to any Team Leader or Coach.

• At Headquarters, your Team/Human Resources Representative know how to respond to claims of harassment.

• You are not limited to these individuals, however. You can

complain to your District, Region or to Headquarters. If you are uncomfortable talking about your situation, write a Let Me Know comment card, being sure to include your name and location, so an investigation may take place.

## Responding to Complaints

• If you, as a team leader, manager, or executive receive a report of harassment or observe something that might be harassment, follow these steps immediately:

• If you work in a Distribution Center, report your concern to the Distribution Center Team Resources and Development Manager or to the General Manager.

• If you work in a store, report to the Store Team Leader or the Team Relations Leader and the District Team Leader or the Regional Personnel Representative.

• At Headquarters, report to any Team/Human Resources Representative.

• IMPORTANT: If the person to whom you are supposed to report the claim of harassment is the same one who is claimed

to have done the harassing, take the claim to someone at the next level of management. If you are not sure who that might be, call Regional Personnel or Headquarters Employee Relations. Do not disclose the claim to the individual being accused of harassment.

• Respect the confidential and sensitive nature of harassment claims. After making your report, do not discuss the matter with anyone else.

• It is essential that you report the claim as described, even if you believe the situation will resolve itself, and even if the person making the complaint makes it clear they don't want to get anyone in trouble. Let the team member know that you have to report it.

## Target's Response to Harassment

• Target investigates all harassment complaints as thoroughly and promptly as possible. Target also strives to keep the information gathered in the complaint and investigation process as confidential as possible.

• If an investigation shows unlawful harassment has happened, Target will take prompt and appropriate corrective action up to and including immediate termination.

## Retaliation

Target prohibits retaliation against anyone who has reported harassment or assisted in investigating harassment complaints. If you feel that you have experienced retaliation, follow the steps outlined in the complaint procedure above. If retaliation has occurred, or if Target's investigation is otherwise interfered with, it may result in discipline, up to and including discharge of the individual retaliating or otherwise interfering with the investigation.

## False Complaint

If Target learns that team member has lodged a false harassment claim or given untrue information about a complaint, Target may take disciplinary action, up to and including discharge, against that team member.

TARGET/HARRIS183



is the team member's responsibility to bring the situation to the attention of his or her supervisor

dictate, personal feelings will almost certainly color the supervisor's actions. Even when the supervisor makes extra efforts to be fair and objective, other team members may (justifiably) perceive favoritism. It's a no-win situation.

For all of these reasons, and more, Target's supervisors may not date those they supervise. When such a relationship begins to develop, it is the supervisor's responsibility to let their supervisor know. Often, one of the two can transfer and end the reporting relationship. If that's not possible, one of the two may choose, or be asked, to leave Target's employment.

Higher-level executives, and those whose unique responsibilities make trust and credibility especially important (for example, Assets Protection and Team Relations) may have direct and indirect reporting relationships, or even district- or region-wide responsibilities. Because of the power inherent in indirect reporting relationships, and/or because of unique position responsibilities, the same rules may apply. Target will evaluate each situation on a case-by-case basis. It

## OFF-THE-CLOCK / CHILD LABOR

Hourly team members must be paid for all hours worked — no exceptions. This includes taking the training manual home to do some extra studying, or taking paperwork home to get it done on a day off.

If you become aware that an hourly team member has worked off-the-clock, work with Team Relations and their supervisor to ensure they are appropriately paid for their time, and disciplined for working off-the-clock. Executives simply cannot look the other way — they have an

TARGET/HARRIS184

## DATING OTHER TEAM MEMBERS

It's no wonder that, given the high quality of the people that Target hires, team members sometimes develop a romantic interest in each other. As long as the relationship is between equals, isn't coercive or forced, and is handled professionally and appropriately in the workplace, it shouldn't be a problem.

