1

2

3            UNITED STATES DISTRICT COURT
           SOUTHERN DISTRICT OF FLORIDA
           FORT LAUDERDALE DIVISION

4

         CASE NO. 00-6107 CIV-FERGUSON

5

6 STEVE HARRIS,

7        Plaintiff,

8 vs.

9 DAYTON HUDSON CORPORATION,
   d/b/a TARGET STORES,

10

       Defendant.

11 _____/

12

13

14

15            May 22, 2000
           Monday - 9:20 a.m.
           Suite 300

16            18301 Biscayne Boulevard
           Aventura, Florida

17

18

19

           DEPOSITION

20

21            OF

22

           TERRY GILLESPIE

23

24      TAKEN ON BEHALF OF THE PLAINTIFF

25

           WORLDWIDE REPORTING SERVICE
           377-DEPO

2

```
 1
 2                          APPEARANCES
 3
 4              RICHARD J. BURTON, ESQ.,
                on behalf of the Plaintiff.
 5
                SHEILA M. CESARANO, ESQ.,
 6              of the law firm of
                Shutts & Bowen,
 7              on behalf of the Defendant.
 8
 9
10                     - - - - - -
11
12
                           INDEX
13
      WITNESS                  DIRECT   CROSS
14
   TERRY GILLESPIE
15      (By Mr. Burton)           3      --
16
17
18
19
                          EXHIBITS
20
   PLAINTIFF'S EXHIBITS                PAGE
21 FOR   IDENTIFICATION
22        1                        26
          2                        27
23
24
25
```

3

1    THEREUPON:
2                        TERRY GILLESPIE
3    a witness named in the Notice heretofore filed,
4    having been first duly sworn, deposes and says on
5    his oath as follows:
6                        DIRECT EXAMINATION
7    BY MR. BURTON:
8         Q.    Please state your name for the record.
9         A.    Terry Gillespie.
10        Q.    Mr. Gillespie, what is your home
11   address?
12        A.    901 Traymore Court, Winter Springs,
13   Florida.
14        Q.    What county is that in?
15        A.    Seminole.
16        Q.    So you're more one 100 miles from the
17   courthouse, correct?
18        A.    Yes.
19        Q.    What is your occupation and career?
20        A.    Regional human resource manager for
21   Target Stores.
22        Q.    How long have you had that role?
23        A.    Five years.
24        Q.    For the record, you're a white male
25   approximately over the age of 40.

                    WORLDWIDE REPORTING SERVICE
                            377-DEPO

4

|    |    |    |
|----|----|----|
| 1  | A. | Correct. |
| 2  | Q. | And prior to that what was your |
| 3  | training? | |
| 4  | A. | What was my training? |
| 5  | Q. | Yes. |
| 6  | A. | I was divisional vice-president of human |
| 7  | resources for a company called Fisher Bidwell.  I | |
| 8  | have a master's degree in human resource | |
| 9  | administration. | |
| 10 | Q. | From where? |
| 11 | A. | LaRoach College, Pittsburgh, |
| 12 | Pennsylvania. | |
| 13 | Q. | Is it a traditional residential school? |
| 14 | A. | It's an accredited university. |
| 15 | Q. | Did you go to courses in attendance |
| 16 | there for a period of two, three years? | |
| 17 | A. | Yes. |
| 18 | Q. | When did you receive that degree? |
| 19 | A. | May, 1991. |
| 20 | Q. | Since it appears that you didn't go |
| 21 | continuously through your program based upon your | |
| 22 | age, can you give me a brief resume of your | |
| 23 | educational background. | |
| 24 | A. | I graduated from high school in 1973 |
| 25 | from St. Claire High School, St. Claire, | |

5

| | |
|---|---|
| 1 | pennsylvania. I attended Indiana University of |
| 2 | Pennsylvania. I graduated in 1977 with a bachelor |
| 3 | of science in business administration with a minor |
| 4 | in personnel management. |
| 5 | Q. After that what did you do? |
| 6 | A. I joined Fisher Bidwell in August of |
| 7 | 1977. I was assistant store manager. |
| 8 | Q. Slow down a little. |
| 9 | Q. What is Fisher Bidwell? |
| 10 | A. It's a chain of discount stories. |
| 11 | Q. Where? |
| 12 | A. Headquartered in New Castle, |
| 13 | Pennsylvania. Operated stores in the midwest. |
| 14 | Q. The reason I'm saying this is these are |
| 15 | not names that customarily a jury might understand |
| 16 | in South Florida. |
| 17 | A. Sure. |
| 18 | Q. So Fisher Bidwell would be parallel to a |
| 19 | K-Mart or Target? |
| 20 | A. Yes. |
| 21 | Q. As a result of working for Fisher |
| 22 | Bidwell did you go back to school or did you receive |
| 23 | that degree on the job? |
| 24 | A. I worked for the company for a period of |
| 25 | years. When I moved into the human resource |

6

1  pyramid, I went to graduate school.

2      Q.    So you took time away from work and went

3  to graduate school?

4      A.    No.   It was done concurrently with my

5  job.

6      Q.    Was that a weekend type thing?

7      A.    Yes.   Evenings, weekends, yes.

8      Q.    You received your masters in 1992 you

9  said?

10     A.    '91.

11     Q.    When did you join Target?

12     A.    In August 30, 1993.

13     Q.    In what role?

14     A.    A regional personnel representative.

15     Q.    So you went from a vice-president in

16 Fisher Bidwell to a regional personnel

17 representative in Target.

18     A.    That is correct.

19     Q.    Would that be considered a demotion?

20     A.    No.

21     Q.    Can you tell me why a personnel

22 representative isn't as high as a vice-president or

23 if it is as high?

24     A.    The scope of the organization was much

25 different.   Fisher Bidwell is a much smaller

7

```
1    privately held regional chain.  Target is a
2    nationally known Fortune 500 organization.
3        Q.    So you went with the bigger boy in 1993.
4        A.    That is correct.
5        Q.    Were the salaries comparable?
6        A.    No.
7        Q.    Can you tell me which was greater?
8        A.    Target.
9        Q.    How long were you a regional personnel
10   person?
11       A.    About a year.
12       Q.    Then what was your next position?
13       A.    Promoted to a regional human resources
14   manager.
15       Q.    The one you are in now?
16       A.    Yes.
17       Q.    That was in 1994?
18       A.    Either late '94, early '95.
19       Q.    For the record, a human resources person
20   generally and customarily involves actions taken
21   regarding the employees of a company, if you will,
22   the affirmative goals programs, the personnel
23   issues; is that correct?
24       A.    Yes.
25       Q.    So you're not an operations person at
```

WORLDWIDE REPORTING SERVICE
377-DEPO

8

1   this time.  You don't run stores or buy product or
2   advertise?
3        A.   No.
4        Q.   A good portion of your time is spent
5   testifying, is it not?
6        A.   Excuse me?
7        Q.   A good portion of your time is spent
8   bringing and prosecuting charges on behalf of
9   Target, correct?
10       A.   Actually, no.
11       Q.   Can you tell me how many challenges to
12  personnel actions are you involved in currently?
13       A.   I receive a lot of phone calls, a lot of
14  information that I funnel out to various parties,
15  regional and human relations specialists.
16       Q.   Can you please answer the question,
17  which is how many.
18       A.   I am answering the question.  In terms
19  of how many am I involved with at the present time?
20       Q.   Yes.  Fifty?  A hundred?
21            MS. CESARANO:  Richard, do you mean
22       litigation or broader than that?
23            MR. BURTON:  No.  Broader than that.
24            THE WITNESS:  Really none that I'm
25       directly involved in -- no.  I shouldn't say

WORLDWIDE REPORTING SERVICE
377-DEPO

9

1         that.    There are two that I'm involved in.
2    BY MR. BURTON:
3         Q.     There are only two personnel matters as
4    the regional director that you're involved in,
5    personnel policy management challenges to actions?
6         A.     Excuse me.   Could you restate that?
7         Q.     My question to you is how many personnel
8    actions are you currently involved with?    I'm not
9    talking about litigation.    I'm talking about from
10   the giving of advice as how to handle it to the
11   preparation or overseeing of preparation of charges.
12        A.     I cannot give you a definitive answer.
13   I answer a lot of phone calls to give advice for the
14   stores.
15        Q.     How many different people are we talking
16   about?  Fifty?  A hundred?  Five?
17        A.     No.  I can tell you that I receive phone
18   calls on a regular basis where I'm asked to give
19   advice.
20        Q.     In the last month how many different
21   people?  Give me your best estimate?
22        A.     I don't know.
23        Q.     Over fifty?
24        A.     And estimate?
25        Q.     Yes.


WORLDWIDE REPORTING SERVICE
377-DEPO

```
 1        A.    Ten.
 2        Q.    How many times have you testified in a
 3   proceeding, whether it's in court or an
 4   administrative proceeding?
 5        A.    How many times have I --
 6        Q.    -- participated in testimony before
 7   either a court or administrative proceeding?
 8        A.    Once.
 9        Q.    This would be the second time you've
10   given a deposition or any kind of testimony in your
11   career?
12        A.    No.
13        Q.    Let's try again.  How many times have
14   you testified in any proceedings?
15        A.    Twice.
16        Q.    And other than this particular time,
17   there would be two other times?
18        A.    That is correct.
19        Q.    So was that before a court or was that
20   in a deposition such as today?
21        A.    One of each.
22        Q.    And when was the last time you
23   participated?
24        A.    Probably about a year and a half ago.
25        Q.    And a year and a half ago what was that
```

11

1    that type of proceeding that you testified in?
2         A.    It was a deposition.
3         Q.    In what case?
4         A.    The name of the individual was Van
5    Alstein.
6         Q.    Where was that proceeding situated?  In
7    other words, was it in United States District Court?
8         A.    It was an EEOC.
9         Q.    So this would be the second time in your
10   life that you've testified in a proceeding?
11        A.    No.  This would be the third.
12        Q.    And what was the other matter?
13             MR. CESARANO:  Let me correct.  Van
14        Alstein went further than EEOC.  We were in
15        court.  It was court.
16             THE WITNESS:  Okay.
17   BY MR. BURTON:
18        Q.    So did you testify in the court
19   proceeding in or was your deposition used or did you
20   do both?
21        A.    My deposition was used.
22        Q.    So you did not sit before a judge, raise
23   your right hand and swear to tell the truth?
24        A.    Ever or in that case?
25        Q.    In that case.

WORLDWIDE REPORTING SERVICE
377-DEPO

12

1        A.    I was given an oath, yes.
2        Q.    So you both had a deposition -- we can
3   be here a long.
4        A.    It doesn't matter to me.
5            MR. CESARANO:  If you understand --
6            THE WITNESS:  I gave a deposition in the
7        Van Alstein case.
8   BY MR. BURTON:
9        Q.    Did you also testify in court?
10       A.    It didn't go to court.
11       Q.    But your lawyer indicated that it was in
12  U.S. District Court.
13           MR. CESARANO:  The case was, but he
14       didn't go to court.
15           MR. BURTON:  I understand.
16  BY MR. BURTON:
17       Q.    Was it eventually settled?
18       A.    Yes.  It was resolved.
19       Q.    While it may be a confidential
20  settlement between the parties, what was the
21  nature of the settlement?
22       A.    Should I?
23           MR. CESARANO:  Yes, it was confidential,
24       but he means was there money involved?
25  BY MR. BURTON:

13

1          Q.     I'm a third party.  I'm allowed to ask
2     this.
3          A.     I'm trying to recall that one.
4               MR. CESARANO:  You don't have to say the
5          amount.
6               THE WITNESS:  Yes, there was.
7     BY MR. BURTON:
8          Q.     What was the nature of the charge that
9     Mr. Van Alstein had against Target?
10         A.     First of all, it was Ms. Van Alstein.
11    It was a gender charge.  A gender and age charge, I
12    believe.
13         Q.     Can you describe the protected situation
14    that she claimed?  Obviously, female.
15         A.     She claimed that she was dismissed due
16    to her gender and age.
17         Q.     And she was a white woman?
18         A.     Yes, that is correct.
19         Q.     Now, you personally, when was the first
20    time you became familiar with Steve Harris?
21         A.     I was part of the selection process that
22    brought Steve into the company.  I was part of the
23    group that hired Steve.
24         Q.     You say "I was part of it."  Sometimes
25    in law we take credit for a good number of things.

WORLDWIDE REPORTING SERVICE
377-DEPO

14

1   When you say you were part of it, can you tell me
2   what part of it you were?
3        A.    I was one of the individuals who
4   interviewed Steve.
5        Q.    And who else was part of that selection
6   process?
7        A.    Terry Hargrove.  I don't recall who
8   else.
9        Q.    Steve was working for a competitor at
10  the time that he was brought on board Target,
11  correct?
12       A.    That is correct.
13       Q.    As part of your function, you were then
14  a regional personnel person?
15       A.    Yes.
16       Q.    When was the last time you took any
17  specialty training in guidelines for affirmative
18  action or EEO, you yourself?
19       A.    When you say specialized training would
20  you define that?
21       Q.    Meaning that you took off from your
22  daily work, went to either a seminar that lasted
23  more than eight hours, or took a course at a school?
24  In other words, where it was something more than
25  just a flier.

15

1         A.    It was course work in graduate school.

2         Q.    So this has been a number of years.

3    About ten years, correct?

4         A.    I can't tell you when it was.

5         Q.    Because if I'm correct, since it was a

6    weekend program -- how long was this program?

7         A.    It was a weekend and evening program.

8         Q.    How long was it?  A year?  Two years?

9    Three years?

10        A.    Four years.

11        Q.    So sometime between 1988 and sometime

12   between 1992 you would have taken a course in that?

13        A.    Yes, that is correct.

14        Q.    And since then you've taken no

15   additional courses and/or specialty program as I've

16   defined it, correct?

17        A.    Outside of the work environment?

18        Q.    Yes.

19        A.    That is correct.

20        Q.    So you were, as you stated, part of the

21   group that interviewed him.  What was the needs that

22   the company, that Dayton Hudson had when Mr. Harris

23   was being interviewed?

24        A.    We were looking to hire experienced

25   retail executives.

16

1    Q.    To the best of your knowledge has Target
2    ever had any either consent decrees and/or any other
3    expressed needs to specifically solicit persons who
4    were African American?
5    A.    I'm sorry.  Could you rephrase that?
6    Q.    At that time or in advance of that time
7    has Target Stores ever been the subject of a consent
8    decree involving affirmative action?
9    A.    I don't know what a consent decree is.
10    Q.    Never heard the term?
11    A.    I've heard the term.  I want the
12    definition of it so I can answer it.
13    Q.    Where there has been an action brought
14    by somebody, whether it's state government, the
15    federal government or local government or persons
16    stating that there were not enough persons of
17    diversity within the Target organization.
18    A.    To my knowledge, no.
19         MS. CESARANO:  A court order.  I mean
20         that the court would have signed.
21         MR. BURTON:  Where they agree that
22         "We'll do X and you'll do Y."
23         MS. CESARANO:  Right.  A court order or
24         EEOC order or anything.
25         THE WITNESS:  Not to my knowledge.

WORLDWIDE REPORTING SERVICE
377-DEPO

17

```
1    BY MR. BURTON:
2         Q.    Was there an affirmative action program
3    in place at Target and/or Dayton Hudson?
4         A.    Actually, no.  The correct corporate
5    term is Target Corporation.
6         Q.    When did that go into effect?
7         A.    A few months ago.  The beginning of
8    March, I believe.
9         Q.    Since the filing of the suit?
10        A.    That's correct.
11              MR. BURTON:  I'm happy to have a
12        voluntary agreement to amend the name and
13        caption if that's acceptable, counsel.
14              MS. CESARANO:  Absolutely.
15              MR. BURTON:  If you send me something
16        that tells me.
17              MS. CESARANO:  The proper name now.
18              MR. BURTON:  Yes.
19              MS. CESARANO:  Sure.
20              MR. BURTON:  I knew it was considered.
21        I didn't know it was passed.
22   BY MR. BURTON:
23        Q.    Target Stores, Inc. or Target, Inc.,
24   contains other stores that are still going by the
25   name of Dayton Hudson, correct?
```

18

1          A.     That is correct.

2                 Well, actually, no.  There are no stores

3     in Dayton Hudson.  There is Dayton and Hudson.

4          Q.     Northern chains.  They're still

5     operating under those names?

6          A.     Yes.

7          Q.     And they are generally higher end

8     merchandise equivalent to Burdines.

9          A.     Yes.

10         Q.     In the Target organization is there or

11    has there been a program of affirmative action,

12    whether it's a goal or a requirement?

13         A.     We establish diversity hiring goals.

14         Q.     You say "we establish."  Who is the

15    "we"?  Well, where are those goals?

16         A.     We, as a leadership team, establish the

17    goals.

18         Q.     I don't like the word "we," because that

19    assumes that you somehow or other are the guy on

20    top.  So when you say "we," I'm going to ask in

21    every instance who it is.  In you weren't the person

22    or persons who were leading that team, please

23    indicate who "we" is.

24         A.     "We" is a group of a leaders who operate

25    our region.  That would include the regional senior

1   vice-president, the regional vice-presidents, the

2   regional human resource director, my peer group of

3   regional human resource managers, and the district

4   team leaders within the region.

5        Q.   So we're talking about a group of maybe

6   fifty people.

7        A.   No.

8        Q.   How large a group is that?

9        A.   Thirty.

10       Q.   Do those 30 persons put on paper their

11  minutes of their meetings?

12       A.   No.

13       Q.   Is there a document or documents that

14  reflects the work they have performed?

15       A.   Yes.

16       Q.   Where and what would those be called?

17       A.   Those would be called diversity goals.

18       Q.   Have they been reviewed on a continuing

19  basis?

20       A.   Yes.

21       Q.   So there would be a number of documents

22  that would fall into that category?

23       A.   There would be prescribed goals, yes.

24            MR. BURTON:  Counsel, I've never seen

25       them.

20

1        MS. CESARANO:  We'll provide them.
2        MR. BURTON:  Thank you.
3   BY MR. BURTON:
4        Q.   How long have you been preparing
5   documents known as diversity goals?
6        A.   For at least several years.
7        Q.   Are there diversity goals for
8   different regions or is it nationwide?
9        A.   Yes.
10       Q.   Which one of the "yes's"?
11       A.   To your first question are there
12  diversity goals for different regions, yes.
13       Q.   What region is South Florida in?
14       A.   South Florida is part of Region 300.
15       Q.   Does that mean there are 300 regions?
16       A.   No.
17       Q.   How many regions are there?
18       A.   Five.
19       Q.   How big is Region 300?
20       A.   Approximately 200 stores.
21       Q.   Is there a subcategory other than
22  Region 300?
23       A.   The southern districts primarily within
24  the State of Florida is called a spoke, which, in
25  essence, is a subregion.

