**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 00-6107-CIV-FERGUSON/SNOW**

STEVE HARRIS,
    Plaintiff,

vs.

TARGET CORPORATION,
Defendant
    Defendant.

_____/

### NOTICE OF FILING AFFIDAVIT OF HARRIS AND DEPOSITIONS IN OPPOSITION TO TARGET CORPORATION's MOTION FOR SUMMARY JUDGEMENT

The Plaintiff, by and through undersigned counsel, and pursuant to the Fed. R. Civ. Pro. Herby files the Affidavit of Steve Harris and the Depositions of;

1. Janice Harris

2. Don Feinkhauser

3. Simone Tripp

4. Karen Napp Lapre

5. Clarissa Howard

6. Petricia Morris

7. Sandra Rosenberg

8. Erica Lyday

9. Shannon Tetrault

Respectfully submitted,



BY_____
Richard J. Burton, FBN 179337



**Certificate of Service**

I HEREBY CERTIFY that a true copy of the foregoing Notice was mailed to Sheila Caesarano, Esq., SHUTTS & BOWEN LLP, 1500 Miami Center, 201 South Biscayne Blvd., Miami, FL 33131 on March 20, 2001.

RICHARD J. BURTON & ASSOC., P.A.
18305 Biscayne Blvd., Suite 300
Miami, FL 33160
Ph: (305) 705-0888    Fax: 935-9542

BY_____
Richard J. Burton, FBN 179337

1

1    THE UNITED STATES DISTRICT COURT
     FOR THE SOUTHERN DISTRICT OF FLORIDA
2         FORT LAUDERDALE DIVISION

3         CASE NO. 00-6107-CIV-FERGUSON
              MAGISTRATE JUDGE SNOW

4

5

6    STEVE HARRIS,                    **COPY**

7              Plaintiff,

     vs.

8

     DAYTON HUDSON CORPORATION,
9    d/b/a TARGET STORES,

10             Defendant.

11   - - - - - - - - - - - - - x

12

13
                         201 South Biscayne Boulevard
14                       Suite 1500
                         Miami, Florida
15                       Thursday, March 15, 2001
                         10:10 a.m. - 11:15 a.m.
16

17

18

19             DEPOSITION OF JANICE HARRIS

20

21

22        Taken before Donald W. McKay, RMR, CRR, a

23   Notary Public for the State of Florida at Large,

24   pursuant to Notice of Taking Deposition filed in the

25   above-styled cause.

2

1

2                              APPEARANCES

3            RICHARD J. BURTON, ESQ., of the firm of
             Richard J. Burton & Associates, P.A., on
4            behalf of the Plaintiff.

5            RENE GONZALEZ-LLORENS, ESQ., of the firm
             of Shutts & Bowen, LLP, on behalf of the
6            Defendant.

7                              ALSO PRESENT

8            Steve Harris

9

10

11

12

13

14

15

16

17                            I N D E X

18
   DIRECT EXAMINATION
19 BY MR. GONZALEZ-LLORENS........................ 5:11

20

21

22

23

24

25

3

1    MR. BURTON:  I'm going to put on the record
2    before we start the following statement:
3    Mr. Llorens faxed me a letter that was a lie
4    yesterday, stating that he had been unable to
5    serve Mrs. Harris.  Mrs. Harris will be happy to
6    comment.

7    Number one, she works for Target; told her
8    supervisor that anytime such came in, that it
9    would be available to be picked up.

10    Two, she herself would take issue with
11    Mr. Llorens' letter, because their blinds don't
12    open and cannot be seen through.  Accordingly,
13    the statements contained in -- they apparently
14    were self-serving because -- basically, the word
15    contempt -- for not showing with Mark Hastings
16    yesterday in Portland, Oregon.

17    And three, nothing Mr. Llorens so far has
18    represented he will produce -- he will not
19    produce any requests or directions or responses
20    from the process server, in writing or
21    otherwise, even though messages were left.
22    Apparently, he's trying to paint a brush that --
23    because they are basically interfering with
24    discovery, violating the rules of the Court, and
25    otherwise trying not to complete discovery so

1    that they can claim foul.

2        That's only in defense of what will be a

3    rule to show cause as to why Mr. Llorens,

4    Ms. Cesarano, the law firm, and Target should

5    not be held in contempt and sanctions issued for

6    their failure to make discovery to Mark

7    Hastings; additionally, failure to give us

8    copies of the documents they received in a

9    subpoena duces tecum without deposition,

10    regarding former employers, such as Zayre's,

11    such as Saks, which they agreed to give over

12    eight months ago, and other material.

13        Ms. Harris will be happy to answer how she

14    would have been available.  However, at the last

15    moment, after 2 o'clock, I did call Ms. Harris;

16    and, of course, she was available, through her

17    husband, to show up immediately without

18    subpoena, which does mean she's not here under

19    order of law.  And as much as you may and will

20    probably try to provoke her, she's a pregnant

21    lady within one month of delivery.  I will ask

22    you to have some decency even if you are paid a

23    lot of money to be abusive.

24        I would like that printed.

25        MR. GONZALEZ-LLORENS:  I won't even dignify

5

```
 1        your comments with a response.  We're here for
 2        Ms. Harris' deposition.
 3            Would you please swear Ms. Harris.
 4            MR. BURTON:  I want that printed by
 5        tomorrow to go with the motion.
 6   Thereupon,
 7                    JANICE HARRIS
 8   was called as a witness by the Defendant, and having
 9   been first duly sworn, testified as follows:
10            THE WITNESS:  So help me God.
11                 DIRECT EXAMINATION
12   BY MR. GONZALEZ-LLORENS:
13        Q.   Will you please state your full name for
14   the record.
15        A.   Janice Lee Harris.
16        Q.   Have you ever had your deposition taken
17   before?
18        A.   No.
19        Q.   This is the first time?
20        A.   Yes.
21        Q.   It's going to be a short deposition.  I'll
22   be asking you some questions about the case that
23   your husband, Mr. Harris, has filed against Target.
24   The questions are towards information that you may
25   have regarding the case.
```

6

1          This is not a marathon.  I understand

2    you're pregnant.  If you wish to take a break at any

3    time, please ask me and we'll take a break.  There

4    is no problem with that.  If you need to stretch for

5    a little bit, go ahead and say so.  We'll take a

6    break.

7          So whenever you feel the need to go to the

8    restroom, get a drink of water, stretch, just go

9    ahead and ask me.  Is that acceptable?

10        A.    Yes.

11        Q.    Have you ever used any other name than

12   Janice Harris?

13        A.    My maiden name, yes.

14        Q.    What was it?

15        A.    Janice Greever.

16        Q.    Can you spell that.

17        A.    G-R-E-E-V-E-R.

18        Q.    When did you change your name?

19        A.    When I got married.

20        Q.    When was that?

21        A.    December 2, 1995.

22        Q.    Are you still married?

23        A.    Yes.

24        Q.    Where do you live?

25        A.    18303 Clear Brook Circle, Boca Raton,

7

1   Florida, 33498.

2       Q.   Do you live with someone else?

3       A.   My husband.

4       Q.   Anyone else?

5       A.   My children.

6       Q.   How old are they?

7       A.   My children?  My son just turned five, and

8   my stepdaughters are 14 and 13.

9       Q.   There is three or two children?

10      A.   There are three children.  Two reside with

11  us currently.

12      Q.   What is your date of birth?

13      A.   8/10/70.

14      Q.   Where were you born?

15      A.   Florida.

16      Q.   What city?

17      A.   Fort Lauderdale.

18      Q.   What is your Social Security number?

19      A.   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.

20      Q.   Have you ever used a different Social

21  Security number?

22      A.   No.

23      Q.   Have you only been married once?

24      A.   Yes.

25      Q.   Have you ever been arrested?

8

1    A.    No.

2    Q.    Have you ever been convicted of a crime?

3    A.    No.

4    Q.    Did you finish high school?

5    A.    Yes.

6    Q.    Which high school did you attend?

7    A.    Zion Lutheran Christian School.

8    Q.    When did you graduate?

9    A.    1988.

10    Q.    Have you attended any colleges or

11    universities?

12    A.    Yes.  Palm Beach Community College and

13    Florida Atlantic University.

14    Q.    Do you have a degree from any of those

15    schools?

16    A.    Yes.  Palm Beach Community College.

17    Q.    What degree is that?

18    A.    Associate in Arts.

19    Q.    What was your major field of study?

20    A.    Business.

21    Q.    When did you graduate?

22    A.    I don't -- when I got my -- probably '90 or

23    '91.  Two years after high school.

24    Q.    Did you get any other degrees after getting

25    an AA?

9

1     A.    No.

2     Q.    Have you attended any vocational or trade

3  schools?

4     A.    No.

5     Q.    Your husband worked at Target for a number

6  of years.  Do you recall the last store he worked

7  at?

8     A.    Deerfield Beach.  I do not know the store

9  number.

10    Q.    Did you ever visit him there?

11    A.    A little.  Sometimes, yes.

12    Q.    How often?

13    A.    Maybe once a month.

14    Q.    Did you ever have lunch with him there from

15  time to time?

16    A.    I've had lunch with him while he was at

17  work, yes.

18    Q.    Do you know any of the employees that

19  worked at the Deerfield Beach store?

20    A.    Yes.

21    Q.    Do you recall their names?

22    A.    Tom Lindsey, Shannon.  I just know them by

23  their first names, because Target goes by their

24  first names, you know, traditionally.  Sandy.

25          I know so many people from Target.  I've

1    worked there for many years.

2            That's all I can recall right now.

3        Q.    And you say you worked at Target for many

4    years.  Target is your current employer.  Correct?

5        A.    Correct.  Along with another employer.  I

6    have two jobs.

7        Q.    Let's talk about Target first.  How long

8    have you been working at Target?

9        A.    Since the Delray Beach store opened.

10       Q.    When was that?

11       A.    It's about seven or eight years now.  I

12   don't know the exact date.

13       Q.    So it's about seven or eight years you've

14   been there?

15       A.    Um-hum.

16       Q.    Have you worked in one store or several

17   stores?

18       A.    Just that one store.

19       Q.    Which store was it?

20       A.    Delray Beach, T-642.

21       Q.    Have you had the same position for those

22   seven or eight years?

23       A.    No.

24       Q.    What was your first position?

25       A.    Cashier supervisor.

11

1    Q.    How long did you have that position?

2    A.    Probably a year and a half.  I'm not sure.

3    Q.    What happened next?

4    A.    Then I went to ready to wear and men's.

5    Then I went to the cash office.  Then I went to

6    sporting goods.  I've also worked in various other

7    departments.

8         I'm currently working as an operator and a

9    competitive shopper.

10    Q.    What is your current title?  I'm sorry.  I

11    didn't catch that.

12    A.    As an operator.  Like clerical.  And a

13    competitive shopper.

14    Q.    How long have you been doing these job

15    duties?

16    A.    The current ones, about five years and --

17    about five years.

18    Q.    So you're an hourly employee?

19    A.    Yes.

20    Q.    What is the level considered at Target?

21    A.    I'm the bottom level, level one.

22    Q.    Level one?

23    A.    Um-hum.

24    Q.    Are you working currently?

25    A.    Yes.

12

```
 1        Q.   Are you on a leave of absence?
 2        A.   No.
 3        Q.   So you're working at Target?
 4        A.   Um-hum.
 5        Q.   How many hours a week do you work?
 6        A.   About ten to fifteen.  It varies.  The past
 7   month, I've been out from Target, one, for being
 8   hospitalized for an anxiety attack; and then two,
 9   with complications with my pregnancy about three
10   weeks later, after being hospitalized.
11        Q.   So, for the past month, you've been on
12   leave from Target?  No?
13        A.   No, I have not.  I've been at Target every
14   week.  I can tell you the exact dates.
15        Q.   I don't need to know the exact dates.
16        A.   Last week, I spoke to my store manager.  I
17   speak to her weekly.  Rene Wasko.
18        Q.   How many hours do you work a week?
19             MR. BURTON:  Ten to fifteen.
20             THE WITNESS:  Ten to fifteen.
21   BY MR. GONZALEZ-LLORENS:
22        Q.   Fifteen hours a week?
23        A.   Um-hmm.
24        Q.   You worked last week 15 hours?
25        A.   I don't recall how many hours.  I'd have to
```

13

```
 1   look at my pay stub.  It varies.  I don't have a
 2   certain set amount of hours.
 3        Q.   You're a part-time employee.
 4        A.   Yes.  Part-time.
 5        Q.   What is your other employer?
 6        A.   Sherwood Honda.
 7        Q.   Where are they located?
 8        A.   3000 South Federal Highway, Delray Beach,
 9   Florida, 33444, I believe.
10        Q.   How long have you worked for them?
11        A.   Two years.
12        Q.   What is your job duty with them?
13        A.   Warranty administrative clerk.
14        Q.   What exactly is that?
15        A.   Filing warranty claims on vehicles.
16        Q.   How many hours do you work with them a
17   week?
18        A.   Forty.
19        Q.   Did you ever meet Doug Barth?
20        A.   Yes.
21        Q.   How many times have you met him?
22        A.   Over the years -- an estimate -- in social
23   events -- Target social events -- I'd say maybe ten,
24   twelve times.
25        Q.   Have you ever had any problems with him?
```

14

```
 1              MR. BURTON:  Object to the form of the
 2         question.  Are you talking about were their
 3         racial comments made?
 4              You can please answer that one.
 5              THE WITNESS:  Yes.
 6    BY MR. GONZALEZ-LLORENS:
 7         Q.   Tell me about them.
 8         A.   With him and other executives.
 9         Q.   Let's talk about Doug Earth right now.
10              MR. BURTON:  She said him and others.  Let
11         her complete the answer.  Don't stop her.
12         Please continue.
13              MR. GONZALEZ-LLORENS:  I'm not stopping
14         her.
15              THE WITNESS:  Did I have a problem with
16         him?
17              MR. GONZALEZ-LLORENS:  Yes.
18              MR. BURTON:  Please continue answering the
19         question you were answering.
20              THE WITNESS:  Yeah.  He would ask my
21         husband -- or whenever we'd be around, he'd say
22         like -- comments would be, of course, about
23         Steve's car, about this; about, you know, "Nice
24         car, Harris," or, "How did you -- it must be
25         nice to drive a Viper.  I wish I could drive
```

15

1    one."  Or always circling around financial --

2    "How does Steve afford this," or, "It must be

3    nice to do this."  You know.  And more than

4    once, "It must be nice for a black guy" -- or,

5    "It must be nice for a," you know -- the term

6    black guy, I would say I've heard more than once

7    with Target executives.

8        MR. GONZALEZ-LLORENS:  Let's talk about

9    Doug Barth right now.

10       MR. BURTON:  She was.

11       THE WITNESS:  It was him included.  Because

12   whenever -- I have never had a one-on-one

13   conversation with him.  It would be in a group

14   with more than -- you know, a group of

15   executives.

16   BY MR. GONZALEZ-LLORENS:

17   Q.   So he would make these comments in a group

18   of people, you're saying?

19   A.   Yes.  Him and others.

20   Q.   You overheard him making these comments?

21   A.   Yes.

22   Q.   You mentioned about nice to drive a Viper.

23   A.   Um-hmm.

24   Q.   Did he mention Mr. Harris' race when

25   referring to the car in any way?

16

1   A.   Yes.  In the comment of, "Must be nice for
2   a black guy to drive this," or a Mercedes was made a
3   comment before, too, because we also owned a
4   Mercedes.
5   Q.   How many times did he say, "Must be nice
6   for a black guy to drive a car like this"?
7   A.   Him and others -- a few times.  A handful
8   of times.  I would walk away after that.  I didn't
9   really want to be a part of, you know --
10  Q.   Sure.
11      MR. BURTON:  Mr. Llorens, don't try to be
12      understanding and say, "Sure."  Let her complete
13      her answer.  You're trying to interrupt her.
14      Let her continue.  Don't be sympathetic.  You're
15      asking a question.  Let her fully answer it and
16      don't have the court reporter break it up with
17      your comments.  That's an amateur trick.  Let
18      her complete her statements.
19      MR. GONZALEZ-LLORENS:  Mr. Burton, let me
20      take this deposition.  I don't appreciate your
21      statements.
22      MR. BURTON:  Then what was your comment of
23      "sure" and shaking your head intended to do
24      other than to break up her answer?
25      MR. GONZALEZ-LLORENS:  Mr. Burton, let me

1    take this deposition.

2        MR. BURTON:  Please take it properly.

3   BY MR. GONZALEZ-LLORENS:

4        Q.   Ms. Harris --

5            MR. BURTON:  Were there other things you

6        would have said if you completed your answer?

7        You have a right to complete your answer.

8            MR. GONZALEZ-LLORENS:  Stop shaking your

9        head and prepping the witness.

10           MR. BURTON:  There is no such thing.  You

11       don't have the right to stop it.

12  BY MR. GONZALEZ-LLORENS:

13       Q.   Ms. Harris --

14           MR. BURTON:  Don't raise your voice.

15  BY MR. GONZALEZ-LLORENS:

16       Q.   Ms. Harris, please finish answering the

17  question, if there is anything else you want to add.

18       A.   Just it would not be specifically him.  It

19  would be a group of people.  I would walk away,

20  because I would feel uncomfortable or feel like --

21  why would these people be making these comments?

22  I've heard it so many times.  Why make these

23  comments to my husband or to us?  Why not talk about

24  other things?

25       Q.   These comments that you say Doug Barth

18

1   made -- you said it was a handful -- how many times

2   do you recall Mr. Barth making these comments?

3       A.   Maybe four or five.

4       Q.   When was the first time?

5       A.   It would be at social events.  Like the

6   boat parade.  What is it called?  The Indy 500

7   events.  The events that we would go as husband and

8   wife to.  There were Christmas parties.  And I'm

9   trying to think what other community -- like -- I

10  don't recall specifically.  Like walks or community

11  events.  Like walkathons or things like that.

12      Q.   When was the boat parade that he allegedly

13  made this comment?

14      A.   It was the year before Steve had -- I don't

15  know the year.  About three years -- two years,

16  three years.

17          MR. BURTON:  You said it was the year

18      before Steve -- if you complete it, I can time

19      it.

20          THE WITNESS:  Steve had been in charge of

21      the boat parade.  It was the year before that.

22      It would have been in -- wait.  I think I was

23      pregnant as well at that time.  It would have

24      been '96, I believe.  '96 or '95.

25  BY MR. GONZALEZ-LLORENS:

1    Q.    Who else heard the comment?

2    A.    The other people standing around in the

3    group.    The other executives which were standing

4    there.

5    Q.    Do you recall their names?

6    A.    Who was usually hanging out together?

7    Probably Joe Toscano, Robert Van Savage.  I'm trying

8    to think who else would be in the group.  Not Mark

9    Hastings.  Mark wasn't there at that time.

10          That's all I can recall.  A lot of red and

11   khaki.

12          MR. BURTON:  You're saying from the boat

13      parade, since that was the specific --

14          THE WITNESS:  Yes.  That was the specific

15      time at the boat parade.  Maybe other

16      executives, but I don't recall their names.  I

17      know those --

18   BY MR. GONZALEZ-LLORENS:

19   Q.    Did anyone else make any comments in the

20   boat parade that you felt were improper or

21   discriminatory comments?

22   A.    Not that I can recall.  Just it was an

23   ongoing question, even to me personally, from my

24   store manager and other executives.  "Oh, it must be

25   nice to afford these things," or, "How does Steve do

20

1   it?"  And, "It must be nice for a brother," or
2   whatever.  Those comments were made to me while
3   working at Delray Beach.
4       Q.   Do you recall when the Indy 500 event you
5   mentioned was?
6       A.   I'm thinking the age of my child so I know
7   which year --
8       Q.   Sure.
9       A.   I believe it was -- that was when -- it was
10  either '96 or '97, in March, in the month of March.
11          MR. BURTON:  To make it helpful for you --
12      Steve, when were you terminated?  What year and
13      what month?
14          THE WITNESS:  It was two years ago.
15          MR. HARRIS:  March 6, 1999.
16          MR. BURTON:  Just to give us --
17          THE WITNESS:  So it might have been '98 or
18      '97.
19          MR. BURTON:  Was Hastings in charge?  Was
20      Toscano in charge?
21          MR. GONZALEZ-LLORENS:  Let me ask the
22      questions.
23          MR. BURTON:  I'm just trying to give her a
24      point of reference.
25          MR. GONZALEZ-LLORENS:  I will.

21

1            MR. BURTON:  Okay, fine.  Go ahead.

2    BY MR. GONZALEZ-LLORENS:

3        Q.   Do you have a recollection as to when it

4    was?  Take your time.

5        A.   Yes.  Let me see.  It was either '97 or

6    '98.  I think it was when Mark Hastings -- yeah,

7    Mark Hastings was in charge of the district at that

8    time.  Because Steve was just -- yeah, it was the

9    year before -- okay, '98, I believe.

10       Q.   '98?

11       A.   Yeah.  '98.

12       Q.   What was the comment made at the Indy 500

13   event?

14       A.   Oh, of course -- it's a car event, so, of

15   course, about cars and vehicles.

16       Q.   What was the comment?

17       A.   We were looking at the Target car -- the

18   Target race car.  And they said, "Maybe Harris will

19   buy this next," and, "It must be nice.  When you

20   going to get rid of the Viper?" or something to that

21   effect.  Just, again, to say -- it would be like a

22   group of people.  And they'd say, "Oh, must be nice,

23   Harris, for a brother like you.  Pretty good for a

24   black guy."  You know, joking, saying those types of

25   comments.

22

1     Q.   In that Indy 500 incident, who made the

2   comments?

3     A.   I have to think of who was -- because it

4   was always a group in that situation, I remember,

5   standing around the car.

6     Q.   Take your time.

7         MR. BURTON:  Who was in the group is what

8      he's asking?

9         THE WITNESS:  Definitely Joe Toscano.  I

10      remember him.

11  BY MR. GONZALEZ-LLORENS:

12     Q.   Who?

13     A.   Joe Toscano.  And -- who else?  It's hard

14  for me -- there is so many -- I think Mark was in

15  that group.  And, of course -- I don't know if their

16  wives were there or not.

17         MR. BURTON:  Mark meaning Mark who?

18         THE WITNESS:  Hastings.

19         MR. BURTON:  I didn't want to coach.  Thank

20      you.

21         THE WITNESS:  Get detailed here.

22         I don't recall right now who else was

23      around.  What was that executive's name?  Sorry,

24      I'm just trying to remember.  I picture faces,

25      but I don't remember their names.  Gosh.  Who

23

1       else?  The Coral Springs manager.  I don't know

2       his name.

3    BY MR. GONZALEZ-LLORENS:

4       Q.    That's fine.  Was he the store manager?

5       A.    The store manager.

6       Q.    The Coral Springs store manager?

7       A.    Yes.  This event was generally all store

8    managers.  Yeah.

9       Q.    Do you recall what was Mr. Harris' title at

10   the time or where he worked at?

11      A.    At that time, he was the store manager.

12      Q.    You said Christmas parties, there were

13   comments made, too.  Can you tell me what comments

14   were made at Christmas parties.

15      A.    Just the same -- like I remember going to

16   Robert Van Savage's house for a Christmas party.

17   What year?  I don't -- just the same type of, you

18   know, comment to him.  Just little innuendoes like,

19   oh, "Do black guys eat this," or -- things of that

20   nature.  That situation was posed jokingly, but I

21   took offense to it.

22      Q.    When you said that someone made a comment

23   about, "Do black guys eat this," was that

24   Mr. Van Savage or somebody else?

25      A.    I believe it was him, because it was his

24

1   party and he was preparing the food, while he was in

2   the kitchen.

3       Q.   Did anyone else hear this comment?

4       A.   Yeah.  I believe his wife, at the time, was

5   there.  And who else was at the party?  Another

6   executive.  What was his name?  Gosh.  I know he has

7   curly hair.  I'm trying to think of his name.

8       Q.   Do you remember where he worked at, what

9   store?

10      A.   He worked at the Boynton store.  Then he

11  worked at the Boca store.  What was his name?

12          MR. BURTON:  Can we take a break for my

13      convenience, after this question is answered?

14          MR. GONZALEZ-LLORENS:  Sure.

15          THE WITNESS:  I don't recall.  I don't

16      remember his name.  There was a few people

17      there.  I don't know -- it was wives, and I

18      don't know all their names.  Wives of executives

19      and families.

20          MR. GONZALEZ-LLORENS:  Mr. Burton asked to

21      take a break.  How long do you need?

22          MR. BURTON:  Five minutes for a bathroom

23      stop.

24          MR. GONZALEZ-LLORENS:  Go ahead.

25          MR. BURTON:  Please step outside.  I don't

25

1    trust Mr. Llorens.  Notwithstanding, thank you.

2         (Thereupon, a brief recess was taken, after

3    which the following proceedings were had:)

4    BY MR. GONZALEZ-LLORENS:

5    Q.    We were talking about Mr. Van Savage's

6    comment before we left.  Did he say anything else on

7    that occasion, the Christmas party?

8    A.    Not that I recall.

9    Q.    Did anybody else say any other improper or

10   discriminatory comments at that Christmas party?

11   A.    Not that I heard, no.

12   Q.    Were there any other Christmas parties in

13   which you heard improper comments or discriminatory

14   comments?

15   A.    No.

16   Q.    You've also mentioned a walkathon.  Do you

17   recall what was the comment he made there?

18   A.    No.  These would be when these people would

19   be around.  I did not hear any comments at that

20   function.

21   Q.    I'm sorry.  You didn't hear any comments

22   then?

23   A.    The walkathon, no.

24   Q.    Someone else made a comment that you were

25   told about.  Is that what you're saying?

26

1    A.   No.

2         MR. BURTON:  Your question was, on how many

3    occasions had she met Doug Barth.  You asked

4    her, "Where did you meet Doug Barth?"  She went

5    through the list of where she met Doug Barth,

6    and she said it would be social occasions, such

7    as -- then you asked her what comments were made

8    and where.  Am I correct so far?

9         THE WITNESS:  Yes.  The social events is

10   where all the executives would be together.

11        MR. GONZALEZ-LLORENS:  Sure.

12        THE WITNESS:  It wouldn't be --

13   BY MR. GONZALEZ-LLORENS:

14   Q.   Let's finish up Doug Barth then.  You

15   mentioned a few comments.  Any other comments that

16   he made regarding your husband's race, that you felt

17   were improper?

18   A.   To me, that I heard, no.

19   Q.   That you overheard yourself.

20   A.   No.

21   Q.   Do you know Terry Gillespie?

22   A.   Yes.

23   Q.   How many times have you met with him or met

24   him?

25   A.   The same.  The larger social events.  The

27

1    boat parade.

2        Q.    About ten or twelve times or more than

3    that?

4        A.    Yeah, about -- about eight times.

5        Q.    Eight times?

6        A.    About.

7        Q.    Did you ever hear Mr. Gillespie make any

8    discriminatory comment about your husband?

9        A.    The same.  At the boat parade, in the same

10   group -- the same comments circulating throughout.

11       Q.    What comments did Mr. Gillespie make?

12       A.    Just adding to the comments that the other

13   people made.  "Oh, yeah, it must be nice.  I wish I

14   could afford a Viper," or this and that.

15       Q.    He said, "Must be nice."  You say he also

16   said, "I wish I could afford a Viper"?

17       A.    Yeah.  That general -- I don't know if

18   those were exact word for word, verbatim, but just,

19   "Must be nice to have this car," or, "that Viper."

20       Q.    Anything else?

21       A.    Not that I can recall, no.

22       Q.    Did you ever meet Mr. Frankhouser?

23       A.    Yes.

24       Q.    How many times did you meet him?

25       A.    Don Frankhouser, he worked at my building,

28

1  Delray Beach.  I don't know what years.  I can't
2  count how many times I've met him, because he worked
3  at Delray Beach.  And I also saw him when he worked
4  at Deerfield Beach, at my husband's store.
5      Q.   Did you ever hear any discriminatory
6  comments made by Mr. Frankhouser?
7      A.   Not by me, no, I haven't.
8      Q.   Mr. Mark Hastings, have you ever met him?
9      A.   Yes.
10     Q.   How many times do you think you met him?
11     A.   Twenty, thirty.  He was the district team
12  leader while I was working as well.  So he was in
13  our store as well.
14     Q.   Did you ever hear Mr. Hastings make any
15  comment about Mr. Harris' race?
16         MR. BURTON:  Other than the ones she's
17     already mentioned?  Because she already included
18     them in the other comments.
19         THE WITNESS:  Yeah.  At the Indy 500 and at
20     the boat parade -- no, I don't think the boat
21     parade -- at the Indy 500 and at the boat
22     parade.
23  BY MR. GONZALEZ-LLORENS:
24     Q.   Let's go over all the comments you heard,
25  actually.  You heard those two comments in the boat

29

1   parade --

2       A.   It would be sharing in.  It would be one

3   person and somebody would add something to it.

4       Q.   But as to Mr. Hastings, which comments did

5   you hear him make?

6           MR. BURTON:  Objection.  Asked and

7       answered.  Explain it again.

8           THE WITNESS:  The same comments.  Doug

9       Barth or him or Joe would say, you know, "How

10      does a brother afford a Viper?"  Stupid things

11      like that.  "Must be nice, Harris, you got" --

12      you know, "How do you afford this," or how

13      financially, you know -- "I wish I could afford

14      this car.  It's pretty good for a brother -- a

15      black guy."  The comment would refer to that.

16      How does Steve afford this, because he's a black

17      guy or he's of this race?

18  BY MR. GONZALEZ-LLORENS:

19      Q.   Any other comments?

20      A.   Not that I recall.

21      Q.   Well, specifically as to the comment, "How

22  does a brother afford a Viper" --

23      A.   Um-hmm.

24      Q.   How many times did you hear that comment

25  from Mr. Hastings?

30

1      A.    Maybe once or twice.  Because it was during

2    social -- from him, social events.

3      Q.    Do you recall when those occasions

4    occurred?

5           MR. BURTON:  Objection, asked and answered.

6      Tell him again.

7           THE WITNESS:  Boat parade and Indy 500.

8    BY MR. GONZALEZ-LLORENS:

9      Q.    The comment, "It's very good for a brother

10   to afford this," is that a separate comment than the

11   ones you just mentioned?

12     A.    Is it very good?  I don't think I said

13   that.

14     Q.    I have, "How does a brother afford a

15   Viper?"

16     A.    Must be nice.  Must be nice for --

17     Q.    -- for a brother to afford a Viper?

18     A.    Right.  Or a black guy.

19     Q.    Which did he use, brother or black guy?

20     A.    Both references were used more than -- I

21   don't know which occasion.  But a reference to his

22   race was used.

23     Q.    By Mr. Hastings?

24     A.    Yes.

25     Q.    How about Mr. Gillespie?  Did you ever hear

31

```
 1   him make references to the words black or brother?
 2   Mr. Gillespie.
 3        A.   He jeered in when that comment was made at
 4   the boat parade.  "Oh, that's real nice," or, "It
 5   must be nice," or that type of general comment.
 6        Q.   You know Shannon Tetro.  You mentioned her
 7   before.
 8        A.   I've met her, yes.
 9        Q.   How many times?
10        A.   Probably about five.
11        Q.   Did you ever hear any discriminatory or
12   improper comments from Ms. Tetro?
13        A.   No.
14        Q.   You've mentioned so far several comments
15   that involve your husband's race.
16        A.   Um-hmm.
17        Q.   Now, other than those comments -- looking
18   for something else -- did you hear anyone at Target
19   make any comments about Mr. Harris' race?
20        A.   I said Joe Toscano.  I've heard him.  And
21   Jason --
22        Q.   You can tell me his title.
23        A.   Yeah.  I don't think -- he doesn't work --
24   he worked at my store.  This is at Delray Beach,
25   when I've heard comments about my husband or --
```

32

1   Jason.   What is his last name?

2       Q.   Do you know Jason's title?

3       A.   Yeah.   He was an executive.

4       Q.   In which department?

5       A.   Sporting goods and health and beauty, I

6   believe.

7       Q.   What comments did you hear Mr. Toscano make

8   regarding your husband's race?

9       A.   The same comments.   It would be at

10  breakfast.   It's a natural thing, at Target,

11  everybody kind of goes to Food Avenue around

12  9 o'clock.   So there would be myself and Joe and

13  other executives, and other team members at various

14  other times, and they would make -- you know,

15  somehow bring up, "How is Steve doing?"   Always

16  bringing up how my husband is doing.   And he

17  bought -- well, he at one time bought a boat.   And

18  that same time, "Do black guys know how to swim?"

19  And would ask how he could afford this.

20      Q.   How many times did Mr. Toscano say, "Do

21  black guys know how to swim"?

22      A.   Maybe once.

23      Q.   How many other comments did he make?

24      A.   He would constantly ask me how Steve would

25  afford this.   Which constantly means at least once a

33

1   week, maybe -- at least twice a month, maybe once a
2   week.  You know, "How is he doing it?  How is he
3   affording this?"  Wanting to know constantly our
4   financial status.
5       Q.   Anything else?
6       A.   Anything else in reference to --
7       Q.   Your husband's race.
8       A.   Well, if I told people who my husband
9   was -- you know -- "Who is your husband?"  And I'd
10  say, "Steve Harris," and they'd look at me kind of
11  strange, which gave me the feeling -- "Oh, Steve
12  Harris."  I said, "Yes, Steve Harris."  I'd tell
13  them where he'd work.  They'd look at me kind of
14  strange, like, "Oh."  Somehow they don't picture us
15  together, you know, because maybe he's black and I'm
16  white, that they wouldn't think I would be married
17  to him.
18      Q.   I'm just referring to Mr. Toscano.
19      A.   Um-hmm.
20      Q.   What other comments did he specifically
21  make?
22      A.   Specifically?  Just how does Steve, you
23  know, afford these things.  Sometimes if Steve would
24  stop by the store, I would be in -- he would say to
25  Steve, "Oh, pretty good for a brother.  Not too bad

34

1    for a black guy."  Those type of -- using that same

2    phrase, but that's the phrase they would say.

3        Q.   How many times did you hear him say,

4    "Pretty good for a brother"?

5        A.   Maybe two to three, that I was in the

6    presence -- with him and Steve; and then at other

7    times, when we were with a group of people at

8    breakfast.

9        Q.   When you were with a group of people at

10   breakfast, how many times did he specifically bring

11   up your husband's race, use the words "black" or

12   "brother," words like that?

13       A.   A few times.  Like I said, about two to

14   three times that I -- until I -- you know, I tried

15   to avoid him, because I knew he was going to ask me

16   how -- you know, the topic of conversation would

17   always be Steve, and how is Steve doing, and did he

18   buy anything else new or things of that matter,

19   which would bother me.  Because why -- you know, why

20   ask me so many questions about Steve and how he's

21   doing and this and that.  You know.

22       Q.   Besides the comments at breakfast you spoke

23   about and the comments to Steve about, "Pretty good

24   for a brother," are there any other comments by Joe

25   Toscano that you heard?

1    A.    Comments for --

2    Q.    Regarding your husband's race.

3         MR. BURTON:  Other than you've already

4    testified to.

5         THE WITNESS:  No.

6         MR. BURTON:  I don't want you to go through

7    all the earlier stuff.  I'm sure he doesn't

8    either.  Correct?

9         MR. GONZALEZ-LLORENS:  Correct.

10   BY MR. GONZALEZ-LLORENS:

11   Q.    You've also identified Jason, an employee

12   at the Delray store.

13        MR. BURTON:  Sporting goods and he was an

14   executive.  Is that correct?

15        THE WITNESS:  Right.

16   BY MR. GONZALEZ-LLORENS:

17   Q.    What comments do you remember Jason making

18   involving your husband's race?

19   A.    When they'd make a comment, they would say,

20   "Pretty good for a black guy.  Yeah, that's pretty

21   good for" -- you know, it would be the same comment.

22   Q.    What was the comment?  I'm sorry?

23   A.    You know, "How does he do it?  That's

24   pretty good."

25   Q.    "How does he do it?  That's pretty good."

36

1      A.    Right.  As far as affording these items.

2   Car, boat, Mercedes, Viper.  "Are you sure he's

3   not" -- you know, "Are you sure he's not in any

4   other line of work?"  Making me feel that because

5   he's black, he's doing something criminal to afford

6   these things.

7      Q.    Did he say that or is that what you think?

8      A.    No.  That's how I felt.

9      Q.    Any other comments besides asking you how

10  does Mr. Harris do it financially?

11     A.    No.

12     Q.    How many times did Jason make these

13  comments to you?

14     A.    Probably two or three.  He would be

15  involved -- it wouldn't be just him.  You know, I

16  wouldn't be talking to these people one on one.  It

17  would be in a group of people.

18     Q.    Do you recall anybody else who was present

19  when he made the comment?

20     A.    It was just the regular breakfast crew.

21  The team members at that time.

22     Q.    Do you recall their names?

23     A.    Paul, Don -- I don't know if any other

24  executives -- Gary.  I'm trying to think who else I

25  had breakfast with.

37

1    Q.    Was Don a man or woman?

2    A.    Don is a woman.

3          Who else?  Those were the mainstay.  I

4    don't recall.

5    Q.    Did anyone else ever tell you they

6    overheard someone else make any discriminatory

7    comments about your husband's race?

8          MR. BURTON:  Are you including did she hear

9       from Steve?

10          MR. GONZALEZ-LLORENS:  Let's talk about

11       people other than Steve.

12          MR. BURTON:  Other than Steve?

13          THE WITNESS:  Other than Steve?  Other team

14       members?  They would just say, "Oh, such and

15       such didn't believe that you were married to

16       Steve."

17    BY MR. GONZALEZ-LLORENS:

18    Q.    Do you know who told you this?

19    A.    Don.  I'm just trying to think of people

20    who I talked to.  Goodness gracious.  Cindy.  Hold

21    on.  My mind is drawing a blank now.  Dorothy and

22    Pat.

23    Q.    Anybody else?

24    A.    No.

25    Q.    What was the comment they would tell you?

38

1    A.    Oh, they would just say, you know, "I was

2    talking to so and so, and they asked me who your

3    husband was and I told them," and they seemed like

4    they were surprised that, you know, my husband was

5    Steve Harris.

6    Q.    Anything else?

7    A.    No.

8    Q.    Did you overhear at Target, any comment

9    whatsoever involving a person's race?

10    A.    Did I overhear --

11    Q.    Yes.    Other than what you've testified to,

12    obviously.

13        MR. BURTON:    Object to the form of the

14    question.    I don't understand what you mean.

15        MR. GONZALEZ-LLORENS:    Sure.

16        THE WITNESS:    About my husband --

17    BY MR. GONZALEZ-LLORENS:

18    Q.    No.    Did you overhear at Target any comment

19    that was discriminatory about a person, any person's

20    race, other than the comments you've testified to so

21    far?

22    A.    People in general?

23    Q.    Sure.

24    A.    No.

25    Q.    Did you hear anyone at Target make any

39

1   comments to you directly about the fact that you

2   married an African-American?

3           MR. BURTON:  Objection.  I think she just

4       answered that.

5           THE WITNESS:  No.  Other than the feeling

6       that when -- the look of shock or surprise on

7       their face when I'd say who my husband is.

8   BY MR. GONZALEZ-LLORENS:

9       Q.   Who was shocked or surprised?

10      A.   Over seven years?  I mean, I don't -- you

11  know, it was really just team members every now and

12  then.

13      Q.   Did someone ever make a comment to you?

14      A.   To me personally?

15      Q.   Regarding the fact that you married --

16      A.   That I was married to -- no.

17      Q.   Did you overhear, at Target, any comments

18  about biracial couples?

19      A.   No.

20      Q.   Let's go back to the question asked

21  earlier.  Did Mr. Harris, himself, ever tell you

22  that someone told him a comment about his race?

23      A.   Of course, yes.

24      Q.   Let's talk about those.  How many comments

25  were there?

1    A.    At least ten, maybe twelve.  I can't -- you
2  know, it's hard for me to put a number on, because
3  we talk --

4    Q.    It would probably make it easier.  Talk
5  about the person who made the comment.  Do you
6  recall who Mr. Harris told you had made these
7  discriminatory comments to him?

8    A.    Terry Gillespie is the first one who comes
9  to mind, when he would talk to him about wearing too
10  much jewelry, or the kind of car he drives for a
11  black man; he shouldn't portray those types of
12  images as an executive, being black, because people
13  will think that he's doing other things than his
14  job.  He has told him that -- not to wear too much
15  excessive jewelry, in that whole conversation, and
16  maybe he should change his car from a Mercedes and
17  drive something a little bit more plain.

18    Q.    What else?

19    A.    I think Robert Van Savage told him the same
20  thing.  That he shouldn't, you know, be too flashy,
21  making the white guys look bad.

22    Q.    What else?

23    A.    Oh, boy.  Well, Joe was always in the
24  presence when he would make those comments to Steve,
25  and other times when I wasn't.  The same type of

```
 1   joke.  "Must be nice, Harris, to afford these
 2   things.  Pretty good for a black guy," or whatever.
 3   "You're making me look bad."  Those types of
 4   references.
 5        Q.   Anyone else?
 6        A.   I believe Mark Hastings had a conversation
 7   with him while he was driving in his Viper.  And Don
 8   Frankhouser actually -- when Don was helping him out
 9   to his car -- he was driving the Mercedes at that
10   time -- he was helping him put merchandise into his
11   trunk, and he made a comment, you know, to Steve --
12   because Steve was the only, you know -- he's the
13   brother, you know -- it must be nice for the black
14   guy.  I keep using those terms, but that's what was
15   used, brother or black guy or --
16        Q.   Anybody else?
17        A.   I'm trying to think if he told me anybody
18   else.  Just the one that really bothers me is Terry
19   Gillespie telling him how he's supposed to dress and
20   what he's supposed to drive, because it's upsetting
21   to me that you could be told -- and then the other
22   people who have Mercedes and wear -- and they're not
23   black, but yet you're being told by your superiors
24   that you have to play down your image because you're
25   a certain color.  You know, insinuating that, you
```

1   know, it's all right for Joe to buy an old Corvette,

2   a classic; but yet when you have a Viper, there is

3   something wrong with it.  It makes me agitated.

4       Q.   Let's talk about those comments regarding

5   Terry Gillespie.  On how many occasions did

6   Mr. Harris tell you that Mr. Gillespie told him he

7   was wearing too much jewelry?

8       A.   He had a meeting with him.  I don't know if

9   it was a meeting, but I know it was -- where they

10  were by themselves, him and Mr. Gillespie.  So I

11  don't know if that was at the district office or it

12  was at his store.  I know Robert said to him -- I

13  recall when Robert said something to him, it was at

14  the Boca store, and he was outside by his vehicle.

15  I think he was coming -- you know, coming on the way

16  home.

17      Q.   Robert is Robert Van Savage?

18      A.   Uh-huh.

19      Q.   With Mr. Gillespie, there was one meeting

20  that he told you about?

21      A.   One time, yes, that he had -- I don't

22  recall if it was at the district office or what --

23      Q.   Were there any other times involving

24  jewelry or being too flashy, involving

25  Mr. Gillespie?

1    A.    No.  Just that.

2         Q.    And you also mentioned, about

3    Mr. Gillespie, that Mr. Gillespie said he shouldn't

4    be driving a Viper or a flashy car.

5         A.    Yeah.  I think, at that time, it was the

6    Mercedes.  It wasn't the Viper.  It was the

7    Mercedes.

8         Q.    On how many occasions did Mr. Harris say

9    that Mr. Gillespie told him he was driving a flashy

10   car?

11             MR. BURTON:  You're talking about other

12        than the group sessions when they said it

13        personally?

14             THE WITNESS:  Yes.  Other than the -- like

15        being in the group and -- so let's count.

16             MR. BURTON:  Other than the ones where

17        there was a group gathering, how many times --

18             THE WITNESS:  Just that once when they were

19        together, which I just answered.  Right?  I

20        don't understand.

21   BY MR. GONZALEZ-LLORENS:

22        Q.    I wanted to just make sure how many times

23   he said, "Mr. Harris, you're driving a flashy car,"

24   or, "You shouldn't be driving a Mercedes."

25             MR. BURTON:  This is other than she's

```
 1          testified in the group gatherings, which might
 2          be the Grand Prix, et cetera.
 3               MR. GONZALEZ-LLORENS:  Obviously.
 4               MR. BURTON:  Other than those.
 5               MR. GONZALEZ-LLORENS:  Yes.
 6               MR. BURTON:  Okay.
 7               THE WITNESS:  Just once, during the --
 8     BY MR. GONZALEZ-LLORENS:
 9          Q.   Do you recall when that occasion was that
10     your husband told you about that incident?
11          A.   What year?  I have to think back.  It was
12     before the Viper, when we had the Mercedes.  He was
13     wearing his Movado watch, which I bought him.  Boy.
14     Probably just when he was coming into -- right
15     before -- no, actually when he was closing down -- I
16     don't know the year -- when he was closing down the
17     Lake Worth area store.  During that time.
18          Q.   Mr. Van Savage's comment regarding the
19     flashy car and making the white guys look bad, was
20     that during a time that Mr. Harris worked with
21     Mr. Van Savage?
22          A.   Yes.
23          Q.   Do you know on how many occasions
24     Mr. Van Savage allegedly made this comment?
25          A.   I don't know.  Steve just told me that one
```

1   occasion.  It might have been more.  But that's what
2   he told me.

3        Q.   Mr. Harris also told you about the comments
4   Joe Toscano had made.  Correct?  To him.

5        A.   Yes.  Him and Joe would be in charge of
6   certain events.  It would also be when I was
7   present, when Steve, like I said -- when Steve would
8   stop by the store, he would bring the Viper by the
9   store.  And it was those times.  And then Steve
10  would come home and say Joe had made a comment again
11  about, you know -- about the car or this and that
12  or the boat.  I think he even took him out on the
13  boat once.

14       Q.   How often were you told that Mr. Toscano
15  made these comments?

16       A.   A handful.  More than once.

17       Q.   Mr. Mark Hastings.  You also testified that
18  Mr. Harris told you that Mr. Mark Hastings had made
19  some comments about his race.  I'm sorry.  He had a
20  conversation while driving.

21       A.   Yeah.  Steve took him out in the Viper.
22  That's the one instance that Steve told me.  And
23  there was discussion on -- you know, he's a district
24  manager, and how does Steve afford a Viper when he
25  can barely afford a -- what's that little car -- a

46

1   little sports car.  It's an older sports car that he

2   had.  And how does, you know -- the same comments or

3   reference to, you know, "Pretty good for a black

4   guy."  That type of comment.  It would be a whole

5   conversation, but that comment would be there as

6   well.  It would be how he would afford -- you know,

7   "How do you exist?  I'm a district manager, and

8   you've got a Viper and a Mercedes and a boat and I

9   have this little car."

10      Q.   You've testified to a number of comments

11   involving your husband's race and discrimination.

12   Are there any other comments that you have not

13   testified to?

14          MR. BURTON:  Object to the form of the

15      question.  I don't even know what you mean.  I'm

16      sure there was zillions --

17          THE WITNESS:  Comments to what?

18   BY MR. GONZALEZ-LLORENS:

19      Q.   Involving your husband's race.

20          MR. BURTON:  Same objection.  It's

21      overbroad.

22          MR. GONZALEZ-LLORENS:  Let me see if I can

23      narrow it down for you.

24   BY MR. GONZALEZ-LLORENS:

25      Q.   You've testified about a number of comments

1    made in regards to your husband's race.

2         A.    Fine.

3         Q.    I want to go into the next area of

4    questioning, and I want to make sure that I've

5    covered all the comments --

6              MR. BURTON:  Objection.  Ask all the

7         questions then.

8    BY MR. GONZALEZ-LLORENS:

9         Q.    My question is other than the comments

10   you've testified to, is there anything else that you

11   overheard that involves your husband's race?

12             MR. BURTON:  Indirectly?

13             THE WITNESS:  Indirectly, yes.

14   BY MR. GONZALEZ-LLORENS:

15        Q.    Let's talk about indirectly.

16        A.    I have to recall who.  Especially when

17   everything was taking place with Target, you know --

18   but it would be in reference to like -- you know,

19   like he's a criminal or something, or he must be

20   doing something illegal to afford these types of

21   things.  So I don't know if they used a racist term

22   in those conversations.  But the feeling I would get

23   is because, you know, he must be doing something

24   criminal or selling drugs or types of feelings like

25   that.

48

1      Q.   I'm asking you what you overheard.

2      A.   What I overheard?

3      Q.   Other than the comments that you testified

4   to that you heard other people making that involved

5   your husband's race, are there any other comments

6   that you heard which you haven't testified to today?

7           MR. BURTON:  Object to the form of the

8        question.  That's way overbroad.  She said that

9        there were comments regarding him being

10       criminal, but didn't use the word race.  You can

11       ask all you want.

12          THE WITNESS:  Yes.  There is lots of

13       comments made that made me feel that they were

14       saying because he's black -- you know, this is

15       what happened.  But they did not come out and

16       say that, no.

17   BY MR. GONZALEZ-LLORENS:

18      Q.   So no one came out and said because he's

19   black --

20      A.   We think he's selling drugs, no.

21          MR. BURTON:  They would just say he's

22       selling drugs.

23          THE WITNESS:  They would say we opened up a

24       flea market, or he's taking merchandise from the

25       store and he and I are selling it at swap shops.

49

1    Just stupid rumors and gossip in the store.

2  BY MR. GONZALEZ-LLORENS:

3    Q.    Who is "they" who is saying these comments

4  to you?

5    A.    A person that overheard somebody else --

6  type of rumor mill within the store.  And from other

7  stores as well.

8    Q.    Other than what you testified today, are

9  there any comments involving your husband's race

10  made by Doug Barth, Terry Gillespie, or Mark

11  Hastings which you have not testified to so far?

12    A.    Not that I -- no -- that my husband told me

13  of or that I heard?

14    Q.    That you, yourself, heard.

15    A.    No.

16    Q.    So you've told me what you heard so far?

17    A.    Yes.

18    Q.    After your husband was terminated, did he

19  make any comments to you regarding any sort of

20  emotional suffering he was undergoing?

21    A.    Of course.

22    Q.    What were they?

23    A.    My husband, after 15 years of working for

24  Target and then being fired from them, after working

25  his whole life to become a store manager and giving

1   Target 120 percent, putting Target before me, making
2   Target the first thing on his list, he didn't know
3   what to do.  If you lost your job today and you
4   could not get a job in your field -- he felt
5   depressed.  He felt he didn't know what to do.  He
6   felt that he needed to support us.  But how is he
7   going to support us when he's going to interviews
8   and not being hired?

9          He was aggravated.  He had panic attacks.
10  And then I'm trying to be the strong one, because
11  now I have to go and work two jobs to try to keep
12  everything going for me and the kids.  And to have a
13  man who put work -- he loved his job, and then to
14  have nothing, it was very hard for him.

15         He was emotional.  When he would come home,
16  he would be -- I've never seen him even -- all the
17  frustrations he had, just with his regular job, he
18  would come home, and he'd be aggravated and like
19  short with the children.  There is lots of, you
20  know -- lots of adjectives I could use to express to
21  you how he felt.

22         And he would tell me he would be
23  frustrated, because he wanted to get a job and he
24  wanted to support us; and he'd go and everything
25  would go well, and then suddenly, no job.  What am I

51

1   going to do next?  How am I going to -- you know.
2   Meanwhile all the other frustrations of how to pay
3   the bills and how to -- you know, keep just the
4   family together.  Most marriages don't make it
5   through these types of things.
6       Q.   During this time, do you know whether he
7   saw a doctor of any sort?
8       A.   Yes.  He called me, because he was
9   driving -- he didn't know -- his heart was racing.
10  I told him -- he drove straight to the doctor's.  It
11  was Dr. Levy.  Told him he was having a panic
12  attack.
13      Q.   Libby, L-I-B-B-Y?
14      A.   L-E-V-Y.  And he told him to -- he gave him
15  a prescription to take, and told him that he needed
16  to calm down, because his blood pressure was just
17  out of control.
18           So then, thank God that Steve took it upon
19  himself to start going to the gym.  And I don't let
20  him come home until he goes to the gym and works out
21  his frustrations, and then he comes home a bit
22  calmer.  But at that time, yes -- some days, he
23  would be in the house all day; and then other days,
24  he'd be in a better mood, and other days he would
25  not.

52

1    Q.    Other than Dr. Levy, did Mr. Harris see any

2    other doctor after his termination that you're aware

3    of?

4    A.    No.

5    Q.    Other than the heart racing that you

6    testified to, did you witness Mr. Harris undergo any

7    other physical pain?

8    A.    Physical --

9         MR. BURTON:    Object to the form of the

10       question.

11       THE WITNESS:    Like I think of physical pain

12       like as ouch, I stubbed my toe.

13   BY MR. GONZALEZ-LLORENS:

14   Q.    Yes.    Well, I'm not talking about emotional

15   pain or depression.    Not those things.

16       MR. BURTON:    You're talking about medical

17       incidents.

18       MR. GONZALEZ-LLORENS:    Yes.    Like heart

19       pain.

20       THE WITNESS:    Yes.    His heart.    At

21       nighttime, his heart would race; or he's like,

22       "I'm feeling funny, I don't feel right."    So I

23       would make him some herbal tea or something.

24       I'd say, "Okay, calm down."

25   BY MR. GONZALEZ-LLORENS:

53

1    Q.    Anything else besides his heart racing?
2    Any other physical symptoms that he told you about?
3    A.    No.  Oh, well, he got a little -- I think a
4    little poison ivy.  Other than that, no.
5    Q.    Just to wrap up, you did not go to the
6    Shooters dinner on January 29th of 1999.  Right?
7    A.    No.  Sorry.
8    Q.    Were you involved in any way in the
9    investigation that arose after the Shooters
10   incident?
11   A.    Not to my --
12         MR. BURTON:  Object to the form of the
13         question.  No proper predicate.  They were
14         investigating him six months before and you both
15         know that.
16         THE WITNESS:  Not that I'm aware of.
17   BY MR. GONZALEZ-LLORENS:
18   Q.    No one ever talked to you.  Is that
19   correct?
20   A.    No.
21   Q.    So you have no knowledge as to the
22   investigation, itself.  Is that correct?
23         MR. BURTON:  Object to the form of the
24         question.
25         THE WITNESS:  Um-um.

54

```
 1   BY MR. GONZALEZ-LLORENS:
 2        Q.   I'm sorry?  Do you have any knowledge as to
 3   the investigation?
 4             MR. BURTON:  Object to the form.  I'm sure
 5        she's gotten some knowledge.
 6             THE WITNESS:  Yes.
 7   BY MR. GONZALEZ-LLORENS:
 8        Q.   What knowledge do you have?
 9             MR. BURTON:  Object to the form of the
10        question.
11             Go ahead.
12             THE WITNESS:  Of course, my husband and I,
13        we talk.  And, of course, he let me know what
14        was going on.
15   BY MR. GONZALEZ-LLORENS:
16        Q.   I understand that.  But I'm talking about,
17   did you participate in any way in the investigation
18   that arose out of --
19        A.   Did Target ask for anything?
20        Q.   Yes.  Did Target ask you or anybody ask you
21   involving the Shooters receipt or anything that
22   happened after January 29th to the point your
23   husband was terminated?
24        A.   So that would be a month --
25             MR. BURTON:  Did Target?
```

55

1           THE WITNESS:  Did Target ask me?  No.

2    BY MR. GONZALEZ-LLORENS:

3        Q.    I'm trying to get to the point where you

4    were involved in any way in the investigation that

5    arose after January 29th of 1999.

6        A.    From the time --

7        Q.    From the Shooters receipt, that dinner,

8    until your husband's termination, were you involved

9    during that time in any way with the investigation?

10           MR. BURTON:  At the request of Target,

11       you're saying, not what she may have been

12       involved with him?

13           MR. GONZALEZ-LLORENS:  Absolutely.

14           THE WITNESS:  Not what he was discussing

15       with me.

16           MR. GONZALEZ-LLORENS:  Just with Target,

17       itself, with the investigation.

18           THE WITNESS:  No.  But afterwards, yes, I

19       would say.  Because I was asked frequently if my

20       husband had found a job or not.

21   BY MR. GONZALEZ-LLORENS:

22       Q.    Who would ask you?

23       A.    Joe Toscano, Sandy Rosenberg.

24       Q.    Anybody else?

25       A.    Team members.

1   Q.   Did they ask you anything other than did

2  Mr. Harris find a job?

3   A.   Joe Toscano specifically -- until I had to

4  tell him, "When Steve finds a job, I'll put it on a

5  blimp or something, so you all know when he has a

6  job." But he would ask me, "How is Steve doing?

7  Did he find a job? How is he feeling?" You know,

8  those types of questions. And that was by Joe, over

9  and over. Each week I saw him, when he was my store

10  manager, he would ask me, until finally I let him

11  know, "Joe, when Steve finds a job, I'll be the

12  first to jump up for joy and let you all know,

13  because I won't have to be working two jobs."

14         MR. GONZALEZ-LLORENS:  Mrs. Harris, I have

15      no further questions of you.

16         MR. BURTON:  I have no cross.  She waives.

17      I'd like a copy in my hands by Monday morning.

18      Thank you.

19         MR. GONZALEZ-LLORENS:  I'm not ordering.

20         MR. BURTON:  I'm ordering, but you're the

21      one taking the deposition.

22         MR. GONZALEZ-LLORENS:  Sure.

23         MR. BURTON:  So you get the first bill; I

24      get the second.  I have no problem with that.

25         MR. GONZALEZ-LLORENS:  I'm not ordering it.

1    If he orders it, I'll get a copy.

2    MR. BURTON: I'll make you a deal. Since

3    he's playing games, as usual -- I want this on

4    the record, that he's not ordering the

5    deposition unless I do. On the record, to be

6    printed, I want this colloquy of ourselves, and

7    I specifically want it by Monday for my copy,

8    whichever decision. I know they're just trying

9    to build up the costs. However, I need it for

10    this motion for summary judgment to be filed on

11    Monday, which is why they took it this late and

12    why they played the games. Obviously, they're

13    just trying to increase the cost to my client.

14    You have no comment.

15    MR. GONZALEZ-LLORENS: I won't even dignify

16    this with a response.

17    Thank you, very much, Mr. Court reporter.

18    MR. BURTON: I am ordering the original,

19    even though it is not customary, so that I will

20    be responsible for paying a larger share than

21    Target, who obviously cannot afford it as much

22    as the Harrises who have one party working two

23    jobs and the other party unemployed. And I want

24    this in the transcript.

25    (Thereupon the taking of the deposition was

58

1  adjourned.)
2
3
          JANICE HARRIS
4
5     Sworn to and subscribed before me this
6     day of          2001.
7
8          Notary Public
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

59

1

2                    C E R T I F I C A T E

3   STATE OF FLORIDA:
    COUNTY  OF  DADE:

4
            I, the undersigned authority, certify that
5   JANICE HARRIS personally appeared before me and was
    duly sworn.
6           WITNESS my hand and official seal this
    16th day of March 2001.
7

8
                    Donald W. McKay, RMR, CRR
9                   Notary Public - State of Florida
                    My Commission No.:  CC890407
10                  Expires:  December 19, 2003

11
    STATE OF FLORIDA:
12  COUNTY  OF  DADE:

13          I, DONALD W. McKAY, RMR, CRR, a Notary
    Public for the State of Florida at Large, hereby
14  certify that I reported the deposition of JANICE
    HARRIS; and that the foregoing pages, numbered from
15  1 to 58, inclusive, constitute a true and correct
    transcription of my shorthand report of the
16  deposition by said witness on this date.
            I further certify that I am not an attorney
17  or counsel of any of the parties, nor a relative or
    employee of any attorney or counsel connected with
18  the action nor financially interested in the action.
            WITNESS my hand and official seal in the
19  City of Miami, County of Dade, State of Florida,
    this 16th day of March 2001.
20

21
                    Donald W. McKay, RMR, CRR
22                  Notary Public - State of Florida
                    My Commission No.:  CC890407
23                  Expires:  December 19, 2003

24

25

H. Allen Benowitz - Jessica R. Berman - Peggy Ann Cook - Matz, Trakman, Feldman & Wildner - Ivy Court Reporting
A Veritext Company    Serving South Florida

60

```
 1              H. ALLEN BENOWITZ & ASSOCIATES, INC.
                  Biscayne Building, Suite 1020
 2                    19 West Flagler Street
                       Miami, FL  33130
 3                      (305) 373-9997

 4

 5   April 16, 2001

 6   Richard J. Burton, Esq.
     Richard J. Burton & Associates, P.A.
 7   18305 Biscayne Boulevard
     Suite 300
 8   Miami, FL  33160

 9
     RE    :    Harris v Dayton Hudson
10   DEPO OF:   Janice Harris
     TAKEN :    March 15, 2001
11
     Dear Counsel:
12
     The original transcript of the deposition listed
13   above is enclosed for your file.

14   The witness did not waive reading and signing and
     was duly notified to come in and read the deposition
15   transcript.

16          Attached to this letter, you will find a copy
            of the corrections made by the witness.
17          PLEASE ATTACH THEM TO YOUR COPY OF THE
            DEPOSITION SO IT WILL BE COMPLETE.

18
            As of the above date, the witness has not
19          come in to read and sign the transcript which
            has been noted on the original transcript.

20
     Sincerely,
21

22
     Donald W. McKay, RMR, CRR
23

24

25
```

**A**

AA 8:25
about 5:22 10:7,11
  10:13 11:16,17
  12:6,9 14:2,7,9,22
  14:23,23 15:8,22
  17:23 18:15 21:15
  23:23 25:5,25
  27:2,4,4,6,8 28:15
  30:25 31:10,19,25
  34:13,20,23,23
  37:7,10 38:16,19
  39:1,18,22,24
  40:5,9 42:4,20
  43:2,11 44:10
  45:3,11,11,19
  46:25 47:15 52:12
  52:16 53:2 54:16
above 60:13,18
above-styled 1:25
absence 12:1
Absolutely 55:13
abusive 4:23
acceptable 6:9
Accordingly 3:12
action 59:18,18
actually 28:25 41:8
  44:15
add 17:17 29:3
adding 27:12
additionally 4:7
adjectives 50:20
adjourned 58:1
administrative
  13:13
afford 15:2 19:25
  27:14,16 29:10,12
  29:13,16,22 30:10
  30:14,17 32:19,25
  33:23 36:5 41:1
  45:24,25 46:6
  47:20 57:21
affording 33:3 36:1
African-American
  39:2
after 4:15 8:23,24
  12:10 16:8 24:13
  25:2 49:18,23,24
  52:2 53:9 54:22
  55:5
afterwards 55:18
again 21:21 29:7
  30:6 45:10
against 5:23
age 20:6
aggravated 50:9,18
agitated 42:3
ago 4:12 20:14
agreed 4:11
ahead 6:5,9 21:1
  24:24 54:11
allegedly 18:12
  44:24
ALLEN 60:1
Along 10:5
already 28:17,17

35:3
always 15:1 22:4
  32:15 34:17 40:23
amateur 16:7
amount 13:2
another 10:5 24:5
answer 4:13 14:4,11
  16:13,15,24 17:6
  17:7
answered 24:13
  29:7 30:5 39:4
  43:19
answering 14:18,19
  17:16
anxiety 12:8
anybody 25:9 36:18
  37:23 41:16,17
  54:20 55:24
anyone 7:4 19:19
  24:3 31:18 37:5
  38:25 41:5
anything 17:17 25:6
  27:20 33:5,6
  34:18 38:6 47:10
  53:1 54:19,21
  56:1
anytime 3:8
apparently 3:13,22
APPEARANCES
  2:2
appeared 59:5
appreciate 16:20
April 60:5
area 44:17 47:3
  55:5
arose 53:9 54:18
around 14:21 15:1
  19:2 22:5,23
  25:19 32:11
arrested 7:25
Arts 8:18
asked 24:20 26:3,7
  29:6 30:5 38:2
  39:20 55:19
asking 5:22 16:15
  22:8 36:9 48:1
Associate 8:18
associates 2:3 60:1
  60:6
Atlantic 8:13
ATTACH 60:17
Attached 60:16
attack 12:8 51:12
attacks 50:9
attend 8:6
attended 8:10 9:2
attorney 59:16,17
authority 59:4
available 3:9 4:14
  4:16
Avenue 32:11
avoid 34:15
aware 52:2 53:16
away 16:8 17:19
a.m 1:15,15

**B**

back 39:20 44:11
bad 33:25 40:21
  41:3 44:19
barely 45:25
Barth 13:19 14:9
  15:9 17:25 18:2
  26:3,4,5,24 29:9
  49:10
basically 3:14,23
bathroom 24:22
Beach 8:12,16 9:8
  9:19 10:9,20 13:8
  20:3 28:1,3,4
  31:24
beauty 32:5
become 49:25
before 1:22 3:2 5:17
  16:3 18:14,18,21
  21:9 25:6 31:7
  44:12,15 50:1
  53:14 58:5 59:5
behalf 2:4,5
being 12:7,10 40:12
  41:23 42:24 43:15
  48:9 49:24 50:8
believe 13:9 18:24
  20:9 21:9 23:25
  24:4 32:6 37:15
  41:6
BENOWITZ 60:1
besides 34:22 36:9
  53:1
better 51:24
bill 56:23
bills 51:3
biracial 39:18
birth 7:12
Biscayne 1:13 60:1
  60:7
bit 6:5 40:17 51:21
black 15:4,6 16:2,6
  21:24 23:19,23
  29:15,16 30:18,19
  31:1 32:18,21
  33:15 34:1,11
  35:20 36:5 40:11
  40:12 41:2,13,15
  41:23 46:3 48:14
  48:19
blank 37:21
blimp 56:5
blinds 3:11
blood 51:16
boat 18:6,12,21
  19:12,15,20 27:1
  27:9 28:20,20,21
  28:25 30:7 31:4
  32:17 36:2 45:12
  45:13 46:8
Boca 6:25 24:11
  42:14
born 7:14
both 30:20 53:14
bother 34:19
bothers 41:18
bottom 11:21
bought 32:17,17

44:13
Boulevard 1:13
  60:7
Bowen 2:5
boy 40:23 44:13
Boynton 24:10
break 6:2,3,6 16:16
  16:24 24:12,21
breakfast 32:10
  34:8,10,22 36:20
  36:25
brief 25:2
bring 32:15 34:10
  45:8
bringing 32:16
Brook 6:25
brother 20:1 21:23
  29:10,14,22 30:9
  30:14,17,19 31:1
  33:25 34:4,12,24
  41:13,15
brush 3:22
build 57:9
building 27:25 60:1
burton 2:3,3 3:1 5:4
  12:19 14:1,10,18
  15:10 16:11,19,22
  16:25 17:2,5,10
  17:14 18:17 19:12
  20:11,16,19,23
  21:1 22:7,17,19
  24:12,20,22,25
  26:2 28:16 29:6
  30:5 35:3,6,13
  37:8,12 38:13
  39:3 43:11,16,25
  44:4,6 46:14,20
  47:6,12 48:7,12,1
  52:9,16 53:12,23
  54:4,9,25 55:10
  56:16,20,23 57:2
  57:18 60:6,6
Business 8:20
buy 21:19 34:18
  42:1

**C**

C 59:2,2
call 4:15
called 5:8 18:6 51:8
calm 51:16 52:24
calmer 51:22
came 3:8 48:18
car 14:23,24 15:25
  16:6 21:14,17,18
  22:5 27:19 29:14
  36:2 40:10,16
  41:9 43:4,10,23
  44:19 45:11,25
  46:1,1,9
cars 21:15
case 1:3 5:22,25
cash 11:5
Cashier 10:25
catch 11:11
cause 1:25 4:3
CC890407 59:9,22

certain 13:2 41:25
  45:6
certify 59:4,14,16
Cesarano 4:4
cetera 44:2
change 6:18 40:16
charge 18:20 20:19
  20:20 21:7 45:5
child 20:6
children 7:5,7,9,10
  50:19
Christian 8:7
Christmas 18:8
  23:12,14,16 25:7
  25:10,12
Cindy 37:20
Circle 6:25
circling 15:1
circulating 27:10
city 7:16 59:19
claim 4:1
claims 13:15
classic 42:2
Clear 6:25
clerical 11:12
clerk 13:13
client 57:13
closing 44:15,16
coach 22:19
College 8:12,16
colleges 8:10
colloquy 57:6
color 41:25
come 45:10 48:15
  50:15,18 51:20
  60:14,19
comes 40:8 51:21
coming 42:15,15
  44:14
comment 3:6 16:1,3
  16:22 18:13 19:1
  21:12,16 23:18,22
  24:3 25:6,17,24
  27:8 28:15 29:15
  29:21,24 30:9,10
  31:3,5 35:19,21
  35:22 36:19 37:25
  38:8,18 39:13,22
  40:5 41:11 44:18
  44:24 45:10 46:4
  46:5 57:14
comments 5:1 14:3
  14:22 15:17,20
  16:17 17:21,23,25
  18:2 19:19,21
  20:2 21:25 22:2
  23:13,13 25:10,13
  25:14,19,21 26:7
  26:15,15 27:10,11
  27:12 28:6,18,24
  28:25 29:4,8,19
  31:12,14,17,19,25
  32:7,9,23 33:20
  34:22,23,24 35:1
  35:17 36:9,13
  37:7 38:20 39:1
  39:17,24 40:7,24

42:4 45:3,15,19
46:2,10,12,17,25
47:5,9 48:3,5,9,13
49:3,9,19
**Commission** 59:9
59:22
**community** 8:12,16
18:9,10
**competitive** 11:9,13
**complete** 3:25 14:11
16:12,18 17:7
18:18 60:17
**completed** 17:6
**complications** 12:9
**connected** 59:17
**considered** 11:20
**constantly** 32:24,25
33:3
**constitute** 59:15
**contained** 3:13
**contempt** 3:15 4:5
**continue** 14:12,18
16:14
**control** 51:17
**convenience** 24:13
**conversation** 15:13
34:16 40:15 41:6
45:20 46:5
**conversations** 47:22
**convicted** 8:2
**copies** 4:8
**copy** 56:17 57:1,7
60:16,17
**Coral** 23:1,6
**CORPORATION**
1:8
**correct** 10:4,5 26:8
35:8,9,14 45:4
53:19,22 59:15
**corrections** 60:16
**Corvette** 42:1
**cost** 57:13
**costs** 57:9
**counsel** 59:17,17
60:11
**count** 28:2 43:15
**county** 59:3,12,19
**couples** 39:18
**course** 4:16 14:22
21:14,15 22:15
39:23 49:21 54:12
54:13
**court** 1:1 3:24 16:16
57:17
**covered** 47:5
**crew** 36:20
**crime** 8:2
**criminal** 36:5 47:19
47:24 48:10
**cross** 56:16
~~CRR~~ 1:22 59:8,13
59:21 60:22
**curly** 24:7
**current** 10:4 11:10
11:16
**currently** 7:11 11:8
11:24

**customary** 57:19

———— **D** ————
**D** 2:17
**dade** 59:3,12,19
**date** 7:12 10:12
59:16 60:18
**dates** 12:14,15
**day** 51:23 58:6 59:6
59:19
**days** 51:22,23,24
**dayton** 1:8 60:9
**deal** 57:2
**Dear** 60:11
**December** 6:21
59:10,23
**decency** 4:22
**decision** 57:8
**Deerfield** 9:8,19
28:4
**Defendant** 1:10 2:6
5:8
**defense** 4:2
**Definitely** 22:9
**degree** 8:14,17
**degrees** 8:24
**delivery** 4:21
**Delray** 10:9,20 13:8
20:3 28:1,3 31:24
35:12
**department** 32:4
**departments** 11:7
**DEPO** 60:10
**deposition** 1:19,24
4:9 5:2,16,21
16:20 17:1 56:21
57:5,25 59:14,16
60:12,14,17
**depressed** 50:5
**depression** 52:15
**detailed** 22:21
**different** 7:20
**dignify** 4:25 57:15
**dinner** 53:6 55:7
**DIRECT** 2:18 5:11
**directions** 3:19
**directly** 39:1
**discovery** 3:24,25
4:6
**discrimination**
46:11
**discriminatory**
19:21 25:10,13
27:8 28:5 31:11
37:6 38:19 40:7
**discussing** 55:14
**discussion** 45:23
**district** 1:1,1 21:7
28:11 42:11,22
45:23 46:7
**even** 3:21 4:22,25
~~19:23 45:12 46:15~~
50:16 57:15,19
**event** 20:4 21:13,14
23:7
**events** 13:23,23
18:5,7,7,11 26:9
26:25 30:2 45:6

47:20,23 56:6
**Don** 27:25 36:23
37:1,2,19 41:7,8
**donald** 1:22 59:8,13
59:21 60:22
**Dorothy** 37:21
**Doug** 13:19 14:9
15:9 17:25 26:3,4
26:5,14 29:8
49:10
**down** 41:24 44:15
44:16 46:23 51:16
52:24
**Dr** 51:11 52:1
**drawing** 37:21
**dress** 41:19
**drink** 6:8
**drive** 14:25,25
15:22 16:2,6
40:17 41:20
**drives** 40:10
**driving** 41:7,9 43:4
43:9,23,24 45:20
51:9
**drove** 51:10
**drugs** 47:24 48:20
48:22
**duces** 4:9
**duly** 5:9 59:5 60:14
**during** 30:1 44:7,17
44:20 51:6 55:9
**duties** 11:15
**duty** 13:12
**d/b/a** 1:9

———— **E** ————
**E** 2:17 59:2,2
**Each** 56:9
**earlier** 35:7 39:21
**easier** 40:4
**eat** 23:19,23
**effect** 21:21
**eight** 4:12 10:11,13
10:22 27:4,5
**either** 20:10 21:5
35:8
**emotional** 49:20
50:15 52:14
**employee** 11:18
13:3 35:11 59:17
**employees** 9:18
**employer** 10:4,5
13:5
**employers** 4:10
**enclosed** 60:13
**Especially** 47:16
**esq** 2:3,5 60:6
**estimate** 13:22
**et** 44:2

ever 5:16 6:11 7:20
7:25 8:2 9:10,14
13:19,25 27:7,22
28:5,8,14 30:25
31:11 37:5 39:13
39:21 53:18
**every** 12:13 39:11
**everybody** 32:11
**everything** 47:17
50:12,24
**exact** 10:12 12:14
12:15 27:18
**exactly** 13:14
**EXAMINATION**
2:18 5:11
**excessive** 40:15
**executive** 24:6 32:3
35:14 40:12
**executives** 14:8 15:7
15:15 19:3,16,24
24:18 26:10 32:13
36:24
**executive's** 22:23
**exist** 46:7
**Expires** 59:10,23
**Explain** 29:7
**express** 50:20

———— **F** ————
**F** 59:2
**face** 39:7
**faces** 22:24
**fact** 39:1,15
**failure** 4:6,7
**families** 24:19
**family** 51:4
**far** 3:17 26:8 31:14
36:1 38:21 49:11
49:16
**faxed** 3:3
**Federal** 13:8
**feel** 6:7 17:20,20
36:4 48:13 52:22
**feeling** 33:11 39:5
47:22 52:22 56:7
**feelings** 47:24
**felt** 19:20 26:16
36:8 50:4,5,6,21
**few** 16:7 24:16
26:15 34:13
**field** 8:19 50:4
**fifteen** 12:6,19,20
12:22
**file** 60:13
**filed** 1:24 5:23
57:10
**Filing** 13:15
**finally** 56:10
**financial** 15:1 33:4
**financially** 29:13
~~36:10 59:18~~
**find** 56:2,7 60:16
**finds** 56:4,11
**fine** 21:1 23:4 47:2
**finish** 8:4 17:16
26:14
**fired** 49:24

**firm** 2:3,5 4:4
**first** 5:9,19 9:23,24
10:7,24 18:4 40:8
50:2 56:12,23
**five** 7:7 11:16,17
18:3 24:22 31:10
**FL** 60:2,8
**Flagler** 60:2
**flashy** 40:20 42:24
43:4,9,23 44:19
**flea** 48:24
**florida** 1:1,14,23
7:1,15 8:13 13:9
59:3,9,11,13,19
59:22
**following** 3:2 25:3
**follows** 5:9
**food** 24:1 32:11
**foregoing** 59:14
**form** 14:1 38:13
46:14 48:7 52:9
53:12,23 54:4,9
**former** 4:10
**fort** 1:2 7:17
**Forty** 13:18
**foul** 4:1
**found** 55:20
**four** 18:3
**Frankhouser** 27:22
27:25 28:6 41:8
**frequently** 55:19
**from** 3:20 8:14 9:14
9:25 12:7,12
19:12,23 29:25
30:2 31:12 37:9
40:16 48:24 49:6
49:24 55:6,7
59:14
**frustrated** 50:23
**frustrations** 50:17
51:2,21
**full** 5:13
**fully** 16:15
**function** 25:20
**funny** 52:22
**further** 56:15 59:16

———— **G** ————
**games** 57:3,12
**Gary** 36:24
**gathering** 43:17
**gatherings** 44:1
**gave** 33:11 51:14
**general** 27:17 31:5
38:22
**generally** 23:7
**getting** 8:24
**Gillespie** 26:21 27:7
27:11 30:25 31:2
40:8 41:19 42:5,6
42:10,19,25 43:3
43:3,9 49:10
**give** 4:7,11 20:16,23
**giving** 49:25
**go** 5:5 6:5,7,8 18:7
21:1 24:24 28:24
35:6 39:20 47:3

---

H. Allen Benowitz - Jessica R. Berman - Peggy Ann Cook - Matz, Trakman, Feldman & Wildner - Ivy Court Reporting
A Veritext Company          Serving South Florida

50:11,24,25 53:5
54:11
**God** 5:10 51:18
**goes** 9:23 32:11
  51:20
**going** 3:1 5:21
  21:20 23:15 34:15
  50:7,7,12 51:1,1
  51:19 54:14
**GONZALEZ-LL...**
  2:5,19 4:25 5:12
  12:21 14:6,13,17
  15:8,16 16:19,25
  17:3,8,12,15
  18:25 19:18 20:21
  20:25 21:2 22:11
  23:3 24:14,20,24
  25:4 26:11,13
  28:23 29:18 30:8
  35:9,10,16 37:10
  37:17 38:15,17
  39:8 43:21 44:3,5
  44:8 46:18,22,24
  47:8,14 48:17
  49:2 52:13,18,25
  53:17 54:1,7,15
  55:2,13,16,21
  56:14,19,22,25
  57:15
**good** 21:23 29:14
  30:9,12 33:25
  34:4,23 35:20,21
  35:24,25 41:2
  46:3
**Goodness** 37:20
**goods** 11:6 32:5
  55:13
**Gosh** 22:25 24:6
**gossip** 49:1
**gotten** 54:5
**gracious** 37:20
**graduate** 8:8,21
**Grand** 44:2
**Greever** 6:15
**group** 15:13,14,17
  17:19 19:3,8
  21:22 22:4,7,15
  27:10 34:7,9
  36:17 43:12,15,17
  44:1
**guy** 15:4,6 16:2,6
  21:24 29:15,17
  30:18,19 34:1
  35:20 41:2,14,15
  46:4
**guys** 23:19,23 32:18
  32:21 40:21 44:19
**gym** 51:19,20
**G-R-E-E-V-E-R**
  6:17

**H**
**H** 60:1
**hair** 24:7
**half** 11:2
**hand** 59:6,18
**handful** 16:7 18:1

45:16
**hands** 56:17
**hanging** 19:6
**happened** 11:3
  48:15 54:22
**happy** 3:5 4:13
**hard** 22:13 40:2
  50:14
**harris** 1:6,19 2:8
  3:5,5 4:13,15 5:2
  5:3,7,15,23 6:12
  14:24 15:24 17:4
  17:13,16 20:15
  21:18,23 23:9
  28:15 29:11 31:19
  33:10,12,12 36:10
  38:5 39:21 40:6
  41:1 42:6 43:8,23
  44:20 45:3,18
  52:1,6 58:3 59:5,14 60:9
  60:10
**Harrises** 57:22
**Hastings** 3:15 4:7
  19:9 20:19 21:6,7
  22:18 28:8,14
  29:4,25 30:23
  41:6 45:17,18
  49:11
**having** 5:8 51:11
**head** 16:23 17:9
**health** 32:5
**hear** 24:3 25:19,21
  27:7 28:5,14 29:5
  29:24 30:25 31:11
  31:18 32:7 34:3
  37:8 38:25
**heard** 15:6 17:22
  19:1 25:11,13
  26:18 28:24,25
  31:20,25 34:25
  48:4,6 49:13,14
  49:16
**heart** 51:9 52:5,18
  52:20,21 53:1
**held** 4:5
**help** 5:10
**helpful** 20:11
**helping** 41:8,10
**her** 3:7 4:16,20
  12:17 14:11,11,14
  16:12,13,13,14,15
  16:18,18,24 20:23
  26:4,7 31:6,8
**herbal** 52:23
**herself** 3:10
**high** 8:4,6,23
**Highway** 13:8
**him** 9:10,14,16
  13:21,25 14:8,10
  14:16 15:11,13,19
  15:20 16:7 17:18
  22:10 23:18,25
  26:23,24 27:24
  28:2,3,8,10 29:5,9
  30:2,6 31:1,20
  33:17 34:3,6,15

36:15 39:22 40:7
40:9,14,19 41:7,8
41:10,19 42:6,8
42:10,12,13 43:9
44:13 45:4,5,12
45:21 48:9 50:14
50:16 51:10,11,14
51:14,15,20 52:23
53:14 55:12 56:4
56:9,10
**himself** 39:21 51:19
**hired** 50:8
**Hold** 37:20
**home** 42:16 45:10
  50:15,18 51:20,21
**Honda** 13:6
**hospitalized** 12:8,10
**hourly** 11:18
**hours** 12:5,18,22,24
  12:25 13:2,16
**house** 23:16 51:23
**hudson** 1:8 60:9
**husband** 4:17 5:23
  7:3 9:5 14:21
  17:23 18:7 27:8
  31:25 32:16 33:8
  33:9 38:3,4,16
  39:7 44:10 49:12
  49:18,23 54:12,23
  55:20
**husband's** 26:16
  28:4 31:15 32:8
  33:7 34:11 35:2
  35:18 37:7 46:11
  46:19 47:1,11
  48:5 49:9 55:8

**I**
**identified** 35:11
**illegal** 47:20
**image** 41:24
**images** 40:12
**immediately** 4:17
**improper** 19:20
  25:9,13 26:17
  31:12
**INC** 60:1
**incident** 22:1 44:10
  53:10
**incidents** 52:17
**included** 15:11
  28:17
**including** 37:8
**inclusive** 59:15
**increase** 57:13
**indirectly** 47:12,13
  47:15
**Indy** 18:6 20:4
  21:12 22:1 28:19
  28:21 30:7
**information** 5:24
**innuendoes** 23:18
**insinuating** 41:25
**instance** 45:22
**intended** 16:23
**interested** 59:18
**interfering** 3:23

**interrupt** 16:13
**interviews** 50:7
**investigating** 53:14
**investigation** 53:9
  53:22 54:3,17
  55:4,9,17
**involve** 31:15
**involved** 36:15 48:4
  53:8 55:4,8,12
**involves** 47:11
**involving** 35:18
  38:9 42:23,24
  46:11,19 49:9
  54:21
**issue** 3:10
**issued** 4:5
**items** 36:1
**ivy** 53:4

**J**
**J** 2:3,3 60:6,6
**janice** 1:19 5:7,15
  6:12,15 58:3 59:5
  59:14 60:10
**January** 53:6 54:22
  55:5
**Jason** 31:21 32:1
  35:11,17 36:12
**Jason's** 32:2
**jeered** 31:3
**jewelry** 40:10,15
  42:7,24
**job** 11:14 13:12
  40:14 50:3,4,13
  50:17,23,25 55:20
  56:2,4,6,7,11
**jobs** 10:6 50:11
  56:13 57:23
**Joe** 19:7 22:9,13
  29:9 31:20 32:12
  34:24 40:23 42:1
  45:4,5,10 55:23
  56:3,8,11
**joke** 41:1
**joking** 21:24
**jokingly** 23:20
**joy** 56:12
**JUDGE** 1:3
**judgment** 57:10
**jump** 56:12
**just** 6:8 7:7 9:22
  10:18 17:18 19:22
  20:16,23 21:8,21
  22:24 23:15,17,18
  27:12,18 30:11
  33:18,22 36:15,20
  37:14,19 38:1
  39:3,11 41:18
  43:1,18,19,22
  44:7,14,25 48:21
  49:1 50:17 51:3
  51:16 53:5 55:16
  57:8,13

**K**
**keep** 41:14 50:11

51:3
**khaki** 19:11
**kids** 50:12
**kind** 32:11 33:10,13
  40:10
**kitchen** 24:2
**knew** 34:15
**know** 9:8,18,22,24
  9:25 10:12 12:15
  14:23 15:3,5,14
  16:9 18:15 19:17
  20:6 21:24 22:15
  23:1,18 24:6,17
  24:18 26:21 27:17
  28:1 29:9,12,13
  30:21 31:6 32:2
  32:14,18,21 33:2
  33:3,9,15,23
  34:14,16,19,21
  35:21,23 36:3,15
  36:23 37:18 38:1
  38:4 39:11 40:2
  40:20 41:11,12,13
  41:25 42:1,8,9,11
  42:12,15 44:16,23
  44:25 45:11,23
  46:2,3,6,15 47:17
  47:18,21,23 48:14
  50:2,5,20 51:1,3,6
  51:9 53:15 54:13
  56:5,7,11,12 57:8
**knowledge** 53:21
  54:2,5,8

**L**
**lady** 4:21
**Lake** 44:17
**Large** 1:23 59:13
**larger** 26:25 57:20
**last** 4:14 9:6 12:16
  12:24 32:1
**late** 57:11
**later** 12:10
**lauderdale** 1:2 7:17
**law** 4:4,19
**leader** 28:12
**least** 32:25 33:1
  40:1
**leave** 12:1,12
**Lee** 5:15
**left** 3:21 25:6
**let** 14:10 16:12,14
  16:15,17,19,25
  20:21 21:5 46:22
  51:19 54:13 56:10
  56:12
**letter** 3:3,11 60:16
**let's** 10:7 14:9 15:8
  26:14 28:24 37:10
  39:20,24 42:4
  43:15 47:15
**level** 11:20,21,21,22
**Levy** 51:11 52:1
**Libby** 51:13
**lie** 3:3
**life** 49:25
**like** 4:24 11:12

4

14:22 16:6 17:20
18:5,9,10,11,11
21:21,23 23:15,18
29:11 33:14 34:12
34:13 38:3 43:14
45:7 47:18,19,24
50:18 52:11,12,18
52:21 56:17
**Lindsey** 9:22
**line** 36:4
**list** 26:5 50:2
**listed** 60:12
**little** 6:5 9:11 23:18
40:17 45:25 46:1
46:9 53:3,4
**live** 6:24 7:2
**Llorens** 3:3,11,17
4:3 16:11 25:1
**LLP** 2:5
**located** 13:7
**long** 10:7 11:1,14
13:10 24:21
**look** 13:1 33:10,13
39:6 40:21 41:3
44:19
**looking** 21:17 31:17
**lost** 50:3
**lot** 4:23 19:10
**lots** 48:12 50:19,20
**loved** 50:13
**lunch** 9:14,16
**Lutheran** 8:7
**L-E-V-Y** 51:14
**L-I-B-B-Y** 51:13

_____ **M** _____

**made** 14:3 16:2 18:1
18:13 20:2 21:12
22:1 23:13,14,22
25:17,24 26:7,16
27:13 28:6 31:3
36:19 40:5,6
41:11 44:24 45:4
45:10,15,18 47:1
48:13,13 49:10
60:16
**MAGISTRATE** 1:3
**maiden** 6:13
**mainstay** 37:3
**major** 8:19
**make** 4:6 15:17
17:22 19:19 20:11
27:7,11 28:14
29:5 31:1,19 32:7
32:14,23 33:21
35:19 36:12 37:6
38:25 39:13 40:4
40:24 43:22 47:4
49:19 51:4 52:23
57:2
**makes** 42:3
**making** 15:20 17:21
18:2 35:17 36:4
40:21 41:3 44:19
48:4 50:1
**man** 37:1 40:11
50:13

**manager** 12:16
19:24 23:1,4,5,6
23:11 45:24 46:7
49:25 56:10
**managers** 23:8
**many** 9:25 10:1,3
12:5,18,25 13:16
13:21 16:5 17:22
18:1 22:14 26:2
26:23 27:24 28:2
28:10 29:24 31:9
32:20,23 34:3,10
34:20 36:12 39:24
42:5 43:8,17,22
44:23
**marathon** 6:1
**March** 1:15 20:10
20:10,15 59:6,19
60:10
**Mark** 3:15 4:6 19:8
19:9 21:6,7 22:14
22:17,17 28:8
41:6 45:17,18
49:10
**market** 48:24
**marriages** 51:4
**married** 6:19,22
7:23 33:16 37:15
39:2,15,16
**material** 4:12
**matter** 34:18
**may** 4:19 5:24
55:11
**maybe** 9:13 13:23
18:3 19:15 21:18
30:1 32:22 33:1,1
33:15 34:5 40:1
40:16
**mckay** 1:22 59:8,13
59:21 60:22
**mean** 4:18 38:14
39:10 46:15
**meaning** 22:17
**means** 32:25
**medical** 52:16
**meet** 13:19 26:4
27:22,24
**meeting** 42:8,9,19
**members** 32:13
36:21 37:14 39:11
55:25
**mention** 15:24
**mentioned** 15:22
20:5 25:16 26:15
28:17 30:11 31:6
31:14 43:2
**men's** 11:4
**Mercedes** 16:2,4
36:2 40:16 41:9
41:22 43:6,7,24
44:12 46:8
**merchandise** 41:10
48:24
**messages** 3:21
**met** 13:21 26:3,5,23
26:23 28:2,8,10
31:8

**Miami** 1:14 59:19
60:2,8
**might** 20:17 44:1
45:1
**mill** 49:6
**mind** 37:21 40:9
**minutes** 44:22
**moment** 4:15
**Monday** 56:17 57:7
57:11
**money** 4:23
**month** 4:21 9:13
12:7,11 20:10,13
33:1 54:24
**months** 4:12 53:14
**mood** 51:24
**more** 15:3,6,14 27:2
30:20 40:17 45:1
45:16
**morning** 56:17
**Most** 51:4
**motion** 5:5 57:10
**Movado** 44:13
**much** 4:19 40:10,14
42:7 57:17,21
**must** 14:24 15:2,4,5
16:1,5 19:24 20:1
21:19,22 27:13,15
27:19 29:11 30:16
30:16 31:5 41:1
41:13 47:19,23
**myself** 32:12

_____ **N** _____

**N** 2:17
**name** 5:13 6:11,13
6:18 22:23 23:2
24:6,7,11,16 32:1
19:5,16 22:25
24:18 36:22
**narrow** 46:23
**natural** 32:10
**nature** 23:20
**need** 6:4,7 12:15
24:21 57:9
**needed** 50:6 51:15
**never** 15:12 50:16
**new** 34:18
**next** 11:3 21:19
47:3 51:1
**nice** 14:23,25 15:3,4
15:5,22 16:1,5
19:25 20:1 21:19
21:22 27:13,15,19
29:11 30:16,16
31:4,5 41:1,13
**nighttime** 52:21
**Notary** 1:23 58:8
59:9,13,22
**noted** 60:19
**nothing** 3:17 50:14
**Notice** 1:24
**notified** 60:14
**Notwithstanding**
25:1
**number** 3:7 7:18,21

9:5,9 40:2 46:10
46:25
**numbered** 59:14

_____ **O** _____

**Object** 14:1 38:13
46:14 48:7 52:9
53:12,23 54:4,9
**objection** 29:6 30:5
39:3 46:20 47:6
**obviously** 38:12
44:3 57:12,21
**occasion** 25:7 30:21
44:9 45:1
**occasions** 26:3,6
30:3 42:5 43:8
44:23
**occurred** 30:4
**offense** 23:21
**office** 11:5 42:11,22
**official** 59:6,18
**often** 9:12 45:14
**oh** 19:24 21:14,22
23:19 27:13 31:4
33:11,14,25 37:14
38:1 40:23 53:3
**okay** 21:1,9 44:6
52:24
**old** 7:6 42:1
**older** 46:1
**once** 7:23 9:13 15:4
15:6 30:1 32:22
32:25 33:1 43:18
44:7 45:13,16
**one** 3:7 4:21 10:16
10:18 11:21,22
12:7 14:4 15:1
29:2 32:17 36:16
36:16 40:8 41:18
42:19,21 44:25
45:22 48:18 50:10
53:18 56:21 57:22
**ones** 11:16 28:16
30:11 43:16
**one-on-one** 15:12
**ongoing** 19:23
**only** 4:2 7:23 41:12
**open** 3:12
**opened** 10:9 48:23
**operator** 11:8,12
**order** 4:19
**ordering** 56:19,20
56:25 57:4,18
**orders** 57:1
**Oregon** 3:16
**original** 57:18 60:12
60:19
**other** 4:12 6:11 8:24
11:6 13:5 14:8
16:24 17:5,24
18:9 19:2,3,15,24
25:9,12 26:15
27:12 28:16,18
29:19 31:17 32:13
32:13,14,23 33:20
34:6,24 35:3 36:4
36:9,23 37:11,12

37:13,13 38:11,20
39:5 40:13,25
41:21 42:23 43:11
43:14,16,25 44:4
46:12 47:9 48:3,4
48:5 49:6,8 51:2
51:23,24 52:1,2,5
52:7 53:2,4 56:1
57:23
**others** 14:10 15:19
16:7
**otherwise** 3:21,25
**ouch** 52:12
**ourselves** 57:6
**out** 12:7 19:6 41:8
45:12,21 48:15,18
51:17,20 54:18
**outside** 24:25 42:14
**over** 4:11 13:22
28:24 39:10 56:8
56:9
**overbroad** 46:21
48:8
**overhear** 38:8,10,18
39:17
**overheard** 15:20
26:19 37:6 47:11
48:1,2 49:5
**owned** 16:3
**o'clock** 4:15 32:12

_____ **P** _____

**pages** 59:14
**paid** 4:22
**pain** 52:7,11,15,19
**paint** 3:22
**Palm** 8:12,16
**panic** 50:9 51:11
**parade** 18:6,12,21
19:13,15,20 27:1
27:9 28:20,21,22
29:1 30:7 31:4
**part** 16:9
**participate** 54:17
**parties** 18:8 23:12
23:14 25:12 59:17
**party** 23:16 24:1,5
25:7,10 57:22,23
**part-time** 13:3,4
**past** 12:6,11
**Pat** 37:22
**Paul** 36:23
**pay** 13:1 51:2
**paying** 57:20
**people** 9:25 15:18
17:19,21 19:2
21:22 24:16 25:18
27:13 33:8 34:7,9
36:16,17 37:11,19
38:22 40:12 41:22
48:4
**percent** 50:1
**person** 29:3 38:19
40:5 49:5
**personally** 19:23
39:14 43:13 59:5
**person's** 38:9,19

phrase 34:2,2
physical 52:7,8,11
  53:2
picked 3:9
picture 22:24 33:14
place 47:17
plain 40:17
Plaintiff 1:7 2:4
play 41:24
played 57:12
playing 57:3
please 5:3,13 6:3
  14:4,12,18 17:2
  17:16 24:25 60:17
point 20:24 54:22
  55:3
poison 53:4
Portland 3:16
portray 40:11
posed 23:20
position 10:21,24
  11:1
predicate 53:13
pregnancy 12:9
pregnant 4:20 6:2
  18:23
preparing 24:1
prepping 17:9
prescription 51:15
presence 34:6 40:24
present 2:7 36:18
  45:7
pressure 51:16
pretty 21:23 29:14
  33:25 34:4,23
  35:20,20,24,25
  41:2 46:3
printed 4:24 5:4
  57:6
Prix 44:2
probably 4:20 8:22
  11:2 19:7 31:10
  36:14 40:4 44:14
  56:24
problem 6:4 14:15
  56:24
problems 13:25
proceedings 25:3
process 3:20
produce 3:18,19
proper 53:13
properly 17:2
provoke 4:20
Public 1:23 58:8
  59:9,13,22
pursuant 1:24
put 3:1 40:2 41:10
  50:13 56:4
putting 50:1
P.A 2:3 60:6

___ Q ___

question 14:2,19
  16:15 17:17 19:23
  24:13 26:2 38:14
  39:20 46:15 47:9
  48:8 52:10 53:13
  53:24 54:10

questioning 47:4
questions 5:22,24
  20:22 34:20 47:7
  56:8,15

___ R ___

R 59:2
race 15:24 21:18
  26:16 28:15 29:17
  30:22 31:15,19
  32:8 33:7 34:11
  35:2,18 37:7 38:9
  38:20 39:22 45:19
  46:11,19 47:1,11
  48:5,10 49:9
  52:21
racial 14:3
racing 51:9 52:5
  53:1
racist 47:21
raise 17:14
Raton 6:25
RE 60:9
read 60:14,19
reading 60:14
ready 11:4
real 31:4
really 16:9 39:11
  41:18
recall 9:6,21 10:2
  12:25 18:2,10
  19:5,10,16,22
  20:4 22:22 23:9
  24:15 25:8,17
  27:21 29:20 30:3
  36:18,22 37:4
  40:6 42:13,22
  44:9 47:16
receipt 54:21 55:7
received 4:8
recess 25:2
recollection 21:3
record 3:1 5:14 57:4
  57:5
red 19:10
refer 29:15
reference 20:24
  30:21 33:6 46:3
  47:18
references 30:20
  31:1 41:4
referring 15:25
  33:18
regarding 4:10 5:25
  26:16 32:8 35:2
  39:15 42:4 44:18
  48:9 49:19
regards 41:1
regular 36:20 50:17
relative 59:17
remember 22:4,10
  22:24,25 23:15
  24:8,16 35:17
rene 2:5 12:17
report 59:15
reported 59:14
reporter 16:16

57:17
represented 3:18
request 55:10
requests 3:19
reside 7:10
response 5:1 57:16
responses 3:19
responsible 57:20
restroom 6:8
richard 2:3,3 60:6,6
rid 21:20
right 10:2 14:9 15:9
  17:7,11 22:22
  30:18 35:15 36:1
  42:1 43:19 44:14
  52:22 53:6
RMR 1:22 59:8,13
  59:21 60:22
Robert 19:7 23:16
  40:19 42:12,13,17
  42:17
Rosenberg 55:23
rule 4:3
rules 3:24
rumor 49:6
rumors 49:1

___ S ___

Saks 4:11
same 10:21 23:15
  23:17 26:25 27:9
  27:9,10 29:8 32:9
  32:18 34:1 35:21
  40:19,25 46:2,20
sanctions 4:5
Sandy 9:24 55:23
Savage 19:7 23:24
  40:19 42:17 44:21
  44:24
Savage's 23:16 25:5
  44:18
saw 28:3 51:7 56:9
saying 15:18 19:12
  21:24 25:25 48:14
  49:3 55:11
school 8:4,6,7,23
schools 8:15 9:3
seal 59:6,18
second 56:24
Security 7:18,21
see 21:5 46:22 52:1
seemed 38:3
seen 3:12 50:16
self-serving 3:14
selling 47:24 48:20
  48:22,25
separate 30:10
serve 3:5
server 3:20
sessions 43:12
set 13:2
seven 10:11,13,22
  39:10
several 10:16 31:14
shaking 16:23 17:8
Shannon 9:22 31:6
share 57:20

sharing 29:2
Sherwood 13:6
shock 39:6
shocked 39:9
Shooters 53:6,9
  54:21 55:7
shopper 11:9,13
shops 48:25
short 5:21 50:19
shorthand 59:15
show 4:3,17
showing 3:15
Shutts 2:5
sign 60:19
signing 60:14
since 10:9 19:13
  57:2
Sincerely 60:20
situation 22:4 23:20
six 53:14
SNOW 1:3
social 7:18,20 13:22
  13:23 18:5 26:6,9
  26:25 30:2,2
some 4:22 5:22
  45:19 51:22 52:23
  54:5
somebody 23:24
  29:3 49:5
somehow 32:15
  33:14
someone 7:2 23:22
  25:24 37:6 39:13
  39:22
something 21:20
  29:3 31:18 36:5
  40:17 42:3,13
  47:19,20,23 52:23
  56:5
Sometimes 9:11
  33:23
son 7:7
sorry 11:10 22:23
  25:21 35:22 45:19
  53:7 54:2
sort 49:19 51:7
South 1:13 13:8
SOUTHERN 1:1
speak 12:17
specific 19:13,14
specifically 17:18
  18:10 29:21 33:20
  33:22 34:10 56:3
  57:7
spell 6:16
spoke 12:16 34:22
sporting 11:6 32:5
  35:13
sports 46:1,1
Springs 23:1,6
standing 19:2,3
  22:5
start 3:2 51:19
state 1:23 5:13 59:3
  59:9,11,13,19,22
statement 3:2
statements 3:13

16:18,21
STATES 1:1
stating 3:4
status 3:4
step 24:25
stepdaughters 7:8
steve 1:6 2:8 15:2
  18:14,18,20 19:25
  20:12 21:8 29:16
  32:15,24 33:10,11
  33:12,22,23,25
  34:6,17,17,20,23
  37:9,11,12,13,16
  38:5 40:24 41:11
  41:12 44:25 45:7
  45:7,9,21,22,24
  51:18 56:4,6,11
Steve's 14:23
still 6:22
stop 14:11 17:8,11
  24:23 33:24 45:8
stopping 14:13
store 9:6,8,19 10:9
  10:16,18,19 12:16
  19:24 23:4,5,6,7
  23:11 24:9,10,11
  28:4,13 31:24
  33:24 35:12 42:12
  42:14 44:17 45:8
  45:9 48:25 49:1,6
  49:25 56:9
stores 1:9 10:17
  49:7
straight 51:10
strange 33:11,14
Street 60:2
stretch 6:4,8
strong 50:10
stub 13:1
stubbed 52:12
study 8:19
stuff 35:7
stupid 29:10 49:1
subpoena 4:9,18
subscribed 58:5
suddenly 50:25
suffering 49:20
Suite 1:14 60:1,7
summary 57:10
superiors 41:23
supervisor 3:8
  10:25
support 50:6,7,24
supposed 41:19,20
sure 11:2 16:10,12
  16:23 20:8 24:14
  26:11 35:7 36:2,3
  38:15,23 43:22
  46:16 47:4 54:4
  56:22
surprise 39:6
surprised 38:4 39:9
swap 48:25
swear 5:3
swim 32:18,21
sworn 5:9 58:5 59:5
sympathetic 16:14

**T**

T 59:2,2
take 3:10 6:2,3,5
    16:20 17:1,2 21:4
    22:6 24:12,21
    51:15
taken 1:22 5:16
    25:2 60:10
taking 1:24 47:17
    48:24 56:21 57:25
talk 10:7 14:9 15:8
    17:23 37:10 39:24
    40:3,4,9 42:4
    47:15 54:13
talked 37:20 53:18
talking 14:2 25:5
    36:16 38:2 43:11
    52:14,16 54:16
target 1:9 3:7 4:4
    5:23 9:5,23,25
    10:3,4,7,8 11:20
    12:3,7,12,13
    13:23 15:7 21:17
    21:18 31:18 32:10
    38:8,18,25 39:17
    47:17 49:24 50:1
    50:1,2 54:19,20
    54:25 55:1,10,16
    57:21
tea 52:23
team 28:11 32:13
    36:21 37:13 39:11
    55:25
tecum 4:9
tell 12:1 14:7
    23:13 30:6 31:22
    33:12 37:5,25
    39:21 42:6 50:22
    56:4
telling 41:19
ten 12:6,19,20 13:23
    27:2 40:1
term 15:5 47:21
terminated 20:12
    49:18 54:23
termination 52:2
    55:8
terms 41:14
Terry 26:21 40:8
    41:18 42:5 49:10
testified 5:9 35:4
    38:11,20 44:1
    45:17 46:10,13,25
    47:10 48:3,6 49:8
    49:11 52:6
Tetro 31:6,12
thank 22:19 25:1
    51:18 56:18 57:17
their 3:11 4:6 9:21
    9:23,23 14:2 19:5
    19:16 22:15,25
    24:18 36:22 39:7
themselves 42:10
they'd 21:22 33:10
    33:13 35:19

thing 17:10 32:10
    40:20 50:2
things 17:5,24 18:11
    19:25 23:19 29:10
    33:23 34:18 36:6
    40:13 41:2 47:21
    51:5 52:15
think 18:9,22 19:8
    21:6 22:3,14 24:7
    28:10,20 30:12
    31:23 33:16 36:7
    36:24 37:19 39:3
    40:13,19 41:17
    42:15 43:5 44:11
    45:12 48:20 52:11
    53:3
thinking 20:6
thirty 28:11
though 3:21 57:19
three 3:17 7:9,10
    12:9 18:15,16
    34:5,14 36:14
through 3:12 4:16
    26:5 35:6 51:5
throughout 27:10
Thursday 1:15
time 5:19 6:3 9:15
    9:15 18:4,18,23
    19:9,15 21:4,8
    22:6 23:10,11
    24:4 32:17,18
    36:21 41:10 42:21
    43:5 44:17,20
    51:6,22 55:6,9
times 13:21,24 16:5
    16:7,8 17:22 18:1
    26:23 27:2,4,5,24
    28:2,10 29:24
    31:9 32:14,20
    34:3,7,10,13,14
    36:12 40:25 42:23
    43:17,22 45:9
title 11:10 23:9
    31:22 32:2
today 48:6 49:8
    50:3
toe 52:10
together 19:6 26:10
    33:15 43:19 51:4
told 3:7 25:25 33:8
    37:18 38:3 39:22
    40:6,14,19 41:17
    41:21,23 42:6,20
    43:9 44:10,25
    45:2,3,14,18,22
    49:12,16 51:10,11
    51:14,15 53:2
Tom 9:22
tomorrow 5:5
topic 34:16
Toscano 19:7 20:20
    22:9,13 31:20
    32:7,20 33:18
    34:25 45:4,14
    55:23 56:3
towards 5:24
trade 9:2

traditionally 9:24
transcript 57:24
    60:12,15,19,19
transcription 59:15
trick 16:17
tried 34:14
true 59:15
trunk 41:11
trust 25:1
try 4:20 16:11 50:11
trying 3:22,25
    16:13 18:9 19:7
    20:23 22:24 24:7
    36:24 37:19 41:17
    50:10 55:3 57:8
    57:13
turned 7:7
twelve 13:24 27:2
    40:1
Twenty 28:1
twice 30:1 33:1
two 3:10 7:9,10 8:23
    10:6 12:8 13:11
    18:15 20:14 23:8
    34:5,13 36:14
    50:11 56:13 57:22
type 23:17 31:5
    34:1 40:25 46:4
    49:6
types 21:24 40:11
    41:3 47:20,24
    51:5 56:8
T-642 10:20

**U**

Uh-huh 42:18
Um-hmm 12:23
    15:23 29:23 31:16
    33:19
Um-hum 10:15
    11:23 12:4
Um-um 53:25
unable 3:4
uncomfortable
    17:20
under 4:18
undergo 52:6
undergoing 49:20
undersigned 59:4
understand 6:1
    38:14 43:20 54:16
understanding
    16:12
unemployed 57:23
UNITED 1:1
universities 8:11
University 8:13
unless 57:5
until 34:14 51:20
    55:8 56:3,10
upsetting 41:20
use 30:19 34:11
    48:10 50:20
used 6:11 7:20
    20:20,22 41:15
    47:21
using 34:1 41:14

usual 57:3
usually 19:6

**V**

v 60:9
Van 19:7 23:16,24
    25:5 40:19 42:17
    44:18,21,24
varies 12:6 13:1
various 11:6 32:13
vehicle 42:14
vehicles 13:15 21:15
verbatim 27:18
very 30:9,12 50:14
    57:17
violating 3:24
Viper 14:25 15:22
    21:20 27:14,16,19
    29:10,22 30:15,17
    36:2 41:7 42:2
    43:4,6 44:12 45:8
    45:21,24 46:8
visit 9:10
vocational 9:2
voice 17:14
vs 1:7

**W**

W 1:22 59:8,13,21
    60:23
wait 18:22
waive 60:14
waives 56:16
walk 16:8 17:19
walkathon 25:16,23
walkathons 18:11
walks 18:10
want 5:4 16:9 17:17
    22:19 35:6 47:3,4
    43:11 57:3,6,7,23
wanted 43:22 50:23
    50:24
Wanting 33:3
warranty 13:13,15
Wasko 42:17
wasn't 19:9 40:25
    43:6
watch 44:13
water 6:8
way 15:25 42:15
    48:8 53:8 54:17
    55:4,9
wear 11:4 40:14
    41:22
wearing 40:9 42:7
    44:13
week 12:5,14,16,18
    12:22,24 13:17
    33:1,2 56:9
weekly 12:17
weeks 12:10
well 18:23 28:12,13
    29:21 32:17 33:8
    40:23 46:6 49:7
    50:25 52:14 53:3
went 11:4,5,5 26:4

were 3:14,21 7:14
    14:2,19 17:5 18:8
    19:3,20 20:2,12
    21:17 22:16 23:12
    23:14 25:3,5,12
    25:24 26:7,17
    27:18 30:20 34:7
    34:9 37:3,15 38:4
    39:25 42:10,23
    43:18 45:14 48:9
    48:13 49:22 53:8
    53:13 55:4,8
West 60:2
we'll 6:3,5
We're 5:1
whatsoever 38:9
whichever 57:8
while 16:9 20:2 24:1
    28:12 41:7 45:20
white 33:16 40:21
    44:19
whole 40:15 46:4
    49:25
wife 18:8 24:4
wish 6:2 14:25
    27:13,16 29:13
witness 5:8,10 12:20
    14:5,15,20 15:11
    17:9 18:20 19:14
    20:14,17 22:9,18
    22:21 24:15 26:9
    26:12 28:19 29:8
    30:7 35:5,15
    37:13 38:16 39:5
    43:14,18 44:7
    46:17 47:13 48:12
    48:23 52:6,11,20
    53:16,25 54:6,12
    55:1,14,18 59:6
    59:16,18 60:14,16
    60:18
wives 22:16 24:17
    24:18
woman 37:1,2
word 3:14 27:18,18
    48:10
words 31:1 34:11,12
work 9:17 12:5,18
    13:16 31:23 33:13
    36:4 50:11,13
worked 9:5,6,19
    10:1,3,16 11:6
    12:24 13:10 23:10
    24:8,10,11 27:25
    28:2,3 31:24
    44:20
working 10:8 11:8
    11:24 12:3 20:3
    28:12 49:23,24
    56:13 57:22
works 3:7 51:20
Worth 44:17
wouldn't 26:12
    33:16 36:15,16
wrap 53:5
writing 3:20
wrong 42:3

| X | | | | |
|---|---|---|---|---|
| **x** 1:11 2:17 | **33498** 7:1 | | | |
| | **373-9997** 60:3 | | | |
| **Y** | | | | |
| | **5** | | | |
| **yeah** 14:20 21:6,8 | **5:11** 2:19 | | | |
| 21:11 23:8 24:4 | **500** 18:6 20:4 21:12 | | | |
| 27:4,13,17 28:19 | 22:1 28:19,21 | | | |
| 31:23 32:3 35:20 | 30:7 | | | |
| 43:5 45:21 | **58** 59:15 | | | |
| **year** 11:2 18:14,15 | **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** 7:19 | | | |
| 18:17,21 20:7,12 | | | | |
| 21:9 23:17 44:11 | **6** | | | |
| 44:16 | **6** 20:15 | | | |
| **years** 8:23 9:6 10:1 | | | | |
| 10:4,11,13,22 | **8** | | | |
| 11:16,17 13:11,22 | **8/10/70** 7:13 | | | |
| 18:15,15,16 20:14 | | | | |
| 28:1 39:10 49:23 | **9** | | | |
| **yesterday** 3:4,16 | **9** 32:12 | | | |
| | **90** 8:22 | | | |
| **Z** | **91** 8:23 | | | |
| **Zayre's** 4:10 | **95** 18:24 | | | |
| **zillions** 46:16 | **96** 18:24,24 20:10 | | | |
| **Zion** 8:7 | **97** 20:10,18 21:5 | | | |
| | **98** 20:17 21:6,9,10 | | | |
| **0** | 21:11 | | | |
| **00-6107-CIV-FE...** | | | | |
| 1:3 | | | | |
| **1** | | | | |
| **1** 59:15 | | | | |
| **10:10** 1:15 | | | | |
| **1020** 60:1 | | | | |
| **11:15** 1:15 | | | | |
| **120** 50:1 | | | | |
| **13** 7:8 | | | | |
| **14** 7:8 | | | | |
| **15** 1:15 12:24 49:23 | | | | |
| 60:10 | | | | |
| **1500** 1:14 | | | | |
| **16** 60:5 | | | | |
| **16th** 59:6,19 | | | | |
| **18303** 6:25 | | | | |
| **18305** 60:7 | | | | |
| **19** 59:10,23 60:2 | | | | |
| **1988** 8:9 | | | | |
| **1995** 6:21 | | | | |
| **1999** 20:15 53:6 | | | | |
| 55:5 | | | | |
| **2** | | | | |
| **2** 4:15 6:21 | | | | |
| **2001** 1:15 58:6 59:6 | | | | |
| 59:19 60:5,10 | | | | |
| **2003** 59:10,23 | | | | |
| **201** 1:13 | | | | |
| **29th** 53:6 54:22 | | | | |
| 55:5 | | | | |
| **3** | | | | |
| **300** 60:7 | | | | |
| **3000** 13:8 | | | | |
| **305** 60:3 | | | | |
| **33130** 60:2 | | | | |
| **33160** 60:8 | | | | |
| **33444** 13:9 | | | | |

1              IN THE UNITED STATES DISTRICT COURT

2            FOR THE SOUTHERN DISTRICT OF FLORIDA

3                 FORT LAUDERDALE DIVISION

4                       - - -

5    Steve Harris,                    :
                                      :
6              Plaintiff,             :   Civil Action No.
                                      :   00-6107-CIV
7         vs.                         :
                                      :
8    Dayton Hudson Corporation,       :
     dba Target Stores,              :
9                                     :
               Defendant.            :

10

11                      - - -

12                   DEPOSITION

13   of Don Fankhauser, called by the Plaintiff under

14   the applicable Rules of Federal Civil Court

15   Procedure, taken before me, Michael O. Spencer,

16   a Notary Public in and for the State of Ohio,

17   held at the offices of Armstrong & Okey, 185

18   South Fifth Street, Columbus, Ohio, on Monday,

19   February 12, 2001, at 9:30 A.M.

20                      - - -

21               Armstrong & Okey, Inc.
             185 S. Fifth Street, Suite 101
22              Columbus, Ohio   43215
             (614) 224-9481 - (800) 223-9481
23               Fax - (614) 224-5724

24                 **ORIGINAL**

     ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

2

1 | APPEARANCES:

2

3 | Richard J. Burton & Associates, P.A.
By Mr. Richard J. Burton
18305 Biscayne Boulevard

4 | Suite 300
North Miami Beach, Florida   33160

5

6 | On behalf of the Plaintiff.

7

8 | Shutts & Bowen, LLP
By Ms. Sheila M. Cesarano

9 | 1500 Miami Center
201 South Biscayne Boulevard

10 | Miami, Florida 33131

11 | On behalf of the Defendant.

12

13

14

15 | - - -

16

17

18

19

20

21

22

23

24

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

3

```
 1                    INDEX TO EXHIBITS

 2                          - - -

 3                                              MARKED

 4
     1    Target Card Account Statement           133
 5
     2    Letter dated 2-25-99 to Steve           134
 6        Harris from First Union

 7   3    First Union Account Statement           134
         for Steve Harris
 8
     4    Statement of Donna Keil                 176
 9
     5    Statement of Shannon Tetrault           178
10
     6    Statement of Shannon Tetrault           180
11
     7    Statement of Natalle McKenna            192
12
     8    Statement of Caryn Knapp                192
13
     9    Statement of Sandy Grisbak              200
14
    10    Statement of Dina McHugh                201
15
    11    Receipt                                 201
16
    12    Statement of Donna Keil                 201
17
    13    Target Card Statement for               209
18        Steve Harris

19  14    Target Card Statement for               220
         Steve Harris
20
    15    Target Stores Travel Report             223
21
    16    Employee Status & Change Notice         226
22
    17    Statement of Shannon Tetrault           231
23

24
                          - - -

        ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481
```

4

```
 1                     Monday Morning Session,
 2                     February 12, 2001.
 3                          - - -
 4                     DON FANKHAUSER
 5    being by me first duly sworn, as hereinafter
 6    certified, deposes and says as follows:
 7                     CROSS-EXAMINATION
 8    By Mr. Burton:
 9         Q.    Please state your name for the
10    record.
11         A.    Don Fankhauser.
12         Q.    And what is your home address, sir?
13         A.    33 Avon Drive, Lexington, Ohio
14    44904.
15         Q.    Okay.  And when did you start
16    residing there?
17         A.    October of 1999.
18         Q.    Okay.  And prior to that where did
19    you live?
20         A.    In Coral Springs, Florida.
21         Q.    Who is your employer now?
22         A.    Target.
23         Q.    Who was your employer then?
24         A.    I am sorry.
```

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

5

```
 1          Q.   Who was your employer in Florida?
 2          A.   Target.
 3          Q.   Okay.   What is your current position
 4    with Target?
 5          A.   Asset Protection Team Leader.
 6          Q.   For the purpose of this Jury who
 7    won't see you, can you knowledge that you have
 8    light brown hair, touch of gray, very white
 9    skinned person?
10          A.   Yes, sir.
11          Q.   Blue eyes?
12          A.   Brown.
13          Q.   Brown eyes.   And wearing a suit with
14    red tie and white button down collar?
15          A.   Yes, sir.
16          Q.   Prior to taking, commencing the
17    deposition, you were meeting with Mrs. Cesarano;
18    correct?
19          A.   Yes, sir.
20          Q.   Have you retained her for your
21    personal counsel?
22          A.   No.
23          Q.   Prior to today have you spoken with
24    her before?
```

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

6

```
 1          A.   Yes, sir.
 2          Q.   How many different occasions?
 3          A.   One.
 4          Q.   Was that in Florida or was that in
 5     Ohio?
 6          A.   That was in Ohio.
 7          Q.   So she came up here to see you?
 8          A.   No, sir.
 9          Q.   Okay.  Can you explain how you spoke
10     with her before today?
11          A.   On the telephone.
12          Q.   I see.  This is the time you first
13     physically meet her?
14          A.   Yes.
15          Q.   Prior to today have you spoken with
16     other employees or persons representing Target
17     Corporation about Mr. Harris either before it
18     became a case or since?
19          A.   No, sir.
20          Q.   Who did you report to in Florida
21     when you were there?  Who was your supervisor?
22          A.   Doug Barth.
23          Q.   Who is Mr. Doug Barth?
24          A.   I am sorry.
```

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

7

```
 1            Q.    Who is Mr. Doug Barth?
 2            A.    He was the District Assets
 3    Protection Manager.
 4            Q.    And what district was that?
 5            A.    District 310.
 6            Q.    Where did that encompass?
 7            A.    Broward and West Palm County, West
 8    Palm Beach.
 9            Q.    Okay.  And in Florida where were you
10    stationed to work?
11            A.    Various stores.
12            Q.    Well, let's slow down.  Give me a
13    brief resume of when you graduated, last
14    graduate of a formal educational institution?
15            A.    Last graduated was high school.
16            Q.    Okay.  Where was that?
17            A.    Lake Wood.
18            Q.    Which is where?
19            A.    It's in Ohio.
20            Q.    So local Ohio boy?
21            A.    Yes, sir.
22            Q.    And what year was that?
23            A.    1967.
24            Q.    And after graduating then what?
```

8

| | | |
|---|---|---|
| 1 | A. | I worked at Western Electric. |
| 2 | Q. | Didn't get in the military then? |
| 3 | A. | No, sir. |
| 4 | Q. | Any particular reason that you were |

5  not drafted?  Because I know that was before

6  numbers, same age as I am, I know exactly when

7  they came in.

8         A.   I have no knowledge.

9         Q.   You were 1-A, never got called?

10        A.   Exactly.

11        Q.   Have you ever given a deposition

12  before?

13        A.   Yes, sir.

14        Q.   How many different occasions?

15        A.   Well, can't answer that.  I don't

16  remember.

17        Q.   More than 10?

18        A.   No.

19        Q.   They were involved with personal

20  matters with which you were a participant?  In

21  other words, a party?

22        A.   No.

23        Q.   All been working for your employer?

24        A.   Yes.

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

9

1      Q.   Okay.  And do you recall the last

2    time you gave a deposition?

3      A.   No, I don't know the date.

4      Q.   Would it have been within the last

5    two years?

6      A.   No.

7      Q.   Okay.  As Asset Protection Manager,

8    that is a form of security?

9      A.   Yes, sir.

10      Q.   So you perform the security-type

11   function for an employer?

12      A.   Yes, I do.

13      Q.   And how long have you been in

14   the asset protection field?

15      A.   Since 1989.

16      Q.   What, with Target or with an earlier

17   employer?

18      A.   That would be with Target.

19      Q.   What training did you have prior to

20   being selected to go in the asset protection

21   field, in security?

22      A.   I don't understand what you are

23   saying.

24      Q.   Okay.  Well, I do know there are

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

10

1   forms of training where you train people to
2   perform security techniques and there are
3   experts who teach this.  Did you have any kind
4   of schooling to teach you security functions in
5   the retail environment? Was it on the job?
6        A.   No.
7        Q.   Was it all on the job training?
8        A.   I had my in-service training with
9   Target.
10       Q.   That is on the job, sir.
11       A.   Yes, sir.
12       Q.   In-service doesn't mean like
13  military police or something?
14       A.   No.
15       Q.   Okay.  So you have never formally
16  attended an outside organization's formal
17  training program to teach any rudiments of
18  security?
19       A.   I did attend several courses at Ohio
20  State University and Central Ohio Technical
21  College.
22       Q.   When at Central Ohio?
23       A.   From 1971 to 1986.
24       Q.   In '89 when you became the security

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

11

1  person did you have any preparation for that

2  specific job?  Did you take any specifically

3  targeted courses for industrial or retail

4  security such as the Wachenhut organization?

5       A.   No.

6       Q.   Do you know there are such

7  institutions?

8       A.   Yes, I do.

9       Q.   And never took time to take any of

10 them; did you?

11       A.   No.

12       Q.   Now, prior to 1989 when you became

13 the security person that you were, what did you

14 do with Target?  Or did you join them in that

15 capacity?

16       A.   I joined in that capacity.

17       Q.   Where had you worked prior?

18       A.   For the Licking County Sheriff's

19 Department.

20       Q.   What did you do there?

21       A.   Chief of Detectives.

22       Q.   Okay.  Did you receive any training

23 to become chief of detectives?

24       A.   Yes, sir.

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

12

1    Q.    What training was that?

2    A.    Ohio Peace Officer basic training,

3    numerous courses throughout my tenure.

4    Q.    When did you become a, I don't know

5    if Ohio has one of these things, a registered or

6    recognized police officer for the first time?

7    A.    1971.

8    Q.    And was that as a result of going to

9    the police academy?

10    A.    Yes, sir.

11    Q.    Where?

12    A.    The Academy I attended was in

13    Millersport, Ohio.

14    Q.    Millersport, Ohio.  And at that time

15    would you have been 21?

16    A.    That's correct.

17    Q.    And they didn't have any requirement

18    for any college at that time to be in the police

19    academy?

20    A.    No, sir.

21    Q.    Have you ever taken any courses

22    which you ever received a formal grade in other

23    than 3-credit course or 2-credit course, a

24    graded course in junior college or any other

```
                                                    13
 1   institution?
 2         A.   Yes, sir.
 3         Q.   What courses have you taken?
 4         A.   I was in criminal justice.
 5   The exact courses I don't recall.
 6         Q.   This was before 1971?
 7         A.   No.  It was after 1971.
 8         Q.   Do you remember how many courses you
 9   took?
10         A.   Two.
11         Q.   And did you complete the
12   program?  Did you get any degree or
13   certification?
14         A.   No, sir.
15         Q.   And give a brief resume then what
16   you did after graduating from the police academy
17   in 1971.
18         A.   I worked as officer with the Union
19   Township Police Department.
20         Q.   Union Township in Ohio?
21         A.   Yes, sir.
22         Q.   And were in uniformed service or --
23         A.   Yes.
24         Q.   For how long?
```

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

```
                                                        14
 1            A.    Two years.

 2            Q.    And after the two years what did you

 3      then do?

 4            A.    Joined the Licking County Sheriff's

 5      Department.

 6            Q.    Where is Licking County?

 7            A.    It's in Newark, Ohio.

 8            Q.    And how big a county is that?

 9            A.    In terms of?

10            Q.    Population at the time you were

11      there.

12            A.    I don't know.

13            Q.    Was it a big city?

14            A.    Newark?

15            Q.    Newark, Ohio.  How big is that

16      approximately more or less?

17            A.    50,000.

18            Q.    So fairly small rural city?

19            A.    Yes.

20            Q.    Okay.  And are there any -- what is

21      the population of black people in that county?

22      Do you have any --

23            A.    I have no idea.

24            Q.    Percentages?
```

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

15

1          A.    No.

2          Q.    Certainly not a Miami-Dade or

3     Broward with a very significant black

4     population; is it?

5          A.    No, sir.

6                MS. CESARANO:   Object to form.

7          Q.    Did you understand that question;

8     sir?

9          A.    Yes, sir.

10         Q.    Okay.  So you were in Licking County

11    until approximately what year?

12         A.    1989.

13         Q.    How many detectives worked with you

14    in Licking County?

15         A.    Five.

16         Q.    So the whole detective force

17    consisted of five persons with badges?

18         A.    Yes, sir.

19         Q.    Did that include non-badged people

20    or just badged people, the five?

21         A.    They were all sworn officers.

22         Q.    Okay.  Any of them black?

23         A.    No, sir.

24         Q.    And you were the chief; correct?

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

16

1          A.    Yes, sir.

2          Q.    And I presume that you were paid

3    more at Target which is why you left; correct?

4          A.    That I would be paid more?

5          Q.    Yes.   That is one of the reasons you

6    left for greater salary?

7          A.    The pay was about equal.

8          Q.    Okay.   So where were you first

9    assigned at Target?

10         A.    South Bend, Indiana.

11         Q.    Okay.   And what was your first

12   capacity or roll?

13         A.    The same as I am doing now, Asset

14   Protection Team Leader.

15         Q.    Asset Protection Team Leader is a

16   term of art in Target; isn't it?

17         A.    I am sorry.   What?

18         Q.    Term of art.   They give names, team

19   something, to most jobs.   So Asset Protection

20   Team Leader reflects a person working at a store

21   level who is in charge of security?

22         A.    That's correct.

23         Q.    So if I hear the term I will think

24   of the store's top detective.   Is that a fair

17

1    way to put it?

2         A.    That's correct.

3         Q.    Okay.  And underneath you are the

4    people who put on the devices that detour theft

5    so people can't walk out with everything;

6    correct?

7         A.    That's correct.

8         Q.    Prior to that function when you were

9    in Licking County and then went to Target have

10   you ever taken any courses in retail security?

11        A.    No, sir.

12        Q.    Have you ever taken any specialized

13   courses in industrial security?

14        A.    No, sir.

15        Q.    Ever taken courses in retail

16   security?

17        A.    No, sir.

18        Q.    There are people who specialize in

19   that; aren't there?

20        A.    Yes, sir.

21        Q.    You were not one of them at that

22   time?

23        A.    No.

24        Q.    So you are now made the Asset

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

18

1    Protection Team Leader in South Bend at

2    the Target story; correct?

3          A.   Yes, sir.

4          Q.   How long were you there? Or let's

5    start with what year does that take us to?

6          A.   1990.

7          Q.   So there for one year?

8          A.   Roughly.

9          Q.   Then where were you assigned?

10         A.   Elkhart, Indiana.

11         Q.   The store that you were initially

12   assigned, South Bend, what was the predominate

13   population of the surrounding neighborhood?

14         A.   I have no idea.

15         Q.   You have no idea what the prominent

16   neighborhood it was located in, what the

17   population looked like?

18         A.   I don't recall, sir.

19         Q.   Well, was there a high number of

20   black persons?

21              MS. CESARANO:   Object to the form.

22         Q.   Please answer.

23         A.   I don't recall.

24         Q.   What do you recall South Bend

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

```
                                                      19
 1    being?  An industrial city, urban city or rural
 2    town?
 3          A.    Probably rural.
 4          Q.    Okay.  Is it known for any
 5    particular universities?
 6          A.    Yes, sir.
 7          Q.    Notre Dame?
 8          A.    Yes, sir.
 9          Q.    So university rural town.  Is that a
10    good way to describe it?
11          A.    Yes, sir.
12          Q.    And from there you went on to
13    Elkhart, Indiana.  That is pretty rural?
14          A.    Yes, sir.
15          Q.    Predominant white rural population?
16          A.    Again, I don't know.
17          Q.    You have no opinion on that
18    whatsoever?
19          A.    No, I don't.
20          Q.    Okay.  What kind neighborhood was --
21                MS. CESARANO:  Object to form.
22          Q.    What was the makeup of the persons
23    who lived there?
24                MS. CESARANO:  Objection to form.
```

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

20

1              A.    It was in the suburbs of Elkhart.

2              Q.    Would that make it predominantly

3      white middle class?

4              A.    No, sir.

5              Q.    In either of those cities were

6      there any black store managers that you worked

7      under?

8              A.    No.

9              Q.    How long were you at Elkhart?

10             A.    I am sorry.

11             Q.    How long were you at Elkhart?

12             A.    Until June of '91.

13             Q.    Okay.  Without invading any

14     corporate secrets, I don't think we will be

15     taking about any, but were you sent to stores

16     because there are specific problems?  In other

17     words, were you sent there on a specific task, a

18     store, to clean up the town, go home, or was it

19     just normal rotation?

20             A.    In Indiana it was a normal rotation.

21             Q.    That would be both South Bend and

22     Elkhart?

23             A.    Yes, sir.

24             Q.    Okay.  Then you said in '91 -- where

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

```
                                                    21
 1 │ did you go to?
 2 │      A.    In 1991 transferred to South
 3 │ Florida.
 4 │      Q.    Why were you transferred, if any
 5 │ reason that you know of, to South Florida?
 6 │      A.    They were opening a new market.
 7 │      Q.    That was when Target was coming into
 8 │ Florida?
 9 │      A.    That's correct.
10 │      Q.    So this was normal rotation and
11 │ possible way to advance your career?
12 │      A.    Yes, sir.
13 │      Q.    Now, are you married?
14 │      A.    Yes, sir.
15 │      Q.    And what is your wife's career?
16 │      A.    Then or now?
17 │      Q.    Then.
18 │      A.    She was a homemaker.
19 │      Q.    Stay home mom?
20 │      A.    Yes, sir.
21 │      Q.    Okay.  And where did you move to in
22 │ South Florida in 1991?
23 │      A.    Pompano Beach.
24 │      Q.    Okay.  And what store were you going
```

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

22

1   to be assigned to?

2        A.    Boynton Beach.

3        Q.    Prior to moving in 1991 to South

4   Florida had you been trained specifically by

5   Target for any specific tasks relative to your

6   functioning in Boynton Beach, or more of the

7   same?

8        A.    More what?

9        Q.    More of the same.  Just go there,

10  asset protection guy, normal rotation?

11       A.    Yes, sir, normal rotation.

12       Q.    So how long did you stay at the

13  Boynton Beach -- do you know the store number

14  there?

15       A.    Yes, sir.  It was 644.

16       Q.    Okay.  And when you went to 644 did

17  you have a white or black store manager?

18       A.    Hispanic.

19       Q.    White Hispanic?

20            MS. CESARANO:  Object to form.

21       Q.    Were you aware there are Hispanics

22  that are white colored persons that can walk

23  through a community and wouldn't know them to,

24  perhaps their last name, what race they are?

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

```
                                                       23
 1    Are you aware of that, sir?
 2                MS. CESARANO:  Object to form.
 3         Q.   Was that person a white Hispanic or
 4    back Hispanic?
 5                MS. CESARANO:  Object.
 6         Q.   You can still answer.
 7         A.   Dark.
 8         Q.   Dark.  So the person was a black
 9    Hispanic?
10         A.   Yes, sir.
11                MS. CESARANO:  Object to form.
12         Q.   What was that person's name?
13         A.   Roman Garza.
14         Q.   Do you know if the person was
15    Mexican origin or Cuban origin or any other
16    particular origin?
17         A.   I have no knowledge.
18         Q.   Did you ever have a conversation
19    with that person about their background?
20         A.   I don't recall.
21         Q.   You have no recollection ever having
22    any sort of discussion where the person came
23    from, any particular foreign parentage or
24    anything like that?
```

```
                                                    24
 1           A.    No, sir.
 2           Q.    Came from the southwest United
 3    States or from South Florida?
 4           A.    I know where he came from.
 5           Q.    Where he came from.  You mean
 6    raised?
 7           A.    No.  Prior to Florida.
 8           Q.    You mean you know what store he was
 9    transferred from by Target?
10           A.    I know what state he came from.
11           Q.    What was that?
12           A.    Texas.
13           Q.    Okay.  That is what I was trying to
14    elicit.
15           A.    Okay.
16           Q.    Thank you very much.  And do you
17    know what city in Texas he was from?
18           A.    I do, but I cannot recall right now.
19           Q.    Now, Mr. Garza, had he previously
20    been with Target in the southwest regions?
21           A.    Yes.
22           Q.    Okay.  And what area was that?
23           A.    What area was he --
24           Q.    What store had he been from that you
```

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

25

1   were aware of?

2       A.   He was in Texas.  I don't know

3   the --

4       Q.   He didn't tell you Dallas or --

5       A.   Yes, he did tell me, and I don't

6   recall.

7       Q.   And while you were there in Boynton

8   Beach was he the store manager at all times?

9       A.   Yes, sir.

10      Q.   How long did you work under Mr.

11  Garza in Boynton Beach?

12      A.   A year and a half approximately.

13      Q.   Okay.  The reason I ask is Garza

14  happens to be a Mexican name, and is that what

15  you believe his parentage to be?

16          MS. CESARANO:  Object to the form.

17      A.   I don't know.

18      Q.   No clue?

19      A.   No, I don't know.

20      Q.   Now, you were with Mr. Garza's

21  store 644 for how long?

22      A.   Approximately a year and a half.

23      Q.   Okay.  That takes us to about 1993.

24      A.   Yes, sir, it does.

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

26

1        Q.   And where were you then assigned?

2        A.   I had been assigned to so many

3   stores it's hard to recall exact dates,

4   honestly.

5        Q.   Okay, sir.  You don't have notes

6   before you today.  Did you look at any documents

7   to refresh your memory?

8        A.   No.

9        Q.   When was the last time you have seen

10  any documents related to Harris?

11       A.   Friday.

12       Q.   Who provided them to you?

13       A.   Margaret Davis.

14       Q.   Who is that, sir?

15       A.   I believe it is Miss Cesarano's

16  assistant.

17       Q.   And what did she have sent to you

18  to assist you?

19            MS. CESARANO:  I am going to object.

20  Attorney-client privilege.

21       Q.   Please answer.

22            MS. CESARANO:  Go ahead and answer.

23       A.   Statement prepared by myself, some

24  copies of store documentation.

        ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

27

1      Q.    What do you mean store

2   documentation?

3      A.    Documents that are prepared at

4   the store level.

5      Q.    Can you be more specific?

6      A.    There was two vouchers, cash

7   vouchers. There was a copy of a receipt,

8   restaurant receipt.  And as I recall probably

9   statements from two other people.

10      Q.    Terry Gillespie?

11      A.    No, sir.

12      Q.    Do you know those persons who you

13   read statements of?

14      A.    Do what?

15      Q.    Do you remember the names of the

16   other people?  You said two other people.  Who

17   are they?

18      A.    One was Shannon Tetrault.  I am

19   trying to think of the other girl's name.  Keil.

20   I can't think of the first name.

21      Q.    Keil?

22      A.    Yes, sir

23      Q.    Okay.  And those are the two

24   statements that you were sent; correct?

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

28

1          A.    Yes, sir.

2          Q.    Have you ever been shown any

3    material other than that prior to that material

4    on Friday, I guess would be the 9th of February,

5    2001?

6          A.    No, sir.

7          Q.    In other words, you have never read

8    Mr. Gillespie's deposition or any depositions of

9    any other witnesses?

10          MS. CESARANO:    That was the

11   Plaintiff's deposition that I sent.

12          A.    Yes.

13          Q.    You did read Mr. Harris' deposition?

14          A.    Yes.

15          Q.    When did you get that?

16          A.    It was Friday last week.

17          Q.    You read it over the weekend?

18          A.    No, I didn't, as a matter fact.

19          Q.    So you have not read that through

20   today?

21          A.    Haven't what?

22          Q.    Read it since you received it?

23          A.    Yes, sir.

24          Q.    When?

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

```
                                                         29
 1          A.    Thursday and Friday.

 2          Q.    Okay.  And did you read it on your

 3    time or company's time?

 4          A.    Company time.

 5          Q.    Was it considered part of your work

 6    assignment?

 7          A.    Yes, sir.

 8          Q.    And were you paid for that time?

 9          A.    Yes, I was.

10          Q.    To prepare?

11          A.    Yes, sir.

12          Q.    Okay.  And did you tell your boss

13    that you would be doing this so you would have

14    no other duties?

15          A.    Yes.

16          Q.    Who did you tell?

17          A.    Chris Barnett.

18          Q.    And he is the store manager where

19    you work now?

20          A.    No.  He is my manager. He is

21    District Asset Protection Manager.

22          Q.    The security, SS call it, reports

23    directly on line from one SS office to the other

24    SS office; correct?
```

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

30

1          A.    Yes.

2          Q.    That is a colloquialism you have

3    heard before?

4          A.    Certainly.

5          Q.    What does that connote in your mind?

6                MS. CESARANO:  Object to relevancy.

7          Q.    Noted.  Please answer.

8          A.    What asset means to me?

9          Q.    Assets or SS.

10         A.    Assets.

11         Q.    I heard SS.  Miss Cesarano is

12    shaking her head yes.

13               MS. CESARANO:  No.  I didn't know

14    what you were talking about.  See, that is why

15    --

16         Q.    Your accent is very difficult for me

17    to perceive sometimes, sir.  I won't comment.

18    The assets group reports directly to each other

19    up the line?

20         A.    That's correct.

21         Q.    Do you know why that is done, not

22    to the store manager?  Is there a business

23    reason that you are aware of why you wouldn't

24    report to the person you theoretically work

          ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

31

1   under?

2        A.    I do report to the person I work

3   under.

4        Q.    Which is the Asset Division, but not

5   the store manager?

6        A.    Correct.

7        Q.    That is what I am asking you.  Do

8   you know why, if there is a reason that a

9   subordinate to the store manager would not

10  report to the store manager when something comes

11  to his attention and report instead to the head

12  police officer?

13       A.    I do report to the store manager.

14  My supervisor is the district security manager.

15       Q.    I am asking you do you know why your

16  supervisor is not the person you report to, if

17  there is any reason you are aware of, any

18  security reason that would cause this to be so?

19       A.    I can't answer that because the

20  question you are asking me makes no sense.

21       Q.    You have the president of the

22  company and people work below him; correct?

23       A.    Yes, sir.

24       Q.    Okay.  Most people if they work in a

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

32

1    unit report to the head of the unit in the

2    store.  You don't really have the store manager

3    as your supervisor, you have the police officer.

4         MS. CESARANO:  Object.

5         Q.   Is that not so?

6         A.   My supervisor is the district

7    security manager.

8         Q.   Yes.

9         A.   I work hand-in-hand with the store

10   manager.  I do in fact report to him on

11   situations that are occurring within his store.

12        Q.   What would you report to your

13   supervisor about that would be different from

14   the store manager?

15        A.   Investigative information.

16        Q.   Can you explain what that means to a

17   lay person?

18        A.   Investigations that are conducted

19   within the store.

20        Q.   That would be spying?

21        A.   No, not spying.

22        Q.   So then what is it that you would

23   investigate that would be inappropriate for

24   store manager to be aware of and you would

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

33

1    report to the police officer?

2              MS. CESARANO:  Object to the form.

3    He didn't use police office.

4              MR. BURTON:  He reported to the

5    police officer, yes, that was  his term five

6    questions ago.

7         Q.   The police function of your store is

8    the Director of Asset Protection, like the

9    security police; correct?

10        A.   No.  I don't recall saying that.

11        Q.   Okay.  Let's try it again, sir.

12   When I say reporting to the top police official

13   do you know what I mean?

14        A.   I am assuming you mean District

15   Security Manager.

16        Q.   Yes.

17        A.   I understand that.

18        Q.   My question to you is what kind of

19   investigation that you could be performing that

20   would be relevant to the top police officer but

21   wouldn't be important for the store manager to

22   be aware of?

23        A.   Most investigations are covered with

24   the store manager also.

         ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

34

1     Q.    How about the ones that don't get
2  covered?
3     A.    Of a confidential nature.
4     Q.    Give me an example?
5     A.    Investigations that would concern a
6  close friend of the store manager.
7     Q.    Who makes that determination?
8     A.    Which determination?
9     Q.    Whether or not a store manager
10  should be involved.
11     A.   Myself and the district security
12  manager.
13     Q.    Suppose you guessed wrong.   Who
14  would be there to intercede in case you are
15  overzealous?
16          MS. CESARANO:   Objection to form.
17          MR. BURTON:   Noted.
18     A.   It would be the District Manager.   He
19  is supervisor.
20     Q.    How would anyone find out though
21  this is occurring before the fact?
22     A.    I have no idea
23     Q.    In other words, there is no
24  mechanism to the police, is there?

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

35

```
 1          A.    I don't understand what --
 2          Q.    Is there a mechanism in place that
 3   if one of its asset protection leaders such as
 4   yourself has made a wrong choice and deleted the
 5   information from the store manager and really
 6   should have been given to him, is there any way
 7   that currently exists and that you are aware of
 8   that can be remedied before a problem?  In other
 9   words, who oversees whether or not you are
10   making the right choice?
11          A.    District Security Manager.
12          Q.    Same guy you are speaking to?
13          A.    Yes, sir.
14          Q.    So if the two of you are off in left
15   field there is no protection for civil rights;
16   is there?
17                MS. CESARANO:  Object to form.
18                MR. BURTON:  Noted.
19          A.    I don't understand.
20          Q.    Sir --
21          A.    Are you asking --
22          Q.    Sir, do you realize that you could
23   go on an investigation and you dig up something
24   on somebody they could be stigmatized?
```

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

36

1          MS. CESARANO:  Object to form.

2     Q.   Have you ever heard of that term?

3     A.   Yes.

4     Q.   What does that mean?

5     A.   False accusations.

6     Q.   Yes.

7     A.   And puts you in a bad light.

8     Q.   Right.  What mechanisms are in place

9  so that you and your district asset protection

10 manager don't stigmatize somebody so that no

11 matter what happens thereafter they are not held

12 in a bad light?

13         MS. CESARANO:  Object to form.

14    Q.   Please answer.

15    A.   A code of confidentiality.

16    Q.   Code of who?

17    A.   I don't understand.

18    Q.   Sir, it's you and him.  Is there a

19 third party in this system to look over your

20 shoulders to make sure that you are not hurting

21 somebody who is in the system already?

22    A.   I report to my supervisor.

23    Q.   And I asked are you aware of any

24 third party that watches out to make sure that

        ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

```
                                                   37
 1    the two of you don't wrongfully hurt somebody?
 2              MS. CESARANO:  Object.
 3        Q.    That you are aware of as you sit
 4    here today?  It's yes, I am, or no, I am not.
 5        A.    Team Relations.
 6        Q.    Is that a built in oversight as to
 7    your functioning as an investigator for your
 8    boss?  Yes or no?
 9              MS. CESARANO:  Objection to form.
10              MR. BURTON:  Noted.
11        A.    Repeat the question again.
12        Q.    Sir, Team Relations doesn't watch
13    your investigations on a daily basis; do they?
14        A.    No.
15        Q.    Asking you if there is any oversight
16    that is built into the system so that you and
17    your district boss don't wrongfully stigmatize
18    somebody even accidentally?
19              MS. CESARANO:  Object to the form.
20        A.    No.
21        Q.    Thank you.  Sir, you do know that
22    doing investigations becomes the subject of
23    rumor and gossip; don't you?
24              MS. CESARANO:  Object to form.
```

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

38

1          A.    No, I don't know that.

2          Q.    Okay.  So you have not heard in

3    stores that prior to your releasing what your

4    findings are there is gossip in the stores

5    regarding it?

6          A.    Occasionally.

7          Q.    You have heard of that?

8          A.    Occasionally there is gossip.

9          Q.    And since you said that

10   confidentiality is the key, obviously gossip and

11   rumors don't square with either of those; do

12   they?

13         A.    Yes, sir, they do.

14         Q.    You are saying gossip and

15   confidentiality are compatible?

16         A.    No, they are not.

17         Q.    So if there is gossip, and you have

18   known of this before, my question goes back to

19   what happens if someone is stigmatized?  How

20   would they ever clear their name?

21              MS. CESARANO:  Object to form. Go

22   ahead and answer.

23         A.    I don't have an answer to that.

24         Q.    You know of no way for that to

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

1  happen; do you?

2       A.   No, I don't.

3       Q.   Okay.  Now, sir, you said you read

4  the depositions.  Let me go back now.  Have any

5  of your asset protection district supervisors

6  ever been black?  Not in the system, that you

7  have worked under?

8       A.   No, sir.

9       Q.   Okay.  You said when you were a

10 police officer you didn't have any black

11 co-employees when you were the detective's group

12 leader; right?  You didn't have any black

13 officers?

14      A.   Not that worked directly under me in

15 that capacity.

16      Q.   Now, sir, you said you read Shannon

17 Tetrault's statement; right?

18      A.   I read a statement, yes, sir.

19      Q.   Okay.  Did you know Shannon?

20      A.   Yes, sir.

21      Q.   Do you have an opinion on her work

22 habits?

23      A.   No, sir.

24      Q.   Never came to your attention that

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

40

1  she was a slacker, that she was a whiner, or

2  that she was inefficient and virtually every

3  other employee thought that she had no business

4  in the store?

5          MS. CESARANO:  Object to the form.

6      A.   No.

7      Q.   Did you ever hear any negative

8  comments about Shannon?

9      A.   Not that I recall.

10     Q.   She is a pretty white girl?

11         MS. CESARANO:  Object to the form.

12 Go ahead and answer.

13     A.   Yes, she was.

14     Q.   Now, is the first time you had come

15 in contact with Shannon Tetrault as a result of

16 her claims regarding Mr. Harris?

17     A.   No, sir.

18     Q.   Why had you come to be familiar with

19 her before?

20     A.   In my capacity as a District

21 Operations Specialist.

22     Q.   Can you translate to English what a

23 District Operations Specialist is?

24     A.   Worked out of the district office

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

41

1   assisting the stores in operational concerns,

2   operational weaknesses.

3        Q.   Talking about security; aren't we?

4        A.   Security?

5        Q.   Yes.

6        A.   No, sir.

7        Q.   Well, let's go into that. When did

8   you become a specialist in operations as opposed

9   to security, and in what way did you learn?

10       A.   1997.

11       Q.   Okay.  So let's go back a little

12  bit.  I want to refocus you.  We were still in

13  1993 where you transferred out of Boynton Beach

14  and went to another store.  Where did you

15  go?  You said so many you didn't remember

16  the names.  Talk about places.

17       A.   Okay.  Rundown the list?

18       Q.   Sure.

19       A.   Because I don't remember the dates

20  is the only thing.

21       Q.   Fine.

22       A.   1991 went to South Florida, Boynton

23  Beach, store 644.  During that time they also --

24  company had a concept, it was called multi-store

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

42

1    assets protection manager, which meant that

2    multi-store, had more than one store.  I was in

3    charge of asset protection for the 644, and also

4    West Palm, 392.

5         Q.    Okay. You said that went through

6    approximately year and half to two?

7         A.    Somewhere like that.

8         Q.    Then what did you do?

9         A.    Then I transferred to the Coral

10   Springs store, 630.

11        Q.    This is single store, or no longer

12   multi?

13        A.    It was single store.

14        Q.    Yes.  And who did you report to?

15        A.    Doug Barth too.  Take that back.

16   Kelly Brandes.

17        Q.    Kelly Brandes?

18        A.    Yes.

19        Q.    White man?

20        A.    Yes.

21        Q.    And he was the district asset --

22        A.    Security Manager.

23        Q.    And who was the store manager at the

24   time?

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

43

1          A.    He is deceased.  I cannot recall his

2    name.

3          Q.    Okay.  How long were you at Coral

4    Springs?  More or less?

5          A.    Six months.

6          Q.    Okay.  And were you there as special

7    assignment, just general rotation?

8          A.    General rotation.

9          Q.    So then where did you then work?

10         A.    Then went to Deerfield Beach store.

11         Q.    Okay.  And that would be 1994 more

12   or less?

13         A.    And also had the Delray Beach.

14         Q.    At the same time?

15         A.    Yes.  I was back in the position of

16   multi-store asset protection manager.

17         Q.    And how long did that last?

18         A.    What year are we up to,

19   approximately?

20         Q.    '94, thereabouts.

21         A.    Probably a year.

22         Q.    To '95 for sake of argument.  What

23   did you do next?

24         A.    As I recall they disbanded the

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

44

1   theory of multi-store and I just had the Delray

2   Beach store.

3        Q.   How long did you do that?

4        A.   A year.

5        Q.   Delray Beach until '96 say; right?

6        A.   Yes.

7        Q.   What did you do then?

8        A.   I was transferred to the Hollywood,

9   Florida store.

10       Q.   That is the one on University out

11  there?

12       A.   On Hollywood Boulevard at the corner

13  of Hollywood and Park.

14       Q.   Okay.

15       A.   Right across from the Hollywood

16  Police Department.

17       Q.   Okay.  And how long were you there?

18       A.   Converted to a Home Depot if I am

19  not mistaken. Sears store.

20       Q.   Sears store.  How long were you

21  there?

22       A.   Approximately a year.

23       Q.   Okay.  All of these general

24  rotations, or are you specifically going out

```
                                                     45
 1   trying to root out some perceived wrong?
 2        A.    Some of the stores there was
 3   specific objectives.
 4        Q.    Can you give me those?
 5        A.    Delray store.
 6        Q.    What were the specific objectives at
 7   Delray?
 8        A.    High stock shortage.
 9        Q.    There was the belief there were some
10   people, insiders, stealing out the back door
11   more or less?
12        A.    Could have been.
13        Q.    Okay.  Was that the general belief,
14   or were you there to observe the persons who
15   were not observing the conduct?
16        A.    No, not exactly.
17        Q.    Please explain in your words why you
18   believe you were sent there, what you think you
19   saw or found?
20        A.    The store was having high stock
21   shortage.  Could have been related to theft or
22   operational issues.
23        Q.    What did you determine or believe
24   when you left?
```

46

1         A.    When I left?

2         Q.    Yes.   What?

3         A.    It was both.

4         Q.    Okay.   Lots of outside theft, people

5    coming in and shop lifting?

6         A.    Correct.

7         Q.    In addition to people who worked

8    there stealing merchandise themselves?

9         A.    That occurred a little, and then

10   some of the day-to-day operations, the business

11   of the store was not being conducted properly

12   which related to shortage.

13        Q.    Who was the manager?

14        A.    Bob Mouck.

15        Q.    White man?

16        A.    Yes.

17        Q.    Was he terminated?

18        A.    Was he terminated?

19        Q.    Yes.

20        A.    No, sir.

21        Q.    Does he still work for Target?

22        A.    I don't believe he does.

23        Q.    Did he work for Target after you

24   left the store?

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

```
                                                      47
 1        A.    Yes.

 2        Q.    So was there any form of

 3   disciplinary action taken against him?

 4        A.    I don't know that.

 5        Q.    Did you recommend any, sir?  Did you

 6   participate in any that you are aware of?

 7        A.    No.

 8        Q.    Okay.  So Mr. Mouck had an out of

 9   control store and in 1995 that you are sent to

10   clean up; correct?

11              MS. CESARANO:  Objection to form.

12        A.    No, sir.

13        Q.    Mr. Mouck ran a store that had

14   serious problems that you were sent in to try to

15   observe and rectify in 1995; correct?

16              MS. CESARANO:  Objection to form.

17        A.    No, sir.

18        Q.    How would you define what the

19   problems were there in 1995 in Delray?

20        A.    They had a high stock shortage rate.

21        Q.    And you were sent in with

22   the intention of trying to figure out why and

23   cure it; correct?

24        A.    That's correct.
```

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

48

1       Q.   And would you define Mr. Mouck's

2   store to be below par in that --

3       A.   No, sir.

4       Q.   Was it average?

5       A.   In what, sir?

6       Q.   In unexplained inventory loss.

7       A.   It was high.

8       Q.   Good.   Was any discipline ever taken

9   against Mr. Mouck that you are aware of?

10          MS. CESARANO:   That you are aware

11  of.

12      A.   No.

13      Q.   Okay.   Did he go to another job with

14  Target that you are aware of?

15      A.   No, sir.

16      Q.   When you left the store was he still

17  the manager?

18      A.   Yes, sir.

19      Q.   Okay.   Now, in 1995 was that the

20  only specific objective store that you were ever

21  sent to before then?  Was that the first time

22  you were sent to a store with a specific

23  function or purpose to determine a specific

24  security problem?

            ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

49

1        A.    Yes.

2        Q.    Has that occurred since then, since

3   1995, in any location?

4        A.    Yes.

5        Q.    Where?

6        A.    Delray.  Or, I am sorry, Deerfield.

7        Q.    So in '96 Hollywood just basically

8   converting to Sears in to Target and it's

9   opening; correct?

10       A.    That store had already be opened.

11       Q.    So sent in normal rotation though?

12       A.    Yes, sir.

13       Q.    How long were you there?

14       A.    Probably a year.

15       Q.    Okay.  Then what is your next

16  assignment?

17       A.    Then transferred to Boca, Boca Raton

18  638.

19       Q.    And was that normal rotation or were

20  there specific objectives?

21       A.    I had requested that store.

22       Q.    Why did you request it?

23       A.    It was closer to my home.

24       Q.    And they gave you a store closer to

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

50

1    your home?

2          A.    Yes.

3          Q.    And who are you reporting to at this

4    point? Kelly Brandes still there or Doug Barth?

5          A.    Doug Barth was there.

6          Q.    When did Doug Barth come in?

7          A.    Oh, just prior to me coming to Boca,

8    and I am not sure exactly what year that was.

9          Q.    '96-'97?

10         A.    That is fair.

11         Q.    And he is a white male?

12         A.    Yes, sir.

13         Q.    Do you know what he had done either

14   with Target or for any prior employer

15   immediately prior to that assignment?  Did he

16   ever tell you?

17         A.    I know he was with Target.  He was a

18   store asset protection manager.

19         Q.    Promoted from store to a district?

20         A.    Yes, sir.

21         Q.    Do you know where he worked prior to

22   this?  What store, what region, what part of the

23   country?

24         A.    Prior to what?

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

51

1       Q.   Being the district supervisor?

2       A.   Worked in South Florida.  He went

3  down in '91.

4       Q.   So you had known him since '91?

5       A.   Yes.

6       Q.   Did you become friends with him?

7       A.   Yes.

8       Q.   Did you go out socially with him?

9       A.   No.

10      Q.   The only functions would be Target

11 related functions?

12     A.   Yes.

13     Q.   Okay.  During that -- since you both

14 went down in '91 to get Target opened up in

15 the South Florida region or area, how many

16 people were in this group of asset protection

17 managers that had come down in 1991?

18     A.   Four.

19     Q.   What were their names? Other than

20 yourself and Barth, obviously?

21     A.   Stewart Caurette.  There was myself,

22 Doug Barth.  And I don't recall who was at the

23 Boca store.

24     Q.   It was a white male, non-Latin?

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

```
                                                52
 1          A.   Boca?
 2          Q.   Yes.
 3          A.   I don't recall who was there.
 4          Q.   Do you recall any others being
 5   black?
 6          A.   Yes. Stewart Caurette.
 7          Q.   And is he still with the company?
 8          A.   I don't know.
 9          Q.   When was the last time you heard
10   where he was?
11          A.   I don't recall, honestly don't.
12          Q.   So did he stay through that whole
13   period '91 to '96?
14          A.   No.
15          Q.   That is what I am trying to find --
16          A.   He was there for three or four years
17   and seemed like he transferred back to Georgia I
18   believe.
19          Q.   So who was there in the mid '90s,
20   '95, '96, '97?  Any black asset protection
21   managers at the stores or district level?
22               MS. CESARANO:  What year?
23          Q.   '95, '96 or '97?
24          A.   Yes.
```

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

53

1          Q.    Who was that?

2          A.    Ed Hall.

3          Q.    Where was he?

4          A.    He had worked out of the district

5    office.

6          Q.    Where is the district office?

7          A.    In West Palm Beach.

8          Q.    But he was assigned to a store?

9          A.    No, sir.

10         Q.    Were there any store or district

11   supervisors in assets that were black?

12         A.    Ed Hall.

13         Q.    What was he supposed to be doing if

14   he didn't work with a store and wasn't district?

15         A.    He was district.  He was shortage

16   specialist.

17         Q.    He was specialist in a specific area

18   but wasn't overall like team leader in a store?

19         A.    No.

20         Q.    I asked were there any black store

21   team leaders in asset protection or District

22   Managers in either Miami-Dade or Broward, Palm

23   Beach?

24         A.    Other than Stewart Caurette.

     ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

54

1          Q.    I thought he had gone by then.
2    Talking '95, '6, '7?
3          A.    Okay.
4          Q.    Until you moved back to Ohio do you
5    recall any?
6          A.    Yes.
7          Q.    That were in that area?
8          A.    Yes.
9          Q.    Can you give me the names of a black
10   store team leader in asset protection?
11         A.    Ricardo Hernandez.
12         Q.    Mr. Hernandez black or Hispanic,
13   sir?
14         A.    He was, as you say, a black
15   Hispanic.
16         Q.    Do you know if he listed himself as
17   a black person on his application?
18         A.    No, I don't.
19               MR. BURTON:   Counsel, would you get
20   me Mr. Hernandez's application?  I will make a
21   supplemental request.
22               MS. CESARANO:   You can make the
23   request.
24               MR. BURTON:   Just did.

          ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

55

1          Q.   Is Mr. Hernandez still with the

2    company in the south Florida area?

3          A.   I don't know.

4          Q.   When was the last time you recall

5    having a meeting or discussion with him about

6    anything?

7          A.   '97

8          Q.   Okay.  And where did he work out of?

9          A.   He was in the Kendall store.

10         Q.   He was in Dade County?

11         A.   Yes.

12         Q.   Outside Broward County in your

13   region any black asset team leaders, anyone

14   working for Doug Barth who would have been a

15   team leader was black and put black on their

16   application for the purpose of your goals?

17              MS. CESARANO:  Object to the form.

18   He doesn't know what --

19              MR. BURTON:  Well, he does.  Come

20   on.

21              MS. CESARANO:  On the application?

22   No, he doesn't.

23         Q.   Sir, do you know anyone who was

24   considered a black person as a police officer?

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

56

1  Sir, do you know anyone who was a black person
2  who worked under Doug Barth who was a team
3  leader?
4       A.  Ed Hall.
5       Q.  Ed Hall.  Didn't you just say he
6  wasn't in the store?
7       A.  He went back into the store.
8       Q.  When?
9       A.  I don't recall.
10      Q.  While you were there?
11      A.  Yes.
12      Q.  And so Ed Hall was a person.  Was he
13  there for a specific purpose?  In other words,
14  to root out --
15      A.  No.
16      Q.  Just general rotation?
17      A.  Yes.
18      Q.  Now, sir, most respectfully, in that
19  division at the time were there any black team
20  leaders store manager?
21      A.  That is what I am trying to recall.
22      Q.  As store managers?
23      A.  Yes.
24      Q.  Yes. Wasn't there a black woman who

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

57

1  was transferred?

2         A.   A guy who worked for

3  the Hollywood --

4         Q.   You don't remember the person who

5  worked for Hollywood's name?

6         A.   I do.   I can't think of it right off

7  the top of my head.

8         Q.   That is only 1996, sir.

9         A.   Wilburt Merriwether.

10         Q.   Is he still with the company?   Do

11  you know if he still is at that store?

12         A.   No.   Transferred to Alabama, I

13  think.

14         Q.   So one guy transfers to Georgia, one

15  guy transfers to Alabama.   Do you know if any

16  stayed there?

17         A.   Stayed where?

18         Q.   In South Florida. You told me

19  the last guy transferred back to Atlanta, and

20  this guy transferred to Alabama.   Were there any

21  that stayed in that district in Broward or Palm

22  Beach County?

23         A.   No.

24              MR. BURTON:   With that let's take a

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

58

1    break for personal needs.

2              (Recess Taken)

3         Q.    Continuing your career, you said

4    you went to Boca in '97 because it was closer to

5    your home.  That was a normal assignment.  We

6    then talked about Deerfield, which you said you

7    were sent back for a special purpose.  What was

8    the special purpose regarding Deerfield?

9         A.    After the Boca store?

10        Q.    Yes.

11        A.    When went to district office.

12        Q.    District office?

13        A.    Yes.

14        Q.    What did you do at the district

15   office?

16        A.    I was a shortage reduction

17   specialist.

18        Q.    Did you replace Ed Hall?

19        A.    No.

20        Q.    Did you work together with Ed Hall?

21        A.    No.  Ed Hall had been promoted and

22   was in Tampa at that time.

23        Q.    So wasn't there either, wasn't a

24   black man at that time either, then asked if

              ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

59

1    there was a black man at that time in '96-'97,

2    you said yes, Ed Hall.

3            A.    Ed was there in '96-'97 when in Boca,

4    which should be beyond --

5            Q.    No.  Not there yet, just '97, and

6    said Ed left the year before.  So trying to get

7    my dates straight.

8            A.    Really not sure on that.

9            Q.    So you went to Boca you said in '97,

10    would be probably closer to '96 because left by

11    '99?

12            A.    Yes.

13            Q.    Let's work backwards.  I don't care.

14            A.    Probably closer to '96.

15            Q.    Okay.  So push everything back a

16    little bit in time.

17            A.    That is fine.

18            Q.    So all of these people who, like

19    Wilbur, we have left in '95, he had gone to

20    Alabama instead of '97?

21            MS. CESARANO:    If you know.  Don't

22    guess.

23            Q.    Best of your recollection.

24            A.    I am not clear on the time line.

60

1          Q.    Well, before Boca you were in

2     Hollywood; correct?

3          A.    Yes, sir.

4          Q.    And '96 was Boca, then '95 was

5     Hollywood and '93 is Deerfield Beach and Delray.

6     Would that be about right?

7          A.    To the best of my recollection.

8          Q.    Okay.  So now that is, yes, best of

9     my recollection.  Yes, to the best of my

10    recollection you said?

11         A.    To the best of my recollection.

12         Q.    Okay.  So now we are in '96 to '97

13    and transferred to the district office;

14    correct?

15         A.    Approximately '97.

16         Q.    Okay.  '97.  Mr. Ed Hall has

17    the year before gone to Tampa and are there any

18    blacks in Doug Barth's whole operation at that

19    time?

20         A.    Not that I recall at that time.

21         Q.    Okay.  Until the time you left,

22    correct, between '97 and '98 there were no

23    blacks in Doug Barth's operation, correct, as

24    team leaders, or the equivalent?

          ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

61

| | | |
|---|---|---|
| 1 | A. | Yes, there was. |
| 2 | Q. | Who? |
| 3 | A. | Effie, last name was Johnston, I |

4  believe.

| 5 | Q. | Where was Effie team leader? |
|---|---|---|
| 6 | A. | 644, Boynton Beach. |
| 7 | Q. | And just been hired? |
| 8 | A. | Yes. |
| 9 | Q. | That was just '99, you were leaving? |
| 10 | A. | No.  She was there when I was at |

11  the Boca store because I trained her.

| 12 | Q. | Trained her at Boca in '95, '96 you |
|---|---|---|

13  said?

| 14 | A. | That is what -- |
|---|---|---|
| 15 | Q. | So how long did she stay there? |
| 16 | A. | Stayed -- |
| 17 | Q. | With Target in the Broward County |

18  area?

| 19 | A. | She is still there to the best of |
|---|---|---|

20  my --

| 21 | Q. | Is she team leader? |
|---|---|---|
| 22 | A. | Yes. |
| 23 | Q. | Okay.  Now, Effie Johnston was |

24  Boynton; correct?

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

                                            62
1          A.    Yes.
2          Q.    All right.  She is the only black
3    person, female person, during those years as
4    team leader?
5          A.    In asset protection.
6          Q.    Yes.
7          A.    I believe so.
8          Q.    Then '97 transferred to district
9    office with Mr. Barth and specializing in what?
10         A.    Shortage.
11         Q.    Is shortage a generic term for
12   inventory, unexplained inventory loss?
13         A.    Yes.
14         Q.    And in that capacity what are your
15   functions or duties?
16         A.    I went to the stores, had 10 stores,
17   I went to the stores, performed various audits
18   in different operational areas of the store to
19   determine whether or not they were operating
20   properly.  I then go back with those people and
21   teaching and training.
22         Q.    As a result of your work in shortage
23   was anyone disciplined or terminated that you
24   are aware of, or that you remember?

          ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

```
                                              63
 1          A.   Not that I remember.
 2          Q.   Okay.  How long were you in shortage
 3   with the district office?
 4          A.   Think for about a year.
 5          Q.   Okay.  Then said assigned to
 6   Deerfield?
 7          A.   Yes.
 8          Q.   That in '98, thereabouts?
 9          A.   Yes.
10          Q.   Who did you replace?
11          A.   Who did I replace there.  Johnny
12   Kianka.
13          Q.   And did Mr. Kianka stay with the
14   company?
15          A.   Yes.
16          Q.   Where was he transferred to?
17          A.   I think went to Delray.
18          Q.   So going to Deerfield, what were
19   your marching orders or instructions?
20          A.   Marching orders?
21          Q.   You said you were sent there for
22   special purposes earlier.
23          A.   They had high stock shortage.
24          Q.   Okay.  Okay.  Anything else?
```

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

64

1          A.    No, sir.

2          Q.    Okay.  Now, at the time that this

3     occurred, this is prior to Mr. Harris coming;

4     correct?

5          A.    At the time what occurred?

6          Q.    When you went there was Harris

7     there?

8          A.    Yes, he was.

9          Q.    How long had he been there?

10          A.    I don't recall that.

11          Q.    Hadn't he just transferred from

12     another store, or almost immediately just

13     transferred in there?

14          A.    I don't recall.  I know talking

15     about transferring there, but I don't recall

16     when he transferred there.

17          Q.    You don't know whether the stock

18     shortage was while he was in charge or whether

19     someone else was in charge?

20          A.    No, sir.

21          Q.    Okay.  But at the time you get there

22     Mr. Harris is the store manager?

23          A.    That's correct.

24          Q.    Okay.  Been store manager prior to

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

```
                                                          65
 1   that assignment anywhere else that you are aware
 2   of?
 3        A.    I don't believe so.
 4        Q.    Did anybody give you any information
 5   regarding Mr. Harris?
 6        A.    No.
 7        Q.    Okay.  Now, you said you had spoken
 8   to Shannon Tetrault before she was in that
 9   store.  Can you tell me the story about --
10        A.    Before she was in the store?
11        Q.    Yes.
12        A.    No, before I was in the store.
13        Q.    Why did you speak with Shannon
14   Tetrault before you were in the store?
15        A.    My position as shortage specialist
16   out of the district office, again went and did
17   audits in all the different areas of the stores.
18   One of the areas I would have audited would have
19   been hers.
20        Q.    She was cashier?
21        A.    She was cashier, she was considered
22   I guess service team leader which --
23        Q.    Which --
24        A.    Customer Service Manager.
```

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

66

1          Q.   Okay.  She ran a cash register up
2     there; did she not?  In other words, one of her
3     functions as customer service was refunds; am I
4     correct?
5          A.   Yes.
6          Q.   Okay.  Opens the drawer, out goes
7     money or in comes money; correct?
8          A.   Yes.
9          Q.   So that is why you would have been
10    concerned because she was overseeing an area
11    that was a revenue receiving --
12               MS. CESARANO:  Objection to the
13    form.
14         A.   She was in charge of the entire front
15    end, the sales locations, point of sale
16    location, and also the refund center.
17         Q.   She was in charge of all of the
18    registers?
19         A.   Yes, sir.
20         Q.   That is what I was trying to say.
21         A.   I didn't understand what you said.
22         Q.   Okay.  She was in charge of all
23    the registers?
24         A.   Yes, sir.

     ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

67

1          Q.    Which store?

2          A.    Deerfield.

3          Q.    Same one that was having the high

4    shortages?

5          A.    Yes, sir.

6          Q.    Had you as shortage specialist at

7    the store.  You actually saw her as --

8          A.    I went to that store while I was in

9    the shortage specialist capacity.

10         Q.    Had you seen her before or after

11   meeting Mr. Harris?

12         A.    I don't recall that.

13         Q.    So when you went to that store when

14   she was the head of all the cash registers they

15   had been reporting a high stock shortage

16   problem; correct?

17         A.    Yes.

18         Q.    And she was the team leader

19   affiliated with at least the front end of

20   the store, as you phrase it, which means cash

21   registers and the customer service functions?

22         A.    That is correct.

23         Q.    Okay.  Do you know how long she had

24   been an employee of Target?

          ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

68

```
 1          A.   No.  I don't
 2          Q.   Do you know what training, if any,
 3    she had ever received?
 4          A.   No, I don't.
 5          Q.   Now, as a result of meeting with her
 6    did you determine that any of her functions were
 7    proper or improper?  Come to any conclusions
 8    regarding Shannon Tetrault?
 9          A.   I did training with Shannon.
10          Q.   How many times did you train
11    Shannon?
12          A.   One that I recall.
13          Q.   Okay.  What was the result of your
14    training with Shannon?
15          A.   Hopefully be a better understanding
16    of her responsibilities.
17          Q.   Did their losses go down?
18          A.   Did what?
19          Q.   Losses go down?
20               MS. CESARANO:  Objection.
21          Q.   After you trained her?  That you
22    recall?
23          A.   Can't answer that.
24          Q.   You don't recall?
```

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

69

1          A.    Can't answer it.

2          Q.    Why?

3          A.    For inventory one year, talking

4     about a high stock shortage which is determined

5     once a year.

6          Q.    Sir, I guess I mean you didn't do

7     any follow up on her training?

8          A.    Yes, I did.

9          Q.    Did you determine whether or not her

10    losses ever went down?

11              MS. CESARANO:  Objection to form.

12         A.    Can't answer that question. Talking

13    two different things.

14         Q.    Sir, in fact you were later

15    transferred into that store and would be

16    responsible for finding out whether the losses

17    went down, weren't you, in that same store?

18         A.    What losses are you talking about?

19         Q.    The shortages. You were then

20    transferred into the Deerfield store because

21    shortages had not gone down after training her;

22    correct?

23              MS. CESARANO:  Objection to form.

24         A.    Again you are talking two different

          ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

70

1    things.  You are not talking the same as I am

2    talking.

3         Q.    Sir, can you answer the question?

4    If you can't answer it I will rephrase it.

5         A.    No, can't answer.

6         Q.    Fine.  Sir, you initially went there

7    to train Shannon Tetrault because they had a

8    high stock shortage problem; correct?

9         A.    No, sir, not correct.

10        Q.    Were you aware that they had a high

11   stock shortage problem and you trained Shannon

12   at the time?

13        A.    Yes.

14        Q.    Okay.  After that training at some

15   subsequent point within the next year you were

16   assigned to that store as the asset protection

17   team leader; correct?

18        A.    Yes.

19        Q.    During that period had there been

20   any improvement in the high stock storage?

21        A.    Yes, there was.

22        Q.    Did you determine in your own mind

23   what portion of the store improved?  Whether it

24   was the shop lifting portion of it, or was the

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

71

1    front services portion, or other people stealing

2    out the back?  Did you come to any conclusion as

3    what made it improve?

4         A.    Two sources I attribute it to.

5         Q.    Go ahead.

6         A.    Front end and receiving.

7         Q.    Okay.  Front end was one that she

8    was the I guess team leader; correct?

9         A.    Yes.

10        Q.    Before you go there physically had

11   it improved, or when you got there, after you

12   got there did it improve?

13             MS. CESARANO:  Objection to form.

14        Q.    Do you understand the question?

15        A.    No.

16        Q.    When you walked through the door

17   the first day there had things improved in

18   the front?

19        A.    Some.

20        Q.    Haven't improved completely?

21             MS. CESARANO:  Objection to form.

22        Q.    Didn't get to the maximum level of

23   improvement by the time you left; did it?

24        A.    By the time I left?

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

72

1          Q.   Yes, because you left Deerfield at
2     one point; didn't you?
3          A.   Yes.
4          Q.   Okay.  Sir, you got to the store
5     approximately at some period of time after you
6     trained Shannon Tetrault; correct?
7          A.   Yes.
8          Q.   And you said it improved some
9     between the time you trained her and time of
10    going to the store; correct?
11         A.   Yes.
12         Q.   Okay.  By the time you left
13    the store at some point and went to Deerfield
14    had it recovered further?
15         A.   Yes.
16         Q.   So there was some need of correction
17    to do while you were at the store, still hadn't
18    improved to the optimal or best condition while
19    Shannon was in charge; correct?
20              MS. CESARANO:  Objection to form.
21    Go ahead and answer if you can.
22         A.   You are referring to once I left,
23    when I left that store?
24         Q.   Yes.

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

73

1          A.    Come back up to Ohio?

2          Q.    When you left the store was it

3     better?

4          A.    Yes, it was better.

5          Q.    Thank you.    That wasn't a tough

6     question; was it?

7               MS. CESARANO:    He already said that.

8          Q.    I didn't hear you say that, sir.    I

9     am trying to talk English.    Please try and

10    follow me.    Are you aware that Shannon at the

11    time had a race problem?

12              MS. CESARANO:    Objection to form.

13         A.    No.

14         Q.    You don't know of a problem with

15    Betty Gaston?

16              MS. CESARANO: Objection.

17         A.    No.

18         Q.    All right.    Had you ever heard about

19    a problem with Betty Gaston?

20         A.    No.

21         Q.    What about Gary Barker?    Do you know

22    that she had a problem with Gary Barker?

23         A.    No, I don't.

24         Q.    So nobody told you that she had a

          ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

74

1    race problem?

2         A.   No, sir.

3         Q.   Now, when Mr. Kianka was there --

4    they had these problems before Mr. Harris;

5    correct?

6         A.   What about Harris?

7         Q.   Before Mr. Harris and Kianka was

8    there they had high stock shortage problems?

9         A.   Yes.

10        Q.   Okay.  What disciplinary action was

11   taken again him?

12        A.   Against who?

13        Q.   Mr. Kianka and --

14        A.   I have no idea.

15        Q.   Okay.  There was like a room where

16   employees might take breaks?

17        A.   Yes, sir.

18        Q.   Do you know if they had any pictures

19   of characters or carton people on it?

20        A.   Yes, sir.

21        Q.   Do you remember one of them was

22   black?

23        A.   Yes.

24        Q.   Why was that black person removed

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

75

1    after Mr. Harris left?

2              MS. CESARANO:   Objection to form.

3         A.   I don't know.

4         Q.   Sir --

5         A.   I have no idea.

6         Q.   Do you know who removed the black

7    person's picture?

8         A.   No, sir, I don't.

9         Q.   Are you aware that Ms. Tetrault --

10   were you, sir, told by a number of people that

11   Ms. Tetrault was a trouble maker; weren't you?

12        A.   No, sir.

13        Q.   So Lisa LeFue -- do you know who

14   Lisa LeFue is?

15        A.   Yes, sir.

16        Q.   Who was Lisa LeFue?

17        A.   She was a girlfriend of one of my

18   employees.

19        Q.   Is she a person you interviewed

20   prior to performing your investigation of Mr.

21   Harris?

22        A.   No, sir.

23        Q.   Didn't interview her boyfriend?

24        A.   No, sir.

     ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

76

1          Q.    Okay. To the best of your knowledge
2    did you take a statement from either of them?
3          A.    Not that I am aware of.
4          Q.    Okay.   Caryn Knapp, do you know who
5    she is?
6          A.    Caryn Knapp I knew was a cashier
7    supervisor.
8          Q.    She worked under Shannon?
9          A.    Yes.
10          Q.    Never heard she had a problem with
11    Shannon?
12          A.    No.
13          Q.    That Shannon was always trying to
14    get out of doing work, and never heard about any
15    of that?
16          A.    No, sir.
17          Q.    At the time that you were the asset
18    protection manager?
19          A.    No, sir.
20          Q.    So if any of that occurred it
21    occurred without your knowledge; correct?
22          A.    Yes.
23          Q.    Are you aware that she also had
24    similar situations that she reported to

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

77

1    Mr. Harris a number of times?

2        A.    She --

3        Q.    Miss Knapp reported.

4        A.    No.

5              MS. CESARANO:  Objection to form.

6        Q.    Now, there were many voucher book

7    errors, that was a problem that also occurred?

8    Ms. Knapp, did she talk to you about that?

9        A.    No.

10       Q.    Never heard anything about that.

11   Are you aware Ms. Knapp told you and told other

12   people that what Mr. Harris was doing was

13   following up yellow voucher copies?

14       A.    No, sir.

15       Q.    Didn't she specifically say these

16   words, "Mr. Harris gave me everything out of his

17   pocket"?  Did she say those words?  Did you have

18   that conversation with her?

19             MS. CESARANO: Object to form.

20       Q.    You yourself?

21       A.    Not that I recall.

22       Q.    Okay.  Didn't she tell you she was

23   involved in the money that was taken out of his

24   pocket for dinner?

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

78

1          A.    Okay.  Yes.

2          Q.    Do you remember that, sir?

3          A.    Yes.

4          Q.    She supposedly was the person who he

5     turned the money into?

6          A.    Yes, sir.

7          Q.    What do you remember about the

8     discussion you had with her when you were

9     investigating it, if anything?

10         A.    Honestly, I don't recall

11    interviewing her, talking to her.

12         Q.    You have no recollection of doing

13    that as you sit here today?

14         A.    That is correct.  I have no

15    recollection of it, speaking with her.

16         Q.    What other purpose or function did

17    she purport to perform as related to Mr. Harris?

18    Do you know if she was involved as a witness in

19    any other capacity, any other transaction?

20         A.    I have no idea.

21         Q.    As you sit here you know of none?

22         A.    No.

23         Q.    Okay.  Sir, after Mr. Harris was

24    suspended before action was taken against his

          ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

79

1   job are you aware that it was rampant that you
2   had accused him of sexually harassing Shannon
3   Tetrault in the store?
4        A.   I am aware of that?
5        Q.   Yes.
6        A.   No.
7        Q.   Didn't hear there was rumors,
8   gossip?
9        A.   No.
10       Q.   So the first time you ever heard
11  that was today?
12       A.   Yes.
13       Q.   There were rumors in that store that
14  Harris was accused of sexually harassing people?
15       A.   Never heard that.
16       Q.   Not with Shannon? Heard that with
17  the other people?  With Steve?
18       A.   No.
19       Q.   Okay.  So no rumors to the best of
20  your knowledge in that store after he was put on
21  leave?
22            MS. CESARANO:  Objection to form.
23       Q.   Sir --
24       A.   No.

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

80

1          Q.    Do you understand the question?

2          A.    Yes.

3          Q.    Okay.   Were there rumors that

4    Mr. Harris ever harassed anyone in the store?

5                MS. CESARANO:   Objection to form.

6          Q.    That you are aware of?

7          A.    I recall an incident, but I don't

8    know any specifics about it, that there was some

9    type of harassment, I believe he was at the 391

10   West Palm Beach store.

11         Q.    What supposedly happened there?

12         A.    I have no idea, sir.

13         Q.    You don't recall having reviewed any

14   of those documents prior to taking action

15   against Mr. Harris as you sit here today?

16         A.    No, sir, I do not.

17         Q.    Okay. Sir, you used to walk Steve

18   back to his car at the end of the day; didn't

19   you?

20         A.    I am sorry.

21         Q.    Ever walk Steve back to his car when

22   he left the store?

23         A.    Steve Harris?

24         Q.    Yes.

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

81

```
 1          A.    To his car?

 2          Q.    Yes.

 3          A.    Occasionally, sir.

 4          Q.    What was he driving?

 5          A.    His Viper.  And sometimes he drove I

 6   believe it was his wife's car.  It was a

 7   Lincoln.

 8          Q.    What race is his wife?

 9          A.    Caucasian.

10          Q.    That is the same as white?

11          A.    Yes, sir.

12          Q.    Now, do you remember ever speaking

13   with Steve about how he acquired a Viper?

14          A.    No.

15          Q.    Have you ever commented to him about

16   his Viper?

17          A.    We discussed his Viper.

18          Q.    Tell me what you discussed, what you

19   said.

20          A.    What year it was, how fast it went,

21   number of cylinders, how it drove, how it

22   handled.  Typical conversation.

23          Q.    How many other employees that you

24   discussed those same questions with about their
```

82

1    cars that you can recall as you sit here

2    today?  Can you name one?

3          A.    There was one, Robin Johnson.

4          Q.    What kind of car?

5          A.    She had a 5 liter Mustang.

6          Q.    So exotic?

7          A.    High performance exotic.

8          Q.    Do you remember if Steve had any

9    other motor vehicles?

10         A.    He had a boat.

11         Q.    How do you know that?

12         A.    He had talked to me about it.

13         Q.    What kind of boat?  Do you remember?

14         A.    I don't recall what it was.  It was

15   either a cabin cruiser or had a cuddy cabin.  I

16   don't recall right off.

17         Q.    How many conversations did you have

18   about the boat? More than one?

19         A.    Probably two, maybe three.

20         Q.    How many other conversations do you

21   recall with any other specific employee about

22   what boats they had?

23         A.    I don't know anybody else that had a

24   boat other than Ron Rappy, he had a small boat.

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

```
                                                        83
 1              Q.    What led you to believe this was a
 2     bigger boat?  A cuddy cabin is a pretty big
 3     boat?
 4              A.    Rappy maybe.
 5              Q.    Sir, most respectfully, as a man in
 6     security weren't you curious how he could afford
 7     a Lincoln and boat with cuddy cabin, and Viper?
 8              A.    Was I curious about it?
 9              Q.    Yes.
10              A.    No.
11              Q.    Do you recall asking him how a
12     Target employee could do that and be honest,
13     sir?
14              A.    No.
15              Q.    More than once, sir?
16              A.    More than once?
17              Q.    Asking him more than once, more than
18     one time?
19              A.    No, sir.
20              Q.    So you never had that conversation
21     with him?
22              A.    No, sir, I did not.
23              Q.    You don't recall anything about how
24     a black man could afford a Viper and boat?
```

84

1         A.    No, sir.

2         Q.    I see.   Why did it take so long to

3    look into the Evan party voucher shortage

4    question?

5         A.    How long did it take?

6         Q.    How long do you remember it taking?

7    You are the security guy.

8         A.    Three days.

9         Q.    I see.   And in three days what did

10   you do?   What do you remember doing regarding

11   it?

12        A.    What I remember doing regarding

13   the voucher?

14        Q.    Yes.   To investigate it.   You said

15   three days.   What did you do?

16        A.    We went to dinner.

17        Q.    Who was with you?   Do you remember?

18        A.    Yes, sir.   There was myself, Steve

19   Harris, Evan Feldman, Shannon Tetrault.   I think

20   that was it.   I think only four of us showed up.

21        Q.    And nothing improper about taking

22   people to dinner when Mr. Feldman was going to

23   leave, was it?

24        A.    No.

85

1          Q.    And tell me the sequence that you

2     recall.

3          A.    Sequence of --

4          Q.    That going to dinner and your

5     investigation.

6          A.    Well, number one, there was no

7     investigation.

8          Q.    Tell me the sequence of going to

9     dinner.

10         A.    Evan Feldman turned in his notice

11    that he was leaving the company.  Steve Harris

12    made arrangements for someone to, another

13    executive, to cover the store so the entire

14    staff could go to dinner.  Natelle McKenna who

15    was executive from another store came down to

16    manage the store while we went to dinner.

17              Steve had Natelle to write a voucher

18    to pay for the dinner.  I signed off on the

19    voucher.  She rang the voucher up at the service

20    desk, put the money in an envelope, and handed

21    it to me.  I in turn handed it to Steve Harris.

22         Q.    Okay.  And what then after dinner

23    happened?

24         A.    Went to dinner.

86

1          Q.   Where?

2          A.   Shooters on the intercostal.

3          Q.   Did you pay for your own dinner?

4          A.   No, sir.

5          Q.   Who paid for it?

6          A.   Steve.

7          Q.   Okay.  Then what happened?  Anyone

8     drinking?

9          A.   Yes.

10         Q.   You?

11         A.   Yes.

12         Q.   What did you drink?

13         A.   I had two beers.  I don't recall

14    what it was.

15         Q.   Anyone have more than two beers?

16         A.   I don't know.  I got there after

17    some people was already there.

18         Q.   Okay.  So you don't know if -- there

19    is not a prohibition about people drinking at

20    these kind of parties; is there?

21         A.   Prohibition?

22         Q.   Does Target discourage or encourage

23    or not have any opinion as whether or not

24    employees can have a party and serve liquor that

          ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

87

1   is paid for by the company?

2         A.    They don't encourage it.

3         Q.    Is it in fact prohibited in the rule

4   book for security purposes?

5         A.    No.

6         Q.    So they don't encourage it.  How is

7   it registered that it is not encouraged?

8         A.    How is it registered?

9         Q.    Is it part of the rule book that

10  says that we discourage the company from buying

11  alcohol for employees because they can get into

12  accidents and could be sued?

13        A.    I know that is true, but I don't

14  know where it's documented.

15        Q.    But that is a policy; isn't it?

16              MS. CESARANO:  If you know.

17        A.    I don't know.

18        Q.    You don't know that is a policy as

19  Security Director?

20        A.    It's not a security policy.  I don't

21  know.

22        Q.    Never been a store policy?  You said

23  it was and you don't know.  Which is it?

24        A.    I don't know it to be policy.

            ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

88

1          Q.    Is it something that is discouraged

2    by the company?

3          A.    Yes.

4          Q.    Where have you heard it mentioned

5    that it was discouraged by the company?

6          A.    At various meetings I have attended.

7          Q.    How many times have you heard it

8    discouraged?

9          A.    Probably three or four.

10         Q.    Okay.  And you yourself violated it

11   that night; didn't you?

12              MS. CESARANO:  Objection to form.

13         Q.    Go ahead.

14         A.    Can't answer that because I don't

15   know what I violated.

16         Q.    You were drinking on company money

17   at a company function; weren't you?

18         A.    Yes.

19         Q.    That is a violation of what you

20   understood was discouraged by the company;

21   correct?

22              MS. CESARANO:  Objection to form.

23         A.    Okay.

24         Q.    Sir, how many times before that did

              ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

89

1    you at a company function while the company

2    discouraged that buy liquor for people or beer

3    or wine?

4         A.    How many?

5         Q.    Yes.

6         A.    I have no idea.

7         Q.    More than five?

8         A.    Yes.

9         Q.    Okay.  Doug Barth ever do this?

10   Ever see him drink?

11        A.    Did I ever see him drink?

12        Q.    Yes, at a place with him when he was

13   drinking?

14        A.    Yes.

15        Q.    Okay.  Now, Mr. Harris certainly was

16   drinking.  You didn't tell him not to, and you

17   are the police officer.

18             MS. CESARANO:  Objection to form.

19        Q.    Did you tell him not to?

20        A.    No, sir.

21        Q.    Telling anyone else not to?

22        A.    No.

23        Q.    Okay.  So people were doing whatever

24   they felt comfortable with; correct?

             ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

90

```
 1        A.    Yes.
 2        Q.    And you as security chief didn't do
 3   anything to discourage it; correct?
 4        A.    Correct.
 5        Q.    And do you know how many drinks Mr.
 6   Harris may have had?
 7        A.    No, I have no idea.
 8        Q.    But you came after he was already
 9   there?
10        A.    Yes, sir.
11        Q.    And when did this evening end?
12   Early, late?
13        A.    What is late?
14        Q.    You tell me.
15        A.    7, 8, something like that.
16        Q.    Everyone go back to work?
17        A.    Did I?
18        Q.    Did anyone go back to work?
19        A.    Not to my knowledge.
20        Q.    Okay.  So when was the next time
21   that Mr. -- was it your understanding he paid
22   cash for the check?
23        A.    Yes, sir.
24        Q.    Did he have a company credit card?
```

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

91

1          A.    Yes, sir.

2          Q.    Do you know why he paid cash for the

3     check?

4          A.    He took the money to pay cash.    I

5     mean, all I know.

6          Q.    That was nothing unusual; was

7     it?  People often would take cash out for store

8     things?

9          A.    Yes.

10          Q.    And then when was the next time you

11     heard about it?

12          A.    That I heard about what, sir?

13          Q.    Next time you heard about this

14     incident regarding that receipt and repayment of

15     the money that was not used, anything to do with

16     that particular party?

17          A.    As I recall I believe it was

18     the following day.

19          Q.    What did you hear?

20          A.    Or Monday.

21          Q.    What did you hear?

22          A.    We were closing out the calendar

23     month and I was checking to make sure that the

24     account was going to be closed properly.

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

92

1          Q.    Okay.

2          A.    I checked the voucher book to make

3     sure we didn't have any outstanding vouchers.

4          Q.    And?

5          A.    And saw where that one had been

6     reran.

7          Q.    Okay.  That normal?

8          A.    Yes, sir.

9          Q.    So reran means closing it out?

10         A.    Yes, sir.

11         Q.    And what, if anything, did you

12    notice?

13         A.    That $500 was removed, $205 was

14    returned.

15         Q.    You noticed the amount of the check?

16         A.    Yes.

17         Q.    What, if anything, did you do?  Did

18    you go to anyone, talk to them?

19         A.    Yes.  Talked to Doug Barth.

20         Q.    Why were you not talking to Harris?

21         A.    Because I reported to Doug Barth.

22         Q.    You were telling me you report to

23    the store manager unless you are investigating

24    him; right?

          ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

93

1          A.    That would be a fair assumption.

2          Q.    Were you already investigating Steve

3     Harris?

4          A.    No.

5          Q.    You knew of nothing that Steve had

6     done to warrant an investigation; did you?

7          A.    No.

8          Q.    So why not talk to Steve Harris?

9          A.    Because it involved him and my

10    responsibility to report to my District Manager.

11         Q.    So you already made

12    the determination there may be impropriety in

13    your mind; correct?

14         A.    Yes.

15         Q.    Okay.  And what police skills did

16    you draw on to determine that as opposed to

17    error?

18         A.    Ask me again now.

19         Q.    I will restate it, sir.  What police

20    skills did you draw upon as to conclude it was

21    impropriety as opposed to error on a person with

22    whom you worked, never had any prior problems?

23             MS. CESARANO:  Objection to form.

24         A.    Maybe a problem with math.

          ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

94

1          Q.   I see.  Have you ever given wrong
2     change or anything in your life?
3          A.   I am sure I have.  I am sure I have,
4     sir.
5          Q.   Did you do it to steal?
6          A.   Did I ever give wrong change?
7          Q.   Yes.  Did you ever make any math
8     error.  You said yes.  Now the question is did
9     you do it to steal?
10          A.   No.
11          Q.   Sir, have there not been other
12     persons who have given wrong change on a payout
13     before with the company that you are aware of?
14          A.   No, not that I am aware of.
15          Q.   I see.  Are you aware that in your
16     books yellow copies aren't even attached for
17     payouts while you were in charge of security
18     there?
19          A.   In my books --
20          Q.   Yellow copy, cash receipts journals
21     there is supposed to have a receipt attached
22     explaining why money was spent; correct?
23          A.   Yes.
24          Q.   Was that yes or no?

          ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

95

1          A.    Yes.

2          Q.    Okay.  Sir, are you aware that in a

3    number of those entries during the time that you

4    were an asset protection leader they do not have

5    receipts attached or explanation?

6          A.    No, sir, I am not.

7          Q.    Was is part of your responsibility

8    to make sure that procedure was followed?

9                MS. CESARANO:  Objection to form.

10         A.    No, sir.

11         Q.    Whose responsibility was it?

12         A.    The customer service manager.

13         Q.    At the time?

14         A.    Yes.

15         Q.    Did you ever talk to her about not

16   observing that duty?  Do you recall if you had

17   to talk to her because you noted they weren't

18   attached to close it out properly?

19         A.    No, sir.

20         Q.    Sir, did you ever mention it to

21   Mr. Harris?

22         A.    Mention what?

23         Q.    Until the time that there was

24   charges brought, investigation was formal, did

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

96

1 | you ever go to Harris and say Steve, what the
2 | hell happened with the money?
3 |     A.   No, I did not.
4 |     Q.   I see.  Were you aware at the time
5 | that Steve had previously had some problem with
6 | the Target credit card?
7 |     A.   No, sir.
8 |     Q.   Ever heard of that?
9 |     A.   No, sir.
10 |     MS. CESARANO:  At the time?
11 |     Q.   Heard it since?
12 |     A.   Yes.
13 |     Q.   Who told you?
14 |     A.   It was part of the investigation
15 | that was done subsequent to everything that
16 | happened, or what happened.
17 |     Q.   You were involved in that
18 | investigation, weren't you?
19 |     A.   To a degree.
20 |     Q.   So at this point to the best of your
21 | knowledge you tell Doug Barth there is a
22 | possible infraction or violation occurring
23 | involving Mr. Harris; is that correct?
24 |     A.   Yes, sir.

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

Q. What else did you tell him?
A. That was all.
Q. What did he instruct you to do?
A. I don't recall what instructions he gave me.
Q. What did you do?
A. I don't have any knowledge.
Q. Did you do anything else regarding it?
A. Did I?
Q. Yes.
A. At Doug Barth's instructions to take statements from various people.
Q. Do you remember who you took them from? I asked earlier about Knapp. You said you don't recall speaking with her; correct?
A. No.
Q. Okay. So who else are we talking about?
A. I think I took a statement from Shannon.
Q. Shannon, why take one from Shannon?
A. Involving --
Q. What could she conceivably know

98

1   about what money was taken and what was put back

2   other than the fact that she was a pretty person

3   physically?

4           A.    There was an issue with a voucher

5   prior to the $500 voucher.

6           Q.    With Harris?

7           A.    Yes.

8           Q.    What voucher was that?

9           A.    It was a $300 voucher for breakfast.

10          Q.    So when did you discover that?

11  Before or after?

12          A.    After.

13          Q.    Who told you about it?

14          MS. CESARANO:    When you say before

15  or after --

16          Q.    After the Evan party, correct, after

17  you spoke to Barth; correct?

18          A.    No.    Shannon had mentioned that to

19  me before.

20          Q.    I see.    So when did Shannon mention

21  this to you?

22          A.    I have no idea when.

23          Q.    What did she say before this?

24          A.    There was an outstanding voucher

        ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

99

1    that she was waiting on Steve to give her the

2    receipt to.

3        Q.    How much before this had she

4    mentioned it?

5        A.    I don't know.

6        Q.    Was it a week, month?

7        A.    I don't know.

8        Q.    Well, you read the depositions.  As

9    you sit here today do you remember when in

10   advance it had been?

11       A.    No.  I don't recall.

12       Q.    Wasn't a couple months before?

13       A.    I don't recall.

14       Q.    Sir, when you were told did you

15   investigate it at that time as the police

16   officer in charge?

17            MS. CESARANO:  Objection to form.

18            MR. BURTON:  Noted.

19       A.    No.

20       Q.    What about the other bad things

21   Shannon said about Steve?

22            MS. CESARANO:  Objection to form.

23       A.    I don't know of anything bad she

24   said about him.

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

100

1      Q.    How many other things were said that

2  you wouldn't want printed in the newspaper by

3  either one of you?

4            MS. CESARANO:   Objection to form.

5      A.    None.

6      Q.    She said he was harassing her?

7      A.    No.

8      Q.    She never said that to you?

9      A.    No.

10     Q.    So you hear this sometime before,

11  you don't recall whether day, month or year, you

12  did not call Doug Barth there was supposed to be

13  $300 missing; correct?

14     A.    No, sir, that is not --

15     Q.    Did you call Doug Barth about that?

16     A.    No.

17     Q.    Then tell me what you did do about

18  this $300?

19     A.    Shannon told me that she had $300

20  shortage that she was waiting on Steve to return

21  the receipt from.

22     Q.    That was before you said the

23  incident regarding Shooters; correct?

24     A.    Correct.

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

101

1          Q.    What did you do regarding that?  Did

2    you tell anyone?

3          A.    No.

4          Q.    What did you do with

5    the information?

6          A.    I did nothing.  Shannon said she

7    talked to Steve.

8          Q.    Just the conversation that you had

9    with Shannon at that time?

10         A.    I don't recall.

11         Q.    Did you ever check to see the book

12   to see if it was valid?  Do you remember any

13   investigation; sir?

14         A.    See what was valid?

15         Q.    If there is $300 that was missing

16   from the book?

17         A.    Yes.

18         Q.    What did you do?

19         A.    I looked in the voucher book and saw

20   that --  No, I don't recall come to think of it

21   now.

22         Q.    You don't recall looking, do you,

23   at that time?

24         A.    No.

          ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

                                                            102
1        Q.    You don't recall doing anything, do

2    you, as you sit here today; do you?

3        A.    I recall doing something, but I

4    don't recall what I did.

5        Q.    Will your memory be better at the

6    time of trial or now?

7              MS. CESARANO:   Object to the form.

8        A.    I don't know whether it will be

9    better.

10       Q.    Sir, do you recall speaking to Mr.

11   Barth about it?

12       A.    No.

13       Q.    Do you remember speaking to any

14   third party about it?

15       A.    No.

16       Q.    Do you recall speaking to Mr. Harris

17   about it?

18       A.    No.

19       Q.    Isn't one of your functions to do

20   special these like that, talk to people who

21   maybe have a problem, or just sit there and --

22             MS. CESARANO:   Object to form.

23       Q.    Answer the question.

24       A.    That is my objective.

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

103

| | |
|---|---|
| 1 | Q.    Your objective is to talk with |
| 2 | people and find out if there is a problem |
| 3 | and resolve it? |
| 4 | A.    I talked to Shannon. |
| 5 | Q.    Did you talk to Harris? |
| 6 | A.    No. |
| 7 | Q.    So talked with the accuser but not |
| 8 | the supposed perpetrator.  That is your way to |
| 9 | investigate? |
| 10 | MS. CESARANO:  Object to form. |
| 11 | Q.    Sir, is that the way you were taught |
| 12 | to investigate? |
| 13 | A.    There was no perpetrator. |
| 14 | Q.    Well, $300 missing and Harris took |
| 15 | it.  You are not saying there was a perpetrator |
| 16 | implied in that statement? |
| 17 | A.    No. |
| 18 | Q.    So as you sit here today you did not |
| 19 | investigate by asking the accused what they have |
| 20 | to say; is that correct? |
| 21 | A.    There was no accusation. |
| 22 | Q.    Didn't she say that Harris had taken |
| 23 | $300 and hadn't returned it back? |
| 24 | A.    She was waiting on him to bring a |

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

104

1   receipt back.

2          Q.    And she was saying that for what

3   purpose?  To the best of your knowledge what was

4   the purpose in her telling you that?

5          A.    What was her purpose in telling me?

6          Q.    What would be in your mind

7   the purpose of her informing that to you, her

8   being the cashier, you being the police chief?

9          A.    We were closing out the accounts for

10  the month as I recall, and anything

11  outstanding --

12         Q.    Right.

13         A.    Recapping, she said she had a $300

14  shortage that she was waiting on Steve to return

15  a receipt.

16         Q.    Having heard that don't you believe

17  you have a duty to go to the person and say did

18  you forget to give her the receipt, she would

19  like to close out the month?

20         A.    She already talked to him, said he

21  was bringing it in.

22         Q.    So you had no responsibilities then

23  in mind?

24         A.    No, not after she talked with him.

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

105

1          Q.    But you don't know if she just said

2    that, you don't know if it actually happened; do

3    you?

4          A.    That is correct.

5          Q.    And made no verification whether it

6    happened?

7          A.    No.

8          Q.    And didn't feel any need to see if

9    he was actually following through; did you?

10          A.    Not as I recall.

11          Q.    So how many investigations have you

12    been on since you have been with Target that at

13    least would be considered criminal behavior?

14          A.    50 or 60.

15          Q.    How many actually had been filed

16    with the police or some other agency?

17          A.    Probably 40 out of --

18          Q.    You didn't file charges against Mr.

19    Harris; did you?

20          A.    No.

21          Q.    So the other ones, the person had a

22    right to defend themselves in Court, 40 people;

23    correct?

24          A.    Yes.

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

106

1        Q.    You chose not to give Mr. Harris a

2   right to defend himself; didn't you?

3              MS. CESARANO:  Object to form.

4              MR. BURTON:  Noted.

5        A.    Didn't charge him with anything.

6        Q.    I know that.  How can one clear

7   their name if they are not charged, all just

8   gossip, rumor and hearsay?

9              MS. CESARANO:  Objection to form.

10       Q.    How do you clear your name?

11       A.    I have no idea.

12       Q.    So you didn't charge Mr. Harris with

13  theft, but that is what you would have charged

14  him with, correct, stealing $300?  Isn't theft

15  taking money and not give a receipt or

16  reporting, telling what it was for?  Do you know

17  another name for it?

18       A.    I don't recall ever saying he stole

19  $300.

20       Q.    You told me Shannon said he hadn't

21  given a receipt for $300, previously you did not

22  have that information, and then at sometime in

23  the future you go check a book and interviewed

24  Shannon because Barth said speak to Shannon.  So

        ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

```
                                                          107
 1   far accurate?

 2         A.    Yes.

 3         Q.    Okay.  Why Shannon?  When did Barth

 4   become aware of the 300?

 5         A.    That I don't know.

 6         Q.    Did you tell him about it?

 7         A.    Not that I recall.

 8         Q.    So then he told you to ask Shannon.

 9   What did Shannon have to do with Evan Feldman's

10   receipt?  She wasn't the one you gave it to, she

11   wasn't the one who took the money back.  Why

12   interview her for Evan Feldman's receipt?

13         A.    I didn't interview her for the

14   receipt.

15         Q.    You then are making the conclusion

16   that he is a bad guy?

17         A.    No.

18         Q.    Why did you go talk to Shannon?

19         A.    Direction of Doug Barth, my boss.

20         Q.    Please, maybe I am missing

21   something.  If he wasn't told about the $300 why

22   did he tell you to talk to Shannon?

23               MS. CESARANO:  Objection to form.

24         Q.    Some name came up, or am I
```

108

1  concluding something that I have no right to

2  conclude?

3        A.    I think you are concluding something

4  you have no right to conclude.

5        Q.    What did he tell you to do with

6  Shannon?

7        A.    Talk to Shannon, get a statement

8  from her.

9        Q.    About what?

10       A.    About the $300 voucher.

11       Q.    How did he hear about that?

12       A.    I don't know.

13       Q.    You didn't tell him?

14       A.    No, sir.

15       Q.    Okay.  Already knew of it?

16       A.    Yes, sir.

17       Q.    Did you ask him who told him?

18       A.    No, sir.

19       Q.    Okay.

20            MR. BURTON:  Counselor, we will be

21  taking Mr. Barth's deposition.

22            MS. CESARANO:  Whatever you are

23  going to notice within the discovery period,

24  fine.

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

109

1    Q.    Did you ask him how he knew about

2  Shannon's receipt if you haven't told him?

3        MS. CESARANO:    You already asked him

4  that.

5    Q.    Trying to go further and refresh

6  your recollection.

7    A.    No.

8    Q.    So were you curious how he would

9  have known about it?    How he would have known

10  without you being aware of it?

11    A.    How I was aware of it?

12    Q.    You were aware, but how he became

13  aware of it without you telling him?    Weren't

14  you curious how he would have heard about it

15  without you being the conveyor of the message?

16    A.    No.

17    Q.    Do you know if he was dating

18  Shannon?

19    A.    Not to my knowledge.

20    Q.    Did you ask him who told him?

21    A.    No.

22    Q.    No curiosity whatsoever?

23    A.    Curious, but didn't ask.

24    Q.    What else did he discuss with you

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

110

1    about whose statements you should take that he

2    knew about that you didn't tell him about to

3    start with?

4              MS. CESARANO:    Object to form.

5         Q.    Did he --

6         A.    No.

7         Q.    Give any other instructions who else

8    to interview, what to do with them?

9         A.    Seems like he wanted me to obtain a

10   statement from Sandy Grisbak.

11        Q.    What were you supposed to speak to

12   Sandy Grisbak about and why?

13        A.    About some beach towels that were

14   improperly marked.

15        Q.    Did you know anything about that?

16        A.    Yes.

17        Q.    Tell me what you knew about it and

18   go step-by-step.    What did you know about the

19   beach towels?

20        A.    That the beach towels had been

21   improperly marked for clearance; that Sandy told

22   Shannon to put them in the storeroom until she

23   had time to research them.    And some towels had

24   already been purchased by team leaders.

          ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

111

1    Q.  Mr. Harris and others?

2    A.  I think every one of them, yes, sir.

3    Q.  And others; correct?

4    A.  Yes, sir.

5    Q.  Okay.  And how did the others get to

6  these?

7    A.  I have no idea.

8    Q.  Well, did you have statements about

9  how others got them, or just about Harris may

10  have gotten them?  What did he tell you to do?

11    A.  To get a statement from Sandy

12  Grisbak regarding the beach towels.

13    Q.  About Mr. Harris, but not all

14  the others?

15    A.  I don't recall what he asked me to

16  obtain.

17    Q.  You didn't document who else

18  purchased them; did you?

19    A.  I don't think I documented anything

20  regarding that; did I?

21    Q.  Do you remember documenting anything

22  about how Mr. Harris may have purchased them?

23    A.  No.

24    Q.  Do you have a recollection who you

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

112

1    spoke to to get those statements?

2         A.    Spoke to Sandy Grisbak.

3         Q.    What did she supposedly tell you?

4    Do you recall?

5         A.    That the towels were improperly

6    marked and they were put in the stockroom

7    upstairs until she had a chance to look into

8    whether that was appropriate merchandise or what

9    happened.

10        Q.    Okay.  Do you know who Sandra

11   Riesenberg is?

12        A.    Yes.

13        Q.    Do you recall that you ever

14   interviewed her?

15        A.    No.  Trying to recall who she is.

16        Q.    Who does she work for?  What did she

17   do?

18        A.    That is what I am trying to

19   recall. I think she was the clerical at

20   the Deerfield store.

21        Q.    What do you mean clerical?

22        A.    She worked for the personnel

23   manager.

24        Q.    Okay.  Who did she report to?

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

113

1          A.    Oh, there were two or three

2    personnel managers while I was there.

3          Q.    You don't recall ever speaking with

4    her regarding the investigation regarding

5    Harris; do you?

6          A.    No.

7          Q.    It's no?

8          A.    No, I don't remember.

9          Q.    Okay.  You don't remember discussing

10   with her Shannon Tetrault and sexual harassment;

11   do you?

12         A.    No.

13         Q.    Or any other subject?

14         A.    No, I don't.

15         Q.    Okay.  You keep notes of your

16   interview like most police officers generally

17   do?

18         A.    I am sure I do.

19         Q.    Would you have the notes of these

20   interviews you did take?

21         A.    Everything was transferred over to

22   the district office.

23              MR. BURTON:  I have never seen,

24   counselor, never seen the notes by this man.

           ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

114

1          MS. CESARANO:  I have to check into

2     it.

3          MR. BURTON:  He is saying that is

4     the practice of a police officer and I am

5     inclined to believe that he would have in fact

6     done that.

7          MS. CESARANO:  I have no idea. I

8     have to check with my paralegal and with my

9     associate.

10          MR. BURTON:  Please do so because

11     that would be something --

12          MS. CESARANO:  Personally I don't

13     necessarily know all the documents.

14          MR. BURTON:  I have asked that

15     question to every police officer and never had a

16     contrary response in my life.  So please do find

17     them.  If not I want to know what happened to

18     them.

19          MS. CESARANO:  Absolutely. This is

20     the first I have heard about any notes.

21      Q.   So, did you speak to anyone else

22     other than Ms. Grisbak about the towels, or just

23     you were asked to speak to Ms. Grisbak and you

24     don't care what else the facts were?

          ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

```
                                                    115
 1            A.    That would be at the discretion of
 2    Doug Barth.
 3            Q.    You did what you were told, you did
 4    no further work; correct?
 5            A.    Correct.
 6            Q.    Okay.  Did you speak to Mr. Harris
 7    investigating him about the towels?
 8            A.    No.
 9            Q.    You didn't speak with him what
10    happened with the towels?
11            A.    No.
12            Q.    I see.  So, Inspector Cluso, what
13    did you -- I am sorry.  Who next did you speak
14    to investigating the towels?
15            A.    Didn't speak to anyone else.
16            Q.    Now --
17            A.    That I recall.
18            Q.    Why didn't you speak to the cashier
19    who took the material, scanned it and made that
20    change?
21                  MS. CESARANO:  Object to form.
22            Q.    Were you aware that someone changed
23    the regular towel price?
24            A.    Yes.
```

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

116

1    Q.    Did you interview that person?

2    A.    No, sir.

3    Q.    So you have no idea whether or not

4  Mr. Harris in fact was directed that he should

5  pay that price by another person?

6    A.    I have no knowledge.

7    Q.    Wouldn't that be an important

8  investigation as a former chief of detectives to

9  find out what the person who changed the price

10  told him?

11    A.    I would say so.

12    Q.    So if you were directing your own

13  investigation you would consider that necessary?

14    A.    Yes.

15    Q.    I see.  So you would consider it if

16  no one did that to be an omission in the

17  investigation; correct?

18    A.    I would assume that, yes, sir.

19    Q.    Well, it would be an omission not to

20  talk to Mr. Harris, wouldn't it?  Wouldn't

21  the investigator ask to speak to the accused to

22  see if he could exonerate himself?

23    A.    Yes, sir.

24    Q.    And you didn't do that in this

117

```
 1   investigation?
 2        A.    I was not the supervisor, sir.
 3        Q.    Who was?
 4        A.    Doug Barth.
 5        Q.    So you are really not
 6   the investigator, Doug Barth is the
 7   investigator?
 8        A.    No.
 9        Q.    So you never meet Terry; did you?
10        A.    No.
11        Q.    About this.  That is no?
12        A.    No, I did not.
13        Q.    Sir, did you ever discuss this with
14   Terry Gillespie?
15        A.    No.
16        Q.    Now, did Terry ever give you any
17   instructions about your investigating --
18        A.    Not that I recall.
19        Q.    Was he ever present at any meetings
20   that you had?
21        A.    No.
22        Q.    Did Mr. Barth ever mention that he
23   was doing this at the direction of Terry
24   Gillespie to you?
```

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

118

| 1 | A. That I don't recall. |
| 2 | Q. Now, did you speak to Patricia |
| 3 | Morris about the towels? |
| 4 | A. No. |
| 5 | Q. Do you know who she is? |
| 6 | A. No, sir, I don't. |
| 7 | Q. How long were you at that store? |
| 8 | MS. CESARANO: Which store? |
| 9 | MR. BURTON: Deerfield. |
| 10 | A. Approximately one year. |
| 11 | Q. Okay. Who is Deanne Vass? |
| 12 | A. She had to be the price change team |
| 13 | leader. |
| 14 | Q. Does that mean the person who would |
| 15 | mark down things? |
| 16 | A. Yes, sir. |
| 17 | Q. So she is the one who determined |
| 18 | whether things were supposed to be marked down |
| 19 | or not; correct? |
| 20 | A. I don't know her position at the |
| 21 | time she left the company. |
| 22 | Q. Did you know that Shannon Tetrault |
| 23 | bought these same towels at that same price as |
| 24 | Mr. Harris? |

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

119

1          A.    No, I did not know.

2          Q.    Would that be of interest to you now

3    to know?

4          A.    Would it be of interest to me?

5          Q.    As police officer, investigator to

6    find out that the lead witness bought the same

7    towels that you are investigating someone

8    buying.

9               MS. CESARANO:    Object to form.

10         Q.    Would it be of interest to you as

11   investigator and something you may wish to

12   explore further?

13         A.    Possibly, yes.

14         Q.    Were you ever asked to go back after

15   Mr. Harris wrote a response to the EEOC, made a

16   complaint to the EEOC, were you ever asked to

17   get back and investigate any of the charges or

18   statements he made to see if they were true?

19         A.    No.

20         Q.    So never asked to determine whether

21   or not any of the witnesses that claimed that

22   they could exonerate him actually could?

23         A.    No, sir.

24         Q.    Isn't that a normal investigative

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

1   function if you are given the name of an alibi,

2   I was told by so and so, don't you talk to them?

3            MS. CESARANO:  Object to form.

4        Q.   Sir?

5        A.   I will in some, it is, yes.

6        Q.   In an investigation would you do

7   that?

8        A.   Probably would, yes, sir.

9        Q.   Okay.  Now, Ms. Vass was in charge

10  of marking the towels down?

11       A.   No, that is not correct.

12       Q.   Mrs. Vass was in charge of marking

13  it down, Mrs. Grisbak was in charge of the whole

14  back room?

15       A.   Right.

16       Q.   That is what I thought I said.  So

17  wasn't Mrs. Vass in charge of marking down

18  towels if there was any markdown to give?

19       A.   Yes, if she was the one there then.

20  I don't recall whether she was there at that

21  time.

22       Q.   You don't recall if she was there?

23       A.   That is correct. She left and I

24  don't recall when she left.

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

121

1          Q.    And what did Ms. McHugh do?

2          A.    She was the Manager of the soft

3     lines department.

4          Q.    Soft lines include also towels;

5     didn't they?

6          A.    No.

7          Q.    What is soft lines?

8          A.    Clothing.

9          Q.    Clothing.  Now, you just don't know

10    how it was that Mr. Barth knew that Steve Harris

11    had purchased these towels and Ms. Grisbak would

12    be the person you should speak to?

13              MS. CESARANO:  Objection to form.

14         A.    No.

15         Q.    You spoke to Doug Barth about the

16    towels and Mr. Harris before?

17         A.    No.

18         Q.    You said you had no idea about

19    the towels originally.  When did you first know

20    about them and from whom?

21         A.    When Sandy Grisbak told me.

22         Q.    What had she told you?

23         A.    When it occurred.

24         Q.    Did you then do anything about that

              ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

122

1    information?

2          A.    About what information?

3          Q.    Ms. Grisbak comes to you.  Can you

4    help me understand?

5          A.    Talking about Sandy Grisbak.  Okay.

6          Q.    Where were you?

7          A.    We were walking the store.

8          Q.    Okay.  And she said to you what?

9          A.    She was walking upstairs in

10   the stockroom, there is an area up there called

11   Tips, okay, where merchandise goes that hasn't

12   been ticketed or ticketed incorrectly.

13              She pointed out that it seemed like

14   some boxes of towels, if I recall she pointed

15   them out and said they had been ticketed

16   incorrectly and she was researching it.

17         Q.    Okay.  And then how did you next

18   hear of Mr. Harris related to the towels?  Did

19   you tell somebody?

20         A.    No.  Didn't tell anyone.

21         Q.    When Mr. Barth said I want you to

22   talk to Sandy Grisbak about the towels that

23   Harris bought, is that substantially what he

24   told you?

```
                                                   123
 1           A.    Probably is.
 2           Q.    Do you know how he knew that Harris
 3     bought them as opposed to Shannon Tetrault?
 4           A.    No, sir.
 5           Q.    Did you ask him?
 6           A.    No.
 7           Q.    Now, if someone is reporting to your
 8     boss over your head or around you is that a code
 9     breaker?
10           A.    No.
11           Q.    How did Mr. Barth know these details
12     of the story if you are not telling him and he
13     already knows about it?
14           A.    He is conducting his own fact
15     finding.
16           Q.    That is what I am asking.  To the
17     best of your knowledge he is already performing
18     an investigation; correct?
19           A.    I don't know.
20           Q.    So my question to you, sir, you are
21     a bright man, he knows that, you haven't
22     conveyed to him those things, do you have a
23     reason to believe as how he gained that
24     knowledge?
```

124

1          A.    He is talking to the individual that

2     he is directing me to take statements from.

3          Q.    Yes.   Directly he is speaking to

4     them and then asking you to take a statement.

5          A.    I don't know.

6          Q.    That is your best assumption as you

7     sit here today as a former police officer?

8               MS. CESARANO:   If you know.

9          Q.    Asking about a reasonable degree of

10    probability as a cop.

11         A.    I don't know.

12         Q.    You have no clue is what you are

13    telling this jury; correct?

14         A.    How Doug Barth new it?

15         Q.    Yes.

16         A.    I don't know.

17         Q.    You have no estimate how he would

18    have obtained the knowledge; do you?

19              MS. CESARANO:   He already answered

20    the question.

21              MR. BURTON:   This man is a private

22    investigator, detective.

23         A.    One of two ways he could have.

24         Q.    Please tell me your opinion of the

              ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

125

1    one of two ways.

2         A.    Either someone told him other than

3    myself, or he talked to that person.

4         Q.    In other words, someone other than

5    yourself he was talking to about Steve Harris is

6    your opinion?

7         A.    Correct.

8         Q.    Thank you.

9              MS. CESARANO:  Maybe Steve Harris

10   told him.

11             MR. BURTON: Counsel, move to strike

12   your comments.

13             MS. CESARANO:  It's possible.

14             MR. BURTON:  I asked him that

15   question.  He said he didn't.

16        Q.    Let's go further.  Sir, was it at

17   all curious to you that there was this knowledge

18   of your store manager and you weren't involved?

19   Did you think he didn't trust you?

20        A.    No.

21        Q.    Is it normal that there is

22   investigations outside normal channels, back

23   channel investigations, if you were?

24        A.    Yes.

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

126

1      Q.    That is pretty common in your

2   company?

3      A.    One that involves an investigative

4   question.

5      Q.    Do you know what a back channel

6   investigation is first?

7          MS. CESARANO:  Object to form.

8      A.    I am not sure what --

9      Q.    What did you think I meant when you

10  just answered?

11     A.    Someone going around behind my back.

12     Q.    That is a good understanding.  I

13  accept it, sir.  Do you know when this back

14  channel investigation first commenced so that

15  Mr. Harris would have been under suspicion at

16  first?

17     A.    No, I don't.

18     Q.    Would the person to know that

19  information be Mr. Barth to the best of your

20  knowledge?

21     A.    No.

22     Q.    He is the only person you can think

23  to ask?

24     A.    No.

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

127
1        Q.   Who else might know?
2        A.   Mark Hastings.
3        Q.   Who is Mark Hastings?
4        A.   He was Steve's direct supervisor.
5        Q.   Did you ever interview him regarding
6   Steve?
7        A.   No.
8        Q.   You didn't interview Mark Hastings?
9        A.   No.
10       Q.   Mark Hastings is a white person?
11       A.   Yes, sir.
12       Q.   Still work with the company?
13       A.   I believe he does.
14       Q.   South Florida?
15       A.   No.
16       Q.   Where is he located?
17       A.   Out in the northwest somewhere, but
18  not sure.  Got a promotion and transferred.  I
19  don't know.
20            MR. BURTON:  Counselor, if it turns
21  out Mark Hastings is a key witness I would ask
22  you to bring him down, if indeed he is the
23  person that knows the most.  If it turns out he
24  is not we can just do the deposition by

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

128

1    telephone.

2              MS. CESARANO:   We can talk about

3    that later.

4              MR. BURTON:   I want it on the record

5    at this juncture because --

6         Q.   Now, did you ever investigate anyone

7    else at the direction of Barth or anyone else

8    regarding these ongoing investigations of

9    Mr. Harris?

10        A.   I don't recall whether I did or not,

11   whether I took any other statements.

12        Q.   Lisa LeFue, do you know her?

13        A.   Yes.

14        Q.   Who is she?

15        A.   An accountant.

16        Q.   Okay.  Did you interview her

17   regarding the towels or --

18        A.   No.

19        Q.   Have you interviewed her regarding

20   anything else?

21        A.   I don't recall talking to her.

22        Q.   All right.  Keep thinking that you

23   talked to her, but I guess you didn't.

24        A.   Blacklick worked for me.

        ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

129

1      Q.   Did you interview him about Steve?

2      A.   No.

3      Q.   What is his name?

4      A.   Tim Blacklick or something.

5      Q.   Blackneck?

6      A.   That could be.  Sounds like

7   Blacklick or Blackneck or Black something.

8      Q.   Didn't tell you that he specifically

9   could refute everything Shannon Tetrault had

10  said about Steve?

11     A.   I don't recall talking to Tim about

12  anything.

13     Q.   Anything.  Certainly not about

14  Steve?

15     A.   Correct.

16     Q.   And you don't recall talking to her

17  about Steve?

18     A.   Her.

19     Q.   Her meaning Lisa?

20     A.   No.

21     Q.   Okay.  Were there other areas that

22  you were checking out about Mr. Harris then or

23  later?

24     A.   Not that I recall.

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

130

1      Q.    You said you later became familiar

2   that there were credit cards that were looked

3   at, stuff like that looked into.  Do you

4   remember that?

5      A.    Not that I looked into.

6      Q.    That were looked into.

7      A.    Yes.

8      Q.    Tell me what you know of those.

9      A.    He had an American Express card

10  which as I recall had been -- had some

11  unauthorized purchases on it.

12     Q.    Personal purchases; correct?

13     A.    I don't know.

14     Q.    Okay.  Do you know that he paid it

15  back with interest?

16     A.    I have no idea.

17     Q.    Okay.  Question.  The American

18  Express card, was it in his own name or

19  corporate name?

20     A.    I don't know.  It was a corporate

21  card through Target, but I don't know whose name

22  was on the card.

23     Q.    You can get a card also, can't you,

24  through Target and Target gets a small

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

131

1    percentage of the interest?

2         A.    No.

3         Q.    Okay.  So corporate card, you don't

4    know his name or company name?  Is that correct?

5         A.    It would have been in his name.

6         Q.    Okay.  Do you know if anyone ever

7    has put charges on the corporate account and

8    then paid them?

9         A.    I have no idea.  I don't know.

10        Q.    In other words, as opposed to --

11        A.    I understand what you are saying.  I

12   don't know.

13        Q.    Do you know if it's prohibited if

14   you pay that and pay interest?  Do you know if

15   it's prohibited any specific place?

16        A.    According to Target policy, yes.

17        Q.    Is it in writing?

18        A.    Yes, sir.

19        Q.    Okay.  Do you know if it occurred

20   before?

21        A.    I don't know.

22        Q.    Do you know of a warning given for

23   something like that?

24        A.    I have no idea.

132

1          Q.    Do you if he turned back his

2     corporate card before this occurred? These two

3     instances we are talking about, Shannon and

4     the towels?

5          A.    He had his corporate card on January

6     29th of '99.

7          Q.    Do you know if he was current on his

8     charges at that point?

9          A.    No.

10         Q.    Do you know if it was ceased being

11    used at that point?

12         A.    No.

13         Q.    Why January 29th?  Something about

14    that certain date?

15         A.    Well, the date that we went to

16    Shooters.

17         Q.    How do you know it was the corporate

18    card?

19         A.    Saw it in his wallet.

20         Q.    Do you know if it was still good

21    or --

22         A.    No.  I told you I don't know.

23         Q.    Turned back the card right, cut it?

24         A.    Never heard that.

          ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

133

1    Q.   Probably 100 cards that are sent to

2   me that I didn't ask for that I call them up and

3   tell them I don't want them.

4           MS. CESARANO:   Objection to form.

5    Q.   Has that happened to you?

6    A.   Yes.

7    Q.   Okay.  So, didn't you know that he

8   and Janice had paid all of the charges by March

9   10, 1999?

10    A.   No, sir.

11          (EXHIBIT MARKED FOR IDENTIFICATION)

12    Q.   Do you remember when it was that you

13   were investigating him, what year?  1999, wasn't

14   it?  You said January 29, '99 was the date you

15   went to Shooters; correct?

16    A.   Yes.

17    Q.   So all this occurred approximately

18   January, February, March of '99; correct?

19    A.   January only I think.

20    Q.   Well, the time he was terminated was

21   March I believe.

22    A.   Okay.

23    Q.   Does that ring a bell?

24    A.   Yes.

           ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

134

1       Q.    Okay.  And didn't he send to your

2   office and through your office an apology letter

3   that he received from First Union that said

4   there were some unrelated charges that they made

5   errors on and apologized to him?

6       A.    No.

7       Q.    Do you remember seeing the letter of

8   February 25, 1999?

9       A.    No.

10              (EXHIBIT HEREBY MARKED FOR

11   IDENTIFICATION PURPOSES.).

12      Q.    There was some statement that he had

13   a dishonored check that exacerbated the

14   situation.  Ever hear about that?  Dishonored by

15   accident when sending all the paperwork in by

16   the bank.  This is dated February 25, '99.  Ever

17   hear about that one?  Or seen those papers

18   before?

19      A.    No, sir.

20              (EXHIBIT HEREBY MARKED FOR

21   IDENTIFICATION PURPOSES.).

22      Q.    Didn't even see them.  Were you ever

23   asked to assist in responding to the EEOC?

24      A.    No, sir.

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

                                                      135
1          Q.   So they didn't, Target didn't even
2    ask you to participate in the response even
3    though you were the lead investigator?
4               MS. CESARANO:  Object to form.
5          Q.   Even though you were an
6    investigator?
7          A.   I don't recall being asked to
8    participate.
9          Q.   Okay.  So no one interviewed you to
10   see whether anything they had responded or
11   written was in any way accurate; correct?  In
12   other words, you did not use your police skills
13   to follow up on leads that he provided to
14   determine whether there was any truth to what he
15   had said; did they?
16         A.   No.
17         Q.   Do you know anyone that they hired
18   to do that function?
19         A.   Do which function?
20         Q.   Well, before they responded to the
21   EEOC did they do any investigation?  Do you know
22   if anyone was hired if they didn't use you?
23         A.   No.
24         Q.   Do you know if Target ever reversed

          ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

136

1    their thoughts on any firing and decided maybe

2    they did something improper, maybe they did jump

3    to the wrong conclusions?  Have you ever heard

4    that, known that to happen?

5         A.    To --

6         Q.    Reverse their position saying you

7    are right, gee, we didn't take this into

8    account, or words to that effect.

9              MS. CESARANO:  Objection to form.

10        A.    Do I personally know of anyone?

11        Q.    Yes.

12        A.    Can't say that I personally know of

13   anyone.

14        Q.    Hear of them doing it?

15        A.    Yes.

16        Q.    Tell me the instance where you heard

17   of it being done.

18        A.    I don't recall an instance.  That is

19   why they have the special procedure to afford

20   them the ability to continue their

21   investigation.

22        Q.    Do you know if anyone was asked to

23   follow up on anything that Harris presented in

24   his defense?

         ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

137

```
 1          A.    No, I don't.
 2          Q.    So there is a procedure to follow
 3   up, but don't know that any follow up was done
 4   in this case; do you?
 5          A.    I don't have that knowledge.
 6          Q.    Now, you don't recall Harris sending
 7   you e-mail approximately February 20th, 1999 on
 8   Saturday saying he would like to meet with you,
 9   copy to Barth, to Hastings, to explain all of
10   these situations after he heard the rumor that
11   you are out to get his job?
12          A.    I recall an e-mail, but I don't
13   recall what the context of it was now.
14          Q.    As you sit here today you don't
15   remember that Harris was trying to sit there and
16   arrange to give everybody documents and names to
17   you that he could think of so he could keep his
18   job after he heard the rumor that you are out to
19   get his job?
20          A.    No, I don't know that.
21          Q.    I see.  And he sent a e-mail to you
22   requesting to see you on Monday about this,
23   2-20-99.  Do you remember that?
24          A.    Yes.
```

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

138
1          Q.    What do you remember him saying on
2     or about February 20, 1999 about how he would
3     like to cooperate so wouldn't be fired, if
4     anything?
5          A.    Didn't talk to him.
6          Q.    Didn't think you did.  What did you
7     do?
8          A.    Also called Mark Hastings, District
9     Manager.
10          Q.    Right.  And Doug Barth?
11          A.    Okay.
12          Q.    Did any of you meet with him?
13          A.    I believe Mark and Doug did.
14          Q.    I see.  Now, my question is real
15     simple.  Did anyone interview any of the named
16     persons that he gave to this group?
17          A.    I have no knowledge of that.
18          Q.    Did you make any recommendation to
19     someone to speak to any of these people?
20          A.    No, sir.
21          Q.    Sir, as a former head of detectives
22     that would be a fairly good idea; wouldn't it?
23          A.    Not following our protocol, no, sir.
24          Q.    It wouldn't be a good idea trying to

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

139

1   find out whether someone is telling the truth to
2   interview people he is telling you could
3   substantiate it?
4          A.    That would be a very good idea.
5          Q.    Okay.  You don't know why they
6   didn't do it in your procedure?
7                MS. CESARANO:  Object to form.  He
8   said he didn't know if it was done.
9          Q.    Sir, you said in our procedure we
10  don't do it, is that correct, not under our
11  procedure?
12         A.    No, that is not what I said.
13         Q.    We can have it read back, sir.  I
14  said do you know why they didn't go and
15  interview these people?
16         A.    I have no idea why they didn't.
17         Q.    You have no knowledge that they did
18  as you sit here today; correct?
19         A.    I can't answer that.
20         Q.    Have you seen anything indicating
21  that they interviewed the people whose names
22  they were given?
23         A.    I don't know the names given.
24         Q.    I have just given you a bunch of

140

```
 1   them.  Patricia Morris, those names mentioned.
 2                MS. CESARANO:  Objection.
 3                MR. BURTON:  Withdraw.
 4        Q.   Sir, did you make any recommendation
 5   to your boss whether he should speak to some of
 6   these people?
 7        A.   No.
 8        Q.   Do you know if anyone was called in
 9   from outside the company?
10        A.   I have no idea.
11        Q.   Did they ever discuss, they being
12   Hastings, Barth or Gillespie, that they are
13   going to do any further inquiry during this
14   suspension period about checking with any of the
15   people he mentioned?  Was that ever mentioned to
16   you?
17        A.   No.
18        Q.   On that Monday they took his store
19   keys, didn't they, to the best of your
20   knowledge?
21        A.   I don't know.
22        Q.   Do you know who worked in the store
23   after that?
24        A.   No.
```

141

1        Q.    Ever come back to the store after

2    that?

3        A.    No.

4        Q.    Do you know who Donna Keil is?

5        A.    Yes.

6        Q.    Do you know what she said about who

7    got the $300 on that day?

8        A.    That I don't know.

9        Q.    Sir, you didn't read Mr. Harris'

10   deposition this past Thursday and Friday, three

11   days ago?

12       A.    No, didn't read the entire thing.

13       Q.    So you did not read his side of the

14   story?

15       A.    No, I did not read that.

16       Q.    I see.  Ever read what he said about

17   Donna Keil, if anything, as you sit here today?

18       A.    What he said about her?

19       Q.    Yes.

20       A.    No.

21       Q.    Were you ever advised that prior to

22   February 20th that the Target credit card had

23   been paid off?

24       A.    Which Target credit card?

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

```
                                                    142
 1            Q.    The corporate card in question.   In
 2    other words, that they were told that day.
 3                 MS. CESARANO:  Objection to form.
 4            Q.    Sir, please answer it.
 5            A.    I don't know which Target credit
 6    card.
 7            Q.    There is the Target credit card that
 8    he used .
 9            A.    That is American Express.
10            Q.    Okay.  Do you recall him telling
11    them that has been paid off before that meeting?
12    That is, they being told it was paid off?
13                 MS. CESARANO:  Objection to form.
14            A.    Again sir, I don't know which card
15    you are speaking about.
16            Q.    Whatever card it was.
17            A.    He had two cards to the best of my
18    knowledge.
19            Q.    Who told you that?
20            A.    He had an American Express card and
21    you just handed me a paper here that is a Target
22    charge card.
23            Q.    Right.  And asking you do you know
24    if both of those were paid off?
```

143

1        A.    That is not what you asked me.    You

2    asked me if the Target card was paid.

3        Q.    Do you know if the American Express

4    card had been paid off?

5        A.    No, sir, I don't.

6        Q.    Do you remember if either

7    Gillespie, Barth or Hastings, just say that

8    group, ever tell you that he explained it had

9    been paid off?

10        A.    No.

11        Q.    This is the first time you ever

12    heard it sitting here?

13        A.    First time I heard what?

14        Q.    That it was paid off.

15        A.    Which card?

16        Q.    Either or both.    I am not playing

17    word games with you.

18        A.    I am not either.

19        Q.    And he said both paid off is

20    the first time you heard that as you are sitting

21    here today?

22        A.    Yes.

23        Q.    Didn't read anything in the

24    deposition on that?

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

144

```
 1          A.    No.
 2          Q.    Do you recall what he said?
 3          A.    No.
 4          Q.    Thank you.  You didn't read it in
 5    the last three days?  Didn't you see --
 6               MS. CESARANO:  He didn't read the
 7    whole thing.
 8          Q.    I don't care what portion.  Sir, you
 9    did scan it or read it within the last three
10    days; is that correct?
11          A.    Yes, sir
12          Q.    Today is Monday?
13          A.    Yes, sir
14          Q.    Following?
15          A.    Yes, sir.
16          Q.    Do you know if anyone was ever
17    asked to give him a recommendation for him to
18    get future employment?
19          A.    I have no idea.
20          Q.    If Target gets contacted to give him
21    a letter of recommendation would it show that he
22    was discharged without comments or make any
23    comments?
24          A.    My understanding Federal law
```

145

1   prohibits any comments.

2          Q.   So any person making a comment, if

3   they are black balling him, use that term, that

4   would be illegal in your opinion?

5          MS. CESARANO: Objection to form.

6          Q.   Your understanding of the law as a

7   cop.  Come on.

8          MS. CESARANO:   Objection.

9          Q.   Is it your understanding that would

10  be illegal?  That is the word you used.

11         MS. CESARANO:  Object.  Calling for

12  a legal opinion.

13         Q.   Fine.  Asking a person in the

14  security field.  Go ahead.

15         A.   Now you have got me confused.

16         Q.   You just answered it would be in

17  your opinion illegal to do what?

18         MS. CESARANO:  Object to form.

19         MR. BURTON:  Noted.

20         A.   I don't know what you are asking.

21         Q.   Sir, I just asked you if they put a

22  comment about how he was discharged, you said it

23  was my understanding that would be illegal.  Do

24  you remember saying that?

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

1          A.    About how he was discharged.

2          Q.    Yes, about what would be comments in

3     his personnel record.  Do you remember saying

4     that 25 seconds ago?

5          A.    You asked if I had any knowledge of

6     the company giving any recommendations.

7          Q.    Right.

8          A.    I said no.

9          Q.    And the question then was do you

10    know if there would be any indication in his

11    file as to under what circumstances he was let

12    go.

13         A.    I don't know that you asked that

14    question.

15               MR. BURTON:  Okay.  Thank you very

16    much. I will move for contempt.

17               (Recess taken)

18         Q.    Sir, did you ever know that Betty

19    Gaston gave support of Mr. Harris?

20         A.    No, I did not.

21         Q.    Annette Sternberg, do you know who

22    she was?

23         A.    Yes.

24         Q.    Do you know what she did?

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

147

1          A.    She was the Level 3 of the flow

2     team.

3          Q.    What does that translate to?

4          A.    She supervised the unloading of

5     trucks and placement of merchandise to the sale

6     floor.   Then later she was a Level 3 which is

7     mid-management on the sales floor.

8          Q.    Didn't you ask her to lie about

9     Steve Harris?

10         A.    No, sir.

11         Q.    So if she swore that Don Fankhauser

12    wanted me to give a statement that says Steve

13    told me to skip the trucks and work upstairs,

14    that would be a lie on her behalf?

15         A.    Absolutely.

16         Q.    Okay.  And Ms. Sternberg, did she

17    have a reason for disliking you?

18         A.    Not to my knowledge.

19         Q.    Okay.  Do you remember checking with

20    her at all about Steve Harris?

21         A.    It seems like I recall speaking to

22    her about -- I can't remember the context of the

23    conversation right now.

24         Q.    Was she one of the people that you

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

148

1    were asked to talk to by Barth?

2         A.    Very well could be, but I am not

3    certain.

4         Q.    Sir, now, your memory is good for

5    certain things, and a police officer generally

6    has a very good memory about certain things.  So

7    you don't remember whether or not you

8    interviewed, or whether or not you were asked to

9    interview her as you sit here today.  That is

10   your answer?

11        A.    I said I seem to recall talking with

12   her.

13        Q.    You don't remember what she said, do

14   you?

15        A.    No.

16        Q.    Or what subject it involved, do you?

17        A.    Yes, I do.

18        Q.    What subject was it?

19        A.    There had been comments made about

20   what they call repack boxes being thrown away as

21   opposed to returning to the distribution center.

22        Q.    We talked about that before, haven't

23   we?

24        A.    No.

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

149

1          Q.   Where did you hear about it and

2     when?

3          A.   When I don't know.

4          Q.   Was it before or after Evan's --

5          A.   It would be before.

6          Q.   So do you remember what you heard

7     about the repack boxes?

8          A.   Yes.  That instead of returning to

9     the distribution center he had directed --

10         Q.   He being Steve?

11         A.   Steve, to throw them in the

12    compactor.

13         Q.   Who gave you this gossip?

14         A.   I believe it was --

15              MS. CESARANO:  Objection to form.

16         Q.   Go ahead.  Sandy Grisbak?

17         A.   Yes.

18         Q.   Was that in the conversation about

19    the towels, different one or --

20         A.   This would have been a different

21    conversation.

22         Q.   So how long were you looking at

23    Steve and his misconduct now that we have taken

24    it before the towels?

          ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

150

1      A.   I was not looking at Steve for any

2    misconduct.

3      Q.   You are telling me you got in a

4    conversation with Ms. Grisbak about Steve

5    directing that she throw boxes in the box

6    compactor.

7      A.   I don't recall that being said.

8    What I recall is that Sandy Grisbak told me that

9    she heard that Annette or someone was going to

10   throw repack boxes in the compactor instead of

11   returning to the DC.

12     Q.   How did that fit into that equation?

13     A.   When I talked to Annette.

14     Q.   What did she say?

15     A.   I believe she was directed to by

16   Steve because there wasn't room to hold them to

17   be returned to the distribution center.

18     Q.   I see.  Did you ever ask her for a

19   statement on that?

20     A.   I think I took a statement from her.

21          MR. BURTON:  I haven't seen that,

22   counselor.  Sure haven't seen that.

23     A.   I may not have taken a statement

24   from her.

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

151

1          Q.    Well, you did or didn't you?

2          A.    I don't recall.

3          Q.    Sir, do you recall being sent your

4     statement before you came here today to refresh

5     your recollection about what you might be asked

6     here today?  Or notes in your own hand by

7     the company?

8               MS. CESARANO:  Objection to form.

9          Q.    Were they sent to you?

10         A.    No.

11         Q.    It's basic police work that you keep

12    notes about what conversations were; isn't it?

13         A.    Yes.

14         Q.    You have probably done that all

15    your life; haven't you?

16         A.    I am sure I have.

17         Q.    In this case you were following any

18    procedures you had ever done; correct?

19         A.    Probably.

20

21              MS. CESARANO:  Object to form.

22         Q.    You would have interview notes if

23    you followed your our own policies and

24    procedures as a police officer, and then as

          ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

152

1    asset protection person of ever interview you

2    conducted; correct?

3              MS. CESARANO:    Objection.

4         A.    That is standard.

5         Q.    And there is a standard procedure

6    for doing them.  You have date, name of the

7    interviewee, and persons present?

8         A.    That is standard, yes.

9         Q.    And then write down a synopsis of

10   what the person said, and never ask them to sign

11   it, by it is to refresh your recollection to say

12   this is what I was told on this day.

13        A.    That is correct.

14        Q.    That is taught to every single

15   person at every police academy to the best of

16   your knowledge; correct?

17        A.    I am sure it is.

18        Q.    Now, did you ever have Mrs. Grisbak

19   sign the statement regarding the throw away of

20   the boxes?

21        A.    No.

22        Q.    You say you are sure that Annette

23   confirmed it, but you don't have your notes, and

24   never asked her to sign a statement to the best

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

153

```
 1    of your recollection as you sit here today;
 2    correct?
 3         A.    Correct.
 4         Q.    And this was conducted before the
 5    towel incident with Grisbak; correct?
 6         A.    That I don't recall.
 7         Q.    You said you thought it was before
 8    the towel incident when I asked earlier.
 9         A.    It could be.  I don't know
10    the sequence how this happened.
11         Q.    You only got to this store in I
12    think '98?
13         A.    Yes.
14         Q.    Something like November, October,
15    November?
16         A.    I believe it was.
17         Q.    So only worked with Steve for three
18    months.
19         A.    Three, four or five months.
20         Q.    Yes.  But by January 29th, three
21    months into it, you are conducting this
22    investigation, bath towels before that, boxes
23    before that.  Sir, were you instructed to go in
24    and investigate Steve to get rid of him?
```

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

154

```
 1        A.    No, sir.
 2        Q.    Who else were you conducting this
 3   kind of surveillance on?
 4             MS. CESARANO: Object to form.
 5             MR. BURTON:  Noted.
 6        A.    There was no surveillance, sir.
 7        Q.    Well, Denney's occurred before or
 8   afterwards?
 9             MS. CESARANO:  Before or after what?
10        Q.    It was before the Shooters incident
11   and it's after the Denney's.  The Denney's was
12   $300; wasn't it?
13        A.    Yes.  I recall it being before.
14        Q.    So there is four things.
15             MS. CESARANO:  Objection.
16        Q.    Who did you speak to to investigate
17   the Denney's incident?  Correct me if I am
18   wrong, Steve had, it was around Christmas time,
19   a group of people working all night to get
20   material available for Christmas, and took them
21   to Denney's in the morning because they worked
22   extra long hours trying to do store preparation
23   for Christmas.  That substantially correct?
24        A.    There was Denney's and breakfast for
```

155

1   the overnight people.  I don't know if he took

2   them or if they brought it back.  I don't know.

3        Q.   But regarding extra work around

4   Christmas time for a time frame.

5        A.   Yes.

6             MS. CESARANO:  If you know.

7             MR. BURTON:  He said yes.

8        Q.   That is yes, sir?

9        A.   It was for their work.

10       Q.   For Christmas time?

11       A.   Yes.

12       Q.   That is all I needed.  Thank you.

13  What did you do when you first heard about this

14  incident?

15       A.   Which incident?

16       Q.   The Denney's breakfast.

17       A.   And I told you Shannon brought it to

18  my attention.

19       Q.   I never mentioned the Denney's

20  segment of it.

21       A.   You said the $300 voucher issue.

22       Q.   But didn't mention what for until

23  just now, did I?

24       A.   I thought you did.

156

1     Q.   Didn't mention it until just two

2   seconds ago.

3     A.   Okay.

4     Q.   Sir, when was the first time you

5   found out about the Denney's breakfast?

6     A.   When I had a conversation with

7   Shannon.

8     Q.   What did she say?

9     A.   That there was an outstanding

10   voucher that she had as I recall.

11     Q.   How long after the Denney's

12   breakfast did she tell you this?

13     A.   That I don't recall.

14     Q.   Well, presumably the end of the

15   month would have been December 31 after

16   Christmas; correct?

17     A.   We were working closing out the

18   month. I don't know what the date of

19   the Denney's breakfast was.  Possibly January.

20     Q.   It was following Christmas?

21     A.   I would have been.

22     Q.   Okay.  But, sir, wouldn't be the

23   same calendar month as the January 29th

24   incident?

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

157

1           A.    It could have been.

2           Q.    January 29th would be the same

3     calendar month as the Denney's breakfast?

4           A.    Very well could be.

5           Q.    Most months have 30 days; don't

6     they.

7                 MS. CESARANO:  He doesn't know.

8                 MR. BURTON:  He doesn't know if

9     months have 30 days?

10                MS. CESARANO:  He doesn't know when

11    this happened.

12          Q.    My question is do you know if

13    calendar months have 30 days?

14          A.    Yes. Most do.

15          Q.    Except for 31 and 29 or 28 days

16    maybe?

17          A.    Correct.

18          Q.    So something before Christmas

19    wouldn't probably be the same calendar month as

20    January 29th?

21          A.    That is correct.

22          Q.    That is all I was trying to

23    establish.

24          A.    I know is was around Christmas, sir.

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

158

1        Q.   You said before Christmas.

2             MS. CESARANO:  He said he didn't

3    know.

4             MR. BURTON:  Please don't talk. Just

5    note your objection for the record.  You have

6    been doing speaking instructions, counsel. Say

7    objection to form of the question.

8             It could be highlighted in here

9    every time you said he didn't say that, or he

10   didn't know.

11            MS. CESARANO:  I am just making the

12   objection for the record.

13            MR. BURTON:  Then say objection to

14   form of the question.  That is basic Evidence 1.

15   So please don't do this.

16            MS. CESARANO:  I have been very

17   liberal with you.

18            MR BURTON:  You have been very,

19   very, very talkative, and that is not proper.

20   And, you know, I would like to continue my

21   deposition.

22            MS. CESARANO:  I would be very happy

23   for you to do that, really.

24            MR. BURTON:  Then let's proceed.

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

159

1          Q.   Sir, you don't have any notes here

2     so you can't tell me when you did things;

3     correct?

4          A.   That is correct.

5          Q.   If you had your notes you could tell

6     me probably when you did things; correct?  They

7     would all be dated; wouldn't they?

8          A.   For what notes I have taken, yes,

9     sir.

10         Q.   You transferred to the Baco Target

11    after Deerfield; right?

12         A.   No.

13         Q.   Stayed there?

14         A.   Wait a minute.  No.

15         Q.   Transfer anywhere else after

16    Deerfield?

17         A.   After Deerfield?

18         Q.   Yes.

19         A.   Up here.

20         Q.   Okay.

21         A.   Columbus.

22         Q.   When did you come into Columbus?

23    What month?

24         A.   October.

          ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

160

1          Q.    When most all of this was happening?

2          A.    That I don't. I guess it was.

3          Q.    Yes.  How does Shannon finalize

4     guess services as team leader?  Is there a

5     process that you are aware of?

6          A.    Yes.  There is a report called an

7     F137 commonly referred to as over/short report.

8          Q.    How often is that to be filed?

9          A.    Daily.

10          Q.    You don't have to wait until the end

11     of the month to determine if there is overage;

12     do you?

13          A.    I don't have to wait until what,

14     sir?

15          Q.    To determine there is overage or

16     shortage, do you?

17          A.    Correct.

18          Q.    Should be a daily report?

19          A.    Yes, sir

20          Q.    It gets done daily; doesn't it?

21          A.    Yes, sir.

22          Q.    Why would you wait until the end of

23     the month to talk to Shannon about the overage

24     regarding Denney's, or shortage?

          ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

161

1         A.    I don't know that I waited until
2    the end of the month when I talked to her about
3    that one.  We talk on a daily basis.  At the end
4    of the month is when we sit down and make sure
5    that everything will be closed out properly.
6         Q.    When was the first you heard there
7    is over or short then?  At the end of the month
8    or when it happened?
9         A.    It would have been shortly after it
10   happened.
11        Q.    So you knew about it a day or two
12   after it happened when you got a daily report on
13   it?
14        A.    Correct.
15        Q.    Do you remember if the conversation
16   was at the end of the month or was it the next
17   day?
18        A.    It wouldn't have been the next day.
19        Q.    I see.  What organizations do you
20   belong to, sir?
21        A.    I am sorry.  What organizations?
22        Q.    Yes.
23        A.    Currently don't belong to any
24   organizations.

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

162

1          Q.   Not NRA, not National Sheriff's
2    Association?
3          A.   No, sir.
4          Q.   Nothing?
5          A.   No.
6          Q.   Okay.  What magazine subscriptions
7    do you get?
8          A.   I don't.
9          Q.   Any hobbies?
10         A.   Woodworking.
11         Q.   Anything that is involving other
12   people?
13         A.   No.
14         Q.   Steve is a pretty gregarious guy;
15   isn't he?
16         A.   I don't know what you mean.
17         Q.   You don't know what gregarious
18   means?
19         A.   No, sir, I don't.
20         Q.   Pretty sociable guy; since he?
21   Handsome black guy, well spoken?
22         A.   Yes, sir.
23         Q.   Bright, educated?
24         A.   I don't know about education.  He

          ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

163

1   has also been pleasant.

2          Q.   Have you ever belonged to any clubs

3   or organizations?  Something like being a Boy

4   Scout leader?

5          A.   Oh, for a short time I was a member

6   of the Buckeye State Sheriff's Association when

7   I was in law enforcement.

8          Q.   That was because you have to be;

9   right?

10         A.   No.

11         Q.   Pay $20 or --

12         A.   Didn't have to pay.

13         Q.   Became a member but dropped

14  afterward?

15         A.   Yes.  Didn't drop it.

16         Q.   You have to be a law enforcement

17  officer to --

18         A.   For what I was in.  I was in

19  the active part of it.

20         Q.   Then dropped it?

21         A.   Could have been an associate member,

22  but didn't have the same benefits.

23         Q.   So became a member because of good

24  benefits for you?

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

164

```
 1        A.    Yes.
 2        Q.    Anything to do because you just
 3   wanted to be with people?
 4        A.    I am sorry.
 5        Q.    Does it have anything to do that you
 6   joined voluntarily to serve the community as
 7   opposed to serve yourself? Some people stand on
 8   the street corner for the Boy Scouts or Girl
 9   Scouts. Some doesn't have a direct cause and
10   effect.
11        A.    Nothing that I can think of.
12        Q.    Like being a cop?
13        A.    Did I?
14        Q.    Yes.  Do you?
15        A.    I am not a cop.
16        Q.    Okay.  Did you like being a cop?
17        A.    Yes.
18        Q.    Like what you are doing now?
19        A.    Yes.
20        Q.    Have you ever felt that you made a
21   mistake?  Did you ever come to find out that
22   there were errors you made?
23        A.    I am sorry.
24        Q.    Did you ever determine that there
```

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

165

1    are errors that you made in any of

2    the investigations?  Ever say I made a wrong

3    conclusion there, you know, shouldn't have done

4    that.  Ever felt that you kind of were jumping

5    to the wrong conclusion?  Have you ever

6    acknowledged that you ever made one?

7         A.    Certainly.

8         Q.    Ever told anyone that I make a

9    mistake that you recall?

10        A.    Other than the people who work for

11   me or in the asset protection field, no.

12        Q.    Ever recall telling anyone at Target

13   that you made a mistake after looking at it?

14        A.    Certainly.

15        Q.    Who?

16        A.    My boss, people who work under me.

17        Q.    Who did you tell that you made a

18   mistake to specifically?

19        A.    I don't recall.  Various employees.

20        Q.    Have you ever said to some one you

21   thought this person was guilty and they are not.

22   Words to that effect?

23        A.    Yes.

24        Q.    Who?  Can you give any --

166

1          A.    I don't know the names.

2          Q.    Sir, are you familiar with any of

3    these documents?  Have you ever seen the

4    personnel file of Mr. Harris?

5          A.    No.

6          Q.    Have you ever seen his benefits

7    file?

8          A.    No.

9          Q.    Ever shown the Target position

10   statement to the EEOC?

11         A.    No.

12         Q.    Were you ever shown a description of

13   team leader in the Target manual?

14         A.    Job description?

15         Q.    Yes.

16         A.    Yes.

17         Q.    Okay.  Have you ever read the job

18   manual yourself through this day, go through

19   every page of it?

20         A.    Which job?

21         Q.    The Target job procedures manual,

22   one they have in the book, the big book?

23         A.    Policy and procedures?

24         Q.    Yes.

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

167

1          A.   No, I have not read every single

2     page in it.

3          Q.   Okay.   Were you instructed that you

4     were supposed to?

5          A.   No.

6          Q.   Do you know of a document that

7     requires you to sign after you read every page?

8          A.   No.

9          Q.   Have you ever read the cash voucher

10    policy of Target?

11         A.   Yes.

12         Q.   Okay.   Have you seen the Shooters

13    receipt?

14         A.   Yes.

15         Q.   The beach towel receipt, did you see

16    that?

17         A.   Yes.

18         Q.   Did you see Mr. Harris' Target

19    account statement?

20         A.   Again which Target account

21    statement?

22         Q.   Either or both.

23         A.   Yes.

24         Q.   Have you seen both of them?

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

168

```
 1          A.    Yes.
 2          Q.    Okay.  Business travel policy, ever
 3    seen that?
 4          A.    Yes.
 5          Q.    Read it?
 6          A.    Yes, sir.
 7          Q.    Have you seen Mr. Harris' personal
 8    account?
 9          A.    Yes.
10          Q.    Which one?
11          A.    The Target account, this one
12    (indicating).
13          Q.    Okay.  Is it a violation of Target
14    policy if someone has a minor financial
15    difficulty behind there account that reflects
16    poorly on their job?
17          A.    That I have no idea.
18          Q.    Have you ever had a problem on any
19    credit card statements?
20          A.    I am sure I have, yes.
21          Q.    Have you ever reported that to
22    Target?
23          A.    That I am delinquent on my account?
24          Q.    Yes.
```

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

169

1          A.    No.

2          Q.    Personal stuff?

3          A.    No.

4          Q.    Do you have a Target account?

5          A.    No.

6          Q.    Okay.  One reason is you don't want

7     them to know stuff like that, just keep them out

8     of your business?

9          A.    No.  I had a Target account.

10         Q.    Were you ever behind in it?

11         A.    No.

12         Q.    Ever a day that you were late?

13         A.    Not that I recall.

14         Q.    That because you didn't want them to

15    see that you might have a problem?

16         A.    No.

17         Q.    So other credit cards that you did

18    get a little bit behind, but never Target's;

19    correct?

20             MS. CESARANO:  Objection to form.

21         A.    No, that is not correct.

22         Q.    You said you were late on some

23    accounts before.

24         A.    Yes, sir.

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

170

1          Q.    And I asked whether Target and you

2      said no.

3          A.    Yes, sir.

4          Q.    You said you had a Target account

5      but never had it late.

6          A.    Correct.

7          Q.    My question then is there were other

8      accounts that you were a little behind but never

9      Target's.

10         A.    That is not true.

11         Q.    Well, can you tell me how you are

12     reconciling those two statements?

13         A.    The Target account was 21 percent

14     interest.  Preferred not to have 21 percent

15     interest card.

16         Q.    Okay.

17         A.    So open for a very short time and

18     inactive.

19         Q.    You thought the interest rate was

20     bad; is that correct?

21         A.    Correct.

22         Q.    Was there ever counseling provided

23     to Mr. Harris before disciplinary action was

24     taken on him?

            ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

171

```
 1          A.    I have no knowledge.

 2          Q.    Did you ever counsel him?

 3          A.    Did I?

 4          Q.    Yes.

 5          A.    No, sir.

 6          Q.    Do you know if anyone ever took any

 7    action less than terminating him on the spot?

 8          A.    No, sir.

 9          Q.    Who is Brandy Svoboda?

10          A.    I have no idea

11          Q.    Lori Wagner?

12          A.    I have no idea.

13          Q.    Who is Lisa Arondo?

14          A.    That name sounds familiar, but I

15    don't know.

16          Q.    Any recollection of any contact with

17    anyone regarding Mr. Harris regarding Ms.

18    Arondo?

19          A.    No.

20          Q.    Who is Melissa McCabe?

21          A.    That is one I was talking about

22    earlier.  Wait a minute.

23          Q.    That wasn't -- I said Keil earlier?

24          A.    No.  The one I said worked for me.
```

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

172

1  Thinking it was Lisa LeFeu.  That is Melissa

2  McCabe. This is the one that worked for me.

3        Q.   I see.  Do you know what she did in

4  reference to Mr. Harris?  Anything?

5        A.   No.

6        Q.   Any reason why you would have spoken

7  to her regarding Mr. Harris?

8        A.   No.

9        Q.   What about Corrine Robbins?

10       A.   I have no idea.

11       Q.   Have you ever seen handwritten notes

12 by Sandy Grisbak, do you remember, recall,

13 regarding anything to do with this?

14       A.   No.

15       Q.   Caryn Knapp.  Do you know if she

16 gave a statement, and if so what it said?  Give

17 a second statement, if so what it may have said?

18       A.   I don't recall.

19       Q.   Did this Blacknick give a statement

20 in this case?

21            MS. CESARANO: Objection to form.

22       A.   Do I know that he did?

23       Q.   Yes.

24       A.   Yes, I do.

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

```
                                                173
 1           Q.    Who told you?
 2           A.    That I don't know.
 3           Q.    What do you recall him saying?
 4           A.    That he had purchased a riding toy
 5   for Mr. Harris.
 6           Q.    Do you remember speaking with him
 7   about it?
 8           A.    No.
 9           Q.    Do you remember who spoke with him
10   about it?
11           A.    No, I don't.
12           Q.    The riding toy incident, what was
13   the gossip or hearsay?
14           A.    That was the situation I heard, that
15   I believe Donna Keil was involved in.
16           Q.    Tell me about it.
17           A.    That her and Steve had a
18   conversation about some merchandise that had
19   been in the stockroom that he wanted to buy that
20   she reduced.  Said it was old merchandise, he
21   asked I believe it was Donna to set the price on
22   it.
23                 She set a, after some research, set
24   a price on it based on the information that was
```

174
1   old merchandise.  She took it up to the front
2   lanes and asked Tim Blacknick to purchase it for
3   him.
4        Q.   Okay.  And --
5        A.   Then later it was determined that it
6   was not old merchandise, it was in fact new
7   display that had not be put out on the sales
8   floor yet.
9        Q.   Okay.  And Mr. Blacknick, is that
10  supposedly what he said?
11       A.   No. The only thing he knew about it
12  was he made the purchase for Steve.
13       Q.   Didn't he talk with you, that in
14  fact told you that didn't occur that way?
15       A.   What didn't occur that way?
16       Q.   What you just said, Mr. Blacknick
17  said that specifically didn't occur that way
18  that you just told that it did.
19       A.   I don't remember having that
20  conversation with him.
21       Q.   Didn't Donna Kiel admit she is the
22  one that actually gave him the wrong price, that
23  it wasn't Steve's fault?
24       A.   Donna Kiel set the price.

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

175

1          Q.   She set the price, he didn't?

2          A.   Based on information that it was old

3     merchandise.

4          Q.   Yes.   Told him it was old

5     merchandise; correct?

6          A.   Told her it was old merchandise as I

7     recall.

8          Q.   I see.

9          A.   I thought she was new to the store,

10.   but I could be mistaken.

11         Q.   Didn't she specifically say that he

12    said don't give me a good price because I am

13    team leader, give me whatever it is, before she

14    set the price?

15         A.   She say that?

16         Q.   Wasn't she quoted as saying don't

17    give me a special or good price because I am

18    team leader, I want what it's supposed to be?

19         A.   I don't recall exactly what was

20    said.

21         Q.   Didn't you take this statement of

22    Donna Keil that she quoted as exactly that?

23         A.   I don't know.

24         Q.   Sir, is this your statement that you

          ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

176

1    prepared and typed?  Did someone else do that?

2    Is that your job?  Did you take that statement;

3    sir?

4         A.    No.

5         Q.    So you have know knowledge of having

6    seen this before, what is now Exhibit 4?

7              (EXHIBIT HEREBY MARKED FOR

8    IDENTIFICATION PURPOSES.)

9         A.    I have seen the document.

10        Q.    Who took it?

11        A.    I don't know who was directed to

12   write the statement.

13        Q.    Who is doing the directing?

14        A.    As stated before, sir, either Doug

15   Barth or Mark Hastings.

16        Q.    Is it customary to have people

17   directing statements being written and typed?

18   Is that performing a proper investigation?  Is

19   that the way Target does it?

20             MS. CESARANO:  Object to form.

21        A.    You say is that --

22        Q.    Is that the custom to say what

23   statements that they want?  Is that doing a

24   thorough investigation?

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

177

1    A.    I don't know that they didn't do a

2    thorough investigation.

3    Q.    Well, I asked about what you would

4    do and you went through that earlier, and I am

5    asking if that is common that go out and get

6    information that you want to substantiate as

7    opposed to doing a complete investigation?

8    MS. CESARANO:    Object to form.

9    MR. BURTON:    Noted.

10    A.    I believe there was a complete

11    investigation done, sir.

12    Q.    I already gave you names that you

13    said you weren't sure were ever looked upon or

14    statements --

15    A.    Didn't see those.

16    Q.    Then you can't make the conclusion

17    that it was a complete investigation, can you,

18    if you don't know?

19    A.    No.

20    Q.    Is the statement you took from

21    Shannon Tetrault No. 5?

22    (EXHIBIT HEREBY MARKED FOR

23    IDENTIFICATION PURPOSES.)

24    MR. BURTON:    Counselor, I would like

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

178

1   a copy all of exhibits.  I have not seen a

2   number of them.

3            MS. CESARANO:  Okay. That is fine.

4       A.   I don't recall taking that

5   statement.  I do remember seeing it.

6       Q.   Well, you don't recall taking it?

7       A.   No.

8       Q.   Where is the statement you took from

9   her originally?  You said you took a statement

10  of Shannon Tetrault, directed to by Mr. Barth.

11  Where is that document, the one that you took?

12      A.   Is something missing from that?  Top

13  of that?

14      Q.   That is the date, dated 12-17-99.

15  This is, to the best of my knowledge this is a

16  single piece of paper.  This is page 110, one

17  before it is 109.  So if it is missing I don't

18  get it.

19           MS. CESARANO:  I will look and see.

20      Q.   It would be interesting to find it,

21  wouldn't it, sir?

22      A.   That could be the statement.

23      Q.   You don't recall that being it, do

24  you, as you sit here today?

         ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

179

1          A.   No, I don't recall that being it. I

2     have taken a statement and turned it over. I

3     don't recall whether that is it or not.  I

4     recall seeing that statement.  Whether that is

5     the statement I took or not, I don't remember.

6          Q.   Would you initial the statements

7     when you took them?  Would that be your custom

8     and practice as a police officer when someone

9     gave a written statement, you would initial it?

10         A.   No.

11         Q.   Wouldn't in any way indicate that

12    you had anything do with it?

13         A.   No.

14         Q.   Not for evidence purposes?

15         A.   No.

16         Q.   Okay.  Sir, what do you remember

17    being on the statement that you are looking at,

18    second sheet or the last sheet of paper?

19         A.   I don't remember anything being on

20    any statement.  I am telling you I don't know

21    that is the one I took from her.

22         Q.   I --

23         A.   I remember seeing a statement, or

24    taking a statement from her.

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

                                                                 180
1          Q.   This is not one you recall?
2          A.   I don't recall whether that is it or
3    not.
4          Q.   Because the last sentence, I asked
5    Betty.  Who is Betty?  Do you remember?
6          A.   Assuming Betty Gaston.
7          Q.   Yes.  Talks about the voucher and
8    money processing, she did it, never gave --
9    never got back any change.
10              Did you ever ask Betty Gaston if she
11   got back change?
12         A.   No.
13         Q.   Never asked it?
14         A.   No.
15         Q.   This other statement, this is a
16   different statement, this 12-17-98, is this
17   the statement that you took from Shannon?
18              (EXHIBIT HEREBY MARKED FOR
19   IDENTIFICATION PURPOSES.).
20         Q.   Do you remember that is
21   the statement --
22         A.   I believe this is the one that I
23   took from her.
24         Q.   So, sir, that is three months before

      ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

181

1    the Evan party.

2              MS. CESARANO:   I am going to object

3    to form.   There is no date on this statement.

4         Q.   When was this taken?

5         A.   I don't know.  No date on it that I

6    see.

7         Q.   Okay.  Sir, this statement, did you

8    ask it be prepared in this fashion?

9         A.   Did --

10        Q.   Did you ask it be prepared in this

11   fashion?

12        A.   I don't understand what --

13        Q.   The way it is, did you ask for the

14   wording to be put on there?

15        A.   No.

16        Q.   What did you ask her to do?

17        A.   I am sure to write a statement about

18   what information she had on the $300 and

19   anything else that Mr. Harris would have done

20   that she was knowledgeable of.

21        Q.   I see.  And that was at the request

22   of Mr. Barth?

23        A.   Or Mark Hastings.  I don't know -- I

24   am not sure which one.

          ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

                                                    182
1        Q.   Or Mark Hastings.  This one also
2   refers to that Betty seems to remember
3   processing the voucher.  This is Shannon's
4   statement only.  You didn't talk to Betty on
5   this either; did you?  Weren't told to; correct?
6        A.   Yes.
7        Q.   And this one has, let me see, "On
8   another occasion I say Steve buy two towels out
9   of charge back. When I questioned him on the
10  towels he told me Maureen Merecks bought about
11  20 or 30 towels. My service desk team member
12  Mona told me Steve told Angela to take them out
13  of charge back and sell them."
14            MS. CESARANO:  What number?
15       Q.   Second paragraph.
16            MS. CESARANO: Exhibit 6?
17       Q.   Yes.  Sir, did you talk to any of
18  these other people that are mentioned, five or
19  six different names in there?
20       A.   No, sir, I did not. Again, I did not
21  conduct the investigation.
22       Q.   Sir, what would you do if you were
23  told to set someone up to fire them?
24            MS. CESARANO:  Object to form.

     ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

183

1          MR. BURTON:  Noted.

2     A.   I was never told to --

3     Q.   If you were told to set someone up

4  what would you do?

5     A.   I have never been told to set anyone

6  up.

7     Q.   So you didn't consider this a set up

8  of Steve when you were told to take statements

9  and one person who in their own words put six

10  other names out there and you checked on none of

11  them; is that correct?

12     A.   That is -- no, that is not correct.

13     Q.   Sir, did you speak to Mona?

14     A.   No.  I told you I didn't.

15     Q.   Did you speak to Angela?

16     A.   No.

17     Q.   Speak to Maureen?

18     A.   No.

19     Q.   Speak to Betty?

20     A.   I know I spoke to Betty, but I can't

21  recall what the exact conversation was.

22     Q.   Speak to Sandy?

23     A.   Yes.

24     Q.   Donna?

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

184

1          A.    Donna Grisbak. I told you that.

2          Q.    All right.  Sir, correct me if I am

3    wrong, didn't you have a meeting regarding a 10

4    percent coupon, executive meeting?

5          A.    Yes.

6          Q.    What is a 10 percent coupon?

7          A.    It is instant credit on a credit

8    card application.  Instance credit card account

9    application.

10          Q.    And what about the 10 percent

11    coupon?  Did you ever hear that Shannon Tetrault

12    was padding those things to make herself look

13    good?

14          A.    No.

15          Q.    Never told that people were taking

16    out credit card applications to meet quotas?

17          A.    No.

18          Q.    First time you heard this today?

19          A.    Yes.

20          Q.    Would that be a violation of store

21    policy?

22          A.    Having people fill out credit card

23    applications?

24          Q.    To get the 10 percent.

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

185
1          MS. CESARANO:  Objection to form.
2      A.    Who is filling out the application?
3      Q.    Having customers or other people
4  fill out credit card applications telling them
5  they will get 10 percent with people saying they
6  don't want to get the credit, and the purpose in
7  doing that is pushing the Target credit.
8          MS. CESARANO:  Object to form.
9      Q.    Would that be a violation of Target
10  policy, sending out phony applications to get 10
11  percent discount?
12     A.    Phony applications are a violation,
13  yes.
14     Q.    Telling them to do that would be
15  just as bad; wouldn't it?
16     A.    I don't understand what you are
17  asking.
18     Q.    Does Target promote or encourage
19  people to get Target credit cards so they can
20  make interest on sales?
21     A.    No.  We encourage everyone to push
22  Target charge account to enhance sales.
23     Q.    Yes, sale at 21 percent that you
24  don't want but want someone else to pay;

186

1  correct

2              MS. CESARANO:  Object to form.

3         A.    Whether pay or not is up to them.

4  They can purchase and pay the card off.

5         Q.    Sir, as you sit here today looking

6  at the jury, sir, aren't you saying that same 21

7  percent is what you don't want to pay but trying

8  to push other persons?  Yes or no?

9         A.    Yes.

10        Q.    Okay.  Now, there is an incentive

11  and you make the employee look good if this

12  store meets its pushing Target cards at 21

13  percent interest; correct?

14        A.    No.  What is the incentive?

15        Q.    The executive looks good with

16  meeting their quota.

17        A.    No.  We don't keep track of who did

18  it.

19        Q.    You don't?

20        A.    No, sir.

21        Q.    Okay.  Wasn't there discussion with

22  Sandy, yourself, and Steve regarding the 10

23  percent quota?  Do you remember any such

24  discussion about the 10 percent coupon?

              ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

1       A.    With who?

2       Q.    With yourself, Sandy, Don and Mark.

3  Do you remember this conversation?

4       A.    No.

5       Q.    Okay.  So you don't recall Shannon

6  Tetrault, Steve and you discussing the pushing

7  of 10 percent cards?

8       A.    Yes.

9       Q.    Please tell me what you recall of

10  that meeting, where and when and how.

11      A.    We was in a meeting, I don't recall

12  what forum it was, Shannon talked to Steve about

13  the use of the 10 percent card and it was a

14  violation of policy, and Steve said that he had

15  received permission from Mark, that is the then

16  district manager, to try it for a two week

17  period.

18      Q.    Did you ever speak to Mark Hastings

19  about that?

20      A.    Did I?

21      Q.    Yes.

22      A.    Yes.

23      Q.    What did he say?

24      A.    Said he never gave permission.

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

188

1    Q.    I see.  And did they do or not do it

2  for a two week period or not?

3    A.    I don't know how long it went on.  I

4  went on for a short time.

5    Q.    Okay.  And was this grounds for him

6  being untrustworthy?

7    A.    Who?

8    Q.    Mr. Harris.

9    A.    Grounds for him being --

10    Q.    Untrustworthy.

11    A.    Yes.

12    Q.    Assuming that it did or didn't

13  happen, what would Mr. Harris get out of it?

14    A.    I have no idea.

15    Q.    Why did you ask Ms. Tetrault to

16  write about it then in statement No. 6?

17    A.    It was one of the things that I was

18  asked to get a statement from her regarding.

19    Q.    From whom?

20    A.    Either Doug Barth or Mark Hastings

21  asked me to get a statement.

22    Q.    Why would they care that Mr. Harris

23  even said or didn't say this when there would be

24  no benefit to him whatsoever?

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

189
1          A.    Sir, I don't understand why they
2    care, I don't know what the thinking was.
3          Q.    I see.  So, you were asked to speak
4    with Shannon and that resulted in No. 6 being
5    drafted.  You had a long list of statements to
6    take and subjects?
7          A.    Correct.
8          Q.    They sent that paper, correct, gave
9    it back to Mr. Gillespie or Mr. Barth; correct?
10         A.    Gave it back, yes, that is correct.
11         Q.    To someone in that division of
12    security?
13         A.    Probably Doug Barth.
14         Q.    And not been seen since?
15         A.    No, haven't seen it.
16         Q.    Okay.  Nor have I.  You don't know
17    what the thinking was, but you were given these
18    instructions; correct?
19         A.    Not necessarily.  Could have been a
20    piece of scratch paper lying on my desk, got a
21    phone call and someone just said do me a favor,
22    take a statement or whatever.
23         Q.    That wasn't what happened here.  You
24    said you had very specific topics from specific

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

190

1  people, so unlikely it was on a scratch piece of

2  paper.

3          A.    No.   Not lengthy at all.

4          Q.    So you keep telling me and this

5  Court --

6          A.    I don't know whether I kept it or

7  not.

8          Q.    You may have gotten these

9  instructions, you probably would have taken

10  written statements, you don't have any copies of

11  these either; correct?

12          A.    Sir, you get me confused here asking

13  me three questions as one.

14          Q.    I will try --

15          A.    May not have gotten instructions,

16  yes, or I would have received directions --

17          Q.    But they were written down?

18          A.    From a superior.

19          Q.    These are pretty specific, aren't

20  they, (indicating) who said what to whom at a

21  meeting on 10 percent coupon, meeting with

22  six specific people?

23          A.    No, sir.

24          Q.    To get all that right wouldn't have

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

191

```
 1   required writing it down?
 2        A.   No.
 3        Q.   I see.  Would you have in fact
 4   transcribed her meeting with you?
 5        A.   Would --
 6        Q.   Sit down with yourself and write
 7   notes comprising the nature of that
 8   conversation?
 9        A.   No.
10        Q.   So now you don't have any notes of
11   anything?
12        A.   I don't know.  I am assuming there
13   were notes.
14        Q.   Haven't seen them either?
15        A.   No.
16        Q.   No idea what were on the notes as
17   you sit here today; correct?
18        A.   No, sir.  I don't remember what my
19   notes were of.
20        Q.   And never asked them what they are
21   thinking or trying to achieve, correct, because
22   they are superiors and they can ask you to do
23   anything; correct?
24        A.   To a agree, yes, sir.
```

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

192

1          Q.   Who is Ms. McKenna?

2          A.   She was manager from another Target

3     store.

4          Q.   What statement did you get of her?

5     Did you get a statement?

6          A.   Didn't get a statement of her.

7          Q.   Do you know who received this

8     supplemental statement of Ms. McKenna?

9          A.   No.

10         Q.   Do you know who asked for it?

11         A.   No, I don't.

12         Q.   Do you know whose instructions were

13    given?

14         A.   No, I don't.

15              (EXHIBIT HEREBY MARKED FOR

16    IDENTIFICATION PURPOSES.)

17         Q.   No. 7 you have never seen?

18         A.   I have seen it, statement, yes, sir.

19         Q.   When did you see it?

20         A.   It was in the package that I

21    received about three weeks ago.

22         Q.   What else was in that package you

23    received three weeks ago?

24         A.   What I told you about.

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

193

1          Q.    You said you received something from

2     her secretary last Thursday.  What did you

3     receive three weeks and from whom?

4          A.    When I told you I received something

5     last Thursday, Wednesday or Thursday, it was

6     transcribed.

7          Q.    Yes.

8          A.    That was last Wednesday or Thursday.

9          Q.    You received another package from

10    whom?

11         A.    Approximately two weeks ago from

12    Margaret Davis.

13         Q.    Margaret Davis.  Who is that?

14         A.    Her associate; is that correct?

15         MS. CESARANO:  Yes.

16         Q.    When you received a package two

17    weeks earlier what was in that package?

18         A.    That is what I went in to, sir,

19    earlier.

20         Q.    You said two statements, one from

21    Keil and Shannon?

22         A.    I said statements, statements I

23    recall I told you and copy of the Shooters

24    receipt, and copy of cash vouchers.

          ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

194

1          Q.    Because you haven't mentioned Ms.
2    McKenna's name before.
3          A.    Okay.
4          Q.    Do you agree you haven't mentioned
5    her name before now?
6          A.    No, haven't mentioned.
7          Q.    In relation to having received a
8    statement from her?
9          A.    No, not having received a statement.
10         Q.    Yes.   Statements, you said Keil and
11   Shannon.
12         A.    Okay.
13         Q.    Didn't mention her name.
14         A.    I am sorry.   Overlooked it or
15   statement was in there.
16         Q.    Do you remember any others as you
17   sit here?
18         A.    See, I had one statement in there --
19   no, I don't recall what all statements were in
20   there.
21         Q.    Sir, do you remember getting a copy
22   of your own statement that you made?
23         A.    Yes, sir.
24         Q.    Okay.   And I asked you earlier if

          ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

195

1    you recall he didn't want to use his American

2    Express card because he didn't want to incur

3    obligations on it.  Do you remember me asking

4    that earlier?

5         A.    No.

6         Q.    Did you have a conversation with him

7    about not wanting to use the American Express

8    card?

9         A.    No.

10        Q.    Okay.  Do you remember seeing this

11   statement of Caryn Knapp either in the package

12   or at the time you got the package one or two

13   weeks ago?

14        A.    Yes, I do.

15        Q.    Did you obtain it or did somebody

16   else?

17        A.    I believe I obtained this.

18        Q.    This one you obtained?

19        A.    Yes.

20        Q.    Okay.  There is a form that you

21   have, statement form that is?

22        A.    Yes.

23        Q.    Target document?

24        A.    Yes.

196

1    Q.   Now, did you approach Miss Knapp or

2   how did it come about?

3    A.   I don't recall honestly.

4    Q.   Okay.  It says also gave me more

5   than the difference back.  What do you interpret

6   that to mean?

7    A.   That gave her more money than what

8   she rang in.

9    Q.   Did she tell you how this

10   transaction occurred?  Do you recall her saying

11   how it a occurred?

12    A.   As I recall her telling me that

13   Steve handed her a receipt and some money and

14   said you need to ring this back in.  She went to

15   the service desk, she rang the voucher.  First

16   didn't realize there had already be a payout on

17   it of $500.  Okay.

18    Q.   Okay.

19    A.   Then she saw in the voucher book that

20   there had already been a payout of $500.

21    Q.   Right.

22    A.   She rang in $205, the difference

23   between the $295 Steve said he spent and the 500

24   that he took.

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

197

1      Q.    Yes.

2      A.    She then went and told Steve here,

3  you gave me more money, and Steve said I don't

4  know, just gave you the money I had in my

5  pocket. That is what I recall.

6      Q.    You don't remember her telling that

7  there was approximately more than 100 difference

8  that he gave her?

9      A.    Yes.

10     Q.    Sir, this is not rocket science, but

11 if someone gives 100 additional back, if he was

12 off by a digit, everybody drinking at Shooters,

13 and instead of 205 he gives her 305, that would

14 have rectified the error, wouldn't it?

15     A.    That is not what I recall he said.

16     Q.    Sir --

17         MS. CESARANO:   Let him answer the

18 question.

19     Q.    My question is real simple, sir.   If

20 he gave her 100 difference that would have

21 rectified the complete error; wouldn't it

22         MS. CESARANO: I am going to object

23 to form.

24     Q.    Yes or no?

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

198

1          A.   No.

2          Q.   His math error is cured by the fact

3     that he gave back the right change?

4               MS. CESARANO:  Objection.

5          Q.   She said he gave her more than 100

6     difference?

7          A.   That is what the statement says,

8     yes.

9          Q.   Never took that into account, sir,

10    did you, Detective Cluso?

11              MS. CESARANO: Object to form.

12         A.   I didn't conduct the investigation

13    or the interview of this.

14         Q.   Sir, did you take into account Mr.

15    Harris' error?

16         A.   No.

17         Q.   It didn't matter?

18         A.   I took the statement, turned the

19    statement over to them.

20         Q.   They could do what they wanted with

21    it no matter even if they were going to crucify

22    him; right?

23              MS. CESARANO:  Object to form.

24         A.   Can't answer that.

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

199

1    Q. Put your hands up like you don't

2 care.

3    A. Put my hands up like I can't answer

4 that.

5    Q. I see.  Didn't she tell you

6 specifically that she said he took the money out

7 of his pocket, all of the money difference, and

8 receipt, take it, it's the deal?

9    A. No.

10    Q. Or words to that effect?

11    A. No.

12    Q. Okay.  If she swore to that she

13 would be lying?

14    MS. CESARANO:  Objection to form.

15    A. I don't know that she would be lying

16 or not.

17    Q. Well, did it happen or not?

18    A. No, not to my recollection it did

19 not happen.

20    Q. I see.  Do you remember seeing this

21 other Sandy Grisbak report, one dated 2-12-99?

22 Did you get this from her?

23    MS. CESARANO:  Are you going to

24 mark this?

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

```
                                                    200
 1              (EXHIBIT HEREBY MARKED FOR
 2    IDENTIFICATION PURPOSES.).
 3         Q.   Sir, did you receive 9?
 4         A.   No, sir, I didn't.
 5         Q.   Seen it before today?
 6         A.   No.  I don't recall.
 7         Q.   Was it part of the package that was
 8    given to you three weeks ago?
 9         A.   I don't recall seeing this one.
10         Q.   Okay.  Did you ever take a statement
11    from Dina McHugh?
12         A.   No.
13         Q.   Do you know who she is?
14         A.   Yes.
15         Q.   Who is she?
16         A.   Told you she was soft lines manager.
17    You asked if that included towels and I said no.
18         Q.   Do you know if this is her complete
19    statement or was she ordered to write those
20    words?
21         A.   I have no idea, sir.
22         Q.   Nothing to do with it anyway.
23    Didn't interview her; right?
24         A.   No.

      ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481
```

201

1           (EXHIBIT HEREBY MARKED FOR
2  IDENTIFICATION PURPOSES.)
3       Q.   This is the receipt you were shown
4  by Barth?
5       A.   No.  Question again, sir?  This is
6  the receipt I was shown?
7       Q.   Yes.
8       A.   I don't know if it is the same one
9  or not.  I don't know.
10      Q.   You don't recall this being part of
11 Mr. Harris' deposition?
12      A.   There was a receipt with a towel on
13 it or two towels.
14      Q.   Do you remember if it's the same
15 thing you read three days ago?
16      A.   No.
17      Q.   Good.
18           (Exhibit Marked for Identification)
19      Q.   What is PPTL?
20      A.   Pricing Presentation Team Leader.
21      Q.   Who is Pricing Presentation Team
22 Leader on or about March of '99?
23      A.   That I don't recall.
24      Q.   Well, have you seen this one before?

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

202

1          A.    Yes.

2          Q.    Okay.    In what context did you see

3    it then or now?

4          A.    Probably information that was sent

5    to me approximately three weeks ago.

6          Q.    What is it supposed to represent to

7    you as you read it today or now or then?

8          A.    Nothing.

9          Q.    Okay.    Do you know what it seems to

10   say?    Because it seems to stay that the pricing

11   of the towels was set by someone else other than

12   Steve.    Am I correct?

13         A.    No, that is not correct.

14         Q.    Well, who is PPTL?

15         A.    I don't recall who PPTL was at the

16   time.

17         Q.    Now, what is eaches per hour?

18         A.    You have 5,000 items that need to

19   have a price change done on them.

20         Q.    Okay.

21         A.    If you do those 5,000 in 10 hours,

22   okay, how many is that per hour?

23         Q.    Okay.

24         A.    That is what per hour is.

203

1          Q.   Do you know what eaches is referring

2     to on there?  Do you know what price changes

3     they are referring to there?

4          A.   No.   This is taken off of a report

5     which would be a either weekly or monthly

6     report.

7          Q.   But involving what products?

8          A.   All price change products, all price

9     change items.  Anything.

10         Q.   But this doesn't refer to towels,

11    doesn't refer to anything specific?

12         A.   Not at all.

13         Q.   What does Donna Keil and eaches

14    price changes have to do with this case?

15         A.   That they were manipulating the

16    system by not doing price changes correctly,

17    which caused the Deerfield store to be two to

18    three times higher because of the price changes.

19         Q.   Sir, weren't you there to tell them

20    that as the person in charge --

21         A.   I did tell them that, sir.

22         A.   Who did you tell and when? That is

23    going back to Shannon Tetrault; isn't it?

24         A.   What is going back to Shannon?

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

204

1          Q.    When you first met with Shannon

2    Tetrault.

3          A.    That had nothing to do with Shannon.

4          Q.    Sir, when you came into that store

5    when did you first notice they were doing it

6    wrong?

7          A.    I don't recall.

8          Q.    First couple weeks or two?

9          A.    Could have been.  I would say

10   somewhere between three, maybe three weeks and

11   six weeks.

12         Q.    Put it into October, November,

13   December of '99?

14         A.    No, sir.

15         Q.    Came in October?

16         A.    November.

17         Q.    So have to put it in November of '98

18   or December of '98?

19         A.    Yes, sir.

20         Q.    Who did you say they were doing it

21   wrong to?

22         A.    To the Price Change Team Leader.

23         Q.    Can you give the name of the person?

24         A.    I don't recall.

205

```
 1          Q.    You don't recall telling Steve as
 2    you sit here today?
 3          A.    Talked to Sandy Grisbak about it.
 4          Q.    You didn't ask to talk to Steve?
 5          A.    Yes, I did.
 6          Q.    About that?
 7          A.    Yes.
 8          Q.    What did you say?
 9          A.    Told him that they are doing it
10    improperly.
11          Q.    Who was responsible for doing
12    ticketing?  Sandy Grisbak; wasn't she?
13          A.    No.  She had just gotten to the
14    store.  She came over when I did.
15          Q.    Sir, this is dated March 1, '99.
16          A.    Donna Keil was the boss before
17    Sandy came there.
18          Q.    So my question to you is before she
19    came there her boss told her to do it that way.
20    What does that have to do with anything with
21    this case other than trying to set this guy up?
22          A.    Not trying to set up --
23          Q.    What does it have to do --
24          A.    You can read it and explained it to
```

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

206

1    you.  They are doing price changing which Donna

2    knew to be wrong, not according to policy.  She

3    asked them why are you doing this price changing

4    this way, who told you to do this.

5         Q.   She said your boss.

6         A.   Your boss, meaning Donna Keil's boss

7    being Steve Harris.

8         Q.   So even though you are there before

9    Grisbak you didn't notice it?

10             MS. CESARANO:  Objection.

11        Q.   You are in charge of this.

12        A.   I am not in charge of this.

13        Q.   Who is?

14        A.   This person right here (indicating),

15   Donna Keil.

16        Q.   So Donna Keil was told she was doing

17   it wrong by someone?

18        A.   No.  You re-read it, sir, that

19   doesn't say Donna Keil was doing it wrong.  She

20   was the one doing the questioning.

21        Q.   Who told her? Who was the PPTL?

22        A.   I don't know.

23        Q.   Did you ask who that was?

24        A.   No.

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

1          Q.    So as you sit here you don't know

2     who she spoke to; correct?

3          A.    No.

4          Q.    You don't know who that was that

5     told her, you didn't investigate

6     the conversation at all, did you, between Keil

7     and --

8          A.    No.

9          Q.    Do you know when Steve Harris got

10    there?

11         A.    No.

12         Q.    Assuming Steve Harris got there one

13    month or two months before you she worked for

14    Mr. Kianka for three years; didn't she?

15         A.    No.  Mr. Kianka was security

16    manager.  She never worked for the security

17    manager.

18         Q.    Who is store manager prior to Steve

19    Harris?  Joe?

20         A.    Joe Toscano.

21         Q.    Do you know if this happened under

22    Joe Toscano?

23         A.    No.  I told you I don't know.

24         Q.    Okay.  So what you are saying is

208

1  you jumped to the conclusion that the boss was

2  Steve Harris.

3        A.   I remember being told that Steve was

4  the one telling them to do that.

5        Q.   Why didn't you write a note to it

6  or --

7        A.   Why?

8        Q.   Why not a note?

9        MS. CESARANO:  Objection to form.

10       Q.   To the conversation you had.  Why

11 didn't you keep notes of the conversation you

12 had to show us today, sir?

13       A.   Maybe I did.

14       Q.   Maybe you did.

15       A.   I don't recall.

16       Q.   Sir, you have put a cop on

17 disciplinary action for taking less effort;

18 haven't you?

19       A.   Taken what?

20       Q.   Less effort documenting their

21 investigation.

22       MS. CESARANO:  Objection to form.

23       Q.   Answer the question.

24       A.   No, I haven't.

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

209

1        Q.   Would you put yourself on report for
2   the lack of documentation you have kept?
3        A.   No.
4             MS. CESARANO:  Objection to form.
5        Q.   Now, correct me if I am wrong, what
6   does Steve Harris' Target card have to do with
7   this case showing that at one time he was a
8   little bit behind?
9        A.   I have no idea.
10       Q.   But you have shown that his personal
11  Target credit card at one point had problems,
12  money problems; right?
13            MR. BURTON:  Mark that.
14            (Exhibit Marked for Identification.)
15       Q.   Have you seen that before?
16       A.   Yes.
17       Q.   When did you see that?  Three days
18  or three weeks or --
19       A.   Three weeks ago.
20       Q.   Okay.  Why is the company pulling
21  credit card information?  Isn't that private
22  information?  They have no more right to that
23  than I would.
24       A.   No.  It is a proprietary card.

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

210

1        Q.    Proprietary?

2        A.    Yes.

3        Q.    Which means that the company can

4    look at the personal Target credit card

5    expenditures of all employees?

6        A.    No.    What I am saying is you asked

7    why we have a right to look at it.    I said

8    because it is a proprietary card, not Visa or

9    MasterCard, it's a Target credit card.

10        Q.    The one company business card that

11    was in the name of Steve and Janice Harris. What

12    does proprietary mean to you?

13        A.    What does it mean to you?

14        Q.    It doesn't matter.

15        A.    It means we own it. This is ours,

16    this is our Target charge account.

17        Q.    That you have granted Target a piece

18    of the interest.    Is that not owned by Retailers

19    National Bank?

20        A.    Correct.

21        Q.    Okay.    What right do you, Target,

22    have to look in my Visa personal account?

23        A.    That is not looking at Visa.

24        Q.    What right does the company have to

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

211

1    look at my personal credit with or without

2    the Target card?  Are you following me, sir?

3         A.    I don't know that we have a right to

4    look at your personal credit.

5         Q.    Does Target have the right to look

6    and see the underlying charges or credit status

7    of employees because that have a Target card?

8         A.    For investigative purposes, yes.

9         Q.    Under what theory, sir?

10        A.    What do you mean?

11        Q.    Who told you that for investigative

12   purpose the company can look into the underlying

13   credit of its employees because they keep a

14   Target Visa?

15        A.    That is not Visa or MasterCard.

16        Q.    Target card meaning that they can

17   buy from Target at the 21 percent credit.  Sir,

18   who told you the company can look into its

19   employees' payments of their personal

20   obligations?  Who told you that one?

21             MS. CESARANO:  Object to form.

22        A.    I can't answer that because I am not

23   sure.

24        Q.    You say for investigative purposes

         ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

```
                                                    212
 1   you can look in it and I am asking you who told
 2   you that?
 3        A.    Part of the investigation
 4   procedures.
 5        Q.    Done it before and done it
 6   afterwards; correct?
 7        A.    Yes.
 8        Q.    Okay.  Are you aware that a person's
 9   credit history is privileged and a proprietary
10   function that you have no right to get without
11   subpoena of the court, sir?
12             MS. CESARANO:  Objection.
13        Q.    Have you ever been told that is in
14   the Federal Credit Reporting Act among others?
15             MS. CESARANO:  Objection.
16             MR. BURTON:  Noted.
17        A.    I don't know.
18        Q.    Are you aware that a Target card
19   owned by the employee is their own credit,
20   nothing related to the company and not allowed
21   to pull their records?
22        A.    No, I am not.
23             MS. CESARANO:  Objection.
24        Q.    Without the law being enforced
```

1    regarding obtaining personal credit

2    information?

3                MS. CESARANO:  Object.

4         Q.    Proceed.

5         A.    No, I am not aware of that.

6         Q.    How many times have you heard of it

7    being done other that Mr. Harris who is black

8    with a white wife?

9                MS. CESARANO:  Objection to form.

10         A.    I don't know what the question is.

11         Q.    How many times have you pulled

12    credit other than Mr. Harris?

13         A.    I didn't pull credit.

14         Q.    How many times have you pulled

15    anyone's credit?

16         A.    I answered that question.

17         Q.    In investigation of their personal

18    credit as an employee to determine --

19    investigation of a personal credit card, not the

20    company card?

21                MS. CESARANO:  Objection.

22         A.    Probably three or four times looked

23    at someone's purchases.

24         Q.    Did you ever charge them with

214

1    criminal violations in each of those cases?

2         A.   Yes.

3         Q.   This is the only time there was no

4    criminal charges pending that you are aware of

5    as you sit here today; correct?

6         A.   What is the only time?

7         Q.   That you have been able to get

8    someone's personal underlying charges and credit

9    information as to their personal proprietary

10   account where there are no criminal charges

11   against those people; correct?

12        MS. CESARANO:   Objection to form.

13        Q.   Are there any others as you sit here

14   today that you can think of?

15        A.   That has been charges filed?

16        Q.   Yes.

17        A.   Yes.

18        Q.   How many times?

19        A.   I don't have any idea.

20        Q.   That you were involved in?

21        A.   Yes.

22        Q.   I see.   Still doing it?

23        A.   Still doing what?

24        Q.   Pull any charges in the last four

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

215

1  years?

2          A.    Yes.

3          Q.    Is there a policy in the company

4  that you can do this?

5          A.    Do what?

6          Q.    When investigating an employee pull

7  their personal proprietary cards as part of the

8  investigation?

9          A.    If they are related to part of the

10  investigation, yes, sir.

11          Q.    Define your terms.

12          A.    There could be multiple reasons to

13  cause me to want to look at that.

14          Q.    Other than collection of funds could

15  you give any example?  Because collection of

16  funds would be a legal process.

17          A.    Purchase history.

18          Q.    Sir, when it has material that is

19  private credit information and private accounts

20  can you give me any example when you are allowed

21  to pull this private information with all of

22  their charges?

23          A.    I told you pursuant to

24  investigation.

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

216

1    Q.    You are telling me what would be
2    appropriate.  I am asking a specific question.
3    A.    Hypothetical, someone telling me that
4    they saw somebody walk out the door with a
5    television set, they asked for a receipt, they
6    said, well, I don't have a receipt but put it on
7    my Target charge card.  I can pull up their
8    purchase history and make certain that it was
9    paid for.
10    Q.    Correct.  But first you see it going
11    out the store though.
12    A.    Going to see them going out?
13    Q.    Yes.
14    A.    No.
15    Q.    Who is reporting this?
16    A.    It would be one of my employees.
17    Q.    I see.  So they say that, you go to
18    the computer and pop it in?
19    A.    I can, yes.
20    Q.    Okay.  You just determine you need
21    to pull people's credit history on a need to
22    know basis?
23    A.    No, that is not true.
24    Q.    Do you have prior approval?

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

217

```
 1          A.   No.  I am not pulling the credit
 2   history, I am pulling up the transaction.
 3          Q.   But it shows credit history, you can
 4   pull that too?
 5          A.   I am.
 6          Q.   Sir, other than this have you ever
 7   seen anyone's credit history pulled up?
 8          A.   No.
 9          Q.   So the only time you have seen the
10   credit history pulled is regarding Mr. Harris
11   and his white wife?
12          A.   No.
13               MS. CESARANO: Objection.
14          Q.   You have seen credit histories
15   pulled up?  Either you have seen other people's
16   or you haven't seen other people's credit
17   histories.
18          A.   Okay.  Calling this credit history?
19          Q.   Right.  That is a protected document
20   under the law.
21               MS. CESARANO:  Objection to form.
22          Q.   Have you pulled them before for
23   another employee that wasn't related to a
24   criminal investigation?
```

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

218

1        A.    No.

2        Q.    So this is the only one that you

3    have ever seen pulled up not for a criminal

4    investigation; is that correct?

5              MS. CESARANO:  Objection to form.

6              MR. BURTON:   Noted.

7        A.    No, that is not correct.

8        Q.    Tell me others that you have seen

9    pulled up and a credit history was displayed

10   and related to a specific purchase of a specific

11   item that is unrelated to a criminal

12   investigation.

13             MS. CESARANO: Same objection.

14       Q.    Are there any?

15       A.    I have had an investigation

16   performed that does not result in criminal

17   charges being filed.

18       Q.    That wasn't my question.  Sir, do

19   you recall anywhere pulling a credit history,

20   not just for the purchase of an item, as you sit

21   here today that did not result in a criminal --

22       A.    Yes.

23       Q.    When was the last one?

24       A.    I have no idea.

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

```
                                                    219
 1              Q.    In the last four years?
 2              A.    Yes, certainly was.
 3              Q.    When you pull credit history, there
 4    is credit history information?
 5                    MS. CESARANO:  Object to the form.
 6              Q.    Yes or no?
 7              A.    Yes.
 8              Q.    Did you do that in Florida more than
 9    for Mr. Harris?
10              A.    Did I do --
11              Q.    Other than Mr. Harris did you ever
12    participate in Florida where you pulled a credit
13    history for information for a Target employee?
14              A.    Yes.
15              Q.    Okay.  More than one?
16              A.    Yes.
17              Q.    Did you have any rule or regulation
18    guiding you in doing this?
19              A.    Confidentiality.
20              Q.    Any written rules or any
21    requirements that allow you or not allow you to
22    decide whether to do it?  Any guideline,
23    safeguards?
24              A.    No.

          ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481
```

220

1          Q.    Thank you.  Sir, as to Mr. Harris'

2    proprietary card, and if this is proprietary or

3    not, I don't know, this card seems to deal with

4    charges -- here is '96 and the latest charge on

5    this is '98.

6               (Exhibit Marked for Identification)

7    This is one marked No. 14.  There is Target 145,

8    146.  The latest date is 12-22-98.  Is that

9    correct?  At the time Mr. Harris doesn't use it

10   but for emergencies.

11         A.    4-27 of '98 is the first date here I

12   see.

13         Q.    Yes.

14         A.    The last date on here I see being

15   12-22-98.

16         Q.    Nothing on '99 on there?

17         A.    No, sir, don't see any.

18         Q.    Okay.  Sir, at the time that it was

19   pulled did anyone determine whether or not Mr.

20   Harris in fact made arrangements for and repaid

21   this account?

22         A.    I have no knowledge of that.

23         Q.    Ever heard it discussed whether he

24   made arrangements?

     ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

221

1          A.    No.

2          Q.    Okay.   What due process was Mr.

3     Harris afforded before he was stigmatized?

4               MS. CESARANO:   Objection to form.

5               MR. BURTON:   Noted.

6          Q.    Please answer.

7          A.    I don't have any idea, sir.

8          Q.    Are you aware that a black person

9     has a right not to be stigmatized?

10              MS. CESARANO:   Objection to form.

11         Q.    Or branded without due process of

12    law even by private employers?

13         A.    I am sure that is true for anyone

14    regardless of race, sir.

15         Q.    Specifically true for black people?

16         A.    Okay.

17         Q.    What right did he have to contest

18    the method, means or the manner in which he

19    would be terminated before he was terminated?

20              MS. CESARANO:   You asked him that.

21         Q.    Please try it again then.

22         A.    I am sorry.

23         Q.    Are you aware of any method, means

24    he had or right to protest or clear his name

          ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

222

1   before he was stigmatized?

2            MS. CESARANO:  Object to form.

3        Q.   Go ahead.

4        A.   I wasn't involved in the original

5   conversation.

6        Q.   Just the posse?

7            MS. CESARANO: Object to form.

8        A.   Wouldn't even dignify that.

9        Q.   Please do.

10       A.   No, sir.

11       Q.   Posse is a legal term; isn't it?

12       A.   I don't know whether it is or not in

13  the context you are using it.

14       Q.   Can you tell me, have you seen 14

15  before?

16       A.   What?

17       Q.   Have you seen No. 14 before?

18       A.   In that package I received.

19       Q.   Three weeks ago.  Do you know what

20  that is supposed to prove?

21       A.   Pardon?

22       Q.   Do you know what it is intended to

23  prove?

24       A.   No idea, sir.

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

223

1              (EXHIBIT HEREBY MARKED FOR

2    IDENTIFICATION PURPOSES.).

3         Q.   No. 148, was this Target's travel

4    report information for 11-17-97?  Do you know

5    what that is supposed to show?  Ever seen it

6    before?

7         A.   No.

8         Q.   Okay. Did you see the document,

9    Target Employee Status and Change Notice? Have

10   you seen these documents before?

11        A.   Yes, sir.

12        Q.   This is a public record, the

13   personnel file of Mr. Harris; correct?  That is

14   your understanding?

15        A.   There is a copy at headquarters.

16        Q.   This is in regard to Mr. Harris'

17   employment status; correct?

18        A.   I believe it is, yes, sir.

19        Q.   Yes.  Do you know what right he had

20   to contest the charge detrimental behavior

21   becoming a security risk before it was put into

22   ink and signed off?

23        A.   What right he had?

24        Q.   Yes.  Stigmatized by those words.

         ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

```
                                                            224
  1            A.    Those are not my words.

  2            Q.    Whose wording is this?

  3            A.    Whoever filled out the form.

  4            Q.    Was it done with company policy and

  5     procedures and in accordance with the guideline

  6     that you are aware of for Target employees?

  7            A.    Yes.   Sure it was.

  8            Q.    As far as official branding?

  9                  MS. CESARANO:   Objection to form.

 10            Q.    Is that the words used, official

 11     branding of Mr. Harris?

 12                  MS. CESARANO:   Object to form.

 13            Q.    How he is labeled?

 14            A.    No, sir.

 15            Q.    Who chose those words?

 16                  MS. CESARANO:   If you know.

 17            A.    I don't know.

 18            Q.    Have you ever seen anyone else that

 19     has been in handwriting where it says becoming

 20     security risk, detrimental behavior?

 21            A.    Yes, sir.

 22            Q.    Is that a standard term used in

 23     Target?

 24            A.    Yes, sir.
```

225

1           Q.    And where did that come out of?

2           A.    Out of our Policy and Procedure

3    Corrective Counseling section.

4           Q.    I see.  And now that he has been

5    branded with that document and those words upon

6    him, do you know what right he had --

7                 MS. CESARANO:  Object to form.

8           Q.    To contest it, if any?

9           A.    Sir, we have not branded him.

10          Q.    Sir, do you hire someone who is

11   detrimental behavior, become a security risk?

12   It sounds like the Boston Strangler.

13                MS. CESARANO:  Object.

14          A.    What I will do has no relation to

15   this document in front of me.

16          Q.    Sir, if you were aware of the

17   content of this document would you hire that

18   person?

19                MS. CESARANO:  Object to the form.

20          Q.    If that is the only document you saw

21   was this document would you hire this individual

22   who appears to be the Boston Strangler?

23                MS. CESARANO:  Object to form.

24          A.    Am I going to hire this guy, the

          ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

226
1  Boston Strangler?
2        Q.    Would you hire someone that has
3  gross misconduct, detrimental behavior, becoming
4  a security risk, would you knowing the content
5  of this document?  Would you hire that person;
6  sir?
7              MS. CESARANO:   Object to form.
8        Q.    Would you recommend such a person be
9  hired by your company, sir?
10             MS. CESARANO:   Objection to form.
11       Q.    Go ahead.
12       A.    With proper explanation, possibly.
13             (EXHIBIT HEREBY MARKED FOR
14  IDENTIFICATION PURPOSES.)
15       Q.    Sir, who is Christina Harwell?
16       A.    She is in personnel.  I believe she
17  is the regional -- no -- yes, regional personnel
18  director.
19       Q.    Sir, do you have reason to believe
20  Mr. Harris is in any way working in the retail
21  business or any other business?
22       A.    I have no idea.
23       Q.    Do you have a belief that he is?
24       A.    I have no idea what Mr. Harris is

        ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

227

1  doing.

2          Q.    Do you care?  Honestly?

3                MS. CESARANO:  Objection.

4          A.    Yes, I do. I prayed for him.

5          Q.    What religion are you, sir?

6          A.    Pardon?

7          Q.    What religion are you?

8          A.    Protestant.

9          Q.    Okay.  Did you have anything to do

10  with the preparation or any documents that were

11  put together for any legal purposes?

12         A.    No, sir, I did not.

13         Q.    Now, do you recall having heard Mr.

14  Harris accused you a long time ago of making

15  this statement?  "How can a black man afford to

16  drive a Viper working at Target?"

17         A.    No.

18         Q.    You didn't read that in the

19  deposition?

20         A.    I did read that, but you said a long

21  time ago.  I didn't know until I saw it in the

22  deposition.

23         Q.    First time you ever heard of that

24  being said?

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

228

1          A.    Yes, it is.

2          Q.    Terry Gillespie participate at all

3     in the investigation as far as you are

4     concerned?

5          A.    I don't understand what you mean as

6     far as --

7          Q.    Did he to the best of your knowledge

8     interview people?

9          A.    Yes.

10          Q.    Who did he interview?

11          A.    Oh, I don't know who he interviewed.

12     I know he was one that talked to Steve Harris.

13          Q.    Other than Mr. Harris?

14          A.    I don't know who else he spoke to.

15          Q.    You have no belief as you sit here

16     today, no understanding he spoke to anyone else?

17          A.    No.

18          Q.    My question is you don't know that

19     he spoke to anyone else as you sit here today;

20     do you?

21               MS. CESARANO:  Isn't that the same

22     thing?

23               MR. BURTON:  No, it's not.  I would

24     like to know out of him.

          ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

229

1      A.    I told you I don't know anyone he

2    spoke to.

3           MR. BURTON:    Thank you.    Because

4    the affidavit is hearsay then.    That is what I

5    was trying to say for the motion for summary

6    judgment.    And talk about what he did, and if

7    talk about other people that talked to him it's

8    barred.    So what you are telling me is that you

9    have got a bad affidavit.

10          MS. CESARANO:    Yes, I have a bad

11   affidavit, right.

12          MR. BURTON:    Just hearsay.

13      Q.    Okay.    Whose is Paula Lane?

14      A.    She is assistant manager at

15   the Deerfield store.

16      Q.    Okay.    There is a affidavit in here

17   that frankly I have not, you know, paid much

18   attention to.    Did you speak with her about

19   anything Steve may have said to her or didn't

20   say to her?

21      A.    Honestly, I don't recall whether I

22   did or not.    Her name is familiar to me, but

23   someone I worked with, so --

24      Q.    Okay.    She was an executive at the

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

```
                                                    230
 1   Deerfield store?

 2         A.    Yes.

 3         Q.    What was her title?

 4         A.    Executive Team Leader.

 5         Q.    What does that mean?

 6         A.    She was in charge of an area of the

 7   store.

 8         Q.    What area?

 9         A.    She had soft lines.

10         Q.    Okay.  So do you know if she did

11   participate in this?

12         A.    I don't remember.

13         Q.    Have you seen a document from her in

14   advance of this deposition?

15         A.    Saw her name somewhere.  I don't

16   recall what it -- where I saw it, no.

17         Q.    But nothing to do with her

18   investigation?

19         A.    I don't recall what her involvement

20   was, so can't tell yes or no.

21         Q.    Were you ever shown anything by

22   Terry Gillespie?  Have you seen his deposition?

23         A.    No.

24         Q.    That was taken?
```

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

231

1      A.    No.

2      Q.    Have you seen any other deposition

3    transcripts?

4      A.    No.

5      Q.    Other that the statement by Shannon

6    Tetrault, 3 pages, 227 through 229, ever seen

7    this one before?

8            MS. CESARANO:   What number?

9            MR. BURTON:   This would be the next.

10   17.

11           (EXHIBIT HEREBY MARKED FOR

12   IDENTIFICATION PURPOSES.)

13     A.    I hadn't seen this.

14     Q.    Do you know who went and got that

15   one?

16     A.    I am sorry.

17     Q.    Do you know who went and got that

18   one?

19     A.    No, sir, I do not.

20     Q.    You don't remember speaking to

21   Annette Sternberg?

22     A.    I told you I spoke to her.

23     Q.    Was that before the Evan Feldman --

24     A.    Yes.

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

232

```
 1          Q.    Is that correct?
 2          A.    Yes.
 3          Q.    That is when you took whatever
 4    statements you needed to, whatever you did;
 5    right?
 6                MS. CESARANO:  Object to form.
 7          Q.    You weren't asked to take a
 8    statement by Mr. Barth from her; were you?
 9          A.    I don't recall.  Probably was.
10          Q.    How would he have known of Ms.
11    Sternberg's problem if you only had one call
12    with him were he told you to take a bunch of
13    statements?
14                MS. CESARANO:  Objection to form.
15          Q.    You didn't tell him about Ms.
16    Sternberg?
17          A.    Yes, I am sure I did.
18          Q.    Before you took it did you tell him?
19          A.    It would be before I took it.
20          Q.    What would have triggered you to
21    tell him about Ms. Sternberg's comments?
22          A.    Because it caused a monetary loss to
23    the Target corporation throwing boxes away.
24          Q.    When did you start investigating Mr.
```

233

1    Harris regarding monetary losses?

2            A.    I did not start to investigate.

3            Q.    When did you start reporting or

4    snitching on Mr. Harris to Mr. Barth?

5                  MS. CESARANO:  Objection to form.

6                  MR. BURTON:  Noted.

7            A.    Started gathering facts as they were

8    relayed to me after I was assigned to the

9    Deerfield store.

10           Q.    Were you assigned there for

11   the purpose of trying to weed out losses?

12           A.    Try to reduce their stock shortage,

13   yes, sir.

14           Q.    I see.  And it was your considered

15   mission to go there and find out all the areas

16   where there were stock losses?

17           A.    That is my mission in every store.

18           Q.    Were you specifically sent to

19   Deerfield because they had a bad history of it?

20           A.    Because what?

21           Q.    Bad history of stock shortages as

22   you said.

23           A.    No.  I was sent there because of

24   high shortage and see if I could impact it.

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

234

1        Q.    All right.   Were you given any names

2   of persons who might be the causes before you

3   went there?

4        A.    No.

5        Q.    When did you first come up with

6   targets that you could look at?   Target meaning

7   people?

8              MS. CESARANO:   Object to form.

9        Q.    Investigative term target, when did

10  you first come up with targets that might be

11  persons that you could speak with regarding

12  persons you could target to lessen the stock

13  shortage problem?

14             MS. CESARANO:   Objection to form.

15       A.    I don't understand what you are

16  asking me.

17       Q.    Sir, there came a time when you came

18  up with these people that were causing some

19  problems.

20       A.    Yes.

21       Q.    When did that happen?

22       A.    I don't remember.

23             MS. CESARANO:   Object.

24       Q.    Who else did you rat on?

235

1            MS. CESARANO: Objection to form.
2       Q.   Who else did you report to Mr.
3  Barth other than Steve?
4       A.   I don't recall anyone.
5            MR. BURTON:  No further questions.
6                 - - -
7            DIRECT EXAMINATION
8  By Ms. Cesarano:
9       Q.   We looked at lots of exhibits here
10 today.  Are any of these employee statements in
11 your handwriting?
12      A.   No.
13      Q.   At any time during the investigation
14 of Steve Harris at the direction of anybody in
15 management, including Doug Barth or Mark
16 Hastings or Gary Gillespie to whatever extent he
17 was involved, did any of those people mention
18 Steve's race?
19      A.   No.
20      Q.   Did race have anything at all to do
21 with the investigation of Steve Harris?
22      A.   Absolutely not.
23      Q.   Is it part of a store manager's job
24 duties at the time to make sure that boxes are

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

236

1    properly accounted for?

2              MR. BURTON:  Object to the form of

3    the question.

4         A.    Yes, it is.

5         Q.    Is it part of store manager's areas

6    of responsibility to account for all cash taken

7    out of the store, all receipts?

8              MR. BURTON:  Object to the form of

9    the question.

10        A.    Yes, it is.

11        Q.    Now, was a portion of

12   the investigation of Steve Harris which led to

13   his termination conducted by Doug Barth?

14             MR. BURTON:  Objection to the form

15   of the question.

16        A.    A portion of it.

17        Q.    Of the investigation?

18        A.    Most of it was.

19        Q.    Most of it.  What about Mark

20   Hastings?  Same question.

21        A.    Did he take part?

22        Q.    Yes.

23        A.    I am sure he did.  He was the

24   superior.

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

237

1          Q.    Okay.

2          A.    Supervisor.

3          Q.    All right. Did Doug Barth or any

4    other manager ask you for your recommendation as

5    to whether Steve Harris should be terminated?

6          A.    No.

7          Q.    Were you involved with any meetings

8    having to do with Steve Harris' termination?

9          A.    No.

10         Q.    Is part of your job responsibilities

11   to recommend employees for termination?

12         A.    No.

13         Q.    With respect to this Shooters

14   voucher and the events which led to

15   the investigation, what impropriety with the

16   $500 caused you to investigate that particular

17   Shooters voucher?

18              MR. BURTON:    Objection to the form

19   of the question.

20         Q.    Let me rephrase it.

21         A.    Okay.

22         Q.    You mentioned in your testimony that

23   with respect to the Shooters incident, that you

24   used the words when you noticed the $205 was

238

1    returned in cash.

2            A.    Right

3            Q.    What caught your attention?

4            A.    When we had dinner at Shooters

5    and the bill was brought, it was given to Mr.

6    Harris and he looked at it, and I was sitting

7    immediately to his right, and looked at me and

8    he said the bill is $135, what should the tip

9    be.

10            And Target customarily leaves 20

11    percent tip.  Just a real rough figure in my

12    head, 10 percent is 13.25, times 2, I said leave

13    $25 dollars.  160 will cover it.

14            Q.    That was the total amount then,

15    $160?

16            A.    That's correct.

17            Q.    So, when you saw $205 on the books

18    with respect to the Shooters voucher, again what

19    caught your attention?

20            MR. BURTON:  Objection.

21            A.    Bill was 160, should have been 340

22    returned out of the 500 that was taken.

23            Q.    Okay.  Is that what led to

24    the investigation?

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

239

1      A.    Correct.

2            MS. CESARANO:  Okay.  No further

3    questions.

4            MR. BURTON:  Do you want to read or

5    waive?

6            MS. CESARANO: Yes.  I want you to

7    have a chance to read the deposition transcript.

8    The reporter will type it up and then you can

9    read it to make sure it's accurate to what you

10   said.

11           THE WITNESS:  Yes.

12                     - - -

13       (Thereupon, at 2:00 P.M. the deposition

14   was concluded)

15                     - - -

16

17

18

19

20

21

22

23

24

         ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

240

```
 1    State of                    :
                                        SS:
 2    County of                   :

 3          I, Don Fankhauser, do hereby certify

 4    that I have read the foregoing transcript of my

 5    deposition given on February 12, 2001; that

 6    together with the correction page attached

 7    hereto noting changes in form or substance, if

 8    any, it is true and correct.

 9

10                      _____
                              Don Fankhauser

11          I do hereby certify that the foregoing

12    transcript of the deposition of Don Fankhauser

13    was submitted to the witness for reading and

14    signing; that after he had stated to the

15    undersigned Notary Public that he had read and

16    examined his deposition, he signed the same in

17    my presence on the _____ day of _____,

18    2001.

19
                        _____
20                            Notary Public

      My commission expires
21    _____,20____.

22                        -  -  -

23

24

         ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481
```

241

1                           CERTIFICATE
        State of Ohio              :
2                                        SS:
        County of Franklin         :
3
                I, Michael O. Spencer, Notary Public in
4       and for the State of Ohio, duly commissioned and
        qualified, certify that the within named Don
5       Fankhauser was by me duly sworn or affirmed to
        testify to the whole truth in the cause
6       aforesaid; that the testimony was taken down by
        me in stenotypy in the presence of said witness,
7       afterwards transcribed upon a computer; that the
        foregoing is a true and correct transcript of
8       the testimony given by said witness taken at the
        time and place in the foregoing caption
9       specified.
                I certify that I am not a relative,
10      employee, or attorney of any of the parties
        hereto, or of any attorney or counsel employed
11      by the parties, or financially interested in the
        action.
12              IN WITNESS WHEREOF, I have hereunto set
        my hand and affixed my seal of office at
13      Columbus, Ohio, on this 6th day of March, 2001.

14
                        Michael O. Spencer, Notary Public
15                         in and for the State of Ohio and
                           Registered Professional Reporter.
16      My commission expires
        July 30, 2003
17

18

19

20

21

22

23

24

        ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

1

```
 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF FLORIDA
 2                FT. LAUDERDALE DIVISION

 3              CASE NO. 00-617-CIV-FERGUSON
                  Magistrate Judge Snow
 4

 5    Steve Harris,

 6              Plaintiff,              ORIGINAL

 7    vs.

 8    Dayton Hudson Corporation d/b/a
      Target Stores,
 9
                Defendant.
10
      - - - - - - - - - - - - - - - X
11

12

13                         4375 Sheridan Street
                           Hollywood, Florida
14                         Miami, Florida
                           Friday, October 13th, 2000
15                         10:22 A.M. - 11:05 A.M.

16

17

             DEPOSITION OF SIMONE TRIPP
18

19

          Taken before ELLIOTT MARSHALL, A.S.,
20
      Registered Professional Reporter and Notary
21
      Public in and for the State of Florida at Large,
22
      pursuant to Notice of Taking Deposition in the
23
      above cause.
24

25
```

```
 1              - A P P E A R A N C E S -

 2    on behalf of the Plaintiff

 3              Richard J. Burton & Associates, P.A.
                18305 Biscayne Boulevard
 4              Suite 300
                Miami, Florida 33160
 5              Tel 705-0888 - fax 935-9542

 6    on behalf of the Defendant

 7              Shutts & Bowen
                201 South Biscayne Boulevard
 8              Suite 1500
                Miami, Florida 33131
 9              BY: Rene J. Gonzalez-Llorens, Esq.
                TEL 358-6300 - FAX 381-9982
10
                      ALSO PRESENT
11
                      Steve Harris
12
                      - - - - - -
13
                    - I N D E X -
14
      WITNESS          DIRECT   CROSS   REDIRECT   RECROSS
15
      SIMONE TRIPP
16
      BY MR. BURTON      3                42
17
      BY MR. GONZALEZ-LLORENS  34                  43
18
                - E X H I B I T S -
19
         PLAINTIFF'S        FOR IDENTIFICATION
20
                    none marked
21

22

23

24

25
```

3

1    Thereupon--
2              SIMONE TRIPP
3    was called as a witness by the Plaintiff, and,
4    after having been first duly sworn, was examined
5    and testified as follows:
6              DIRECT EXAMINATION
7    BY MR. BURTON:
8         Q.   Please state your name for the
9    record.
10        A.   Simone Susan Tripp.
11        Q.   And Miss Tripp, you're here as a
12   subpoenaed witness; correct?
13        A.   Yes.
14        Q.   And you were served a subpoena to be
15   here today?
16        A.   Yes.
17        Q.   You're not represented by Target's
18   counsel; am I correct?
19        A.   No.
20        Q.   You never hired them to represent you
21   personally?
22        A.   No.
23        Q.   Okay.  Because of that, have you ever
24   given a deposition or statement in court before?
25        A.   No.

1          Q.   I'm going to make it real simple for

2     you.

3          A.   Okay.

4          Q.   When I ask a question, I'll try to

5     use the English language, although lawyers

6     sometimes are lacking.

7               To the extent that I use the

8     English language, if I use it wrong or you don't

9     understand me, just simply say "I don't

10    understand that question.  I really can't

11    answer it as you asked.  Please ask it again."

12         A.   Okay.

13         Q.   If you can help me out because

14    you're not sure what I'm asking; "Are you asking

15    A or B?"  I'll re-ask it, indicating which answer

16    I'm trying to obtain.

17         A.   Okay.

18         Q.   The second and third instructions

19    you've just about done perfectly, which is;

20    please don't do what everyone else does because

21    "uh-hum" and "uh-uh" and shakes their head,

22    because if you do that I don't know if you said

23    yes or no.  So if you use yes, no -- real words

24    -- we'll have a real easy approach to this.

25               If you ever need a break for

```
 1   your own convenience -- you don't even have to
 2   indicate what it is -- just say "I need a break,"
 3   and that's fine.
 4        A.   Okay.
 5        Q.   So, Miss Tripp, what is your home
 6   address?  And again I may ask you questions that
 7   are personal, and the reason is I may have to
 8   serve you a subpoena or whatever.
 9        A.   That's fine.
10        Q.   I want you to understand the
11   questions I ask here.  If they involve things
12   that you normally wouldn't discuss socially,
13   keep in mind I'm not trying to pry into anything
14   or embarrass anyone.
15        A.   Okay.
16        Q.   Your home address?
17        A.   55 Tropic Isle Drive, Apartment 34D,
18   Delray Beach, Florida, 33483.
19        Q.   My process server, when he went
20   there, said he had trouble finding that number.
21        A.   Right.  Theirs no "D" on the door.
22   It just means downstairs.
23        Q.   Okay.  So if I put 34 he'll get
24   there.  If I put 34D he'll ask why I can't find
25   you?
```

```
 1          A.    It's easier to get in touch with me,
 2    because I don't work for Target -- at least not
 3    during operating hours.  I work overnight or
 4    morning.
 5          Q.    What other store do you work at?
 6          A.    I'm a general manager for Mailboxes
 7    Etc., 777 East Atlantic Avenue.
 8          Q.    And what address is that?  I'm
 9    laughing because I was given that as the address
10    by Miss Cesarano for the Target store there and
11    that was the other reason the process server
12    called me.  So that's Mailboxes Etc.?
13          A.    Yes, suite Z.
14          (Informal discussion off the record.)
15    BY MR. BURTON:
16          Q.    This is different from conversational
17    language in one regard.  In conversations people
18    never wait for the other person to finish their
19    statement because they don't have to.  They sort
20    of figured it out and no one is recording it.
21          A.    Okay.
22          Q.    And if it was being recorded it
23    wouldn't matter; but this man is taking a
24    verbatim transcript, which means that if you
25    start answering toward the tail end of my
```

1   question, you're going to show as if you somehow

2   or other stopped me from asking the question and

3   if I asked another question or completed

4   something then that means nothing.

5        A.   Okay.

6        Q.   So that's a suggestion to make it

7   easier for all of us.

8             If there is an objection by opposing

9   counsel, let him make it.  He and I may have

10  disagreements on whether or not it should have

11  been or shouldn't have been asked and answered,

12  but again, because we want to have it clean, just

13  stop and we'll go forward from there.

14       A.   Okay.

15       Q.   And he will not tell you "don't

16  answer it," because under the rules, the only

17  thing you're not supposed to he answer is

18  attorney/client privilege, and there are really

19  none here.

20            So he'll just make his statement

21  for the record, which is for the Judge, and later

22  on the Judge can determine whether or not that

23  was a proper question?

24       A.   Okay.  I understand.

25       Q.   When did you complete your last year

```
 1    of schooling and what level of schooling was it?
 2              A.    An MS in human resources management
 3    -- it's called HRD -- from Atlantic?
 4              Q.    Is that personnel, in the old form?
 5              A.    Personnel, yeah.
 6              Q.    And you received a master's degree in
 7    that?
 8              A.    Yes, an MS.
 9              Q.    And when did you receive that?
10              A.    In December of '99.
11              Q.    So, can I assume that you went back
12    to school after you joined the work force?
13              A.    Yes, I did.
14              Q.    Before then, either your high school
15    or your college, did you -- I'd like to know the
16    last degree before you entered the work force for
17    the first time on a full-time job basis?
18              A.    High school diploma.
19              Q.    And what year was that?
20              A.    Ooh.  I believe, '85, '86.
21              Q.    And after that, what was your next --
22    what was your employment?
23              A.    I worked for several different
24    places.  I worked for Perkins Restaurant in
25    Orlando and I started as a waitress.  I became a
```

```
 1    supervisor and eventually became a manager.

 2             Q.   And that was through about what year?

 3             A.   Through '93.  No, I'm sorry.  '94.

 4    The beginning of '94.

 5             Q.   So you were in Orlando till '94?

 6             A.   Uh-hum.  '93.  I transferred down to

 7    Delray Beach in '94.

 8             Q.   In Perkins also?

 9             A.   Uh-hum.

10             Q.   That's yes?

11             A.   Yes.  I'm sorry.

12             Q.   During that period of time were you

13    also going to school for your undergraduate?

14             A.   No, I wasn't.

15             Q.   Did you at some point?

16             A.   I had started years ago with my

17    undergraduate like when I first got out of high

18    school.

19             Q.   Yes.

20             A.   But life happened, I got married

21    and stopped going to school, but I had quite a

22    few credits from Broward Community College for

23    my associate but it was almost 12 years ago.

24             Q.   When did you go back to school to get

25    your initial bachelors degree before your
```

1  masters?

2         A.    Um... I started back -- let's see --

3  probably around '96 I started getting my

4  associate degree.

5         Q.    And between then and '99 you got your

6  associate degree?

7         A.    Right.  Right.  I got my associate

8  degree in probably about six months at Palm Beach

9  Community College, which then I was taking also

10  some classes at FAU, and then I went over to Palm

11  Beach Atlantic Christian College.

12         Q.    I'm intentionally speaking slower

13  than I normally would --

14         A.    Okay.

15         Q.    (Continuing) -- exactly for this

16  reason; so that he'll be able to take all of our

17  statements down.

18         A.    Okay.

19         Q.    Now, you worked with Terry Gillespie,

20  did you not?  Do you know who Terry Gillespie is?

21         A.    I knew he was human resource manager.

22         Q.    For what?

23         A.    For Target.

24         Q.    For the region?

25         A.    I believe so.  Yes.

```
 1          Q.   Did you ever work in the human
 2   resources or human relations division of Target?
 3          A.   No, I haven't.
 4          Q.   I understand you applied for a
 5   position with them.
 6          A.   Yes, I did.
 7          Q.   And you were denied?
 8          A.   Yes, I was.
 9          Q.   When was that?
10          A.   Just recently; about four months
11   ago.
12          Q.   I see.  And up to that point were you
13   working full time for Target?
14          A.   Yes, I was.
15          Q.   I understand you filed a
16   discrimination complaint against Target.
17          A.   I dropped it.  I talked to a lawyer
18   and I was going to begin it, and then I talked to
19   our new store manager and she assured me that
20   there wasn't a problem and she then sent me for
21   round-robin.
22          Q.   And what is round-robin?
23          A.   That is our internal interviewing
24   process.
25          Q.   And out of that interviewing process
```

12

```
 1    you still weren't selected?
 2           A.   No, I wasn't.  But I chose to join
 3    another company.
 4           Q.   Just so I have it clear, you believe
 5    that there was discrimination against you;
 6    correct?
 7           A.   Yes, I did.
 8           Q.   On what basis did they discriminate
 9    against you?
10           A.   I believed it was a discrimination
11    about my weight.
12           Q.   And how was that, do you believe,
13    evidenced?
14           A.   I was told by a store manager that
15    that's the reason I hadn't been sent.  The store
16    manager is no longer with the company.
17           Q.   Who is that?
18           A.   Oh, God.  I can't remember his name
19    now.  I'm sorry, Robert Van Savage.
20           Q.   Van Savage?
21           A.   Yes.
22           Q.   And what store was that at?
23           A.   At Boca.  It was 638.
24           Q.   Now, did you ask him why it is you
25    hadn't been selected with your masters and what
```

1    have you?

2         A.    At the time when I was talking to him

3    I was finishing by bachelors degree and starting

4    my masters and he just told me wait until I got

5    my masters and maybe with the extra education it

6    would overcome the weight issue.

7         Q.    Now, Mr. Gillespie is one of

8    the persons on the selection committee;

9    is he not?

10         A.    He wasn't one of my interviews.  No.

11         Q.    How many times had you been passed

12    over because of what you perceived to be their

13    perception of your weight?

14         A.    I was probably passed over for the

15    round-robin interview process about five times

16    when I was told I was going to go to the next one

17    and then wasn't sent.

18         Q.    Did you ever fill out papers saying

19    you were discriminated against, even

20    intentionally?

21         A.    No, I -- I kept feeling that it

22    wasn't.  I hadn't finished my education.

23    I was given reasons saying that -- you know --

24    well, when you finish then we'll send you, and

25    then I'd show him I finished this section or that

14

```
 1   section, and they'd say, "Well, maybe next time
 2   we'll send you." So at that point I just felt
 3   they were brushing me off.
 4        Q.   I see.  Going to your career at
 5   Target; when did you start with them?
 6        A.   I started in July of, I believe,
 7   '94, it may be '95.  I'm not quite sure.
 8        Q.   Just so we're correct, I have never
 9   interviewed you before today; have I?
10        A.   No.
11        Q.   You and I have no relationship in
12   talking to each other?
13        A.   No.
14        Q.   At all?
15        A.   No.
16        Q.   Have you ever talked to any
17   representatives of Target regarding Mr. Harris or
18   in any other fashion?  Anyone from the human
19   relations or security?
20        A.   I've talked to Erica.
21        Q.   Erica who?
22        A.   Liday, when I found out about the
23   situation.
24        Q.   What situation?
25        A.   That I was going to be called and
```

1   everything.

2           Q.   Did she call you?

3           A.   Well, I called her and she called me

4   back.

5           Q.   And what did she talk to you about?

6           A.   Just basically, she told me just that

7   she would have me subpoenaed because I told her

8   there was a work issue and because I had to leave

9   my other job to come here.

10          Q.   Okay.

11          A.   And she just basically told me --

12   you know -- just answer the questions as fully as

13   I could.

14          Q.   Did you speak with her about any of

15   the facts of Mr. Harris' suit or any questions

16   about it?

17          A.   No.

18          Q.   She didn't ask you; you didn't ask

19   her?

20          A.   No.   It's pretty much understood.

21   There was so many rumors flying around.

22          Q.   Tell me the rumors that you heard

23   that were flying around?

24          A.   That people -- well, you know, it's

25   hearsay.

16

1    Q.   That's fine.  We're allowed to ask

2  it.   That's not like the television dramas.

3  You're allowed to ask about it here.

4    A.   That if we testified we would be

5  fired, because I keep Target for my insurance.

6    Q.   The rumor was if you testified in

7  support of Mr. Harris you'd be fired?

8    A.   That you would be let go... not for

9  that purpose... but they would find a reason.

10    Q.   I see.  Had there been other persons

11  that had been confronting Target where people had

12  testified or cooperated with them and had been

13  let go?

14    A.   No.  But I know a lot of us stopped

15  calling the 1 (800) number because there was not

16  general repercussions, but we could always tell

17  there was repercussions from calling the 1 (800)

18  number.  It's a number that if you have a problem

19  with the store, if you think there's any issues

20  going on that shouldn't be going on, that you

21  would be reprimanded.

22    Q.   It's a help line, but --

23    A.   Right.

24    Q.   (Continuing) -- but if you go for

25  help you find you're the one who needs it?

```
 1          A.    Right.

 2          Q.    Now, this had been a policy that's

 3   been going on in Target for a while; if you call

 4   the 1 (800) number you better be the one with a

 5   lawyer?

 6          A.    No.

 7                MR. GONZALEZ-LLORENS:   Objection.

 8   It assumes an unestablished fact, conclusion and

 9   speculation.

10   BY MR. BURTON:

11          Q.    You said during the time that you

12   were there.   When did these rumors of retaliation

13   start?

14          A.    Probably when Steve Clemente was a

15   manager.  A lot of us had issues with his

16   management style, so there was a lot of calls

17   made to that number.  And when -- when he was

18   confronted with those calls he made it really

19   clear that not coming out and saying exactly what

20   was going to happen, but that he didn't

21   appreciate it.

22          Q.    Anyone who could be tied to a call

23   had their career sort of shortcut?

24          A.    A lot of people stepped down.

25   A lot of people left.
```

18

```
 1           Q.   I see.
 2           A.   That had made the calls.
 3           Q.   Which store is Mr. Clemente in?
 4           A.   638.
 5           Q.   And he was the store manager there;
 6      the team leader, as they call it?
 7           A.   Yes.
 8           Q.   And you worked under his auspices
 9      there?
10           A.   Yes, I did.
11           Q.   And was he removed from that
12      store?
13           A.   He moved on to another store.
14      We have a lot of switching around, so you don't
15      know.
16           Q.   He was a white man?  Is he white?
17           A.   Yes, he is.
18           Q.   There were complaints about his
19      management style?
20           A.   Yes.
21           Q.   Can you be more specific?
22           A.   Just about the way he approached the
23      employees.  The way he talked to people.
24           Q.   Can you be more specific?  I mean,
25      was he --
```

1          A.   I can be specific about my case with

2     him.

3          Q.   Okay.

4          A.   I asked him for more retraining

5     because I came out of a food atmosphere.  I used

6     to be a manager of the food area and I went out

7     to the floor area and I asked him to give me more

8     training.  I just had been kind of placed in a

9     spot and with very little training and I had

10    asked him for it and I didn't get any.  And then

11    I was getting repercussions because I didn't know

12    what I was doing.  And rather than allow me to go

13    train or allow me to -- to get the tools,

14    I was pretty much brought to tears several

15    times.

16         Q.   What did he do?  Did he demean you?

17         A.   Pretty much.

18         Q.   Can you give me an example of the

19    kind of behavior?

20         A.   Um... he would threaten write-ups and

21    I would say, "Well, can you explain the process

22    to me because I don't know where I'm going

23    wrong?"

24         Q.   Uh-hum.

25         A.   And rather than explain the

20

1   process, he would basically urge me into another
2   department or put me down for not knowing what I
3   was supposed to be doing.
4        Q.   Did he ever talk disparaging to
5   women?
6        A.   Not necessarily to women.  I think,
7   because of his education, he talked down to a lot
8   of employees.
9        Q.   He was an equal opportunity
10  talk-downer too?
11       A.   Yeah.  Yeah.  At our meeting he
12  tended to use large -- you know -- use language
13  that the normal everyday employee might not
14  understand.  And rather than explain it to them,
15  he would make them feel bad about not knowing
16  what it meant.
17       Q.   I see.  And you say his background,
18  what was his background.  Do you know?
19       A.   I believe he was very educated or he
20  seemed to be -- I think he had his master's
21  degree or he was going for it.
22       Q.   Okay.
23       A.   And he used a lot of the lingo that
24  just the everyday employee didn't understand.
25       Q.   And he was doing this to show off or

1 show he was knowledgeable or something?

2     A.   I think he used it to pretty much to

3 intimidate a little bit.

4     Q.   When you say that you called the 1

5 (800) number, did you hear that other people

6 called about other issues other than intimidating

7 or threatening people?

8     A.   Well, we're a pretty close-knit group

9 over there, so if one person called we all pretty

10 much knew about it.

11     Q.   Did you ever work with Steve Harris?

12     A.   Yes, I have.

13     Q.   Where?

14     A.   At Boca.  638.

15     Q.   Is that the store he was at before he

16 went over to Deerfield?

17     A.   Yes.

18     Q.   When he worked there, was he a good

19 manager?

20     A.   I believe so.

21     Q.   Did he work under Mr. Clemente?

22     A.   No, he didn't.  He worked for Robert

23 Van Savage.

24     Q.   That was the --

25     A.   Prior manager.

```
1          Q.   Mr. Van Savage was there and then
2     Mr. Clemente?
3          A.   Yes.
4          Q.   So when he worked for Mr. Van Savage,
5     what position was he in?
6          A.   Um... I believe he was a hard lines
7     team leader.
8          Q.   That means in charge of a
9     department?
10         A.   No.  Well, no.  He was in charge of
11    part of the store.  It's broken up into areas of
12    executives.  He was an in executive hard lines.
13         Q.   "Hard lines," representing what?
14         A.   God, it's been --
15         Q.   Power tools and things?
16         A.   Health and beauty, I believe, toys at
17    that time.
18         Q.   That's what I said.  The department
19    of the store.
20         A.   An area, yes.
21         Q.   And were there any other black
22    executives at a high level at that store,
23    other than Mr. Harris?
24         A.   Not when Mr. Van Savage was there.
25    No.
```

1          Q.   After he left, were there any other

2     black executives appointed to replace Mr. Harris?

3          A.   About a year ago we had one.  I don't

4     remember his name.

5          Q.   Just 1999 for a period of time?

6          A.   I'd say either 1999 or late 1998.

7          Q.   And how long was that person there?

8          A.   I'd say, about six months.

9          Q.   Were they then transferred or

10    replaced?

11         A.   I believe he transferred.

12         Q.   To some other location?

13         A.   To another location.  Yes.

14         Q.   And you don't have any sense --

15         A.   No, I didn't work with him, and I was

16    on overnight at the time, so I don't really work

17    with him at all.

18         Q.   Now, Mr. Clemente; how long was he

19    there?

20         A.   I'd say, approximately about a year,

21    maybe a little longer.

22         Q.   And where is he now?

23         A.   West Palm Beach, I believe,

24    I'm not sure.

25         Q.   Is he a team leader there?

24

```
 1            A.   Yes, he's a store manager.

 2            Q.   Now, the voucher procedure; did you

 3      ever hear of any complaints filed on the voucher

 4      procedure?

 5            A.   I had a situation with a team leader

 6      that was a GSTL.

 7            Q.   What does that stand for, for the

 8      record?

 9            A.   A guest service team leader.

10      And we had some questionable vouchers.  We went

11      to security about it and nothing was, nothing

12      that we could see was being done and we called

13      the 1 (800) number.

14            Q.   Who was the person responsible --

15            A.   I was the cashier supervisor, but at

16      the time there was two year supervisors.  I was

17      on the service desk.

18            Q.   You said we had some problems with

19      some vouchers regarding a person and that was a

20      GSTL.

21                 What was that person's name?

22            A.   Kelly O'Donnell.

23            Q.   And is that person a white person?

24            A.   Yes, he is.

25            Q.   And was that person a supervisor of
```

25

1  any nature?

2      A.   He was the executive for the front

3  end.

4      Q.   A white male?

5      A.   Yes.

6      Q.   And what were the problems with the

7  vouchers that you recall with Kelly O'Donnell,

8  as best you can recall?

9      A.   He was doing guest service.  He was

10  doing vouchers for -- I don't know the term on it

11  anymore... dissatisfaction.  And instead he was

12  going out to lunches and things like that.

13          So we were questioning why we were

14  turning in those guest service transactions for

15  lunches.

16      Q.   For himself you mean?

17      A.   For himself.

18      Q.   This wasn't business-related?

19      A.   No, it wasn't business-related.

20      Q.   So when you brought this to someone's

21  attention, did you talk to the team leader?

22      A.   We talked to the person that was

23  security at the time.

24      Q.   Who was that?

25      A.   I don't remember.

26

```
 1              Q.   Was Mr. Fankhauser involved?  He was
 2       security.
 3              A.   I don't know for for sure if he
 4       was there at the time.  I believe it was a
 5       transitional period that he was there and also
 6       another -- another security.
 7              Q.   So Fankhauser and somebody else were
 8       the security at the time?
 9              A.   Right.
10              Q.   And what did Mr. Fankhauser and this
11       other human being do about this with this white
12       male that might be having lunches?
13                   MR. GONZALEZ-LLORENS:  Objection.
14       It assumes things not in evidence and not
15       established as a fact.
16                   THE WITNESS:  I didn't say
17       anything.  I just figured to let him do his job.
18       BY MR. BURTON:
19              Q.   Was that person, Kelly O'Donnell,
20       fired?
21              A.   No, he wasn't.
22              Q.   Is he still with the store?
23              A.   He transferred to another store and
24       left the company and now he's back.
25              Q.   He's back with the company now.
```

1     Is he promoted?

2         A.    I don't know.

3         Q.    Which store is he presently in now?

4         A.    I really don't know. I just heard

5     through the grapevine that he was back.

6         Q.    You said that there were other rumors

7     about Mr. Harris and then we got off on a

8     tangent. What were the rumors?

9         A.    About Mr. Harris?

10        Q.    Yeah. And the testimony you might be

11    asked to give or why he was fired or anything

12    about Mr. Harris.

13        A.    Um -- well, when Mr. Harris was first

14    fired, we heard it was an issue to do with price

15    change, because I guess his wife works with price

16    range or his wife used to handle something with

17    price range or something like that. And that was

18    what we heard. It was something to do with price

19    range. And then we heard it was a sexual

20    harassment. And there was so many different

21    things going on.

22        Q.    Please tell me all of them.

23    I'm curious?

24        A.    Off the top of my head, I can't think

25    of any other ones.

1          Q.    So when price ranges didn't pan out

2     because his wife still there, the next one was

3     sexual harassment?

4          A.    Right.

5          Q.    Any other details on that?

6          A.    No.

7          Q.    Any other rumors about what he may

8     have done wrong?

9          A.    That was pretty much the general gist

10    of it.

11         Q.    When you said you also went to the

12    team leader, who was the team leader you went to

13    regarding Kelly O'Donnell?

14         A.    I went to the security team leader.

15         Q.    And then would you have gone to,

16    you said you called the 800 number on that?

17         A.    Yes, we call the 800 number on that.

18         Q.    And pretty much most of the people in

19    the store were aware of this problem?

20         A.    The front end people were.

21         Q.    And that would be you and who else?

22         A.    It was three years ago.  I'm trying

23    to remember who else was there.

24         Q.    Sure.

25         A.    Pat Connor was cash office.  Norma --

```
 1    I don't know Norma's last name -- I think it may

 2    be Bernstein -- Was The cashier -- was one of the

 3    cashiers, level-two supervisors.

 4            Q.   Now, what race is Mr. Harris' wife?

 5            A.   I believe, white.

 6            Q.   I see.  Most respectfully, was he

 7    driving -- do you know the car that he was

 8    driving there?

 9            A.   Yeah.  He was driving a Viper.

10            Q.   Was there any resentment or comment

11    that you heard about or gossip?

12            A.   No.  We just thought it was a cool

13    car.

14            Q.   People there seemed to have gotten

15    along real well with Mr. Harris; is that correct?

16            A.   At our store, yes.

17            Q.   Mr. Van Savage; was he Mr. Harris'

18    boss for the whole time or did he --

19            A.   For when I was there with Mr. Harris,

20    yes.

21            Q.   Was there a "good old boy" mentality

22    in Target?

23                 MR. GONZALEZ-LLORENS:  Objection.

24                 MR. BURTON:  That if you don't do

25    what they want you're not promoted?  In your
```

```
 1   opinion.
 2                MR. GONZALEZ-LLORENS:  Objection.
 3   Speculation.
 4                MR. BURTON:  Good, old and boy.
 5                THE WITNESS:  I'd rather not
 6   opinionate on that.
 7                MR. BURTON:  Okay.  I'll leave that
 8   for later.
 9   BY MR. BURTON:
10       Q.   Now, Erica Liday; was she familiar
11   with this problem with Mr. Kelly O'Donnell?
12       A.   No.  We went directly to security.
13       Q.   What was her role?  Who is she?
14       A.   She is the human resource manager,
15   I guess.  They call it TRL.
16       Q.   At that store?
17       A.   Uh-hum.
18       Q.   That's a yes?
19       A.   Yes, I'm sorry.
20       Q.   She would have been made
21   knowledgeable, wouldn't she, customarily under
22   the way that Target works that there was a
23   problem?
24       A.   I don't believe so.  I think we went
25   right to security and then security tried to keep
```

```
 1      it as quiet as possible until they actually build
 2      a case or something, and then she would be
 3      brought in on it.
 4              Q.    I see.
 5              Q.    Were you ever asked by Mr. Fankhauser
 6      about your work and the procedure at your store
 7      for vouchers in relationship to Mr. Harris?
 8              A.    No.
 9              Q.    Did he ever approach anyone that
10      you know of at that store and interview anyone at
11      that store to find out whether Mr. Mr. Harris
12      followed all the proper procedures?
13              A.    Not to my knowledge.  I was in
14      another department.  I wasn't up front.
15              Q.    Do you know who Sandy Grizbek is?
16              A.    No.
17              Q.    Does Mr. Harris' wife work at your
18      store or the store at Deerfield or where?
19              A.    I worked with his wife in Delray for
20      a while.  I transferred from Boca to Delray.
21              Q.    When he was there?
22              A.    Steve Harris was still at Boca.
23      I transferred to Delray because it was closer to
24      my house.
25              Q.    And that was where his present wife
```

```
 1    works?
 2              A.   Yes.  I believe she still works
 3    there.  I'm not sure.
 4              Q.   When you went to Delray, were there
 5    stories or gossip about why Mr. Harris was
 6    terminated?
 7              A.   No, I had come back.
 8              Q.   You were back at Boca by then?
 9              A.   Yes.
10              Q.   That's what I was trying to find out,
11    because I thought you said you were back at Boca.
12              A.   Yes.
13                   MR. BURTON:  Let me take a few
14    second break.
15                   (Short Pause.)
16    BY MR. BURTON:
17              Q.   One last clarification.  When the
18    voucher issue came about at your store --
19              A.   Yes.
20              Q.   Under Kelly O'Donnell I think it is;
21    correct?
22              A.   Uh-hum, yes.
23              Q.   Mr. Clemente was the team leader
24    there at the time; correct?
25              A.   Yes, he was.
```

1          Q.   He would necessarily have known,

2     would he not have, because it would have shown as

3     unsubstantiated vouchers and reflected on him at

4     some point; wouldn't it?

5          A.   I -- I can't answer that.  All I

6     could say is we did go to security and where it

7     went from there we didn't --

8          Q.   You don't know whether they would

9     have brought in or not brought in the team

10    leader?

11         A.   Sometimes they do, sometimes

12    they don't.  It depends on the investigation,

13    I believe.

14         Q.   Have you been on any of the positions

15    as an acting human resources director selected

16    for that?

17         A.   I did help out in Delray while our

18    leader was on maternity leave.  I handled a lot

19    of the community events and in-store events.

20         Q.   Is there any procedure where there's

21    investigations as to who is notified or how it's

22    conducted?

23         A.   Not that I'm aware of.  I don't know.

24         Q.   So you've never been told there's any

25    specific procedures or if it's random?

```
 1              A.   No.  Generally, if you had an issue
 2    with another employee or you thought somebody was
 3    stealing or was unethical you went to security
 4    and they did an investigation on that.
 5              Q.   And in this case, that would have
 6    been Don Fankhauser, you said?
 7              A.   Like I said, I believe he was there.
 8    It was a transition period.
 9                   MR. BURTON:  Nothing further.
10    Any cross?
11                   MR. GONZALEZ-LLORENS:  Actually,
12    I have a few follow-up questions.
13                   MR. BURTON:  He's allowed to ask
14    that too.
15                        CROSS-EXAMINATION
16    BY MR. GONZALEZ-LLORENS:
17              Q.   You worked in Mr. Harris' store, 638?
18              A.   Yes, I did.
19              Q.   Did you work with him at any other
20    store?
21              A.   No.  But I was the trainer for the
22    food area.
23              Q.   Uh-hum.
24              A.   So there was times that I had to go
25    out to his store.
```

```
 1              Q.   And when you say "his store" you mean
 2    store --
 3              A.   I believe, Deerfield.
 4              Q.   He was the store manager at the time?
 5              A.   Right.
 6                   MR. BURTON:  Team leader.
 7                   MR. GONZALEZ-LLORENS:  Team leader.
 8    That's the correct, proper term in Target.
 9    BY MR. GONZALEZ-LLORENS:
10              Q.   As a store manager, did you ever have
11    a chance to evaluate his performance?
12              A.   No, I didn't.
13              Q.   Would it be accurate that from the
14    time he was a store manager, you were not present
15    at the store all the time; correct?
16              A.   No, I was not.
17              Q.   And you would not be involved in any
18    investigation; is that correct?
19                   MR. BURTON:  Object to the
20    form of the question, as to whether she would
21    or she would not be.  That's not her choice.
22    She wasn't, she said.
23                   MR. GONZALEZ-LLORENS:  You can
24    answer the question.
25                   THE WITNESS:  Okay.  Can you
```

36

1  rephrase the question?  I don't understand what

2  you're asking.

3  BY MR. GONZALEZ-LLORENS:

4       Q.   Yes.  During the investigation

5  involving Mr. Harris when he was a store manager,

6  you were not part of an investigation?

7       A.   No, I wasn't.

8       Q.   In fact, you were working in a

9  different store altogether.

10      A.   Yes.

11      Q.   Do you have any personal

12 knowledge..., that is, did you hear anything,

13 see anything involving any incident that could be

14 race discrimination against Mr. Harris?

15      A.   No.

16      Q.   You testified there were some rumors

17 that a person would be fired if he or she

18 testified in favor of Mr. Harris; is that

19 correct?

20      A.   Yes.

21      Q.   Now, who made those statements or

22 those rumors?

23      A.   It went around the store.  I couldn't

24 pinpoint a specific person, but it was just let

25 known to me that there was a list out there of

```
 1   people's names on it and those people -- like I
 2   said, I only work a few hours a week, so --
 3        Q.   The people that spoke to you about
 4   this rumor; were they hourly employees?
 5        A.   Yes.
 6        Q.   Were there any other persons who let
 7   you know that if you testified against Mr. Harris
 8   managers, and you said no; right?
 9             MR. GONZALEZ-LLORENS:  Right.
10             THE WITNESS:  In other words, no
11   managers spoke to me.  No managers spoke to me.
12             MR. BURTON:  Let me finish the
13   question so he can transcribe it.  It's kind of
14   hard.
15             MR. GONZALEZ-LLORENS:  Object to the
16   form.
17   BY MR. BURTON:
18        Q.   We need to do it that way.
19             Do you know anyone who has been
20   fired or testified on behalf of Mr. Harris?
21        A.   No.
22        Q.   Do you know anyone who has been
23   fired for testifying on behalf -- of testifying
24   of any employee who sued Target on a
25   discrimination claim?
```

```
 1              A.    I don't know of any employee who sued
 2    Target on a discrimination claim.
 3              Q.    So you were the only one that was
 4    fired for that reason?
 5              A.    I wasn't fired for that reason.
 6              Q.    Not you.  I mean anyone else.
 7              A.    No.
 8              Q.    The rumors you heard about Mr. Harris
 9    were rumors you heard at your store where you
10    work at; right?
11              A.    Yes.
12              Q.    And what store is that, again, ma'am?
13              A.    638.
14                    MR. BURTON:  Boca.
15                    THE WITNESS:  Boca.
16                    MR. BURTON:  Any other questions,
17    counsel?
18                    MR. GONZALEZ-LLORENS:  Let me
19    check.
20                    (Short Pause.).
21    BY MR. GONZALEZ-LLORENS:
22              Q.    Do you have any information
23    whatsoever regarding any defamatory comments made
24    by anyone at Target regarding Mr. Harris?
25                    MR. BURTON:  Objection to the form
```

```
 1      of the question.
 2                MR. GONZALEZ-LLORENS:  You can
 3      answer.
 4                MR. BURTON:  She's testified to a
 5      number of them.
 6                MR. GONZALEZ-LLORENS:  She can
 7      answer the question.
 8                THE WITNESS:  Just the rumors that
 9      I've heard.
10      BY MR. GONZALEZ-LLORENS:
11           Q.   From hourly employees?
12           A.   Right.
13           Q.   You also testified that Mr. Van
14      Savage made a comment to you that you were
15      not promoted because of your weight; is that
16      correct?
17           A.   Yes.
18           Q.   Do you recall when he made this
19      comment to you?
20           A.   Yeah, it was about -- it was about
21      two weeks before he left the company.
22           Q.   Do you recall when that was?
23           A.   I can't give you a specific date.
24           Q.   How about a year?
25           A.   I'd say, maybe it was two years ago.
```

1    He was in the process of moving.

2           Q.    Did anyone else at Target ever make a

3    comment to you regarding your weight, that that

4    was the reason why you were not promoted?

5           A.    They hadn't said specifically that

6    wasn't the reason I wasn't promoted, but everyone

7    that I've talked to about going to a round-robin

8    has basically mentioned that it was my outward

9    appearance.

10          Q.    And when you say everyone who had

11   spoken to you, were those hourly employees or

12   managers?

13          A.    No, they were managers... store

14   managers.  Bob Mach which was a store manager at

15   one time.

16          Q.    Uh-hum.

17          A.    Because I was in the restaurants and

18   I was there with the grease, I couldn't always

19   wear suits.  I had to wear aprons.  So I guess it

20   didn't give me a professional appearance.

21          Q.    Besides Bob Mach, anybody else?

22          A.    One of the human resources managers

23   mentioned it to me.  I had gone to school with a

24   few of the Target employees and they kept saying,

25   off the cuff -- you know -- "if you dropped a

41

```
 1   few pounds" -- you know -- "maybe you'd get a
 2   better chance of getting it." But it was said in
 3   a personal fashion.
 4          Q.   Is this the human resources person
 5   or some of the employees that went to school with
 6   you?
 7          A.   One of them was a human resource
 8   manager.
 9          Q.   Okay.  So Bob Mach was a human
10   resource manager?
11          A.   He was a store manager.
12          Q.   And anyone else that was a manager
13   that made this comment to you?
14          A.   No, it hasn't been made out like
15   because of your weight you're not getting sent to
16   the round-robin.  It was basically -- you know --
17   we need to -- I got a lot of excuses, as far as I
18   was concerned.
19          Q.   And you mentioned it was because of
20   your outward appearance; is that correct?
21          A.   Yes.
22          Q.   And you also testified there was
23   something about wearing aprons with grease?
24          A.   I worked in the restaurant so it was
25   hard to maintain a perfect uniform.
```

42

```
 1              MR. GONZALEZ-LLORENS:  I have no
 2   further questions.
 3              MR. BURTON:  I have one additional
 4   follow-up.
 5              REDIRECT EXAMINATION
 6   BY MR. BURTON:
 7        Q.   You said to him; did anyone
 8   specifically mention to you directly any
 9   discriminatory comments about Mr. Harris?
10              What I will ask is; what comments
11   did you hear through gossip or hearsay or general
12   talk in the restaurant that you can't attribute
13   to specific people but you heard regarding
14   Mr. Harris as far as discriminatory comments?
15        A.   About his firing?
16        Q.   Or anything.  His race, his firing
17   his car, his wife.
18        A.   Well, when Steve is here --
19   when Steve was at our store, nobody really had
20   a problem with Steve.  We all liked him.  We all
21   knew what kind of car he drove.  Nobody had any
22   real issues with him.
23              When he was terminated that's when
24   rumors were flying.  I've never heard anything
25   derogatory about Steve before that.  He was
```

1  always a hard worker and a good manager, so...

2         Q.   When you said "The issue of the

3  markdowns," does that impute him being a thief?

4              MR. GONZALEZ-LLORENS:  Objection.

5  Speculation.

6              THE WITNESS:  Um... implied, but not

7  actually said.

8  BY MR. BURTON:

9         Q.   Implied that he was a thief?

10        A.   That things were disappearing and

11 things were getting marked down.

12        Q.   I see.  And that was the rumor?

13        A.   Yes.

14             MR. BURTON:  Thank you.  No further

15 questions.

16             MR. GONZALEZ-LLORENS:  Just one

17 follow-up.  I didn't ask you this.

18                RECROSS-EXAMINATION

19 BY MR. GONZALEZ-LLORENS:

20        Q.   How often did you go to store 393

21 when Mr. Harris was the store manager?

22        A.   I probably went out every month to do

23 the inventory for about three or four months.

24        Q.   So for three or four months?

25        A.   Just one day.

44

```
 1          Q.   How long were you there?
 2    A few hours?
 3          A.   About six hours to do the inventory.
 4    Sometimes I was there longer.  If he needed me to
 5    train he went through people for the food area.
 6    It's very common to go through a lot of people.
 7    And so I went out several months in a row to
 8    train people for inventory.
 9               MR. BURTON:  I have to give you some
10    instructions by law.
11               THE WITNESS: Okay.
12               MR. BURTON:  So please be patient.
13               First of all, I would, as you
14    suggested -- and you have the right to talk to
15    anyone you want, but for your own benefit you
16    probably are best not speaking to either one of
17    us or anyone claiming to represent anyone
18    representing us, so no one can retaliate it in an
19    informal setting and so you won't be caught in
20    the process of speaking to anyone.
21               THE WITNESS:  That's okay.
22               MR. BURTON:  That's the way the
23    world is.  But it's just a suggestion.
24               The second thing is you have
25    a right to read and sign this.  And that's done
```

1  primarily, to make sure that this gentleman had

2  taken down the right words. Target would like

3  each of the witnesses to sign it. But again

4  they're individuals. We have no position. We

5  don't care whether you do or don't. But even if

6  you want to change an answer, you can't.

7        All you can do is write an addenda,

8  saying I meant to say there... T-H-E-R-E... and

9  they put "their," or whatever the case may be as

10  an addendum to it, but you can't change the

11  substance of any answer or names or say I have

12  meant to say this or that. You can't change the

13  testimony.

14        I am not going to recommend

15  you to do so, but if you say you wish to, this

16  gentleman will send a letter to your house saying

17  it's ready to be read and you'll have to go to

18  his office within 10 days or it will be filed as

19  if you had and be useable in all respects.

20        I'll ask you now whether you wish to

21  read and sign or whether you wish to waive the

22  reading and signing, so that you would not have

23  to go to downtown Miami.

24        MR. GONZALEZ-LLORENS: Actually,

25  as a party in this case, I suggest she read.

46

```
 1              MR. BURTON:  It's your choice.
 2              MR. GONZALEZ-LLORENS:  We request
 3    that she read, though.
 4              THE WITNESS:  I will not be able to
 5    go to Miami, though.
 6              MR. BURTON:  That's where it will
 7    have to be.
 8              MR. GONZALEZ-LLORENS:  He can mail
 9    it to her house.
10              We will request she read according
11    to the Rules of Civil Procedure.  And I also
12    think that the comments that you initially made
13    are improper.
14              MR. BURTON:  I don't know which
15    comments they were, but I believe that the woman
16    has said there's a fear of retaliation.  You made
17    a suggestion that she not speak to anyone,
18    therefore, everything will be done under
19    subpoena.
20              I believe that's a proper statement,
21    in light of her fears and in light of her request
22    that she be subpoenaed.
23              MR. GONZALEZ-LLORENS:  I don't
24    believe that's what she said.
25              MR. BURTON:  If you don't send out
```

1    an investigator we won't have a problem.

2                    MR. GONZALEZ-LLORENS:  I won't

3    answer your questions.  I think they are highly

4    improper.  We do request that she read it.

5                    MR. BURTON:  It's up to you.  The

6    procedure is the procedure.  Have a good day.

7                    THE WITNESS:  Do I need to have --

8    I can't take any time off of work.

9                    MR. GONZALEZ-LLORENS:  It will be on

10   your own time.  If you don't read it, actually,

11   within 30 days it's deemed as accepted.

12                    THE WITNESS:  So you'll just send it

13   to me?

14                    MR. GONZALEZ-LLORENS:  I believe the

15   court reporter will take care of that.

16                    MR. BURTON:  Thank you very much for

17   your time, ma'am.

18                         DEPONENT

19   Subscribed and sworn to before me this _____

20   day of _____ 2000.

21   My Commission expires:_____

22

23

24

25

48

```
 1                     CERTIFICATE OF REPORTER

 2      STATE OF FLORIDA   :

 3                         :   SS.
        COUNTY  OF  DADE   :
 4

 5

 6

 7           I, ELLIOTT MARSHALL, A.S., RPR, being a
        Notary Public in and for the State of Florida at
 8      Large, do hereby certify that I reported the
        deposition of SIMONE TRIPP, a witness called by
 9      the PLAINTIFF in the above-styled cause; that the
        said witness was duly sworn by me; that the
10      reading and subscribing of said deposition were
        not waived by the witness and by counsel for the
11      respective parties; and that the foregoing pages,
        numbered from 1 to 48, inclusive, constitute a
12      true and correct transcription of my shorthand
        report of the deposition by said witness.
13
             I further certify that I am not an attorney
14      or counsel of any of the parties, nor relative or
        employee of any attorney or counsel connected
15      with the action, nor financially interested in
        the action.
16
             WITNESS my hand and official seal in the
17      City of Miami, County of Dade, State of Florida,
        this 28th day of October, 2000.
18

19           _____
             ELLIOTT MARSHALL, A.S., RPR
20           My Commission Expires 5-19-2001

21

22

23           ELLIOTT MARSHALL COMORA
             MY COMMISSION # CC 845782
24           EXPIRES: May 19, 2001
             Bonded Thru Notary Public Underwriters

25
```

Worldwide Reporting Service
Miami ∞ Orlando ∞ Tampa

1

1    UNITED STATES DISTRICT COURT
          SOUTHERN DISTRICT OF FLORIDA
2            FT. LAUDERDALE DIVISION

3      CASE NO. 00-617-CIV-FERGUSON
              Magistrate Judge Snow
4

5    Steve Harris,                    ORIGINAL

6              Plaintiff,

7    vs.

8    Dayton Hudson Corporation d/b/a
     Target Stores,
9
               Defendant.
10
        -  -  -  -  -  -  -  -  -  -  -  -  -  -  - X
11

12

13                        4375 Sheridan Street
                          Hollywood, Florida
14                        Miami, Florida
                          Friday, October 13th, 2000
15                        11:20 A.M. - 12:00 P.M.

16

17
                  DEPOSITION OF KAREN NAPP LAPRE
18

19
          Taken before ELLIOTT MARSHALL, A.S.,
20
     Registered Professional Reporter and Notary
21
     Public in and for the State of Florida at Large,
22
     pursuant to Notice of Taking Deposition in the
23
     above cause.
24

25

```
 1              - A P P E A R A N C E S -

 2    on behalf of the Plaintiff

 3              Richard J. Burton & Associates, P.A.
                18305 Biscayne Boulevard
 4              Suite 300
                Miami, Florida 33160
 5              Tel 705-0888 - fax 935-9542

 6    on behalf of the Defendant

 7              Shutts & Bowen
                201 South Biscayne Boulevard
 8              Suite 1500
                Miami, Florida 33131
 9              BY: Rene J. Gonzalez-Llorens, Esq.
                TEL 358-6300 - FAX 381-9982
10
                     ALSO PRESENT
11
                     Steve Harris
12

13

14              - - - - - -

15

16              - I N D E X -

17    WITNESS          DIRECT  CROSS  REDIRECT  RECROSS

18    KAREN NAPP LAPRE

19    BY MR. BURTON    3              42

20    BY MR. GONZALEZ-LLORENS  41

21         - E X H I B I T S -

22    PLAINTIFF'S _____ FOR IDENTIFICATION

23         none marked

24

25
```

```
 1      Thereupon--
 2                 KAREN NAPP LAPRE
 3      was called as a witness by the Plaintiff, and,
 4      after having been first duly sworn, was examined
 5      and testified as follows:
 6                 DIRECT EXAMINATION
 7      BY MR. BURTON:
 8           Q.   Now, please state your name for the
 9      record.
10           A.   Karen Napp Lapre.
11           Q.   And I believe you recently got
12      married and "Lapre" was added a couple months
13      ago?
14           A.   That is correct.
15           Q.   Congratulations.
16           A.   Thank you.
17           Q.   And where do you reside?
18           A.   At 4724 S.W. 13th Street.
19           Q.   In what town?
20           A.   Delray Beach.
21           Q.   Miss Lapre, keep in mind that --
22      have you ever given a deposition or any type of
23      legal statement before?
24           A.   No, I have not.
25           Q.   What you just saw there is what I'm
```

4

```
 1    going to talk to you about.  If you answer a
 2    question because you're pretty sure because you
 3    know what the rest of it is going to be like,
 4    as we would in conversational language, he's not
 5    going to take it down properly if you say
 6    something in the middle of what I'm saying he'll
 7    put your statement there and he'll put the
 8    remainder of my statement afterwards like there
 9    were three separate speeches.
10                    So what you have to do is take a
11    very tiny little breath and wait for me to finish
12    and then see if this gentleman is going to raise
13    an objection.
14                    You've never hired him individually
15    as your lawyer; have you?
16         A.    No.
17         Q.    So he's not going to tell you don't
18    answer.  He's not allowed to do that.  Because
19    the only thing you're allowed to say don't answer
20    in Federal Court is if your attorney told you
21    something.  And since neither of us have an
22    attorney here, and that is for the Judge to
23    review as to technical points of law, that
24    doesn't mean that should influence your answer to
25    my question.
```

5

```
 1            By the same token, you can't shake
 2   your head and say "uh-uh" or "uh-hum," or shrug,
 3   because he can't say "the witness shrugged no" or
 4   "yes" or "uh-uh," meaning yes or no.  He's got
 5   to put the words that come out down as you say
 6   them.  So when I'll ask you a question I'll
 7   require a verbal answer.
 8            The third instruction is real
 9   simple.  If anything I say doesn't make sense and
10   I ask you a question that you don't understand --
11   and whether it makes sense to me or whether it
12   sounds like it makes sense to you -- you should
13   say, "I don't understand that question," or "I
14   don't understand that second part of the
15   question." Just tell me that and I'll restate
16   it.
17            The reason is, I don't want you to
18   answer anything you don't understand.  And by the
19   same token, I don't want, when you do answer
20   something, for it not to be clear in your mind,
21   so I get a complete answer; and if I ask you the
22   same question later, in other words, I won't get
23   the same answer back.
24            If you need a break or any other
25   convenience, just say "I'd like to take a break."
```

1              Do you understand all those

2    instructions?

3         A.   Yes.

4         Q.   And as you see, the lawyers,

5    we are not like Court TV. We had a witness

6    earlier that said "I can't answer that. That's

7    hearsay." We're allowed to have hearsay. We're

8    allowed to do a lot of things that they don't

9    have in these TV movies. And, hopefully, we're a

10   little less intimidated with the TV movies.

11              With in mind, I'll be asking you

12   questions that are personal or that you really

13   wouldn't go around talking about and that a lot

14   of people feel are questions spreading gossip or

15   telling stories or violating confidences in this

16   proceeding. We're keeping it private among

17   ourselves.

18              I will not go to other people and

19   say he said and she said. But by the same token,

20   you do have to tell what you heard or remember to

21   the best of your ability; okay?

22        A.   Okay.

23        Q.   Ms. Lapre, with whom do you reside

24   that's over the age of 15?

25        A.   John Lapre.

```
 1              Q.   And if I loused up any names, let me
 2     know.
 3              A.   Okay.
 4              Q.   But I will.  I've been doing this all
 5     my life and I never get it right.  I remember
 6     everything except names.
 7                   Can you give me a brief resume of
 8     your educational background?
 9              A.   I graduated from Stranahan High
10     School in 1993 and went to FAU from '93 through
11     August of 1997.
12              Q.   Did you graduate?
13              A.   Yes, I did.
14              Q.   With what degree?
15              A.   A bachelors in psychology.
16              Q.   And were you working at any time
17     between '93 and '97?
18              A.   Yes.
19              Q.   Where?
20              A.   I worked for Mervin's, I worked for
21     Target, and I also worked for Walgreen's.
22              Q.   Can I presume that you didn't work
23     for all three of them at the same time?
24              A.   That's correct.
25              Q.   Which employer did you start with?
```

```
 1              A.   I started with Mervin's.
 2              Q.   And what years were you working with
 3    Mervin's?
 4              A.   From '93 through '96.
 5              Q.   And what did you do with Mervin's?
 6              A.   I was a sales associate on the floor
 7    about 20 hours a week.  I was going to school,
 8    so I was only working part time.
 9              Q.   And did they provide any training for
10    you, other than on-the-job training?
11              A.   No.
12              Q.   And in '96 where did you then proceed
13    to work?
14              A.   I went to Walgreen's for three
15    months.
16              Q.   What did you do there?
17              A.   I was on the sales floor as well as a
18    pharmacist technician.
19              Q.   Is that the persons that take the
20    orders and pay?
21              A.   That's correct.
22              Q.   You take the money and hand out the
23    medicines afterward?
24              A.   Right.
25              Q.   Is there any reason you left there?
```

```
 1              A.    Yes.   I was -- another Mervin's
 2    offered me the same amount of pay that I had
 3    before and it was a better deal.
 4              Q.    So you went back to Mervin's?
 5              A.    That's correct.
 6              Q.    Until when?
 7              A.    Until 1997.
 8              Q.    In '97 where did you then work?
 9              A.    I transferred to Target because
10    Mervin's closed its stores in South Florida.
11              Q.    Is that the same company that owns
12    them?
13              A.    That's correct.
14              Q.    So you were transferred from one
15    Dayton Hudson company to another?
16              A.    Correct.
17              Q.    And did they provide you any training
18    before you transferred?
19              A.    No.
20              Q.    In 1997, what was your first job with
21    Target and where was it at?
22              A.    I was a level one sales associate in
23    soft lines.
24              Q.    What does "soft lines" mean?
25              A.    That is the clothing part of the
```

1  store.

2         Q.   And how long were you at that store?

3         A.   To this date.

4         Q.   Which store is that?

5         A.   Delray Beach.

6         Q.   And when you went to work there,

7  do you know who was the team leader?

8         A.   My direct supervisor or the store

9  supervisor?

10        Q.   The store supervisor.

11        A.   That would be Joe Toscano.

12        Q.   After how long a period did Joe

13  Toscano leave?

14        A.   (No response.)

15        Q.   More or less.

16        A.   I would say, a year.

17        Q.   And who replaced him?

18        A.   Joy Mansik, I believe.

19        Q.   When Mr. Harris was there?

20        A.   No.  Not at that point in time.  Oh,

21  no, I got it backwards.  It was Steve and then

22  Joe.

23        Q.   That's what I was going to say.

24        A.   Like I said, I'm sorry.  I'm thinking

25  names and I'm not thinking the time.  I'm sorry.

```
 1              Q.   So it was Mr. Toscano?

 2              A.   Correct.

 3              Q.   And then it was Mr. Harris?

 4              A.   Correct.

 5              Q.   And he was there for about a year?

 6              A.   About a year.

 7              Q.   And then Joy replaced him?

 8              A.   Correct.  I'm sorry.

 9              Q.   It's okay.  My memory's better

10    because I've been studying it more.

11              A.   (Witness laughs).

12              Q.   Obviously, you were promoted from a

13    level one sales associate at some point; correct?

14              A.   Correct.

15              Q.   What was your next promotion and

16    when?

17              A.   Well, I was still level one, but I

18    got a financial raise to become a cash office

19    person.

20              Q.   What does a cash office person do?

21              A.   I process the money that came in from

22    the day before the service desk and from the

23    registers and made the deposits to send out.

24              Q.   Now, how long did you perform that

25    task or function?
```

```
 1              A.   Probably about a year.

 2              Q.   Was that contemporaneous with the

 3     period that Mr. Harris was there?

 4              A.   Yes, it was.

 5              Q.   So you were in that role pretty much

 6     from the time you got there until the time you

 7     left?

 8              A.   No.  That's not true.

 9              Q.   Well, then correct it.

10              A.   I was in the cash office and then I

11     got promoted to being a cashier's supervisor

12     during that period.

13              Q.   So you went from the cash office

14     offers to a cashier's supervisor?

15              A.   Correct.

16              Q.   And who was your superior?

17              A.   That would be Evan Feldman and then

18     Shannon Tetrault.

19              Q.   Now, Shannon Tetrault was the GSTM?

20              A.   GSTL.

21              Q.   Yes, which stands for what?

22              A.   Guest service team leader.

23              Q.   So she was the second level above

24     you?

25              A.   Yes.
```

13

1          Q.   The first level was the front office
2     supervisor?
3          A.   I was that position and then it was
4     Shannon and then it was Steve.
5          Q.   Now, was she there the whole time
6     Steve was or did she leave before Steve?
7          A.   I'm not sure on that point.
8          Q.   I understand from other people and I
9     know that you certainly knew Sandy Rosenberg.
10         A.   Yes.
11         Q.   And that Shannon Tetrault had some
12    problems and was not really considered the
13    optimum employee.  Is that fair to state?
14              MR. GONZALEZ-LLORENS:  Objection.
15    It assumes facts not established.
16              MR. BURTON:  You can answer.
17              THE WITNESS:  I can agree with that
18    to some point.  Yes.
19    BY MR. BURTON:
20         Q.   Tell me what you experienced?  As I
21    said, I'm going to ask you about your experience
22    with Shannon.
23              How would you describe her, if you
24    had a term that you would use?
25         A.   (Witness laughs).

1          Q.    You're smiling, and the record

2     doesn't show that.

3                    THE WITNESS:   (Witness laughs).

4                    THE REPORTER:   The record shows she

5       laughed.

6                    MR. BURTON:   Yes.   Go ahead.

7                    THE WITNESS:   I'm trying to think of

8       how to --

9     BY MR. BURTON:

10          Q.    You don't have to be diplomatic.

11    This is not a diplomatic place?

12          A.    Yes, I understand.

13          Q.    I want your honest opinion,

14    undiplomatically, if you will.

15          A.    Maybe a little flighty.   A lot of

16    times I felt I did her job for her.

17          Q.    Were there other people that had

18    similar feelings that she wasn't prepared to do

19    the job she was doing?

20          A.    I would agree with that.

21          Q.    Was there anyone else in the front

22    office that believed that?

23          A.    Yes.

24          Q.    And was that the whole time she was

25    there that people felt she wasn't able to do her

-06107-WDF    Document 60    Entered on FLSD Docket 03/21/2001    Pag

15

```
 1    job?
 2              A.    Yes.
 3              Q.    Did you ever raise that to her?
 4              A.    A couple times, yes.
 5              Q.    And what did you say to her about her
 6    behavior?
 7              A.    Sometimes I would say, "I feel like I
 8    do more of your job than you do." And she would
 9    just laugh, thinking I'm making a joke.
10              Q.    Was she immature?
11              A.    Yes.  I believe so.
12              Q.    When you say she just laughed and did
13    not take it seriously, did she seem to have an
14    irresponsible attitude?
15              A.    Can you be more clear?
16              Q.    Well, she wasn't responsible for the
17    work she was doing and didn't care.
18              A.    I would say she cared, but it was
19    more towards the point of how they would look and
20    how they would get promoted.  What would make her
21    look good in order to make her go further.
22              Q.    I see.  So would you say she was
23    selfish and ambitious?
24              A.    Yes.  Absolutely.
25              Q.    And she would say almost anything
```

Worldwide Reporting Service
Miami ∞ Orlando ∞ Tampa

16

```
 1   necessary to make herself appear good and someone
 2   else bad if they were hurting her?
 3        A.   Yes.
 4             MR. GONZALEZ-LLORENS:  Objection to
 5   speculation.
 6   BY MR. BURTON:
 7        Q.   Did there come a time when you --
 8   she was there about how long a period?
 9        A.   I believe, about a year, a
10   year-and-a-half.
11        Q.   Now, was she there prior to
12   Mr. Harris?
13        A.   I believe she came on board around
14   the same time, but I'm not sure.
15        Q.   You're not sure if Joe Toscano was
16   her manager ever or not?
17        A.   Oh, shoot!  I think Joe Toscano left
18   when she came on board.  Or it was right around
19   the time.
20        Q.   Did you ever have a personal
21   conversation with her where you knew what she had
22   done or where she had worked before?
23        A.   No.
24        Q.   Do you know what background
25   qualification or skill she had to get for this
```

```
1   position?
2        A.   I was told that she had a masters
3   degree, but she and I never had a discussion
4   about her personal background.
5        Q.   Were you told that she was hired as a
6   team leader at that level?
7        A.   Yes.
8        Q.   So she had not worked in Target and
9   was not familiar with the procedures, to the best
10  of your knowledge?
11       A.   That is correct.
12       Q.   Attractive woman?
13       A.   If I was a man, yes.  (Witness
14  laughs).
15       Q.   Did she try -- there are certain
16  women that act provacative.  Was she one of them?
17            MR. GONZALEZ-LLORENS:  Objection.
18  Speculation.
19            MR. BURTON:  In your opinion.
20            THE WITNESS:  A little.  Yes.
21  BY MR. BURTON:
22       Q.   Now, did there come a time where
23  you ever heard that any other manager talked to
24  her about her behavior?
25       A.   I was not aware of it.
```

18

```
 1            Q.    Did you ever see Mr. Harris treat her
 2      in an improper fashion?
 3            A.    No.
 4            Q.    You saw them together periodically,
 5      as you would with all employees; correct?
 6            A.    Correct.
 7            Q.    And you never saw him treat any
 8      female in a derogatory fashion; did you?
 9            A.    No.
10            Q.    And he certainly never did anything
11      improper as to you; correct?
12            A.    No.
13            Q.    Did he have a reputation for being a
14      nasty guy?
15            A.    Not to me.
16            Q.    You don't know of any such
17      reputation?
18            A.    No.
19            Q.    Now, do you know Don Fankhauser?
20            A.    Yes, I do.
21            Q.    Was he working at the store at any
22      point before Mr. Harris was terminated?
23            A.    Yes.
24            Q.    What was he doing there?
25            A.    I -- I -- he was the asset protection
```

```
 1   team leader.
 2          Q.   For your store?
 3          A.   Yes.
 4          Q.   So he was the director of security
 5   for your store itself?
 6          A.   Correct.
 7          Q.   Or for the region?
 8          A.   No, for the store.
 9          Q.   For the store?
10          A.   Correct.
11          Q.   Did he work there on a regular basis?
12          A.   Yes.
13          Q.   And how many days a week at what
14   point in time?
15          A.   He was in and out a lot, but I'd say,
16   probably three or four days a week.
17          Q.   Do you know or did you ever meet
18   Mr. Harris' wife?
19          A.   No, I did not.
20          Q.   You don't know who he's married to at
21   all?
22          A.   I'm aware of who he's married to,
23   but I personally have never met her.
24          Q.   And are you aware of her race?
25          A.   Yes.
```

20

```
 1              Q.   And that is?
 2              A.   She's white.
 3              Q.   Does she still work at the store,
 4      to the best of your knowledge?
 5              A.   Yes.  I believe she works at Delray.
 6              Q.   The Delray Store.  Not the Deerfield?
 7              A.   Correct.
 8              Q.   Did she work at Deerfield at any
 9      time, to the best of your knowledge?
10              A.   Not to my knowledge.
11              Q.   So they didn't work with each other?
12              A.   No.
13              Q.   Now, Mr. Harris, did you ever see the
14      car he drove?
15              A.   Yes.
16              Q.   And what was that?
17              A.   I've seen him drive a Viper, and I
18      believe he had a Mercedes as well.
19              Q.   Was there any resentment that
20      you were aware of because his skin color in
21      relationship to his assets or what he drove or
22      his wife?
23              A.   No.
24              Q.   No one really gave a darn; did they?
25              A.   Well, things were said, but I don't
```

1    think it had to do with his color.

2         Q.    Like what was said?

3         A.    Like someone would say, "I wonder

4    where he got the money to get that car."

5         Q.    Do you remember anybody specifically?

6         A.    I don't remember the names, but I

7    know several people said it in the store as a

8    kind of gossip thing.

9         Q.    That was the word on the street?  The

10   gossip?

11        A.    Right.

12        Q.    You were there in the swing room

13   where there was a painting of various team

14   members.  The swing room, the recreational room

15   for employees when they were off.  There was a

16   painting in there.  Was it --

17        A.    There was a painting of like Mickey

18   Mouse.

19        Q.    At a point in time it had people's

20   faces; didn't it?

21        A.    It the conference room it had

22   people's faces.  Yes.

23        Q.    And when Mr. Harris was there one of

24   the faces was black?

25        A.    Yes.

```
 1          Q.   And after Mr. Harris left, that black
 2   was painted out?
 3          A.   Yes; but I believe the whole thing
 4   was painted over too.
 5          Q.   Do you know who ordered it painted
 6   over?
 7          A.   No, I don't know.
 8          Q.   When you say "the whole thing was
 9   painted over," you believe they cleaned out all
10   the faces?
11          A.   Correct.
12          Q.   Now, did you ever hear any -- not in
13   relation to Mr. Harris -- but any racial comments
14   made about anything by any person you worked with
15   there in the store?
16          A.   No, I can't recall anything.
17          Q.   Were you ever interfered by any
18   person in relationship to Mr. Harris or his
19   termination?
20          A.   No.
21          Q.   So you had never been spoken to by
22   Mr. Fankhauser?
23          A.   Yes, I have.  But I didn't know it
24   had anything to do with Mr. Harris' termination.
25          Q.   What did he talk to you about that
```

1   you may now have put together that way?

2          A.    He spoke to me about a voucher for a

3   fellow worker's going away party.

4          Q.    You said that there was a party of

5   a coworker that was going away.

6                Do you remember what incident that

7   was?

8          A.    There was a party for Evan Feldman,

9   I believe, at Shooter's.

10         Q.    You can't ask him, but okay.

11               And what role were you in at the

12   time that you were talked to?  Were you cash

13   adjustment?  Were you cashier manager?  What

14   position were you at the time?

15         A.    I was cashier supervisor, but I

16   also was filling in in the cash office because

17   I'm not sure if they were fired or away,

18   but I remember I was in the cash office

19   as well.

20         Q.    And how much after the fact were you

21   talked to?

22         A.    I'm not really sure on that point.

23         Q.    A couple months?

24         A.    I'm pretty sure it was weeks, but I

25   don't know if it was a month.  I'm not positive.

1          Q.    What was asked to you and what did

2     you say?

3          A.    I was shown the voucher and the

4     receipt -- actually, no, I was shown the voucher

5     and asked about the receipt, but the receipt was

6     not there.

7          Q.    You had received the receipt, though;

8     hadn't you?

9          A.    Yes, I had.  But it wasn't with the

10    voucher I saw.

11         Q.    So he showed you a document with a

12    missing item?

13         A.    Well, no.  It had been attached to

14    something else which had been sent to central

15    sales audit.  The yellow copy which was the final

16    copy from the voucher book was the one they had

17    to show me.

18         Q.    But he didn't have a copy of the

19    actual receipt which he could have gotten by fax?

20         A.    That is correct.

21         Q.    Do you know why he showed it to you

22    incomplete?

23         A.    I don't know that.  No.

24         Q.    What did he ask you about this

25    voucher without the receipt attached?

25

1          A.    He had just showed me that the
2    register had been short and what did I remember
3    about this voucher.
4          Q.    So he announced to you that the
5    register had been short?
6          A.    Yes.
7          Q.    Wouldn't you have known it that
8    day when you did the cash audit a month before?
9          A.    Shannon at the time spoke to me about
10   a month before that, but I hadn't been spoken
11   about it by AP until at the time.
12         Q.    Shannon at the time told you the cash
13   register was short?
14         A.    Yes.
15         Q.    With the voucher and the receipt,
16   would it still have been short?
17         A.    I voided the receipt because I had
18   done something improper in the machine because
19   I didn't realize the money was paid out to
20   Mr. Harris -- and he was there -- a sheet showing
21   both transactions and voided also.  And I didn't
22   understand why there would be a shortage in the
23   register.
24         Q.    To the best of your knowledge, there
25   was a voiding, which, if you missed it, would

1   have shown a short, but with the two documents

2   next to each other the register should have shown

3   a correct balance?

4        A.   Yes.

5        Q.   And that was left there the day you

6   left?

7        A.   Yes.

8        Q.   And what was Tetrault upset about?

9             MR. GONZALEZ-LLORENS:   Objection.

10  Speculation.

11  BY MR. BURTON:

12       Q.   What did you say or what did you hear

13  was said?

14       A.   Oh.  She only asked me what happened.

15       Q.   Did you tell her?

16       A.   I explained to her and even showed

17  the receipt for the one that was voided.  And I

18  didn't understand why there would be a missing

19  voucher there at that time.

20       Q.   Did she ever locate the missing

21  voucher?

22       A.   Well, no.  I'm just saying it was all

23  there.  I showed her everything there that I had

24  done and there should be no reason for the

25  shortage in the register.

1          Q.    In other words, everything that

2     Mr. Harris gave you balanced out to the register?

3          A.    That's correct.

4          Q.    Did you, at the time that you were

5     told by Tetrault, show her that it should have

6     balanced and the proper documentation had been

7     supplied?

8          A.    I did, yes.

9          Q.    What was her response when you showed

10    her that?

11         A.    I don't think she knew what to do.

12    I assumed it was a computer glitch, and I don't

13    know what was done about it at that point.

14         Q.    When you say "I don't think she knew

15    what to do," how did she react to that?

16         A.    She never did anything beyond what I

17    said.  She just took my word and never did

18    anything about it.  She never researched it or

19    did anything to the best of my knowledge.

20         Q.    Do you know if she reported it to

21    Mr. Fankhauser?

22         A.    That I don't know.

23         Q.    Now, after Mr. Fankhauser,

24    did you tell him you had gone over this with

25    Shannon at the time to prove to her that the

1    register should have balanced?

2          A.    Yes.

3          Q.    What did he say?

4          A.    Well, he just had me write down what

5    I did with the voucher.  He didn't discuss it.

6          Q.    So let's go back.  He didn't ask you

7    to write down the conversation, did he, with

8    Shannon Tetrault?

9          A.    No, Shannon was not discussed.

10   We would just discuss the voucher.

11         Q.    But didn't you tell him that you had

12   talked to Shannon about it?

13         A.    I told him I showed him a receipt,

14   but I don't remember that he said anything to me

15   about it after that.

16         Q.    And he didn't ask you to write down

17   that portion of it; did he?

18         A.    No.

19         Q.    Do you know why he asked to

20   selectively write events rather than writing down

21   all the events that occurred?

22                MR. GONZALEZ-LLORENS:  Objection.

23   It assumes facts.

24                MR. BURTON:  Noted.

25                THE WITNESS:  I don't know.

Worldwide Reporting Service
Miami ∞ Orlando ∞ Tampa

1    BY MR. BURTON:

2         Q.    Now, you said the register balanced.

3    Was there any indication that Mr. Harris had not

4    turned back the proper amount of money in the

5    end?

6         A.    No.

7         Q.    Did everything balance out with him?

8         A.    Well, whenever he gave you the money

9    bag, I actually had more money than what I should

10   have had.

11        Q.    Why was that?

12        A.    I don't know.  I returned the extra

13   money to Mr. Harris and told him that there was

14   more money than what I should have gotten back,

15   and he said "I just gave you what was in my

16   pocket."

17        Q.    Did you tell Mr. Fankhauser that was

18   exactly what he did?

19        A.    Yes.

20        Q.    That he gave you more money

21   than the register receipt should have been...

22   the difference?

23        A.    Right.

24        Q.    And Mr. Harris said, "I gave you

25   everything that was in my pocket just so that it

1    would be covered," or words to that effect?

2         A.   To that effect.

3         Q.   And what did Mr. Fankhauser say when

4    you told him that?

5         A.   Like I said, he more or less had

6    me write everything down.  He didn't really

7    discuss it with me.  He just really said, "Tell

8    me the events as you did."

9         Q.   But did he have you write down that

10   "Mr. Harris gave me everything out of his

11   pocket" and say those words?

12        A.   Right.

13        Q.   Did you write that down?

14        A.   I don't recall.  No.  No, I don't

15   think I did.

16        Q.   That's what I'm asking you.  I'm

17   looking at your statement now.  This is your

18   statement; is it not?  It's attached to one of

19   the Target documents.

20                  The statement of Karen Napp.

21   Is this the statement we're talking about?

22        A.   Yes, it is.

23        Q.   I don't notice any of those items in

24   there?

25        A.   Okay.

```
 1        Q.   I didn't notice -- in the Shannon
 2   Tetrault statement I didn't notice the statement
 3   that Mr. Harris proffered or was turning over all
 4   his money or you were returning the balance to
 5   him.
 6             Do you understand --
 7        A.   I was asked -- he asked me how much
 8   money that I thought I had extra, and I told him
 9   that I couldn't remember the amount, and I wrote
10   that in there.   I didn't write the fact -- that's
11   true, I didn't write the fact that he gave me
12   everything in his pocket.
13        Q.   And you didn't write that you had
14   previously confronted Shannon Tetrault to show
15   her how the register balanced?
16        A.   That is correct.
17        Q.   Did he indicate, "he" meaning Don
18   Frankhauser, what portions he wanted you to write
19   down, just asking you questions?  Please answer
20   it on paper, as opposed to writing down the whole
21   event.
22        A.   I guess.   Because I really don't
23   recall -- you know -- him saying, "Well, write
24   down everything."  He was pretty much kind of
25   questioning me and I wrote down what I felt was
```

```
 1    relevant, I guess, to the voucher.
 2         Q.    To what he asked you?
 3         A.    I guess that's correct.  I guess.
 4         Q.    So he didn't ask you a statement of
 5    everything that happened.  He said, "Please just
 6    write how much you received," and you wrote that?
 7         A.    He basically asked me about the
 8    voucher.  He really didn't ask me about who I
 9    spoke to and what I did outside of that voucher.
10         Q.    I see.  Did he ever express to you
11    what he intended to do with the selected portions
12    of your statement he wished to use?
13         A.    No, he did not.
14         Q.    Had he and Mr. Fankhauser done
15    something like this in the past by interviewing
16    you and asking you selective questions?
17         A.    Not that I can recall.
18         Q.    This was the only instance?
19         A.    Yes.  That's the only statement that
20    I remember giving to him.
21         Q.    I see.  What kind of car did he
22    drive?
23         A.    I couldn't tell you.
24               Is there any water?
25               MR. BURTON:  Sure.  Right there.
```

33

```
 1   BY MR. BURTON:
 2        Q.   I understand from Mr. Feldman that
 3   Mr. Fankhauser was at the dinner himself.
 4        A.   That I'm unaware of.  I didn't go
 5   myself.
 6        Q.   Did Mr. Fankhauser ever tell you that
 7   he himself was consulted about how much the tip
 8   should be at that dinner?
 9        A.   No.
10        Q.   Or that he had counted Mr. Harris'
11   money?
12        A.   No.
13        Q.   And, for the record, Don Frankhauser
14   is a white male?
15        A.   That's correct.
16        Q.   Had he ever had a superior that was a
17   black man before, that you know of?
18        A.   I honestly don't know.
19             MR. GONZALEZ-LLORENS:  Objection.
20   Speculation.
21             MR. BURTON:  I asked if she knew.
22   She said no.
23   BY MR. BURTON:
24        Q.   Now, the gentleman or the person that
25   followed Mr. Harris as the team leader there was
```

1    a white person; correct?

2         A.    Yes.

3         Q.    Is that person still there?

4         A.    No, she isn't.

5         Q.    What is she doing now?

6         A.    She has got some sort of district

7    job where she goes from store to store, and,

8    I guess, does store improvement or something to

9    that effect.

10        Q.    Did you ever have any other

11   discussion with any other person at Target at all

12   regarding any of the events regarding Steve

13   Harris, either whether he was identified as Steve

14   Harris or whether you realized it?

15        A.    No.

16        Q.    Has anyone asked you for any

17   statements regarding what happened with Shannon

18   Tetrault?

19        A.    No.

20        Q.    Had you are you aware that

21   Miss Tetrault had animus to Mr. Harris?

22              MR. GONZALEZ-LLORENS:  I object.

23   It assumes facts not in evidence.

24   BY MR. BURTON:

25        Q.    Are you aware that Shannon Tetrault

1  ever accused Mr. Harris of harassment?

2        A.    No.

3        Q.    Had you ever heard that Mr. Harris,

4  as one of the rumors, had been actually sexually

5  harassing anyone?

6        A.    Yes.

7        Q.    What did you hear from whom?

8        A.    From Tina McHugh.

9        Q.    What did Tina McHugh say?

10       A.    She had told me, I believe it was

11  Halloween of '98, Mr. Harris had gotten her

12  drunk, so to speak, and was trying to harass her.

13       Q.    Where did this supposedly happen?

14       A.    I'm not sure wherever she said.

15  Some hotel for a function for the store.

16       Q.    Do you know if she ever made any

17  comment to anyone about it?

18       A.    That I don't know.

19       Q.    Did she say said she had?

20       A.    No.

21       Q.    Did anything further happen that you

22  are aware of concerning that?

23       A.    No.

24       Q.    When did she tell you this?

25       A.    I would say, maybe around

36

```
 1   Christmastime this year that just passed.
 2          Q.    In other words -- oh, in other words,
 3   two years after the fact?
 4          A.    Probably, yes.  Well, it would be
 5   about a year after the fact.
 6          Q.    A year after the fact?
 7          A.    Right.
 8          Q.    A year after Mr. Harris was no longer
 9   with the company?
10          A.    Right.
11          Q.    How did that conversation come up,
12   that you would have been discussing Mr. Harris a
13   year after he had left?
14          A.    To be honest, I don't remember.
15   I just remember what she said.
16          Q.    Where were you when she said that?
17          A.    We were -- it's funny.  I don't even
18   remember where we were.  I just remember what she
19   said.
20          Q.    Other than that, have you ever heard
21   any gossips about why Mr. Harris was relieved
22   from the company?
23          A.    No.
24          Q.    Have you ever heard any stories at
25   all?
```

1              A.    No.

2              Q.    Have you ever heard anything

3      regarding Mr. Harris, before this incident of a

4      year ago, that he had harassed anyone?

5              A.    No.

6              Q.    What reason, if any, were you given

7      for Mr. Harris no longer being with the company?

8              A.    I was not given a reason.

9              Q.    How was it announced to you that he

10     had no longer been with the company?

11             A.    That's all they said, that he was no

12     longer with the company.

13             Q.    Prior to that incident and

14     subsequent to that incident, had you ever had

15     any indication that Mr. Harris had in any way

16     done anything in any way to take any money from

17     Target or do anything improper regarding its

18     funds?

19             A.    No.

20             Q.    Prior to that instance with Miss

21     McHugh -- what does miss McHugh do there?

22             A.    She, I believe, is the soft lines

23     team leader up in North Carolina.

24             Q.    Has she been a soft lines team leader

25     in North Carolina before this?

```
 1          A.   No.
 2          Q.   Where had she worked prior to this?
 3          A.   She worked in my store as a soft
 4    lines team leader.
 5          Q.   When?
 6          A.   From -- it must have been before
 7    Halloween '98 until March of this year.
 8          Q.   In March she was transferred to North
 9    Carolina?
10          A.   Yes.
11          Q.   Now, this receipt that I'm showing
12    you, it's a Shooter's receipt.  Was this the
13    receipt or not that you were shown by
14    Mr. Fankhauser?
15          A.   I had seen this receipt before
16    whenever I processed the transaction in the cash
17    office and this was the one that he did not show
18    me at the statement time.
19          Q.   "He," meaning Mr. Fankhauser?
20          A.   Correct.
21          Q.   How much money do you recall giving
22    back to Mr. Harris?
23          A.   I don't remember the amount.
24          Q.   A lot of money?  A little money?
25          A.   It was quite a bit of money.
```

```
 1              Q.    So he had given you a large sum of
 2    money and you ended up giving -- in the hundreds
 3    you're talking about?
 4              A.    I would say, at least a hundred.
 5    Yes.
 6              Q.    So he had given you over $100 excess
 7    and you gave that back, whatever the differences
 8    were?
 9              A.    That is correct.
10              Q.    Was Mr. Fankhauser there through the
11    time that Mr. Harris was leaving in that
12    position?
13              A.    Yes.
14              Q.    Now, is Shannon Tetrault still
15    there?
16              A.    Not in my store.
17              Q.    Where did she go now?
18              A.    I know she went to the Coral Springs
19    store after mine, but I'm not sure exactly where
20    she is now.
21              Q.    Do you know Sandy Grizbek?
22              A.    Yes.
23              Q.    And what is her function with the
24    stores?
25              A.    She's the team relations leader in my
```

```
 1   store.
 2            Q.    And what does a team relations leader
 3   mean?
 4            A.    They are in charge of the payroll and
 5   helping out with any issues that that come up in
 6   the store between other team members, helping
 7   them with their time off or benefits, or she's
 8   kind of the in-between.
 9            Q.    Employee discounts and things?
10            A.    Yes.
11            Q.    After Mr. Harris left, how long was
12   Shannon Tetrault there before she left and went
13   to this other store in Coral Springs?
14            A.    I don't remember.
15            Q.    Was it before or after Mr. Harris?
16   Do you recall?
17            A.    I really don't remember the time.
18            Q.    Is this Miss McHugh... Tina McHugh;
19   do you know anything about her background?
20            A.    Referring to what, specifically?
21            Q.    I'm just curious.  Did she have any
22   altercations with Mr. Harris that you noticed?
23            A.    Not that I noticed.  No.
24            Q.    Did she say that they ever had any
25   disputes together?
```

```
 1              A.    Other than the sexual harassment, no.
 2              Q.    And to the best of your knowledge,
 3       it was never pursued, if it existed at all?
 4              A.    To the best of my knowledge.
 5              Q.    And you don't know whether it existed
 6       at all?
 7              A.    I didn't witness it.
 8              Q.    Did you know that Tina McHugh
 9       at the time was one of the people who had filed
10       supported statements to enforce Mr. Harris'
11       termination?
12              A.    No, I did not.
13              Q.    And you don't know that through
14       today; did you?
15              A.    No.
16              Q.    Have you heard that there are rumors
17       that support Mr. Harris, in testimony, would be
18       fired?
19              A.    No.
20                    MR. BURTON:   I have nothing further
21       of this witness.
22                    MR. GONZALEZ-LLORENS:   Just one
23       question.
24                    CROSS-EXAMINATION
25       BY MR. GONZALEZ-LLORENS:
```

```
 1              Q.   Mr. Burton showed you a statement
 2     you had written up for Mr. Fankhauser; is that
 3     correct?
 4              A.   Yes.
 5              Q.   Did Mr. Fankhauser tell you what to
 6     write in that statement?
 7              A.   Not really.  He just showed me the
 8     voucher and said, "Tell me what you remember
 9     about this."
10              MR. GONZALEZ-LLORENS:  Okay.  That's
11     it.  Thank you very much.
12                   REDIRECT EXAMINATION
13     BY MR. BURTON:
14              Q.   He didn't ask you to tell you what
15     happened in general?  He just said about the
16     voucher specifically?  He limited it to the
17     voucher; correct?
18              A.   Right.
19              MR. BURTON:  Nothing further.
20              MR. GONZALEZ-LLORENS:  And she'll
21     read.
22              MR. BURTON:  I have to give her
23     instructions and then she can leave.
24              MR. GONZALEZ-LLORENS:  I'm sorry.
25     I thought you were leaving.
```

```
 1                    MR. BURTON:  No, I'm just moving
 2    myself for a second.  But under the law, since
 3    neither one of us are your attorney, you have the
 4    right to read and sign this document before it is
 5    considered official.
 6                    Now, if you waive that right it will
 7    be filed, because this gentleman is independent.
 8    He's just is taking down what we say.
 9                    If you choose to exercise that
10    right, he will notify you and you'll go to his
11    office within 10 days in Miami and the statement
12    will be there.  You are not allowed to edit it.
13                    In other words, you can't change the
14    words you said, but you can add an addenda in the
15    back saying as I meant to say there...
16    T-H-E-R-E... and he wrote "their."
17                    I believe Target will recommend that
18    you sign it through your counsel.  I have no
19    position whether you do or not.  If you are told
20    to sign it and you do not, it will be filed as a
21    final statement in a short period of time under
22    the rules.
23                    I would recommend -- and I can
24    only recommend -- that you speak to neither party
25    or any one else without a Court Order in a
```

44

```
 1    proceeding because later on you'll get yourself
 2    into "What did you say, to who, and when?"
 3                THE WITNESS:  Okay.
 4                MR. BURTON:  Obviously, you can
 5    speak to anyone you choose.  I can only give you
 6    the recommendation.  I can't tell you what to
 7    do.  It's certainly not illegal if you speak to
 8    anyone, but it certainly would make problems if
 9    you do.
10                MR. GONZALEZ-LLORENS:  I request
11    that she read it.
12                MR. BURTON:  That's okay.
13                Do you want to read it or waive it?
14                THE WITNESS:  I will read it.
15                MR. BURTON:  And we'll order it.
16                MR. GONZALEZ-LLORENS:  A copy too.
17                        DEPONENT
18    Subscribed and sworn to before me this _____
19    day of _____ 2000.
20    My Commission expires:_____
21
22
23
24
25
```

1                    CERTIFICATE OF REPORTER

2        STATE OF FLORIDA   :

3                           :   SS.
         COUNTY  OF  DADE   :

4

5

6

7            I, ELLIOTT MARSHALL, A.S., RPR, being a
         Notary Public in and for the State of Florida at
8        Large, do hereby certify that I reported the
         deposition of KAREN NAPP LAPRE, a witness called
9        by the PLAINTIFF in the above-styled cause; that
         the said witness was duly sworn by me; that the
10       reading and subscribing of said deposition were
         not waived by the witness and by counsel for the
11       respective parties; and that the foregoing pages,
         numbered from 1 to 45, inclusive, constitute a
12       true and correct transcription of my shorthand
         report of the deposition by said witness.

13
             I further certify that I am not an attorney
14       or counsel of any of the parties, nor relative or
         employee of any attorney or counsel connected
15       with the action, nor financially interested in
         the action.

16
             WITNESS my hand and official seal in the
17       City of Miami, County of Dade, State of Florida,
         this 28th day of October, 2000.

18

19
                         ELLIOTT MARSHALL, A.S., RPR
20                       My Commission Expires 5-19-2001

21

22                          ELLIOTT MARSHALL COMORA
                            MY COMMISSION # CC 845782
                               EXPIRES: May 19, 2001
23                       Bonded Thru Notary Public Underwriters

24

25

```
 1                  UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF FLORIDA
 2                    FT. LAUDERDALE DIVISION

 3                  CASE NO. 00-617-CIV-FERGUSON
                        Magistrate Judge Snow
 4

 5     Steve Harris,

 6              Plaintiff,                ORIGINAL

 7     vs.

 8     Dayton Hudson Corporation d/b/a
       Target Stores,
 9
                Defendant.
10
       - - - - - - - - - - - - - - - - X
11

12

13                          4375 Sheridan Street
                            Hollywood, Florida
14                          Miami, Florida
                            Friday, October 13th, 2000
15                          12:08 P.M. - 12:40 P.M.

16

17
            DEPOSITION OF CLARISSA HOWARD
18

19
            Taken before ELLIOTT MARSHALL, A.S.,
20
       Registered Professional Reporter and Notary
21
       Public in and for the State of Florida at Large,
22
       pursuant to Notice of Taking Deposition in the
23
       above cause.
24

25
```

```
 1              - A P P E A R A N C E S -

 2     on behalf of the Plaintiff

 3              Richard J. Burton & Associates, P.A.
                18305 Biscayne Boulevard
 4              Suite 300
                Miami, Florida 33160
 5              Tel 705-0888 - fax 935-9542

 6     on behalf of the Defendant

 7              Shutts & Bowen
                201 South Biscayne Boulevard
 8              Suite 1500
                Miami, Florida 33131
 9              BY: Rene J. Gonzalez-Llorens, Esq.
                TEL 358-6300 - FAX 381-9982
10
                    ALSO PRESENT
11
                    Steve Harris
12
                    - - - - - -
13
                  - I N D E X -
14
       WITNESS        DIRECT  CROSS  REDIRECT  RECROSS
15
       CLARISSA HOWARD
16
       BY MR. BURTON      3
17
       BY MR. GONZALEZ-LLORENS   28
18
19              - E X H I B I T S -

20       PLAINTIFF'S           FOR IDENTIFICATION

21            none marked

22

23

24

25
```

3

```
 1    Thereupon--
 2                  CLARISSA HOWARD
 3    was called as a witness by the Plaintiff, and,
 4    after having been first duly sworn, was examined
 5    and testified as follows:
 6                  DIRECT EXAMINATION
 7    BY MR. BURTON:
 8         Q.    Please state your name for the
 9    record.
10         A.    Clarissa Howard.
11         Q.    Miss Howard, have you ever given a
12    statement in court before?
13         A.    No.
14         Q.    I'm going to make this real easy for
15    you.  We're not like Court TV or whatever you see
16    on these old movies.  We do ask for hearsay.
17    People say, "Oh, my God, you're not supposed to
18    ask that," but we really he are allowed to.
19         A.    Okay.
20         Q.    And the second thing is when I'll be
21    asking you questions, a lot of these things would
22    be questions people don't normally ask you on the
23    street.  It would be an invasion of privacy.
24                  I will ask have to ask you
25    questions what you saw or what people told you or
```

4

```
 1    what you heard because that's the only way to
 2    find out what you have you heard, saw or did.
 3              Now, when I ask you a question,
 4    if I ask you one and you don't understand what I
 5    mean, please, this is not a bad movie,
 6    hopefully. Tell me "I don't understand the
 7    question. Can you ask it again?" Or if you
 8    understand a portion of it and you don't
 9    understand the rest of it or that person wasn't
10    in a meeting, please say, "I don't understand
11    it," or "That happened but that person wasn't
12    there." Whatever is necessary.
13              The most difficult instruction I'm
14    going to give you today is one to ask you not to
15    talk like you normally talk. Most people in a
16    conversation that I know, when you sort of hear
17    enough of the question to answer you jump in and
18    give the answer. People just talk that way.
19              In this deposition this man is
20    taking down what is said (indicating). When you
21    stop in the middle of my statement, he puts you
22    down there even though I may have had a
23    continuous statement and you understood it to be
24    a continuous statement and you sort of jumped in
25    before the last five words.
```

5

```
 1              So please take a small breath
 2    because I want my question on the record clean
 3    and you'd like your answer clean.
 4              He may have the right to object, but
 5    you didn't hire him for this deposition
 6    personally; did you?
 7              THE WITNESS:  No.
 8              MR. BURTON:  So he's not your lawyer
 9    for the purpose of the deposition, although he
10    represents Target.
11              Now, he has the right to object on
12    the record for things that I may ask, the way I
13    may ask it, or an answer you may give.  That is
14    not for you or me to determine.  The Judge later
15    on will see whether or not the Judge agrees with
16    what he does for technical purposes but it has
17    nothing to do with your statement.
18              THE WITNESS:  Okay.
19              MR. BURTON:  But give him the chance
20    to say whatever little thing he wants to say.
21    We'll be polite to you, we'll be polite to each
22    other.  We have no problems at all, and we're
23    going to try to handle this as adult human
24    beings.
25              What I will ask is one other
```

6

1    instruction -- and you've done a brilliant job

2    so far -- is people tend to do a lot of stuff

3    which is like a stupid question, that when you

4    assume is an obvious question, you'll say,

5    "yeah," "uh-hum," shrug or shake your head.

6    He can't take that down for the record.  Or even

7    you may hear me say "you're smiling."  The reason

8    is the record doesn't show you're smiling and we

9    don't have a videotape, so you have to speak and

10    answer verbally --

11         A.    Okay.

12         Q.    (Continuing) -- giving an answer

13    that's an okay, a yes or no.  And if I ask you a

14    direct question; did so and so happen, and you

15    want to talk more, I'm not going to stop you;

16    I don't want to stop you; but say yes first and

17    then tell about it.

18              A lot of people go on and answer and

19    tell a story and don't say whether the answer is

20    yes or no.  Sometimes when you read the record,

21    while it's obvious to us what you said, a person

22    who was not in the room and didn't follow the

23    context might not understand that.

24              You understand that; correct?

25         A.    Yes.

```
 1              Q.   With that in mind, we'll be out of
 2     here a bit after you were supposed to be, but
 3     we'll get you out of here soon.
 4                   We're doing pretty well; are we
 5     not?
 6                   MR. GONZALEZ-LLORENS:  Yes, we are.
 7     BY MR. BURTON:
 8              Q.   Miss Howard, what is your address
 9     where you live?
10              A.   180 N.e. 30th Ct., Pompano Beach,
11     Florida, 33064.
12              Q.   Let me tell you one thing.  The
13     reason I asked that is not that we're going to
14     bother you, but if there has to be a subpoena to
15     serve on you, they have to serve it on your
16     home.
17              A.   Okay.
18              Q.   That's the only way we can
19     make people to show up in court, if necessary,
20     with that.
21                   What is your phone number?  So if
22     the process server has to schedule some time for
23     you, he'll be able to reach you.
24                   What is your phone number?
25              A.   (954) 785-9088.
```

```
 1           Q.    And with whom do you reside there?
 2    Who lives with you there?
 3           A.    Me and my three kids.
 4           Q.    Are any of them over 15?
 5           A.    Yeah.
 6           Q.    What are the ones over 15?
 7           A.    My daughter, Sherika McCutcheon.
 8           Q.    M-C-C-T-C-H-E-O-N?
 9           A.    Right.  That is correct.
10           Q.    I'm terrible on names.  I got it
11    right this time.  Every time I get a victory I'm
12    happy.
13           A.    Right.
14           Q.    What is your educational background?
15    What is the highest education you received?
16           A.    13 years of schooling.  I finished
17    12th and went to nursing for a year.
18           Q.    About when would that have been?
19    Without prying too much, what would have been
20    the last year you would have been in school?
21    What calendar year?
22           A.    1983.
23           Q.    Since then, can you give me a brief
24    resume of your experienece in work?
25           A.    I did nursing.
```

```
 1              Q.   Nursing was the next one.  And that
 2    was in '83 till when?
 3              A.   About '84.
 4              Q.   And then what was your next job?
 5              A.   And then then I went to cashiering.
 6              Q.   With whom?
 7              A.   At Marshall's.  And then I was at
 8    Picadilly.
 9              Q.   How long were you cashiering at
10    Marshall's?
11              A.   I did that about 10 months.
12              Q.   So 1984 or so?
13              A.   Uh-hum.
14              Q.   Then next?
15              A.   Then I was at Picadilly for about two
16    years.
17              Q.   Is that the restaurant?
18              A.   Yeah.
19              Q.   And so in '86, what did you do next?
20              A.   Then I was at Target.
21              Q.   You went to Target in '86?
22              A.   No, I went to Target in 1990.
23              Q.   That's fine.  And what was your first
24    position in Target?
25              A.   Cashier.
```

10

1        Q.   At which store?

2        A.   The Deerfield.   393.

3        Q.   Is that where you currently work?

4        A.   Uh-hum.

5        Q.   And you all worked there?

6        A.   Uh-hum.   Yes.

7        Q.   You started as a beginning or entry

8    level cashier?

9        A.   Yeah.

10       Q.   And what position are you now?

11       A.   I'm level two.

12       Q.   What is the additional

13   responsibilities for the level two cashier?

14       A.   Well, the responsibilities is

15   supposed to be if the level three is not there

16   you're supposed to take over from the level

17   three, then if the level three is not there --

18       Q.   Is the level three the supervisor of

19   the front end?

20       A.   Yes.  Well, it's all over the store,

21   they have level threes all over the store.

22       Q.   I know they use the "team leader" and

23   "associate."

24            What would be the title in the level

25   three over you?

```
1           A.    She will be my supervisor over me.
2           Q.    I know.  What would her title be?
3    Is it the GSTL?
4           A.    Just the level three.
5           Q.    Do they call it team leader?
6           A.    Yeah, team leader.
7           Q.    Is the that the front leader they
8    call it?  I'm trying to find out which person
9    we're talking about.  I'll do it the other way.
10                Is Miss Napp the person who is the
11   level three or is she higher than that?
12          A.    Who is that?
13          Q.    Miss Napp, who was just here,
14   Miss Lapre.  The woman before you was Karen.
15          A.    Karen?
16          Q.    Yes.
17          A.    Karen is level three in soft lines.
18          Q.    That's what I wanted to know.
19          A.    Right.
20          Q.    That's a level three.  We know what
21   she calls herself.  I just want to know.
22          A.    Right.  She's in soft lines.
23          Q.    Right.  Now, while you were there one
24   of your supervisors at one level was Shannon
25   Tetrault; correct?  Do you remember Shannon?
```

```
 1              A.    No.
 2              Q.    You don't remember a GSTL named
 3     Shannon?
 4              A.    Yes, in personell.
 5              Q.    Well, whatever; do you remember her?
 6              A.    Yes.
 7              Q.    You didn't have much contact with
 8     her?
 9              A.    No.
10              Q.    There was an incident with some
11     markdown of some towels with Mr. Harris; correct?
12              A.    Uh-hum.
13              Q.    Is that a yes?
14              A.    Yes.
15              Q.    That's the kind of "uh-hum" we're
16     talking about sneaking in there.
17              A.    Yes (Witness laughs).
18              Q.    Have you ever been asked about this
19     before?
20              A.    No.
21              Q.    So Mr. Fankhauser didn't ask
22     you about any of these things with Mr. Harris?
23              A.    No.
24              Q.    Now, you were the person that
25     Mr. Harris went to for those towels; am I right?
```

13

```
 1            A.    Yeah.
 2            Q.    And do you remember what you told him
 3   about the markdown of the towels?
 4            A.    No. He didn't come to me about the
 5   markdown of the towels.  He --
 6            Q.    Tell me about that.
 7            A.    He asked me, "Was there any more
 8   towels left."  And I told him "Let me check and
 9   see." And I went and found three towels and I
10   paged him I told him that I have three towels for
11   him and I'll leave them behind the camera booth.
12                  And so he paged me later and asked
13   me where the towel was, and I told him I took
14   them up to the service desk and that was it.
15            Q.    I understand that these were towels
16   that were marked down; correct?
17            A.    Uh-hum.
18            Q.    That's yes?
19            A.    Yes.
20            Q.    And other employees were buying them
21   at the same price?
22            A.    Yes.
23            Q.    And did he tell you how he knew
24   that there were markdown towels available at
25   that price?
```

```
 1          A.   No.
 2          Q.   He wasn't in the back and didn't
 3    even know where they were kept; correct?
 4    To the best of your knowledge, he wouldn't have
 5    asked you if he knew where they were kept?
 6          A.   Well, they know the towel was in
 7    the back in TVA, but the towel is supposed --
 8    they said not to put the towels on the floor
 9    because they were supposed to have been
10    researched.
11          Q.   So what I'm saying is; Mr. Harris
12    didn't go back and get anything, did he?
13    He had you see if there were any left; right?
14          A.   Right.
15          Q.   And were the prices on them at the
16    time?
17          A.   Yes, the marked price.  Yes.
18          Q.   So the marked down price that
19    he paid was on those towels, to the best
20    of your knowledge?
21          A.   Yes.
22          Q.   And did Mr. Fankhauser ever ask you
23    about how -- I'll ask you the question.
24               Did you ever know that
25    Mr. Fankhauser was asking people about
```

```
 1   Mr. Harris' purchase of marked down towels?
 2         A.   No.
 3         Q.   No one told you they were even
 4   questioned about it?
 5         A.   No.
 6         Q.   You've had some problems with Target
 7   regarding discrimination; have you not?
 8         A.   Yes.
 9         Q.   Can you tell me about it now?
10         A.   Well, it was with the manager,
11   Paula.  There was a manager there named Paula,
12   and she just kept picking on me.
13         Q.   And you have reason to believe it was
14   because you were black?
15         A.   Yes, yes.  Because I was doing my
16   job.  And the reason is, you know, because I was
17   black.  And I just went to the N double A PC.
18         Q.   And when when you went to the NAACP
19   is it --
20         A.   Yes.
21         Q.   Did you ever speak to any of your
22   supervisors or the 800 number about this?
23   You know the 800 number I'm talking about?
24         A.   No, I never called the 800 number.
25         Q.   Why didn't you call the 800 number?
```

1    Is that because of your reputation?

2         A.    No.   I didn't even think about it at

3    the time.

4         Q.    Did you speak to any of your

5    supervisors to try to resolve it, other than --

6         A.    I can't recall.

7         Q.    Did you ever talk with anyone about

8    it at the store, other than Paula herself?

9         A.    No.

10        Q.    After you went to the NAACP, did the

11   store contact you and talk to you about it?

12        A.    Yes.

13        Q.    Who did?

14        A.    What is her name?   I don't remember

15   her name.   I can't remember her name.

16        Q.    Was she in human resources or

17   something?

18        A.    Yes.

19        Q.    In the store or from the region?

20        A.    She wasn't in the store.

21   She was from the region.

22        Q.    I see.   And what did she

23   talk to you about?   Do you remember?

24        A.    Yeah.   She called me and told me to

25   explain -- you know -- what was going on.   And I

17

1    told her what was going on and she took it from

2    there.

3          Q.    Was anything done?

4          A.    Yes.

5          Q.    What was done?

6          A.    Well, they put me in another

7    department from Paula and I got -- you know --

8    the stores hours that I asked for.

9          Q.    In other words, also the schedule was

10   the wrong schedule.  Paula wouldn't give you a

11   good schedule because you were black?

12         A.    Well, no.  I had the schedule over

13   there but in another department.  You know.  The

14   schedule's different, so I wanted to keep my same

15   schedule.

16         Q.    So you were transferred to a

17   different department under a different

18   supervisor?

19         A.    Right.

20         Q.    Whatever much happened to Paula?

21         A.    I think she went to another store.

22         Q.    She wasn't fired, to the best of your

23   knowledge?

24         A.    I don't know.  To the best of my

25   knowledge, I don't know.

```
 1              Q.    You've never heard she was fired?
 2              A.    No.
 3              Q.    Why do you believe that it was
 4    because you were black that this was happening,
 5    as opposed to some other reason?
 6              A.    Because I -- it just -- like saying
 7    it was just me -- I was only one in the shoe
 8    department.  I was the only one at that time in
 9    the shoe department, and she was saying that I
10    wasn't communicating with her.  If I had
11    something to communicate I would go to her.
12    But every day I don't have nothing to talk
13    about.  I just come there and do my job.
14              Q.    So she was just picking on you?
15              A.    Right.
16              Q.    Embarrassing you?
17              A.    Uh-hum.
18              Q.    That's a yes?
19              A.    Yes.
20              Q.    At the time who was that
21    store manager?  They call them team leader.
22    Who was the team leader at the time?
23                    Do you remember?
24              A.    I don't recall.  I think was -- no,
25    I don't recall.
```

19

1        Q.   Was it before Mr. Harris?

2        A.   Yes.

3        Q.   Does the name Steve Clemente make

4    sense to you then -- not Clemente.  Joe Toscano.

5        A.   Yes.

6        Q.   Joe Toscano was the team leader?

7        A.   Yeah, Joe was.

8        Q.   Did Joe Toscano over ever talk to you

9    about this incident?

10       A.   No.

11       Q.   Now, you got to know Mr. Harris

12   pretty well during the year he was there right?

13       A.   Yeah.

14       Q.   Were there any other high level

15   executives that were black at that store?

16       A.   Before him?

17       Q.   Before or after.

18       A.   Yeah.  Before him there was

19   Mr. Mayweather.

20       Q.   And he's no longer at the store;

21   right?

22       A.   Not at that store, but another store.

23       Q.   I'm saying, when Mr. Harris was

24   there, Mr. Harris was the only black executive?

25       A.   Right.

20

```
 1          Q.   I'm sorry.  If you need to take a
 2    break, please do.
 3          A.   No.
 4          Q.   During the time that you worked with
 5    Mr. Harris, was he professional?  Did he act
 6    professionally?
 7          A.   Yeah.
 8          Q.   Did he seem knowledgeable and
 9    interested in his job?
10          A.   I can't recall because I didn't --
11          Q.   No.  When you saw him, he seemed to
12    be doing a good job?
13               Mr. Harris, when you had contact
14    with him, did he seem to be doing a good job?
15          A.   Um -- I could -- I can't -- well,
16    when I have contact with him, it was just
17    speaking, yeah, when we were walking around the
18    store.
19          Q.   Obviously you don't know what happens
20    when you're not there?
21          A.   Right.
22          Q.   Did you ever hear a human resource
23    manager rumor that if people testified for
24    Mr. Harris they'd get in trouble?
25          A.   No.
```

```
 1              Q.   Now, do you know who Diane Vass is?
 2              A.   Yes.  She was the level three over
 3     price change.
 4              Q.   Now, was she the person who marked
 5     down the towels?
 6              A.   I don't know who marked down
 7     the towels, but she was the markdown, and two
 8     other ladies; so there was three of them.
 9              Q.   One of the three under Miss Vass
10     was the one that physically marked them down;
11     right?
12              A.   Right.
13              Q.   Miss Vass got in trouble with the
14     company and was about to be fired on other
15     issues?
16              A.   I don't know.
17              Q.   You never heard she was supposed or
18     would be fired?
19              A.   No.
20              Q.   You never heard that she was called
21     at home by Sandy Grezbek about this?
22              A.   No.
23              Q.   Did she ever have a conversation with
24     you about Mr. Harris?
25              A.   No.
```

```
 1              Q.    Have you been talked to by anyone
 2    since you got your subpoena or have you talked
 3    to anyone before about this incident about
 4    Mr. Harris and that he might list you as a
 5    witness?
 6              A.    No.    The only person I talked to him
 7    was him.
 8              Q.    And do you remember what he said and
 9    what you said to him?  Did he ask you questions
10    about Miss Vass?
11              A.    No.
12              Q.    Or Miss Grizbek?
13              A.    No.
14              Q.    What did he tell you or what did you
15    tell him?
16              A.    He just -- he was asking me about do
17    I remember about the towels.  And I told him,
18    "yeah," and I said the same thing that I told
19    you.
20              Q.    That this was the price, and he got
21    the same price the other employees did, and that
22    was the end of it; right?
23              A.    Right.
24              Q.    Did you ever talk to Miss Vass and
25    tell her that you had brought the towels up at
```

1    the price that was labeled on them?

2              A.    No.

3              Q.    Did she ever ask you about it?

4              A.    No.

5              Q.    Have you ever heard any

6    resentment expressed toward Mr. Harris by

7    anyone?  Resentment because of who he's married

8    to or the car he drove or anything like that?

9              A.    No.

10             Q.    Have you ever heard of any

11   discriminatory comments being made about him?

12             A.    No.

13                   MR. BURTON:  Let me take a few

14   seconds break, please.

15                   (Short Pause.)

16   BY MR. BURTON:

17             Q.    Now, I had thought that Miss Vass

18   had left the firm -- had left Target for a while;

19   hadn't she?  You do remember that she had quit?

20             A.    Yeah, she did quit.

21             Q.    Between the time of the towels and

22   the time that Mr. Harris was gone, she quit.

23                   Do you remember that?

24             A.    I don't recall the time she left,

25   but she did leave.  I don't know when she left,

```
 1    but she did leave.
 2            Q.    She's back at the company now;
 3    isn't she?
 4            A.    Yes, she are.
 5            Q.    Do you understand or did you hear
 6    that she had left because she had done something
 7    wrong or was being fired or had to leave?
 8            A.    No, I didn't.
 9            Q.    Did she ever tell you how she was
10    able to get her job back, ma'am?
11            A.    No, she didn't.
12            Q.    Did you ever ask her how she was able
13    to get her job back after signing a statement
14    against Mr. Harris?
15            A.    No, I didn't.
16            Q.    She did get her job back there;
17    didn't she?
18            A.    She got her job back.  Yes.
19            Q.    Shortly after Mr. Harris was gone?
20            A.    Uh-hum.
21            Q.    That's yes?
22            A.    Yes.
23            Q.    And you never were curious about a
24    person who left and was able to go back to the
25    company?
```

```
 1                  MR. GONZALEZ-LLORENS:  Objection.
 2                  THE WITNESS:  No.  Because a lot of
 3      people leave and come back.
 4      BY MR. BURTON:
 5           Q.   So you don't know if she was under
 6      fully different circumstances when she left?
 7           A.   No, I didn't know that.
 8           Q.   You spoke with her about the towels
 9      -- I know that; right? -- at one point about
10      Mr. Harris.
11           A.   Spoke with Diane, no, I did not.
12           Q.   You never smoke with Diane?
13           A.   No, I didn't speak with Diane about
14      towels.
15           Q.   You didn't speak with die or
16      Mr. Fankhauser or anyone else about the towels?
17           A.   No, I did not.
18           Q.   Was if your register the towels were
19      running on?
20           A.   No, I wasn't on the register.
21           Q.   She was; right?
22           A.   Diane, no.
23           Q.   She was just in the back and one of
24      the people marked them down; right?
25           A.   I don't know who marked the towels
```

1   down.

2          Q.    She was one of the three that --

3          A.    She was one of the three that marked

4   it down.

5          Q.    Do you recall any conversation you've

6   ever had with Sandy Grizbek?

7          A.    No.

8          Q.    Do you know who Sandy Grizbek is?

9          A.    Yes, I do.

10         Q.    Who is she?

11         A.    She's a personnel manager, STL.

12         Q.    That's like the personnel manager?

13         A.    Uh-hum.

14         Q.    That's yes?

15         A.    Yes.

16         Q.    And you don't recall her ever

17  speaking to you either?

18         A.    No, she never spoke with me.

19                MR. BURTON:  I see.  I have nothing

20  further.  Let me take this call because I'm

21  expecting one.

22                MR. GONZALEZ-LLORENS:  I have a few

23  questions.  Just wait a few minutes.

24                (Short Pause.)

25                MR. BURTON:  I'll continue now.

```
 1    Do you have questions?
 2                    MR. GONZALEZ-LLORENS:  A few
 3    questions, actually.
 4                    CROSS-EXAMINATION
 5    BY MR. GONZALEZ-LLORENS:
 6         Q.   Ma'am, you a mentioned that you went
 7    to the NAACP regarding Paula Lane; is that
 8    correct?
 9         A.   Right.
10         Q.   Do you recall when that was,
11    roughly?  The month or year?
12         A.   No, I can't recall.  But I --
13                    MR. BURTON:  Tell her Joe Toscano
14    was there from '97 to '98.
15                    MR. GONZALEZ-LLORENS:  Okay.
16                    THE WITNESS:  Okay.  So it was
17    during --
18    BY MR. GONZALEZ-LLORENS:
19         Q.   During that time?
20         A.   (Continuing) -- during that time Joe
21    was there.
22         Q.   And do you remember Joe Toscano was
23    the store manager, not Mr. Harris?
24         A.   Joe was the store manager.
25                    MR. BURTON:  I thought that would
```

1    help.

2                    MR. GONZALEZ-LLORENS:  No, it did,

3    thank you.

4                    No further questions.  Thank you.

5                    MR. BURTON:  Okay, ma'am.  I have to

6    give you some instructions under law.  Target

7    would like you to read this, although you have

8    the right to read or you have the right to say I

9    don't want to read this thing.  But even after

10   you read it after it's printed you'll only be

11   allowed to like file an addenda at the end of it

12   and if you think there was something you said one

13   way and they printed it another because of the

14   way he heard it.  Target has requested all of the

15   persons at the depositions, to the extent it can

16   influence them, read it before it's filed.

17                   I have no position one way or the

18   other.  You have the right not to because that

19   would mean you have to go to Miami, and I hope

20   they put it on the clock.  If it would help,

21   I'll request that they keep you on the clock

22   because under the Fair Labor Act that is

23   conpensable wages.

24                   MR. GONZALEZ-LLORENS:  She'll read

25   it.  Is that true?

```
 1                    MR. BURTON:  Yes, it is.
 2                    Thank you.  I have no further
 3         questions.
 4                    She'll read.  And I make a
 5         suggestion that you don't speak to anyone about
 6         this -- them or us -- about what you said because
 7         it will probably keep you in less of this
 8         controversy.  I made this suggestion to
 9         everyone.
10                    You have the right to speak to
11         anyone you want, but, to the extent that you say
12         you cannot, it's probably better for everyone;
13         although he'll say you do have the right,
14         but we'll see.
15                    MR. GONZALEZ-LLORENS:  That's fine.
16                    DEPONENT
17         Subscribed and sworn to before me this _____
18         day of _____ 2000.
19         My Commission expires:_____
20
21
22
23
24
25
```

1                    CERTIFICATE OF REPORTER

2    STATE OF FLORIDA   :

3                      :  SS.
     COUNTY  OF  DADE   :

4

5

6

7         I, ELLIOTT MARSHALL, A.S., RPR, being a
     Notary Public in and for the State of Florida at
8    Large, do hereby certify that I reported the
     deposition of CLARISSA HOWARD, a witness called
9    by the PLAINTIFF in the above-styled cause; that
     the said witness was duly sworn by me; that the
10   reading and subscribing of said deposition were
     not waived by the witness and by counsel for the
11   respective parties; and that the foregoing pages,
     numbered from 1 to 30, inclusive, constitute a
12   true and correct transcription of my shorthand
     report of the deposition by said witness.

13
          I further certify that I am not an attorney
14   or counsel of any of the parties, nor relative or
     employee of any attorney or counsel connected
15   with the action, nor financially interested in
     the action.

16
          WITNESS my hand and official seal in the
17   City of Miami, County of Dade, State of Florida,
     this 28th day of October, 2000.

18

19
          ELLIOTT MARSHALL, A.S., RPR
20        My Commission Expires 5-19-2001

21

22

23                                         

24

25

1

1       UNITED STATES DISTRICT COURT
        SOUTHERN DISTRICT OF FLORIDA
2          FT. LAUDERDALE DIVISION

3        CASE NO. 00-617-CIV-FERGUSON
           Magistrate Judge Snow
4

5    Steve Harris,

6           Plaintiff,

7    vs.                    ORIGINAL

8    Dayton Hudson Corporation d/b/a
     Target Stores,
9
            Defendant.
10
     -  -  -  -  -  -  -  -  -  -  -  -  -  -  - X
11

12

13                      4375 Sheridan Street
                        Hollywood, Florida
14                      Miami, Florida
                        Friday, October 13th, 2000
15                      12:45 P.M. - 1:05 P.M.

16

17
            DEPOSITION OF PATRICIA MORRIS
18

19
          Taken before ELLIOTT MARSHALL, A.S.,
20
     Registered Professional Reporter and Notary
21
     Public in and for the State of Florida at Large,
22
     pursuant to Notice of Taking Deposition in the
23
     above cause.
24

25

```
 1              - A P P E A R A N C E S -

 2        on behalf of the Plaintiff

 3                Richard J. Burton & Associates, P.A.
                  18305 Biscayne Boulevard
 4                Suite 300
                  Miami, Florida 33160
 5                Tel 705-0888 - fax 935-9542

 6        on behalf of the Defendant

 7                Shutts & Bowen
                  201 South Biscayne Boulevard
 8                Suite 1500
                  Miami, Florida 33131
 9                BY: Rene J. Gonzalez-Llorens, Esq.
                  TEL 358-6300 - FAX 381-9982
10
                      ALSO PRESENT
11
                      Steve Harris
12

13

14              - - - - - -

15

16              - I N D E X -

17   WITNESS           DIRECT   CROSS   REDIRECT   RECROSS

18   PATRICIA MORRIS

19   BY MR. BURTON         3                18
     BY MR. GONZALEZ-LLORENS   17
20

21              - E X H I B I T S -

22      PLAINTIFF'S                FOR IDENTIFICATION

23               none marked

24

25
```

1    Thereupon--

2                    PATRICIA MORRIS

3    was called as a witness by the Plaintiff, and,

4    after having been first duly sworn, was examined

5    and testified as follows:

6                    DIRECT EXAMINATION

7    BY MR. BURTON:

8         Q.   Please state your full name for the

9    record?

10        A.   Patricia Ann Morris.

11        Q.   Miss Morris, have you ever testified

12   in anything before?  Any kind of lawsuit or

13   anything at all?

14        A.   No.

15        Q.   Well, we're not like Court TV or

16   these bad movies on TV, hopefully; which means

17   I'm going to ask questions of you and hopefully

18   in a way that you can understand them.

19              If you can't understand them

20   then tell me.  I mean, you are a participant in

21   this too.  If you don't I understand the question

22   or you don't understand what I'm asking, say

23    "Please repeat it." And if you tell me why you

24   can't understand it it will make it easier for me

25   to re-ask it.

1                The second instruction is that he

2       can't take down shrugs of the head or "uh-hum's"

3       or "uh-uh's" because he's not allowed to say it

4       really was a yes or it really was a no, and when

5       you read the record you can't tell what it meant,

6       so we try to ask people to answer in words, like

7       that.

8               A.    Okay.

9               Q.    The third thing is; if you don't

10      keep your voice up he's not going to hear it and

11      then it won't get on paper and we're going to end

12      up repeating ourselves.

13              A.    Okay.

14              Q.    So you have to keep your voice up

15      real loud, even for you.

16                And the fourth thing is; if I ask

17      if you for an opinion or what someone said or

18      gossip -- everyone is now a lawyer because they

19      watch Court TV and they say "it's hearsay" --

20      but that's okay because I want to ask you about

21      what other People May have said, seen or heard

22      that they don't like to repeat, but this is the

23      appropriate place and way to have it done.

24                And, unfortunately, we have to ask

25      you things of what you saw and heard.  I'll ask

5

1    you to try your hardest to try to remember stuff
2    and there there will be nothing -- you know --
3    this is what has to be done on this matter.
4            With that in mind, do you understand
5    the instructions I just gave you?
6        A.    Yes.
7        Q.    If you need to take a break, say
8    "I have to take a break." We're adults. That's
9    all you have to say. Okay?
10       A.    Okay.
11       Q.    Now, Miss Morris, what is your home
12   address?
13       A.    4411 N.W. 18th Street, apartment
14   M208, Lauderhill, Florida, 33313.
15       Q.    And with whom do you reside there?
16       A.    Myself. Me. Just me.
17       Q.    Now, Ms. Morris, I'll do it a little
18   differently than I have done.
19            What is the last formal education
20   that you have had?
21       A.    High school... graduation from high
22   school.
23       Q.    And before Target, did you work in
24   any kind of retail stores, or was this the first
25   one?

1          A.    No.   This is the first one.

2          Q.    And when did you start working at

3     Target?

4          A.    October of 1999.

5          Q.    October '99, or is it just six months

6     or a year ago?

7          A.    I mean '98.

8          Q.    Thank you.   That's what I thought.

9          · A.    (Witness laughs).

10          Q.    We have an advantage.   We actually

11     know when you did.

12          A.    (Witness laughs).

13          Q.    So it's not we're that smart, but we

14     actually just have little cheat sheets?

15          A.    Uh-hum.

16          Q.    With that in mind, I've never spoken

17     to you before; have I?·

18          A.    No.

19          Q.    And I never asked you what you might

20     try to say, and I have no idea what you're going

21     to say; right?

22          A.    No.

23          Q.    Has anyone else spoken to you about

24     being here today or before today concerning

25     Mr. Harris?

```
 1              A.   Yes.
 2              Q.   Who?
 3              A.   I talked with him at Target
 4         (Indicating).
 5              Q.   You're talking with about Mr. --
 6                   MR. GONZALEZ-LLORENS:
 7         Gonzalez-Llorens.
 8         BY MR. BURTON:
 9              Q.   And when did you speak with him?
10              A.   Tuesday.
11              Q.   And what did he ask you?
12              A.   Um... basically, about Mr. Harris and
13         what did I know.
14              Q.   What did you tell him you knew?
15         We'll start with that and we'll go on from
16         there.
17              A.   Um... no more than about some towels.
18              Q.   You say "no more."
19              A.   It was like I heard it from someone
20         else.
21              Q.   Who did you hear it from?
22              A.   Clarissa.
23              Q.   And what did you hear from Clarissa?
24              A.   It was something pertaining to some
25         towels about Mr. Harris wanted her to get some
```

1    towels for him and leave them at guest service,

2    and that's what she did.  What happened to the

3    towels after that, I don't know.

4         Q.   So where was Mr. Harris and you at

5    the time?  You weren't there?  You weren't there

6    at all?  Were you with Mr. Harris with the towels

7    or you just heard it from Clarissa?

8         A.   I heard it from Clarissa.

9         Q.   Weren't you in the back when you saw

10   Mr. Harris talking with Sandy about the towels?

11        Q.   Do you remember Sandy Grizbek?

12        A.   Yes, I know Sandy Grizbek.

13        Q.   Do you recall if she was in the back

14   with Mr. Harris then too, with you in the back?

15   Do you have any recollection of that?

16             I'm trying to refresh your memory.

17   I think you were there.

18        A.   There were one incident where he

19   and Sandy came back in the back and they was

20   talking about the towels.  Sandy was saying that

21   the towels was not marked right and that they was

22   going to have to do research on them that they

23   wasn't going to let anybody buy them until they

24   do the research on the towels.

25        Q.   And afterward is when I believe

1   Mr. Harris asked the towels be brought up

2   after they did the research; right?

3       A.   I don't know if they did the

4   research, but I do know that the towels was

5   brought out to the floor and guests and employees

6   were buying them.

7       Q.   And Mr. Harris didn't bring them

8   out, they were brought out by Sandy and Diane;

9   is that right?

10      A.   I don't know who brought them out.

11  All I know is they were on the floor.

12      Q.   If they weren't supposed to be

13  brought out, Sandy had said that, and they got

14  brought out, who would have been the people that

15  could have brought them out and put them on the

16  floor so that the guests and staff could buy

17  them?

18      A.   I don't know.

19      Q.   Who marked them?

20      A.   I don't know who marked them.

21      Q.   I see.  Did Sandy work back there?

22  Sandy Grizbek.

23      A.   She was -- I didn't see her working

24  back there before you at the time -- you know --

25  she was --

1        Q.    This conversation occurred back

2    there; right?

3        A.    Yes.

4        Q.    Who was your boss at that time?

5        A.    Diane Vass.

6        Q.    Wasn't Diane Vass fired shortly after

7    that?

8        A.    Hmmmm... she was no longer.

9    She wasn't there then, but she's back at

10   Target now.

11        Q.    I know.  But shortly after that she

12   was fired; wasn't she?

13        A.    Yes.

14        Q.    Do you know what she was fired

15   for or what the gossip said she was fired for?

16        A.    No, I don't.  I don't even know

17   if she was fired or left on her own.  I don't

18   know.

19        Q.    And about five months later she came

20   back?

21        A.    She came back, but I don't know how

22   long it's been.

23        Q.    Diane Vass was in charge of marketing

24   at that time; wasn't she?

25        A.    Yes.

1          Q.    Now, you say Diane may have left on

2    her own or may have been fired.  You don't know;

3    right?

4          A.    I don't know.

5          Q.    Now, Miss Vass came back shortly

6    after Mr. Harris was gone; right?

7          A.    I believe so.

8          Q.    Did anyone ever ask you about what

9    you knew, what you just told me that Miss Grizbek

10   and Mr. Harris had this conversation and after

11   the conversation.  Somehow or another the towels

12   got marked and put on the floor for sale and then

13   sometime around then Clarissa had a conversation

14   with Mr. Harris about the towels and bought some.

15              Did anyone ever talk to you about

16   that until we talked about it today, other than

17   this conversation with Mr. Gonzalez?

18         A.    No, that's it.  Besides Mr. Harris

19   phoned me.

20         Q.    Mr. Harris phoned you and asked you

21   if you my knew about these things; right?  And

22   you said "yeah," and you told him what you just

23   told me; right?

24         A.    Right.

25         Q.    Didn't Shannon Tetrault buy some of

1    those same towels?

2         A.    I don't know.  I can't tell you.

3    It was a lot of employees that bought towels,

4    but I don't know who.

5         Q.    You say a lot of them.  You just knew

6    a lot of them were being bought by a lot of

7    people?

8         A.    Yes.

9         Q.    Executives and floor people and

10   hourly people and everyone else.

11        A.    Yes.

12        Q.    I see.  Who was the manager of soft

13   goods at the time?  Was that Miss Napp, or was

14   that before Miss Napp?

15             Do you remember who was soft goods

16   manager at the time?

17        A.    No.

18        Q.    Do you know a Tina McHugh in soft

19   goods?

20        A.    Tina.

21        Q.    Yeah.  She was the soft goods manager

22   at the time; wasn't she?

23        A.    I guess.

24        Q.    Your best recollection she was there

25   in that position; correct?

```
 1              A.    Uh-hum.
 2              Q.    That's yes?
 3              A.    Yes.
 4              Q.    The towels would have gone into soft
 5        goods; wouldn't they?  That the section of the
 6        place they went into.  Am I correct?
 7              A.    No.  Towels are over on the hard
 8        lines.
 9              Q.    Hard lines?
10              A.    Uh-hum.
11              Q.    Who was in charge of hard lines at
12        the time?
13              A.    Um... I don't know.
14                    THE REPORTER:  The witness said,
15        "I don't know."
16        BY MR. BURTON:
17              Q.    You know Sandy.  When I say Sandy,
18        that's Grizbek; right?
19              A.    Yes.
20              Q.    She was in charge of all of the
21        markdown team; wasn't she?  She sort of was
22        responsible for employee markdowns?
23              A.    Yes.
24              Q.    And do you know if she ever got in
25        trouble when the goods got sold out and they were
```

1    being put on the floor and all these employees

2    buying them?

3              Did you ever hear any stories on

4    that?

5         A.   No.

6         Q.   Did anyone ever make any comments

7    about it later?

8         A.   No.

9         Q.   Now, some of the questions I'm going

10   to ask you now are going to be a little bit tough

11   because they're going to ask for your opinion as

12   a black woman, and I realize it's going to be

13   hard to ask you the questions but I sort of have

14   to.

15             Do you know what kind of car

16   Mr. Harris drove when he was the team leader

17   there?

18         A.   Um... all I know is it was a white

19   car.

20         Q.   Did anyone ever comment about the car

21   or Mr. Harris, that you know about?  Did they

22   make any comments about it?

23             It was a sports car; wasn't it?

24         A.   I guess.  The car is.

25         Q.   It looked like a sports car?

```
 1              A.   Yes.
 2              Q.   Did anyone ever make any comments,
 3    good, bad or indifferent, that you know of?
 4              A.   No.
 5              Q.   When Mr. Harris was the team leader
 6    the year that you were there and you were there,
 7    was he professional?
 8              A.   (No response.)
 9              Q.   Ma'am, was he professional?
10              A.   Yes.
11              Q.   Did you ever hear any rumors that
12    anyone who testified in favor of Mr. Harris would
13    be in trouble or get fired by the company?
14              A.   No.
15              Q.   Have you ever heard any rumors about
16    what Mr. Harris was fired for?
17              A.   No.
18              Q.   Is this the first time you were told
19    that he was fired, as opposed to resigning
20    voluntarily?
21              A.   Yes.
22              Q.   You so you never heard that he
23    had been fired up until a couple days ago;
24    correct?
25              A.   Correct.
```

1    Q.   Did you ever speak to Dan Fankhauser

2    about anything?

3         A.   No.

4         Q.   What is Miss Grizbek doing now?

5         A.   She's what?  Personnel.

6         Q.   Is that the same job she had then,

7    or has she been promoted?

8         A.   I guess it's a promotion, because

9    it's not the same job that she had then.

10        Q.   Then she was in charge of markdowns

11   and some employee benefits and now she's overall

12   personnel director?

13        A.   Yes.

14        Q.   Is she a white woman?

15        A.   Yes.

16             MR. BURTON:  Wait.  Let me talk to

17   my client for a second.

18             I'm not going to have any more

19   questions of this woman at this time.

20             MR. GONZALEZ-LLORENS:  I just have

21   one question which I'm not sure about.

22                  CROSS-EXAMINATION

23   BY MR. GONZALEZ-LLORENS:

24        Q.   The towels we're talking about are

25   beach towels; correct?

1        A.    Yes.

2        Q.    Were they brought to the front of the

3    store so customers could purchase the beach

4    towels or were they kept in the back of the

5    store?

6        A.    That morning when I came in it was

7    back by what we call the ups room.  It was on

8    floats and repack boxes.

9        Q.    In the back of the store?

10       A.    Yes.

11       Q.    Were those towels ever brought to the

12   front of the store so customers could purchase

13   those towels?

14       A.    No.  It was like the employees was

15   coming back there by word of mouth.  They was

16   coming back there to get the towels and when the

17   store would open they would purchase it.

18            MR. GONZALEZ-LLORENS:  I have no

19   further questions.  Thank you.

20            MR. BURTON:  I have one question.

21                 REDIRECT EXAMINATION

22   BY MR. BURTON:

23       Q.    I have one question.  You said later

24   they were brought out.  Were they ever brought

25   out, or just employees were buying them off the

1   floor after Grizbek spoke with them?  You told
2   me --

3        A.   The towel -- this happened about
4   the towels with Mr. Harris and Miss Grizbek back
5   over in the chargeback area there where they was
6   talking about the towels.  They said the towels
7   was going to be back there because they was going
8   to research them.  This happened one Friday, and
9   we came back in maybe like a Monday or a Tuesday
10  that they said they were putting the towels back
11  out on the floor.  But I don't know who put them
12  out on the floor.  I don't know.  All I saw was
13  some guests buying them and some employees
14  buying them.

15       Q.   And that's after Mr. Harris bought
16  them; right?  About the same time when they were
17  just about over; correct?

18       A.   I don't know when Mr. Harris bought
19  his towels.

20       Q.   But you do know they got out somehow
21  at whatever price?

22       A.   Right.  Uh-hum.

23       Q.   And that's when the employees and
24  guests were buying them at the price they were
25  marked down at?

1        A.  Yes.

2        Q.  And whether it was a good price or

3  bad price, you don't know?

4        A.  I don't know.

5        MR. BURTON:  I have nothing further.

6        MR. GONZALEZ-LLORENS:  No questions.

7        MR. BURTON:  Ma'am, I'm going to

8  give you an instruction.  I already know what

9  Mr. Gonzalez is going to say.

10       You have the right to read and sign

11  this.  You can give up the right to read and

12  waive it, or Target would prefer that you have

13  the opportunity to read it and sign it.

14       To do that you'll get a notification

15  from this gentleman when it's typed, at which

16  time you can go to his office and read it.  I

17  will tell you, in my opinion, you should get

18  paid for the time it takes you go there to read

19  and sign it.  And if you don't get paid, please

20  let me know directly or indirectly

21  on that one.

22       It's called suffer or permit under

23  the Fair Labor Standards Act, but he's going to

24  request that you go and read it.

25       MR. GONZALEZ-LLORENS:  Right.

1            MR. BURTON:  I'm going to request

2       that you charge the time off to them, but I

3       make a recommendation -- it's not part of my

4       instructions -- that you don't talk to anyone,

5       him or me or anyone outside of a formal

6       proceeding because it will be less aggravation.

7            THE WITNESS:  Okay.

8            MR. BURTON:  I can't keep you from

9       doing that, but it certainly would be less

10      aggravation if you didn't.  I recommend no one

11      speak to anyone without a formal proceeding just

12      because it's that kind of matter, and we don't

13      want you later to learn things that would have

14      been important earlier or hear something now and

15      confuse it with then.

16            With that, I presume you're going to

17      read it, ma'am?

18            MR. GONZALEZ-LLORENS:  We request

19      her to read it.

20            THE WITNESS:  Yes.

21            MR. BURTON:  She'll read.  It is

22      ordered.

23            THE REPORTER:  You need a copy,

24      counsel?

25            MR. GONZALEZ-LLORENS:  Are you

```
 1   ordering it?
 2                MR. BURTON:  Yes.
 3                MR. GONZALEZ-LLORENS:  Yeah, we'll
 4   have a copy too.
 5                     DEPONENT
 6   Subscribed and sworn to before me this _____
 7   day of _____ 2000.
 8   My Commission expires:_____
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

CERTIFICATE OF REPORTER

STATE OF FLORIDA    :

                    :    SS.
COUNTY   OF   DADE  :


        I, ELLIOTT MARSHALL, A.S., RPR, being a
Notary Public in and for the State of Florida at
Large, do hereby certify that I reported the
deposition of PATRICIA MORRIS, a witness called
by the PLAINTIFF in the above-styled cause; that
the said witness was duly sworn by me; that the
reading and subscribing of said deposition were
not waived by the witness and by counsel for the
respective parties; and that the foregoing pages,
numbered from 1 to 22, inclusive, constitute a
true and correct transcription of my shorthand
report of the deposition by said witness.

        I further certify that I am not an attorney
or counsel of any of the parties, nor relative or
employee of any attorney or counsel connected
with the action, nor financially interested in
the action.

        WITNESS my hand and official seal in the
City of Miami, County of Dade, State of Florida,
this 28th day of October, 2000.


                    ELLIOTT MARSHALL, A.S., RPR
                    My Commission Expires 5-19-2001


ELLIOTT MARSHALL COMORA
MY COMMISSION # CC 645732
EXPIRES: May 19, 2001
Bonded Thru Notary Public Underwriters

1             UNITED STATES DISTRICT COURT
            SOUTHERN DISTRICT OF FLORIDA

2            FT. LAUDERDALE DIVISION

3
         CASE NO. 00-617-CIV-FERGUSON
4          Magistrate Judge Snow

5
  Steve Harris,
6
       Plaintiff,
7
  vs.                  ORIGINAL
8
  Dayton Hudson Corporation d/b/a
9  Target Stores,

10       Defendant.

11  - - - - - - - - - - - - - - - - X

12

13

14                4375 Sheridan Street
                Hollywood, Florida
                Miami, Florida
15                Friday, October 13th, 2000
                9:24 A.M. - 10:18 A.M.
16

17

18     DEPOSITION OF SANDRA ROSENBERG

19

20     Taken before ELLIOTT MARSHALL, A.S.,

21  Registered Professional Reporter and Notary

22  Public in and for the State of Florida at Large,

23  pursuant to Notice of Taking Deposition in the

24  above cause.

25

```
 1              - A P P E A R A N C E S -

 2        on behalf of the Plaintiff

 3               Richard J. Burton & Associates, P.A.
                 18305 Biscayne Boulevard
 4               Suite 300
                 Miami, Florida 33160
 5               Tel 705-0888 - fax 935-9542

 6        on behalf of the Defendant

 7               Shutts & Bowen
                 201 South Biscayne Boulevard
 8               Suite 1500
                 Miami, Florida 33131
 9               BY: Rene J. Gonzalez-Llorens, Esq.
                 TEL 358-6300 - FAX 381-9982
10
                      ALSO PRESENT
11
                      Steve Harris
12
                      - - - - - -
13
                 - I N D E X -
14
        WITNESS          DIRECT  CROSS  REDIRECT  RECROSS
15
        SANDRA ROSENBERG
16
        BY MR. BURTON        3
17
        BY MR. GONZALEZ-LLORENS   53
18
19               - E X H I B I T S -

20        PLAINTIFF'S              FOR IDENTIFICATION

21               none marked

22

23

24                              .

25
```

1          MR. BURTON: Okay. For the

2     record, I'd like to ask formally of Mr. Llorens;

3     Mr. Llorens, you sent me a fax on October 6th

4     asking whether I want to receive documents.

5       "You," quote, "just received nine voucher books

6     with evidence of petty cash balances of Target

7     Stores.

8               I wrote you yesterday saying,

9     yes, please bring them here. You advised me that

10    since they had not been Bate stamped that you had

11    not hand opportunity to bring them. If we have

12    to retake this deposition, I will use that as a

13    basis to retake discovery in thr form of a

14    deposition.

15               MR. GONZALEZ-LLORENS: You --

16               MR. BURTON: I'm not asking for a

17    response.

18               MR. GONZALEZ-LLORENS: Let me make a

19    response for the record, since your statement is

20    not correct.

21               I said to you that I have been out

22    of the office for two days. I told you that the

23    fax came at 4 o'clock. Both those documents

24    hadn't been Bate stamped. Pursuant to the

25    Florida Rules of Procedure they must be Bate

1    stamped.  I don't have them with me.  You are

2    welcome to come to the office and get copies next

3    week.

4              MR. BURTON:  I'll reserve any

5    questions of these witnesses.  If it is required

6    and necessary -- this has been asked for three

7    months ago.  I'm not asking for anything further,

8    and I'm not making any statements more for the

9    record.  There is no response required.

10              MR. GONZALEZ-LLORENS:  I have no

11    problem for you acquiring these documents later

12    on, if these people have knowledge of them.

13              MR. BURTON:  That's fine.

14              MR. GONZALEZ-LLORENS:  Then let's

15    proceed with this deposition and let's take it

16    very politely.  And, presently, I don't like to

17    be called "scum," as you did initially.

18              MR. BURTON:  Sir, I will not respond

19    one way or the other, and I don't wish to in

20    this record say anything negative about you.

21    I haven't yet, and I'm not starting.

22              MR. GONZALEZ-LLORENS:  Well,

23    you did when you started this deposition.

24              MR. BURTON:  There was no deposition

25    in progress.  You'll hear on the record there

1    were no comments between you and I.  I said it

2    privately.

3                    One does not do that.  That was

4    called a cheap shot.  Don't do it anymore.

5                    MR. GONZALEZ-LLORENS:  I think the

6    rules require you to be pleasant and be polite --

7                    MR. BURTON:  I am being pleasant and

8    polite.  I am trying to take the deposition --

9                    MR. GONZALEZ-LLORENS:  I don't

10   appreciate being called a scum.

11                   MR. BURTON:  Please, let me proceed.

12                   MR. GONZALEZ-LLORENS:  Sir, you may

13   proceed.

14                   MR. BURTON:  Ma'am, I'm sorry for

15   the behavior you just witnessed.

16                   MR. GONZALEZ-LLORENS:  And so am I

17   ma'am. Very much so.

18   Thereupon--

19               SANDRA ROSENBERG

20   was called as a witness by the Plaintiff, and,

21   after having been first duly sworn, was examined

22   and testified as follows:

23               DIRECT EXAMINATION

24   BY MR. BURTON:

25           Q.   Ma'am, did you ever hire this lawyer

6

```
 1   personally?
 2        A.   No.
 3             MR. GONZALEZ-LLORENS:  I represent
 4   Target stores.
 5             THE WITNESS:  He doesn't represent
 6   me.
 7             MR. BURTON:  I have to ask
 8   you on the record, but please, Mr. Llorens, the
 9   appropriate manner is to object.  Please don't
10   answer for her.
11             MR. GONZALEZ-LLORENS:  I was
12   trying just to give her some guidance.
13             MR. BURTON:  You don't have to.
14   She's her own person and a witness.  So when I'm
15   saying that -- and I'll keep a civil tone at all
16   times with you.  I will not raise my voice.
17             Have you ever given a deposition
18   before?
19        A.   No.
20        Q.   Our talking back and forth shouldn't
21   hopefully discourage you about the system, but
22   the system is very simple.
23             I'm going to ask questions which if
24   you understand, please answer.  If you don't
25   understand, say "I don't understand," and if
```

7

1    there's a reason that you don't understand, you
2    said this and I don't understand what that means,
3    just say "I don't understand," and I'll try to
4    re-ask the question.

5                There's nothing that I'm going to
6    ask here that shouldn't be within your own
7    experience or your own knowledge. And if it's
8    something you don't know, simply say, "I don't
9    know." If it's something that you heard about,
10    say "I heard about it, but you have to talk to so
11    and so because they were the ones that told me."
12    And if you heard anything, say what you heard.
13    That's all.

14                We're not going to ask you to be a
15    Judge or a jury. We're just trying just elicit
16    the facts that you know.

17                If there's anything that you need
18    a break for, please ask me. And the reason I
19    asked you if you had hired this man, if you did,
20    he has certain rights. If not, there's other
21    rights; but that's for the Judge on the record to
22    read, not for you.

23                Do you understand the instructions?
24        A.    Uh-hum.
25        Q.    You can't use "uh-hum" or "uh-uh" or

1    shake your head because he can't take it and he

2    and I will not agree with yes or no later.

3         A.    Okay.

4         Q.    That's better.  You have to give

5    verbal answers that are available on the record;

6    okay?

7         A.    Yes.

8         Q.    Now, please state your name for the

9    record.

10        A.    Sandra Rosenberg.

11        Q.    And, Ms. Rosenberg, what is your home

12   address?

13        A.    343 S.W. 34th Avenue, Deerfield

14   Beach, Florida, 33442.

15        Q.    And what is your home phone number,

16   should it be necessary to subpoena you?

17        A.    Area code (954) 418-0623.

18        Q.    And do you reside there with any

19   person there over the age of 15?

20        A.    My husband.

21        Q.    And what is his name?

22        A.    James Rose.

23        Q.    And that's because if they need to

24   serve a subpoena, they can serve it on him?

25        A.    Okay.

1          Q.   By the way, anything I ask you here

2     -- and I'll say this to you as if we're talking

3     before a jury, since this is a new system to

4     you.  I might ask you many things that normally

5     you wouldn't talk about to friends or strangers,

6     but since this is a legal proceeding, if I ask a

7     question I hope I don't make you feel

8     uncomfortable.  We're just trying to get to the

9     bottom of the facts of what happened, and I'm not

10    in any way attempting to ask you questions that

11    are too personal for any other reason but for

12    this case, and that's where it stays; okay?

13          A.   Okay.

14          Q.   What's your educational background?

15          A.   High school.

16          Q.   And when did you graduate?

17          A.   Ninety -- oh it's so long.  Sorry.

18    1987, not 90.

19          Q.   From where?

20          A.   North Miami Beach Senior High.

21          Q.   You were from the North Miami Beach

22    area?

23          A.   Yes, Miami.

24          Q.   I won't even ask for which

25    neighborhood because I've lived there most of my

1    life.

2              A.    I've actually lived all over.

3              Q.    And after you graduated from high

4    school, did you receive any further training in

5    any educational endeavor?

6              A.    No.

7              Q.    After high school, did you proceed to

8    go into work?

9              A.    I actually was working while I was in

10   high school.

11             Q.    With whom?

12             A.    At the time I was with John Berry.

13   It's an accessory store.

14             Q.    And where was that?

15             A.    163rd Street Mall.

16             Q.    And how long did you stay with him

17   after high school, or did you get a job after

18   that?

19             A.    Yes.   I stayed with him after high

20   school.

21             Q.    For how long?

22             A.    Probably about a year-and-a-half.

23             Q.    And what type of work were you doing

24   there?

25             A.    I was a sales associate and also an

1    acting assistant manager.

2            Q.    Did there come a time where you

3    changed jobs?

4            A.    Yes.

5            Q.    To work with whom?

6            A.    From John Berry to Beverly Hills

7    Cafe.

8            Q.    And what did you do there?

9            A.    I was a hostess.

10            Q.    Was that the one in Aventura at the

11    time?

12            A.    No.    It's about a block from

13    Federal Highway.    A block -- yeah, Federal

14    Highway.    It's about a block west from Federal

15    Highway.

16            Q.    In what city?

17            A.    It's in Miami, still, it's kind of

18    close to Aventura.    I'm not sure if there's a new

19    one opening.

20            Q.    You're talking about the one off

21    of West Dixie, not Federal, one block in from

22    Biscayne?

23            A.    Yeah, that's probably the one.

24            Q.    The name changes when you get to Dade

25    County?

1       A.      Yeah (Witness laughs).

2       Q.      And how long did you work there?

3       A.      Maybe about six to eight months.

4       Q.      And what were you doing there?

5       A.      Hostess.

6       Q.      And then what was your next job?

7   You should be about in 1989, 1990; right?

8       A.      Yeah.  Then I left there and moved up

9   to Deerfield.  Actually, that's the reason for me

10  moving up there because I have relocated.

11              I moved up to Deerfield and

12  got a part time job working as an assistant in a

13  cleaners.  Then I left there in 1991 and went to

14  Target.

15      Q.      And at which store initially did you

16  apply for a position?

17      A.      The 393 Deerfield Beach Target.

18      Q.      And what was your first job you

19  obtained with Target?

20      A.      Service desk.

21      Q.      They call their employees associates;

22  correct?

23      A.      They call them team members.

24      Q.      Team members.

25      A.      (Witness nods head in the

1    affirmative.)

2         Q.   And you were a team member assigned

3    to the service desk?

4         A.   Correct.

5         Q.   Were you a manager at that time or

6    just a beginning employee?

7         A.   When I first came in I was a

8    beginner.  Entry level.

9         Q.   Did they provide any training for

10   you?

11        A.   Yes.

12        Q.   What type of training did they

13   provide?

14        A.   I was partnered up with another

15   associate when I first got there and for training

16   with that team member.

17        Q.   In other words, on-the-job training

18   with a team member to show you the ropes?

19        A.   Correct.  Correct.  Correct.

20        Q.   Is that customarily how Target trains

21   people?

22        A.   Back at that time, yes.  We have a

23   new system now.

24        Q.   I want to -- I'll stop for the

25   purpose of my questions.

1          A.    Okay.

2          Q.    Before or after Mr. Harris?

3    Because if it's before he was terminated and

4    these were the procedures, just let me know and

5    it'll make it simpler, or if it changed then;

6    whatever.

7          A.    From the time I was hired we

8    didn't have computer training on LPC.  Now we

9    have for the last couple of years we've been

10   learning LPC computer training which gives you

11   the knowledge in all different areas from Target.

12              So from the time I was hired we

13   didn't have it.  But from the time he was in the

14   store in know that there was LPC.

15         Q.    Just so you understand,

16   this gentleman is the best and fastest court

17   reporter I've ever had --

18         A.    Okay.

19         Q.    (Continuing) -- but you may be going

20   pretty fast, so slow down.

21         A.    Okay.  I will.

22              (Discussion held off the record.)

23         Q.    So when you were first there you were

24   learning on the job.  They partner you with a

25   more experienced employee at the same level?

1          A.    Correct.

2          Q.    And you just did what you were to do,

3    and if you had any questions they'd tell you what

4    procedures were?

5          A.    Correct.

6          Q.    You said by the time Mr. Harris

7    was there toward the last two or three years

8    from today backwards, so it would be 1987, 1988,

9    1989 they started having computer training?

10         A.    Correct.

11         Q.    Was that on-the-job training,

12   or would they give you tapes to take home?

13         A.    No.   You would come into the store

14   and take CD rom courses right at the computer

15   that tells you about different areas and

16   familiarize you with different areas of the

17   Target store.

18              Once you've completed that, then

19   you would go on the floor and have training with

20   a partner.

21         Q.    It would just show you how the store

22   layout is maintained and what the general

23   overview of the store would be?

24         A.    No.   It showed you like cash

25   registers.   Every little thing about the

1   particular jobs. Planogram, like the labels and

2   the signing. It also talked about safety.

3   There's hazardous, bloodborne. There's sales

4   floor. They tell you how to set up four-foot

5   sections. It familiarizes you with every little

6   section of the store.

7        Q. But what I'm trying to say is it

8   primarily involved with the logistics and how you

9   put it together and what have you. What to use a

10   cash register for, and things like that?

11        A. Basically how to, yeah.

12        Q. It wasn't equipped, in other words,

13   through an internet-linked answer to specific

14   questions; was it?

15        A. No, it was not.

16        Q. So if you had a specific question

17   about a specific policy or change in policy,

18   you'd still have to ask other associates?

19        A. Yes, you would have to ask.

20        Q. Because I know some of them can be

21   interactive now. I just wanted to know whether

22   or not this one was?

23        A. No, it was not.

24        Q. So as I understand it, you were

25   there initially on the cash register as a

1    trainee?  And now we're in about 1992 or so.

2    After that what did you do?

3         A.    Actually, I was promoted before the

4    end of '91 to a level two cashiership/office

5    personnel.  This was before the year was over.

6         Q.    And in that job what were you

7    responsible to perform?

8         A.    All functions of cash office.

9    All the money that had to deal with the store,

10   as well as servicing the front lanes and the

11   teams up front.

12        Q.    The front lanes are generally the

13   checkout lanes?

14        A.    Yes.

15        Q.    So just for the record, we'll know

16   the front lanes is the same as the checkout area?

17        A.    Correct.

18        Q.    Am I correct that, as the supervisor,

19   you were the responsible person for the money

20   that comes in for what you are receiving at the

21   time?

22        A.    Correct.

23        Q.    And you don't change your policy

24   no matter who the manager is.  You follow your

25   procedures and they have to comply with your

```
 1    procedures if they want to get near the cash;
 2    correct?
 3           A.    Correct.
 4           Q.    Now let's go, first of all, in that
 5    store.  At one time you were there prior to
 6    Mr. Harris; were you not?
 7           A.    Correct.
 8           Q.    And who was the manager then?
 9           A.    Joe Toscano.
10           Q.    And Mr. Toscano is a white person?
11           A.    Correct.
12           Q.    At that time were there any black
13    managers there.  High level managers.
14           A.    At that time with Joe, no.
15           Q.    Was the first high level manager you
16    worked for Mr. Harris?
17           A.    In Target?
18           Q.    Yes.
19           A.    At my store?
20           Q.    Yes.
21           A.    Yes.
22           Q.    And do you remember when he arrived?
23           A.    I believe it was either in the
24    beginning of the year, maybe February.
25                 I could be off on the date.
```

```
 1            Q.   Of what year?
 2            A.   Last year, which was 1999.  Or was it
 3      '98?
 4            Q.   It's your best memory.
 5            A.   I'm not sure of the exact date.
 6            Q.   I will tell you that he's been gone
 7      over a year.
 8            A.   Yeah.  Well, so maybe it was '98
 9      then.  I'm not sure of the exact date.
10            Q.   In that regard, if it's February of
11      '98, for the sake of argument and he was there
12      about a year; correct?
13            A.   Yes.
14            Q.   Now, when he was there or before he
15      was there was there a mural in the work room in
16      the back?
17            A.   Yes, it was.
18            Q.   Did it have any black persons on it?
19            A.   Yes, it did.
20            Q.   That was before he arrived; correct?
21            A.   No.
22            Q.   After he arrived, there was a mural
23      that had black faces?
24            A.   Correct.
25            Q.   I understand that that mural has
```

1 since been changed again; is that correct?

2          A.   Correct.

3          Q.   I believe it deleted the black-faced

4 employees?

5          A.   That is incorrect.

6          Q.   Did it delete any of the black faces?

7          A.   It deleted all of the team members

8 faces that were on the one section of the mural.

9          Q.   In other words, there was a time when

10 it showed black faces and white faces and now it

11 deleted all faces -- all faces on that one side.

12               Do you know who gave the order

13 to delete the black and white faces on that

14 mural?

15          A.   I do not know who gave the order for

16 that.

17          Q.   How long after Mr. Harris was

18 relieved was it changed and the black and white

19 faces were deleted?

20          A.   I do not recall the exact date,

21 but it was soon after.

22          Q.   I see.  Was there any explanation

23 given as to why it was necessary to delete all

24 the faces of the team members, including black

25 and white team members shortly after there Harris

1    was discharged?

2         A.    No, there was no reason.

3         Q.    Correct me if I'm wrong.    You

4    actually knew Shannon Tetrault; correct?

5         A.    Yes, I did.

6         Q.    She had been a problem there for a

7    while; had she not?

8              MR. GONZALEZ-LLORENS:    Objection.

9    Conclusion.    It is not an established fact.

10             You may answer.

11   BY MR. BURTON:

12        Q.    In your opinion.    He can't tell you

13   not to answer.    When I ask a question like that

14   you can tell me your opinion or what you saw or

15   what you heard.

16        A.    My opinion --

17        Q.    Yeah.

18        A.    (Continuing) -- is that she was

19   immature and really didn't -- I really didn't

20   think she made a good GSTL.

21        Q.    What is GSTL.

22        A.    Guest service team leader.

23        Q.    And why do you say that?    What

24   incidents do you recall that would indicate that

25   she didn't make a good GSTL?

1          A.    Just the way she acted and presented

2     herself in front of team members.  She was kind

3     of goofy.

4          Q.    Was she ever whiney?  Or give me

5     other traits that you might say other than

6     "goofy," because I don't know how goofy

7     translates to people envisioning how she acts.

8          A.    An airhead.

9          Q.    Okay.  That's a good answer.

10          A.    I'm sorry.

11          Q.    I think we understand that.

12     Again, this is not meaning to be disparaging.

13                And this is while we she worked

14     under Toscano also?

15          A.    Yes.

16          Q.    Would she take suggestions from other

17     team members when she was acting goofy or an

18     airhead or not holding herself up properly?

19                In other words, would you tell her

20     to clean up her act and would she try to change

21     it or would she just keep doing what she was

22     doing?

23          A.    Can you -- what do you mean,

24     exactly?

25          Q.    When a team leader had a question,

1    they would go to another team leader or someone

2    would counsel another one and say "You don't do

3    the procedure that way.  You do it like that."

4              Did anyone say to her "You have to

5    act differently in front of the customers" or

6    "get back to the customers" or something like

7    that?

8         A.    I wasn't an executive, so I didn't

9    have the authority to go up to her and tell her

10   that she was acting goofy or to straighten up her

11   act because I was under her, not above her at the

12   time, so I didn't feel that I had a right

13   myself.  So I don't know if any executives spoke

14   to her and told her about the way she acted.

15        Q.    When you say she was a superior to

16   you in the chain of command, what role did she

17   have at the time?

18        A.    She was an executive.

19        Q.    She was an executive?

20        A.    Yes.

21        Q.    And what level executive was she?

22   Do you know?  Was the title that she had --

23        A.    Guest service team leader.

24        Q.    So she was the leader of guest

25   services?

```
 1          A.    Correct.

 2          Q.    What does "guest services" mean in

 3     the Target family?

 4          A.    She's in charge of the front lanes,

 5     the cashiers; the cash office; the service desk;

 6     food service; cart attendants.  She's in charge

 7     of the function making sure that the front lanes

 8     run smoothly and the function of the team members

 9     up front.

10          Q.    How old a woman is she?

11          A.    She's in her early -- probably early

12     mid-20s.

13          Q.    So she's somewhere between 22 to 25,

14     26.  Something like that?

15          A.    Correct.

16          Q.    Do you know what level or

17     experience she had to be given that important an

18     assignment?

19          A.    I knew that she went to college.

20     I don't know what courses see she took in

21     college.

22          Q.    While you were there, was she there

23     at all times?  In other words, until she was

24     transferred out?  When you got there, was she

25     there?
```

```
 1            A.    Correct.
 2            Q.    So she was your boss when she was on
 3     duty?
 4            A.    Oh, no.    When I got there in '91,
 5     no, I thought you meant towards the end.    When I
 6     came in 1991 she was not there.
 7            Q.    When did she arrive thereafter,
 8     approximately?
 9            A.    I couldn't tell you the exact date
10     when she came to the store.    It's been in the
11     last -- probably about two years ago.
12            Q.    And did she come there as the guest
13     services team leader or was she promoted into
14     that role?
15            A.    I don't know what her position was
16     before our store.    She came to our building as
17     guest service team leader.
18            Q.    So in the fairly brief period of time
19     that was, she was only there like months or a
20     year; correct?
21            A.    Pretty much, yes.
22            Q.    In that brief period of time,
23     were other people commenting in that office she
24     was an airhead and not focused and other comments
25     such as that?
```

1          A.    Yes.

2          Q.    Some of the other people who would

3    have said the same things, what are their names?

4    The people that had that problem with her.

5          A.    Well, it wasn't necessarily a

6    problem.  It was just she was airheadish.

7    Probably Angie.

8          Q.    Angie is another cashier?

9          A.    No.  She worked in the building.

10   If you want cashiers, if that's --

11         Q.    No.  Any people.

12         A.    But at least I can go through the

13   cashiers such as people.  Angie; Ceal Cavo; Betty

14   Gadsen.

15         Q.    I think there was a third person

16   after the last one you mentioned.

17         A.    Probably Regina Lewis.

18         Q.    Now, was there ever a

19   conversation with any of these people where

20   you were commenting about their behavior or they

21   were commenting to you?

22         A.    I wasn't commenting about their

23   behavior, but they were just talking up front

24   like saying she doesn't do nothing.

25         Q.    Did you see anyone attempt to

```
1    correct her behavior so she could do her job more
2    properly and thereafter make everyone else's life
3    easier?
4              MR. GONZALEZ-LLORENS:  Objection.
5    It assumes facts.  You may answer.
6              THE WITNESS:  Answer?
7              MR. BURTON:  Yes.
8              THE WITNESS:  Not that I'm aware of.
9    BY MR. BURTON:
10       Q.   Weren't you there when --
11              MR. HARRIS:  Can you -- (plaintiff
12   signals time out).
13              MR. BURTON:  I can do whatever I
14   want.
15   BY MR. BURTON:
16       Q.   Let me go to something else for a
17   second.  I'll come back there.  During the period
18   that she was there and obviously there was some
19   criticism.  Is there a mechanism to report
20   someone's behavior that's not proper to hire
21   persons that you know of in Target?
22       A.   If there's an issue with an
23   executive, usually the team members are always
24   told that the executives's doors are always open
25   that if they have a problem with them, they can
```

1    speak to them, either the accumulations leader or

2    the supervisor or STL.   "STL" stands for store

3    team leader.

4         Q.   Now, you're familiar with the

5    procedures for how vouchers are issued;

6    are you not?

7         A.   Correct.

8         Q.   And in this instance were vouchers

9    utilized at that store for cash payouts?

10         A.   Correct.

11         Q.   What was the procedure before

12    Mr. Harris?  Or was there a procedure before and

13    a procedure after?  I don't know.

14         A.   The procedure's always been the

15    same.  You need two supervisors' signature on a

16    voucher in order to get money out of the

17    registers.

18         Q.   And have you always used that

19    procedure?

20         A.   Correct.

21         Q.   You used it with Mr. Harris also?

22         A.   Correct.

23         Q.   Now, in this particular instance

24    there was an issue regarding some of Mr. Harris'

25    vouchers; correct?  Are you familiar with that?

```
 1          A.    I'm not exactly familiar with what
 2    happened.
 3          Q.    I understand that Mr. Harris --
 4    weren't you interviewed by Mr. Fankhauser?  Do
 5    you know who Mr. Fankhauser is?  The director of
 6    security?
 7          A.    Oh, Don -- okay.  Yes, I do.
 8          Q.    Did he ever talk to you about
 9    Mr. Harris' use of vouchers?
10          A.    Yes, he did.
11          Q.    What did he ask you and what did you
12    tell him, to the best you can recall?
13          A.    I remember he asked me or questioned
14    me about some vouchers that was written, but I
15    had on the one voucher that he questioned me I
16    handed it back up to prove that voucher and that
17    was from the trophy store.
18          Q.    In other words, he showed you some
19    material, you said "I got the additional report
20    right here" to prove that it was clean?
21          A.    Right.  That was on the one voucher.
22          Q.    And what about the other voucher?
23          A.    I don't know what that was for.
24          Q.    But you never violated the procedure
25    of Mr. Harris; did you?
```

```
 1        A.   No.   If an executive came to me and
 2   asked me to write up a voucher, I wrote it up for
 3   them because they were my superior.
 4        Q.   You wouldn't give them any money
 5   without a second signature of a second executive;
 6   would you?
 7        A.   No.
 8        Q.   So in every instance -- even
 9   Mr. Harris -- you followed the procedure;
10   correct?
11        A.   Correct.
12        Q.   And he properly accounted for the
13   remaining money, I understand; right?
14        A.   I don't know what you mean by
15   "remaining money."
16        Q.   If he took out $200 and used 180 for
17   breakfast, he would come back with the receipts
18   and put the rest of the money in the register or
19   you couldn't be balanced; correct?
20        A.   That's the correct process.  But I
21   don't know in any instance offhand right now if
22   the person takes money out if they're returning
23   it because they don't return it right that
24   moment.  If they took take $200 out, they leave
25   the building and go whaerever they have to pay
```

1   and come back and fill out a voucher in service

2   to put the money back into the system.

3           Q.    Have you ever seen Mr. Harris breach

4   that procedure?

5           A.    I'm not the front lane, so I don't

6   recall.

7           Q.    What I'm saying is you don't know of

8   any instance; do you?

9           A.    No, I do not.

10              (Short Pause.)

11  BY MR. BURTON:

12          Q.    Now, as I understand the system,

13  the next day, though, if there wasn't a balancing

14  you would know it because the system wouldn't

15  balance; correct?

16          A.    It would show up on a 137 report.

17          Q.    Do you ever recall a 137 report at

18  any time after Mr. Harris had the voucher system

19  being deficient?

20          A.    I do not analyze the 137 research,

21  so I do not know.

22          Q.    My question wasn't that.  Have you

23  ever heard of any?

24          A.    No.

25          Q.    So you've never heard of that

1    happening while you were there; correct?

2              A.    It's happened.

3              Q.    I'm referring to Mr. Harris

4    specifically.

5              A.    But I can't speculate which days he's

6    written a voucher out to make the decision that

7    yes, it was over the very next day.

8              Q.    Did you ever recall approaching

9    Mr. Harris or being asked about Mr. Harris,

10    whether or not he reconciled vouchers by

11    Mr. Fankhauser?

12              A.    I never approached him about any

13    money being shorthanded.  No.

14              Q.    Did he ever ask you about any money

15    being shorthanded with Mr. Harris?

16              A.    No.  Do you mean Mr. Fankhauser.

17              Q.    Yes.

18              A.    I thought you meant Steve asking me.

19              Q.    Now did Mr. Fankhauser ask you about

20    any money he thought Mr. Harris may have been

21    short on?

22              A.    I think when he questioned me about

23    the vouchers there was a question -- you know --

24    if the money was returned or anything.

25              Q.    And you told him, to the best of your

1   knowledge, you had no reason there was anything

2   wrong?

3          A.   No.

4          Q.   Is that bascically what you told him?

5          A.   Yeah.

6          Q.   Now, you know Karen Napp?

7          A.   Yes, I do.

8          Q.   Does she work with you, for you, co

9   with you?  What was her role?

10         A.   She was cashier supervisor of the

11  front lanes and she was a coworker.

12         Q.   Now, as I understand, there was a

13  time where you were given a temporary assignment

14  to the human resources team.

15         A.   Correct.

16         Q.   And was that a promotion or was that

17  just a temporary duty?

18         A.   It was temporary duty until I went to

19  a round-robin process in order to get promoted.

20         Q.   And you eventually got promoted?

21         A.   Correct.

22         Q.   And what is your current position?

23         A.   Team relations leader.

24         Q.   And is that like a personnel

25  oversight person?

1          A.    Yes.   It's an executive.

2          Q.    Now, in the temporary duty, weren't

3     you there when Mr. Harris spoke with Shannon

4     Tetrault?

5          A.    Yes.

6          Q.    And he was trying to have her clean

7     up her act, using the vernacular?

8               MR. GONZALEZ-LLORENS:   Objection.

9     It assumes unestablished facts.

10               THE WITNESS:   Can I just think for a

11    moment?  Because it's been a while.

12               MR. BURTON:   Sure.  Please do.  It's

13    better if you refresh your recollection and think

14    about it.

15               THE WITNESS:   I think I recall it,

16    but I don't remember everything that was said in

17    that meeting.

18    BY MR. BURTON:

19          Q.    But what was said would have been

20    appropriate or you would have remembered it.

21    If there was any touching, fondling, sexual

22    suggestions, you would certainly --

23          A.    No.   Yeah, there was nothing like

24    that in there.

25          Q.    It was what you call business to

1    try to counsel Miss Tetrault to some nature,
2    to the best of your recollection; correct?
3         A.   Yes.   I think I remember him speaking
4    now, as you refresh my memory, about work
5    performance.   I totally forgot that.
6         Q.   So up until now no one asked you
7    about what that conversation consisted of;
8    correct?
9         A.   No.   You're the first.
10        Q.   And this was appropriate conversation
11   in light of her behavior and in light of
12   Mr. Harris' position as team leader; correct?
13             MR. GONZALEZ-LLORENS:   Objection.
14   Speculation.
15             THE WITNESS:   I do not recall
16   everything of that day, but I believe it was
17   about work performance.
18   BY MR. BURTON:
19        Q.   And that would have been appropriate
20   in the role of the people at the time; correct?
21        A.   Correct.
22        Q.   Did you ever see Mr. Harris in any
23   way treat Shannon Tetrault in anything but a
24   professional fashion?
25        A.   Not while I was around.

1          Q.    The answer's no?

2          A.    No.

3          Q.    Did you ever hear later that

4     Mr. Tetrault claimed that Mr. Harris had said

5     something offensive to her?

6          A.    No.

7          Q.    No one ever interviewed you as to

8     whether or not there was any discussions with

9     Miss Tetrault and Mr. Harris other than the one

10    we just discussed; correct?

11         A.    No.

12         Q.    Mr. Fankhauser; how long did he spend

13    with you in this interview of an investigation?

14    Don, as you say.

15         A.    Less -- less than a half hour.

16         Q.    Any other subjects he went into?

17         A.    He just questioned me about the

18    vouchers.

19         Q.    Did he know that you were the human

20    resources team leader designate who was there at

21    the interview with Shannon Tetrault by

22    Mr. Harris?

23         A.    I do not think so.

24         Q.    How long a period were you this human

25    resources designee?  For two months, I think;

1    right?

2              A.    A short term.   Yes.

3              Q.    About the same time, the last two

4    months that Miss Tetrault was there?

5              MR. GONZALEZ-LLORENS:   I think you

6    mean Mr. Harris.

7              MR. BURTON:   No, Miss Tetrault.

8    She was transferred.

9              MR. GONZALEZ-LLORENS:   Okay.

10   I'm sorry.

11             MR. BURTON:   That's exactly what I

12   meant was Miss Tetrault.

13             THE WITNESS:   Okay.   I was out of

14   the building for about five or six weeks at

15   another Target store helping them while they're

16   TRL was doing jury duty.

17   BY MR. BURTON:

18             Q.    "TRL," meaning?

19             A.    Team relations leader.

20             Q.    A Personnel person?

21             A.    Correct.   I was helping that store

22   out, so I do not recall the exact date Shannon

23   left.

24             Q.    However, it was about the same time

25   period that you were assigned to team relations

1    or the personnel department as the last period of

2    Shannon, whether it was the last day or week;

3    correct?

4          A.    Probably, yes.

5          Q.    And how many other counsels did you

6    witness by the team leader, Mr. Harris, in those

7    two months that you were the person acting

8    personnel director at that store?

9          A.    As executive counsels?

10         Q.    Yes.

11         A.    I do not recall.

12         Q.    There were a number of them; correct?

13         A.    I do not recall.

14         Q.    To try to focus you, I understand

15    the procedure was if there was going to be

16    counseling, someone such as yourself... a

17    personal relations designee... would be there so

18    there would be no questions about what was said

19    or how it was said?

20         A.    Correct.

21         Q.    And that followed in Mr. Harris'

22    store at all times as far as you are aware;

23    is that correct?

24         A.    Correct.

25         Q.    And whenever there would be some

1    form of counseling, you would be invited to the

2    session, to the best of your knowledge?

3        A.    Correct.

4        Q.    And did you take notes for these?

5        A.    Shannon's is the only one I recall,

6    now that you refreshed my memory.  And I believe

7    I took notes.  I do not know what happened to

8    those notes, though.

9        Q.    Did anyone from Target ever ask to

10    speak to -- and I'm not saying you -- but the

11    "designated personnel" or "team leader" for the

12    Shannon Tetrault interviews, to the best of your

13    knowledge?

14            MR. GONZALEZ-LLORENS:  Objection.

15    Speculation.

16            THE WITNESS:  Interviews for what?

17    BY MR. BURTON:

18        Q.    Are you aware that Mr. Harris was

19    under a cloud for having said improper things to

20    Miss Tetrault at by Target for about two years?

21        A.    No.

22            MR. GONZALEZ-LLORENS:  Objection.

23            MR. BURTON:  Your eyes went up.

24    You are shocked.  If I was to make that a

25    statement of fact -- your objections are noted.

1    This is a proper question.

2              MR. GONZALEZ-LLORENS:   Excuse me.

3    Objection.  Leading.

4    BY MR. BURTON:

5         Q.   You are shocked?  Answer?  It is

6    shocking; isn't it?

7         A.   I didn't know that.

8         Q.   Your eyes went up when I said it;

9    didn't they?

10        A.   Yes.

11        Q.   So in all of this time you've never

12   heard of these allegations?

13        A.   No.

14        Q.   And no one's ever asked to speak to

15   anyone who was the, quote, "personnel department

16   representative" during the period regarding

17   Mr. Harris and Miss Tetrault, to the best of your

18   knowledge; correct?

19        A.   No.

20        Q.   Now, I understand, and let me just

21   ask you a question, did you ever know a black

22   executive who was dating or married to a white

23   woman that had a sports car in the system?  Not

24   in your store, but in the system.

25        A.   I don't know the other Target

1    executives, so I couldn't re --

2         Q.    You're back at Delray; right?    The

3    same store you started at?

4         A.    No, I'm at Delray Beach.    This is a

5    different store.

6         Q.    So you were at the Delray and you're

7    at the Delray Beach store?

8         A.    No, I was at Deerfield.

9         Q.    Deerfield?

10        A.    And then I was transferred to

11   Deerfield Beach.

12        Q.    I always confuse the two and I

13   apologize.

14        A.    Okay.

15        Q.    They both have too many letters in

16   common.

17              After that time when you were

18   present at the counseling that we refreshed your

19   recollection about, did you notice whether -- and

20   you say I don't remember otherwise -- but did you

21   notice whether Miss Tetraults behavior changed at

22   all?    Whether she got less spacey.

23              MR. GONZALEZ-LLORENS:    Objection.

24   Vague.

25              MR. BURTON:    Do you understand the

42

1    question?

2                THE WITNESS:  I understand it.

3    I just don't remember if she straightened up

4    afterwards or not.

5    BY MR. BURTON:

6         Q.   You understood the question?

7         A.   Correct.

8         Q.   In other words, you don't recall

9    her all of a sudden becoming a model employee;

10   do you?

11        A.   No, I do not recall.

12        Q.   You said you then were assigned at

13   some point toward the very last of her tenure to

14   a different store --

15        A.   Correct.

16        Q.   (Continuing) -- as their acting

17   personnel officer.

18        A.   Correct.

19        Q.   Were you given any additional

20   duties or instructions by the new store that that

21   were no the instructions given to you by Steve

22   Steve Harris at this store?

23        A.   No.

24        Q.   You performed in substantially the

25   same fashion?

```
 1              A.    Correct.
 2              Q.    Did you ever see Steve Harris in any
 3    way harass a woman; say anything inappropriate;
 4    act offensively, to the point where you would
 5    have reported him?
 6              A.    No.
 7              Q.    And how long did you work with him?
 8    For a year?  A year-and-a-half?  However long he
 9    was there?
10              A.    However long his service with
11    Deerfield was.
12              Q.    Were you ever advised as to why he
13    was no longer there?
14              A.    No, I was not, until after this
15    already happened.
16              Q.    What had happened?  What was told to
17    you and by whom as to what had happened?
18              A.    Well, I was actually pulled aside
19    and told that Steve was no longer here because
20    they knew that I worked close with him, so --
21              Q.    By whom?
22              A.    Sandy Grizbek.
23              Q.    And did she tell you any other
24    reasons that Steve was no longer there?
25              A.    No.  She just told me that Steve was
```

44

```
 1    no longer with the company.
 2            Q.   Is it fair to state, Miss Rosenberg,
 3    that I have not interviewed you before today?
 4            A.   No.
 5            Q.   We've never had any contact
 6    whatsoever?
 7            A.   Somebody called my house once.
 8    I don't know who it was.
 9            Q.   Okay.  But you don't recall ever
10    speaking to me or anything else?
11            A.   Like in a conversation-like setting?
12            Q.   Yes.
13            A.   No.
14            Q.   You said somebody called your house.
15    Was that for the purpose of locating you or you
16    don't know?
17            A.   They were asking me questions about
18    Steve.
19            Q.   Did you ever get that person's name?
20    Because I'd like to know.  And it wasn't me.
21            A.   I don't recall.
22            Q.   Did they identify themself?
23            A.   They probably did, but I don't recall
24    because it's been a while.
25            Q.   And do you remember the questions
```

45

1    they asked?

2         A.    What I thought of Steve.  Did I get

3    along working with him.

4         Q.    Was this before or after he was

5    terminated?

6         A.    After.

7         Q.    Did you say that you thought he was a

8    competent manager?

9         A.    I didn't respond to the questions

10   because I didn't know who it was.

11        Q.    Oh.  You said, I choose not to speak

12   to whoever it was?

13        A.    Correct.

14        Q.    Did this person give you any basis

15   for their call, saying, "I'm representing him.

16   I'm not representing him"?

17        A.    He said -- I don't recall exactly

18   where they said they were were from.  I just

19   don't recall.

20        Q.    This was on the telephone?

21        A.    Correct.

22        Q.    Now, in the time that you were

23   there overseeing the front, you would have been

24   responsible for persons who -- would you be

25   involved with people who were overdue on their

1    payments or credit cards or had failed to meet

2    their financial obligations at the store?

3          A.    Are you referring to if a team member

4    balanced a bad check?

5          Q.    Yes.

6          A.    Usually security handles that

7    situation and notifies the team relations leader.

8          Q.    So you would have been notified?

9          A.    If there was a bad check that was

10   made out by a team member, yes.

11         Q.    Or unlawful credit card charge or

12   something of that nature.

13         A.    Not necessarily.   Security usually,

14   if they're watching somebody.   They did usually

15   keep it a hush-hush.

16         Q.    But I mean, if it's a team person

17   from the store using the store's credit card or

18   something, you will know.   You would be told?

19         A.    No.   You mean if somebody has a

20   Target corporate card?

21         Q.    Yes.

22         A.    I don't necessarily get the

23   statements for that, so, no.

24         Q.    As a personnel officer, would you be

25   advised of that?

```
 1              A.    Not --

 2                    MR. GONZALEZ-LLORENS:   I'm sorry.

 3       Objection.   Asked and answered.

 4                    THE WITNESS:   Not that I'm aware of.

 5       BY MR. BURTON:

 6              Q.    Now, do you know who Christina Harlow

 7       is?

 8              A.    I recognize the name.

 9              Q.    You never met her?  Or do you recall?

10              A.    I recognize the name.  I just can't

11       recall the person.  I think she has to do with

12       human resources.

13              Q.    At your store or a higher level?

14              A.    Higher level.

15              Q.    So, to the best of your knowledge,

16       you've never met her; correct?

17              A.    Correct.

18              Q.    And she he never interviewed you?

19              A.    Wait.  I think I did meet her once.

20              Q.    In what context?

21              A.    I don't remember the exact context,

22       but she came to our door one day.  I don't know

23       what it was.  I don't know if she was in there

24       with Don or not.  I don't recall that.

25              Q.    She may have been part of this group
```

1    investigating Mr. Harris or something?

2            A.    Me she might or a might not.

3    I didn't meet her at the Deerfield store but I

4    don't remember what the situation was.

5            Q.    She didn't bother to ask you the

6    similar questions about Steve; did she?

7            A.    That you're asking me now, no.

8            Q.    Now, the person who replaced Steve,

9    what race is that person?

10            A.    Joy was white.

11            Q.    Who else worked closely with Steve,

12    using your own terminology, in your opinion?

13            A.    Do you mean executives?

14            Q.    Executive or lower staff.

15            A.    I presume his whole executive

16    representative staff should work close with him.

17            Q.    And who were they?

18            A.    Rene Wasco, Shannon Tetrault, Carey

19    Murphy was the TRL that worked with Steve before

20    I became temporary TRL.  Don Fankhauser.

21            Q.    And what role was he in?

22            A.    Security.  Assets protection.

23            Q.    Where does he reside?

24            A.    Right now he, I believe I heard that

25    he moved out of Florida.

49

```
 1              Q.   When was that?
 2              A.   Either late last year or early this
 3      year.
 4              Q.   I see.  And does he still work for
 5      the company, to the best of your knowledge?
 6              A.   I do not know.
 7              Q.   Other than that one time that he
 8      spoke with you regarding Mr. Harris, do you
 9      recall him ever otherwise contacting you in
10      relationship to any other issue?
11              A.   No.
12              Q.   So that was the one and only time
13      you've had a personal rapport with him?
14              A.   That I could recall right now.
15              Q.   That's why I was asking why you said
16      he would have worked not with Mr. Harris.  You
17      don't know.  You're just assuming that?
18              A.   I'm assuming that.
19              Q.   You never saw him working with
20      Mr. Harris at that store before or after?
21              A.   What do you mean by that?
22              Q.   Other than this Mr. Harris incident,
23      you don't recall him being in the store a lot;
24      do you?
25              A.   He worked a lot in our store and out,
```

1    because before he came to our store he worked for

2    the district on some district thing that they had

3    him on and then he came into our store.  So he

4    used to be in our store then out a lot, so...

5        Q.    In another role.  When you say he

6    worked for the district, he was doing some other

7    role that would put him there?

8        A.    Right.

9        Q.    But not in relation to being that

10   security chief position?

11       A.    No.  Not in the store.

12       Q.    And the other role he did, do you

13   know what it was?

14       A.    I don't know the exact name.

15   He had to deal with security for the district.

16       Q.    Are you aware of the car that

17   Mr. Harris drove?

18       A.    Yes.

19       Q.    What was it?

20       A.    It was -- was it a Dodge Viper,

21   I believe.

22       Q.    Good guess.

23       A.    Okay.

24       Q.    Was there a lot of resentment because

25   he had a nice car?

1          MR. GONZALEZ-LLORENS:  Objection.

2     Speculation.

3          MR. BURTON:  Go ahead.  You can

4     answer.

5          THE WITNESS:  A lot of people were

6     "Wow, he's got a nice car.  He must have a lot

7     of money." A lot of team members... a lot of

8     people.

9     BY MR. BURTON:

10         Q.   Who said that, that you can recall?

11         A.   I don't remember exact names.  I know

12    That it was hearsay throughout the store.

13         Q.   Right.  I see.  So are there certain

14    people who resented a black man driving a Viper?

15         MR. GONZALEZ-LLORENS:  Objection.

16    It assumes unestablished facts.

17         MR. BURTON:  What unestablished

18    facts?  The fact that he's a black man or the

19    fact that he drove a Viper.  And your response,

20    which made no sense, which is the question, which

21    is the last part of it.

22         MR. GONZALEZ-LLORENS:  Actually,

23    my objection is it assumed unestablished facts.

24    That is my objection.

25         You may answer the question.

BY MR. BURTON:

    Q.   Was there any recent sentiment expressed either directly or what you perceived that "What's a black man driving a car like a Viper for"?

    A.   I do not know of anyone stating that statement.

    Q.   Was that a feeling or an undercurrent?

    A.   Nobody ever actually said "a black man driving a Dodge Viper." No one actually stated that statement.

    Q.   But a person who works at Target driving a Dodge Viper... Expensive sports car.

    A.   No.  Just saying that he has an expensive sports car like that.  Yes.

    Q.   Okay.  Did anyone resent that issue?

        MR. GONZALEZ-LLORENS:  Objection.

        MR. BURTON:  That you are aware of that you could perceive.

        MR. GONZALEZ-LLORENS:  Object. Speculation.

        THE WITNESS:  I don't think so.

BY MR. BURTON:

    Q.   Do you know Betty Gadsen?

1          A.    Yes, I do.

2          Q.    Who is she?

3          A.    Cashier supervisor of front lanes.

4          Q.    Would she have been been a

5    contemporary of yours like Shannon Tetrault or

6    like -- excuse me -- would she have been a

7    contemporary of yours like Karen Napp, or would

8    she have been a higher level or lower level?

9          A.    She was like what Karen Napp was.

10         Q.    And do you know what relationship, if

11   any, she had with Mr. Harris?

12         A.    She was an employee in an executive

13   position, is all I know of.

14         Q.    You never heard of anything bad,

15   good, bad or indifferent or otherwise?

16         A.    No.

17         Q.    And you never saw Mr. Harris treat

18   her in anything but a professional fashion;

19   did you?

20         A.    No.

21              MR. BURTON:    I have nothing further

22   of this witness at this time.   You're free to

23   cross

24                    CROSS-EXAMINATION

25   BY MR. GONZALEZ-LLORENS:

1          Q.   Yes, I have some quick questions.

2               I was a bit unsure what -- excuse

3    me.  I have a cold.

4               Did you supervise Mr. Fankhauser?

5          A.   No, I did not.

6          Q.   Did he report to you in any way?

7          A.   No, he did not.

8          Q.   Did you have any duty to check his

9    schedule at all?

10         A.   No, I did not.

11              MR. GONZALEZ-LLORENS:  That's it

12   thank you.

13              MR. BURTON:  Now, ma'am, under the

14   rules -- and you see we were very civil, weren't

15   we?  When we asked the questions?

16              THE WITNESS:  Yes.

17              MR. BURTON:  (Continuing) -- you

18   have the right to read and sign this and say this

19   is what I said or you can read it and say, well,

20   gee whiz I meant to say there... T-H-E-R-E... and

21   he put their; and you can do an addendum or

22   errata sheet at the back.

23              Because you're not a witness

24   represented by an attorney, I can't tell you

25   whether you should read it or you should say,

1    I believe this man, who is not related to any one

2    of us, did it properly, and you can waive the

3    reading and we'll file it anyway.

4              The majority of people who

5    weren't involved customarily don't read these

6    things because this man is neutral, I think we

7    both agree, and he's just taking down the words

8    to the best of his ability.

9              Having said that, do you wish to

10   read and get notification within 10 days and wish

11   to read and sign it or do you wish to waive it.

12             MR. GONZALEZ-LLORENS:  We request

13   that she read it.

14             THE WITNESS:  I would like to

15   actually read it, then.

16             MR. BURTON:  He will send you at you

17   your own address -- because they're not your

18   attorney -- he will send you a notification to go

19   to his office to go to Miami and you will have 10

20   days to be there and perform this errata sheet.

21             Obviously, you can't change any one

22   of the words or let either one of us tell you it

23   should be this or should be that, or it should be

24   blank, but to see that he took down properly the

25   words and sign it under oath and it will then be

1  used.  If you don't sign it, it won't be used.

2                    Thank you for your time?

3                    THE REPORTER:  Counsel, do you need

4  a copy?

5                    MR. GONZALEZ-LLORENS:  Yes, please.

6                    DEPONENT

7  Subscribed and sworn to before me this _____

8  day of _____ 2000.

9  My Commission expires:_____

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE OF REPORTER

STATE OF FLORIDA    :

                    :  SS.
COUNTY  OF  DADE    :


        I, ELLIOTT MARSHALL, A.S., RPR, being a
Notary Public in and for the State of Florida at
Large, do hereby certify that I reported the
deposition of SANDRA ROSENBERG, a witness called
by the PLAINTIFF in the above-styled cause; that
the said witness was duly sworn by me; that the
reading and subscribing of said deposition were
not waived by the witness and by counsel for the
respective parties; and that the foregoing pages,
numbered from 1 to 57, inclusive, constitute a
true and correct transcription of my shorthand
report of the deposition by said witness.

        I further certify that I am not an attorney
or counsel of any of the parties, nor relative or
employee of any attorney or counsel connected
with the action, nor financially interested in
the action.

        WITNESS my hand and official seal in the
City of Miami, County of Dade, State of Florida,
this 28th day of October, 2000.


ELLIOTT MARSHALL, A.S., RPR
My Commission Expires 5-19-2001


ELLIOTT MARSHALL COMORA
MY COMMISSION # CC 846732
EXPIRES: May 19, 2001
Bonded Thru Notary Public Underwriters

Worldwide Reporting Service
Miami ∞ Orlando ∞ Tampa



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

CASE NO.   00-6107 CIV-FERGUSON

STEVE HARRIS,

       Plaintiff,

vs.

DAYTON HUDSON CORPORATION,
d/b/a TARGET STORES,

       Defendant.
_____/

ORIGINAL

February 15, 2001
Wednesday - 11:05 a.m.
Suite 313
3475 Sheridan Street
Hollywood, Florida 33021

DEPOSITION

OF

ERICA A. LYDAY

TAKEN ON BEHALF OF THE PLAINTIFF

2

1

2                        APPEARANCES

3
                   RICHARD J. BURTON, ESQ.,
4                  on behalf of the Plaintiff.

5
                   RENE GONZALEZ-LLORENS, ESQ.,
6                  of the law firm of
                   Shutts & Bowen,
7                  on behalf of the Defendant.

8
                        ALSO PRESENT
9
                        STEVE HARRIS
10

11

12                   - - - - -

13

14

15                         INDEX

16    WITNESS                       DIRECT    CROSS

17    ERICA LYDAY
           (By Mr. Burton)              3
18         (By Mr. Gonzalez-Llorens)            42

19

20

21                        EXHIBITS

22    PLAINTIFF'S EXHIBITS            PAGE
       FOR IDENTIFICATION
23
            1                         37
24

25

1    THEREUPON:

2                        ERICA A. LYDAY

3    a witness named in the Notice heretofore filed,

4    having been first duly sworn, deposes and says on

5    her oath as follows:

6                        DIRECT EXAMINATION

7    BY MR. BURTON:

8         Q.    Have you ever given a deposition before?

9         A.    No.

10        Q.    Have you ever been involved in a legal

11   proceeding in court, like you go before a judge for

12   a traffic ticket?

13        A.    I just got off jury duty.

14        Q.    Then you saw much to much of it.  Did

15   you ever get on a jury?

16        A.    Yes.  I was on a jury.

17        Q.    You saw when the judge asked questions

18   or when the attorneys asked questions, either of you

19   or of the witnesses.  He wanted the question to be

20   read out before the person answered and then he

21   wanted you to answer verbally, because he can't take

22   down "Huh, huh" or "Nuh, nuh."

23        A.    Right.

24        Q.    And when the judge asked you questions

25   and the attorneys asked you questions when they

4

1    asked you questions to seat you as jurors, they also

2    asked you to answer verbally, correct?

3         A.    Correct.

4         Q.    Same reason.

5         A.    Okay.

6         Q.    I don't want you to guess at something,

7    but I do want you to use your best memory and

8    estimate.  In other words, if you're just guessing

9    at something don't answer it.  If you're saying "I'm

10   not positive, but I'm fairly certain I heard it,"

11   that's fine, or "I didn't hear it, but I heard so

12   and so say it." That's fine.  This is a deposition

13   and we're here to find out what happened.  I just

14   don't want you to say, "Well, I never heard of that,

15   but if anyone would have said it, it would have been

16   so and so," unless you have a real good reason for

17   saying that.

18        A.    Okay.

19        Q.    Fair enough?

20        A.    Okay.

21        Q.    What I'm going to ask you are questions

22   about Target, and let's start with your name.

23   Please state your name for the record.

24        A.    Erica Ann Lyday.

25        Q.    What is your address?

5

```
 1          A.    1366 Northwest 14th Court, Boca Raton,
 2     Florida.
 3          Q.    Is that an apartment or house?
 4          A.    A house.
 5          Q.    Do you reside with anyone there who is
 6     over the age of fifteen years old?
 7          A.    Yes.
 8          Q.    Who is that?
 9          A.    My husband.
10          Q.    What is his name?
11          A.    Douglas Lyday.
12          Q.    Who is your current employer?
13          A.    Target Stores.
14          Q.    Did you have a meeting with Target's
15     lawyers, like this gentleman sitting next to you,
16     yesterday or any time in the past?
17          A.    I met Rene yesterday.
18          Q.    Where?
19          A.    At an office.  I know that wasn't his
20     office.  It was an office off of Broward Boulevard
21     in the First Union Building just to meet him and say
22     "Hi."
23          Q.    Did he ask you what you knew about
24     Mr. Harris?
25          A.    No.  He told me what to expect here
```

6

1    today.

2         Q.    What did he say?

3         A.    For me to relax.  For me to think about

4    each question and then answer it truthfully and

5    don't read into anything or add to anything.

6         Q.    Did he ask you about what you knew about

7    Mr. Harris?

8         A.    No, he didn't ask.

9         Q.    Then let's proceed, and I agree with his

10   instructions.  Is that the first time you had been

11   contacted by someone from Target about this matter?

12        A.    No.

13        Q.    When other time?

14        A.    I did receive an e-mail from Sheila

15   Roach just stating that I would be contacted by

16   Margaret Bradley Davis concerning a deposition.

17        Q.    Just as to time, location and date?

18        A.    That was it.

19        Q.    When is the first time you heard that

20   Steve Harris had brought suit against Target?

21        A.    Simone Tripp

22        Q.    Who is Simone Tripp?

23        A.    She left Target a couple months ago.

24   She was a team leader.

25        Q.    What had she told you about this?

1          A.    She had just told me that she had been

2     subpoenaed.  She had contacted me.  This was right

3     before she left.  She contacted me telling me that

4     she had been subpoenaed, and I told her "Okay,

5     whatever time you need off," and she said, "I'm

6     going to need this day or this day," because I was

7     handling all the scheduling.  That was the first I

8     heard of it.

9          Q.    Ms. Lyday, you work in what position

10    for Target?

11         A.    Team relations.  It's human resources

12    executive for the Boca Raton store.

13         Q.    Have you been at that store

14    continuously?

15         A.    I opened that building in 1991, and I've

16    been in that building since.  I never left.

17         Q.    And you've been the human resources

18    director effectively?

19         A.    Yes.

20         Q.    Prior to today, had you ever worked

21    with Steve Harris in the store?

22         A.    He worked in the Boca store.

23         Q.    When more or less?

24         A.    I'm trying to think.  It was about

25    four years ago.

8

1       Q.    1996, '97?

2       A.    Somewhere in there.

3       Q.    What do you recall his position to have

4    been?

5       A.    He was the soft lines executive team

6    leader, soft lines meaning women's

7    clothing, shoes, the soft side of the store,

8    the soft things.

9       Q.    How long was he at the store?

10      A.    I'm trying to think.  We have been

11   through so many executives in that building,

12   especially lately.  I'd say about a year.

13      Q.    When he was at the Boca store there was

14   a person who was there under a probation period

15   during the first 90 days that had some disagreements

16   with Steve, correct?

17      A.    Yes.

18      Q.    What was her name?

19      A.    Corrine.  Something like that.

20      Q.    Do you remember?

21      A.    I think it was Corrine.  C-O-R-R-I-N-E.

22      Q.    Do you remember a last name?

23      A.    I don't remember.

24      Q.    She was within her probation period,

25   correct?

9

| | |
|---|---|
| 1 | A. Yes. |
| 2 | Q. Who was she assigned to work with, if |
| 3 | you recall? |
| 4 | A. She worked in a couple of different |
| 5 | areas. She was on the price change team. She |
| 6 | worked on the sales floor. |
| 7 | Q. As I understand it, it's Target policy |
| 8 | that someone within their first 90 days is virtually |
| 9 | dismissible for anything, correct? |
| 10 | A. Pretty much. |
| 11 | Q. That's a yes, pretty much? |
| 12 | A. Yes. |
| 13 | Q. And Corrine was terminated by Steve in |
| 14 | the first 90 days, correct? |
| 15 | A. No. |
| 16 | Q. Please tell me what you recall of the |
| 17 | incident. |
| 18 | A. She asked to go on a leave of absence. |
| 19 | Q. Within the first 90 days? |
| 20 | A. Yes. I had told her, no, that she |
| 21 | couldn't. |
| 22 | Q. And? |
| 23 | A. And she got very quiet. She didn't want |
| 24 | to speak to me. I asked her what was upsetting her |
| 25 | and she said she didn't want to speak to me. She |

1    had a girlfriend that worked there.  Her name was

2    Brandy, and then she told me that Brandy would be

3    speaking to me.  Brandy did come and talk to me.

4         Q.    What did Brandy say?

5         A.    Brandy felt that Corrine had felt

6    uncomfortable with Steve, that Steve had made some

7    comments to her or some advances towards her that

8    she took as invading her space.

9         Q.    She didn't say the reason was that she

10   was ever touched?

11        A.    No.  Brandy didn't tell me that

12   Corrine had told her that she had been touched.

13   Another girl had come forward and said that she had

14   seen that Steve was touching her.

15        Q.    Who was that?

16        A.    Her name was Laura Blackler.

17        Q.    So Corrine said she wanted a leave of

18   absence.  You said no.  She said, "My friend Brandy

19   will tell you."  Brandy said that, in essence,

20   Corrine had felt that Steve had, quote, invaded her

21   space, whatever that meant.

22        A.    Right.

23        Q.    And that was the sum and substance of

24   it.

25        A.    I do remember I asked her to please

1   write a statement so I could see exactly what she
2   was talking about to make sure nothing was being
3   misconstrued.  Brandy worked, at the time, in the
4   food area.  We have a little snack bar type area.
5   She was behind the counter.  The lights had gone
6   out.  The weather was kind of rocky and the lights
7   had gone out in the building for a brief period of
8   time.  Brandy had heard Steve say, "Oh, the lights
9   went out" -- because he was sitting across from
10  Corrine and some other people -- "Isn't this
11  romantic" or something.

12          Q.    He said this to a group of people
13  sitting at the table.

14          A.    Yes.

15          Q.    Anything else that you recall that he
16  supposedly was saying, other than when the lights
17  went out "Isn't this romantic" in a group of people?

18          A.    Laurie Wagner had come to me and asked
19  me that she wanted to say something.  I don't know
20  if Brandy had gone to Laurie or why Laurie had gone
21  to me.

22          Q.    You weren't looking for anything, but a
23  Laurie Wagner went to you unsolicited for no reason
24  you could think of and said that she had seen
25  Steve --

1          A.    Well, she was sitting in the break room
2     upstairs.  It's a two-story building.  The offices
3     are upstairs.  She had been sitting in the break
4     room and Steve had made some type of a comment to
5     Corrine in front of people and Laurie was there, and
6     I guess he had put his arm on her shoulder.
7          Q.    You're touching the top tip of your
8     shoulder.
9          A.    Yes.  That was it.
10         Q.    That she had seen him reach and touch
11    the tip of her shoulder.
12         A.    Yes.
13         Q.    And that was the only thing that you
14    heard from Laurie.
15         A.    Yes.
16         Q.    Anything else regarding anything that
17    rises to the level of what could euphemistically be
18    called inappropriate conduct, other than the comment
19    in front of a number of people isn't it romantic
20    when the lights went off and touching the tip of the
21    shoulder of an employee, that you can recall?
22         A.    There was another employee that had come
23    to me.  She was in security at the time.  Her name
24    was Liza, L-I-Z-A.
25         Q.    What did she say?

1          A.      She also wrote a statement.  She had

2     told me that Corrine was going to go on vacation

3     with her boyfriend or finance or someone that she

4     was seeing, and Steve got upset with her and said,

5     "I didn't think you had a boyfriend and why would

6     you lie to me about this," and this type of thing

7     and that he had been calling her at home.

8          Q.      Liza said that she heard it or was told

9     it?

10         A.      That Corrine had told her this.

11         Q.      So Corrine had said, quote, "You're

12    going on vacation with a boyfriend.  You don't have

13    a boyfriend.  Why would you tell me?  You're lying

14    to me."

15         A.      Right.

16         Q.      During the first 90 days you're not

17    allowed to take a vacation, are you?

18         A.      You could request days off.

19         Q.      But a vacation meaning more than a day

20    or two off would require someone's permission,

21    wouldn't it?

22         A.      Yes.

23         Q.      Did you ever ask Corrine if she intended

24    to take a vacation and was denied it by Steve?

25         A.      No.  Corrine just stopped showing up for

14

1    work.

2         Q.   So she stopped showing up for work --

3         A.   Yes.

4         Q.   -- even after this was done she didn't

5    come back to work.

6         A.   No.

7         Q.   Did she ever come back to work?

8         A.   No.

9         Q.   Didn't she get rehired by the chain

10   after Steve was transferred?  Do you know if she

11   ever came back to work at any store?  Ma'am, isn't

12   it fact that both she and her sisters were rehired

13   after Terry Gillespie got involved and after

14   Mr. Frankhauser got involved?

15             MR. GONZALEZ-LLORENS:   Assumes

16        unestablished facts.

17             MR. BURTON:   But she's in the Division

18        of Human Relations.

19   bY MR. BURTON:

20        Q.   Isn't it fact that she went back to

21   work?

22        A.   I honestly don't remember if she came

23   back to work or not.

24        Q.   Do you know if her sisters work there?

25        A.   I remember her sister did work there.

1      Q.    Did anyone ever pursue this any further
2      than to take these statements of someone who didn't
3      show up for work again in the first 90 days after
4      having her friend or two make comments about
5      Mr. Harris?  Did you do anything further to check
6      this out, to verify, to give Mr. Harris a chance to
7      respond or anything else?

8           A.    I went to our store manager at the time,
9      his name was Robert, and he had me forward
10     everything up to the regional office to Gillespie to
11     see how he would want to handle it.

12          Q.    Outside of this incident with this
13     particular person, you've never had any other
14     objections by any other women that Steve had tried
15     to in any way acted in an inappropriate sexual
16     fashion in their direction that was ever written up,
17     did you?

18          A.    Yes.

19          Q.    When?

20          A.    It was around the same time period.  Her
21     name was Elizabeth.

22          Q.    What did Elizabeth say?

23          A.    Elizabeth's boyfriend worked in security
24     in our building.  His name was Dan Beatle.

25          Q.    What did he do?  What did he say

16

1    existed?

2         A.    I guess his girlfriend felt intimidated

3    and didn't want to go forward and say anything so

4    Dan went to another executive.  This was before I

5    heard it.  He went to another executive.  His name

6    was Matt Ushenbrenner.

7         Q.    He goes to Matt and says what?

8         A.    That his girlfriend felt very

9    uncomfortable around Steve.  He was asking her out

10   to dinner.

11        Q.    Is this what you were told or did you

12   ever confirm?

13        A.    That is what I was told.

14        Q.    Did anyone bother to take a statement

15   from Elizabeth to find out whether it happened?

16        A.    Yes.  I called Elizabeth and I talked to

17   her.

18        Q.    What did she say?

19        A.    I wrote it down.  She pretty much

20   confirmed what Dan had said.

21        Q.    Did she ever write a statement herself?

22        A.    No.

23        Q.    So I guess what I'm saying is, outside

24   of you documenting it, did you ever have anything

25   written by a third party, other than gossip and

17

1   hearsay, where anybody wrote down something at the
2   time it occurred to say that it was done?
3             MR. GONZALEZ-LLORENS:   Objection
4        argumentative.   Assumes unestablished facts.
5   BY MR. BURTON:
6        Q.   I'm trying to get a fact.   Did you ever
7   have anyone prepare a written statement and hand it
8   to you?
9             MR. GONZALEZ-LLORENS:   As to Elizabeth?
10  BY MR. BURTON:
11       Q.   As to Elizabeth?
12       A.   No.
13       Q.   And as to Corrine, did you find out if
14  she did take a vacation with her boyfriend?
15       A.   I don't know if she did or not.   I don't
16  remember.
17       Q.   Well, not that anyone would ever do
18  this, but as a human relations person you are aware
19  that there is a phenomenon of manipulation that
20  occurs with a lot of women if they don't receive a
21  benefit in their employment claim there has been
22  some disturbance or harassment or discrimination.
23  You've heard of that occurring, haven't you?
24            MR. GONZALEZ-LLORENS:   Objection
25       speculation.

18

1    BY MR. BURTON:

2         Q.    Have you ever heard of that as a trained

3    human relations person, ma'am?

4              THE WITNESS:    I'm sure it exists, yes.

5    BY MR. BURTON:

6         Q.    More than sure it exists.    They teach

7    it, don't they?    This is not an unknown phenomenon

8    in the retail environment or in a office

9    environment, if you don't get what you want a number

10   of people effectively cry rape, don't they?

11             MR. GONZALEZ-LLORENS:    Objection.

12   BY MR. BURTON:

13        Q.    Please answer, ma'am.

14        A.    I guess at the time I was a trainer so

15   we were teaching people not to do that.    I was one

16   of the district trainers on sexual harassment for

17   the company.

18        Q.    The reason you were training these

19   people in fact were known to sometimes accuse people

20   of inappropriate conduct so they could manipulate

21   the system is something that you are trained in in

22   human resources, are you not?

23        A.    Yes.

24        Q.    There are ways that you are trained as a

25   human resources person to try to verify stories so

```
 1    that someone is not disparaged, am I correct?
 2         A.    Correct.
 3         Q.    One of the ways you're trained is to
 4    have that person write a statement, correct?
 5         A.    Yes.  If they felt comfortable in doing
 6    so, yes.
 7         Q.    And if they don't feel comfortable, do
 8    we just let the person disparage people for the rest
 9    of their lives?  What is your next procedure?
10              MR. GONZALEZ-LLORENS:  Objection to the
11         form.
12    BY MR. BURTON:
13         Q.    I know this will sound amazing, but
14    since you've acknowledged some of these things
15    aren't real, what do you do if the person says, "I
16    don't feel comfortable writing it down"?  What is
17    your obligation?
18         A.    I think I got someone to take a
19    statement from Corrine.  I don't remember about
20    Elizabeth, but I think we did get a statement from
21    Corrine.
22         Q.    Most respectfully, everyone's personal
23    space is a subjective view, correct?
24         A.    Yes.
25         Q.    Steve Harris, in you noticed, twice
```

```
1    tapped me on the shoulder while we were sitting here
2    in this deposition.  He bugs me too in that regard.
3    However, I don't think it was sexual.  Have you
4    noticed that certain people their personal space is
5    different than other persons?
6               MR. GONZALEZ-LLORENS:  Objection
7          speculation.
8    BY MR. BURTON:
9          Q.    Is that well known in the human
10   relations field?
11              MR. GONZALEZ-LLORENS:  Objection
12         speculation.
13   BY MR. BURTON:
14         Q.    Answer, ma'am.
15         A.    I'm sure people have different
16   perceptions of what their space is, yes.
17         Q.    And the last person if the world who is
18   going to argue against sexual harassment charges is
19   me.  However, what one person feels comfortable with
20   or considers humorous, and there are lines and there
21   are boundaries, what one person may feel is humor
22   and non-offensive and can be said publicly, another
23   person can be appalled at.  It's a subjective
24   feeling, isn't it?
25              MR. GONZALEZ-LLORENS:  Objection
```

21

1    speculation.

2              MR. BURTON:  She's a trained

3         professional.  Let her answer.

4              MR. GONZALEZ-LLORENS:  Improper

5         hypothetical.

6              You can answer the question.

7              THE WITNESS:  Yes.

8   BY MR. BURTON:

9         Q.   So, ma'am, did anyone go to Steve and

10  say so and so feels uncomfortable with you even

11  mentioning -- strike that.  Did anyone ever ask

12  Steve if these things happened that you know of?

13             MR. GONZALEZ-LLORENS:  Objection.

14             THE WITNESS:  In regards to Elizabeth, I

15        had gone to Matt, Matt Ushenbrenner, because I

16        said, "Matt, an employee brought something to

17        you, brought something to an executive, used

18        open door policy, what did you do?"

19        Q.   And what did he say?

20        A.   He said, "I'm going to talk to Steve.

21  I'll handle it.

22        Q.   Do you know if he ever did?

23        A.   He was very good friends with him at the

24  time.  He gave me his word that he would talk to

25  Steve.  I said, "The perception is out there that

22

```
 1   Steve is harassing people."
 2        Q.    There's a perception out there.  You
 3   just mentioned two instances.  What other instance?
 4   Unless you're just a gossip monger, what other
 5   instances were there?
 6             MR. GONZALEZ-LLORENS:  Objection
 7        argumentative.
 8   BY MR. BURTON:
 9        Q.    Please answer, ma'am.
10        A.    I'm not a gossip monger.
11        Q.    So then how did this occur that there
12   was a perception out there, unless Corrine was
13   manipulating it and telling everyone?  Ma'am?
14             MR. GONZALEZ-LLORENS:  Objection
15        speculation.
16             MR. BURTON:  I'm asking her if she knows
17        how it was out there.
18   BY MR. BURTON:
19        Q.    You just told me about two very, very,
20   very finite people with three finite incidents, the
21   likes of which, most respectfully, doesn't seem like
22   a wave of sexual assault.  I'm asking you do you
23   know who was perpetrating the rumors?
24             MR. GONZALEZ-LLORENS:  Objection to the
25        first part of that question as argumentative.
```

23

```
 1    BY MR. BURTON:
 2         Q.    Do you know who was perpetrating the
 3    rumors?
 4              MR. GONZALEZ-LLORENS:   Objection as to
 5         rumors.  Speculation.
 6              MR. BURTON:   Noted.
 7    BY MR. BURTON:
 8         Q.    Please answer.
 9         A.    No.
10         Q.    Do you know if Matt ever spoke with
11    Steve?
12         A.    No.
13         Q.    Did you ever follow up?  You're human
14    resources.  You're human relations.  Did you ever do
15    anything about it any further?
16         A.    Steve was transferred right after.
17         Q.    I didn't ask that question.  Did you do
18    anything about it?  Did you write it up or ever talk
19    to Steve to find out?
20         A.    No.
21         Q.    Who transferred him, Gillespie?
22         A.    I wasn't sure if it was Gillespie or if
23    it was our district team leader at the time.
24         Q.    Who was that?
25         A.    I think it was Mark.
```

24

1    Q.    Mark Hastings?

2    A.    I think so.

3    Q.    Where did they transfer him to?

4    A.    I think it was 392 in West Palm Beach.

5    Q.    Did you ever do anything to follow up on

6    this Corrine incident?

7    A.    I faxed everything to Gillespie, and he

8    told me that he would take of it from there.

9    Q.    Do you know if anyone ever spoke to

10    Steve?

11    A.    After it was forwarded to the regional

12    office, they handled everything from there.

13    Q.    That wasn't my question?  Do you know?

14    A.    I don't know.

15    Q.    Did you speak to him?  Calls for a yes

16    or no.

17    A.    No.

18    Q.    Do you know if Corrine has a problem

19    with black people, black bosses?  Do you know?

20    A.    No.

21    Q.    Aren't there people that you learn about

22    and study in human resources that have a problem,

23    especially women, taking instructions from black men

24    is a noted common problem?

25            MR. GONZALEZ-LLORENS:  Objection

25

1          speculation.  Improper hypothetical.

2     BY MR. BURTON:

3          Q.    Are you unaware of that?

4          A.    I was not aware of that, no:

5          Q.    What color is Steve's wife?

6          A.    White.

7          Q.    How do you know that?

8          A.    I met her several times.

9          Q.    How many other black executives with

10    white wives are there in the system?

11              MR. GONZALEZ-LLORENS:  Objection

12         speculation.

13    BY MR. BURTON:

14         Q.    That you know of?

15         A.    A friend of mine, Crista Hall.

16         Q.    Is she white or black?

17         A.    She's white.  Her husband is black.

18         Q.    Does she work for Target?

19         A.    Yes.

20         Q.    Where?

21         A.    He's a district loss prevention

22    supervisor.  She's a store manager.

23         Q.    Where.

24         A.    She just moved again.  It's the

25    Bradenton area, Clearwater.

```
 1        Q.   How many in Dade and Broward County
 2   working under Hastings or Gillespie?
 3             MR. GONZALEZ-LLORENS:  Objection
 4        speculation.
 5   BY MR. BURTON:
 6        Q.   That you know of?
 7        A.   I really don't know.
 8        Q.   Do you know of any others as you sit
 9   here today?
10             MR. GONZALEZ-LLORENS:  Objection.  Asked
11        and answered.
12             MR. BURTON:  What was the answer?
13             MR. GONZALEZ-LLORENS:  She answered she
14        didn't know.
15             MR. BURTON:  I asked her if she knows of
16        any.  Calls for a yes or no.
17             MR. GONZALEZ-LLORENS:  She said, "I
18        don't know."
19   BY MR. BURTON:
20        Q.   Can you name the name of one as you sit
21   here today?  It's real simple.  Calls for a yes or
22   no.
23             THE WITNESS:  No.
24   BY MR. BURTON:
25        Q.   Did anyone take a statement of Brandy?
```

27

1        A.    Yes.

2        Q.    In writing?

3        A.    Yes.

4        Q.    And she was the one who verified, if you

5    will, that she heard the conversation?

6        A.    Yes.

7        Q.    That's sitting around the table, "Isn't

8    this romantic."

9        A.    Right.

10       Q.    How many people were in that restaurant

11    at the time?

12       A.    I don't remember.

13       Q.    Certainly more than two of them, because

14    Brandy was there.  Were there more people than that?

15       A.    I don't remember.

16       Q.    Did anyone else try to verify if

17    anything else was said by any of those people?

18            MR. GONZALEZ-LLORENS:  Objection

19        speculation.

20            THE WITNESS:  No.

21    BY MR. BURTON:

22       Q.    Did you instruct anyone to do anything

23    to either verify that it did or didn't happen?

24       A.    No.  I was told to gather up the

25    statements and send them to Gillespie and it would

28

```
 1    be handled from there.
 2         Q.    Do you know if Gillespie has a  problem
 3    with black people?
 4         A.    No.
 5         Q.    What kind of car does Steve drive, do
 6    you know?
 7         A.    No.
 8         Q.    Do you know Mr. Frankhauser?
 9         A.    Yes.
10         Q.    Did you know that he has car envy?
11              MR. GONZALEZ-LLORENS:  Objection
12         speculation.
13              MR. BURTON:  Using the term he used.
14              MR. GONZALEZ-LLORENS:  Assumes
15         unestablished facts.
16    BY MR. BURTON:
17         Q.    Do you know that he has car envy?
18              MR. GONZALEZ-LLORENS:  Same objection.
19    BY MR. BURTON:
20         Q.    Do you know that he's really big on hot
21    cars.
22              MR. GONZALEZ-LLORENS:  Same objection.
23    BY MR. BURTON:
24         Q.    Did you know that?
25         A.    No.
```

29

1        Q.    Did he ever comment to you about how
2    fast your car goes, what kind of engine it has, what
3    kind of torque and thrust it has, how you could
4    afford it?

5        A.    No.

6        Q.    Does Target have a mechanism to check
7    out and give someone an opportunity to respond to
8    statements of purported sexual harassment to find
9    out that it is not just a manipulative employee or
10   something like that, a disgruntled employee or what
11   have you?

12       A.    Yes.

13       Q.    What is it?

14       A.    We are to report everything.  At the
15   time, it was Terry Gillespie.  Right now it's Sheila
16   Roach.  There is someone designated that you report
17   it to.

18       Q.    How does a person who is the recipient
19   of it show it didn't happen?  Is there a mechanism
20   set up so that someone has the right not to be
21   stigmatized?

22       A.    It's to be researched by someone at the
23   regional or district level.

24       Q.    That's not my question.  How does
25   someone who is accused of it respond so that they do

Worldwide Reporting Service
Miami ∞ Orlando ∞ Tampa

30

```
 1   not become stigmatized by someone who might just be
 2   disgruntled?
 3              MR. GONZALEZ-LLORENS:  Objection
 4         speculation.
 5   BY MR. BURTON:
 6         Q.    Do you know what the word stigmatized
 7   means?
 8         A.    Yes.
 9         Q.    What does it mean few?
10         A.    Labeled.
11         Q.    Labeled in an inappropriate fashion?
12         A.    Right.
13         Q.    How does someone who is the person
14   accused in Target's system either try to demonstrate
15   or do something so that they do not become
16   stigmatized by someone who is trying to either
17   manipulate the system or is just crazy?
18              MR. GONZALEZ-LLORENS:  Objection
19         speculation.
20              THE WITNESS:  The whole claim is
21         researched with all the witnesses with the
22         person that feels that they are being
23         stigmatized, as well as the other person.
24   BY MR. BURTON:
25         Q.    Do you know if that happened in that
```

1   case?

2           A.    I was told that it did.

3           Q.    By who?

4           A.    Terry Gillespie.

5           Q.    Do you know what was done to research it

6   to determine whether or not there were other

7   attendees in the restaurant; in other words, if

8   anyone interviewed any of these people?

9           A.    No, I don't know.

10          Q.    Do you know if in fact someone followed

11  up on Corrine to find out if maybe she just wanted a

12  vacation with her boyfriend and was denied it, and,

13  therefore, had a reason or motive to say nasty

14  things?

15          A.    No.

16          Q.    Wouldn't it have been simple enough to

17  find out what she did after she left?

18              MR. GONZALEZ-LLORENS:  Objection.

19          Assumes unestablished facts.

20              MR. BURTON:  Noted.

21  BY MR. BURTON:

22          Q.    Wouldn't that have been a simple way?

23              MR. GONZALEZ-LLORENS:  Same objection.

24  BY MR. BURTON:

25          Q.    In your opinion as a human resources

32

1    person, ma'am.  That's what you do for a living.

2              MR. GONZALEZ-LLORENS:  Same objection.

3              MR. BURTON:  Noted.

4    BY MR. BURTON:

5         Q.   Please, answer.  Wouldn't it have been

6    simple enough to follow up with her and find out

7    what she was actually going to do?

8              MR. GONZALEZ-LLORENS:  Same objection.

9              MR. BURTON:  Noted.

10             THE WITNESS:  My instructions --

11   BY MR. BURTON:

12        Q.   I'm not asking for your instructions,

13   ma'am.  I'm asking you a question.  You're a trained

14   professional, correct?

15        A.   Yes.

16        Q.   My question is wouldn't it have been

17   simple enough to find out what she did after she

18   didn't show up again?

19             MR. GONZALEZ-LLORENS:  Same objection as

20        before, and please let her answer the

21        question.

22             MR. BURTON:  I am.

23             MR. GONZALEZ-LLORENS:  No, you're not.

24        You interrupted her answer.

25             Please answer the question, and take

1       your time answering it.

2    BY MR. BURTON:

3       Q.    And I don't want to know what your

4    instructions are.  I want to know what was done.

5       A.    What was done would have been by my

6    regional.

7       Q.    So you don't know if any follow-up was

8    done, do you?

9       A.    There was no follow-up through me as to

10   what they were doing.

11      Q.    And you never heard of any follow-up

12   they ever did again, did you?

13      A.    They would not have given me that

14   information.

15      Q.    Who do they give that information to?

16   Who speaks to Mr. G.?

17         MR. GONZALEZ-LLORENS:  Who is Mr. G.?

18         MR. BURTON:  Gillespie.  Or any

19      personnel that fits the label of Mr. G.  Who

20      speaks to Mr. G.?

21         MR. GONZALEZ-LLORENS:  Objection vague.

22   BY MR. BURTON:

23      Q.    Do you know who I'm referring to?

24      A.    Terry Gillespie?

25      Q.    Yes.

34

```
1              MR. GONZALEZ-LLORENS:  What was the
2         question?
3              MR. BURTON:  Who speaks to Mr. G. to
4         find out if anything was done about it,
5         period.  It's a simple question.  If she
6         knows, she can say she knows.
7              THE WITNESS:  I don't know.
8              MR. GONZALEZ-LLORENS:  My objection is
9         it's vague.
10   BY MR. BURTON:
11        Q.    Ma'am, did anyone ever offer this
12   woman to work in any other store, department or
13   shift?
14        A.    I don't remember.
15        Q.    Did you?
16        A.    I don't remember.
17        Q.    You don't remember if you offered her to
18   make sure she's on a shift that he isn't there?
19        A.    I don't remember.
20        Q.    Are you authorized to make such an offer
21   as the human resources person?
22        A.    Yes.  We can move people around.
23        Q.    Did it ever occur to you to do that as a
24   possible amelioration of this so that you could
25   determine whether a person who might be a good
```

35

```
 1     worker has a real problem versus someone who wants a
 2     vacation?
 3               MR. GONZALEZ-LLORENS:  Objection.
 4          Assumes unestablished facts.
 5               MR. BURTON:  Noted.
 6     BY MR. BURTON:
 7          Q.   Please, answer.
 8          A.   No.  She left.
 9          Q.   Did you ever write her a letter saying
10     "We can work something out"?
11          A.   No, I did not write her a letter.
12          Q.   Did you tell Brandy that you could give
13     her a different shift?
14          A.   No.
15          Q.   Why didn't you tell Brandy that?
16               MR. GONZALEZ-LLORENS:  Objection.
17          Assumes unestablished facts.
18     BY MR. BURTON:
19          Q.   Please, answer.
20          A.   I just remember her leaving before I
21     could really say anymore about it to anything.
22          Q.   Was she angry at you?
23               MR. GONZALEZ-LLORENS:  Objection
24          speculation.
25               THE WITNESS:  No, there was no anger
```

36

1          towards me.

2     BY MR. BURTON:

3          Q.    Did she ever file an EEO claim?

4          A.    Not that I'm aware of.

5          Q.    You're sure you don't remember her being

6     rehired at the same store after he was gone and she

7     quit again?

8          A.    I honestly don't remember.

9          Q.    Does Brandy still work there?

10         A.    Brandy does not work at Target anymore.

11         Q.    What were the circumstances surrounding

12    her leaving?

13         A.    Her brother's death.

14         Q.    Did she move someplace or something?

15         A.    Her brother died.  She ended up picking

16    up two other jobs.  It was something around her

17    brother's death.

18         Q.    Is there a requirement or procedure,

19    because you were talking earlier, you said there was

20    a requirement or procedure to document things when

21    there is an incident.

22         A.    Yes.

23         Q.    I'm going to show for the purpose of

24    this these statements.  I don't know who obtained

25    them, but there seems to be some statements here,

```
 1   witness statements.  One of them is your own.  This
 2   is your handwriting, correct?
 3        A.    Yes.
 4        Q.    Your statement consists of four pages.
 5              Isn't it a fact that Laurie said she
 6   never saw him touch her according to this statement,
 7   that she was told that by Corrine, but she never saw
 8   it?
 9              MR. GONZALEZ-LLORENS:  Can you show her
10        the statement?
11              MR. BURTON:  Yes.  It says on the first
12        page that she didn't see it.  She said she was
13        told it, but she never saw it.
14              MR. GONZALEZ-LLORENS:  Let's mark this
15        as Exhibit Number 1.  Let me read it.
16              MR. BURTON:  This is cross-examination.
17              MR. GONZALEZ-LLORENS:  It is, but you
18        show it to the lawyer on the other side.
19              MR. BURTON:  You gave it to my.
20              MR. GONZALEZ-LLORENS:  I know, but let
21        me read the statement.  Give me a second.
22              (The document referred to was thereupon
23              marked "Exhibit No. 1 for
24              Identification.")
25   BY MR. BURTON:
```

38

1          Q.    Isn't it a fact that she said she never

2     saw?

3          A.    Yes.

4          Q.    So then earlier about what she said she

5     saw was an error, was an error in your memory.

6     Correct, ma'am?

7          A.    Correct.  She must have told me that

8     Corrine had said that.

9          Q.    So as you're sitting here you don't know

10    anyone who ever saw him touch her at all or said

11    they did, do you?

12         A.    That saw, no.

13         Q.    And since you told me that Corrine had

14    left and you've never spoken again, how did you

15    obtain the statement from her?  You said you didn't

16    know what she did afterward, you didn't follow up on

17    it, so I would like to know how you got this piece

18    of paper?

19         A.    We all have those statements.  We all

20    have the witness copies.  Any executive at anytime

21    could have someone take a statement.

22         Q.    But you told me she went to the store,

23    you couldn't talk to her, you couldn't ask her and

24    she just left.  Right?

25         A.    Yes.  She didn't feel comfortable coming

1    to me.

2            Q.    Do you know why someone else interviewed

3    her approximately sometime thereafter, Ron Repleo?

4    Who is he?

5            A.    At the time, he was an executive over

6    loss prevention in our building.  He's no longer

7    with Target.  Liza worked under him and asked for

8    his protection.

9            Q.    They were the security force.

10           A.    Yes.

11           Q.    So security went there to document these

12    things.  In fact, he witnessed your statement,

13    didn't he or didn't he?  Was he there when you wrote

14    it?

15           A.    Yes.  The reason why is because his was

16    the only office with a door.  We have upstairs

17    cubicles.  He was there.

18           Q.    Let me ask you a question.  When did you

19    get Corrine to come back and give her statement?

20                 MR. GONZALEZ-LLORENS:  Objection

21           speculation.

22                 THE WITNESS:  I'm not sure.

23    BY MR. BURTON:

24           Q.    Do you know if he ever verified whether

25    or not she just was going on vacation?

40

```
 1              MR. GONZALEZ-LLORENS:  Same objection.
 2              THE WITNESS:  I don't know.
 3    BY MR. BURTON:
 4         Q.   Didn't they let Ron go for harassment,
 5    for sexual harassment?
 6              MR. GONZALEZ-LLORENS:  Object
 7         speculation.
 8              THE WITNESS:  I don't know why they let
 9         Ron go.
10    BY MR. BURTON:
11         Q.   You do know that he was dismissed and
12    terminated?
13         A.   No.
14         Q.   You know he's no longer there and not on
15    a voluntary basis?
16              MR. GONZALEZ-LLORENS:  Object
17         speculation.
18              THE WITNESS:  I do not know that either.
19    BY MR. BURTON:
20         Q.   What race is Ron?
21         A.   White.
22         Q.   When did he cease being an employee of
23    Target?
24         A.   I don't know.  He wasn't with our
25    building anymore.  He had been transferred so I
```

41

1    don't know the date.

2        Q.    When he took this statement was he with

3    your building?

4        A.    Yes.

5        Q.    So he's in your building, he's

6    transferred, and then you hear he's gone.

7        A.    Yes.

8        Q.    All within a year.

9            MR. GONZALEZ-LLORENS:    Objection.

10        Assumes unestablished facts.

11   BY MR. BURTON:

12        Q.    Is that basically correct?

13            MR. GONZALEZ-LLORENS:    Same objection.

14            THE WITNESS:    I don't know the time

15        frame.    What we were told?

16   BY MR. BURTON:

17        Q.    Yes.

18        A.    He had left to pursue other career

19   opportunities.

20        Q.    But yet there was a rumor as to why

21   Steve was no longer with the company, wasn't there?

22            MR. GONZALEZ-LLORENS:    Object

23        speculation.

24            THE WITNESS:    I was told the same

25        thing -- they don't tell you anything -- that

42

1          person has left to pursue other career

2          opportunities.  I honestly thought that he

3          left on his own.

4     BY MR. BURTON:

5          Q.    So then your store apparently doesn't

6     spread rumors is what you're telling me, correct?

7               MR. GONZALEZ-LLORENS:  Objection

8          argumentative.

9               THE WITNESS:  We weren't told anything

10         else.

11              MR. BURTON:  I'll have this marked as an

12         attachment to this deposition as Exhibit

13         Composite 1.

14              MR. BURTON:  I have nothing further.

15                    CROSS EXAMINATION

16    BY MR. GONZALEZ-LLORENS:

17         Q.    You were not involved in the

18    investigation on the allegations of sexual

19    harassment against Mr. Harris, correct?

20         A.    No.  Once it was sent to regional, that

21    was it.

22         Q.    And regional was Mr. Terry Gillespie,

23    correct?

24         A.    Yes.

25         Q.    And Mr. Terry Gillespie undertook the

43

1    investigation; is that correct?

2            MR. BURTON:  Objection speculative.

3        She's guessing that he did.

4            THE WITNESS:  To the best of my

5        knowledge, yes.  I told him when we forward

6        everything to Gillespie, he handles it.

7    BY MR. GONZALEZ-LLORENS:

8        Q.    And who did you forward it to?

9        A.    Terry Gillespie.

10       Q.    Is that the person who at the time was

11   the individual who you would forward allegations of

12   sexual harassment to?

13       A.    Yes.

14       Q.    When you forwarded an allegation of

15   sexual harassment to Mr. Gillespie, were you

16   required to conduct an independent and separate

17   investigation?  Let me rephrase that.  Once you gave

18   the documents to Mr. Gillespie were you required to

19   separately investigate the allegations or was

20   Mr. Gillespie in charge at that point of

21   investigating or designating someone to investigate

22   the allegations?

23           MR. BURTON:  Objection.  She Is

24       speculating.

25           THE WITNESS:  I was not in charge of

44

1      that.  I was not put in charge of that.

2   BY MR. GONZALEZ-LLORENS:

3      Q.   These statements that are marked as

4   Composite Exhibit 1, when was the last time you

5   reviewed these statements?

6      A.   It was 1996.

7      Q.   So you haven't seen these statements for

8   the past five years?

9      A.   No.

10          MR. GONZALEZ-LLORENS:  I have no further

11          questions.  She'll waive.

12          (Thereupon, the deposition was concluded

13          at 11:50 a.m.)

14

15

16

17

18

19

20

21

22

23

24

25

45

1                    CERTIFICATE OF NOTARY

2    STATE OF FLORIDA:

3                 :    SS.

4    COUNTY  OF  DADE:

5         I, STEVEN WASSERMAN, a Notary Public and

6    certified Shorthand Reporter in and for the State of

7    Florida at Large, do hereby certify that I reported

8    in shorthand the deposition of ERICA A. LYDAY

9    pursuant to Notice of Taking Deposition, on behalf

10   of the Plaintiff; that the witness was first duly

11   sworn by me; that the reading and signing of the

12   deposition were waived by counsel for the deponent;

13   was waived by the deponent; that the foregoing

14   pages, numbered from 1 to 44, inclusive, constitute

15   a true and correct transcript thereof.

16        I further certify that I am not an attorney or

17   counsel to any of the parties, nor related to any of

18   the parties, nor financially interested in the

19   action.

20        WITNESS my hand and seal this 9th day of March,

21   2001.

22

23

24                    STEVEN WASSERMAN
                      NOTARY PUBLIC
25        My commission expires April 20, 2002

                   STEVEN WASSERMAN
                   My Commission # CC 820596
                   Expires: 04/20/2003
                   Fla. Notary Service & Bonding Co
                   1-800-3-NOTARY

SUPPLEMENTAL STATEMENT    Store No. 638

| ☐ Narrative Supplement | Name Subject # 1 _____ |
| | Name Subject # 2 _____ |
| ☐ Witness Statement: | Name Corinne hobbins Address _____ Phone _____ |
| | Employer C. hobbins ____ Date ____ Time ____ DOB 3-23-7 |

Narrative/Statement: Steve Harris asked me if I was married. I told him yes. A couple weeks later I asked for a vacation and on the paper I wrote fiance. Surprised me. With tickets. So Steve called my friend Brandy into his office, and was asking her all kinds of questions like why did Corinne lie to me? he asked her for my home phone # where I live with my fiance, & he kept calling my house trying to find out why I lied to him. But I avoided all his phone calls because I was newous & didn't know what this had to do with my Boss or the way I perform my job. So, the next day I came to work and he confronted me. Why did you lie to me? And things to that effect. On another occassion in food Ave, he sat me down and started talking to me in the course of this conversation he asked for me & my daughter to come live with him to coach me a week and he would make a responsible women out of me. Another time in food Ave he sat me down for another 50 min talk and the lights went out and came right back on and he said to me, "Oh, I was just about to get romantic."

Witnesses: Ron Raploe AFL    Report/Statement by Corinne Hobbin

EXHIBIT    Position/Title ____

Page 1 of 2    2/5/01    1    Target/Harris 249

SUPPLEMENTAL STATEMENT

| ☐ Narrative Supplement | Name Subject #1 _____<br>Name Subject #2 _____ |
|---|---|

☐ Witness Statement:
Name _____ Address _____ Phone _____
Employer Corinne Robbin Date _____ Time _____ DOB _____

Narrative/Statement: One time he called me in his office, and I can't remember what for but while I was up there, I complemented his wife. I said "Is that your wife, she's pretty." And Steve said "yeah pretty fucking ugly!" And there are other occasions. Where, he said little things like always complimenting me, not on how I work & how I good I'm doing at my job. But, how I look & personal things. He would always put his arm around me. He always made me feel uncomfortable. He would brag to me about his possesions (his car and how his wife. can't go out on it because of the baby & she's rabius. He told me about his personal realationships with other women. (His ex-wife) Things my other BOSS'es don't take me, out of work to talk to me about.

Target/Harris 250

Witnesses: Don Rankio APTL
_____

Report/Statement by Corinne Robbin
Position/Title _____

Page 2 of 2

| ☐ Narrative Supplement | Name Subject #1 _____ |
| | Name Subject #2 _____ |

| ☐ Witness Statement: | Name ERIKA Lyday Address _____ Phone _____ |
| | Employer _____ Date _____ Time _____ DOB _____ |

Narrative/Statement: _____

On Monday, Sept 9, Mary Dent of Florence Fuller's office called to ask me when I would like to arrange the check presentation for the press. Target had given them a $4000.00 check, for their parent-service projects. I asked her if there were any events coming up, that I would make an appearance. She told me that she would get back with me.

She then, told me that she felt really good that she was able to accommodate one of our employees. That given though she had not met him, she had met his wife and were able to take his two girls for the summer. She mentioned that because of everything Target had done for the low-income daycare center that she felt good about helping one of our employees. I asked her, who the employee was — she said Steve Harris, my jaw almost hit the floor. I ended the phone call telling her that I would look at me schedule) and she could look at upcoming events, and we could arrange a date and time for the check presentation. Florence Fuller is a daycare for economically-disadvantaged families, scholarship level, major waiting list to get your child in the school.

Witnesses: Ron Rylee APTI

Report/Statement by _____
Position/Title _____

F1343.24 (Ed. 6-85)

Target/Harris 251

**TARGET**

-08107-WDF

| ☐ Narrative Supplement | Name Subject # 1 _____ |
|---|---|
| | Name Subject # 2 _____ |

| ☐ Witness Statement: | Name ERIKA Lyday Address _____ Phone _____ |
|---|---|
| | Employer _____ Date _____ Time _____ DOB _____ |

Narrative/Statement: Right after the birth of Steve Harris's son Steve, Steve came to me to let me know that his wife Janice had given notice at the Michael store Tal.A. He asked if both she and Steve could. He added to his insurance. I gave him. The Prudential change form, and told him to fill out the information needed and to give back to me A.A.P. I then called Lori Lee at 7642 and had her to fax me over a statement of last coverage along with the last date of employment. The next day, Steve brought me back the Change form, showing Kimsell, Janice, Steve, and two other children. I asked him if the girls lived with them. He said yes, that he now had residential custody and that the children were enrolled in Sand piper Shores elementary school. I asked him if this arrangement was permanent. He said yes, that he did not have to pay Child Support any longer because they lived with him. I explained to him that Prudential would not cover the children if they lived in another country, that routine care would the non-existent. He explained that the children did not do well at all in Canadian schools, and were happy here, as the benefits administrator for the store, I just wanted to let him know of any stipulations. On Saturda

Witnesses: Ron Ryder APTL

Report/Statement by _____

Position/Title _____

F1343.24 (Ed. 6-85)

Target/Harris 252

☐ Narrative Supplement

Name Subject # 1 _____

Name Subject # 2 _____

☐ Witness Statement:

Name ERIKA Lyday  Address _____ Phone _____

Employer _____ Date _____ Time _____ DOB _____

Narrative/Statement: September 14, 1996 both Ron Rapley and Raul Bizerra told me at different times of the day that Steve Childers rebede lien Minela. They do not live here, and Steve does not have custody. Apparently one day last week Steve was eating breakfast and one of our llevel II's, Marla Paul, asked him how his kids were doing. He told her in front of David Jereerng that the kids live in Canada with their mother. That she wanted them in Canada, and he did not have a problem with the arrangement.

Target/Harris 253

Witnesses: Ron Rapley APTL

Report/Statement by _____

Position/Title _____

Page 3 of 3

**SUPPLEMENTAL STATEMENT**

☐ Narrative Supplement

Name Subject #1 _Steve Harris_
Name Subject #2 _Corrine Roberts_

☐ Witness Statement:

Name _Laurie Wagner_ Address _____ Phone _____
Employer _____ Date _____ Time _____ DOB _____

Narrative/Statement: ___ I was never present when Steve Harris touched Corrine Roberts. She was working with us on the pull team and did come to our team at breaktime to tell us how Steve Harris put his arm around her while explaining something he wanted her to do. She joked about it but you could tell that it bothered her.

I do remember one other instance where we were having a conversation with Steve Harris and Somehow he brought up how he wanted to take Corrine Roberts home. I can't really remember how this came up in conversation but we all felt it was odd & inappropriate.

**Target/Harris 254**

Witnesses: _Ron Rylee APTL_

Report/Statement by _Laurie Wagner_
Position/Title _Pull team_

Page _1_ of _1_
F1343.24 (Rev 6-85)

| ☐ Narrative Supplement | Name Subject # 1 _____ |
| | Name Subject # 2 _____ |

| ☐ Witness Statement: | Name Brandy Svoboda _____ Address _____ Phone _____ |
| | Employer Target _____ Date _____ Time _____ DOB _____ |

Narrative/Statement: I was in food ave behind the cash register and saw Steve Harris and Corine Robbins talking. The lights whent out for a few seconds and came back on. Steve Harris noted ah we were having a romantic dinner which corine said made her fell uncomfortable. I was also interview for my level 3 position in Steves office with him when he saw a pice of paper that was request for time off that had corine name on it. It had read she need Time off to go away with her fiance for a few weeks. He said she told me she was married she did he asked me to wait a few minutes and tried to call her she was not home at the time and I thout that was odd of

Target/Harris 255

Witnesses: _____

Ron Rylee APTL

Report/Statement by Brandy Svoboda

Position/Title Food Ave Team Lea

Page 1 of 1

F1343.24 (Ed. 6-85)

☐ Narrative Supplement

Name Subject # 1 _____
Name Subject # 2 _____

☐ Witness Statement:

Name LIZA J. ARRONDO  Address 9290 NW 40 ST CS  Phone 341-3140
Employer TARGET  Date 9-16 Time 12:00pm DOB 08/05/70

Narrative/Statement: The other day I was walking Brandy out to her car in order to say 'hello to Corrine's daughter. I asked Corrine if she was going to return to work or if she had quit. She then informed me that she was not returning to work until Steve's tranfer was complete. I asked her why. She then stated to me that Steve was harassing her & that was why she took a leave of absence. I told her she should have told an executive like Erika or Robert or David. She said that she was afraid she would loose her job and if her Boyfriend found out what he would K.II Steve. I told her that no one should have to live scared of their Boss. I also asked her to describe some of the behavior that made her think that Steve was acting inappropriate. She said that he had made comments to her about how beautiful she was and how she could move in with him & he would take care of her & her baby. She also stated that he always had his arm around her and touched her. She also mentioned that he phoned her at home on several occasions. A few days latter I ran into Corrine again at Food Lve & I asked her how she was. She told me that she was going to have dinner at the CCVE & saw Steve docking his boat so she ran out of the Restaurant. I said she shouldn't have to live that way and maybe she should talk to Erika. She asked me to talk to Erika first so she wouldn't feel so uncomfortable. If not time I informed Erika & Ron of the situation.

Target/Harris 256

Witnesses: Ron Rylie APD

Report/Statement by _____
Position/Title _____

Page 1 of 1
F1343.24 (Ed. 6-85)

```
 1

 2
                    UNITED STATES DISTRICT COURT       ORIGINAL
 3                  SOUTHERN DISTRICT OF FLORIDA
                      FORT LAUDERDALE DIVISION
 4
                    CASE NO.   00-6107 CIV-FERGUSON
 5

 6    STEVE HARRIS,

 7             Plaintiff,

 8    vs.

 9    DAYTON HUDSON CORPORATION,
      d/b/a TARGET STORES,
10
               Defendant.
11    _____/

12

13

14
                        February 15, 2001
15                      Wednesday - 12:05 a.m.
                        Suite 313
16                      3475 Sheridan Street
                        Hollywood, Florida 33021
17

18

19
                         DEPOSITION
20

21                          OF

22
                     SHANNON TETRAULT
23
                             .
24          TAKEN ON BEHALF OF THE PLAINTIFF

25
```

2

```
 1                    APPEARANCES

 2

 3          RICHARD J. BURTON, ESQ.,
            on behalf of the Plaintiff.
 4

 5          RENE GONZALEZ-LLORENS, ESQ.,
            of the law firm of
 6          Shutts & Bowen,
            on behalf of the Defendant.
 7

 8              ALSO PRESENT

 9              STEVE HARRIS

10

11              - - - - - -

12

13

14                    INDEX

15     WITNESS                    DIRECT   CROSS

16   SHANNON TETRAULT
        (By Mr. Burton)              3      --
17

18

19                   EXHIBITS

20
     PLAINTIFF'S EXHIBITS          PAGE
21    FOR IDENTIFICATION

22          2                       71
            3                       96
23          4                       96

24

25
```

3

1    THEREUPON:

2                    SHANNON TETRAULT

3    a witness named in the Notice heretofore filed,

4    having been first duly sworn, deposes and says on

5    her oath as follows:

6                    DIRECT EXAMINATION

7    BY MR. BURTON:

8         Q.    Please state your name for the record.

9         A.    Shannon Tetrault.

10        Q.    My name is Richard Burton.  I'm

11   Mr. Harris' attorney.  Have you ever given a

12   deposition before?

13        A.    No.

14        Q.    I'm going to ask questions much the same

15   way I'm asking them now.  Please be courteous enough

16   for him, not for me, to let me finish them, because

17   he can only take one person down at a time.  Then

18   I'll ask you to give your answer to the best of your

19   recollection.  Also, talk verbally.  "Huh, huh" or

20   "Nuh, nuh" or shakes of the head, he can't take any

21   of that down.  So to make makes things easier you

22   have to have verbal responses.

23        A.    Okay.

24        Q.    If I ask you a question that requires

25   you to give a yes or no and you want to explain,

Worldwide Reporting Service
Miami ∞ Orlando ∞ Tampa

1  please be courteous enough to give a yes or no and
2  then explain, because I don't want to keep coming
3  back without a yes or a no.  So if I tell you do you
4  know how to make a watch and tell me, say "Yes, I
5  know how to" or "No, I don't," and then go forward.
6  It will be a lot easier that way.
7       A.    Okay.
8       Q.    Ms. Tetrault, what is your home address?
9       A.    8454 Southwest 42nd Court, Davie,
10  Florida 33328.
11       Q.    Do you live there with anyone over the
12  age of 15?
13       A.    Yes.
14       Q.    Who?
15       A.    Tomar Case.  T-O-M-A-R.
16       Q.    You have a little bit of a western
17  accent.
18       A.    Yes.  I'm from New York.
19       Q.    Let's try that again.
20       A.    Tomar Case.
21       Q.    Is that a man or a woman?
22       A.    That is a woman.
23       Q.    Is there anyone else over the age of 15?
24       A.    Maya Marar.  M-A-Y-A M-A-R-A-R.
25       Q.    Anyone else?

5

```
 1        A.    No.
 2        Q.    And they're your roommates?
 3        A.    Yes.
 4        Q.    And Ms. Tetrault, what is your
 5   educational background from high school forward?
 6        A.    I have a bachelor's, a B.S., from Siena
 7   College.
 8        Q.    Where?
 9        A.    Laudenville, New York.
10        Q.    When did you receive that?
11        A.    '93.
12        Q.    When did you graduate high school?
13        A.    '90.
14        Q.    Where did you graduate from?
15        A.    Columbia High School.
16        Q.    In what town?
17        A.    East Green Bush, New York.
18        Q.    After high school, did you immediately
19   go to college or did you start working?
20        A.    Immediately went to college.
21        Q.    And that's a three-year program for
22   bachelor's?
23        A.    I went summers, and I took between 18
24   and 21 credit hours each semester to get it in three
25   years.
```

```
 1          Q.    What was your specialization area?
 2          A.    Economics.
 3          Q.    So upon your graduation what did you
 4    next do?
 5          A.    I went to Stetson University for my
 6    masters.  I have an MBA from Stetson.
 7          Q.    In what?
 8          A.    Masters in Business Administration.
 9          Q.    Any specific area of MBA?
10          A.    No.
11          Q.    What year did you receive that?
12          A.    '95.
13          Q.    Prior to '95, did you have any specific
14    full-time job?
15          A.    Yes.  I waitressed my way through
16    school.
17          Q.    After '95, where did you then go to
18    work?
19          A.    The Court of Claims for New York State.
20          Q.    You went back to New York from Stetson.
21    How long were you working for the Court of Claims?
22          A.    Two and a half years.
23          Q.    That takes us to about '98?
24          A.    Takes us to the end of '97.
25          Q.    What did you then do?
```

7

1    A.    Then I went to Target.

2    Q.    Did you start in South Florida?

3    A.    Yes.

4    Q.    At what store?

5    A.    394.  Oakland park.

6    Q.    Who was your boss there?

7    A.    I was in training, and I reported to

8  Deborah Toth.

9    Q.    Did Mr. Gillespie hire you?

10    A.    I interviewed with two people.  I don't

11  know who made the decision to hire me.

12    Q.    Was one of them Terry Gillespie?

13    A.    Yes.

14    Q.    Who was the other?

15    A.    Jeff Warren.

16    Q.    With your master's degree, were you

17  coming in at an entry level or at a higher position?

18    A.    I was still an EIT.  No.  I was a PT.

19    Q.    What is a PT?

20    A.    Second position.

21    Q.    One above the entry level?

22    A.    That is right.

23    Q.    Is it customary to interview with

24  Mr. Gillespie if you're aware?  Is he the person who

25  normally hires entry level personnel?

8

```
1         A.    I don't know.
2         Q.    What is his position?
3         A.    Terry Gillespie?
4         Q.    Yes?
5         A.    Regional --
6         Q.    -- manager, isn't it?
7         A.    -- team Relations Leader.
8         Q.    That's the regional manager, isn't it?
9         A.    No.  He's the regional team relations.
10   That's like human resources in other lingo.  The
11   regional manager is not him.
12        Q.    So he's the human resources relations
13   director.  Do you know anyone else who interviewed
14   with the regional human relations director for an
15   entry level job?
16        A.    Not off the top of my head.
17        Q.    So you're the only person that you're
18   aware of that did it that way?
19        A.    I don't remember anybody else right now.
20        Q.    You don't know anybody else as you sit
21   here today.
22        A.    No.
23        Q.    So you came in through Mr. Gillespie,
24   and he put you with the Oakland Park store with
25   Ms. Toth?
```

9

1              MR. GONZALEZ-LLORENS:   Objection.

2         Assumes unestablished facts.

3              THE WITNESS:   I don't know who put me

4         there.

5    BY MR. BURTON:

6         Q.   One of the two of them assigned you to

7    that store, correct?

8         A.   I don't know who assigned me.

9         Q.   But as a result of that you went to work

10   there.

11        A.   Right.

12        Q.   In what position?

13        A.   An EIT, Executive In Training.

14        Q.   As an executive in training, you were

15   initially assigned to Oakland Park.  What did you do

16   and how long did you do it there for?

17        A.   I trained in all the positions of the

18   store through Christmas, and I think I reported to

19   Deerfield sometime in February.  I'm not sure.

20        Q.   February of what year?

21        A.   '98 maybe?  '98.

22        Q.   Were you working at the store with

23   Mr. Harris initially or was there somebody else?

24        A.   Somebody else.

25        Q.   Who was that?

10

| | | |
|---|---|---|
| 1 | A. | Joe Toscano. |
| 2 | Q. | And how long was Mr. Toscano there |
| 3 | before Mr. Harris was there? | |
| 4 | A. | I don't remember. |
| 5 | Q. | Was it six, eight months or thereabouts? |
| 6 | A. | I don't know. |
| 7 | Q. | You have no recollection? |
| 8 | A. | I know it wasn't longer than a year. |
| 9 | Q. | Can you get anymore accurate than that? |
| 10 | A. | Honestly, I don't remember.  I went to |
| 11 | two other stores. | |

12      Q.    How long did you work with Mr. Harris?

13      A.    I don't remember.

14      Q.    So when you went to work for the

15   Deerfield store for Toscano, were there any policies

16   or programs that were changed from the store that

17   you previously worked at at Oakland Park?  Did he

18   run his store any differently?

19      A.    No.  For two months I had been there

20   during Christmas.  A lot changes after Christmas.  I

21   didn't know all the policies and procedures anyway.

22   I wouldn't know the answer to that question.

23      Q.    During that first year you were pretty

24   much of a novice?

25      A.    Yes.  That is accurate.

11

1       Q.    So just for the sake of argument, when
2    you went over to the Deerfield store what was your
3    classification or position?
4       A.    ETLGS.
5       Q.    Employee In Training Guest Services?
6       A.    No.  I wasn't in training anymore.  This
7    was my first position now.
8       Q.    What does ETLGS stand for?
9       A.    ETL is Executive Team Leader.  GS is
10   Guest Services.
11      Q.    So you were the Team Leader for Guest
12   Services after your internship at Oakland Park,
13   correct?
14      A.    Yes.
15      Q.    Had you ever worked in guest services
16   before?
17      A.    Yes.
18      Q.    Where?
19      A.    I was a waitress for six years.
20      Q.    Other than being a waitress for six
21   years, had you ever worked in guest services with
22   Target before?
23      A.    No.
24      Q.    So you are now in charge of the GSTL.
25   Is that what they call it?

12

1           A.    No.   ETLGS.

2           Q.    What is the difference between a GSTL

3    and an ETLGS?

4           A.    One is a Guest Services Team Leader, and

5    they changed that.   It's now Executive Team Leader

6    for Guest Services.

7           Q.    A different name for the same cast.

8           A.    Right.

9           Q.    So you were described a couple days ago

10   as a GSTL at that store.   Would that be what they

11   called it then?

12          A.    Maybe.   I don't remember when it

13   changed.

14          Q.    Would you say that the job, whatever you

15   called it, is substantially the same?

16          A.    Yes.

17          Q.    You were in charge of the front end of

18   the store.

19          A.    Yes.

20          Q.    And that meant the registers, the

21   customer returns and service area and even the food

22   stand in the front, correct?

23          A.    Yes.

24          Q.    When you first got there, did you have

25   any conflicts with anyone?

13

1          A.    I don't remember when I first got there.
2          Q.    The people who were cashiers, did any of
3    those persons ever have any conflicts with you that
4    you recall?
5               MR. GONZALEZ-LLORENS:  Object as to the
6          term "conflict."  You may answer the question.
7               THE WITNESS:  I don't remember that far
8          back honestly.
9    BY MR. BURTON:
10         Q.    Had there been conflicts that you had
11   with employees that you worked with?
12              MR. GONZALEZ-LLORENS:  Same objection as
13         before.
14              THE WITNESS:  No.
15   BY MR. BURTON:
16         Q.    Do you recall any person ever stating
17   that you were being lazy?
18         A.    No.
19         Q.    Were you lazy?
20         A.    No.
21         Q.    You were also in charge of the cash
22   payouts, the yellow book, if you will, the book that
23   has the receipts for payouts, correct?
24         A.    Yes.
25         Q.    Who do you delegate that to?

14

1      A.    I don't remember.

2         Q.    Didn't you delegate it to people to do?

3      A.    Yes.

4         Q.    And, in fact, you had some words on a

5    number of occasions with -- well, do you remember

6    when Mr. Harris came in the store?

7      A.    I remember little bits and pieces, but

8    nothing of a full picture.

9         Q.    He was the first black boss you ever

10    had, wasn't he?

11            MR. GONZALEZ-LLORENS:  Objection.

12            MR. BURTON:  I'll restate it.

13    BY MR. BURTON:

14         Q.    Was he the first black team leader you

15    had as a boss at Target?

16      A.    Yes.

17         Q.    During the time that you first joined

18    the organization and the first time you met

19    Mr. Harris about a year later, had you spoken at all

20    again with Terry Gillespie?  Had you kept in contact

21    with him?

22      A.    Yes.

23         Q.    Can you tell me in what instances?

24      A.    I went for interviews for the next

25    level, and he was also in that interview process

15

1    once again.

2          Q.    What level would that be?

3          A.    P3.

4          Q.    So he's interviewing you for a third

5    level entry position?

6          A.    Yes.

7          Q.    Where did that take you to?

8          A.    No place.

9          Q.    Did you get the P3?

10         A.    No.  He said I hadn't had enough time

11   with Target.

12         Q.    And how much before you were transferred

13   to Deerfield was that?

14         A.    Excuse me?

15         Q.    How long a period was that from when you

16   first started to when you went to your P3?

17         A.    Months.  Not years.

18         Q.    So within the first five or six months

19   that you were working for them?

20         A.    I don't know honestly.  I'm not going to

21   guess.  I don't know.

22         Q.    Ma'am, as of now you've been employed

23   four years.  We're talking about the first year or

24   two.

25         A.    Right, and I don't remember months,

16

1   categories.  I know it was before the first year.  I
2   know that.
3         Q.    Let's try to work backwards.  About
4   1998, in February of '98 you went to Deerfield,
5   correct?
6         A.    Yes.
7         Q.    How much before then was the P3 request
8   where you met with Mr. Gillespie?
9               MR. GONZALEZ-LLORENS:  Objection.
10         Assumes unestablished facts.
11               MR. BURTON:  She said she interviewed
12         with Mr. Gillespie and she didn't have enough
13         time.
14               MR. GONZALEZ-LLORENS:  That's not
15         beforehand.
16               MR. BURTON:  Let's try it again.
17               THE WITNESS:  I don't remember when it
18         was.
19   BY MR. BURTON:
20         Q.    Was it before or after you were promoted
21   to Deerfield as a GSTL?
22         A.    After.
23         Q.    It was afterwards?
24         A.    Yes.
25         Q.    So you were still a P2 and you were

17

```
 1    the GSTL?
 2         A.    Yes.
 3         Q.    Was Mr. Frankhauser at the store at the
 4    time?
 5         A.    I have no idea.
 6         Q.    Do you know who Don Frankhauser is?
 7         A.    Yes.
 8         Q.    Who do you recall him to be?
 9         A.    Excuse me.
10         Q.    Who do you remember him to be?
11         A.    The APTL.
12         Q.    That's security?
13         A.    Asset Protection Team Leader.
14         Q.    That's what we call security in every
15    other company.
16         A.    Right.
17         Q.    Was he there?
18         A.    Was he at Deerfield?
19         Q.    Yes.
20         A.    Yes, he was at Deerfield.
21         Q.    Was he there during that time that you
22    came in with Joe Toscano?  Was he the APTL?
23         A.    No.
24         Q.    Do you remember who was?
25         A.    Johnny.
```

18

```
 1        Q.    Anything else more than Johnny or is
 2   that it?
 3        A.    Johnny.
 4        Q.    Had you met Mr. Frankhauser before he
 5   was transferred to your store?
 6        A.    Yes.
 7        Q.    In what context?
 8        A.    He gave a meeting for all the GSTL's.
 9        Q.    For what purpose, if you recall?
10        A.    Training.
11        Q.    Was it at your store?
12        A.    No.
13        Q.    Outside of that one meeting, do you
14   remember if you ever spoke with him again before he
15   joined your store?
16        A.    Yes.
17        Q.    Tell me about it.
18        A.    I remember he came to my store once.  I
19   don't remember the conversation.  I don't know what
20   he said.
21        Q.    No memory as you sit here today?
22        A.    It had to be some kind of audit.
23        Q.    I don't want you to guess.
24        A.    I don't remember.
25        Q.    That's fine.  That's a good answer.  I
```

19

1       don't want you to just try to make up things.  If

2       you don't remember, just say "I don't remember."

3                   So you're there.  You met him twice.  Do

4       you remember how much after you were there he joined

5       your store?

6              A.    No.

7              Q.    Who is Evan Feldman?

8              A.    Hard lines.

9              Q.    What was he?

10             A.    The hard lines ETL.

11             Q.    He was the team leader at the time?

12             A.    Yes.

13             Q.    How long was he there before he left?

14             A.    I don't know.

15             Q.    Do you remember how many months or years

16      you worked with him?

17             A.    No.

18             Q.    Do you know who Betty Gadsen is?

19             A.    Yes.

20             Q.    Who is she?

21             A.    She was a cashier supervisor.

22             Q.    She worked then under you?

23             A.    Yes.

24             Q.    How many years had she been working at

25      Target?

20

```
1        A.    I have no idea.
2        Q.    Did she ever give you any pointers as to
3   how she was suppose to do her job?
4        A.    Possibly.  I don't remember.
5        Q.    Do you ever remember her giving you
6   suggestions on how you should do your job?
7        A.    Yes.
8        Q.    Can you tell me some of the areas you
9   remember her suggesting?
10       A.    I remember her talking about the
11  cashiers to me.
12       Q.    Do you remember anything more specific
13  than that?
14       A.    Yes.  She was like a mother figure to
15  them.
16       Q.    She was like the head mother cashier
17  that everyone goes to with questions?
18       A.    Yes.
19       Q.    Do you remember any of the advice that
20  she gave you?
21       A.    No.  That's all I remember about it.
22       Q.    That she was knowledgeable, but you
23  don't know about what.  Is that basically correct?
24       A.    I don't even remember what she was in
25  charge of in my front.
```

```
1          Q.    How long was she there with you working?

2          A.    The entire time.

3          Q.    How many years was that?

4          A.    At Target?

5          Q.    Yes.

6          A.    I got there in February of '98.  I left

7    in May of '99.

8          Q.    So over a year you worked with her and

9    you don't recall anything that she did?

10         A.    She did speed and service.  I think she

11   was in charge of it for a while.

12         Q.    But you don't have any recollection as

13   to what she did?

14         A.    Speed and service.

15         Q.    Anything more specific than that?

16         A.    Cashier supervisor.

17         Q.    When I asked you earlier do you remember

18   any of the suggestions she gave you to help you do

19   your job you said yes.

20         A.    Mother cashier.  I liked that.  I liked

21   the way she did that.  That was neat to me.

22         Q.    What did she suggest to you that would

23   help you do your job better?  That was my question.

24         A.    That's what I asked her.  I asked her

25   how she became like a mother figure to them, because
```

1   they all liked her for that.

2          Q.   Do you remember what she said?

3          A.   No.

4          Q.   So after that where did you go?  We're

5   now in May of '99.

6          A.   Coral Springs.

7          Q.   Are you still there?

8          A.   What?

9          Q.   Are you still in Coral Springs?

10          A.   No.

11          Q.   How long were you in Coral Springs?

12          A.   One year.

13          Q.   So that would be about 2000.  Then where

14   did you go?

15          A.   Tamarac.

16          Q.   What job did you have at Tamarac?

17          A.   Soft lines.  ETL soft lines.

18          Q.   And Coral Springs what did you do?

19          A.   Hard lines.

20          Q.   Hard lines, soft lines, GSTL.  Are you

21   still in Tamarac?

22          A.   Yes.

23          Q.   And you are still soft lines?

24          A.   Yes.

25          Q.   Were you ever told by Terry Gillespie

1    that you would probably be a store manager or a TL?

2    Do you remember that he had that conversation with

3    you?

4         A.    Yes.

5         Q.    When?

6         A.    In the interview.

7         Q.    What do you remember him saying about

8    that?

9         A.    I don't remember his exact words.

10        Q.    Something like I just said, but you're

11   not sure exactly what his words were?

12        A.    They ask a question do you want to be

13   something like that.

14        Q.    And you said, yes, you would.

15        A.    Yes.  So then he says, "When you are a

16   store team leader for Target" --

17        Q.    So you were under the impression that

18   was something that would happen?

19        A.    Yes.

20        Q.    Do you know who Sandy Grisback was?

21        A.    Yes.

22        Q.    Who is she?

23        A.    She works for Target.  She came in as a

24   logistics.

25        Q.    She came in after you were at Deerfield

24

1    or before?

2         A.    Afterwards.

3         Q.    How long was she there do you remember?

4         A.    I left and she was still there.

5         Q.    So she was there at least through May of

6    '99?

7         A.    Yes.

8         Q.    You say logistics.  What does that mean?

9    Is that team leader?

10        A.    Yes.

11        Q.    And logistics, can you explain what you

12   mean by it.  I have my own thoughts?

13        A.    That's the only position I haven't held,

14   but it's the back of the store.

15        Q.    How they bring trucks in and out and get

16   stuff in and out of the trucks?

17        A.    Yes.

18        Q.    It's not a selling position.  It's a

19   receiving and distribution position?  Is that a fair

20   way to describe it?

21        A.    There are other areas that were involved

22   at the time, I believe, than just that.

23        Q.    Such as?

24        A.    Price change and plan-a-gram belongs to

25   logistics.

25

1    Q.    They moved it around a couple of times?

2    A.    Yes.

3    Q.    When you say price change, that's a

4    department that remarks prices depending on how

5    things are moving, correct?

6    A.    No.

7    Q.    What does price change mean then to you?

8    A.    Price change means when markdowns or

9    comp shop prices drop into the symptom, you mark

10   them.  It's a daily work load that occurs and you

11   mark as the things drop from Target.

12   Q.    Aren't there other groups that also mark

13   down prices customarily, such as the hard lines or

14   soft lines team leaders when they find that there

15   might be a reason to move something down?

16   A.    Not on a daily basis.

17   Q.    So you're telling me that the cashiers

18   don't call back to the departments for price changes

19   to find out if there is something under twenty

20   dollars and someone says, "I saw it marked as X,"

21   what price should it be?

22   A.    The empowerment theory is different than

23   price change.

24   Q.    I'm asking about the action.  I'm not

25   asking what you call it.

26

1          A.     Okay.

2          Q.     Don't in fact other people than Price

3    Change change prices?

4          A.     Through empowerment, yes.

5          Q.     You're using apparently a Target term.

6          A.     Right.   I'm speaking in Target lingo.

7          Q.     And I'm trying to get you into English

8    for the jury?

9          A.     Okay.

10         Q.     So empowerment means that other people,

11   other than price change, as long as you've been

12   there, also mark down prices, correct?

13         A.     Yes.

14         Q.     And those people include most of the

15   team leaders, correct?

16         A.     Yes.

17         Q.     And they mark down prices for any number

18   of different reasons and ways, don't they?

19         A.     Yes.

20         Q.     Because people claim that they saw it

21   some place at a different price, they're allowed to

22   mark it down.   They come in with a coupon showing

23   it's the same item, different price at a different

24   store.   Things get marked down.

25         A.     Yes.

```
 1          Q.    Who does that?  Cashier, team leader?
 2     Who?
 3          A.    Cashier.
 4          Q.    So that's one form of a markdown.  The
 5     cashier is allowed to do it, correct?
 6          A.    Yes.
 7          Q.    All they have to do is see a local ad
 8     that shows a competitor item and they can mark it
 9     down.
10          A.    Actually, that's not the policy.
11          Q.    But that's what is done, isn't it?
12          A.    What is done is when WalMart or KMart
13     has an ad in Target, then if it's in the current
14     week's ad, they can match ads.
15          Q.    That's what I just said.  Someone comes
16     in with a piece of paper that shows the stores,
17     other competitive stores, and says, "This is what
18     they're selling the same product for.  I want to pay
19     it here," and the cashier then marks it down,
20     correct?
21          A.    Like I say it.
22          Q.    Is that accurate?
23          A.    What I said is exactly the policy.
24          Q.    I don't want your exact policy.  I want
25     to know how it practices.
```

28

```
1          A.    That's how it practices.
2          Q.    Does it require a team leader to sign
3   off?
4          A.    No.
5          Q.    How do we know that that really
6   happened.  Is there a special code put in?
7          A.    Yes.
8          Q.    What code is that?
9          A.    Match ad.
10         Q.    What code on the register is that?
11         A.    Override 2.
12         Q.    So when an Override 2 is put in, the
13  price is dropped whatever the competitor does.
14         A.    Yes.
15         Q.    Doesn't the cashier also have a 99999
16  code?
17         A.    Yes.
18         Q.    What does that mean?
19         A.    That means we have no way to identify
20  the item so we use it.
21         Q.    You have no way to identify the item or
22  the price?
23         A.    No, if there's not a bar code on the
24  item.
25         Q.    So if, A, it wasn't marked the first
```

1    time or, b, the bar code, like a towel had been

2    pulled off, someone had taken and pulled the tag off

3    and left the towel, if someone likes that towel,

4    it's the fourth of a set and they don't have the

5    rest of them, and you don't have the item or its

6    price, what is the cashier allowed to do before she

7    enters a 99999?

8         A.    Ask the guest the price.

9         Q.    Meaning the customer.  "Guest" means

10   customer, doesn't it?

11        A.    Yes.

12        Q.    The purchaser is allowed to name their

13   price effectively, correct?

14        A.    Within certain guidelines.

15        Q.    It has to look about the right price to

16   the cashier.

17        A.    And it has to be an item under twenty

18   dollars.

19        Q.    How does the cashier know whether it is

20   or it isn't?  If the customer says it's 18.85 and

21   and they believe it's thirty, how would the cashier

22   know that?

23        A.    I don't know.

24        Q.    There who no specific guidelines that

25   you're aware of, are there?

1        A.    Yes.   An item under dollars.

2        Q.    No.   The customer says it's under

3   twenty.  How do you verify that it was an item under

4   twenty dollars?

5        A.    If they don't know, they need to ask.

6        Q.    I guess the question I'm asking you is

7   are you telling me that cashiers are expected to

8   know the fifty or a hundred-thousand different

9   items and sizes for things there are in the store?

10        MR. GONZALEZ-LLORENS:   Objection.

11        Assumes unestablished facts.

12        MR. BURTON:   She's in charge of the

13        area.

14   BY MR. BURTON:

15        Q.    Are they suppose to know that?

16        MR. GONZALEZ-LLORENS:   Same objection.

17        THE WITNESS:   They are called to use

18        empowerment.  If they don't know or they have

19        a question, they are told to ask.

20   BY MR. BURTON:

21        Q.    So if their best judgment says, yeh, it

22   looks okay, you shook your head.  Is that a yes?

23        A.    Yes.

24        Q.    Who else is allowed to markdown prices

25   other than the cashiers in those instances, other

1    than the price change person at the time?  Who else

2    is allowed to change prices?  You said the team

3    leaders were allowed to be called.

4         A.    Within twenty dollars, everybody in the

5    store can.

6         Q.    Everybody does it.

7         A.    It's called a team member empowerment.

8    Within twenty dollars and an item under twenty

9    dollars.

10        Q.    Everyone can down to the lowest zoner.

11        A.    Under twenty dollars.

12        Q.    That's a, yes, down to the lowest zoner?

13        A.    Down to the lowest zoner for under

14   twenty dollars.

15        Q.    And over twenty dollars who do they have

16   to talk to?  Give me the range of people.

17        A.    Cashier supervisor.

18        Q.    What about the people in the various

19   lines -- soft lines, hard lines -- are they allowed

20   to mark down the products in their areas?  You mark

21   down soft line stuff all day, don't you?

22        A.    You said the range.  I'm sorry.  I

23   thought you meant the range in which they would go.

24   First they would go to the cashier supervisor.  Then

25   they would call the manager on duty.

1          Q.    But you could actually, as the manager

2     of soft lines and all your subordinates, mark down

3     goods in soft lines all day long, don't you?  Don't

4     you change prices all day long to keep the customer

5     happy?

6          A.    I don't change prices all day long, no.

7     I would on occasion meet a guest's needs.

8          Q.    What does that mean to Target?

9          A.    That means if the guest finds an item

10    under twenty dollars --

11         Q.    We're now over twenty dollars.  A T.V.

12    is missing an instruction book and I don't think I

13    should pay that amount, can you amount it down?

14         A.    I can change the price.

15         Q.    Can your subordinate change the price if

16    you aren't there?

17         A.    Another manager on duty, yes.

18         Q.    Any manager at any level.

19         A.    No.  It has to be an executive team

20    leader.  It can't be a cashier supervisor.

21         Q.    Anyone above a cashier supervisor who is

22    given the title team leader can do it?

23         A.    Executive team leader.

24         Q.    What is the difference between executive

25    team leader and team leader?

1          A.    Team leaders are the department

2    supervisors in the store.  An executive team leader

3    is the managers.

4          Q.    How many managers are there in the

5    store?

6          A.    Depends on the volume.

7          Q.    How many the low to the high?

8          A.    I don't know.

9          Q.    In your store right now how many are

10   there?

11         A.    Five.  Six including a.p., but he

12   doesn't really count.

13         Q.    Asset protection if a.p.

14         A.    Yes.

15         Q.    So five, six different people in the

16   store, depending on the volume, have the authority

17   to mark down items for sale, correct?

18         A.    Right.

19         Q.    Were you ever involved in applications

20   for credit cards?

21         A.    Yes.

22         Q.    Tell me about that.  Where did you do

23   that and when?

24         A.    Deerfield.

25         Q.    What did you do there?

34

1          A.      I was the person in charge of credit for
2      the district.
3          Q.      Who made you the person in charge of
4      credit for the district?
5          A.      Mark Hastings.
6          Q.      Had you been out socially with Mark
7      Hastings before?
8          A.      No.
9          Q.      How did he select you?  Was it an open
10     selection process?
11         A.      I have no idea.
12         Q.      You were just chosen out of thin air?
13              MR. GONZALEZ-LLORENS:  Objection
14              THE WITNESS:  I don't know.
15     BY MR. BURTON:
16         Q.      Did you apply for the position?
17         A.      No.
18         Q.      So you were selected for no reason you
19     could determine, correct?
20         A.      Right.
21         Q.      Did he call you?
22         A.      No.
23         Q.      Can you tell me how you first became
24     aware that you had been selected by Mark Hastings?
25         A.      An e-mail.

1          Q.    By who?

2          A.    Mark Hastings.

3          Q.    Had you ever spoken to him before then

4    or ever met him before then?

5          A.    Yes, I met him.

6          Q.    In what context?

7          A.    District manager.

8          Q.    At this point, most respectfully, you're

9    a P2 that has been there a little over a year.

10   When did you first meet him?

11         A.    When he was introduced to the districts,

12   I was at Oakland Park.  He came around and

13   introduced himself.  Jeff Warren introduced him as

14   the person taking over for him.  That's when I met

15   him.

16         Q.    I understand, but at that point you're

17   an executive in training, correct?

18              MR. GONZALEZ-LLORENS:  Objection.

19         Assumes unestablished facts.

20              THE WITNESS:  At Oakland Par, I'm an

21         EIT, an executive in training.

22   BY MR. BURTON:

23         Q.    Other than saying, "Hello,

24   Mr. Hastings," did you have any conversation with

25   him?

1          A.    I don't remember.

2          Q.    Do you know why your name would come up

3    of all of the multiple employees that could be

4    reviewed?

5          A.    No, I don't.

6          Q.    So you get an E-mail while you're at

7    Deerfield making you district director of credit

8    card applications, right?

9          A.    District credit captain.

10          Q.    What are the duties of the district

11    credit captain?

12          A.    To E-mail, communicate credit issues.

13          Q.    What do you know about that?  Before you

14    were chosen, did you have any training?

15          A.    I was trained for the GSTL position and

16    credit is involved in that draining.

17          Q.    I'm sure that credit is involved in

18    everything in America.  What training did you have

19    either in your schooling or at Target specifically

20    in credit?

21          A.    At Sawgrass.

22          Q.    What did you do at Sawgrass?

23          A.    I trained.

24          Q.    For how long?

25          A.    Two weeks.

37

```
 1        Q.    What did you learn?
 2              MR. GONZALEZ-LLORENS:  Objection vague.
 3              THE WITNESS:  What did I learn about
 4        what?  Credit?
 5   BY MR. BURTON:
 6        Q.    Yes.  What were they teaching you?
 7        A.    They taught me to how to enter the
 8   applications, how to pursue it.
 9        Q.    Who else was in this training they were
10   offering you?
11        A.    Troy.
12        Q.    Troy who?
13        A.    I don't know his last name.  He was the
14   trainer.
15        Q.    So it was you and Troy?
16        A.    Yes.
17        Q.    Was this while you were at Deerfield?
18        A.    I don't believe I was at Deerfield yet.
19        Q.    So you were still at your executive in
20   training program, correct?
21        A.    Yes.
22        Q.    Ma'am, didn't there come a time where at
23   least someone accused you, some of your co-workers,
24   of filling out applications for credit that weren't
25   real?
```

38

```
1          A.    No.
2                MR. GONZALEZ-LLORENS:   Objection.
3          Assumes unestablished facts.
4                THE WITNESS:   No.
5     BY MR. BURTON:
6          Q.    Did there ever come a time that anyone
7     challenged the way that you were doing that job?
8          A.    I don't remember.
9          Q.    Didn't Steve have a discussion with you
10    about that?
11         A.    I don't remember.
12         Q.    Now for being the credit captain of the
13    district, did you receive any additional monies?
14         A.    No.
15         Q.    What, if anything, did you receive that
16    you are aware of?
17         A.    A T-shirt maybe.  A polo shirt.  I won
18    something once from it.
19         Q.    What did you win?
20         A.    A chair.
21         Q.    A chair?
22         A.    A director's chair.
23         Q.    Like the canvass type you see?
24         A.    Yes.
25         Q.    Do you recall any incidents where
```

1    someone was telling you that it was being done wrong
2    and it was misleading results, because some of the
3    people that were receiving the credit applications
4    had no intention of getting a card?  Do you remember
5    something like that?
6         A.    No.
7         Q.    Isn't it a fact that people who applied
8    for credit were given a 10 percent discount on their
9    bill at Target that day?  Do you remember anything?
10   Your eyes are just looking at me.  You're in
11   headlight look.
12              MR. GONZALEZ-LLORENS:  Objection to the
13         "you're in headlight look."  She's thinking
14         about it.
15              MR. BURTON:  She's looking at me.  Her
16         eyes are wide open and staring.
17              MR. GONZALEZ-LLORENS:  Not really.
18         She's thinking about it.
19              THE WITNESS:  The policy is that when
20         you apply for a Target card, the first time
21         you use it you get the 10 percent off.
22   BY MR. BURTON:
23         Q.    That's what I thought I asked.  Do you
24   recall that if you applied for a credit card you get
25   10 percent off the purchase on that card the first

40

1    time.

2         A.    Right.

3         Q.    Has that always been the policy that you

4    are aware of?

5         A.    Yes.

6         Q.    Do you now, and I'm trying to refresh

7    your recollection, recall there being a discussion

8    as to whether or not those people who were applying

9    for credit cards at some point in time, whether it

10   was you or Toscano or any time that this occurred,

11   that there was a problem that people who were

12   applying were doing it even though they weren't

13   going to keep the credit card?

14        A.    No.

15        Q.    You don't recall ever having any

16   controversy that you're aware of?

17        A.    No.

18        Q.    Do you ever recall there being a

19   controversy regarding signing up of people for

20   credit?

21        A.    No.

22        Q.    Do you know who Donna Kyle is?

23        A.    Yes.

24        Q.    Who is she?

25        A.    She was the logistics person at

41

```
 1     Deerfield?
 2          Q.    Was she before or after Sandy Grisback?
 3          A.    Before.
 4          Q.    Do you know if their policies were the
 5     same in the things that they did?
 6          A.    I'm sorry.  What?
 7          Q.    Do you know if there were any
 8     differences in the policies that the two of them
 9     implemented?
10          A.    I don't know.
11          Q.    Who is Karen Knapp?
12          A.    She was my cashier team leader.
13          Q.    Was that the same as a supervisor?
14          A.    Yes.
15          Q.    So she was a cashier supervisor?
16          A.    Right.
17          Q.    Do you ever recall her having any
18     differences or disagreements with you the way you
19     did your job or the way she did hers?
20          A.    I don't remember them specifically.
21          Q.    You have no recollection of any as you
22     sit here today?
23          A.    No.  But I do have to go to the lady's
24     room.
25          Q.    Perfectly acceptable.
```

42

```
 1              (Thereupon, a brief recess was taken.)
 2   BY MR. BURTON:
 3        Q.    Did the guy Troy that you mentioned, did
 4   he ever work at any other store or just work at
 5   Sawgrass for the purpose of training?
 6        A.    I don't know.
 7        Q.    Do you know was he the authority on the
 8   scanning for the Target down here?
 9              MR. GONZALEZ-LLORENS:   Objection
10        speculation.
11              THE WITNESS:   I don't know.
12   BY MR. BURTON:
13        Q.    Do you know what he did --
14        A.    Yes.
15        Q.    -- other than train you for two weeks?
16        A.    He was the GSTL at Sawgrass.
17        Q.    That's what I was trying to get.  So he
18   was the GSTL at Sawgrass.
19        A.    Yes.
20        Q.    So when you said you trained at
21   Sawgrass, you meant at the store and he was the
22   person who you were assigned to to learn from.
23        A.    Right.
24        Q.    And the only person being trained there
25   was you at the time.
```

43

1        A.   Yes.
2        Q.   Did he teach you anything more about
3   credit there or was it the whole function of GSTL?
4        A.   No.  He taught me other things.
5        Q.   So credit was one small portion of the
6   program at Sawgrass in GSTL, correct?
7        A.   It was a part of the training.
8        Q.   What else was included at Sawgrass?
9   What else was he teaching other than how to fill out
10   a credit application?
11        A.   Over and short reports.
12        Q.   What are over and short reports?
13        A.   At the registers where they are short
14   and over on a daily basis.
15        Q.   So this is given to you on a daily basis
16   and you can tell if there is a failure to balance a
17   register daily, correct?
18        A.   Right.
19        Q.   What are you suppose to do when that
20   happens on a daily basis?
21        A.   Research it.
22        Q.   What do you mean?
23        A.   Find out where the money is.
24        Q.   And then do what?
25        A.   Rectify the situation.

44

1    Q.    How?

2    A.    Depends on what the reason is that it

3    was missing.

4    Q.    I'm not trying to be funny.

5    A.    I'm not either.

6    Q.    If you see that a register is short,

7    meaning it's short cash, do you go to those books to

8    see if it gave anyone any money?

9    A.    I'm sorry.  What?

10   Q.    You know there are books, paid out, cash

11   books, that you have there.  Are you aware that they

12   keep books and journal entries when people take

13   money out of the store?

14   A.    Yes.

15   Q.    How do they reconcile those when the

16   register is short?

17   A.    You go to the voucher book.

18   Q.    That's what we're talking about.  What

19   will the voucher book show you?

20   A.    If somebody who took the money or who

21   didn't take the money.

22   Q.    So you see that the voucher book shows

23   that someone took some money out.  What are you

24   suppose to do?

25   A.    Make sure the transaction was processed.

1           Q.      How do you do that?

2           A.      We go to the voucher book.

3           Q.      We've already been there.  If it's in

4   there, what do you do next?

5           A.      If it's in the book?

6           Q.      Yes.

7           A.      Then that's not the reason it's short.

8           Q.      What other reasons could there be?

9           A.      There could be various reasons why a

10  register is short.  Somebody could steal.  Somebody

11  could make a mistake.  The cash counter could

12  give the wrong money at the beginning of the day.

13          Q.      All of these things have happened?

14          A.      Yes.

15          Q.      Short of stealing; in other words,

16  someone putting their hand in the register and at

17  gun point or an employee sitting there and taking a

18  hundred dollars and putting it in his pocket, have

19  you known anyone who was fired for that, other than

20  someone who intentionally took the money out?

21          A.      Yes.

22          Q.      Who?

23          A.      I had a cashier that was fired.

24          Q.      For what?  What did she do?

25          A.      She was taking credit cards.

46

```
 1          Q.    You're saying a theft, correct?
 2          A.    I thought you meant a cash theft.
 3          Q.    A credit card theft is different than a
 4    cash theft?
 5          A.    It goes to different accounts.
 6          Q.    But same idea.
 7          A.    Okay.
 8          Q.    Other than someone who is thieving,
 9    stealing, trying to fake credit cards in different
10    names and things, do you know anyone who has been
11    fired for that?
12          A.    I don't know.
13          Q.    Have there been employees who actually
14    legitimately got short changed where someone put a
15    twenty on the side of a one dollar bill and they
16    looked at it briefly and got the wrong amount?
17               MR. GONZALEZ-LLORENS:  Objection
18          speculation.
19               THE WITNESS:  I don't know.
20    BY MR. BURTON:
21          Q.    Have you ever heard if someone didn't
22    balance out and they couldn't find out why?
23          A.    Yes.
24          Q.    What is the general reason that you have
25    come to a conclusion on that?
```

47

```
 1        A.    I don't come to a conclusion or reason.
 2        Q.    What do you do?  Do you fire the person?
 3        A.    No.  We research it.
 4        Q.    Have you always come up with an answer
 5   is what I'm trying to get to.
 6        A.    No.
 7        Q.    Have you fired the people when you don't
 8   come up with an answer?
 9        A.    No.
10        Q.    What do you do?
11        A.    We speak to them.
12        Q.    What do you say?
13        A.    "Your register is short.  This is a
14   first time.  This is a warning.  Watch your money."
15        Q.    So you give them a chance to correct
16   their actions.
17        A.    Right.
18        Q.    On how many occasions has that occurred
19   a failure of the person to respond.
20        A.    I don't know.
21        Q.    How many times have you done it?
22        A.    I don't know.
23        Q.    More than ten?
24              MR. GONZALEZ-LLORENS:  Objection.  Asked
25        and answered.
```

48

1              THE WITNESS:  I don't know.

2      BY MR. BURTON:

3          Q.    You have no memory if you've done it

4      more than ten times?

5          A.    I don't remember.

6          Q.    Did there come a time where you and

7      Steve had some disagreements as to how you were

8      doing your job?  Any memory of having any

9      disagreements with him?  He was your boss, wasn't

10     he?

11         A.    Yes, he was.

12         Q.    Do you remember having any disagreements

13     with him?

14         A.    I don't remember any offhand.  I'm sure

15     we did, but I don't remember them.

16         Q.    Do you remember any disagreements that

17     you ever had with any boss as you can sit here today?

18         A.    Yes.

19         Q.    Can you tell me one of them?

20         A.    With any boss at Target?

21         Q.    Yes.

22         A.    Yes.

23         Q.    Tell me one.

24         A.    I had a boss that micromanaged me and I

25     didn't like it.

49

```
 1        Q.    Who was that?
 2        A.    Mike.
 3        Q.    Mike what?
 4        A.    Mike Hernandez.
 5        Q.    What do you mean by micromanaged you?
 6        A.    He was trying to micromanage me.  He
 7   would get into too many "minutes" that I didn't need
 8   him to help me out with.
 9        Q.    What did you do then?
10        A.    I asked him not to do it.
11        Q.    And that was the end of it?
12        A.    I don't remember the details, but that
13   was the conflict.
14        Q.    How was it resolved?
15        A.    He said, Okay.  Until I see you can't do
16   it anymore, I'll lay off."
17        Q.    Which store was that?
18        A.    Tamarac.
19        Q.    So how long was that?
20        A.    Within the last six months.
21        Q.    Do you remember anything that happened
22   before that?
23        A.    Yes, at Coral Springs.  I was 24 hours
24   late on a transition for Christmas, and John Walker
25   told me next time to have better planning.
```

50

| 1 | Q. Anything else? |
| 2 | A. I don't know. |
| 3 | Q. Can you think of anything else? |
| 4 | A. Not right now. I'm sure I could over |
| 5 | time. |
| 6 | Q. Did you ever have any conversations with |
| 7 | either Mr. Frankhauser or Mr. Gillespie or Mr. Barth |
| 8 | about Mr. Harris? |
| 9 | A. Yes. |
| 10 | Q. Which one? Tell me what you remember. |
| 11 | A. I remember being asked to write a |
| 12 | statement. |
| 13 | Q. Let me ask you a question. Who asked |
| 14 | you to write that statement? |
| 15 | A. I don't remember. |
| 16 | Q. If I try to help you, do you remember if |
| 17 | Mr. Frankhauser asked you to write a statement? |
| 18 | MR. GONZALEZ-LLORENS: Objection. |
| 19 | Assumes unestablished facts. |
| 20 | MR. BURTON: Because I'm not going to |
| 21 | get anywhere without my spending about a week. |
| 22 | BY MR. BURTON: |
| 23 | Q. Ma'am, do you remember if it was |
| 24 | Mr. Frankhauser? |
| 25 | A. It was either Mr. Frankhauser or |

```
 1    Mr. Hastings.  I don't remember specifically.
 2           Q.    You had spoken with both of them.
 3           A.    Yes.
 4           Q.    Tell me what you remember Mr. Hastings
 5    talked to you about about Steve?
 6           A.    I don't remember the conversation.
 7           Q.    Did you ever speak with Doug Barth?
 8           A.    No.  Not that I remember.
 9           Q.    Did you ever pick up the phone and call
10    Mr. Hastings yourself --
11                 MR. GONZALEZ-LLORENS:  Objection vague.
12    BY MR. BURTON:
13           Q.    -- regarding anything to do with Steve
14    Harris?
15           A.    I don't remember.  I don't think so.  I
16    don't know.
17           Q.    Do you have any recollection as to what
18    you were asked to write a statement on or why?
19           A.    Yes.
20           Q.    What?
21           A.    A $300 shortage I had.
22           Q.    When you say a shortage had you, was it
23    still short at that time?
24           A.    Yes.
25           Q.    How many days or weeks after it did you
```

52

1  write your statement?

2        A.    I don't know.

3        Q.    Why did you wait days or weeks to point

4  out a $300 short?

5             MR. GONZALEZ-LLORENS:   Assumes

6        unestablished facts.

7             THE WITNESS:   I didn't wait.  I was

8        asked.

9  BY MR. BURTON:

10       Q.    How would they know it?

11            MR. GONZALEZ-LLORENS:   Objection

12       speculation.

13            THE WITNESS:   Rephrase the question.

14 BY MR. BURTON:

15       Q.    You're in charge of that portion of the

16 store at the time.

17       A.    Right.

18       Q.    You're the first person to know about

19 the short, correct?

20       A.    Right.

21       Q.    When you found out about the short,

22 whenever it occurred, what did you do yourself

23 without being asked?

24       A.    I began to research it.

25       Q.    How?  Tell me what you did.

53

1        A.    I went to the register.  I pulled out
2   the drawer.  There was no money underneath it.  Then
3   I went to the voucher book.  Then I asked my cashier
4   supervisors had they given any money out.
5        Q.    What did they say?
6        A.    I don't remember.
7        Q.    You have no recollection of what you
8   did, ma'am?  Didn't you find out immediately that
9   $300 had been taken out the night before by Steve
10  Harris for which he signed a voucher?
11       A.    I don't remember.
12       Q.    You have no recollection of that as you
13  sit here today?
14             MR. GONZALEZ-LLORENS:  Asked and
15        answered.
16  BY MR. BURTON:
17       Q.    You have no recollection as you sit here
18  today?
19       A.    I remember there was $300 given to Steve
20  for Denny's.  I don't know who did it.  I remember
21  finding that out.
22       Q.    When you found out, do you remember
23  talking to that person?
24       A.    I talked to three people about it.
25       Q.    Who?

54

```
 1              A.    My cashier supervisors.
 2              Q.    Do you remember what any of them may
 3     have told you as you sit here today?
 4              A.    I remember asked asking Steve for the
 5     receipt.
 6              Q.    I asked you about cashier supervisors.
 7              A.    I asked all three of them.
 8              Q.    Do you remember what any of them
 9     said to you as you sit here today?
10              A.    As I sit here today?
11              Q.    Yes.
12              A.    Specifically, no.
13              Q.    Do you remember generally what any
14     of them may have told you?
15              A.    Betty remembered something about it, but
16     she didn't know what she remembered.
17              Q.    She remembered something about it, but
18     she said she didn't remember what she remembered?
19              A.    I don't know.  I don't remember the
20     exact conversation.  Generally, she had no specifics
21     on it.
22              Q.    Did you ever do anything after that to
23     research it between then and the time that you were
24     asked to write down the statement that you recall?
25              A.    Yes.
```

55

| | | |
|---|---|---|
| 1 | Q. | What did you do? |
| 2 | A. | I asked Steve for the receipt. |
| 3 | Q. | What did he tell you if you recall? |
| 4 | A. | He had it and he was going to bring it |
| 5 | to me. | |
| 6 | Q. | Do you know if he ever brought it to the |
| 7 | cashiers? | |
| 8 | A. | To the cashiers. |
| 9 | Q. | Yes. |
| 10 | A. | I don't know. |
| 11 | Q. | To this day, did you ever find out |
| 12 | whether they had had it given to them? | |
| 13 | A. | No. |
| 14 | Q. | Before you wrote the statement, did you |
| 15 | determine whether it had ever been given to the | |
| 16 | cashiers? | |
| 17 | A. | Yes. |
| 18 | Q. | What did you determine and from whom? |
| 19 | | MR. GONZALEZ-LLORENS:  Objection.  Asked |
| 20 | | and answered. |
| 21 | | THE WITNESS:  I don't remember. |
| 22 | BY MR. BURTON: | |
| 23 | Q. | Did you determine whether or not it had |
| 24 | been given; in other words, did you remember which | |
| 25 | one of those it turned out to be? | |

1          A.      I remember that nobody had ever seen a

2     receipt.

3          Q.      That's what you remember as you sit here

4     today.

5          A.      That's what I remember.

6          Q.      At the time you wrote the statement had

7     you updated it to find out whether or not that was

8     still accurate?

9          A.      What?

10         Q.      Let's assume this happened, and I'm just

11    giving a hypothet to explain it, it's now a month

12    later and you're asked to write about it.  Did you

13    go "Now that I'm asked to write about it, I'll check

14    again to see whether it's there."  Did you go back

15    to see whether the receipt was there at the time you

16    wrote the statement to see whether or not it had

17    been in fact supplied?  Did you go again do you

18    recall?

19         A.      Yes.

20         Q.      And you're saying as you sit here today

21    you don't recall anyone saying they had it in their

22    book?

23         A.      I know there is not a voucher processed

24    for it.

25         Q.      Was it given to anyone as you sit here

1    today?  Did you determine whether or not it had been
2    given to anyone?
3              A.    That's how I determined that it had not
4    been.
5              Q.    Did you ask anyone, ma'am?  I'm not
6    asking you to look at the stupid book.
7              A.    I don't remember.  I talked to all three
8    of my supervisors.
9              Q.    Initially, correct?
10             A.    Yes.
11             Q.    Did you speak to all three of them
12   again?
13             A.    Yes.
14             Q.    And you recall all three of them saying
15   they didn't know anything about it?
16             A.    I don't remember our conversations
17   specifically.
18             Q.    Did it stay outstanding for the whole
19   time that you know of or don't you know?
20             A.    What stayed outstanding?
21             Q.    Was it still out of balance for $300
22   until the time that Steve left to the best of your
23   knowledge?
24             A.    Yes.
25             Q.    Did you speak to Betty Gadsen?

1          A.     Yes.

2          Q.     Didn't Betty tell you that she had had

3    the receipt since the next morning?

4                 MR. GONZALEZ-LLORENS:  Objection.

5          Assumes unestablished facts.

6                 THE WITNESS:  I don't remember.

7    BY MR. BURTON:

8          Q.     Didn't Betty Gadsen tell you that the

9    next day she told you that she had reconciled it?

10                MR. GONZALEZ-LLORENS:  Objection.

11         Assumes unestablished facts.

12                THE WITNESS:  I don't remember.

13   BY MR. BURTON:

14         Q.     Ma'am, you just simply said you checked

15   it out.  Wasn't she one of the people you checked it

16   with?

17         A.     Yes, she was, but I also said I don't

18   remember the conversations.

19         Q.     You said that it wasn't reconciled, and

20   I'm asking you if may have been in error when you

21   made that statement a few seconds ago?

22         A.     Not to the best of my knowledge and

23   recollection.  I don't know.

24         Q.     You don't know whether you were in error

25   or not in error, do you?

1          A.    Well, I wasn't in error.

2          Q.    So you're saying that if Betty Gadsen

3     told you she had that conversation with you she's

4     lying?

5               MR. GONZALEZ-LLORENS:   Objection

6          argumentative.

7               THE WITNESS:   No.

8     BY MR. BURTON:

9          Q.    Ma'am, you don't remember Betty Gadsen

10    specifically telling you that she rang a register

11    for voucher for the receipt for Steve for Denny's

12    that morning?

13              MR. GONZALEZ-LLORENS:   Objection.   Asked

14         and answered.

15              THE WITNESS:   I don't remember.   I know

16         there was no voucher processed for that

17         Denny's for Steve.

18    BY MR. BURTON:

19         Q.    Ma'am, who did you tell this to?   Did

20    you ever tell it to Gillespie?

21         A.    No.

22         Q.    Did you ever tell Barth?

23         A.    No.

24         Q.    Frankhauser?

25         A.    Yes.

60

```
 1        Q.    Why?
 2        A.    Because he was my check in the store,
 3   and he asked me about a $300 shortage.
 4        Q.    So he knew about it before you talked to
 5   him?  He asked you about it?
 6        A.    Yes.
 7        Q.    Did you speak to Mr. Hastings?
 8        A.    I don't remember.
 9        Q.    You may have, but you're not sure?
10        A.    I don't know.
11        Q.    Is it normal for you to call up and
12   report on your boss and tattle on him?
13            MR. GONZALEZ-LLORENS:  Objection.
14   BY MR. BURTON:
15        Q.    I like the word.  I'll use it.  Is it
16   normal for you to tattle on your boss.
17            MR. GONZALEZ-LLORENS:  Objection
18        argumentative.
19   BY MR. BURTON:
20        Q.    Answer.  Do you understand the question,
21   ma'am?
22        A.    Yes.
23        Q.    Please answer.
24            MR. GONZALEZ-LLORENS:  Same objection.
25            THE WITNESS:  I don't know what
```

1           tattling.

2    BY MR. BURTON:

3           Q.    You don't know what the word tattling

4    means?

5           A.    I don't know what you consider tattling.

6           Q.    Is it normal for you to pick up the

7    phone and call your boss' boss and say, "I'll tell

8    you something that you may not like to hear about

9    what my boss did, which is your employee"? Is that

10   normal for your process. Do you do that?

11              MR. GONZALEZ-LLORENS:  Objection.

12              Assumes unestablished facts and speculation.

13              THE WITNESS:  If I don't like something,

14              there is an open door policy for human

15              resources that you can call at anytime if you

16              don't feel comfortable.

17   BY MR. BURTON:

18          Q.    Did you do that in this case or every

19   case involving Steve Harris, did you call up

20   Mr. Hastings?

21          A.    No.

22          Q.    You're sure?

23          A.    Not that I remember.

24          Q.    Is that "I'm sure" or "I don't

25   remember"?

62

```
 1            A.    I'm sure I never called Mark.
 2            Q.    Who would you have called if you were
 3    going to report Mr. Harris' conduct?
 4            MR. GONZALEZ-LLORENS:  Objection.
 5        Assumes unestablished facts.
 6            MR. BURTON:  Noted.
 7            THE WITNESS:  I don't know.  I wouldn't
 8        have called anybody I don't think.  I would
 9        have called Mark or Terry.
10    BY MR. BURTON:
11            Q.    Terry meaning Terry Gillespie or Mark
12    Hastings?
13            A.    Yes.
14            Q.    Since you are now saying if that did
15    happen you would have called them, do you remember
16    how many times you called them?
17            MR. GONZALEZ-LLORENS:  Objection.
18        Assumes unestablished facts.
19            THE WITNESS:  I don't even recall that I
20        called them.
21            MR. BURTON:  I'm going to have her step
22        out and explain to you Mr. Gonzalez-Llorens
23        why I'm asking this.  Please step out for a
24        second, ma'am.
25            THE WITNESS:  Fine.
```

63

1              MR. GONZALEZ-LLORENS:   That's fine.   I

2        have no problem with that.

3              (Thereupon, the witness left the

4              deposition room.)

5              MR. BURTON:   What she said was Mr.

6        Frankhauser said is I did not have a

7        conversation with her about it first.   I was

8        told to call her by Mr. Barth, who already

9        knew of the incident.  He surmised the only

10       conceivable way that could have occurred,

11       since it did not come through him, was a call

12       that she made either directly or indirectly to

13       either Mr. Hastings or Mr. Gillespie and he

14       said it would have had to have been Mr. Barth

15       or Mr. Hastings or Mr. Gillespie, because it

16       didn't come any other way.  So that is a

17       perfectly proper question.

18             MR. GONZALEZ-LLORENS:   But she doesn't

19       remember anything.

20             MR. BURTON:   She doesn't remember

21       anything, which is true.  We can stop the

22       question right there, but the question is I

23       would like to probe her memory, because,

24       apparently, what we have here, for whatever

25       reason, I believe them to be discriminatory,

Worldwide Reporting Service
Miami ∞ Orlando ∞ Tampa

64

1    however, we have someone who is, if you will,

2    I use the term back-channeled that I used

3    three days ago.  Apparently, they

4    back-channeled on her and I'm going to inquire

5    about it.

6         MR. GONZALEZ-LLORENS:  That's fine.  You

7    can ask her whatever you want.

8         MR. BURTON:  I'll note all your

9    objections.  They're all preserved.  Let me

10    proceed with it.

11         MR. GONZALEZ-LLORENS:  Absolutely.

12         MR. BURTON:  What I'm saying to you is

13    all of your objections are throwing her off,

14    which doesn't take very much as you can see.

15    All your objections are noted and preserved.

16         MR. GONZALEZ-LLORENS:  I can't do that

17    on the record.  I have to object every single

18    time.  That's what the rule is.  Ask her the

19    questions, but I'll make the objections.

20         (Thereupon, a brief recess was taken.)

21    BY MR. BURTON:

22         Q.    Up until that time had you seen and

23    spoken to Mr. Gillespie more than once?  You said

24    you hadn't yet met him for the P3 interview, but you

25    just answered "If I had called anyone, I would have

65

1    called Terry," using his first name, or Mark.

2         A.    Rephrase the question.

3         Q.    "If I had called someone, I would have

4    called Terry or Mark, Mark Hastings or Terry

5    Gillespie."

6         A.    Right.

7         Q.    Had you spoken to Mr. Gillespie or

8    Mr. Hastings personally between the time you had

9    been asked to be the captain for credit cards at

10   this point?

11        A.    Yes.

12        Q.    For what purpose or purposes?

13        A.    Visits in the store, credit.

14        Q.    Ever go out and have a drink with him?

15        A.    No.

16        Q.    Ever drink with him at any Target

17   function?

18        A.    I don't drink.

19        Q.    Did you ever go and have a coke while

20   they had a drink?

21        A.    I mean we went on the Target boat.

22        Q.    What's the Target boat?

23        A.    It's a cruise they take for the boat

24   parade.

25        Q.    That would have been Christmas, I guess,

66

1  of '98?

2          A.    '97, '98.

3          Q.    Was Mr. Harris there?

4          A.    For '98, yes.

5          Q.    Were you talking specifically, do you

6   remember, to Mr. Hastings, as long with

7   Mr. Gillespie, on that boat?

8          A.    I don't know.

9          Q.    You said "If I called someone, I would

10  have called them."  Why are you answering that way?

11         A.    Because they were the people you go to

12  in an open door policy.

13         Q.    This is a written policy?

14         A.    I know there's an open door policy.  I

15  don't know where in writing it is.

16         Q.    I'm asking some very specific questions,

17  because I have reason to believe that you had a

18  conversation that did not go to Mr. Frankhauser, but

19  where you told about this $300 to someone, either

20  Mr. Gillespie, Mr. Hastings or Mr. Barth.  I'm

21  asking you do you recall having such a conversation

22  before Mr. Frankhauser came to you?

23         A.    I don't recall having such a

24  conversation.  I don't recall it.

25         Q.    Do you recall if you ever talked to

67

```
 1    Mr. Gillespie, Mr. Hastings or Mr. Barth about
 2    Mr. Harris at all prior to the witness statement?
 3         A.    Yes.
 4         Q.    Tell me what you recall about that.
 5         A.    I remember talking to Mark Hastings.
 6         Q.    Tell me what you said to Mark Hastings.
 7         A.    I don't remember.
 8         Q.    What was it about?
 9         A.    Steve.
10         Q.    Tell me what you were saying about
11    Steve.
12         A.    I don't remember.  I remember a brief
13    conversation with Mark.
14         Q.    You picked up the phone and called him
15    or he called you?
16         A.    I don't remember.  I think he called me,
17    but I'm not sure.
18         Q.    About how much before you were asked to
19    make the statement?
20         A.    I don't know.
21         Q.    Was it before?
22         A.    I don't know.
23         Q.    You have no recollection of anything
24    that you may have badmouthed Steve about?
25              MR. GONZALEZ-LLORENS:  Objection.
```

68

```
1    BY MR. BURTON:
2         Q.   Using the term absolutely.  What was he
3    asking?
4         A.   He was asking something about Steve.
5         Q.   And I'm asking what.
6         A.   I don't remember.
7              MR. GONZALEZ-LLORENS:  Objection.  Asked
8         and answered.
9    BY MR. BURTON:
10        Q.   Had you yet told him about the $300?
11        A.   No.
12        Q.   So tell me, since he doesn't know about
13   the $300, what he was asking about Steve to you?
14             MR. GONZALEZ-LLORENS:  Objection
15        speculation as to the $300.
16             MR. BURTON:  She said he hadn't been
17        told yet.
18             THE WITNESS:  I don't know if he hadn't
19        been told.
20   BY MR. BURTON:
21        Q.   You don't recall telling him at that
22   time.
23        A.   No.  I don't remember any of the
24   conversation, other than him calling me and me being
25   surprised to hear from Mark Hastings.  That's like
```

69

1    an honor at Target, because he never would call me

2    on a personal level.

3        Q.    So do you remember what he called you on

4    a personal level about Steve for?

5        A.    No.

6        Q.    Do you remember how much before Steve

7    was fired?

8        A.    No.

9        Q.    Since you were so honored, do you

10    remember what you did as a result of having been

11    called?

12            MR. GONZALEZ-LLORENS:   Objection.

13            THE WITNESS:   I don't remember.   I

14        don't remember doing anything.

15    BY MR. BURTON:

16        Q.    I know your memory isn't the best in the

17    world.   I'm not saying that to insult you.   You do

18    recall the Denny's was approximately around

19    Christmas of 1998.

20        A.    Yes.

21        Q.    Because these people were being bought

22    breakfast for having worked long hours to get ready

23    for Christmas, as I recall.

24        A.    It was for the flow team breakfast.

25        Q.    What is that?

70

1         A.    The flow team are the people that flow
2     the trucks.
3         Q.    There is no doubt that there was a flow
4     team breakfast?
5         A.    Right.
6         Q.    There's no doubt that the money was paid
7     for by Mr. Harris, correct?
8              MR. GONZALEZ-LLORENS:   Objection
9          speculation.
10             THE WITNESS:   I don't know.   I didn't go
11         to Denny's.
12    BY MR. BURTON:
13        Q.    Did you talk to any of the people who
14    did go to Denny's to find out who paid for it?
15        A.    No.
16        Q.    You're not suggesting that the money
17    wasn't used for that, are you, as you sit here
18    today?
19        A.    I'm not suggesting anything.
20        Q.    I know that, but one of those
21    suggestions isn't that Mr. Harris didn't use the
22    money for that purpose, is it?
23        A.    No.
24        Q.    Was there any other problem you had with
25    Steve Harris, other than the $300 that day?

1          A.    What kind of problem?

2          Q.    Of any nature.  Anything in the world,

3   ma'am.  I don't want to lead you.

4          A.    No problems.

5          Q.    Do you recall any problems, differences,

6   altercations, any comments about the way he did his

7   job as you sit here today other than the $300?

8          A.    I'm sure we did, but I don't remember

9   them.  Of course, he's the boss, he's my boss, but I

10  don't remember in detail.

11         Q.    You did write two statements.  Do you

12  recall that?

13         A.    Yes.

14         Q.    One of them is marked.  It's Target 268,

15  269 and 270.  This is right after you spoke with

16  Mark the first time?

17             MR. GONZALEZ-LLORENS:  This is Composite

18         Exhibit Number 2?

19             MR. BURTON:  Yes.

20             (The document referred to was thereupon

21             marked "Exhibit No. 2 for

22             Identification.")

23  BY MR. BURTON:

24         Q.    Do you recall writing that, ma'am?

25             MR. BURTON:  Counselor, this is why I

72

1    wanted Mark Hastings' deposition.  This is on

2    the record.  I'm sure you can appreciate that

3    now.  I didn't appreciate being given people

4    who would not know the answers to questions.

5         MR. GONZALEZ-LLORENS:  I do object to

6    your statement that we did not give you people

7    who know the answers to your questions.

8         MR. BURTON:  So far no one has

9    identified them as a witness.

10        MR. GONZALEZ-LLORENS:  Sure.  They're in

11   the position statement.  That's before the

12   EOC.  I thought that was there.

13        MR. BURTON:  He's the guy that compiled

14   this job.

15        MR. GONZALEZ-LLORENS:  Well, we both got

16   self-serving statements on the record.

17        MR. BURTON:  So we're going to take Mark

18   Hastings.

19        MR. GONZALEZ-LLORENS:  I'm not agreeing

20   to anything at this point.

21        MR. BURTON:  You don't have to agree.

22   It's already been agreed to by your

23   co-counsel.

24        MR. GONZALEZ-LLORENS:  I don't know

25   about that.

73

1      MR. BURTON: I'm setting them for the
2      first week of March.
3      MR. GONZALEZ-LLORENS: You can do
4      whatever you wish. I still have to see
5      whether she agreed to it, which I don't think
6      she did. Whether we can work this out, well,
7      I hope we can.
8      MR. BURTON: I'm not even going to
9      comment or dignify that. I told her I was
10     noticing it and she agreed to it. You can ask
11     her yourself, and, by the way, I expect
12     Mr. Hastings to be here.
13     MR. GONZALEZ-LLORENS: Let's avoid any
14     further self-serving comments.
15  BY MR. BURTON:
16     Q.   Ma'am, did you ever speak to anyone
17  other than Mr. Hastings about what you claim
18  Mr. Harris' conduct to be? Did you speak to
19  Mr. Gillespie?
20     A.   No.
21          Wait. Yes.
22     Q.   Before or after the incidents? Before
23  or after the firing?
24     A.   I don't remember.
25     Q.   Do you remember what you said to him?

1          A.    No.

2          Q.    Now, this is an undated statement.  Do

3     you remember when you wrote it?

4          A.    I was still in Deerfield.

5          Q.    That gives us a good year.  Do you

6     remember within that year when you wrote it?

7          A.    Between Christmas and April.

8          Q.    Anything closer than Christmas and

9     April?

10         A.    I don't know.

11         Q.    Why don't you write on this "I wrote

12    this between Christmas and April." Why don't you put

13    those words on there.  That's perfectly proper.

14              MR. GONZALEZ-LLORENS:  No, it isn't.

15              MR. BURTON:  Why?  I'm asking her on

16         there to date it now.  It's my exhibit.  Tell

17         me why it isn't proper.  If you can give me

18         one rule of evidence that says why I can't do

19         that.

20              MR. GONZALEZ-LLORENS:  Let me look at

21         this first.

22              MR. BURTON:  It's just a statement she

23         wrote.  She's saying that she wants to say

24         between Christmas and April.  If that's the

25         best she can do, I just want it on there so

75

```
1          I'll know what it means later.
2               MR. BURTON:  Please write it on there.
3               THE WITNESS:  Upon reexamining it, I
4          notice I have February 10th on there so it was
5          after February 10th.
6     BY MR. BURTON:
7          Q.   So between February 10th and April is
8     your best estimate?
9          A.   Yes.
10         Q.   Please put that on there, "I wrote this
11    between February 10th and April."
12              MR. GONZALEZ-LLORENS:  And my objection
13         to her writing on this composite exhibit.
14              MR. BURTON:  Certainly noted.
15    BY MR. BURTON:
16         Q.   At whose request did you write that?
17         A.   I don't remember who it was.
18         Q.   Who did you speak to about this as you
19    sit here today?
20         A.   Don Frankhauser.
21         Q.   Anyone else?
22         A.   I don't remember if it was Mark Hastings
23    or Don Frankhauser.
24         Q.   They asked you to write something?
25              MR. GONZALEZ-LLORENS:  Objection.
```

76

1          Assumes unestablished facts.
2     BY MR. BURTON:
3          Q.    Did they ask you to write something?
4          A.    Yes.
5          Q.    Was this in response to what they asked
6     you to write?  Did they ask you to write about these
7     incidents?
8               MR. GONZALEZ-LLORENS:  Same objection.
9               THE WITNESS:  No.
10    BY MR. BURTON:
11         Q.    Why did you choose these incidents.
12         A.    I don't remember what they asked me to
13    write or why I wrote that right now, but they must
14    have been incidents that stood out in my head.
15         Q.    Did they go over incidents with you, "Do
16    you know this one?  Do you know that one"?
17         A.    No.
18         Q.    You weren't there for the miscellaneous
19    on the register, were you, for the towels?
20         A.    No.
21         Q.    So why were you writing about something
22    that you knew at best third-hand?
23               MR. GONZALEZ-LLORENS:  Objection.
24               THE WITNESS:  What does it say?
25    BY MR. BURTON:

1     Q.    Ma'am, do you remember writing about the

2     towels?

3     A.    No, I don't.  That's why I'm asking you

4     what it says.

5     Q.    You just finished reading it.  It took a

6     few minutes for you to read the three pages of that

7     document.  Is that accurate?

8     A.    Yes.

9     Q.    You don't remember what you read maybe

10    less than five minutes ago?

11    A.    I was remembering a lot of stuff as I

12    read that, but I don't remember.

13    Q.    So you have no recollection of anything

14    that you wrote regarding towels?

15    A.    Can you read it to me?

16    Q.    No, I'm not.  Do you have any

17    independent recollection even after having refreshed

18    yourself?

19    A.    About what?

20    Q.    About towels.

21    A.    Yes.

22    Q.    What?

23    A.    I remember there was an issue in the

24    store about towels.

25    Q.    Ma'am, didn't you buy one of those

78

1    towels yourself at the same markdown price?  I have

2    three people that said you also bought towels.

3         A.    I bought towels, yes.

4         Q.    At the same price that Steve bought

5    them, correct?

6         A.    I don't know what price Steve bought

7    them at.

8         Q.    They were the same towels, weren't they?

9         A.    I don't know.  I didn't see them.

10        Q.    You bought the towels and you didn't

11   see?

12             MR. GONZALEZ-LLORENS:  Objection.

13             THE WITNESS:  I didn't see Steve's

14        towels.

15   BY MR. BURTON:

16        Q.    Didn't you buy markdown towels one or

17   two days of when he bought it that you found out

18   later may not have properly been marked down?

19        A.    No.

20        Q.    You were never told they were the same

21   towels at the same price?

22        A.    I know there were no towels left.  By

23   the time I got to the store everybody else had

24   bought them.

25        Q.    So this was everyone buying them, right?

79

```
 1        A.    There were two other people that I had
 2   talked to that had bought them.
 3        Q.    And you bought them too, didn't you?
 4        A.    No.   There were none left.
 5        Q.    Didn't you buy additional towels later?
 6        A.    Not later.   I bought calls way before.
 7        Q.    Do you know if it was a markdown or not?
 8        A.    It was on clearance.
 9        Q.    So that means, yes, it was on markdown
10   clearance, correct?
11            MR. GONZALEZ-LLORENS:   Objection.
12            THE WITNESS:   Right.   It was on
13        clearance.
14   BY MR. BURTON:
15        Q.    Do you know if those were the same price
16   or the same towels?
17        A.    No.   I don't know.   I never saw the
18   towels.
19        Q.    Did you ever tell Mr. Hastings that you
20   also bought towels like most of the other people in
21   the store that you just told the court reporter?
22        A.    I don't remember.
23        Q.    You don't remember if you did or if you
24   didn't?
25        A.    If I told him?
```

1       Q.      Yes.

2       A.      No.  Specifically, if I wrote it in a

3   letter, I don't know.

4       Q.      Until today you've never told him that

5   you recall that you bought towels.

6       A.      I bought towels.

7       Q.      But did you tell him that?

8               MR. GONZALEZ-LLORENS:  Objection.  Asked

9           and answered.

10              THE WITNESS:  I don't know.

11  BY MR. BURTON:

12      Q.      Did you tell Frankhauser?

13      A.      I don't know.

14  BY MR. BURTON:

15      Q.      Do you remember telling either of them

16  when you were asked about the towels of Steve that

17  you had also brought it and so had other people?

18      A.      No, I don't remember.

19      Q.      What about the toy?  Do you remember a

20  toy that Mr. Blotnick bought?

21      A.      No.

22      Q.      You don't remember a toy that he put on

23  his employee number versus Mr. Harris and his

24  number?

25              MR. GONZALEZ-LLORENS:  Objection.

81

1          Assumes unestablished facts.

2    BY MR. BURTON:

3          Q.    Did you ever hear that?

4          A.    No.

5          Q.    Do you remember an incident regarding

6    Evan's party, his going-away party at Shooters?

7          A.    I went to that party at Shooters.

8          Q.    Did you?

9          A.    Yes.

10         Q.    I noticed you said you were not drinking

11   and I accept that.  Other people were drinking,

12   weren't they?

13         A.    I don't remember.

14         Q.    You don't remember people drinking,

15   ma'am.

16         A.    I would imagine.

17               MR. GONZALEZ-LLORENS:  Objection.  Asked

18         and answered.

19   BY MR. BURTON:

20         Q.    Ma'am, I don't want to know imagine.

21         A.    I don't remember.

22         Q.    Do you remember how long the party went?

23         A.    No.

24         Q.    Do you remember anything about the party

25   other than you went there?

82

```
 1        A.    I got pizza.
 2        Q.    Other than you're eating pizza, do you
 3   remember anything else?
 4        A.    It was a nice atmosphere.  We sat on the
 5   patio.
 6        Q.    Did you pay for your pizza?
 7        A.    No.
 8        Q.    Who paid for it?
 9        A.    I don't know who paid the bill.  I
10   thought Steve did.
11        Q.    What made you believe Steve paid the
12   bill?
13        A.    Because he had the money to pay for it
14   from the store.
15        Q.    That's a good start.  How do you know he
16   had the money from the store?
17        A.    Because he was the one who took it.
18        Q.    In your presence?
19        A.    No.
20        Q.    From who did you find that out?
21        A.    I just assumed he had it.  It wasn't me.
22   It wasn't Evan.  It wasn't Don.  It had to be Steve.
23        Q.    Do you know if he ever offered the
24   change back, which would have equalled more
25   than --
```

1          A.    I don't know.

2          Q.    Ma'am, are you aware that he gave money

3     back to the register?

4          A.    There is a voucher processed.  I'm aware

5     there was a voucher processed.

6          Q.    Who do you remember processing the

7     voucher?

8          A.    I don't remember who did that.

9          Q.    Did you speak with that person?

10         A.    I don't remember.

11         Q.    Didn't you report or rat on Mr. Harris

12    to Mr. Frankhauser about that?

13              MR. GONZALEZ-LLORENS:   Objection

14         argumentative and assumes unestablished facts.

15    BY MR. BURTON:

16         Q.    Didn't you speak with Mr. Frankhauser

17    about how Steve had given less?

18         A.    No.

19         Q.    You didn't have a conversation with

20    Frankhauser --

21         A.    No.

22         Q.    -- at all about Steve and the meeting at

23    Shooters?

24         A.    No.

25         Q.    Never did to the best of your

```
 1   recollection?

 2        A.    Not that I remember.

 3        Q.    Were you asked to write anything about

 4   that by anyone that you can recall, either Mark or

 5   anyone?

 6        A.    I don't know.

 7        Q.    So you have no recollection of having

 8   been asked to doing it as you sit here today?

 9        A.    No.

10        Q.    Did you ever hear about Steve supposedly

11   throwing out cardboard boxes in the back against the

12   policy of Target?  Ever hear of that story?

13        A.    I heard a rumor.

14        Q.    What did you hear?

15        A.    That Steve threw out Target

16   cardboard boxes?

17        Q.    And who supposedly was involved in that?

18        A.    Steve.

19        Q.    Who did it for him?  Was he the only one

20   involved?

21        A.    I only remember Steve's name in the

22   story.

23        Q.    Who did you hear the story from?

24        A.    I don't remember.

25        Q.    What did you here about the story?
```

85

1          A.     Steve threw out cardboard boxes, repack
2     boxes.
3          Q.     Did you ever speak with anyone about
4     that story that you recall?
5          A.     No.
6          Q.     Do you know if it's true?
7          A.     No.
8          Q.     What about Power Wheels.  Did anyone
9     ever buy any Power Wheels there?
10         A.     Yes.
11         Q.     Who?
12         A.     The guests.  We sold them.
13         Q.     Did Steve ever buy any that you are
14    aware of?  Have you ever heard any stories regarding
15    that?
16         A.     I heard a story that he bought some.
17         Q.     From whom?
18         A.     I don't remember, but I think it might
19    have been Donna Kyle.
20         Q.     What do you remember Donna saying about
21    the Power Wheels?
22         A.     Steve bought Power Wheels.
23         Q.     Anything improper about that that would
24    have resulted in there being a story about it?
25         A.     It was a rumor that he bought Power

86

1    Wheels that were old and left in the back room.

2         Q.    Is that what Donna Kyle, to the best of

3    your recollection, told you?

4         A.    Yes.

5         Q.    Do you know if that is true, whether he

6    actually did that?

7         A.    No.

8         Q.    Do you know if they were old or if they

9    were new?

10        A.    No.

11        Q.    If there were some old Power Wheels in

12   the back and Donna Kyle had told him they were old

13   Power Wheels they'd be discounted to get rid of

14   them, wouldn't they?

15             MR. GONZALEZ-LLORENS:  Objection.

16        Assumes unestablished facts.

17   BY MR. BURTON:

18        Q.    That comes under the policy of Target?

19        A.    No.

20        Q.    There wouldn't be a policy if they're

21   old and sitting in the back, they wouldn't want to

22   get them out the door?

23        A.    There would be a clearance markdown

24   price, the last possible clearance in the book and

25   you go look it up, yes.

1      Q.    So there would be a markdown procedure.

2      A.    Correct.

3      Q.    That's all I was saying if there was a

4   markdown procedure.

5      A.    A markdown procedure, yes.

6      Q.    Was Donna Kyle involved in that aspect?

7      A.    I don't know.

8      Q.    You don't know whether she was or

9   wasn't?

10     A.    I don't know.

11     Q.    Who is Paula Lane?

12     A.    She was the soft lines executive at

13  Deerfield.

14     Q.    Who was Diane Bass?

15     A.    She worked at Deerfield Target.

16     Q.    What did she do?

17     A.    Price change.

18     Q.    Did she work under Grisback?

19     A.    I don't remember.

20     Q.    Is that the same type of division?

21     A.    Yes.    That would have been under Sandy.

22     Q.    So if she had marked a price change on

23  something you wouldn't know whether it was accurate

24  or inaccurate?

25     A.    I don't know.

88

```
 1        Q.    But that would be the kind of thing that
 2   Ms. Bass would be responsible to do?
 3        A.    She did whatever price changes her
 4   duties were.
 5        Q.    If she puts a price on it, you can
 6   assume that's what it's suppose to be?
 7             MR. GONZALEZ-LLORENS:  Objection.
 8   BY MR. BURTON:
 9        Q.    That would be your understanding of her
10   job.
11        A.    That she took price markdowns, yes.
12   BY MR. BURTON:
13        Q.    Now, was there a mural painted at that
14   time in the store?
15        A.    Yes.
16        Q.    It was like where the employees hang out
17   where the mural was, the Target conference room?
18        A.    Target conference room.
19        Q.    Is that where employees are allowed to
20   go and other people weren't?
21        A.    Yes.  I mean, no.  I mean anyone is
22   allowed to go in there.
23        Q.    Generally people don't hang out in the
24   conference room unless they work there.  Is that a
25   fair way to put it?
```

89

1          A.    That's a fair way.

2          Q.    Do you know if the mural had any black

3    faces on it, any characters of black people?

4          A.    Yes.

5          Q.    Was that painted that way?

6          A.    Yes.

7          Q.    Do you know that it was changed later

8    and the black faces were painted out?

9                MR. GONZALEZ-LLORENS:   Objection.

10         Assumes unestablished facts.

11               THE WITNESS:   I know the entire mural

12         was overpainted.

13   BY MR. BURTON:

14         Q.    When?

15         A.    I don't remember.

16         Q.    When you were there?

17         A.    I don't remember.   I remember hearing

18   about it.   I don't remember.

19         Q.    You don't remember whether it was the

20   next three months or ever?

21         A.    No.

22         Q.    You don't know whether you were there or

23   not at the time?

24         A.    No, I don't.

25         Q.    Do you know who Annette Sternberg is?

90

1        A.    Yes.

2        Q.    Who is she?

3        A.    She was the team leader in the store.

4        Q.    Were you ever told that she was asked to

5   make a statement that she didn't think was true by

6   Mr. Frankauser?

7             MR. GONZALEZ-LLORENS:  Objection.

8        Assumes unestablished facts.

9             THE WITNESS:  No.  I don't know anything

10        about that.

11  BY MR. BURTON:

12       Q.    Would she have been involved with the

13  boxes?

14       A.    I don't know.

15       Q.    Was that her job as team leader?

16            MR. GONZALEZ-LLORENS:  Objection

17        speculation.

18  BY MR. BURTON:

19       Q.    Was she in the front or the back?

20       A.    She was a sales floor team leader.

21       Q.    Would that put her in the front or would

22  that put her in receiving?

23       A.    She did two jobs.  She did key carrier

24  too, I believe, for a short time.

25       Q.    Key carrier would put her in the back,

91

```
 1    doesn't it?
 2         A.    Yes.
 3         Q.    So she also would have been responsible
 4    for what happens to boxes and what have you,
 5    correct?
 6         A.    Yes.
 7         Q.    Ma'am, do you remember giving any other
 8    statement in writing other than the one that we had
 9    marked?
10         A.    Yes.
11         Q.    Where is a copy of that.  Have you been
12    shown it recently?
13         A.    Yes.
14         Q.    Do you have a copy of it with you?
15         A.    No.
16         Q.    Who showed it to you?
17         A.    Rene.
18         Q.    The gentleman next to you?
19         A.    Yes.
20         Q.    When did you talk or meet with him?
21         A.    Yesterday.
22         Q.    Where?
23         A.    Broward Boulevard.
24         Q.    Did he tell you at all what might be
25    asked of you today?
```

92

1          A.     Yes.

2          Q.     What did he say?

3          A.     He explained the deposition process,

4   your name, where you're from.  Stuff like that.

5   Just explained to me the process of how it would

6   happen.

7          Q.     Isn't is it fair to say that if I look

8   at the voucher book I'll find any number of vouchers

9   that don't have the receipts attached?

10         A.     Yes.

11         Q.     Why would that be, other than the ones

12  that were filed by Mr. Harris?

13         A.     Because you're suppose to send the

14  receipts in.

15         Q.     To where?

16         A.     Central Audit.

17         Q.     I'll ask the other side.  Do you know

18  why the voucher book would have the receipts

19  attached to it now for other vouchers?

20         A.     It has what's called a pop-up slip that

21  shows it has been processed.

22         Q.     Is there a consistency in there?  In

23  other words, some of them are allowed to be this way

24  and some are allowed to be that way?

25         A.     They're all suppose to be the same.

93

1       Q.    Do you know if that was done when you
2   were in charge of it if it was done properly?
3       A.    No.  Not all the time.
4       Q.    Can you tell me why it would not have
5   been done properly all the time?
6       A.    No.  Cashiers made mistakes that are
7   rushed.
8       Q.    When that happened what did you do to
9   make sure that you were properly acting as Target's
10  GSTL?
11      A.    I have an auditor assigned to my store
12  that goes through all the vouchers.  When she
13  receives them, once that voucher reaches her I can
14  double-check anything I need to.
15      Q.    No what you could do.  What did you do?
16      A.    When I was missing a voucher.
17      Q.    Yes.
18      A.    I called my auditor.
19      Q.    But there were times that you never got
20  it correct.
21          MR. GONZALEZ-LLORENS:  Objection.
22          Assumes unestablished facts.
23  BY MR. BURTON:
24      Q.    Weren't there ones that never got
25  done properly?

94

1        A.    Vouchers?

2        Q.    Yes?

3        A.    There were vouchers not having the

4    pop-up slip that would make it incorrect, but I had

5    to research it if there was a shortage no matter

6    if there was a pop-up slip or not.

7        Q.    I understand.  You said you researched

8    it.  What was the culmination?  How did you conclude

9    the research?  What happened?  If you didn't get the

10   receipt, how would you resolve it?

11       A.    I would find out from the auditor where

12   the voucher was processed from.

13       Q.    That's circular, ma'am.  Weren't there

14   items that never worked properly and checked out and

15   you just simply said that's all we can do?

16       A.    Oh, yes.

17       Q.    Once that happened, what did you then do

18   to reconcile the books?

19       A.    I would have to write all of the

20   research I had done.

21       Q.    To who would you write it?

22       A.    Just on a sheet.

23       Q.    And give it to who?

24       A.    Nobody.

25       Q.    It just stayed in there as it was?

95

```
 1          A.    Don Frankhauser.
 2          Q.    You gave it to Don and that was the last
 3    you heard about it is what you're telling me,
 4    correct?
 5          A.    Right.
 6          Q.    Do you know why that wasn't done
 7    regarding Mr. Harris' receipt?
 8                MR. GONZALEZ-LLORENS:  Objection.
 9          Assumes unestablished facts.
10                THE WITNESS:  I don't know what you're
11          talking about.  What wasn't done?
12    BY MR. BURTON:
13          Q.    Did you go to Don and say, "I'm missing
14    this receipt from Denny's.  We definitely know it
15    was breakfast."
16          A.    I don't remember.
17                MR. BURTON:  I was looking for her other
18          statement.
19                MR. GONZALEZ-LLORENS:  It's Exhibits D
20          and E to the position statement.  You have it
21          there.  Can I see your position statement?
22                MR. BURTON:  I used it yesterday.  I
23          thought I had another copy.
24                MR. GONZALEZ-LLORENS:  I think I may
25          actually have it here.
```

96

1    BY MR. BURTON:

2         Q.    I'm looking now at what was courteously
3    supplied as Exhibits 110 and 112, which are two
4    other statements that you prepared.  I've tried to
5    find dates on these and cannot.  One talks about the
6    12/17/98.  This is the Denny's $300, and the other
7    one is also about the $300, but there are two
8    separate statements.  Can you tell me why you were
9    asked to write this?  This is now three statements
10   on the same $300?

11        A.    I don't know.

12        Q.    Do you see what I'm talking about?

13              MR. BURTON:  Would you allow me to

14        attach them?

15              MR. GONZALEZ-LLORENS:  Sure.

16              MR. BURTON:  This will be 3 and 4.

17              (The documents referred to were

18              thereupon marked "Exhibit Nos. 3 and 4

19              for Identification.")

20   BY MR. BURTON:

21        Q.    I asked you when and you're just looking
22   at them.  You have no idea when you wrote them?

23        A.    Before I left Deerfield.

24        Q.    That would put it in the same category
25   as between February or even earlier, I don't know,

1    perhaps between January and May.  Is there anything

2    that you can do a little bit better to see if there

3    is anything in there that will help you pin that

4    down as to who you wrote them to or when you wrote

5    them or why you wrote them and what you were asked?

6              A.    I was asked to write them.

7              Q.    Do you remember by whom?

8              A.    Either by Mark or Don.

9              Q.    Mark Hastings or Don Frankhauser,

10   correct?

11             A.    Yes.

12             Q.    Did they tell you what the purpose was

13   in writing them?

14             A.    No.

15             Q.    Had you spoken with Mr. Gillespie or

16   Mr. Hastings before you were asked to write them?

17             A.    I don't know.

18             Q.    You may have.  You don't recall.

19             A.    I don't recall.

20             Q.    I know that Target has a form called the

21   supplemental statement form.  You've seen these all

22   over the place, correct?

23             A.    Yes.

24             Q.    Can you tell me why you weren't asked to

25   write one of them, but why you were asked to write

98

1    on a piece of paper?  It looks like one of them is
2    lined and one is unlined.
3         A.    I don't know.
4         Q.    Were you asked to write about a specific
5    subject that you recall?
6         A.    No.
7         Q.    What were your instructions?  I'm trying
8    to figure it out.
9         A.    I don't even remember who asked me.  I
10   don't remember my instructions.
11        Q.    Did you ever look into what may have
12   happened after Steve took the Evan Feldman money
13   back?  Anything to do with that at all?
14        A.    No.
15        Q.    Do you recall ever being asked about
16   that by anyone?
17        A.    I don't recall, no.
18        Q.    Did you ever hear that Steve had ever
19   been accused of sexually harassing anyone in a prior
20   store?
21        A.    No.
22        Q.    You never heard about it at all?
23        A.    What?
24        Q.    You're shaking your head.
25        A.    No.

1          Q.    You never heard that Steve did that at

2     your store, have you?

3          A.    No.

4                Wait.  I have a young girl.

5          Q.    Who?

6          A.    Tina.

7          Q.    Tina who?

8          A.    Tina McCue.

9          Q.    Can you tell me about Tina McCue, what

10    she supposedly did or did not do?  What did you hear

11    about Tina McCue?

12         A.    I don't remember what I heard.

13         Q.    Something to do with the subject, but

14    you're not sure what it was?

15         A.    Yes.  I don't remember.  I wasn't really

16    involved.

17         Q.    So you've never been asked to write

18    about a check-out or do anything?

19         A.    No.

20         Q.    Under the open door policy, did you ever

21    tell anyone that there was this problem?

22         A.    No.

23         Q.    If there was a problem, the person

24    notified certainly would have been Mr. Frankhauser,

25    correct?

100

```
1          A.     No.
2                Q.     Who would have been talked to?
3                A.     Whoever that person feels comfortable
4     with.  I don't know.  I never even did this.  I
5     would call somebody I trusted to tell about it, but
6     I don't know what Tina would do.
7                Q.     Is there a policy of talking to
8     security if somebody is harassed?
9                A.     Security, no.  I don't know of a policy
10    that states that.
11               Q.     Is there a policy that you know of to
12    talk to anyone?  Is there a specific policy?
13               A.     Open door policy with Target.
14               Q.     Ma'am, is there a place you're suppose
15    to address those kinds of concerns to that you're
16    aware of?
17               A.     A specific place, no.
18               Q.     It's not human resources.  It's not
19    anywhere that you know.
20               A.     You could go to Terry Gillespie.  He's
21    the most obvious person.
22               Q.     Isn't Terry six levels up?
23                    MR. GONZALEZ-LLORENS:  Objection.
24               Assumes unestablished facts.
25    BY MR. BURTON:
```

101

1      Q.   Who in the store would you talk to if
2   there was such an issue?
3      A.   Someone that you trusted.
4      Q.   Is there any direction in the store
5   level to go to go to a specific agency, group,
6   whatever?
7      A.   Not that I'm aware of.
8      Q.   And you don't know anyone that Tina
9   McCue did or didn't go to.  You don't even know if
10  it was gossip or rumor, do you?
11     A.   Exactly.
12     Q.   And have you ever heard any other gossip
13  about Steve regarding anything that he did?
14     A.   I'm sure I have.  I don't know it all at
15  this time thought.
16     Q.   Anything regarding his honesty or
17  dishonesty?
18         MR. GONZALEZ-LLORENS:  Objection
19     speculation.
20         THE WITNESS:  I don't know.  I don't
21     remember right now.
22  BY MR. BURTON:
23     Q.   Do you remember what you were told as to
24  the reason why he was leaving, if anything?
25     A.   No.

102

```
 1              MR. BURTON:  Let me check through my
 2          notes for a second and we may be done.
 3              (Thereupon, a brief recess was taken.)
 4    BY MR. BURTON:
 5         Q.   Do you know if Mr. Frankhauser had an
 6    interest in cars?
 7         A.   I don't know.
 8         Q.   Do you ever recall any conversation that
 9    you had with Don Frankhauser as you sit here today?
10         A.   Yes.
11         Q.   Can you tell me about it?
12              MR. GONZALEZ-LLORENS:  Objection vague.
13    BY MR. BURTON:
14         Q.   Give me the facts.  Not that you had.
15         A.   I remember he gave me a card when I was
16    leaving Deerfield.
17         Q.   What did it say?
18         A.   It said, "Don't fart in public."  I kept
19    it.
20         Q.   Anything else other than that card?
21         A.   When I left I remember I gave him a box
22    of chocolates, because he always ate chocolates and
23    he was on a diet.
24         Q.   So he was your buddy?
25         A.   I gave everybody something, all the
```

103

1    executives.

2         Q.    Other than that, do you remember

3    anything specifically that you had a conversation

4    with Don about race?

5         A.    I remember one day I went out to his car

6    and somebody keyed it and I asked him where he got

7    that.  I don't remember his answer, but I remember

8    thinking "I hope he didn't get it here, because I

9    don't want my car keyed."

10        Q.    I'm trying to get specific.  Do you

11   remember if Don had any strong beliefs, religious or

12   social beliefs that you're aware of?

13        A.    I don't remember.

14        Q.    Do you have any black very close

15   girlfriends, very close, that slept over at the

16   house?

17        A.    I have a very close guy friend.

18        Q.    Black man?

19        A.    Yes.

20        Q.    Have you dated him?

21        A.    No.

22        Q.    Have you ever had a black sleep over at

23   your house?

24             MR. GONZALEZ-LLORENS:  Objection

25        irrelevant.

104

1            THE WITNESS: I don't have men sleep

2     over at my house.

3  BY MR. BURTON:

4     Q.    I didn't ask you that.

5     A.    A black woman, yes.

6            MR. BURTON: I have no further

7     questions.

8            MR. GONZALEZ-LLORENS: We'll waive

9     reading.

10          (Thereupon, the deposition was concluded

11          at 1:40 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

105

1          CERTIFICATE OF NOTARY

2     STATE OF FLORIDA:

3               :    ss.

4     COUNTY  OF  DADE:

5          I, STEVEN WASSERMAN, a Notary Public and

6     certified Shorthand Reporter in and for the State of

7     Florida at Large, do hereby certify that I reported

8     in shorthand the deposition of SHANNON TETRAULT

9     pursuant to Notice of Taking Deposition, on behalf

10    of the Plaintiff; that the witness was first duly

11    sworn by me; that the reading and signing of the

12    deposition were waived by counsel for the deponent;

13    was waived by the deponent; that the foregoing

14    pages, numbered from 1 to 104, inclusive, constitute

15    a true and correct transcript thereof.

16         I further certify that I am not an attorney or

17    counsel to any of the parties, nor related to any of

18    the parties, nor financially interested in the

19    action.

20         WITNESS my hand and seal this 9th day of March,

21    2001.

22

23

24               STEVEN WASSERMAN
                  NOTARY PUBLIC
25    My commission expires April 20, 2002



STEVEN WASSERMAN
My Commission # CC 820596
Expires: 04/20/2003
1-800-3-NOTARY    Fla. Notary Service & Bonding Co.

Worldwide Reporting Service
Miami ∞ Orlando ∞ Tampa

this between

Mark,      Feb. 10 + April.

EXHIBIT
Coupo. #2

FYI...

On 12/27/98 I was in charge of working the truck. 5 pallets were not flowed to the floor. Steve instructed us to backstock the unworked pallets.

On 12/28/98 I worked overnight again and was told to push what I could and then backstock the rest of the merchandise unworked. I decided since we only had the ability w/ 5 people to flow and push half of the truck since there wasn't a truck the following night.

- Approx. Oct. 22 The day of rand robin ?ntewiew I was closing and Mark was visiting the next day. I asked if I was signed off. Steve said I would be happy with the results because they were good. The next day after Mark arrived he told me I didn't get signed off. He just wanted me to keep a positive attitude and get a good zone on the night before a visit.

Target/Harris 268

- Also he often puts one exec. against another exec. with he said she said. One day he told me something Paula said about me when I confronted her, she said she never said it.

- She wanted to confront Steve but I was nervous to get into trouble so we didn't.

- On Feb 10, 1999 I went into Steve's office w/ Stacy to confront him on the misc. squggle tickets he had me tape to every register in the store. He told several people including Don Frankhauser, + Sandy Grzybek I was the one who started the program. While we were all in the office he was the one who gave me the instruction to apply the tickets.

- Also in Stacy's presence he said I would have to respect him in order to get transferred out of 393. He said if Mark decided to transfer me w/o Steve's approval he would tell Mark he was responsible for me.

- Also he would often tell one exec's opportunities to the other exec's making us all apprehensive to talk to one another.

**Target/Harris 269**

- Also During the month of Dec. he would shrink wrap unworked freight and put it in the steel in TGA.

# <u>EXHIBIT D</u>

EXHIBIT

3

TARGET/HARRIS109

- From the first week he was in the store he taught the backroom team to do a report to make the ghost % low. I'm not sure which report it is but they were in my office daily printing it

- Another example of a lie Steve told was that he was max. out in vacation and Mark approved him to get vacation pay. He annouced this in the exec. mtg. on 2/8/99. we were all present.


Sherri Tetrault

- On one occasion Steve left the building and when he came back he was in his T-shirt with blonde hairs in his hair several hours later

- Also the first week here he had his own telephone installed for STL use only

- On another occasion Robin Alexis picked him up at 1:00pm for lunch + he returned several hours later.

Target/Harris 270

... had a 300 shortage. This shortage wa

breakfast for everyone on the flow team at De..

On the following Saturday we were back in receiv
throwing boxes into the compactor and I asked hi
again for the Denny's receipt so I could fill
out the voucher. He said he didn't have it but
would bring it in later that week.

Later that week I brought it ___ up whe
I was in his office. He told me he gave ?
to Cecil, Then Caryn, and then Betty. Then he sai
he really couldn't remember.

According to the voucher book there was neve
voucher processed.

I asked Betty she said she remembered someth.
about it, but if she did it she knows Steve
never gave her back any change.

Shannon Tetrault

# EXHIBIT E

**EXHIBIT**

4

TARGET/HARRIS111

- On 12/17/98 Steve told me before I closed the building to give him $300. He took the money for Denny's to by the overnight team breakfast. Betty seems to remember processing a voucher but she said she never recieved any change from the rest of the bill.

- Also on another occasion I saw Steve by 2 towels out of charge back when I questioned him on the towels he told me Maureen Merecka bought about 20 of 30 towels. My service desk team member Mona told me Steve told Angela to take them out of chargeback and sell them.

- Also I asked Steve one day in an exec meeting w/ Sandy, Don, Sunil and myself staked that he e-mailed Mark about the 10% coupon and that it was ok to use the caxper because Mark okayed it. Sandy G also heard him say it.

This is to the best of my recollection.

Steven Titult