When a supervisor is dating someone he or she supervises, however, it presents special challenges. Supervisors are responsible for writing reviews, scheduling, recommending raises, even disciplining those that work for

them. If there is a romantic relationship with the subor-

## RELATIVES

Relatives can't be employed in positions which call on one to report to the other, or which report to the same supervisory position.

If two team members are married while working for Target, and it results in one reporting to the other or to the same person, one may be transferred. If a transfer isn't possible or acceptable to the team members, one of the two may be asked to leave Target's employ.

obligation to look into, correct and follow up on, potential off-the-clock situations. Any Target employee who either **requires** or **allows** an hourly team member to work off-the-clock will be terminated.

Similarly, executives can't order minors to do things prohibited by child labor laws and/or Target policy. Team Relations can advise you of the applicable child labor provisions in your location – please read and familiarize yourself with them.

## SHOPPING AT TARGET

Target team members are some of our best guests. Please keep these simple rules in mind when shopping:

- Only shop when you are "off duty."

- Show your discount card to the cashier at the beginning of the transaction.

- Don't set merchandise aside for yourself that you want to buy later

- Merchandise can't be specially marked down for you or other team members

- Never ring your own purchases

- When returning merchandise, be sure to tell the service desk team member that you purchased the merchandise with a discount, and please don't ask desk personnel to "bend" the refund policy for you because you are a team member.

- We have certain guest satisfaction policies — such as honoring mispriced items or erroneous rain checks -- that reinforce our image as a company that believes in fair and honest dealings with our guests, even though doing so causes us a financial loss. We think the goodwill generated by our willingness to accept and correct (in our guest's eyes) our few mistakes offsets the financial loss. Team members, especially executives, should not take advantage of these policies, even when shopping as a guest.

- If you make purchases at Target by check, be sure you have sufficient funds to cover the check. Team members who bounce checks at Target can be disciplined, even terminated. Similarly, if you make purchases with Target's credit cards, be sure to keep your account in good standing. If you become delinquent, it can mean discipline or termination.

## DRUG-FREE WORKPLACE (DFW)

If you work in a location subject to Target's Drug-Free Workplace policy, you need to understand the policy's application to you and your team. Your Team Relations department can provide that training.

Be sure you know the following:

- Applicants can't begin before their test results come back — please don't pressure Team Relations to bend this rule.

- If someone needs a test while you are in charge, do you know how to arrange it?

- Do you know where the DFW manual is if questions come up?

Team Relations can help you answer these and other important questions about the DFW program.

## TOBACCO-FREE

All Target locations are tobacco-free. Some locations have smoking areas, please limit smoking to these areas.

TARGET/HARRIS185



## LEAVING TARGET

If you decide to resign, please give at least two weeks notice.

If you should leave Target, either voluntarily or involuntarily, you may take only those items of a personal nature, performance reviews, and this handbook without fear of prosecution.

## CORRECTIVE ACTION

Target's disciplinary process is designed to help team members address performance opportunities and correct inappropriate behavior.

We can't list all Target's performance expectations here. Obviously, common sense, sound judgment, and outstanding leadership are expected at all times.

We have listed a few examples of some of the most serious misconduct, behaviors that can lead to immediate discharge.

1. Falsifying company documents or documents relied upon by the company — for example, time records of hourly team members, application/resume, reviews, performance reviews, reimbursement forms.

2. Misusing the team member discount.

3. Using or possessing alcohol, drugs, or weapons/explosives on company property.

4. Violating the Conflict of Interest policy.

5. Fighting or threatening behavior.

6. Violating Target's Harassment policy.

7. Personal behavior that has a detrimental effect on the team member's relationship with Target, or on Target's business or reputation.

When you need to discipline another team member, please take partners before doing so. Team Relations can help you determine the appropriate type of discipline, and your supervisor should always sign off on the

proposed discipline before it is given.

If you supervise others, be sure to go through Target's Counseling & Corrective Action training. If it's been a while since you went through the training, go through it again. It's a good refresher.