21

1          Q.    What is a spoke?
2          A.    Spoke 393.
3          Q.    And 300 being the 300th region and 93
4    would be that spoke.
5          A.    Yes.
6          Q.    And where does that encompass?
7          A.    That encompasses all the stores in the
8    State of Florida and Southern Alabama.
9          Q.    In spoke 393, can you break it down
10   further?
11         A.    Yes.
12         Q.    What is the next breakdown?
13         A.    District.
14         Q.    Which district is this within Spoke 393?
15         A.    The district that Mr. Harris was
16   employed in was district 310.
17         Q.    Where did that encompass?
18         A.    That encompasses primarily the Palm
19   Beach and Broward County stores.  I think there may
20   be one or two Broward County stores in the
21   Southern District as well for South Florida.
22         Q.    So there's a District 310 and then there
23   is a Southern District.
24         A.    Yes.  A Miami District called
25   District 318.

1        Q.    In 310, 318, at the time that Mr. Harris

2    was being solicited for a job, how many

3    African-American general managers were there of

4    stores?

5        A.    I don't know.

6        Q.    Who would know that?

7        A.    I don't know.

8        Q.    Can you think of any names of persons

9    that would have qualified as an African-American or

10   a black person, a black complected person, who was a

11   store manager, a single one, in 310 and 318?

12       A.    Yes.

13       Q.    Who?

14       A.    Kathy Chippey.  C-H-I-P-P-E-Y.

15       Q.    Where was she a store manager?

16       A.    I believe she was a store manager, store

17   team leader, in our West Palm Beach Store.

18       Q.    You said "was."  Did she subsequently go

19   to a different slot or leave?

20       A.    Yes.

21       Q.    Where is she now?

22       A.    In our North Miami Beach Store.

23       Q.    So she still a team leader of a store?

24       A.    Yes.

25       Q.    But she's now in North Miami Beach from

23

1 | West Palm Beach.

2 | A. Yes.

3 | Q. Are there any others?

4 | A. Presently?

5 | Q. Yes.

6 | A. Yes.

7 | Q. Who?

8 | A. Don McGinness.

9 | Q. Where?

10 | A. Cutler Ridge.

11 | Q. It seems that both of these happen to be

12 | in Dade County. I know North Miami Beach and I know

13 | Cutler Ridge. Are there any in District 310?

14 | A. Is the question are there any

15 | African-American store team leaders in District 310

16 | at the present time?

17 | Q. Yes.

18 | A. No, I don't believe so.

19 | Q. At the time that Mr. Harris was seeking

20 | employment and you were soliciting him for a job,

21 | were there any black team leaders in 310 that you

22 | can recall?

23 | A. I believe Kathy Chippey was in

24 | District 310 at that time.

25 | Q. So Ms. Chippey was moved from the 310 to

24

1   the 318 region, and no --

2        A.    District.

3        Q.    I'm sorry, district.

4              So other than Ms. Chippey, who was moved

5   to diverse Dade County in 310, was there any other

6   team leader other than Mr. Harris during that period

7   or tenure?

8        A.    What was the term you used before.

9        Q.    Diverse.  Diverse Dade County.  I'll

10  restate it again.  Dade County is a fairly diverse

11  area, isn't it?  Probably one of the most diverse

12  counties in the world.

13       A.    I couldn't tell you.  ·

14       Q.    You don't know if it has a reputation

15  that it's primarily made up of blacks and Hispanics

16  and a bunch of people who are not white Angle-Saxon

17  Protestants?

18       A.    There is a high level of diversity in

19  Dade County, yes.

20       Q.    Outside of diverse Dade County, now that

21  we've agreed to the term, were there any

22  African-American persons who were team leaders,

23  after Ms. Chippey left and went to diverse Dade

24  County, other than Mr. Harris that you can recall?

25            MS. CESARANO:  And, just for

25

1          clarification, you mean store team leaders,

2          because they use team leaders for all sorts of

3          levels.

4              MR. BURTON: I was just using the term

5          he was.  What I would call store managers in

6          every other organization.

7              MS. CESARANO: Yes.

8              THE WITNESS: I do not recall.

9  BY MR. BURTON:

10        Q.  You don't recall any names, do you?

11        A.   I don't recall if there was one.  I'm

12  going through the work charts in my mind here, and I

13  do not recall any.

14        Q.  As you sit here today, you don't recall

15  any, do you?

16        A.   I do not.

17        Q.  Mr. Harris was a store team leader, was

18  he not?

19        A.   That is correct.

20        Q.  At the time he was a store team leader

21  was Ms. Chippey in Palm Beach, Broward County Region

22  or in the Dade County District?

23        A.   I cannot tell you precisely what her

24  transfer was.  It was around the time that

25  Mr. Harris was a store team leader.  I do not know

26

1   the exact date.
2        Q.   She was either there shortly and was
3   transferred or their paths didn't cross.  One of the
4   two.
5        A.   That's correct.
6        Q.   Mr. Harris wasn't hired as a store team
7   leader, was he?
8        A.   No.
9        Q.   What was he hired as?
10       A.   He was hired as an assistant store team
11  leader.
12       Q.   You've been kind enough and counsel has
13  to send me a copy of his files, it looks like a file
14  called Personnel File of Steve Harris, prior to this
15  deposition.  Did you review this, sir?
16       A.   Correct.
17       Q.   When was the most recent time you
18  reviewed this?
19       A.   About two hours ago.
20            MR. BURTON:  So let's have this marked
21       as Composite Exhibit 1.
22            (The document referred to was thereupon
23            marked "Plaintiff's Exhibit No. 1 for
24            Identification.")
25  BY MR. BURTON:

1          Q.    You also reviewed the benefits file of
2    Steve Harris, did you not?
3          A.    I briefly reviewed that.
4                MR. BURTON:   Let's mark this as
5          Composite Exhibit 2.
6                (The document referred to was thereupon
7                marked "Plaintiff's Exhibit No. 2 for
8                Identification.")
9    BY MR. BURTON:
10         Q.    Going to the initial recruitment of
11   Steve Harris, I believe that this was through a
12   personnel agency, was it not?
13         A.    I believe it was.
14         Q.    When you first met with Mr. Steve Harris
15   were there any African-Americans on the screening
16   committee?
17         A.    No.   I don't believe so.
18         Q.    In 1995, his first year after being
19   hired, I believe that he was considered a valued
20   employee sufficient that he was given bonuses,
21   correct?
22         A.    He would not have earned a bonus until
23   he was a store manager.
24         Q.    When did he become the store manager to
25   the best of your recollection?

28

1      A.      To the best of my recollection, it would
2   have been some time in probably early 1998.
3      Q.      I 1995 and '96 and '97, he was in
4   various locations, was he not?
5      A.      Yes.
6      Q.      Did you have any direct involvement with
7   him after he was hired during that period of time?
8      A.      Yes.
9      Q.      Can you tell me why you would have kept
10  in contact with him?
11     A.      I was involved in a sexual harassment
12  issue that Mr. Harris was involved in.
13     Q.      Can you explain what the story of that
14  was?
15     A.      A group of team members expressed
16  concerns about the way they were being treated in
17  the store.
18     Q.      What was the outcome of that?
19     A.      He was placed on a disciplinary action.
20     Q.      Was any investigation made to determine
21  whether or not that was a valid complaint or charge?
22     A.      Yes.
23     Q.      Who performed that?
24     A.      Myself, as well as one of our market
25  investigators.

29

1          Q.    Who was that?

2          A.    I believe it was Natalie McCaffrey.

3          Q.    What were the purported charges?

4          A.    The purported charges were inappropriate

5     comments, innuendos.

6          Q.    Where is that documented, that

7     investigation?

8          A.    That is documented in the investigatory

9     file.

10         Q.    Where is that?

11         A.    In my office, as well as there are

12    probably notes in the district office concerning it.

13              MR. BURTON:  Counsel, I don't believe

14         that has been provided.

15              MS. CESARANO:  We'll provide it.

16              MR. BURTON:  To the extent that it

17         contains material that I may have to go back

18         over with Mr. Gillespie, I believe that would

19         be appropriate.

20              MS. CESARANO:  That's fine.  In fact, I

21         was going to suggest to you that when we

22         schedule Mr. Harris, because we were going to

23         reschedule that, that Mr. Gillespie will be

24         there, and so, perhaps, we can finish up any

25         questions that you have of Mr. Gillespie.

30

1              MR. BURTON:  As long as I have a
2         sufficient time, sure.
3              MS. CESARANO:  Fine.
4    BY MR. BURTON:
5         Q.   When did that occur, this issue?  Was
6    that before or after he was a store manager?
7         A.   Before.
8         Q.   So he was an assistant store manager.
9    Where was he located?
10        A.   In several stores.  I believe he worked
11   in our West Palm Beach store.  I believe he worked
12   in our Boca Raton store.  There may have been
13   another store that he worked in.
14        Q.   Is it customary to move people around
15   like that in the Target organization?
16        A.   Yes.
17        Q.   So he was rotated as one would normally
18   be at that level?
19        A.   Yes.
20        Q.   Do you remember which store this
21   occurred in?
22        A.   I believe it was the Boca Raton store.
23        Q.   Was that the immediate preceding store
24   to him being promoted to store manager?
25        A.   I'm not sure.

                    WORLDWIDE REPORTING SERVICE
                           377-DEPO

31

1           Q.    This investigation of some purported
2      sexual harassment, you don't remember when.  Two,
3      three, four, five years ago?
4           A.    That's a broad period of time.
5           Q.    That's why I'm asking, because I don't
6      have the notes.
7           A.    It would have been between one to two
8      years before his promotion to store manager, I
9      believe.
10          Q.    There was no physical touching alleged,
11     was there?
12          A.    I don't recall.
13          Q.    Then you would have been called, had
14     there been?
15          A.    Not necessarily.
16          Q.    Was there any EEO that emanated from it
17     from any of these people?
18          A.    No.
19          Q.    So this was a complaint by one or --
20          A.    Several.
21          Q.    So several unnamed and unremembered
22     female employees.
23          A.    I wouldn't say unnamed nor unremembered.
24          Q.    Can you provide their names?
25          A.    I just don't recall their names at the

WORLDWIDE REPORTING SERVICE
377-DEPO

32

1    present time.

2        Q.    Then it's unremembered, isn't it?

3        A.    No.  I don't remember their names.  I do

4    remember the circumstances.

5        Q.    I've asked you the circumstances whether

6    there was touching, and you said you don't remember

7    that either.  Do you remember the words allegedly

8    spoken?

9        A.    No.  I made the comment previously that

10    there were inappropriate comments and innuendos.

11    The exact verbiage, I do recall recall.

12        Q.    When you say innuendos, and I'm trying

13    to figure out, not that any sexual harassment that

14    is appropriate, but I'm trying to determine what was

15    done beyond an investigation and a discussion, if

16    anything, with Mr. Harris?

17        A.    A formal disciplinary action.

18        Q.    What was the nature of that formal

19    disciplinary action?

20        A.    A disorderly conduct warning.

21        Q.    Is it a written warning?  Is it an oral

22    warning?

23        A.    It's a written warning.

24        Q.    And it says, "If you've done this, don't

25    do it again"?

1          A.    No.  We described the policy violation.

2          Q.    You say violation, was there any ability

3  that Mr. Harris had to have testimony taken?

4          A.    Absolutely.

5          Q.    What ability is that to have testimony

6  taken and who was the trier of fact?

7          A.    We asked Mr. Harris.

8          Q.    You.  When you say we, you asked him and

9  the investigator asked him, correct?

10         A.    Either or both of us.

11         Q.    Do you remember if you or she or both of

12  you asked?

13         A.    I had some conversation with Mr. Harris

14  during this, the exact substance of which I do not

15  recall.

16         Q.    When I talk about an adversarial ability

17  to contest a charge, what I mean is can he call in

18  witnesses or are you just interviewing people?

19         A.    He could call upon anyone that he felt

20  would have firsthand information to this.

21         Q.    Do you remember if he did?

22         A.    I don't recall.

23         Q.    So your recollection is fairly vague.

24  Is that an accurate way to put it?

25         A.    Yes.

34

1          Q.    Then I won't pursue it.  I don't want
2     you to guess.
3               As a result of having this written item
4     in his file, which is not in his personnel file, is
5     it?
6          A.    I don't know.
7          Q.    You looked at it two hours ago.  Did you
8     see it?
9               MS. CESARANO:  Why don't you look
10          through it now.
11              THE WITNESS:  No, it's not.
12    BY MR. BURTON:
13         Q.    This purported incident wasn't
14    significant enough to make his personnel file
15    according to your records?
16         A.    The disciplinary action is not in that
17    file.
18         Q.    Who makes that determination whether
19    it's significant enough to make, quote, the
20    personnel file or not?
21         A.    Formal disciplinary action should be
22    part of a team member's personnel file.
23         Q.    So your recordkeeping is poor in this
24    instance?
25         A.    The disciplinary action is not in this

35

1    file.

2            Q.      Then I'll restate my question.  Then

3    your record keeping is poor in this instance; is

4    that correct?

5            A.      The disciplinary action is not in that

6    personnel file.

7            Q.      Then I'm asking you to conclude that

8    your record keeping is poor.

9            A.      I'm not going to make that conclusion.

10   It is our policy that all disciplinary actions be

11   part of a team member's permanent record.

12           Q.      And this would be your responsibility to

13   have it accurate, correct?  In this insurance you

14   violated policy, correct?

15           A.      It is our policy that --

16           Q.      No.  I'm asking who is responsible.

17           A.      We have a service center in our

18   headquarters that maintains the files.  Ultimately,

19   it is my responsibility that the files be current.

20           Q.      And even though we're in litigation in

21   this case, you didn't bother to check to make sure

22   that you yourself had sufficiently followed your own

23   policies in advance of this deposition, correct?

24           A.      I did not check Mr. Harris' personnel

25   file.

36

1               MS. CESARANO:  For the records, I got
2          the file from corporate headquarters.
3               MR. BURTON:  I understand, but he looked
4          at it two hours ago and he didn't notice it
5          either, did you?
6               THE WITNESS:  No.
7     BY MR. BURTON:
8          Q.   Thank you.
9               In this particular instance you said
10    there was a disciplinary action.  It should have
11    been in here.  I'm not prepared to get into too much
12    of this, because, obviously, I haven't heard of this
13    before this, but let's try a little bit and see
14    where we go.
15               How long are they suppose to stay in a
16    personnel file?
17         A.   I believe seven years.
18         Q.   You yourself was involved in the
19    investigation, correct?
20         A.   That's correct.
21         Q.   You say there were several persons, but
22    you don't remember who they were or what was alleged
23    as you've described earlier, correct?
24         A.   I remember the general nature of the
25    complaints.

37

1        Q.    The general nature you've described
2    already, correct?
3        A.    That's correct.
4        Q.    Innuendos and comments that might be
5    considered inappropriate.
6        A.    I believe that was the basis.
7        Q.    And the investigation was performed by
8    you and some other person whose name you don't
9    recall.
10       A.    That is correct.
11       Q.    Did the persons who purportedly made the
12   complaints put it in writing?
13       A.    Yes.
14       Q.    And that's in this other file that I
15   also haven't seen, correct?
16       A.    Yes.
17       Q.    Did you have any further contact with
18   Mr. Harris after this incident perhaps two, three
19   years ago now?
20       A.    Yes.
21       Q.    When was that?
22       A.    Ongoing.
23       Q.    So were you part of the group that
24   recommended him for promotion?
25       A.    Yes.

38

1      Q.    Who else was on that group that
2   recommended him for promotion?
3      A.    I do not exactly who, but it would have
4   been a group of district managers as well as his own
5   district manager.
6      Q.    Do you remember who his own district
7   manager was at the time?
8      A.    I'm trying to recall if Jeff Warren was
9   still his district team leader when Mr. Harris was
10  promoted.  I don't recall whether he was the
11  district team leader or Mark Hasting was.
12     Q.    Let me guess.  Most organizations of
13  your size have review committees when they're
14  talking about promotions.  Is that consistent with
15  Target?
16     A.    We have an assessment center process.
17     Q.    And I would guess that somewhere in
18  there, there is a review of the persons who were
19  competitors with Mr. Harris for that position and
20  also an assessment of Mr. Harris, correct, in
21  writing?
22     A.    Yes.
23     Q.    Where is that file?
24           MR. BURTON:  Counsel, that's another
25       file that is missing.

39

1              MS. CESARANO:  Remember, you just gave
2          me your production request.  I still have time
3          to respond.
4              MR. BURTON:  But this would have been
5          the normal stuff.
6              MS. CESARANO:  We'll get it for you.
7      BY MR. BURTON:
8          Q.   Where is that file, the assessments of
9      the persons who were competitors for various
10     promotions.
11         A.   It's probably in our regional office in
12     Dallas.
13         Q.   Is there a specific name it goes under?
14         A.   It would be part of a store team leader
15     round robin process.
16         Q.   Would he have been subject to any other
17     store team leader round robin processes prior to
18     making the promotion to store team leader?
19         A.   I don't recall.  I don't recall if prior
20     to the time that he went through this, that would
21     have resulted in his recommendation for promotion.
22         Q.   In other words, whether there were prior
23     times he was up for it and wasn't selected.
24         A.   That's correct.
25         Q.   But he might be and you would have to

40

1   check on those records and he certainly could have,
2   correct?
3          A.    Yes.
4          Q.    So Mr. Harris was then promoted at one
5   point to a store team leader?
6          A.    That is correct.
7          Q.    How many assistant store team leaders
8   are there in a typical store?
9          A.    There are in a store currently,
10  depending on the volume, anywhere from a minimum of
11  four.
12         Q.    Is there a chief assistant or is it just
13  assistant?
14         A.    It's a vertical hierarchy.  All
15  executive team leaders report to the store team
16  leader.
17         Q.    So while he was moved around from store
18  to store there were lateral transfers, not
19  promotions.
20         A.    I believe when Mr. Harris was moved
21  around from store to store he was brought in as what
22  is called an assistant store team leader, which is a
23  structure that has since been revised to a
24  horizontal hierarchy.
25         Q.    At the time that he was transferred, can

41

1   you tell me the method or mechanism for it?

2        A.    I believe he was an assistant store team

3   leader when he was promoted.

4        Q.    What I'm taking about is when he was

5   laterally transferred, you said that was a different

6   procedure.  What was the difference?

7        A.    The difference was he was moved from one

8   store to another in different capacities, as opposed

9   to being promoted to a store team leader.

10       Q.    Now they just keep you where you are and

11  promote you horizontally.

12       A.    The process is the same.  People are

13  given various experiences in a variety of stores to

14  prepare them to be a store team leader.

15       Q.    You said it is different.  What is the

16  difference?

17       A.    It was a different hierarchy.  There

18  were two assistant store team leaders at that time.

19  I believe, if the team period serves me well, there

20  were two assistant store team leaders.  Then there

21  would be several subordinate executive team leaders.

22       Q.    So he was always brought in as an

23  assistant store leader, which would be like a

24  vice-admiral on a ship, or something, as opposed to

25  the admiral, and other executives who report to him.

1   Now you just have all of the people named assistant
2   store team leaders in the division.
3        A.   We call them executive team leaders, and
4   they all report to the store team leader now.
5        Q.   Again, so he was brought in at a higher
6   level than your current executives.
7        A.   No.
8        Q.   He was one of two people who reported to
9   the store leader.
10       A.   Yes.
11       Q.   Now there might be three or four people
12   who report to the store leader.
13       A.   It's a different type of a hierarchy,
14   but the positions would be very similar.
15       Q.   But it would be consistent to say that
16   he would go from one area of a store assistant in
17   charge of a particular division to another to get
18   them cross-experience?
19       A.   That is correct.
20       Q.   What cross-experience did he receive?
21       A.   He worked in several different
22   positions.
23       Q.   Go ahead.   Tell me.
24       A.   I don't recall.
25       Q.   Do you recall any of them?