**One important point:** Never fire anyone on the spot. If a tense situation needs to be defused, a team member can be temporarily suspended.

## SAFETY

Target is considered world class in our commitment to protect our team members and guests from unsafe conditions.

There are many shared roles in providing a safe environment and products: the merchants — who select products that will



perform as expected, are easy to use and don't fail under

normal use; the presentation experts who ensure plan-o-grams are safe from excessive weight displays that could fall or hurt people; the trainers — who provide orientation and training in how to operate equipment and perform a job; the distribution team — who, while working at high speeds and tremendous material handling capacity, take the necessary precautions to avoid injuring themselves, and safely transport shipments to the stores every hour.

Ultimately, our executives provide the certainty of a safe place to shop and work. Unsafe conditions must be reported and corrected before anyone is hurt.

Knowledge of basic life safety, including evacuation and emergency response, is essential, even

TARGET/HARRIS186



though these skills are rarely required. In the split second that you need to know what to do, you don't have the time to call or look for the answer.

Set the right example when it comes to reporting accidents. All guest and team member accidents need to be reported. All team member accidents should be treated by our workers' compensation clinics.

When hired or promoted to a supervisory position, you should be trained and familiar with your responsibility to provide a safe work environment. Executives must be observant and communicate proper procedures to team members.

## The "Big Three" causes of accidents are:

- Slips - preventable by CONSTANT surveillance for debris or liquids on floor and corrective action.

- Falls - from ladders or non-approved lifting.

- Strains - improper lifting - usually preventable by proper training early in job and/or team lift.

You can help meet Target's commitment to safety by ensuring:

1  Safety committees are active and meeting to correct cause of accidents.

2  Team members are trained in the proper use of tools, equipment, electrical and hazardous equipment.

3  Making sure minors aren't exposed to hazardous conditions, power equipment, or working too late.

## Guest Accidents

Make sure you know the procedures for handling guest accidents. Remain calm, stay with the guest until help arrives. Don't make any comments about the accident to the guest.

## SHORTAGE

Preventing shortage is a responsibility we all share Stock shortage typically has several causes:

- Team member errors in setting up orders, transmitting data, receiving and handling merchandise

- Ticketing errors, both at our locations and at the vendor, and from price changes.

- Incorrect processing of damaged merchandise and/or transfers.

- Vendor, guest and team member theft.

- Errors at point-of-sale terminal -- incorrect UPC, or accepting a bad check or a bad credit card.

- Merchandise used by store personnel, but not requisitioned

Training and attention to detail can ensure you and your team aren't contributing to stock shortage.

When it comes to team member and guest theft, Assets Protection are the experts. They've been trained to prevent and detect theft, and apprehend when necessary. They've been carefully and thoroughly trained in apprehensions — please let them take the lead in this area. Don't initiate apprehensions, or make accusations of theft. Never give chase to suspected shoplifters — only become involved in an apprehension when asked by Assets Protection



TARGET/HARRIS187

## Acknowledgement of Receipt and Acceptance of New Handbook

*I have received the handbook called **Target Executive Team Member Handbook**. I understand that it is my responsibility to review and follow its provisions. I understand that the handbook contains guidelines and that these guidelines may change.*

_____
Team Member Signature

_____    _____
Team Member Name (please print)    Employee Number

_____
Month/Day/Year

TARGET/HARRIS188

White copy  Target      Yellow copy  Team Member

| Subject: | Counseling, Corrective Action and Termination | | Number: | 03-01-11 |
| --- | --- | --- | --- | --- |
| Date: | 6/1/96* | | Page: | 5 of 15 |

(2) Executives (KMG/DMG)

    (a) Stores - All corrective action steps are to be reviewed and approved by the next level supervisor (District Team Leader and/or Regional Vice President, Regional Senior Vice President) and the Regional Personnel Director before action is taken.