1     A.   No.

2          Q.   So you said you had further contact with

3     him after that incident with this harassment.  Can

4     you tell me what contact you had with him other than

5     seeing his name cross your desk, if you recall any?

6          A.   It was a cursory level of contact.

7          Q.   His name crossing your desk?

8          A.   No.  I can't recall his name crossing my

9     desk after that, other than in terms of -- well, I

10    can't ever recall his name crossing my desk in a

11    sense.

12.        Q.   So, as you sit there two years after

13    he's been given a formal sanction, which you're

14    mindful of, his name is brought up for being a store

15    manager, correct?

16         A.   Yes.

17         Q.   Did you bring it to the attention of the

18    other people that this issue had arisen?

19         A.   Absolutely.

20         Q.   So everyone on that panel was aware of

21    it; is that correct?

22         A.   I can't say that definitively.

23         Q.   It was nothing that was hidden from

24    anyone on the panel.

25         A.   That is correct.

44

1          Q.    Now, mindful of that, has Target
2     promoted over persons that have had an incident such
3     as this to a higher position in the past?
4          A.    Yes.
5          Q.    Who were these other persons?
6          A.    I'm certain that we have, but I can't
7     recall names right now.
8               MR. BURTON:   Pursuant to the
9          interrogatories, I think it would be
10         appropriate at this point so we'll wait to see
11         those answers.
12              MS. CESARANO:   Okay.
13    BY MR. BURTON:
14         Q.    Which store was he promoted to be the
15    manager ever?  And I use the term manager, because
16    team leader is so widely used there.
17         A.    He was promoted to lead the store -- it
18    was Store 392.
19         Q.    Can you tell me where that is?
20         A.    That was in this market.
21         Q.    Do you know the location?
22         A.    I don't recall the address and what we
23    termed it.  I know it was T392.
24         Q.    You don't even remember the city, do
25    you?

1        A.    It was in this market, yes.

2        Q.    This market is a pretty big place.

3        A.    The market being District 310.

4        Q.    Somewhere in Palm Beach and or Broward

5    County.  You don't recall what city, do you?

6        A.    No.

7        Q.    So you physically didn't go there and

8    perform the investigation in advance of his having

9    charges filed, did you?  Did you physically go and

10   perform the investigation yourself?

11       A.    You're talking about him being a

12   store team leader now?

13       Q.    Yes.

14       A.    The first store that he was in was T392.

15   There was no investigation regarding Mr. Harris

16   while he was in 392.

17       Q.    And you don't remember where that was or

18   what that was.  Then he was transferred to another

19   store.  Do you remember what that store was?

20       A.    Yes.  That was T393, Deerfield Beach.

21       Q.    At 392, wherever that may have been, do

22   you know what his ratings were?

23       A.    No, I don't know.

24       Q.    So prior to coming here today and within

25   the last two hours, even though you read it, you

46

1   don't remember what his rating was according to
2   these personnel files?
3        A.    No, I don't.
4        Q.    The other store, was it larger or
5   smaller or you have no idea?
6        A.    I don't recall the volume of that store.
7              MS. CESARANO:   You're talking about 392
8        now?
9              MR. BURTON:   Or 393.
10  BY MR. BURTON:
11       Q.    Do you recall him getting any
12  commendations, merits or demerits in 392?
13       A.    No.
14       Q.    We just saw you review all of his
15  paperwork to find out if the admonishment was in
16  here, and even though you looked at it within the
17  last fifteen minutes, you don't recall anything
18  about his conduct preceding the incident in
19  question, correct?
20       A.    I can tell you I do not know what his
21  exact rating was, no.
22       Q.    You don't remember which store it was,
23  what city it's in.
24       A.    That's not true.
25       Q.    Where was 392?

47

1          A.    That's in Palm Beach County.  It may
2     have been Palm Beach.  I don't know.  It's a store
3     that has since closed.
4          Q.    Was that the reason that he was put in
5     the other store, because of closure of the store, or
6     was he moved before it was closed?
7          A.    I believe he was moved after it was
8     closed.
9          Q.    So he was in a store that was closed or
10    closing.
11         A.    Yes.
12         Q.    And, as a result, he was transferred to
13    another store.
14         A.    Yes.
15         Q.    Was the store he was transferred to a
16    new store that was opening up to replace or
17    supplement the store?
18         A.    No.
19         Q.    It was an existing store of Target?
20         A.    That is correct.
21         Q.    And was there a selection process made
22    for this transfer, since it wasn't a new store, or
23    how was it decided that he would go there?
24         A.    It was a lateral transfer.  Mr. Harris
25    was the closing store manager at T392, and then

1    there was an opening in T393 for which he was
2    selected.
3              MR. BURTON:  If I can take a two, three
4         minute break for a moment, and I suggest that
5         all of you may wish to if you want to.
6              (Thereupon, a brief recess was taken.)
7    BY MR. BURTON:
8         Q.   So in 393 did you have any involvement
9    personally at all with Mr. Harris prior to the
10   incident in question?
11        A.   Yes.
12        Q.   Tell me what that was about?
13        A.   I was in his store on several occasions.
14        Q.   Any particular reason that you were in
15   his store?
16        A.   I believe I was with the regional
17   vice-president once.
18        Q.   Is that a woman?
19        A.   No.
20        Q.   Who was the regional vice-president that
21   you were with?
22        A.   Vick Cacerta.
23        Q.   So why would you be in his store with
24   Vick Cacerta?
25        A.   Just touring stores.

49

1          Q.    It wasn't anything really to Mr. Harris.
2    It was "There's a store and here we are."
3          A.    Yes.
4          Q.    So did you have any other involvement
5    with him up until this incident regarding anything
6    that he purportedly was or was not doing right or
7    wrong?
8          A.    Any direct involvement with Mr. Harris?
9    No.
10         Q.    Indirect involvement?
11         A.    Indirect meaning I understood from the
12   district manager that the store was struggling.
13         Q.    Who is this district manager now?
14         A.    Mark Hasting.
15         Q.    Mr. Hasting, he recently had been
16   appointed district manager?
17         A.    Sometime relatively close to that.
18         Q.    Prior to that, there had been another
19   district manager, correct?
20         A.    That is correct.
21         Q.    Who was that person?
22         A.    Jeff Warren.
23         Q.    And was Mr. Warren promoted?
24         A.    He was promoted.
25         Q.    Promoted to what?

1          A.    A regional -- it was called a spoke

2     director.

3          Q.    I see.  So he was one level up?

4          A.    Yes.

5          Q.    Is he the regional spoke director for

6     this spoke?

7          A.    No.

8          Q.    Where is he located?

9          A.    In Atlanta.

10         Q.    Would you say that during the period of

11    time that Mr. Harris was a store manager, Mr. Jeff

12    Warren was the primary regional manager  -- I'll use

13    the term -- rather than team leader?

14         A.    Is your question -- would you rephrase

15    the question?

16         Q.    Sure.  From what it sounds like you

17    said, Mr. Jeff Warren, until this incident, was the

18    regional manager over Mr. Harris?

19         A.    I can't say that definitively.

20         Q.    Was that your best recollection?

21         A.    My best recollection.

22              MS. CESARANO:  Is it district or

23         regional?

24              THE WITNESS:  District.

25    BY MR. BURTON:

WORLDWIDE REPORTING SERVICE
377-DEPO

51

1      Q.    District, spoke, and then region,
2   correct?
3      A.    Correct.
4      Q.    So Jeff Warren was the guy in charge of
5   the district.
6      A.    Yes.
7      Q.    And Mr. Harris worked for him for most
8   of the period of time that he was a store manager?
9      A.    I can't say that definitively.
10     Q.    It's your best recollection as you sit
11  here today?
12     A.    No, it is not my best recollection.
13     Q.    Do you have a recollection as to who
14  that person or persons were?
15     A.    Yes.  I believe it was split fairly
16  evenly between Jeff Warren and mark Hasting.
17     Q.    Obviously, the best indication would be
18  when Mr. Hasting was transferred into that role,
19  correct?
20     A.    That is correct.
21     Q.    During the time that he was under Jeff
22  Warren, do you recall the ratings for Mr. Harris?
23     A.    No.
24     Q.    Do you recall if he received any
25  benefits our bonuses or awards for his performance?

52

1          A.      As a store team leader, he would have
2     been eligible for a bonus.
3          Q.      Do you know if he received one?
4          A.      In thinking my way through this, I
5     believe that Jeff Warren probably was promoted
6     sometime very early on in Mr. Harris' tenure as a
7     store manager.
8          Q.      Go back to the question I had.  During
9     the time that he was a team leader of the store did
10    he receive any benefits, bonuses or awards?
11         A.      When you say benefits, he was certainly
12    eligible for benefits.
13         Q.      Did he receive it?
14         A.      I'm sure he received his health and
15    welfare benefits.
16         Q.      Did he receive any bonuses?
17         A.      He would not have been eligible to
18    receive a bonus other than as an assistant store
19    team leader.
20         Q.      I didn't ask that.  During the time he
21    was the team leader of the store.
22         A.      Not to my recollection.
23              MS. CESARANO:  Let him finish the
24         question.
25    BY MR. BURTON:

WORLDWIDE REPORTING SERVICE
377-DEPO

1        Q.    During the time he was a team leader of

2    the store, do you know if he received any benefits,

3    bonuses or any awards as a result of his conduct?

4        A.    You said store team leader?

5        Q.    Store team leader for the fourth time.

6        A.    I do not know if he received a bonus or

7    not.

8        Q.    How long was he in Deerfield before the

9    incident in question came to your attention as to

10    the best of your recollection?

11        A.    A few months.

12        Q.    What came to your attention?

13        A.    There was an issue regarding a voucher

14    or a voucher issue.

15        Q.    When you say issue regarding a voucher,

16    police be more specific.

17        A.    There was an incident regarding

18    Mr. Harris taking a group of executives to a dinner

19    and money was taken out of the store for that, and a

20    shortage resulted.

21        Q.    Is Mr. Harris, first of all, allowed to

22    take employees out of the store to buy them

23    breakfast if they work extra hard?

24        A.    Yes.

25        Q.    So that in itself is not a violation of

1    anything.

2        A.    No.

3        Q.    Is he allowed to go in and request a

4    paid-out cash slip to get the money to do it?

5        A.    Yes.

6        Q.    Is he allowed to take the money in

7    advance and then return with the receipts to balance

8    the books of the other side if he doesn't know how

9    much it's going to be?

10       A.    Yes.

11       Q.    So each of the three things I just asked

12   you about are not unusual, nor are they illegal

13   under Target's rules?

14       A.    That is correct.

15       Q.    Had Mr. Harris, to the best of your

16   knowledge, done this in the prior periods?

17       A.    I do not know.

18       Q.    Do other store managers do that, take

19   team members out for breakfast or whatever it is?

20       A.    Yes.

21       Q.    The amount of money in question was how

22   much?

23       A.    There are several instances in question.

24       Q.    Talking about the voucher incident.

25       A.    They both had to do with vouchers.

55

```
1          Q.    The first voucher incident.
2          A.    Can you tell me which one in your mind
3    is the first voucher incident?
4          Q.    Whichever one you remember coming first.
5    I'm not going to say to you which is first.  I'm
6    asking you.
7          A.    The first incident I was aware of was
8    the executive dinner at a place called Shooters.
9          Q.    So it's an executive dinner at a place
10   called Shooters.
11         A.    Yes.
12         Q.    And an executive dinner at Shooters,
13   explain what you understand that to mean?
14         A.    It was a going away party for an
15   executive that was leaving the company and
16   Mr. Harris invited a group of people, a group of
17   executives to go to dinner that night.
18         Q.    Is that in itself a violation of any
19   procedures of Target?
20         A.    No.
21         Q.    Does that happen with other executive
22   leaders, other than Mr. Harris, that they have going
23   away parties paid for by the company?  Do you know
24   of any other instances?
25         A.    Would you repeat that?
```

56

```
1          Q.    Do you know other instances where team
2    leaders have invited other members of their staff to
3    have a going away party?
4          A.    Not specifically.
5          Q.    It's not something that is prohibited,
6    but you don't specifically recall.
7          A.    That is correct.
8          Q.    Have you ever been to a going away
9    dinner?
10         A.    I don't recall being at one.
11         Q.    So what did Mr. Harris purportedly do at
12   the going away dinner?
13         A.    He took a sum of money out of the store,
14   $500 I believe.  The sum of the bill was, I believe,
15   $135.  On the receipt, he noted the amount of the
16   dinner and then $160 notation for a total of $295.
17         Q.    What was the $160 suppose to be?
18         A.    What brought it to our attention was
19   that was the issue that we first thought that it was
20   an exorbitant tip.
21         Q.    What did it turn out to be?
22         A.    It turned out to be a missing sum of
23   money.
24         Q.    How much was the tip?
25         A.    The investigation showed that the tip
```

1    was probably around $25.

2        Q.    When you say tip was probably, who

3    investigated and what did they do to find out?

4        A.    Don Frankhauser, the assets protection

5    team leader, investigated, and as was thoroughly

6    spelled out in our position statement --

7        Q.    I don't want to know about a position

8    statement.  Just tell me what he did.

9        A.    He contacted the waiter, and the waiter

10   recalled it to be about a $25 tip.

11       Q.    Did he get a statement from the waiter?

12       A.    No.

13       Q.    So you don't know whether the waiter

14   just didn't turn in the remainder and pocket it or

15   otherwise, do you?

16       A.    That's correct.

17       Q.    So did anyone ask to take a formal

18   statement of the waiter?

19       A.    It's not our policy to do that.

20       Q.    I didn't ask if it's your policy.  Did

21   they do it?

22       A.    I don't know.

23       Q.    You have no basis to believe they did

24   take a formal statement, do you?

25       A.    That's correct.

```
1         Q.    So Mr. Frankhauser, when you say he
2    interviewed the waiter, do you know how he
3    interviewed him?
4         A.    He contacted the waiter.
5         Q.    In what form or fashion?
6         A.    I believe it was a phone call.
7         Q.    Did he record the phone call?
8         A.    Not to my knowledge.
9         Q.    So Mr. Frankhauser says that he was told
10   by the waiter it was a $25 tip.
11        A.    That's correct.
12        Q.    And you leapt to the conclusion the rest
13   of it was theft.
14        A.    No.
15        Q.    Can you tell me what else was used as
16   proof
17        A.    There was a reconciliation of records at
18   the store, which showed a $135 shortage.
19        Q.    Let me ask you a question.  If he noted
20   $160 on it -- he did note, it, correct?
21        A.    He noted $160.
22        Q.    He gave back the difference between the
23   500 and those two amounts, did he not?
24        A.    Excuse me?
25        Q.    Did he give back the difference between
```

1   the 160 and the 500?

2          A.    I believe he turned some money in.

3          Q.    Did it balance out, adding 160, the

4   bill --

5          A.    No, it didn't balance out.

6          Q.    You say it was $160 shortage.  He claims

7   it was a tip, correct?

8          A.    No.

9          Q.    Did anyone claim it was a tip?

10         A.    No.

11         Q.    Did anyone ever ask what it's suppose to

12  be?

13         A.    I asked Mr. Harris that.

14         Q.    What did he say?

15         A.    He didn't know.

16         Q.    Did you ever ask Mr. Harris for the

17  $135?

18         A.    I don't recall.

19         Q.    Let's slow down.  You sent

20  Mr. Frankhauser to investigate, right?

21         A.    Yes.

22         Q.    There's apparently an amount over the

23  amount of the base bill that is unaccounted for

24  totaling $160, correct?

25         A.    That's correct.

60

1      Q.    Mr. Harris gave back certain monies to

2    you, correct?

3      A.    I believe so.

4      Q.    Did you ever say or ask anyone to ask

5    Mr. Harris to reconcile and give back the balance?

6      A.    We asked where it was.  He could not

7    answer.

8      Q.    You say "we."  Who is "we"?

9      A.    I was there.  Doug Barth was there.

10   Mark Hasting was there.

11     Q.    Anything else?

12     A.    This issue resulted in an unreconciled

13   $135 shortage for which Mr. Harris was not able to

14   explain.

15     Q.    Anything else?

16     A.    No.

17     Q.    Is there another voucher?

18     A.    Yes.  There is an incident with Denny's

19   Restaurant.

20     Q.    What is the incident with Denny's

21   Restaurant?

22     A.    Mr. Harris and Donna Kyle, who was an

23   executive team leader, Mr. Harris took a sum of

24   money to purchase breakfast for the back room team,

25   some kind of recognition I would presume, and went

61

1   to Denny's with a sum of money.  Took the food.
2   There's a substantial amount of change involved and
3   that money was missing as well.
4        Q.    What are we talking about?
5        A.    Over a hundred dollars.
6        Q.    So let's see how much you yourself were
7   involved.  Mr. Harris took money out for which he
8   signed for, correct?
9        A.    I don't recall.
10        Q.    Your understanding is he didn't grab it
11   out of the cash drawer.  He took money out for which
12   he --
13        A.    He took money out, and I'm not sure
14   there was a voucher written at that time, no.
15        Q.    Is it your understanding that a voucher
16   was written and requested the money from a specific
17   cashier?
18        A.    It was my understanding that money was
19   requested by a specific cashier.
20        Q.    He went to a specific cashier and said,
21   "I'd like money to take them out," or words to that
22   effect.
23        A.    Actually, he didn't take them out.  He
24   went to get breakfast and bring it back for the
25   team.

62

```
1          Q.    He goes out.  He takes money out of the
2     drawer for which he notifies the cashier he's about
3     to do, correct?
4          A.    Yes.
5          Q.    He comes back with breakfast for this
6     team for doing whatever they're doing, recognition.
7          A.    Yes.
8          Q.    And how much money was taken out of the
9     drawer?
10         A.    I believe it was around $300.
11         Q.    Ms. Tetralt was the one he took it from,
12    correct?
13         A.    I'm not sure.
14         Q.    Are you aware that the supervisor did
15    recall receiving a receipt for $300?
16         A.    No.
17         A.    What supervisor?
18         Q.    The cashier's supervisor.
19         A.    No.
20         Q.    Did anyone find out by checking with
21    Denny's how much breakfast cost before they made
22    this allegation?  Yes or no?
23         A.    I'm not sure.
24         Q.    Did anyone ask Mr. Harris to take a
25    polygraph?
```

1        A.    No.

2        Q.    What about the first incident, did

3    anyone ask Mr. Harris to take a polygraph?

4        A.    It's not our policy to do that.

5        Q.    I didn't ask if it's your policy.  Don't

6    care what your policies s are.

7        A.    I'm answering your question.

8        Q.    My question was did you ask.  Not what

9    your policies are.

10        A.    We did not ask.

11        Q.    I understand this was for between 32 and

12    36 people?  Something like that?

13        A.    That's what my understanding is.

14        Q.    Were there any other incidents that you

15    relied upon, then or now, in dismissing Mr. Harris?

16        A.    Those were the two issues that led

17    directly to his dismissal.