    Additionally, terminations are to be reviewed and approved by the Vice President of Stores and Distribution Personnel and the Director of Employee Relations.

    (b) Distribution Centers - Corrective action steps are to be reviewed and approved by the next level supervisor, the Director, Distribution Personnel, the Vice President of Stores and Distribution Personnel and the Senior Vice President of Distribution before action is taken.

    Terminations are to be reviewed and approved by the Director of Employee Relations and the Vice President of Stores and Distribution Personnel.

    (c) Headquarters (KMG/DMG) - Corrective action steps are to be reviewed and approved by the next level supervisor, by the Director of Headquarters Team Relations/HR and by the Pyramid Head before action is taken.

    Terminations are to be reviewed and approved by the Vice President of Human Resources and Director of Employee Relations.

(3) Officers

    All Correction Action Process steps are to be reviewed and approved by the Chief Executive Officer and/or the President and the Executive Vice President of Team, Guest and Community Relations before action is taken.

Note: In all cases which involve unusual circumstances or those with potential legal liability for Target, Employee Relations, as well as the appropriate Personnel Director, should be contacted for advice and counsel.

3. Maintenance of Written Warning Notices

    a. Team Relations should establish a "tickler" system to ensure that corrective action steps are removed from the team member's personnel file in a timely manner.

    b. Written Warning Notices will normally be removed from the team member's personnel file one year after the Critical Warning Notice Period and the extension have expired (see examples below).

    Example 1: The team member received a Counseling on January 1 and did not repeat the conduct prior to July 1 (no critical period; 6 month extended period). The Counseling should be removed from the team member's file Jul.    the next year.

**◎ TARGET**

/0

TARGET/HAR

△ π EXHIBIT 10
Deponent Harris
Date 5-00 Rptr. JD
WWW.DEPOBOOK.COM

POLICY and PROCEDURE MANUAL

| Subject: | Counseling, Corrective Action and Termination | Number: | 03-01-11 |
|---|---|---|---|
| Date: | 6/1/96* | Page: | 6 of 15 |

Example 2: An hourly team member received a Counseling on January 1 (no critical period; 6 month extended period) and received a Final Warning for the same conduct on March 15 (one month critical period; 11 month extended period). The Final Warning's extended period will expire on March 15 of the next year. One year after that, the warnings should be stapled together and both removed from the team member's personnel file.

c.    Team Relations shall forward expired corrective action steps to Headquarters Employee Relations where they will be kept in a separate file for an additional period of two years.

NOTE: The team member must be offered the opportunity to acknowledge receipt by signing the corrective action step. If the team member refuses to sign the form, write "team member refused to sign" and offer the team member the opportunity to initial it. If the declines, initial it yourself. The corrective action is in effect whether or not the team member chooses to sign the form.

## III.    OTHER IMPORTANT INFORMATION

A.    LEANING PERIOD TEAM MEMBER - FAILURE TO MEET STANDARDS: An hourly or executive team member will be terminated during the first 90 days of employment for failure to meet company standards, including but not limited to any conduct set forth in Appendix A.

Note: The Corrective Action steps described in the policy do not apply to temporary team members, or hourly or executive team members who are within the first 90 days of employment or reemployment with Target. Supervisors are encouraged to discuss conduct or performance deficiencies with the Learning Period team member prior to the decision to terminate. Corrective action does apply to hourly and executive team members who have completed 90 days of employment but who are within their first 90 days in a different position due to transfer, promotion, demotion, etc. Corrective action also applies to those who have transferred from another DHC company and have more than 90 days with the other DHC company.