18        Q.    Were there any other issues then or now

19    that you're relying upon in supporting your

20    position?

21        A.    In the course of our investigation, we

22    learned of other issues that cast doubt on

23    Mr. Harris' credibility.

24        Q.    Please tell me what they are.

25        A.    Buying a Power Wheel toy and using his

64

1   authority as a store team leader to get it marked
2   down.
3           Q.    A Power Wheel toy, correct me if I'm
4   wrong, is a child's toy?
5           A.    That is correct.
6           Q.    How much are we talking about the
7   purchase is?
8           A.    I believe one of those is a couple
9   hundred dollars.
10          Q.    As a store team person, he's entitled to
11  a markdown of what?
12          A.    A 10 percent discount.
13          Q.    You said he was using his store team
14  position to obtain a discount.  Is there an
15  additional discount beyond that?
16          A.    He went to the supervisor of that area,
17  indicated that it was a discontinued model, which it
18  was not, and reminded her that he was the store team
19  leader and advised her to mark it down.
20          Q.    How much was it marked down?
21          A.    It was marked down to a normal sum.  I
22  believe it was around, I want to say, around fifty
23  dollars.
24          Q.    Was it a new item, a used item?  Do we
25  know?

65

1         A.    I believe it was a new item waiting to
2    to be displayed.
3         Q.    Do you know what purportedly happened
4    with that item?
5         A.    He took it home.
6         Q.    Any other issues that you heard of?
7         A.    In the course of our investigation, we
8    understood that --
9         Q.    When you say "we," please tell me who is
10   "we."
11        A.    We is I, Mark Hasting, Doug Barth.
12              There were other issues, but I don't
13   recall specifically.
14        Q.    Something to do with he had a credit
15   card bill that he took care of, but it was late.
16        A.    Yes.  His Target credit card was in
17   arrears, as was his American Express which he used
18   for personal purposes.
19        Q.    Did he pay it off?
20        A.    I believe after it went to collection.
21   I believe it's paid off now.  I'm not sure.
22        Q.    The American Express bill he paid off.
23   Was that a Target American Express bill?
24        A.    It was a company American Express card
25   issued in his name for business purposes.

66

1      Q.    And there were some charges on it, and
2    he eventually paid it off.
3      A.    I believe ultimately they were paid off.
4      Q.    Before or after your investigation?
5      A.    I believe after our investigation.
6      Q.    Before or after this incident?
7      A.    The incident that led to his dismissal?
8      Q.    Yes.
9      A.    I believe after.
10      Q.    You said eventually it came to your
11    attention. Wouldn't that have come to your
12    attention before it was in arrears?
13      A.    The American Express?
14      Q.    Yes.
15      A.    Not necessarily.
16      Q.    And you said the Target card. The
17    Target card was a personal card, wasn't it?
18      A.    Yes.
19      Q.    What interest is it of yours if one of
20    your employees has trouble paying a personal credit
21    card?
22      A.    A store team leader is held to a very
23    high standard of conduct and ethics, and it's
24    something that is inappropriate for a store team
25    leader.

67

1          Q.    What is your status of your credit
2      personally?
3          A.    Very good.
4          Q.    Do you know of any other persons that
5      are store team leaders that have any problems with
6      their credit?
7          A.    I'm not aware of any.
8          Q.    Have you done any investigation to
9      determine that?
10         A.    No.
11         Q.    So you don't normally and customarily
12     check to see if people are having credit card
13     problems, do you?
14         A.    That is correct.
15         Q.    Why did you in this instance?
16         A.    I don't recall.
17         Q.    So if I were to give you an
18     interrogatory and ask you all of the persons that
19     have ever been behind in their personal credit cards
20     as store people leaders or above, you would be
21     unable to provide me the information without
22     inquiring of each of them, wouldn't you?
23         A.    I would be unable to provide that
24     information.
25         Q.    Without inquiring and confirming with

68

```
 1   each of them --
 2        A.    That is correct.
 3        Q.    -- which would be a violation of their
 4   privacy rights?
 5        A.    I don't know.
 6        Q.    Are you familiar with the Privacy Act?
 7        A.    Not especially.
 8        Q.    So you didn't learn that at all in your
 9   classes?
10        A.    No.
11        Q.    How did you find out his personnel
12   Target card was at one point in arrears, which had
13   been brought up to date?
14        A.    I don't recall.
15        Q.    That's not your division.  That's part
16   of the central finance division, isn't it?
17        A.    That is correct.
18        Q.    Do you have access to a person's
19   personal credit information?
20        A.    Do I have access to it?
21        Q.    Yes.
22        A.    I really don't know.
23        Q.    You don't know how you got it.  You know
24   you got it.  You're not sure who gave it to you.
25        A.    I know how we got it.  Assets Protection
```

69

```
 1    checked it.
 2         Q.    What is that?
 3         A.    That is our assets protection division.
 4         Q.    So you asked Target to provide his
 5    personal credit information?
 6         A.    I didn't ask anyone.
 7         Q.    Under your auspices, Target was asked
 8    to provide his personal credit data?
 9         A.    I don't recall.
10         Q.    Sir, it's in your report.  You compiled
11    it.  You were responsible for this compilation,
12    correct?
13         A.    I'm responsible for it.  I don't recall
14    how we came to check that.
15         Q.    But you took the liberty of getting it
16    and putting it in the public record, correct?
17         A.    I believe I've answered the question.
18         Q.    Did you take the liberty of putting it
19    in the public record?
20         A.    The issue regarding his Target credit
21    card, yes.  That's part of our position statement.
22         Q.    Did you have permission from him?
23         A.    I don't know.
24         Q.    Did you get permission in writing?
25         A.    I don't know.
```

70

1        Q.    Did you ever see anything authorizing
2    you to publish his personal credit data?
3        A.    I do not recall anything authorizing any
4    publication of his Target credit card.
5        Q.    What about some towels that he
6    purportedly purchased?  Anything on that?
7        A.    In the course of our investigation,
8    people came forward and expressed concern about the
9    way that Mr. Harris purchased some towels.
10       Q.    What did he purportedly purchase wrong
11   or right?
12       A.    He purchased some towels that were
13   erroneously priced.
14       Q.    When you say erroneously priced, tell me
15   what you mean.
16       A.    They were not ticketed at the correct
17   price.
18       Q.    I see.  What was your presumption or
19   assumption?
20       A.    There was no presumption or assumption.
21   That's where that individual brought it to our
22   attention that there were some towels in the back
23   room.  She noticed that they were mismarked.  I
24   believe her name was Sandra Grisback.  They put them
25   in an area of the store while they were researching

WORLDWIDE REPORTING SERVICE
377-DEPO

71

1    the price and persons were instructed not to
2    purchase those, and we had information that
3    Mr. Harris purchased some of those towels.
4         Q.    Who was this person who advised people
5    not to purchase the towels?
6         A.    She was the logistics team leader.
7         Q.    How many months, years or days
8    afterwards did this come to your attention that this
9    had occurred?
10        A.    All concurrent with the investigation.
11        Q.    I'm not saying all concurrent.  How many
12   months before had they been purchased?
13        A.    I don't know.
14        Q.    What information or verification was
15   done to make sure that this wasn't just gossip, if
16   any?
17        A.    It was firsthand information from the
18   logistics team leader.
19        Q.    Firsthand information you say.  I'm
20   asking you did anyone at the time go to Mr. Harris
21   when it was being done and say, "Mr. Harris, those
22   are mismarked"?
23        A.    I don't recall.  I don't know.
24        Q.    Did anyone ask if that question had been
25   asked of him?

72

1          A.    I don't know.

2          Q.    So you don't know whether Mr. Harris

3     knew whether they were mismarked or not, do you?

4          A.    According to Ms. Grisback, he was

5     present during that discussion and we have records

6     of him taking those items through the computer

7     checkout.

8          Q.    Do you have records showing that towels

9     were purchased at a particular point in time?

10         A.    I don't know.  In terms of his purchase?

11         Q.    Yes.

12         A.    I believe there was a receipt showing

13    when he purchased them.

14         Q.    And my question to you is did anyone at

15    the time, such as Ms. Grisback, say to him those are

16    mismarked?

17         A.    I believe she did.

18         Q.    Did you have a statement from her?

19         A.    I believe we do.

20         Q.    In writing?

21         A.    Yes.

22         A.    I believe we do.

23         Q.    Who is Maureen Morroca?

24         A.    I believe she is an hourly employee in

25    the store.

73

1        Q.    I'm looking at a statement from a Sharon

2   Tetralt.  Are you using this statement as the basis

3   for the towel charge?

4        A.    No.

5        Q.    Is that a different towel charge?

6        A.    I don't believe so.

7        Q.    Is Ms. Tetralt right or is Ms. Grisback

8   right?

9        A.    They're both indicated.

10       Q.    They both indicate different things.

11       A.    One indicates notifying Mr. Harris of

12   the mismarking, and one observed Mr. Harris, I

13   believe, taking them through the checkout.

14       Q.    And that person also indicates that they

15   were told to put them on the floor at that price.

16   Do you see that in the statement?

17       A.    At what price?

18       Q.    I'm saying as I'm reading this.  I

19   didn't take the statement.  I didn't solicit them.

20           MS. CESARANO:  Do you want to read it

21      again?

22           MR. BURTON:  It seems to be triple and

23      quadruple hearsay.  "Maureen Morroca told me

24      that Mona told him that Angela says."  So when

25      I'm talking about gossip and hearsay, that

1           seems to be third hand.  I could be wrong, but
2           just the way it's phrased it seems to be third
3           hand.
4                THE WITNESS:  This statement indicates
5           that Steve told a team member named Angela to
6           take them out of chargeback and sell them.
7    BY MR. BURTON:
8           Q.   But not told by Angela.  It's told by
9    Sharon.  This is what I'm saying.  "Steve told
10   Angela, according to Mona."  That's what it says,
11   correct?
12          A.   Yes.
13          Q.   That's third hand, isn't it?
14          A.   But Mr. Harris, I believe, bought them
15   out of the stockroom.
16          Q.   This is a different statement then.
17   This says bought them on the sales floor.  That's
18   why I'm trying to ask you which of those happens to
19   be accurate, if you know.
20          A.   I don't know.
21          Q.   You do know that one of them has a
22   different story than the other.
23          Q.   Not really.
24          Q.   Was it not really?  Was it out of the
25   back or out of the sales floor?

1          A.    Ms. Grisback noticed the items were
2     mismarked.    Advised Mr. Harris of that.    Put them in
3     the stockroom.    Mr. Harris was observed buying those
4     items at the wrong price, and we have a receipt to
5     support that.

6          Q.    Is the receipt the right item at a
7     different price or is it the wrong item and it's the
8     wrong stapled ticket, or don't you know?

9          A.    It's the items that were purchased by
10    Mr. Harris.    The tickets that were in the back room.
11    The towels that were in the back room.

12         Q.    I'm having trouble understanding you.
13    Sometimes it's mismarked, because someone takes a
14    premarked ticket and puts the wrong price on it with
15    the right item.    Other times they put the wrong
16    ticket on an item and it's priced wrong.

17               Do you know which of those two
18    circumstances occurred?

19         A.    I can't say definitively at this time.

20         Q.    That's what I'm trying to figure out,
21    whether the item number was correct or the item
22    number was incorrect, and you don't know, do you?

23         A.    I believe the item number is correct.

24         Q.    Then the price was wrong?

25         A.    The price in the stockroom was wrong,

76

1   and they were purchased at the wrong prices.

2       Q.    Who put the wrong prices on them?

3       A.    I don't know.  But Mr. Harris was

4   advised that they were the wrong price according to

5   Ms. Grisback.

6       Q.    And you weren't there and you don't

7   know.

8       A.    I was not there.

9       Q.    And what is Ms. Grisback's position with

10  the company?

11      A.    As I've indicated, she's the logistics

12  team leader.

13      Q.    What is a logistics team leader?

14      A.    She's responsible for everything having

15  to do with the receipt of pricing of merchandise and

16  flow of goods to the selling floor.

17      Q.    So she would be the one that mismarked

18  it and her people according to what you just told

19  me.

20      A.    I don't really know.  They may have come

21  in from the vendor mismarked.

22      Q.    What you're telling me then, and correct

23  me if I'm wrong, is if there was a mistake made it

24  was her area that made the mistake.  Either she

25  didn't check it that it was coming in wrong or she

77

1   mismarked it, correct?

2       A.      It may not have been a mistake from her

3   area.  It may have been done at the D.C.  I don't

4   know where the error was made.

5       Q.      Somewhere between the original vendor

6   and its shipping and her portion is where the

7   error occurred; is that right?

8       A.      That is correct.

9       Q.      So she made a mistake in one form or

10  fashion or her group did.

11      A.      Not necessarily.

12      Q.      I guess what I'm saying is, did it ever

13  occur to you that she may be C.Y.A.'ing herself?

14      A.      I can't comment on that.

15      Q.      You know what I mean by that, don't you?

16      A.      Yes.

17      Q.      That she made an error and was trying to

18  say "It wasn't me.  It was someone else."

19      A.      I believe she discovered the error.

20      Q.      Or she was inquired about it.

21      A.      That requires a lot of conjecture.  I

22  can't comment on that.

23      Q.      Why would she allow the sale to occur if

24  she discovers the error?

25      A.      She didn't allow the sale to occur.  She

1    advised the appropriate parties that the items were
2    mismarked and that they were going to research those
3    items and have them marked correctly.
4         Q.    What I guess I'm saying to you is this.
5    It appears that an error was made either by the time
6    it hit her area or in her area.  For whatever
7    reason, those towels, according to Ms. Tetralt, were
8    were allowed to be placed on the floor, correct?
9         A.    I don't know.
10        Q.    That's what Ms. Tetralt said, isn't it?
11        A.    In that letter?
12        Q.    Yes.  Isn't that what she said?
13        A.    I don't know at what time those items
14    went to the selling floor.
15        Q.    I'm just simply saying what your
16    information you provided me was says.
17        A.    I'm trying to answer your question.
18        Q.    No.  You're trying to avoid my question.
19        A.    No, I'm not.
20        Q.    According to Ms. Tetralt they got to the
21    selling floor, correct?
22        A.    According to Ms. Tetralt they got to the
23    selling floor, yes.
24        Q.    That would have been a violation of
25    procedure for which your logistics would have been

79

1    responsible, correct?

2        A.    Ultimately.

3        Q.    That is a yes ultimately?

4        A.    Yes.

5            MS. CESARANO:    Is it Tetralt or is it

6        Grisback?

7            MR. BURTON:    There are two of them.

8        There are two different statements.  One says

9        one and one says the other, and I'm trying to

10       find out who is covering who.  That's all I'm

11       on.  That's why I keep asking Tetralt.  He

12       keeps answering Grisback.

13           I'm just asking questions.  You provided

14       me the information, and if they're in odds

15       with each other, it's only because the

16       statements are in odds with each other.  It

17       doesn't make either one right or wrong.

18           THE WITNESS:    Actually, they're not at

19       odds with each other.  Somehow they got out on

20       the selling floor.

21   BY MR. BURTON:

22       Q.    That's what I'm saying.  That's the odd.

23   One of them says they were held in the back.  The

24   other says they got to the selling floor.

25       A.    They were held in the back at one point

                    WORLDWIDE REPORTING SERVICE
                            377-DEPO

80

1    in time, and, apparently, were moved to the selling

2    floor at another point in time.

3         Q.    But Ms. Grisback said they weren't

4    suppose to be taken to the selling floor, and

5    Ms. Tetralt said they were on the selling floor.

6    Correct?

7         A.    I believe that's correct.

8         Q.    That is a discrepancy, correct?

9              MS. CESARANO:    If you agree.

10             THE WITNESS:    I don't really believe

11        it's a discrepancy.

12   BY MR. BURTON:

13        Q.    Who would be responsible for making sure

14   they didn't hit the selling floor?

15        A.    The logistics team leader ultimately

16   would be responsible.

17        Q.    Ms. Grisback?

18        A.    Yes.

19        Q.    Thank you.

20             It says, and I'm looking at

21   Ms. Grisback's statement, "My second week at 393, I

22   noticed the P.C. team printing tickets and labels

23   and putting them into bags.    They said they would

24   print the tickets and labels for that day and try to

25   work them when they could.    I asked if they really

WORLDWIDE REPORTING SERVICE
377-DEPO

1    worked them.  They said they had a hard time working

2    them in the day and usually didn't do it.  They told

3    me management told them to do it this way so the

4    store wouldn't be on a late report.  I asked which

5    managers.  They answered all managers.  I told them

6    to stop this ASAP.  I proceeded to ask Steve if he

7    knew this was going on, and he said, yes, and why he

8    has started the procedure.  I asked why this begging

9    tickets wasn't stopped.  Steve and I walked into

10   room and noticed some team members going through a

11   float of breach towels with tickets on them.  I had

12   an LRT and proceeded to scan one of them and noticed

13   some were ticketed incorrectly.  Some scanned

14   regular retail and had clearance tickets on them.  I

15   mentioned to Steve that I will research the tickets

16   and reticket, if necessary, but they would not go to

17   floor until then.  Angela and my staff pushed the

18   float to an isolated area near the back and put a

19   sign 'Don't Touch.  To Be Researched.' A few days

20   later, I mentioned to Tina that I had to go and

21   rescan the beach towels.  She said she noticed Steve

22   buying some beach towels the other night."

23            With that in mind, sir -- and that's the

24   statement that you're referring to, correct?

25        A.    Yes.

82

1        Q.    So if Ms. Grisback didn't see the
2    purchase, it was someone else a couple nights
3    before, correct?
4        A.    I think so.
5        Q.    Some of the tickets were marked
6    incorrectly.  Apparently some were not marked
7    incorrectly.  Is that correct?
8        A.    Based upon this.
9              MS. CESARANO:  Why don't you re-read
10        that.
11             MR. BURTON:  Please.
12             MS. CESARANO:  I think it's the bottom
13        of page 1.
14             MR. BURTON:  Bottom of page 1.  "I
15        noticed that some were marked, and it would
16        have to be researched."
17             THE WITNESS:  Some were ticketed
18        incorrectly.  Some were scanned regular
19        retail.
20    BY MR. BURTON:
21        Q.    It doesn't say "all."  It says "some,"
22    correct?
23        A.    That's correct.
24        Q.    She would have to research it, and she
25    put them aside.  Correct?

83

1        A.    Yes.

2        Q.    Angela was involved in the transaction

3    according to her, correct?

4        A.    Yes.

5        Q.    She didn't think anything more about it

6    for a couple, four or five days it appears.

7    Correct?

8        A.    Is your comment in reference to

9    Angela?

10       Q.    No.    I said Ms. Grisback didn't do

11   anything further for a couple of days, correct,

12   according do that statement?

13       A.    I don't know.    Oh.    "A few days later, I

14   mentioned to Tina."

15       Q.    A few days.    So I was correct.

16             Now, with that in mind, and in all due

17   respect, somehow or other they got on the floor even

18   though they were suppose to be marked "Keep Them

19   Here," correct?

20       A.    It would appear so.

21       Q.    So they're not inconsistent in that

22   regard.

23             Now, do you know if they were rescanned

24   or were suppose to have been rescanned?