B.    EFFECT OF PRIOR WARNINGS: even after the expiration of the extended period, prior disciplinary warnings may be considered in determining whether a team member knew, or should have known, that the conduct is unacceptable, and may be a factor in classifying the conduct as Gross Misconduct rather than Serious Offense where intent is a factor. This is particularly true in cases where the decision is between classifying conduct as "Disorderly" or "Reckless". **Regional, Distribution or Headquarters Team Relations/HR (whichever is appropriate) and Employee Relations must be consulted in cases where expired disciplinary warnings are to be used in determining how to classify conduct.**

C.    COUNTING TIME: Time periods are counted in months as the following examples illustrate.

1.    The team member receives a Counseling for attendance on January 23. It expires 6 months later, on July 23. (No critical period because the Counseling was not issued for performance).

2.    The team member receives either a Written Warning or Final Warning on September 19. The critical periods expires on October 19, and the extended period the following September 19.

If the team member misses a significant amount of time during the critical or extended periods, then time periods under this policy may be extended by the amount of time missed, with the advance approval of Regional, Distribution or Headquarters Team Relations, as appropriate.

⊙ **TARGET**

TARGET/HARRIS160



-06107-WDF        Document 44     Entered on FLSD Docket 02/06/2001       Pag

qryHotel/other98                                      2/23/99

| Emp ID | Last | first | Date of re | Amount | F current | Description |
|--------|------|-------|-----------|--------|-----------|-------------|
| 9612813 | HAR | STEV | 0 | 25 | 1000 | SERVICE CHARGE - ITEM RETURNED BY BAN |
| 9612813 | HAR | STEV | 0 | 1000 | 1000 | RETURNED CHECK           12/22 |
| 9612813 | HAR | STEV | 0 | -400 | -400 | CHECKLESS PYMT RECEIVED-THANK YOU 12/ |
| 9612813 | HAR | STEV | 42798 | 5.89 | 5.89 | YESTERDAYS FT LAUDERDALE FL |
| 9612813 | HAR | STEV | 50698 | 119.33 | 119.33 | CRABBY JACKS     DEERFIELD BEACH  F |
| 9612813 | HAR | STEV | 50898 | 131.87 | 131.87 | CONCHY JOES SEAFOOD JENSEN BEACH |
| 9612813 | HAR | STEV | 50998 | 8.47 | 8.47 | COURTYARD 1XJ     JENSON BEA      F |
| 9612813 | HAR | STEV | 51498 | -127.13 | -127.13 | PAYMENT RECEIVED - THANK YOU  05/14 |