25       A.    I don't know.

84

1    Q.    Do you know if Mr. Harris, who was told
2    they were to be immediately rescanned and put on the
3    floor, believed they were immediately rescanned and
4    put on the floor?

5         A.    I don't know.

6         Q.    But you surmised then that he should
7    have known when they were rescanned, how much they
8    were rescanned for, whether they were corrected or
9    not before he purchased them.  You're jumping to that
10   point, right?

11        A.    If he was part of seeing the items being
12   ticketed incorrectly in the back and then purchased
13   them at that incorrect price, yes, he show have
14   known that.

15        Q.    But it doesn't say he was part of that.

16        A.    The receipt reconciliation, when you
17   look at the receipt, and the SKU item, I believe,
18   matches up with the items that were ticketed
19   erroneously.

20        Q.    I'm reading her statement, and her
21   statement doesn't say that he even knew whether they
22   were up, down or sideways.  It just simply says, "I
23   commented that they may be mismarked."  Is that all
24   it says?  Is there anything more it says?  It says
25   they may be mismarked.  It doesn't say whether

85

1    even Steve discussed how they were mismarked with

2    her.

3         A.    It says, "I have an LRT, and proceeded

4    to scan some of them and noticed some were ticketed

5    incorrectly." So some were ticketed incorrectly.

6         Q.    Was that done in Steve's presence when

7    she actually did that?

8         A.    I don't know.

9         Q.    That's what I'm asking you. You're

10    assuming because Steve was there when she said the

11    first statement that he must have been there and

12    watched her doing this whole procedure because he

13    had nothing better to do for his day, correct?

14         A.    I'm not assuming anything.

15         Q.    You're not?

16         Now, there's a Dina McCue.

17         A.    I think it's Tina.

18         Q.    She wrote a statement that she saw Steve

19    with a bag with towels in it. Do you know if they

20    were new or old?

21         A.    I don't know.

22         Q.    When did you receive or obtain this

23    statement from Dina McCue? It's not dated?

24         A.    I can't tell you when it was. It was

25    done at the time of the investigation.

86

1         Q.    Well, the time of the investigation was
2    in February, wasn't it?  Does the date 2/12 ring a
3    bell?
4         A.    Yes.
5         Q.    She talks about something happening on
6    January 26th --
7         A.    Yes.
8         Q.    -- that this occurred.
9               Who is the investigator here?  Is it
10   Frankhauser?
11        A.    It may have been Frankhauser.  It
12   may have been Doug Barth.
13        Q.    You don't have the persons who take the
14   statements sign for them, do you?
15        A.    No.
16        Q.    Does Mr. Frankhauser or Mr. Barth
17   keep journals?
18        A.    I don't know.
19        Q.    This doesn't have a legal quality to it.
20   They are not sworn to you notice?  Do you ask
21   people to swear to statements?
22        A.    We don't ask people to swear to them,
23   no.
24        Q.    Why not?
25        A.    Because we ask them to tell the truth.

87

1    We don't ask them to swear.  We don't have the
2    authority to have them take an oath.
3         Q.    You don't have the authority to get a
4    notary public?  Is that what you're telling me?
5         A.    No.
6         Q.    Have any of you been trained in any
7    kind of police training?
8         A.    Our assets protection, I believe.
9         Q.    Is that Frankhauser?
10        A.    Yes.
11        Q.    And you're saying to me that you don't
12   have the right to ask people to swear to a statement
13   that is going to result in the loss of their job if
14   they disparage someone?  Are you telling me you
15   don't have the right to do it?
16        A.    We do not require a sworn statement.
17        Q.    That's not what I asked.  Are you
18   telling me that you don't have the authority?  That
19   was the words that you used.  Do you have the
20   authority?
21        A.    That's not our practice.
22        Q.    Do you have the authority?
23        A.    I don't know.
24        Q.    Have you ever asked if anyone has the
25   authority?  Here's my problem, sir.  You have a

1    statement that Target received, apparently by fax,

2    March 13th.  Do you see that?

3         A.    Yes.

4         Q.    The statement talks about the

5    December 12th item --

6         A.    Yes.

7         Q.    -- regarding Donna Kyle's recollection

8    of how she gave him the money to take people out,

9    for which she didn't recall a receipt being

10   received, but he had a receipt.  Someone else

11   recalls a receipt being received.

12               Did anyone try to reconcile these

13   things?

14        A.    Sure.

15        Q.    How do you reconcile Donna Kyle with the

16   cashier who said she saw a receipt?

17        A.    Our receipt was never produced.

18        Q.    That's not my question.  How do you

19   reconcile --

20        A.    We talked to everyone who we believed

21   had knowledge of this and we follow our standard

22   cash management procedures to try to find something

23   that may have been turned in.

24        Q.    When did you start investigating

25   Mr. Harris's credit card?

89

1              A.    I don't recall.

2              Q.    I'm going to show you, which is Harris

3     122, which appears to be the Shooters receipt.  Is

4     this the one in question that we're talking about?

5              A.    Yes.

6              Q.    Was the difference between $297.87 and

7     $500 delivered back to the store?

8              A.    Yes.  The $205, I believe, was delivered

9     back to the store, the difference.

10             Q.    Did there come a time where anyone sat

11    down with Mr. Harris and say, "There is, for

12    whatever reason, a shortage of about $300 total.  Do

13    you have this receipt?" or "What's the issue?" or

14    "Can you give us a check for $300"?  Because if he

15    is a thief, he's a very bad thief.

16             A.    There was a cash shortage.  The shortage

17    amount was $135.  We asked Mr. Harris to explain

18    this and he could not explain it.

19             Q.    Did you ask him for the money?

20             A.    No.

21             Q.    Why not?

22             A.    The issue was not about collecting the

23    money at that time.

24             Q.    He's showing that he took 160 bucks by

25    giving that to you, clearly, right?  Giving you 205.

1   He says, "I don't recall what the 160 is." Did you
2   say, "Can you give us the money? We're shy" like
3   you would is a cashier at a bank is shy?
4       A.    That was not the issue. The issue was
5   finding out whether there was a shortage or not and
6   who was responsible for the shortage.
7       Q.    He acknowledged he was responsible for
8   the shortage.
9       A.    He could not explain how it happened.
10      Q.    And he said there's a shortage. Did you
11  ask him for it?
12      A.    No.
13      Q.    It wasn't that he hid it from you, did
14  he?
15      A.    No. We investigated this. We asked him
16  for an explanation on why, after the fact, for a
17  plausible explanation of why the $160. It wasn't an
18  exorbitant tip. Upon investigation, we found that
19  the tip was around $25 resulting in a cash shortage
20  of $135.
21      Q.    Did he tell you it was a tip?
22      A.    That was what we first thought.
23      Q.    You thought. Did he tell you it was a
24  tip?
25      A.    I don't believe he said it was a tip.

91

1       Q.    At some point he indicated that he had

2    taken $160 for whatever purpose.

3       A.    Actually, he took $500.

4       Q.    But he shows 205, and returns it.

5    Here's the price of the group dinner and $160 for

6    whatever.  You asked him and he says, "I don't

7    recall what the $160 is now."  Is that substantially

8    accurate?

9       A.    He admitted to writing that.  He could

10   not explain the reason for that.

11      Q.    But he didn't deny that he received it.

12      A.    He received $500.

13      Q.    So he didn't deny that he received it,

14   correct?

15      A.    He did not deny that he received $500.

16      Q.    He accounted for everything worth 160,

17   but he showed the 160.

18      A.    But 135 was missing for which he was

19   responsible.

20      Q.    And he said, "You're right.  I'm

21   responsible.  I don't recall what it was."

22      A.    Yes.

23      Q.    And, similarly, you don't doubt that he

24   took the people to Denny's, because he ordered food?

25      A.    Actually, he didn't take them to

WORLDWIDE REPORTING SERVICE
377-DEPO

92

1   Denny's.  He brought the food over to the store.

2           Q.    You don't doubt that he purchased from

3   Denny's food for these people, correct?

4           A.    That's correct.

5           Q.    And you're not sure of the amount and

6   they asked him for a receipt, and he acknowledged he

7   gave a receipt and never did.  Is that essentially

8   where we are?

9           A.    That is correct.

10          Q.    And he didn't deny that he had received

11  the money?

12          A.    That is correct.

13          Q.    Did he tell you whether or not he could

14  find the receipt or lost the receipt or it got stuck

15  in the bags?

16          A.    He had really no explanation.  He

17  indicated that he gave it to one of three people.

18  We spoke to each of those people.  One individual

19  indicated some recollection of seeing something,

20  However, it never manifested itself.

21          Q.    But there was one of the three people

22  that said, "Yes, I saw a receipt."

23          A.    No.  She said she remembered something

24  about it.  Whether she saw a receipt or not, I can't

25  state it.

93

1        Q.   So the issue wasn't whether he

2   surreptitiously went through a drawer and grabbed

3   money.  He did not.

4        A.   The issue, no, it is not.

5        Q.   So there was a sum of money that he was

6   given for which apparently he used a portion of it

7   for a corporate purpose and which he did not give

8   the receipt to you? .

9        A.   Both of these instances resulted in a

10   significant cash shortage for which he was

11   responsible for.

12        Q.   Right, and for which he didn't deny

13   being responsible.

14        A.   That is correct.  Although, he indicated

15   he gave the receipt to several people, although it

16   was never produced, nor did the people have a

17   definitive recollection of receiving the receipt.

18        Q.   I know that this is sort of silly, but

19   I'm going to ask you this.  Did any of you say, "Can

20   you go to Denny's and get a copy of whatever it was

21   for that day?" because they do keep their own

22   receipts.

23        A.   I don't know.

24        Q.   Did Mr. Frankhauser suggest that maybe

25   they could check with Denny's and find out?

94

1          A.     I don't know.

2          Q.     None of you doubted that he didn't go in

3    the back of Denny's and start making the food

4    himself and rip off Denny's, did you?

5          A.     We know that Mr. Harris went to Denny's

6·   with a sum of money to buy food for his float team.

7    There was not a proper reconciliation for which he

8    was responsible.

9          Q.     You said that ten times.

10         A.     The reason that I said it is because

11   those are the facts.

12         Q.     Has anyone ever forgotten to give Target

13   a receipt before that happened to be white?

14         A.     Not to my knowledge.

15         Q.     Ever checked that out?

16         A.     I never checked it out.

17         Q.     Have you ever asked anyone to come up

18   with shortages out of their pocket, such as

19   cashiers?

20         A.     No.

21         Q.     There's never been a shortage situation

22   in Target's history?

23         A.     Yes, there has been.

24         Q.     What did you do?

25         A.     We investigate.  If we found the

95

1    individual is responsible and acted in a negligent
2    fashion, yes, we would terminate them.
3          Q.    In every instance?
4          A.    In every instance that I'm involved in.
5          Q.    So if the person forgets to give a
6    receipt, they're terminable.  Is that correct?
7          A.    Forgets to give a receipt?
8          Q.    Yes.  Yes or no?
9          A.    Depending if it resulted in a cash
10   shortage.
11         Q.    And that's always been the policy?
12         A.    Our policy is to reconcile all
13   disbursements, and there's a prescribed policy to do
14   that.
15         Q.    If Mr. Harris had given you, just for
16   the sake of argument, $595, it would be reconciled,
17   correct?
18         A.    That's not the issue.
19         Q.    Just answer the question.  Is that true?
20         A.    If he gave us $595, would that make up
21   for the cash shortage?
22         Q.    Yes.  Would he be reconciled?  Yes or
23   no?
24         A.    That's not what we do.
25         Q.    That's not what I asked.  I asked you to

96

```
1    answer that question.  If he had given you $595,
2    would he be reconciled?  Yes or no?
3         A.    How do you get to 595?
4         Q.    How about 205 out of 800?  You're given
5    205.  What is the difference between 205 and 800?
6         A.    595.
7         Q.    Would he be reconciled?
8         A.    Well --
9         Q.    Yes or no?
10        A.    If he gave us that money, it would have
11   made up for whatever the shortage was.  It would
12   have been, in terms of the math, it would have
13   reconciled the shortage mathematically.
14        Q.    Who is DHC Travel Services, do you know?
15        A.    That is the Dayton-Hudson Corporation
16   Travel Services.
17        Q.    Who is that?
18        A.    That's our travel department.
19        Q.    Item Numbers 145 and 146, what are these
20   suppose to represent?
21             MS. CESARANO:  He's referring to the
22         numbers.  The Bates stamp on the right-hand
23         side of the page, way at the bottom, it's our
24         Bates stamping.
25   BY MR. BURTON:
```

97

1          Q.    Those are the numbers that I'm referring
2    to.  I'm just asking what those documents are
3    suppose to represent.
4          A.    These documents, I believe, are charges
5    to Mr. Harris' American Express.
6          Q.    Why would Dayton-Hudson Travel
7    Corporation have access to his American Express?
8          A.    His American Express is intended to be
9    used for business travel.
10         Q.    But why would Dayton-Hudson Travel have
11   access to it?
12         A.    Because that's the travel department
13   that processes all the expense reports.
14         Q.    So this is sent directly to
15   Dayton-Hudson, correct?
16         A.    I don't know where that came from.
17         Q.    This shows charges from the year 1998.
18   Do you see that?  Not 1999.  These are all 1998
19   charges.
20              MS. CESARANO:  Exhibit T to the position
21         statement.
22   BY MR. BURTON:
23         Q.    They are all from approximately June of
24   '98.  Do you see that?
25         A.    Yes.


                    WORLDWIDE REPORTING SERVICE
                            377-DEPO

98

1          Q.    So when I asked you earlier about the
2     American Express and you said, "Well, we found out
3     afterwards," didn't -- pardon my French --
4     Dayton-Hudson have that for almost a year?
5          A.    They would have had that information.
6          Q.    And there is nothing on this information
7     where if they had received it that would have
8     disturbed them for a year?
9          A.    I don't believe that they looked at that
10    information.  I don't believe that they regularly
11    monitor that.
12         Q.    Why wouldn't they regularly monitor
13    their own credit card?  Are you telling me they are
14    that negligent?
15         A.    No.
16         Q.    Why wouldn't they be monitoring their
17    own credit card that they're paying for?
18         A.    I don't know.
19         Q.    Then why do you assume that they
20    weren't?
21         A.    Because if they were, I think we would
22    have known about it.
23         Q.    So they're negligence is the reason
24    you didn't know about it?
25         A.    They're not negligent.

1          Q.    If they had monitored it, they would
2     have know about it.  That was your statement,
3     correct?
4          A.    It's probably not their practice to
5     monitor those.  I can't comment on that.  I don't
6     work for them.
7          Q.    You don't work for Dayton-Hudson?
8          A.    I work for Dayton-Hudson.  I don't work
9     for the travel department.  I'm not intimately
10    familiar with their standard operating procedures.
11         Q.    But you use this as one of the bases
12    for dismissing the man, but you don't know
13    anything that it represents.
14         A.    First of all, that is factually
15    inaccurate.  That is not the basis for dismissing
16    the man.
17         Q.    One of the reasons?
18         A.    No.
19         Q.    So you're withdrawing that as a reason;
20    is that correct?
21         A.    The reasons for dismissing Mr. Harris
22    were cash shortages as indicated in our position
23    statement.
24         Q.    I understand, but that was given in your
25    response to the EEOC as a basis or partial basis for

1  his dismissal.  Is that not accurate?

2       A.    In the position statement we indicate

3  the basis for Mr. Harris' dismissal was being a

4  security risk specifically due to the two cash

5  shortages involving the Shooters issue and the

6  Denny's issue, and, in the course of our

7  investigation, we found out other things which cast

8  doubt on Mr. Harris' ability to maintain the level

9  of behavior we expect of a store team leader.

10      Q.    It appears that Mr. Harris paid for

11 these charges himself a good year before there was

12 any issue about his security risk.  Let me finish

13 the question.  Sir, it appears that the nonbusiness

14 charges were paid for voluntarily by Mr. Harris.

15 There are check receipts throughout this.  Do you

16 see this?

17      A.    Which were a violation of company

18 policy.

19      Q.    But he did pay for whatever his charges

20 were on a regular and customary basis.  Would you

21 argue with that?

22      A.    On a regular and customary basis?

23      Q.    Yes.  That's what it shows.

24      A.    Our information is that he was

25 delinquent.  I don't know this date if it was the

1    date the expense was incurred or the date that it
2    was paid.
3        Q.   Sir, don't argue with me.  Does it show
4    that he's paying it?
5        A.   I don't know if that is what is paid or
6    the date of the charges.
7        Q.   It says "Payment received.  Thank you,"
8    and it gives a date.  Do you have any doubt that
9    that is a payment?  The third entry.  Do you have
10   any doubt that's a payment, sir?  I mean you're
11   human resources.  I don't want to argue with you,
12   but it appears to be pretty obvious when it says
13   "Payment Received."
14       A.   Are you referring to --
15       Q.   The third entry.  "Check payment
16   received $400."
17       A.   Well, a portion of his -- well, there is
18   a payment made on that.
19       Q.   So it appears that well over a year
20   before this he is making certain payments.  I can
21   continue.  There are more payments made.  "Payment
22   received 6/11/98.  $475.24.  Thank you."
23       A.   I don't know if the payment was to
24   pay -- I'm responding.
25       Q.   I haven't asked a question, sir.

1          Do you see that he's making payments on
2    a regular and customary basis well over a year
3    before?  Yes or no?
4         A.    I see that payments are being made.
5         Q.    Do you see that the company is accepting
6    them?
7         A.    The company is accepting them.
8         Q.    Do you see that the company is not
9    referring it for violations of company policy?  They
10   are taking the money, putting it in their pocket and
11   saying "Thank you."  Do you see that?
12        A.    Yes.
13        Q.    So can I surmise that the company
14   doesn't expect him to pay for business charges, does
15   it?
16        A.    No.  He's reimbursed for business
17   charges, yes.
18        Q.    Is he reimbursed or do they pay
19   directly?
20        A.    He's reimbursed.
21        Q.    So he gets the statement.  He puts in
22   those that are business.  Those that are not, he
23   pays for.  Is that accurate?
24        A.    It is a violation of company policy to
25   your use American Express corporate card for

103

1    nonbusiness activities, nor does that record show

2    whether the payment is in full.  On an American

3    Express charge you're required to make full payment.

4         Q.    And you don't know whether or not he

5    did, correct?

6         A.    I do not know.

7         Q.    And you don't know what portion or

8    portions of this are business, do you?

9         A.    I cannot make a definitive judgment on

10   that.

11        Q.    When Dayton-Hudson discovered that some

12   of these might not have been business charges, are

13   they under a duty to do anything to notify the

14   employee?

15        A.    In terms of business charges?

16        Q.    Nonbusiness charges.

17        A.    I can't comment on that.  I don't know.

18        Q.    You told me about this violation of

19   policy, and if I were to ask for production of all

20   of Dayton-Hudson's persons that receive or that have

21   used their American Express for personal matters for

22   which they've reimbursed the company, which I

23   certainly have a right to do and will do, do you

24   think I'll find white persons that do it?