| 9612813 | HAR | STEV | 51598 | 93.38 | 93.38 | BOOTLEGGERS       FT LAUDERDALE  F |
| 9612813 | HAR | STEV | 51698 | 29.71 | 29.71 | WELLINGTON COUNTRY CWELLINGTON       F |
| 9612813 | HAR | STEV | 51798 | 86.59 | 86.59 | CITGO0731 MARINA DELDELRAY BEACH   F. |
| 9612813 | HAR | STEV | 60398 | 16.25 | 16.25 | HARVEY HOTEL DFW - FIRVING       T |
| 9612813 | HAR | STEV | 60498 | 10.67 | 10.67 | MAGNETISM 4E        DFW       T |
| 9612813 | HAR | STEV | 60498 | 31.42 | 31.42 | HARVEY HOTEL DFW - FIRVING       T |
| 9612813 | HAR | STEV | 60598 | 63.37 | 63.37 | HARVEY HOTEL DFW  IRVING        T |
| 9612813 | HAR | STEV | 60798 | 30 | 30 | GEORGE / STAVROS MOFFORT LAUDERDALE |
| 9612813 | HAR | STEV | 60898 | 3.81 | 3.81 | BLOCKBUSTER VIDEO #1BOCA RATON FL   F |
| 9612813 | HAR | STEV | 61098 | 17.14 | 17.14 | PAL'S CAPTAINS TABLEDEERFIELD BEACH  F |
| 9612813 | HAR | STEV | 61098 | 467.59 | 467.59 | PAL'S CAPTAINS TABLEDEERFIELD BEACH  F |
| 9612813 | HAR | STEV | 61198 | 104.09 | 104.09 | BOSTON'S ON THE BCH DEL RAY BEACH   F |
| 9612813 | HAR | STEV | 61198 | -475.24 | -475.24 | PAYMENT RECEIVED - THANK YOU   06/11 |
| 9612813 | HAR | STEV | 61498 | 27 | 27 | MARGATE SHELL      MARGATE      F |
| 9612813 | HAR | STEV | 61598 | 47.69 | 47.69 | TARGET STORES     BOCA RATON    F |
| 9612813 | HAR | STEV | 61798 | -47.69 | -47.69 | TARGET STORES     DEERFIELD BEACH  F |
| 9612813 | HAR | STEV | 62098 | 44.77 | 44.77 | PLANET HOLLYWOOD-RESFT LAUDERDALE |
| 9612813 | HAR | STEV | 62198 | 17.3 | 17.3 | SATHYA INC #      MIAMI        F |
| 9612813 | HAR | STEV | 62198 | 13.51 | 13.51 | RUBY TUESDAYS #2755 BOCA RATON   F |
| 9612813 | HAR | STEV | 62498 | 614.74 | 614.74 | NATIONAL TIRE WHOLESDELRAY BEACH   F. |
| 9612813 | HAR | STEV | 62798 | 476.88 | 476.88 | CITY FURNITURE    POMPANO BEACH   F |
| 9612813 | HAR | STEV | 62998 | 271.31 | 271.31 | MAROONE DODGE POMPANPOMPANO BCH |
| 9612813 | HAR | STEV | 70998 | 15 | 15 | ASPE PETROLEUM INC W PALM BEACH   F |
| 9612813 | HAR | STEV | 71198 | 10.68 | 10.68 | HOME DEPOT #204    BOCA RATON    F |
| 9612813 | HAR | STEV | 71198 | 18.23 | 18.23 | HOME DEPOT #204    BOCA RATON    F |
| 9612813 | HAR | STEV | 71998 | 10 | 10 | DEB PETROLEUM     DELRAY BEACH   F |
| 9612813 | HAR | STEV | 72398 | -833.41 | -833.41 | PAYMENT RECEIVED - THANK YOU   07/23 |
| 9612813 | HAR | STEV | 81098 | 44.5 | 44.5 | RAINFOREST CAFE-RETSUNRISE       F |