25        A.    I don't know.

104

1       Q.    Do you think I'll find managers that do
2    it?
3       A.    I don't know.
4       Q.    Did you compare this usage to any other
5    person's usage before you brought this as an EEO
6    defense?
7       A.    No.
8       Q.    Did you ask Dayton-Hudson why they
9    hadn't notified you at least that year?  And, I
10   presume, if I pull the prior year and the prior year
11   and the prior year, did you ask them to see if they
12   had known of it?
13      A.    I don't recall.
14      Q.    You don't recall asking them?
15      A.    I don't recall definitively.  When those
16   charges were so extreme, I believe that we inquired
17   why we did not know about that.
18      Q.    When did you do that?
19      A.    During the investigation.
20      Q.    Sir, a year before he, apparently, in
21   one month piled up $1,598 in charges, which he paid
22   by personal check, and you're asking that you just a
23   year later was curious why they didn't notify you.
24   Is that correct, sir?
25      A.    Yes.


WORLDWIDE REPORTING SERVICE
377-DEPO

105

1        Q.    What is their response?
2        A.    I don't recall.
3        Q.    Did you put it in writing to
4    Dayton-Hudson?
5        A.    I don't recall.
6        Q.    Who was responsible for checking this
7    out?
8        A.    Doug Barth.
9        Q.    What is Doug Barth's responsibility?
10        A.    He was the district assets protection
11    team leader.
12        Q.    Do you have a normal random survey of
13    all cards of all executives or just the ones you
14    want to fire?
15        A.    I don't know.
16        Q.    Is it customary for you to check with
17    all executives or just the ones you want to fire to
18    find out what their credit card usage is?
19        A.    We don't check on credit card usage if
20    their's a reason to investigate.
21        Q.    Why not?  If it's a violation of policy,
22    why not?
23        A.    It's a violation of policy.
24        Q.    Why don't you check on those that you
25    don't wish to fire?

WORLDWIDE REPORTING SERVICE
377-DEPO

106

1          A.     First of all, we don't wish to fire
2     anyone.

3          Q.     Sir, you said, "We only check when we
4     have a reason to check and when we're going to fire
5     someone." I said for those that you're not going to
6     fire do you check on them to make sure that the
7     policy has been maintained or do you selectively
8     choose which policies you will enforce and for what
9     purposes?

10          A.     In the course of our investigation, as
11     we spoke to more and more people about Mr. Harris'
12     conduct, we found more and more things, one of which
13     came to our attention was that he was in arrears on
14     both his Target card and his American Express.  At
15     that point in time, we investigated that.  That was
16     the basis for investigating it.

17          Q.     But, sir, if I were to ask you to show
18     me the records when you found out that he was in
19     arrears, I bet you I will find out, according to
20     your documents here, that it was done the same day
21     as your other investigation.  Is that accurate?

22          A.     I don't know.

23          Q.     What records do you have of when you
24     made that request?

25          A.     I didn't make that request.

1      Q.     What record do you have of when the
2  request was made?
3      A.     I don't know.
4      Q.     What records would you customarily have?
5  Would they be in writing?
6      A.     I don't know.
7      Q.     Does Dayton-Hudson have the right to the
8  company's financial data without putting it in
9  writing?  In other words, you can just pick up the
10  phone and get all of these peoples' private credit
11  histories?
12      A.     I don't believe so.
13      Q.     So there would have been a writing to
14  the Visa or Masters accounts or Target account?
15      A.     I don't know.
16      Q.     Who would know this?
17      A.     Doug Barth.
18      Q.     Where is he located?
19      A.     I don't know.  He's no longer employed
20  by the company.
21      Q.     Can you tell me the circumstances
22  regarding his dismissal or his termination?
23      A.     He left the company.
24      Q.     When?
25      A.     Sometime last year.

108

```
 1         Q.    Under what circumstances?
 2         A.    He was dismissed for job performance.
 3         Q.    Can you tell me about his dismissal for
 4    job performance?
 5         A.    It was a variety of issues.
 6         Q.    Please tell me what they are.
 7         A.    General job performance issues.  I don't
 8    have the specifics.
 9         Q.    Do you have a personnel folder of his?
10         A.    I'm sure there is one.  I don't have it.
11               MR. BURTON:  Would you please produce
12         it.
13    BY MR. BURTON:
14         Q.    When you say you don't recall the
15    circumstances, can you tell me the areas?
16         A.    It was job performance.
17         Q.    That's a broad area.
18         A.    Yes, it is.  Follow-up.  Execution of
19    company programs primarily.
20         Q.    Was it failure to protect persons'
21    rights perhaps?
22         A.    No.
23         Q.    Was it overaggressiveness?
24         A.    Not to my knowledge.
25         Q.    Was it complaints on his performance?
```

109

1          A.     Not to my knowledge.

2          Q.     So when you say that he was dismissed --

3     and that would be a witness, by the way, that would

4     have been involved so please try to give me the

5     name, address.

6                 Can you tell me anything about it more

7     than he was dismissed?

8          A.     He was dismissed for job performance.

9          Q.     Did you have anything to do with his

10    dismissal?

11         A.     I was involved in it.

12         Q.     Can you tell me what portions you were

13    involved in?

14         A.     Speaking with his supervisor.  Ensuring

15    that there was appropriate documentation and

16    ensuring that we went through the counseling and

17    affirmative action policies.

18         Q.     Can you tell me what that means?

19         A.     It means that we go through a job

20    coaching where we identify what areas the individual

21    is deficient in, establish a plan to improve his or

22    her performance, follow-up on the execution of that

23    plan, and, hopefully, get the person back on track.

24         Q.     Tell me what in his case he had to do to

25    be on track.  You're talking about generalities.

110

```
 1        A.    Right.  I don't have the specifics.  The
 2    issues that led to his dismissal were a variety of
 3    job performance issues, which included execution of
 4    company programs, follow-up -- well, that's
 5    primarily the reasons as I recall.
 6        Q.    Now, just so that I'm not incorrect,
 7    Exhibit R to your attachment to the EEOC purports to
 8    be the Target credit card that he violated.  Is
 9    that correct?
10        A.    Your statement was?
11        Q.    That purported to be the Target credit
12    card you referred to.  Is that correct?
13        A.    Yes.
14        Q.    It consists of three pages; is that
15    correct?
16        A.    That is correct.
17        Q.    Can you tell me what a 1996 credit card
18    overdue has to do in 1999?
19        A.    No.  I would assume that it is an amount
20    that's in arrears from past purchases.
21        Q.    Well, by 1997 he's paid it off and the
22    credit card is closed.  Can you tell me what that
23    had to do since that was prior to his promotion?
24        A.    What did it have to do?  I don't know.
25        Q.    You used it to show that he was a bad
```

111

1    risk.

2         A.    It shows that he was delinquent on his

3    Target credit card.  That's what it shows.

4         Q.    Before he was promoted, not afterward,

5    correct?  Please, look.  Tell me if I'm crazy.

6         A.    You're saying he was delinquent on his

7    credit card before he was promoted.

8         Q.    Yes.  And then he was promoted and the

9    credit card was not maintained, nor delinquent

10   thereafter, correct?

11        A.    Correct.

12        Q.    Yet you used it as justification to show

13   that he was a poor risk for Target in the year 1999,

14   correct?

15             MS. CESARANO:  Just for the record,

16        Exhibit R goes with Paragraph 6, our position

17        statement, which links the two together.

18             MR. BURTON:  That's fine for the record.

19        I'm just trying to figure out what it has to

20        do with each other, other than the fact that

21        it's called piling on.

22             THE WITNESS:  It's information that

23        helped us understand Mr. Harris.

24   BY MR. BURTON:

25        Q.    And you didn't have that information

112

1    available when you promoted him?

2         A.    We didn't check that information when we

3    promoted him.

4         Q.    I see.  So if you found out that he had

5    been behind in the credit card, which had long been

6.   made good two years before, that would have been

7    grounds for not promoting him.  Is that your

8    statement?

9         A.    No.  It probably would have had nothing

10   to do with it, but in the course of our

11   investigation that as more information that we

12   found, nor did that have anything to do with his

13   termination of employment.

14        Q.    Then why did you include it in the basis

15   of why you should be terminated?

16        A.    It's additional information.  Actually,

17   the position statement clearly states that it is not

18   part of the reason that he's terminated.  The reason

19   for Mr. Harris' dismissal is the two cash shortages.

20        Q.    Isn't the reason for his dismissal the

21   same reason that they painted out the black color in

22   the swing room?  They painted out the black person

23   in the swing room in his office a couple weeks

24   before they terminated him.  They painted the person

25   white.

WORLDWIDE REPORTING SERVICE
377-DEPO

113

1      A.    I don't know anything about that.
2      Q.    You don't know that the new district
3   manager changed the mural in the swing room to a
4   white person from a black person?
5      A.    No.
6      Q.    So that's of no interest to you, is it?
7   Is that of interest to you?
8      A.    Is that of interest to me?  This is the
9   first that I ever heard of it.  I'd like to
10   understand the circumstances around why they
11   repainted the room.
12      Q.    What circumstances would justify
13   painting out the only black person in the mural that
14   you would say are appropriate, sir?
15      A.    I can't comment on that.
16      Q.    Well, I'm asking you what ones would be
17   good?
18      A.    I don't know.  Maybe it needed
19   repainting.
20      Q.    No.  Just the black person, sir.
21            MS. CESARANO:  Just for the record, he
22         said that he doesn't know about that.
23            MR. BURTON:  And he said it would depend
24         on the circumstances, and I'm saying if they
25         only painted out the black person and changed

114

```
 1            him to a white person, can you tell me any
 2            circumstances that would justify that conduct?
 3                 THE WITNESS:  I do not know.
 4    BY MR. BURTON:
 5            Q.    You can't think of any as you sit here,
 6    can you?
 7            A.    I do not know.
 8            Q.    Can you think of any as you sit here?
 9            A.    I do not know.
10            Q.    That's not an "I do not know" question.
11            A.    Can you repeat the question?
12            Q.    Can you think of any circumstances that
13    would justify changing the color, in the employees'
14    break room, a black person's face to a white
15    person's face?
16            A.    I cannot comment on that, because I do
17    not know the circumstances.
18            Q.    Can you think of any circumstances?  It
19    calls for a yes or no.
20            A.    Yes.
21            Q.    What circumstances would justify it?
22            A.    Perhaps a wall needed repainting.
23    Perhaps it was cracked.  I don't know anything about
24    the circumstance so I cannot comment on it.
25            Q.    Sir, are you aware that there were
```

1   racist comments made to Mr. Harris?  Didn't he tell
2   you that?
3          A.     Please describe the racist comments.
4          Q.     Did he tell you there were any made?
5          A.     I do not recall any racist comments.
6          Q.     Did he tell you that there were racist
7   comments?  Yes or no?  You either heard it before or
8   you hadn't.
9          A.     No.
10         Q.     Were you there at the EEOC when he
11  testified?
12         A.     Yes.
13         Q.     You didn't hear him say that there were
14  racist comments made?
15         A.     I did not hear any discussion about
16  racist comments.
17         Q.     I see.  So you didn't hear him say that
18  the new store district manager didn't like him
19  because of the color of his skin and wanted to find
20  reasons to get ride of him?
21         A.     No.
22         Q.     So since you've gotten the EEOC
23  complaint have you done any inquiry to determine
24  whether any of those allegations are accurate; to
25  wit, whether any other persons who had money which

1   they claimed credit for but they were short have
2   ever been able to repay Target without being
3   terminated?
4       A.    What's the question?
5       Q.    Have you ever done an inquiry since the
6   nature of his claim to determine whether his
7   position, which is, "Had you asked me for the money,
8   and I always claimed it that I took it.  I was happy
9   to give it back to you, and if I needed a receipt I
10  would have gotten it?
11      A.    He never volunteered to give it back.
12      Q.    Did you ever determine whether any other
13  person has been allowed to tender the money who
14  happened not to be African-American?  Yes or no?
15      A.    To give back -- I don't understand the
16  question.
17      Q.    It's really not that tough, and assuming
18  that this is read to a jury --
19      A.    Please, don't be condescending.
20      Q.    I couldn't be.  Please answer the
21  question.
22      A.    Please, restate it.
23      Q.    Did you ever make any inquiry to
24  determine whether any persons who were not
25  African-American who were store managers were ever

WORLDWIDE REPORTING SERVICE
377-DEPO

117

1    allowed to sit there and tender money back where

2    there was a bank imbalance and the money was

3    acknowledged to be the responsibility of a

4    particular manager?

5         A.    I'm not aware of any.

6         Q.    So you made no attempt.  Did you make an

7    attempt to find out whether or not that it ever

8    happened?  Not whether you're aware of it.

9         A.    That Mr. Harris has happened?

10   Absolutely.

11        Q.    Not Mr. Harris.  I'm try again.  We can

12   try this again, and I beg you to do this before a

13   jury.  Sir, the question is, now that Mr. Harris put

14   you on notice that he believed that he was being

15   treated in an improper fashion, that is the nature

16   of what you understand the claim to be?

17        A.    He never indicated to us, until the EEO

18   charged was filed, that he believed that he was

19   being treated any differently due to his race.

20        Q.    Let's try it again.  When he filed the

21   EEO, you believed that he was stating that he was

22   being treated differently on the basis of his race,

23   did you not?

24        A.    That is correct.

25        Q.    In order to determine whether or not

118

```
 1     there was basis to that belief, did you make any
 2     attempt to find out whether any other store manager
 3     had ever been allowed in the history of your company
 4     to pay back a bank shortage?
 5          A.    No.
 6          Q.    So you made no attempt to find out
 7     whether or not he in fact was being treated
 8     differently, did you?
 9          A.    He was held accountable for his actions
10     as a store team leader.  His actions resulted in a
11     cash shortage.
12               MR. BURTON:  Can I please ask that the
13          question be read back, and you answer it.
14               (Thereupon, the last question was
15               read back.)
16               THE WITNESS:  No.
17     BY MR. BURTON:
18          Q.    You personally opposed in the roundabout
19     him being hired, didn't you?  The record will
20     reflect that you are the person who specifically
21     opposed it, didn't you?
22          A.    I don't believe so.
23          Q.    Do you remember any of the other team
24     members' votes?
25          A.    No.  Actually, we don't vote.  We come
```

119

1    to a consensus.

2         Q.    Would it reflect anyone's position or

3    would you not keep that in writing?

4         A.    The position of the people who interview

5    them?

6         Q.    Yes.

7         A.    We usually don't state the positions on

8    this.

9         Q.    Did you tell anyone that Mr. Harris had

10   bad credit, other than publishing it in the public

11   records, which you did do?

12        A.    The only people who were aware of that

13   were people that had access to the investigation.

14        Q.    Such as?

15        A.    Myself, the regional vice-president, the

16   regional personnel director, our counsel in

17   headquarters, and the spoke vice-president and the

18   regional senior vice-president.

19        Q.    Didn't you also tell the employment

20   agency that Mr. Harris went to when he tried to get

21   a reference?

22        A.    No, we did not.

23        Q.    So if he was to state that he was told

24   that Target said that he had bad credit and that he

25   was a security risk, you would deny it or admit it?

120

1        A.    I have no knowledge of any discussion
2    with an employment agency.
3        Q.    Do you know if anyone at Target has
4    spoken to his employment agency trying to get him
5    alternate work?
6        A.    I don't know.
7        Q.    Is it your opinion that that is material
8    that should be kept secret or disseminated?
9        A.    In terms of?
10       Q.    The bad credit card use.
11       A.    On a need to know basis.  People who are
12   involved in the investigation.
13       Q.    What is to be disseminated, in your
14   understanding since you're in charge, to possible
15   employment agencies for their person to maintain
16   alternate work?
17       A.    The dates of employment and the last
18   position held.
19       Q.    So anything beyond that would be
20   inappropriate?
21       A.    Anything beyond that would be not
22   consistent with our policy.
23       Q.    So if anyone were to go beyond that it
24   would be not consistent and inappropriate then under
25   your policy?

121

```
1            A.    Yes.
2            Q.    So if someone were to state that he
3     should never be hired that would be a violation of
4     your policy?
5            A.    State that he should never be hired --
6            Q.    -- by an alternate employer.
7            A.    Would it be a violation of our policy if
8     one of our employees gave him a negative reference?
9            Q.    Yes.
10           A.    Yes, it would be.
11           Q.    And disparaging could possibly interfere
12    with his future employment of course, correct?
13           A.    It may.
14           Q.    And that would be anticipated if that
15    were said, correct?
16           A.    If it were said, it would be something,
17    I'm sure, that a potential employer would consider.
18           Q.    And negatively impact on the potential
19    employee?
20           A.    It may.
21           Q.    That would be your best estimate,
22    wouldn't it?
23           A.    Yes, it would.
24           Q.    Do you know if Mr. Frankhauser or
25    Mr. Barth or Mr. Hasting has spoken to any
```

122

1   subsequent employment agency?

2        A.    Not to my knowledge.

3        Q.    Would they be aware of your policy?

4        A.    Yes.

5        Q.    How would they have been aware of your

6   policy?

7        A.    It's common knowledge that our

8   employment policy is to verify dates of employment

9   and the last position held.

10       Q.    And nothing more?

11       A.    And nothing more.

12       Q.    Is that written down somewhere?

13       A.    I believe it's in our policy manual.

14       Q.    Do you have a policy manual regarding

15  the dissemination of credit information of

16  employees?

17       A.    I don't know.

18       Q.    Mr. Harris, when he originally came to

19  you from, I believe it was, Saks and then Zayre's.

20  Is that correct?  Not Zayre's.  And then Marshal's,

21  I believe, was his prior employer.  Correct?

22       A.    Yes.

23       Q.    He was lauded very highly by these

24  employers, if I recall, and by the employment

25  agency.  Is that not accurate?

123

1          A.    I don't recall.

2          Q.    You don't recall saying he's too good to

3    be true?

4          A.    No.

5          Q.    Those words, you don't recall, having

6    been written?

7          A.    No.

8          Q.    Articulate, friendly, personable,

9    helpful?

10         A.    I don't recall.

11         Q.    Terry Hargrove, who is that?

12         A.    District team leader.

13         Q.    Is he still a district team leader?

14         A.    No.

15         Q.    What is he now?

16         A.    He has resigned from the company.

17         Q.    Any particular reason?

18         A.    Just resigned.  Time to move on.

19         Q.    Went to join another company that you're

20   aware of?

21         A.    Not that I'm aware of.

22         Q.    He's not retiring.  Is he independently

23   wealthy?

24         A.    I can't comment on his financial

25   condition.

124

1       Q.   Was there any incident where he might

2   have felt more comfortable resigning that may have

3   occurred that you're aware of?

4       A.   I think in Terry's mind it was time for

5   him to move on.

6       Q.   Explain what you mean in Terry's mind

7   why it was time for him to move on.

8       A.   Just that.  He had worked for the

9   company for many years, had contributed to the

10   company significantly, and decided that it was just

11   time.  It was a point in his life.  He was going to

12   follow his wife's career, and he wanted to take it

13   easy for a while.  He worked very hard.

14       Q.   Let me ask you a question.  Has anyone

15   in your company authorized any investigation of

16   Mr. Harris during this period of time to find out

17   what he's doing, what he's not doing, how he's

18   doing?

19       A.   No.

20       Q.   So you know of no detective or

21   investigator or any kind of surveillance?