| 9612813 | HAR | STEV | 81098 | 24 | 24 | RAMKISSOON SINGH  FT LAUDERDALE  F |
| 9612813 | HAR | STEV | 81098 | 48.44 | 48.44 | RAINFOREST CAFE    SUNRISE      F |
| 9612813 | HAR | STEV | 81098 | -5.3 | -5.3 | RAINFOREST CAFE-RETSUNRISE       F |
| 9612813 | HAR | STEV | 81198 | 16 | 16 | CHEVRON #0053535   BOCA RATON    F |
| 9612813 | HAR | STEV | 81298 | 40.01 | 40.01 | WATERS EDGE MARINE BOYNTON BEACH |
| 9612813 | HAR | STEV | 81398 | 51.9 | 51.9 | LOW GLOW NEON      orlando      F |
| 9612813 | HAR | STEV | 81498 | 28.07 | 28.07 | THE OLD HOUSE RSTR LANTANA      F |
| 9612813 | HAR | STEV | 81698 | 17.03 | 17.03 | ALAN ROSENBLUM  ALTOMIAMI        F |
| 9612813 | HAR | STEV | 82298 | 20 | 20 | MARGATE SHELL     MARGATE       F |
| 9612813 | HAR | STEV | 82398 | 15.1 | 15.1 | ANTONIO ZALDUMBIDE  DEERFIELD BEACH |
| 9612813 | HAR | STEV | 82699 | 30.15 | 30.15 | CIELITO LINDO 2 LIGHTHOUSE PT FL |
| 9612813 | HAR | STEV | 82898 | 25 | 25 | ANTONIO ZALDUMBIDE  DEERFIELD BEACH |
| 9612813 | HAR | STEV | 82998 | -24.96 | -24.96 | 67 WINE & SPIRITS  BOCA RATON    F |
| 9612813 | HAR | STEV | 82998 | 28 | 28.06 | SEARS AUTO CNTR  BOCA RATON    F |
| 9612813 | HAR | STEV | 82998 | -1531.9 | -1531.9 | PAYMENT RECEIVED - THANK YOU   08/29 |
| 9612813 | HAR | STEV | 82998 | 24.96 | 24.96 | 67 WINE & SPIRITS  BOCA RATON    F |
| 9612813 | HAR | STEV | 82998 | 24.95 | 24.95 | 67 WINE & SPIRITS  BOCA RATON    F |
| 9612813 | HAR | STEV | 82998 | 15.32 | 15.32 | DISCOUNT AUTO PARTS DELRAY BEACH   F |
| 9612813 | HAR | STEV | 82998 | 21.17 | 21.17 | THE HOME DEPOT 218  DEERFIELD BCH   F |
| 9612813 | HAR | STEV | 83098 | 67.5 | 67.5 | CITGO0731 MARINA DELDELRAY BEACH   F |
| 9612813 | HAR | STEV | 90198 | 27.5 | 27.6 | THE FINE LINE MUSIC MINNEAPOUS     M |
| 9612813 | HAR | STEV | 90198 | 11.17 | 11.17 | TOBACCO ROAD INC   MINNEAPOLIS   M |
| 9612813 | HAR | STEV | 90298 | 90.49 | 90.49 | MURRAY'S RESTAURANT MINNEAPOLIS    M |
| 9612813 | HAR | STEV | 90398 | 11 | 11 | GODIVA CHOCOLAT-#301PHILADELPHIA.   P |
| 9612813 | HAR | STEV | 90598 | 41.65 | 41.65 | RUBY TUESDAYS #2146 BOCA RATON   F |
| 9612813 | HAR | STEV | 91198 | 41.1 | 41.1 | BOOTLEGGERS       FT LAUDERDALE  F |
| 9612813 | HAR | STEV | 92398 | -289.95 | -289.95 | PAYMENT RECEIVED - THANK YOU   09/23 |
| 9612813 | HAR | STEV | 92398 | 10 | 10 | EXXON COMPANY USA  BOCA RATON    F |
| 9612813 | HAR | STEV | 92398 | 15 | 15 | ANTONIO ZALDUMBIDE  DEERFIELD BEACH |