22       A.   I'm not aware of that.

23       Q.   You haven't authorized any?

24       A.   I have not.

25       Q.   And you know of none?

125

1    A.    I know of none.

2    Q.    Do you know how Mr. Harris is doing?

3    A.    No, I do not.

4    MR. BURTON:  I'm at a loss right now,

5    because of the lack of material that

6    apparently exists that we talked about.  I

7    don't want to just ramble on.  So what I'm

8    going to do is I'm going to suspend it pending

9    that, and by then the interrogatories and

10    production should be due anyway.

11    MS. CESARANO:  Right.  They're due in

12    about a week, and we can get those to you.

13    Anything new, I have no problem with that.

14    MR. BURTON:  You and I have litigated

15    before.  We've never had a problem.

16    MS. CESARANO:  Any new documents I will

17    get those to you.

18    MR. BURTON:  Apparently, there's a whole

19    bunch of stuff in Dallas, comparative stuff,

20    now that we know what should exist.

21    MS. CESARANO:  Right.  Whatever you've

22    asked me for, you're welcome to.

23    MR. BURTON:  I didn't think that would

24    be an issue.  Of course, you know you have the

25    right to read or sign this.

WORLDWIDE REPORTING SERVICE
377-DEPO

126

```
 1            MS. CESARANO:  We'll read it when it's
 2       completed.
 3            MR. BURTON:  I'm going to hold off
 4       ordering this pending the mediation.
 5            MS. CESARANO:  And I'm going to reserve
 6       any questions I might have on follow-up until
 7       the end of the thing.
 8            MR. BURTON:  No problem.
 9            (Thereupon, the deposition was concluded
10            at 11:50 a.m.)
11
12
13                          .
14
15
16
17
18
19                                              .
20
21
22       .
23
24
25
```

127

1                    CERTIFICATE OF NOTARY

2     STATE OF FLORIDA:

3                  :  ss.

4     COUNTY OF DADE:

5          I, STEVEN WASSERMAN, a Shorthand Reporter and

6     Notary Public in and for the State of Florida at

7     Large, do hereby certify that I reported in

8     shorthand the deposition of TERRY GILLESPIE, a

9     witness called by the Plaintiff in the above-styled

10    cause; that the witness was first duly sworn by me;

11    that the foregoing pages, numbered from 1 to 126,

12    inclusive, constitutes a true record.

13         I further certify that I am not an attorney nor

14    counsel to any of the parties, nor related to the

15    parties, nor financially interested in the action.

16         WITNESS my hand and official seal this 6th day

17    of July, 2000.

18

19

20                   STEVEN WASSERMAN
                     NOTARY PUBLIC
21         My Commission Expires April 20, 2002



STEVEN WASSERMAN
My Commission # CC 820596
Expires: 04/20/2003
1-800-3-NOTARY  Fla Notary Service & Bonding Co

                WORLDWIDE REPORTING SERVICE
                         377-DEPO

# BENEFITS FILE
# OF
# STEVE HARRIS



EXHIBIT

5/22/00 2

TEAM MEMBER
SERVICE CENTER

Date **7/9/97**

Number of pages including cover sheet _____

To:
Met Life Dental

_____

_____

_____

Phone

Fax Phone    **1-630-820-7804**

CC:    _____

_____

From: **Marilyn**
**Target TMSC-Exec. Team**

Address:    3701 Wayzata Blvd.

DHOC 4C-D

Minneapolis, MN  55416

Phone    1-800-394-1885

Fax Phone    (612) 307-5490

REMARKS

☐ Urgent    ☒ For your review    ☐ Reply ASAP    ☐ Please comment

Apparently there is a mix-up in your records - Janice Harris (spouse) was told that Brittany & Raven Harris were dropped off the coverage in March 96 - actually they were added at that time - due to marriage. Also in June 96 another child, Steve was added. Please update your records.

Thank you for your help with this

Marilyn -
TMSC-Exec. Team

## MetLife

# MEDICAL/DENTAL
# CHANGE FORM

## ⊙ TARGET.

(Please print clearly and be sure to sign and date this form. Return your completed form to your personnel office.)

## EMPLOYEE INFORMATION

| LAST NAME | FIRST NAME: | M.I.: | SOCIAL SECURITY NO. |
|---|---|---|---|
| HARRIS | STEVE | L | 591 50 51 54 |

## TYPE OF CHANGE — (Effective Date of Change Should be Indicated Below)

**CHANGES TO BE COMPLETED BY THE EMPLOYEE:**

A. ☒ Add Dependent Coverage — Reason: ☒ Marriage ☒ Birth ☐ Other   If other, explain _____
(Complete Employee and Dependent Information Section Below) _____

B. ☐ Cancel Dependent Coverage — Reason: ☐ Divorce ☐ Other  If other, explain _____
(Indicate all dependents to be cancelled in the Employee and Dependent Information Section Below) _____

## EMLOYEE AND DEPENDENT INFORMATION (Complete this Section If Box A or B above is checked)

Family members to be enrolled/cancelled
(If more space is needed, please use additional enrollment form.)

Indicate With a Check (✓) the Coverage You Want For Each Covered Person

| | Last Name | First Name | Middle Initial | DATE OF BIRTH Mo. | Day | Yr. | SEX M/F | Medical | Dental |
|---|---|---|---|---|---|---|---|---|---|
| Employee | | | | | | | | | |
| Spouse | HARRIS | JANICE | L. | 05 | 10 | 70 | F | | ✓ |
| Dependent Child | HARRIS | RAVEN | S. | 06 | 17 | 86 | F | | ✓ |
| Dependent Child | HARRIS | BRITTANY | A. | 03 | 15 | 87 | F | | ✓ |
| Dependent Child | | | | | | | | | ✓ |

☐ Change in Last Name  Indicate New Name _____

☐ Change in Address or Phone Number  Complete Section Below

| ADDRESS (Street) | | APT. |
|---|---|---|
| | | |

| CITY | STATE | (ZIP CODE) |
|---|---|---|
| | | - |

| TELEPHONE NUMBER |
|---|
| Work: (   )     Home: (   ) |

## OTHER INSURANCE

Do you or any of your dependents have coverage under any other medical plan?  ☐ Yes ☒ No  If yes, provide the following information:

| Name of Spouse/Dependent | Employer Name & Address | Spouse/Dependent Social Security No. | Insurance Company Name |
|---|---|---|---|
| | | | |

Are you or any of your dependents eligible for Medicare?  ☐ Yes ☒ No

## EMPLOYEE SIGNATURE

I certify that the information supplied above is true to the best of my knowledge.

Employee signature: _____    Date: 3-21-96

## TO BE COMPLETED BY EMPLOYER

Employer (Group) Name **Target Stores**  Group Number **36805**  Effective Date of Change  3-21-96

## MetLife

TARGET/HARRIS078

F32140?

# MEDICAL/DENTAL CHANGE FORM

**MetLife**    **TARGET.**

(Please print clearly and be sure to sign and date this form. Return your completed form to your personnel office.)

## EMPLOYEE INFORMATION

LAST NAME: HARRIS
FIRST NAME: SHEVE
M.I.: L
SOCIAL SECURITY NO.: 59V 30 3V8 4

## TYPE OF CHANGE — (Effective Date of Change Should be Indicated Below)

CHANGES TO BE COMPLETED BY THE EMPLOYEE:

A. ☒ Add Dependent Coverage — Reason: ☒ Marriage ☐ Birth ☐ Other    If other, explain _____
(Complete Employee and Dependent Information Section Below) _____

B. ☐ Cancel Dependent Coverage — Reason: ☐ Divorce ☐ Other    If other, explain _____
(Indicate all dependents to be cancelled in the Employee and Dependent Information Section Below) _____

## EMLOYEE AND DEPENDENT INFORMATION (Complete this Section if Box A or B above is checked)

Family members to be enrolled/cancelled
(If more space is needed, please use additional enrollment form.)

Indicate With a Check (✓) the Coverage You Want For Each Covered Person

| | Last Name | First Name | Middle Initial | DATE OF BIRTH Mo. | Day | Yr. | SEX M/F | Medical | Dental |
|---|---|---|---|---|---|---|---|---|---|
| Employee | HARRIS | STEVE | L | 10 | 15 | 62 | M | | ✓ |
| Spouse | HARRIS | JANICE | C | 8 | 10 | 70 | F | | ✓ |
| Dependent Child | HARRIS | RAVEN | S | 6 | 17 | 86 | F | | ✓ |
| Dependent Child | HARRIS | BRITTANY | A | 8 | 15 | 87 | F | | ✓ |
| Dependent Child | HARRIS | STEVE | J | 3 | 3 | 96 | M | | ✓ |

☐ Change in Last Name   Indicate New Name _____

☐ Change in Address or Phone Number   Complete Section Below

ADDRESS (Street): 9664 TEVERWIELR DR    APT.
CITY: BOCA RATON    STATE: FL   (ZIP CODE): 33496-
TELEPHONE NUMBER
Work: (407) 1483-3400    Home: (407) 1477-9548

## OTHER INSURANCE

Do you or any of your dependents have coverage under any other medical plan? ☐ Yes ☒ No  If yes, provide the following information:

| Name of Spouse/Dependent | Employer Name & Address | Spouse/Dependent Social Security No. | Insurance Company Name |
|---|---|---|---|
| | | | |

Are you or any of your dependents eligible for Medicare? ☐ Yes ☒ No

## EMPLOYEE SIGNATURE

I certify that the information supplied above is true to the best of my knowledge.

Employee signature: _____    Date: 5-21-96

## TO BE COMPLETED BY EMPLOYER

Employer (Group) Name __Target Stores__ Group Number __36805__ Effective Date of Change _____

**MetLife**

F3214 03                    TARGET/HARRIS079

Date: Monday, 17 June 1996 10:01am E(
To: Todds.TRL, Barbara.Clancy, Todds.RETL-HL
From: Barbara.Clancy
Subject: STEVE HARRIS

ERINN, PLEASE FOLLOW UP WITH BEV.   WITHOUT THE WRITTEN APPROVAL ON STEVE'S
BENEFIT REQUEST , CANNOT GET THE INSURANCE.

Thanks, Barb
---------------------------( Forwarded letter 1 follows )---------------------
Date: Friday, 14 June 1996 4:08pm D(
To: Barbara.Clancy
From: Bev.Becker
Subject: STEVE HARRIS
InReply-to: The letter of Wednesda, 12 June 1996 9:30am U(

Barb, but did I do a mind blank????
I do not remember this situation.
If there is something I should be doing, please help b, feeble mind.
Bev Becker
Benefits

Date: Wednesday, 11 June 19-c 10:00AM E-
TO: BE..Bocker
TT Todderine, Barbara.Clancy
  cc: Barbara.Clancy
SUBJECT: STEVE HARRIS

YOU CAN SEND THE APPROVAL INFORMATION FOR STEVE HARRIS' DENTAL COVERAGE TO ME
AT THE USI0 DISTRICT OFFICE.  AFTER I RECEIVE IT I WILL KEY THE CHANGES ON THE
SYSTEM.

THANKS FOR YOUR HELP.

BARBARA CLANCY, USI0 DISTRICT OFFICE



33 South Sixth Street
P.O. Box 1392
Minneapolis, Minnesota 55440-1392

Statement of
Lost Group
Medical or Dental
Coverage

If an employee or employee's dependents involuntarily lose their medical or dental coverage under another group plan, the employee may complete this form as a request for employee or employee's dependent coverage under this group plan. This form must be completed within 31 days from the date the employee's or employee's dependent's other group coverage ends. **Please send the completed form to your benefits contact at Headquarters, CC-09J.**

**To be Completed by the Employee**

| Employee's Full Name | Steve L Harris | Employee's Soc. Sec. No. | 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 |

Employee's class: ___ Level I (stores only) ___ Flex Regular ___ Level II ___ Regular ✓ Level III ✓ Executive ___ DXB

Employee's current Target coverage:

**Medical**
___ No Coverage
___ Employee only coverage
___ Two-member coverage
✓ Full family coverage

**Dental**
___ No coverage
✓ Employee only coverage
___ Two member coverage
___ Full family coverage

I hereby certify that the individual(s) named below has/have not been covered under Target's Group Plan because coverage was obtained under another group plan provided by another employer. This coverage has now terminated due to loss of coverage. Individual(s) named below is/are no longer covered under that group plan.

1. Please list the name, relationship, date of birth of each person needing coverage, and check the type of coverage needed:

| Name | Relationship | Date of Birth | Medical | Dental |
|------|--------------|---------------|---------|--------|
| Janice Harris | spouse | 08-10-70 | | ✓ |
| | | | | |
| | | | | |

2. Date other group coverage ended   5/24/96
3. Reason coverage ended   LEAVING COMPANY
4. Name of other employer   TARGET STORES
5. Insurance company which handled other group coverage   ~~PRUDENTIAL~~ METLIFE

I represent that all statements and answers made above are true, complete and correct. They shall be a part of my application for coverage. I agree that the coverage of anyone for whom such statements and answers are made will not be in force until approved by Benefits Administration, CC-09J. Coverage is then provided as specified in the Group plan.

Date   5-21-96        Signature of Employee

**To be Completed by the Personnel Manager**

Location  1638        Personnel Manager   Erica Lyday

The employee whose signature appears above signed this statement in my presence. To the best of my knowledge and belief, the statements and answers made above are true and complete.

Date   5/31/96        Signature of Personnel Manager   Erica Lyday

**To be Completed by Benefits Administration**

___ Approved        ___ Disapproved

If disapproved reason why _____

_____

_____

_____        _____        _____
Signed                                       Position                                    Date

F2000.03 (rev. 2-91)

TARGET/HARRIS082

Date: Thursday, 6 June 1996 2:00pm 0:
To: barbara.Diancy
From: toubo.ink
Subject: steve harris

Barbara,
The PAPERWORK IS FOR ADDING STEVE'S WIFE AND DEPENDENTS.

Steve
------------------------( Forwarded letter 1 follows )--------------------
Date: Thursday, 6 June 1996 1:00pm 0:
To: Toubo.ink, barbara.Diancy
From: barbara.Diancy
Subject: Steve Harris

PLEASE REFRESH MY MEMORY.....I'VE BEEN ON VACATION.    I DID NOT CALL ANYONE AND
can't remember what this is all about.

Thanks, barbara
------------------------( Forwarded letter 2 follows )--------------------
Date: Tuesday, 4 June 1996 2:00pm 0:
To: barbara.Diancy, toubo.ink
From: toubo.ink
Subject: Steve Harris

barbara,
We told her to phone you? DID YOU call her?  IF she sends the forms to
you, can you then put it in his files.  I don't know who this PERSON
is that received the forms to her.

Thanks,
Steve
------------------------( Forwarded letter 3 follows )--------------------
Date: Tuesday, 4 June 1996 12:00pm 0:
To: toubo.ink
From: bev.parker
Subject: Steve Harris

Toby,
We can offer Steve the benefits.  I have approved the form, and sent it back
to you to keep in his file.  The effective date should be 6/10.  Collect any
back premiums due.
Thanks

**TARGET/HARRIS083**

**TARGET**

**Enrollment Form**
For PruCare Plus Calendar
PruCare Plus*/PruCare HMO

## EMPLOYEE

**Last Name:** HARRIS  **First Name:** STEVE  **MI:** L  **Social Security No.:** 591 30 3184

**Address:** 9664 TAVERNIER DR  **Apt:**  **Date of Birth:** 10/15/62  **Sex:** ☒ Male ☐ Female

**City:** BOCA RATON  **State:** FL.  **Zip Code:** 33496-  **Home Phone:** (407) 477 9548

**Marital Status:** ☐ Single ☐ Married ☐ Widowed ☐ Divorced ☐ Smoker ☒ Non-smoker  **Work Phone:** (407) 483 2400

**Type of plan:** ☐ PruCare Plus Preferred (90/70)  ☒ PruCare Plus (80/60)  ☐ PruCare HMO
**Employee Class:** ☒ Executive  ☐ Level I  ☐ Level II  ☐ Level III  ☐ Regular

**DEPENDENTS INFORMATION AND PHYSICIAN SELECTION:** If you want to enroll for dependents coverage, please list below each eligible dependent. Also list the Physician Identification number of the physician selected for each family member (see your Provider Directory for physician selection).

| Last Name (if different than employee's name) | First Name | M.I. | Sex/Relationship | Date of Birth Mo./Day/Year | Physician name or number Primary | OB/GYN | Other group health coverage If yes, with whom? |
|---|---|---|---|---|---|---|---|
| Employee: | / | | | 10/15/62 | 818 | | ☐ Yes ☐ No |
| Spouse | | | ☐ Male ☐ Female | / / | | | ☐ Yes ☐ No |
| Oldest child | | | ☐ Son ☐ Daughter ☐ Stepson ☐ Stepdaughter ☐ Other | / / | | | ☐ Yes ☐ No |
| | | | ☐ Son ☐ Daughter ☐ Stepson ☐ Stepdaughter ☐ Other | / / | | | ☐ Yes ☐ No |
| Child | | | ☐ Son ☐ Daughter ☐ Stepson ☐ Stepdaughter ☐ Other | / / | | | ☐ Yes ☐ No |

**ADDITIONAL DEPENDENT INFORMATION:** Complete only if you are enrolling for dependents coverage.

Is your spouse employed? ☐ Yes ☐ No  Spouse's Social Security Number  Is your spouse eligible for Medicare? ☐ Yes ☐ No
Spouse's employer name:  Employer Address.  If yes, spouse's Medicare number

If you are enrolling a stepchild for coverage, does that stepchild live with you? ☐ Yes ☐ No  If no, complete the "Dependent Child Eligibility Questionnaire" on the last page of this form.

If you checked "Other" for a child, complete the "Dependent Child Eligibility Questionnaire" on the last page of this form.

If child is age 19 or older, is the child an unmarried full-time student who is financially supported by you? ☐ Yes ☐ No
If yes, have the student child complete the "Student Verification Request" on the last page of this form.

**EMPLOYEE AUTHORIZATION:** I elect coverage, as indicated above, and authorize my employer to deduct required contributions (if any) from my earnings. I hereby authorize all hospitals, physicians, medical service providers, pharmacists, employers, and all other agencies or organizations (including insurers, Blue Cross-Blue Shield and pre-paid health plans) to permit The Prudential or its representatives to see, or to get a copy of all past, present and future medical, prescribed drug, employment and insurance coverage records which pertain to me or any covered member of my family. This information will be used in connection with claims for benefits (and other services provided by The Prudential under the plan). This authorization shall remain valid for the term of this coverage. The person who signs this form may have a copy upon request. I understand that, if a covered person is injured through the act or omission of another, The Prudential requires reimbursement for the benefits provided in an amount not to exceed any damages collected (where permitted by law).