Δ π EXHIBIT  12
Deponent  Harris
Date 0 5-01 Rptr. JD
WWW.DEPOBOOK.COM

2-23-1999 12:58PM    FROM DHC TRAVEL SERVICES 612 302 0356    P. 2

| Emp ID | Last | first | Date of re | Amount | F current | Description |
|--------|------|-------|-----------|--------|-----------|-------------|
| 9612813 | HAR | STEV | 100198 | 10 | 10 | ASPE PETROLEUM INC  W PALM BEACH      F |
| 9612813 | HAR | STEV | 100198 | 20 | 20 | MORTY DRANOFF      BOCA RATON      F |
| 9612813 | HAR | STEV | 100298 | 27.31 | 27.31 | CHILI'S RESTAURANT CBOCA RATON      F |
| 9612813 | HAR | STEV | 100298 | 136.63 | 136.63 | TIRE KINGDOM #135  BOCA RATON      F |
| 9612813 | HAR | STEV | 100598 | 15 | 15 | DURU CUNEYT      BOCA RTN      F |
| 9612813 | HAR | STEV | 100898 | 20 | 20 | ANTONIO ZALDUMBIDE  DEERFIELD BEACH |
| 9612813 | HAR | STEV | 100998 | 84.75 | 84.75 | BILL WALLACE NISSAN DELRAY BEACH      F |
| 9612813 | HAR | STEV | 101298 | 29 | 29 | ANTONIO ZALDUMBIDE  DEERFIELD BEACH |
| 9612813 | HAR | STEV | 101698 | 10 | 10 | WARNER BROS 0000077880OSTON      M |
| 9612813 | HAR | STEV | 101798 | 82.92 | 82.92 | ASHWORTH HOTEL INC  HAMPTON      N |
| 9612813 | HAR | STEV | 101898 | 175.19 | 175.19 | ASHWORTH HOTEL      HAMPTON      N |
| 9612813 | HAR | STEV | 101898 | 58.8 | 58.8 | ASHWORTH HOTEL INC  HAMPTON      N |
| 9612813 | HAR | STEV | 101898 | 13.65 | 13.65 | HAMPTON X MART      HAMPTON      N |
| 9612813 | HAR | STEV | 102098 | 15.9 | 15.9 | PEMBROKE LAKES GOLF PEMBROKE PINE |
| 9612813 | HAR | STEV | 102198 | 25 | 25 | ANTONIO ZALDUMBIDE  DEERFIELD BEACH |
| 9612813 | HAR | STEV | 102198 | -349.98 | -349.98 | PAYMENT RECEIVED - THANK YOU    10/21 |
| 9612813 | HAR | STEV | 102298 | 529.22 | 529.22 | THE COVE MARINA N REDEERFIELD BCH      F |
| 9612813 | HAR | STEV | 102998 | -200 | -200 | PAYMENT RECEIVED - THANK YOU    10/29 |
| 9612813 | HAR | STEV | 111498 | 19 | 19 | MOBIL OIL 438      DEERFIEL      F |
| 9612813 | HAR | STEV | 112198 | 17 | 17 | 1201 NE 50TH ST    FT LAUDERDALE      F |
| 9612813 | HAR | STEV | 113098 | 11.05 | 11.05 | AMOCO ACA 5204    BOCA RATON      F |
| 9612813 | HAR | STEV | 120698 | -1000 | -1000 | PAYMENT RECEIVED - THANK YOU    12/06 |
| 9612813 | HAR | STEV | 121798 | -600 | -600 | CHECKLESS PYMT RECEIVED-THANK YOU 12/ |
| 9612813 | HAR | STEV | 121798 | -600 | -600 | CHECKLESS PYMT RECEIVED-THANK YOU 12/ |
| 9612813 | HAR | STEV | 121898 | 600 | 600 | CORRECTION-CREDIT WAS POSTED TWICE |
| 9612813 | HAR | STEV | 122298 | 1000 | 1000 | RETURNED CHECK      12/22 |
| 9612813 | HAR | STEV | 122298 | 25 | 1000 | SERVICE CHARGE - ITEM RETURNED BY BAN |

```
0261 1728                          TOTAL      125.99-
026171740 MV# 044000538546670    REFUND      125.99-
026171755 00-91823 0-143072 00000000
026172151 01/26/99 0393124 5788 1        17:21 069
026172152 001 064040080 BEACH TOWEL   T     1.54
026172157 002 00604     DEPT/CLASS    T     2.04
026172253                  SUBTOTAL          3.58
026172253   9612813 TARG DISCOUNT 10%        .36-
026172253              T=  6.00 % TAX        .20
026172254                     TOTAL          3.42
026172254             CASH PAYMENT           3.42
026172257 00-91481 0-143072 00000000
026172525 01/26/99 0393124 5789 9        17:25 069
026172525 ORIG SALE 01/02/99  0393078  1659
026172526 001 079010541 REFUND       T    11.80-
026172526             CHRKEE SHIRT
026172528 RC = 1 00 NO EXCEPTION
026172533                  SUBTOTAL         11.80-
026172533              T=  6.00 % TAX        .71-
```

Should indicate clearance price




Δπ EXHIBIT 13
Deponent Harris
Date 6-5-00 Rptr. JD
WWW.DEPOBOOK.COM