**Employee signature:** X _(signed)_  **Date signed:** X 6-9-94

**For Personnel Use:** Group Number **87960**  Target Location **2510**  Effective date **06/01/94**  Employment date **06/01/94**  Reason for enrollment: ☐ Transfer ☒ Newly Eligible ☐ Lost Group Coverage ☐ Statement Of Health (approved by Pru)

Prudential Plus in some service areas.  TARGET/HARRIS084

**Change Form**
for PruCare Plus Enrolled
PruCare Plus*/ PruCare HMO

**Check those that apply and complete the lines indicated:**

| | |
|---|---|
| ☐ Employee name change _____ 1-4,6,13 | ☐ Terminate dependent child(ren) _____ 1-4,10-13 |
| ☐ Address and/or phone # change _____ 1-4,5,13 | ☐ Terminate all coverage _____ 1-4,12,13 |
| ☒ Add dependent spouse _____ 1-4,7,8,9,12,13 | ☐ Add Medicare supp. for employee____ 1-4, 13 |
| ☒ Add dependent child(ren) _____ 1-4,7,8,10-13 | ☐ Add Medicare supp. for spouse_____ 1-4,7,9,13 |
| ☐ Terminate dependent spouse _____ 1-4,9,12,13 | |

**1** Employer/Company name
Target

**2** Employee   Last name   First name   Middle initial       **3** Social Security number
HARRIS   STEVE   L

**4** Street address _____ Apt. no.   City   State   Zip code
4004 Inverrary Dr.   Boca Raton   Fl   33-76

**5** New home phone number | **6** Previous name if this is a name change | **7** Spouse's Social Security no.   505, 07 7365 | **8** Is spouse employed? ☒ Yes ☐ No   Employer name Target

| Last name   First name   M.I.<br>(Enter last name if different form that of the employee.) | Date of birth<br>Mo Day Yr   Sex | Physician/Facility* | OB/GYN Physician* | Other group health<br>coverage? With whom? |
|---|---|---|---|---|
| **9** Spouse | 09 10 70 ☐M ☒F | | Dougne Bradley | ☐ Yes ☐ No |
| **10** Child   J | 02 02 96 ☒M ☐F | Ackourey William | | ☐ Yes ☐ No |
| **11** Child   S.   A | ☐M ☒F | Ackourey, William | | ☐ Yes ☐ No |

Reason: ☐ Marriage, date _____ ☐ Divorce   ☐ Employment terminated, date _____
☒ New born   ☐ Age Limit   ☐ Moved out of service area   ☐ Other _____

**13** Coverage granted to persons hereon shall be subject to all provisions and limitations of the group or individual agreement or contract. I am aware that a change in dependents may affect the amount deducted (if any) from my wages for coverage, and I hereby authorize such a change.
Employee signature:                                          Date signed:   3-21-96

* See your Provider Directory for physician selection. Enter the physician number, if any, otherwise enter the physician name.
Some cities allow female members over age 13 to preselect an obstetrician/gynecologist (OB/GYN), in addition to their Primary Care Physician. If applicable, OB/GYN's will be listed as Primary Care or Co-Primary Care Physicians in your Provider Directory.

---

**FOR PERSONNEL REPRESENTATIVE USE**
Group Number   Target       Date Coverage _____   Employment _____
87960   Location # [   ]   Begins _____   Date _____

● Confirm that all appropriate boxes are checked and completed.

● Give the employee the copy of the form label "Employee Copy". Fold and staple the "Personnel Representative Copy" to the benefits enrollment card.

● Send the "Prudential Copy" of the Change Form to:   The Prudential
Billing & Eligibility - PHCS Division
P.O. Box 59047
Minneapolis, MN 55459-0047

● Please complete and input an ESCN, as appropriate.

Prudential Plus in some service areas.

2828.03   91)       PERSON?   TARGET/HARRIS085       Cat no. 1607NS1

# ENROLLMENT FORM

**MetLife** | **TARGET**

PRESS HARD WHEN WRITING

Please print clearly and be sure to sign and date this form. Return your completed form to your personnel office.
Keep the last copy. This can serve as a temporary ID card until the permanent one is issued.

## EMPLOYEE INFORMATION

**LAST NAME:** HARRIS
**FIRST NAME:** STEVE
**M.I.:** L

**ADDRESS (Street):** 9664 TAVERNIER DR.
**APT.:**

**(City):** BOCA RATON
**(State):** FL **ZIP Code:** 33496
**SOCIAL SECURITY NO.:** 591 303 84
**DATE OF BIRTH:** 10 15 62

**Home Phone:** (407) 477-9548
**Work Phone:** ( )
**Spouse's Work Phone:** ( )
**Sex:** ☒ Male ☐ Female
**Marital Status:** ☒ Single ☐ Married

## MEDICAL PLAN SECTION — Choose one from each of the following:

**PLAN OPTION:**
☒ Medical Plan 1 ($250)
☐ Medical Plan 2 ($500)

**TYPE OF COVERAGE:**
☐ Smoker
☒ Non-Smoker

☒ Employee Only ☐ Employee + (1) Dependent ☐ Employee + Family

## DENTAL PLAN SECTION

**PLAN:** ☒ Dental
**TYPE OF COVERAGE:** ☒ Employee Only ☐ Employee + (1) Dependent ☐ Employee + Family

## EMLOYEE AND DEPENDENT INFORMATION

Family members to be enrolled
If more space is needed, please use additional enrollment form.)

| | Last Name | First Name | Middle Initial | DATE OF BIRTH Mo. | Day | Yr. | SEX M/F | Medical | Dental |
|---|---|---|---|---|---|---|---|---|---|
| Employee | HARRIS | Steve | L | 10 | 15 | 62 | M | ✓ | ✓ |
| Spouse | | | | | | | | | |
| Dependent Child | | | | | | | | | |
| Dependent Child | | | | | | | | | |
| Dependent Child | | | | | | | | | |

## OTHER COVERAGE

Do you or any of your dependents have coverage under any other medical/dental plan? ☐ Yes ☐ No If yes, provide the following information:

| Name of Spouse/Dependent | Employer Name & Address | Spouse/Dependent Social Security No. | Insurance Company Name |
|---|---|---|---|
| | | | |

Are you or any of your dependents eligible for Medicare? ☐ Yes ☒ No

## AUTHORIZATION

I certify that the information supplied above is true to the best of my knowledge. Also, until further notice, I desire coverage as indicated above and as described in my Empoyer's current announcement (copy of which I have received). I hereby authorize my Employer, until further notice, to deduct from my pay my contribution (if any) to the cost of such coverage.

Further, I authorize any provider of health services to provide, upon request, any information concerning the health, condition or treatment of any covered person whenever such information is considered necessary with respect to the delivery of medical care, the proper disposition of a claim submitted for payment, medical management activities or in fulfillment of obligations imposed by State or Federal Law.

Signature of employee: _____
Date 6-9-94

## TO BE COMPLETED BY EMPLOYER

**CHECK ONE:**
☐ Active ☐ Early Retiree ☐ COBRA ☐ Retiree

**CHECK ONE:**
☐ Open Enrollment ☐ New Enrollee ☐ Transfer ☐ Statement of Health ☐ Statement of Lost of Group Coverage

**ployer (Group) Name:** Target Stores
**Group Number:** 36805
**Date of Hire:** 6/19/94
**Location:** T-168

Complete the following information:
**Effective date:** 6/9/94

(8/93) Printed in U.S.A.
F321303

TARGET/HARRIS086



## **BENEFICIARY DESIGNATION FORM**

Questions'
Call SRSP Express
1-800-828-585(

**1** **EMPLOYEE INFORMATION**                                 RETURN COMPLETED FORM TO YOUR WORK LOCATION

LAST NAME
H A R R I S

FIRST NAME
S T E V E

M I

SOCIAL SECURITY NUMBER
5 9 1 - 3 0 - 8 4 1 6

AREA CODE   TELEPHONE NO. (Between 8:00 - 5:00 Mon -Fri. Central Time)
4 0 7 - 4 8 3 - 3 4 0 0

CHECK ONE:
MARRIED ☐    SINGLE ☑

COMPANY NAME
T A R G E T

LOCATION CODE
T 6 3 8

**2** **BENEFICIARY CHOICE**

If you are married, your surviving spouse will automatically be paid the value of your SRSP account in the event of your death. If you wish to elect to pay benefits to someone other than your surviving spouse, your spouse must consent to your election.

If you are single, you may name your parents, child, friend, etc. as your primary beneficiary(ies). In the event that you marry, your spouse will automatically become your primary beneficiary unless you specify otherwise.

**PRIMARY BENEFICIARY(IES)**

| | |
|---|---|
| Name(s): | JANICE GREEVER |
| Relationship: | FRIEND |
| Social Security No. | 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 |
| Birthdate: | 08.10.70 |
| Address: | 91064 TAVERNIER DR. |
| | BOCA RATON Fl 33496 |

**SECONDARY BENEFICIARY(IES)**

| | | |
|---|---|---|
| Name(s): | RAVEN HARRIS | BRITTANY HARRIS |
| Relationship: | DAUGHTER | DAUGHTER |
| Social Security No. | 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 | 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 |
| Birthdate: | 6-17-86 | 8.15-87 |
| Address: | 91064 Tavernier Dr. | 91064 Tavernier Dr |
| | BOCA RATON Fl 33496 | BOCA RATON Fl 33496 |

**3** **SPOUSAL CONSENT**   *(Section must be completed if you are married and you have not designated your spouse as sole beneficiary.)*

I, the spouse of the above-named employee, consent to my spouse's designation of another person as primary beneficiary. I understand no benefit will be paid to me from the Plan upon my spouse's death unless I am named also as an additional primary beneficiary or as secondary beneficiary, and the primary beneficiary(ies) is/are deceased.

Spouse's Signature _____   Date _____

Notary Public Acknowledgement

State of_____   County of_____

The spouse listed above, being first duly sworn, signed the election and certified he/she was the spouse of the participant and that the signature was his/her signature.

Sworn to this_____ day of_____ , 19_____

Notary _____   My Commission Expires _____   Official Seal

**4** **EMPLOYEE AUTHORIZATION**

I understand that my designation becomes effective on the day this form is received and replaces any earlier beneficiary designation I have made under the Plan.

Employee's signature _____   Date _____

TARGET/HARRIS087

Last Name _HARRIS_    First _Steve_    Middle _E_

Employee Number _____    Location T– _638_    Social Security Number _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_

---

- **FOR RE-ENROLLMENT:** All employees must return this form to their Personnel Office no later than November 19, 199:
All changes are effective January 1, 1994. Complete Sections 1, 2, 3, 6, 7. Skip Sections 4 and 5.

- **FOR NEWLY ELIGIBLE EMPLOYEES:** Newly eligible employees must return this form to their Personnel Office within 3
days of eligibility. Complete **all** sections.

- See your Personnel Representative for all forms referred to in the following sections.

---

**SECTION 1**

**MEDICAL PLANS**

_____ No Coverage

✓ _per steve -94_ PruCare Plus _6-7_

✗ PruCare Plus Preferred

_____ PruCare HMO

} Complete a Prudential Enrollment Form only if you were not enrolled in the same plan in 1993.

**COVERAGE**

✓ Employee Only

_____ Two Member

_____ Full Family

*If you choose medical you must check desired coverage and also fill ou Section 3.*

---

**SECTION 2**

**DENTAL PLANS**

_____ No Dental Coverage

✓ Dental Coverage (Complete a MetLife Enrollment Form)

**COVERAGE**

✓ Employee Only

_____ Two Member

_____ Full Family

*If you choose dental, you must check desired coverage and also fill out Section 3.*

TARGET/HARRIS088

**EMPLOYEE AND DEPENDENT MEDICAL AND DENTAL ENROLLMENT:** You must check medical or dent for each person as applicable. If more space is needed, please use additional enrollment form.

|  | Last Name | First Name | Sex M/F | Social Security Number | Date of Birth | Relationship to Employee | Medical | Denta |
|---|---|---|---|---|---|---|---|---|
| Employee | HARRIS | STEVE | M | 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 | 10-15-62 | SELF | ✓ | ✓ |
| Spouse |  |  |  |  |  |  |  |  |
| Dependent |  |  |  |  |  |  |  |  |
| Dependent |  |  |  |  |  |  |  |  |
| Dependent |  |  |  |  |  |  |  |  |
| Dependent |  |  |  |  |  |  |  |  |

**SECTION 4**

If you are newly eligible for Additional Low Cost Life Insurance, you must **circle** the amount of additional coverag desired. Note: if you are currently enrolled in Additional Low Cost Life Insurance, you may not increase coverage unless you complete a Statement of Health and are approved for coverage. *(to be filed in by Personnel Representative*

$10,000     $25,000     (**$50,000**)     $75,000     $100,000     $150,000     Effective Date: 6 - 9 - 9

Give full name and relationship of primary beneficiary, and if desired, secondary beneficiary. If two or more beneficiaries are named as primary, the proceeds will be paid in equal shares to the primary beneficiaries. If al primary beneficiaries are not alive, second beneficiary is paid.

**Primary Beneficiary(ies):**                **Secondary Beneficiary(ies):**

GEORGE E. HARRIS
619 CHARRON Street
Ville LaSalle, Montreal, H8P-3L7

**SECTION 5**

**LONG TERM DISABILITY:** You may only enroll without a Statement of Health if you are **newly eligible.** If you are not newly eligible, you must complete a Statement of Health and be approved for coverage.

___ No Coverage          Effective Date: 6-9-94   } To be filled in by
✓ LTD Coverage          Date of Hire: 6-9-94     } Personnel Representative

**SECTION 6**     *Please check the appropriate box:*
                  ☒ Non-Smoker          ☐ Smoker

If you are enrolled in PruCare Plus or PruCare Plus Preferred, Additional Low Cost Life Insurance Plan, and/or the Long Term Disability Plan, you will be charged higher rates, unless you sign below to indicate that you have not smoked or used any tobacco product for six months. **IMPORTANT:** As with all company documents, it is essential that you complete this form accurately. Please be aware that if you falsify information concerning your tobacco use, it is grounds for terminating your employment - so please be honest.

I certify that I have not smoked or used tobacco products for six months.

SIGNATURE _____                DATE 6-9-94

TARGET/HARRIS089

**SECTION 7**

I verify that the information on both sides of this Benefits Enrollment Form is accurate. I certify that I have received a Summary Plan Description (SPD) Booklet for each one of my benefit choices for 1994.

SIGNATURE _____                DATE 6-9-94

**NOTE TO EMPLOYEE:**  If you want to enroll or re-enroll in the Dependent-care Spending Account (DSA), see your Personnel Representative for an Enrollment Form. Keep the employee copy for your records.

**NOTE TO PERSONNEL:**  Retain all 1994 Benefits Enrollment Forms. File this form with the employee's Benefits Enrollment Card.

EMPLOYEE STATUS AND CHANGE NOTICE

INSTRUCTIONS: DO NOT WRITE IN GREEN SHADED AREAS.

**SCREEN 1**

| PAYROLL | EMPLOYEE NUMBER | ACTION TYPE | EFFECTIVE DATE | LAST NAME | NAME | FIRST NAME | M.I. | SOCIAL SECURITY NUMBER | HOME PHONE NUMBER |
|---|---|---|---|---|---|---|---|---|---|

ACTION TYPE: 1 NEW HIRE  2 RE-HIRE  3 REHIRE  4 TRANSFER  5 CHANGE

BOX SUITE APT NO          STREET          ADDRESS          CITY          STATE          ZIP CODE          BIRTH DATE

TARGET DATE | CORPORATE DATE | JOB CODE | POSITION NO

**SCREEN 2**

FEDERAL TAX WITHHOLDING | STATE TAX WITHHOLDING | LOCAL TAX WITHHOLDING

PAYROLL ACCOUNT CHANGES | LOCATION WORK CENTER

**SCREEN 3**

HOURLY RATE | ANNUAL SALARY | COMPENSATION/REVIEWS | NEXT REVIEW DATE | DATE OF LAST INCREASE | AMOUNT OF LAST INCREASE | SHIFT | ADDITIONAL RATES

LEAVE OF ABSENCE | # DAYS

BANK DEPOSIT | BANK NUMBER | EMPLOYEE BANK ACCOUNT NUMBER

BENEFITS | MEDICAL | DENTAL
DO W/BEN BASE DATE | CARR | PLAN | CARR | PLAN | STD | FSA

COMMENTS

EMPLOYEE'S SIGNATURE

The foregoing conforms to my Understanding:

PERSONNEL REPRESENTATIVE

RECOMMENDED BY                    DATE

APPROVED BY                    DATE

TARGET/HARRIS090



TARGET EMPLOYEE STATUS AND CHANGE NOTICE

INSTRUCTIONS: DO NOT WRITE IN SHADED AREAS.

TARGET/HARRIS091

RETAIN THIS FORM
5 YEARS FROM
TERMINATION DATE

Erika -

This note is to confirm that
Janice Harris is leaving Target
effective 5/31/96. Here is a copy
of her statement of test group
coverage. Please key the ESCN
on Steve's coverage.

Thanks,

Lori Lee,
T642

A Division of the Dayton Hudson Corporation          Printed on recycled paper.

**TARGET/HARRIS092**



**Target Stores**
Benefits Administration, CC-09J
33 South 6th Street
P.O. Box 1392
Minneapolis, Minnesota 55440-1392

Statement of
Medical or Dental
Coverage

If an employee or employee's dependents involuntarily lose their medical or dental coverage under another group plan, the employee may complete this form as a request for employee or employee's dependent coverage under this group plan. This form must be completed within 31 days from the date the employee's or employee's dependent's other group coverage ends. **Please send the completed form to your benefits contact at Headquarters, CC-09J.**

### To be Completed by the Employee

Employee's Full Name    _Steve  L  Harris_    Employee's Soc. Sec. No.    _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_

Employee's class: ___ Level I (stores only)  ___ Level II  ✓ Level III  ___ DXB
___ Flex Regular  ___ Regular  Executive

Employee's current Target coverage:

**Medical**
___ No Coverage
___ Employee only coverage
✓ Two-member coverage
✓ Full family coverage

**Dental**
___ No coverage
✓ Employee only coverage
___ Two-member coverage
___ Full family coverage

I hereby certify that the individual(s) named below has/have not been covered under Target's Group Plan because coverage was obtained under another group plan provided by another employer. This coverage has now terminated due to loss of coverage. Individual(s) named below is/are no longer covered under that group plan.

1.  Please list the name, relationship, date of birth of each person needing coverage, and check the type of coverage needed:

| Name | Relationship | Date of Birth | Medical | Dental |
|---|---|---|---|---|
| _Janice Harris_ | _Spouse_ | _08-10.70_ | | ✓ |
| | | | | |
| | | | | |

Date other group coverage ended  _5/24/96_
3.  Reason coverage ended  _LEAVING COMPANY_
4.  Name of other employer  _TARGET STORES_
5.  Insurance company which handled other group coverage  _METLIFE_

I represent that all statements and answers made above are true, complete and correct. They shall be a part of my application for coverage. I agree that the coverage of anyone for whom such statements and answers are made will not be in force until approved by Benefits Administration, CC-09J. Coverage is then provided as specified in the Group plan.

Date _5-21-96_    Signature of Employee _____

### To be Completed by the Personnel Manager

Location _TL-35_    Personnel Manager _Enila  Lylay_

The employee whose signature appears above signed this statement in my presence. To the best of my knowledge and belief, the statements and answers made above are true and complete.

Date _5/21/96_    Signature of Personnel Manager _Enila Lyday_

### To be Completed by Benefits Administration

✗ Approved    ___ Disapproved

If disapproved reason why _____

_B. Barber_    _Benefit Admin._    _4/4/96_
Signed    Position    Date

F2523 03 (rev. 2-91)    TARGET/HARRIS093

