1                   IN THE UNITED STATES DISTRICT COURT

                  SOUTHERN DISTRICT OF FLORIDA

2                   FORT LAUDERDALE DIVISION

3                CASE NO. 00-6107-CA FERGUSON

4 ------------------------------------x

    STEVE HARRIS,                    )

5                                )

                   Plaintiff,    )

6                                )

            - against -        )    ORIGINAL

7                                )

    DAYTON HUDSON CORPORATION, d/b/a  )

8     TARGET STORES,                )

                               )

9                    Defendant.    )

------------------------------------x

10

11

12                 3475 Sheridan Street

                Hollywood, Florida

13                 March 12, 2001

14                 1:30 p.m.

**NIGHT BOX
FILED**

APR - 6 2001

15                           CLARENCE MADDOX
                        CLERK, USDC / SDFL / FTL

16

17

18           DEPOSITION OF DOUGLAS S. BARTH

19

20          Taken before Phillip S. Storch,

21  Registered Professional Reporter and Notary Public

22  in and for the State of Florida at Large, pursuant

23  to Notice of Taking Deposition in the above cause.

24

25

```
 1                 - A P P E A R A N C E S -

 2    On behalf of the Plaintiff:

 3            RICHARD J. BURTON & ASSOCIATES, P.A.
              18305 Biscayne Boulevard - Suite 300
 4            North Miami Beach, Florida 33160
              BY:  RICHARD J. BURTON, ESQ.
 5
      On behalf of the Defendant:
 6
              SHUTTS & BOWEN, LLP
 7            201 South Biscayne Boulevard
              Miami, Florida 33131
 8            BY:  RENE GONZALEZ, ESQ.

 9
                  - A L S O   P R E S E N T -
10
              STEVE HARRIS
11

12                    - I N D E X -

13    WITNESS               EXAMINATION                 PAGE

14    DOUGLAS S. BARTH

15    By Mr. Burton...................................5

16
                    - E X H I B I T S -
17
      PLAINTIFF'S                                        PAGE
18
                          NONE
19

20

21                  - - - - -

22

23

24

25
```

1    Thereupon--

2                    DOUGLAS S. BARTH

3    was called as a witness and, having been duly sworn,

4    was examined and testified as follows:

5                    MR. BURTON:  For the record, I am

6            delivering a copy of the notice of the

7            relocation of the deposition for Wednesday,

8            the 14th, at 9 a.m., of Mr. Mark Hastings,

9            who is currently an employee and who they've

10           refused to bring to Florida, although it

11           appears to be one of the operative people in

12           this transaction.  They have advised me that

13           they will not be appearing and I should look

14           at four letters.  There is no motion for a

15           protective order, no order given, nor any

16           other legal sanction.

17                    I am handing them the notice which I

18           will have marked as Exhibit A to this

19           deposition,  for the purpose of this

20           deposition, and I am not asking for a

21           response.

22                    MR. GONZALEZ:  Well, I am going to

23           give you a response anyway.  We set a

24           deposition with four letters.  We've tried

25           to work with you tremendously in those four

1        letters.  And in addition to that, we tried

2        to work around your schedules.

3            I wouldn't dispute the issue.  I

4        think the issues is clearly set forth in our

5        conversations with you, and those four

6        letters we sent to you, trying to work this

7        out.

8            But let's move on.  Mr. Barth is

9        here.  Let's take his deposition.

10            MR. BURTON:  At no time have I been

11        offered a deposition face-to-face with

12        Mr. Hastings before the discovery cutoff,

13        although the same was both promised to me,

14        and otherwise made necessary by the witness

15        order.  In fact, Miss Cesarano's letters are

16        directly, in my opinion, fly in the face of

17        each other.  On one, she acknowledges that

18        there's no requirement for a subpoena for a

19        current employee and the deposition she

20        required to take in Columbus, Ohio.

21            She acknowledged that Mr. Barth and

22        Mr. Hastings were material persons to the

23        transaction.  She then said she would bring

24        in Mr. Hastings.  Then she said you have to

25        take him in, quote, Oregon.  That's now been

```
 1            set.  And now, with the close of the
 2            discovery time, she is now stating that
 3            there is no time that he will be made
 4            available.
 5                    There is nothing further to be said.
 6            We are here under a subpoena for
 7            Mr. Doug Barth, and I would like the
 8            witness, who has been sworn, to state his
 9            first name for the record.
10                    MR. GONZALEZ:  Just for the record,
11            those statements are very self-serving.  I
12            just stated one objection.  And I agree with
13            you.  Let's start with Mr. Doug Barth's
14            deposition.
15                    So you may answer the question.
16                    DIRECT EXAMINATION
17  BY MR. BURTON:
18            Q.    First of all, what is your full name?
19            A.    Full name?  Douglas Steven Barth.
20            Q.    Mr. Barth, what is your home address?
21            A.    2525 Northwest 49th Terrace, and
22  that's Coconut Creek, Florida.
23            Q.    Is that the address that you were
24  served your subpoena?
25            A.    Yes, it was.
```

 1          Q.    And you have a witness check that was

 2    attached to it; correct?

 3          A.    Correct.

 4                MR. GONZALEZ:  By the way, the check

 5          was for $20.

 6                MR. BURTON:  And?

 7                MR. GONZALEZ:  It should be for $40

 8          under the rules.

 9                MR. BURTON:  I suggest you move to

10          exclude.

11                MR. GONZALEZ:  Exclude the check?

12                MR. BURTON:  Yes.

13    BY MR. BURTON:

14          Q.    Have you ever retained Shutts & Bowen

15    to represent you, personally?

16          A.    Have I personally retained them?

17          Q.    Yes.

18          A.    For this situation, yes, they are

19    representing me.

20          Q.    Since there is an attorney fee

21    claim, how much did you pay them to represent you

22    personally?

23          A.    Target --

24                MR. GONZALEZ:  Objection.  Anything

25          regarding attorney's fees or conversations

1          with the attorneys is confidential.

2                MR. BURTON:  Attorneys' fees are not

3          because they are material, unless it's a

4          suit, itself, and they may be contested.

5          They are the only portion of that that I may

6          ask, is how much or when.

7                MR. GONZALEZ:  Sure.  And unless he

8          gives you the answer to the question, Mr.

9          Barth is not paying any attorney's fees in

10         this case.  He's represented as an agent of

11         Target.

12   BY MR. BURTON:

13         Q.    Sir, you are no longer employed at

14   Target, are you?

15         A.    Correct.

16         Q.    When did you cease being an employee

17   of Target?

18         A.    November of, what, 1999.

19         Q.    So it is over a year and a half,

20   approximately?

21         A.    Correct.

22         Q.    And I believe you left under

23   circumstances which they would not rehire you.

24         A.    That is incorrect.

25         Q.    Can you tell me the circumstances

Worldwide Reporting Service
Miami ∞ Orlando ∞ Tampa

```
 1   upon which you left?
 2          A.    I resigned.
 3          Q.    Can you tell me when you had
 4   announced your resignation in terms of when it
 5   became effective?
 6          A.    Roughly after either the end of
 7   October or the first part of November.
 8          Q.    Did you resign to go to a different
 9   company?
10          A.    No, I did not.  Not at that time.
11          Q.    I see.  So you left without another
12   job, in a way?
13          A.    Correct.
14          Q.    Were there any pending or proposed
15   disciplinary charges against you at that time?
16          A.    I had some disciplinary action that I
17   was counseled for.
18          Q.    What is that --
19          A.    But at no point in time was I under
20   the gun to lose my job.
21          Q.    What was the disciplinary action that
22   you were counseled for?
23          A.    At the time, it was basically -- I
24   don't have the exact wording of it.  But there were
25   some things that my supervisor at the time felt that
```

```
 1   I needed to work on.
 2        Q.    Tell me what he said.
 3        A.    It's been about a year and a half old
 4   and I don't recall the exact wording of it.  But a
 5   lot of it was followup on issues that were pending
 6   within the district.
 7        Q.    Sir, please tell me what you recall
 8   he said that was negative about your work.  You can
 9   recall that, can't you, as you sit here today?
10        A.    Yes.  I don't remember the exact
11   details.
12        Q.    I don't need the words.  I need the
13   incident or the type of material he was stressing.
14        A.    And I already said that.  It was the
15   followup on issues that were pending resolution
16   within the district.
17        Q.    What issues were pending resolution
18   in the district?
19        A.    It could be anywhere from followup
20   with the people that I supervised.  It could be --
21   you know, the exact wording, I don't recall.
22        Q.    Well, I'm not asking for the exact
23   wording.  I am you asking for any incidents that
24   were related to you at all, sir.
25        A.    And I explained that.
```

1          Q.     No, you haven't.  You haven't told me

2     a single incident.  I don't want to know what an

3     example is.  I would like to know what you were

4     being counseled for specifically, sir.  Tell this

5     jury what it is you are being counseled for.

6          A.     It wasn't any specific incident.

7          Q.     I see.  And you have no recollection

8     of any area or subject matter.

9          A.     I explained that.  It was follow up

10    with the issues that I deal with as a supervisor and

11    the supervision of some of the people that I work

12    for.  And that was the issue.

13               Were there any specifics?  No.

14         Q.     So when you say there were no

15    specifics, sir, what is your educational history?

16         A.     I have a Bachelor's Degree in

17    Criminal Justice.  I also have further college after

18    that; probably about another 30 to 40 hours after

19    that.

20         Q.     You got a college degree in Criminal

21    Justice where?

22         A.     In Southern Illinois University.

23         Q.     When?

24         A.     Graduated in 1987.

25         Q.     Since 1987, what has been your

1    employment?

2            A.    Basically starting the summer of

3    1987, I started with Target, and I worked with them

4    up until, you know, October, November of 1999.

5            Q.    Sir, most respectfully, when you say

6    you stared with them, what was your first job and

7    what were your duties?

8            A.    First job was the store's security

9    officer.  My job responsibility was follow up on

10   shrink issues within the store.  I also apprehended

11   shoplifters; identified employee theft issues.  And

12   that was in Champagne, Illinois, in, basically,

13   1987.  And I was there for approximately two years.

14           Q.    And you went to college right after

15   high school?

16           A.    Correct.

17           Q.    So you were obviously not the senior

18   security man at that store.  You were an incoming

19   security specialist; correct?

20           A.    Correct.

21           Q.    After being an incoming security

22   specialist, what did you then do?

23           A.    Okay.  I was promoted to asset

24   protection team leader.  At the time, they called

25   them asset protection managers.

1            I was at the Champagne store for

2     approximately a year in that capacity.  From there,

3     I was transferred to Columbia, Missouri, with the

4     role of asset protection team leader.  I was there

5     for approximately two years, and then I was offered

6     a position down here in South Florida to open up the

7     Coral Springs store in the same capacity.

8          Q.    Now, correct me if I am wrong.  You

9     weren't the head of security at that store.

10         A.    Which?  The Coral Springs store?

11         Q.    Yes.

12         A.    Yes, I was.

13         Q.    So you were then the head of the

14    department.

15         A.    I was also in the Columbia, Missouri

16    store and then also the Champagne, Illinois store.

17         Q.    Had you received any additional --

18    what specific courses did you receive, if any, from

19    Target to qualify you for your new job?

20         A.    It was basically just on-the-job

21    training.

22         Q.    So you stared as the store manager in

23    what store, Coral Springs?

24         A.    No.  I was the asset protection team

25    leader in Champagne, Illinois.

1          Q.      No.  No.  No.  I'm talking down here.

2          A.      Down here?

3          Q.      Yes.

4          A.      Okay.  Down here, I was the asset

5   protection team leader in the Coral Springs store,

6   yes.

7          Q.      Okay.

8          A.      I opened that store when it opened.

9          Q.      And what year was that?

10         A.      Approximately -- I don't know the

11  exact date, but it would probably be around '92.

12  '92, somewhere in there.

13         Q.      How long did you remain the asset

14  protection team leader?

15         A.      I was at that store for a year and a

16  half.

17         Q.      And where did you go afterward, and

18  to what job?

19         A.      I was transferred to the Plantation

20  store as asset protection team leader.  I was there

21  for approximately three months, and then I was

22  transferred to the Sawgrass Mills store, and I was

23  there for approximately three months also.

24         Q.      Why were you in such short terms in

25  those two stores, if you have a reason?

1            A.     Basically, they were normal rotation

2    of duties.  However, going to the Sawgrass Mills

3    store was a promotion for me.  I received more

4    money -- you know, a pay increase -- to go to that

5    store.

6            Q.     You only stayed there three months,

7    though.

8            A.     Correct.

9            Q.     And then where were you transferred?

10           A.     I was promoted and transferred to

11   Oklahoma City, Oklahoma, as a shortage district

12   operations specialist.

13           Q.     And you said shortage.  Was that

14   involved in the shortages in the region?

15           A.     Yes.  The shrink issues for that

16   district.

17           Q.     The shrink issues basically mean

18   shoplifting and employee theft.

19           A.     And paperwork errors.  With the

20   operations specialist's position, it was heavily

21   operational of what I looked at.  But I did get

22   involved with investigations also.

23           Q.     By operations, you are talking about

24   trying to uncover employee theft or people who are

25   shoplifters.

 1              A.      Incorrect.  Operational issues is how
 2     paperwork is being processed to the front of the
 3     store, back of the store.  Any paperwork tissues
 4     that could have happened in the store.
 5              Q.      How long were you in Oklahoma City;
 6     from what period to what period?
 7              A.      As a district operations specialist,
 8     I was there for approximately about eight months.
 9     And then while I was there, I was promoted to
10     district asset protection team leader.
11              Q.      Where?
12              A.      Same area.
13              Q.      A district asset protection is the --
14     you were the district director of security?
15              A.      Correct.
16              Q.      How long were you stationed there in
17     that position?
18              A.      Approximately -- a little bit less
19     than two years.
20              Q.      What year does that take us to?
21              A.      It would have been approximately,
22     '93, '94, in there.  Probably '94.
23              Q.      And then what did you to?
24              A.      I was basically transferred back to
25     South Florida, to become the district asset

16

```
 1    protection team leader of District 310.
 2              Q.    And what is District 310?
 3              A.    District 310 is basically the
 4    Broward -- half of Broward, all of Palm Beach County
 5    District.
 6              Q.    And in that regard, was one of your
 7    store security managers Mr. Feinkhauser?
 8              A.    Yes, he was.
 9              Q.    How long did you serve as the
10    district security director here?
11              A.    Approximately three years.
12              Q.    And that was what you resigned from.
13              A.    Correct.
14              Q.    Is it your understanding, if you
15    hadn't resigned, that there would have been no
16    further disciplinary action?
17              A.    As long as I corrected the issues
18    that they identified, there would have been no other
19    disciplinary action.
20              Q.    And you have no memory at all
21    specifically of any of these areas they identify; is
22    that correct?
23              A.    No, I do not.
24              Q.    Did you ever give a deposition
25    before, sir?
```

```
 1              A.      Maybe once.
 2              Q.      And was it in a Federal Court
 3    proceeding?
 4              A.      I don't know.
 5              Q.      Is this the first Federal Court
 6    proceeding in which you are a witness?
 7              A.      I've been to court several times.  I
 8    don't know if it's federal, state, county, but I
 9    have gone to court a few times.
10              Q.      You don't recall ever being before a
11    federal judge, do you?
12              A.      Not to my recollection.
13              Q.      Do you recall the first time you
14    became familiar with any concerns Target may have
15    had regarding Mr. Harris?
16              A.      Approximately the end of January,
17    based on the issue that Don Feinkhauser brought to
18    my attention.
19              Q.      What issue did he bring to your
20    attention?
21              A.      The Shooter's receipt issue.
22              Q.      So not until the Shooter's receipt
23    did you have any reason to inquire about Mr. Harris
24    or any of his work; correct?
25              A.      No, that's not correct.
```

1          You know, as a district asset

2    protection team leader, part of my responsibilities

3    was going to the stores to follow up and see how the

4    stores were functioning.  And I would then, at that

5    time, go in and deal with Steve on -- you know,

6    Steve and the store on issues that were identified

7    or not identified within the store.

8          Q.    Sir, do you recall any incident

9    before the Shooter's receipt wherein Mr. Harris came

10   to your attention in a negative light greater than

11   that of other store managers?  Yes or no.

12         A.    I do not quite understand the

13   question.

14         Q.    Sir, before the Shooter's incident,

15   was there anything about Mr. Harris' working with

16   Target that came to your attention outside of the

17   normal and routine things that come to your

18   attention as all store managers do?

19         A.    Prior to that incident, no.  There

20   was nothing that came out anything different than

21   Steve -- with Steve in comparison to the other store

22   managers.

23         Q.    Do you recall who you -- you first

24   said you spoke to Mr. Feinkhauser about this

25   Shooter's incident.

1          A.      Correct.

2          Q.      Have you spoken to Mr. Gillespie

3     about any issues that came to the attention of

4     Target that were negative to the way in which

5     Mr. Harris is viewed Target, other than what

6     Mr. Feinkhauser said, before Mr. Feinkhauser?

7          A.      Not to recollection.

8          Q.      What about Mr. Hastings?

9          A.      Mark and I -- it was common for Mark

10    and I to talk about the status of the store

11    managers.  It was very common for us, as part of our

12    status sessions, either every other week or once a

13    month, to talk about all the store managers.

14         Q.      And my question was, is there

15    anything that was specific about Mr. Harris' conduct

16    before the Shooter's receipt that came to you

17    through Mr. Hastings?

18         A.      Not that I can recall.

19         Q.      Now, what kind of car did Mr. Harris

20    drive?

21         A.      I knew he had a couple of different

22    cars.  One of them was a Viper.  I believe he had a

23    Cadillac.  And at one time, I thought I had heard he

24    had a Mercedes, but I'm not quite sure.

25         Q.      Sir, who was the store manager of the

1   Sawgrass Mills store?

2          A.    Bill Mora.

3          Q.    What kind of cars did he drive?

4          A.    A Cadillac Deville, the North Star

5   version, 32 valves.

6          Q.    Do you always check everyone's care

7   out?

8          A.    No.  When we meet at meetings, we see

9   the people drive up in their vehicles.  It's pretty

10  common.

11         Q.    What kind of car do you drive?

12         A.    Right now, I have a corporate car.

13  It's a Malibu.

14         Q.    Who do you work for?

15         A.    I work for Eckerd's.

16         Q.    What do you do for Eckerd's?

17         A.    I'm what's called a loss prevention

18  representative.

19         Q.    I see.  That's not the manager of

20  security for the region.

21         A.    For my district, yes, it is.

22         Q.    So you drive a Malibu.

23         A.    Correct.

24         Q.    And did you own your car when you

25  worked for Target?

```
 1          A.     I made payments on it.

 2          Q.     What kind of car was it?

 3          A.     Okay.  I owned a Jeep Wrangler.

 4          Q.     A Jeep Wrangler.

 5          A.     Correct.

 6          Q.     What color Mr. Harris' wife?

 7          A.     His wife?

 8          Q.     Yes.

 9          A.     She's white.

10          Q.     How many other managers were black

11   with a white wife?

12          A.     In the district?

13          Q.     Yes.

14          A.     None to my recollection.

15          Q.     Have you ever been given any training

16   on the Equal Employment Opportunity's regulations?

17   Specifically.  Not in general, but specifically a

18   course in that.

19          A.     We have had two or three meetings

20   based on diversity, where they covered those issues

21   within the meetings.  And they were full-day

22   meetings each time.

23          Q.     Well, the diversity meetings were.

24          A.     Correct.

25          Q.     How many involved the regulations of
```

1    the EEOC; specifically that topic that you

2    specifically went to as director of incoming

3    security?

4         A.    Are you asking me did I go to a

5    meeting that the topic was EEOC, and that's all they

6    talked about?

7         Q.    Yes.

8         A.    Never once went to a meeting

9    specifically for that only.

10        Q.    Did you ever receive specific

11   training in the EEOC as either a store manager of

12   security or as a regional manager of security?

13        A.    We talked about --

14        Q.    Not that you talked about.  Listen to

15   the words, sir.

16              Did you ever attend a course

17   specifically for that purpose, the EEOC, as the

18   store manager or as a district manager of security,

19   where that was the topic?  Not generally.

20        A.    I have never gone to a meeting

21   specifically EEOC related.  However, I've been in

22   meetings that have covered, talked about, EEOC;

23   stuff like that.

24        Q.    And when was the last one you went

25   to?

```
 1            A.      It was approximately two to two and a

 2   half after years ago.

 3            Q.      Who else was present?

 4            A.      A lot of the store asset protection

 5   team leaders.

 6            Q.      Do you know their names?

 7            A.      Don Feinkhauser would have been

 8   there.

 9            Q.      Not would have been.  Was he or

10   wasn't he?  I don't want you to guess.

11            A.      I don't have a list of people that

12   were actually there with me.

13            Q.      So you have no memory of anyone who

14   specifically was at that specific meeting, do you?

15            A.      No.  I have no documentation showing

16   that the people were there.  The people -- I can

17   give you a list of people that I sort of can recall

18   that were there.  However, it was two to two and a

19   half years ago.

20            Q.      Is your memory that poor that you

21   can't remember persons who you met two and a half

22   years ago?

23                    MR. GONZALEZ:  Objection.

24                    MR. BURTON:  Noted.

25            Q.      Is your memory that poor?
```

```
 1              A.      No.
 2              Q.      Do you consider yourself to have a
 3    decent memory?
 4              A.      Yes.
 5              Q.      Now, sir, did you ever have a
 6    conversation with anyone other than Mr. Feinkhauser
 7    about Mr. Harris, as pertaining to anything that
 8    would lead to disciplinary action?
 9              A.      Prior to the Shooter's receipt, or
10    afterwards?
11              Q.      Before or after.
12              A.      Prior to, no.  Afterwards, yes.
13              Q.      Who?
14              A.      Mark Hastings, Terry Gillespie.
15              Q.      Anyone else?
16              A.      There were some people during this
17    investigation that I also talked to.
18              Q.      Who?
19              A.      Some of the statements that were --
20    that I'm sure that are in the files.  I talked to a
21    good chunk of those people.  I don't recall.  I know
22    there's a Donna Keil, because I got information from
23    her.  Sandy Gryzbak, I talked to her.  There were
24    several people like that.
25              Q.      Well, sir, let's slow down for a
```

1   second. Do you remember who was the first person

2   you spoke to after you got this information from

3   Mr. Feinkhauser?

4        A.      After I received the information

5   pertaining to the Shooter's receipt, I went to Mark

6   Hastings concerning that and basically showed him

7   the information that I was given.

8        Q.      What were you given? What do you

9   remember being given? I don't want to know the

10  document. I want to know what the information's

11  message was.

12       A.      The information's message?

13       Q.      Yes.

14       A.      Basically, I was given a receipt of

15  Shooter's, and I was given copies of the vouchers

16  book showing how they processed.

17       Q.      Now, do you remember anything that

18  Mr. Feinkhauser told you about that incident?

19  Specifically.

20       A.      Specifically, he was going through

21  the vouchers based on it was getting towards the

22  month end, to get the stuff reconciled. And as he

23  was going through the voucher book, he noticed the

24  stuff and that's when he brought it to my attention.

25       Q.      Did he tell you that he actually was

1   there when it occurred?

2           A.      Which part of it?

3           Q.      All of it.  When the purchase was

4   made at Shooter's, he was sitting there.  Did he

5   tell you that?

6           A.      Correct.

7           Q.      Did he tell you that he, in fact, was

8   the one who noted to Mr. Harris the amount of the

9   bill and he added it up?

10          A.      Correct.

11                  MR. GONZALEZ:  Objection.  It assumes

12          unestablished facts.

13          Q.      Did he tell you that he,

14  Mr. Feinkhauser, was there when the money turned in?

15          A.      No.  That never came up.

16          Q.      Did you ask him why he didn't go to

17  Mr. Harris?

18          A.      Part of his --

19          Q.      Did you ask him why he didn't go to

20  Mr. Harris?  That's the only question that I have

21  before you.

22          A.      No.

23          Q.      Did you suggest that he talk to

24  Mr. Harris?

25          A.      No.

```
 1              Q.     Did you talk to Mr. Harris?
 2              A.     Later, upon --
 3              Q.     No.  Before the charges were
 4   preferred.
 5                     MR. GONZALES:  Objection to the word,
 6          charges.
 7              Q.     Do you understand the question, sir?
 8              A.     Yes, I do.
 9              Q.     Did you talk to Mr. Harris before
10   these charge were preferred?
11                     MR. GONZALEZ:  Same objection.
12              A.     Myself, Mark Hastings and Terry
13   Gillespie talked to Steve at the time on that Monday
14   when all this came to light.
15              Q.     Sir, isn't it a fact that on that
16   Monday, when all this came to light, there had
17   already been, if you will, disciplinary action that
18   had already been prepared against Mr. Harris?
19                     MR. GONZALEZ:  Objection.  It assumes
20          unestablished facts.
21              A.     Not to my knowledge of the
22   disciplinary action regarding established, written
23   up or anything.
24              Q.     Okay.  Well, let's go through this.
25   The best of your knowledge and memory then is -- by
```

1    the way, did you bring any of your personal notes?

2        A.    No.

3        Q.    Did you bring your personnel file?

4        A.    No.

5        Q.    You do have a copy of that first

6    document, don't you?

7        A.    No.

8        Q.    And you didn't keep any personal,

9    like, diaries or note pads or notes?

10        A.    Ho.

11        Q.    And you never write down any

12    investigatory material.

13        A.    Everything that I have, I left with

14    the case file that I left in my office when I left.

15        Q.    So as you're sitting here, did you

16    ever interview Mr. Blacknik?

17        A.    Tim Blacknik?

18        Q.    Yes.  Yes or no.

19        A.    I don't recall interviewing him.  I

20    may have but I don't recall.

21        Q.    You have no recollection of doing so

22    as you are sitting here today; correct?

23        A.    Correct.

24        Q.    What about Stacy Faulkner?  Do you

25    know who she is?

1          A.      I believe she was team relations or

2    clerical.  I'm not 100 percent sure.  I may have

3    talked to her.  I may have not.

4          Q.      Sir, when I say do you recall having,

5    I'm not asking you to guess, saying I --

6          A.      I do not recall.

7          Q.      You have no recollection presently as

8    you sit here today of having done so; correct?

9          A.      Correct.

10         Q.      Tough question.  I don't want to know

11   whether or not it's possible that you conceivably

12   did because if you don't remember that well, then,

13   obviously, you can't talk about it very much.  So

14   let's talk about what you can remember very well.

15   Okay?

16         A.      Okay.

17         Q.      Did you talk to Betty Gadson about

18   Mr. Harris' conduct at any time during this

19   proceeding?

20         A.      I don't recall.

21         Q.      You don't recall having done so as

22   you sit here today; correct?

23         A.      Correct.

24         Q.      Did you talk to Sandy Gryzbak, as you

25   recall sitting here today?

1        A.      Yes, I do.

2        Q.      Do you remember what you said to her

3  and what she said to you?

4        A.      It was a phone conversations with her

5  after I received one of the statements that she had

6  written.  I believe she only wrote one, but I'm not

7  100 percent sure, based on some of the issues that

8  were identified when, I believe, possibly Don talked

9  to her.  I had Don Feinkhauser talking to several of

10  the people and then he made sure the statements got

11  to me.

12        Q.      So you assigned the responsibility to

13  Don; correct?

14        A.      Correct.

15        Q.      Because he had said he had perceived

16  the responsibility -- that you were the one leading

17  it, not him.

18        A.      I was leading the investigation.

19        Q.      Did you ever, as you were leading the

20  investigation, ask to take a statement from

21  Mr. Harris, telling him that you had to see if there

22  was a reasonable explanation?

23        A.      Did I ever ask Mr. Harris for a

24  statement?

25        Q.      Yes.

```
 1              A.      No, I did not.

 2              Q.      Did you ever ask Mr. Feinkhauser for

 3    a statement?

 4              A.      No, I did not.

 5              Q.      Isn't it customary as a police

 6    agency -- and security is certainly a police

 7    agency -- isn't it customary to ask the person who

 8    did allegedly wrong what it was about to, if nothing

 9    else, get some information?

10              MR. GONZALEZ:   I object to the term,

11         police agency.

12              Q.      As an investigator, is it customary

13    or not?

14              A.      When you do an investigation, you

15    identify and look at all the facts, and then, at

16    that point in time, once you identify all the

17    issues, that's when you sit down and talk to the

18    person that's involved.

19              Q.      I see.  Supposing you found that

20    you -- strike that.  I'll go back the other way.

21              It's my understanding -- and

22    especially Mr. Feinkhauser said the first person

23    he'd speak to to find out if there is anything is

24    the person that's accused, to find out if there's

25    just been a misunderstanding?
```

1        A.    I don't know for sure if

2    Mr. Feinkhauser said that or not.

3        Q.    Do you believe that that's a valid

4    way to perform an investigation; to find out if

5    there is anything wrong first?

6        A.    Every investigator has some different

7    ways they process or do things.  However, if I am

8    doing an investigation on an executive at Target,

9    I'm going to basically look at the facts first, see

10   what stuff I can find, and then that's the time we

11   sit down and talk with the detective and find out

12   basically from their side what happened.

13       Q.    Are you aware that Mr. Harris gave

14   back to the cashier the next morning virtually all

15   of the money, including money over and above the

16   amount of the check?

17            MR. GONZALEZ:  Objection.  It assumes

18            an unestablished fact in evidence.

19            MR. BURTON:  Noted.

20       A.    According to one of the statements

21   that I had read that he had given a handful of money

22   to the cashier that you are speaking of.

23       Q.    Which exceeded the amount that would

24   have been the difference between the wrong adding.

25       A.    Correct.  And that's exactly what was

1    wrong with that.

2            Q.    Yes.

3            A.    Correct.

4            Q.    And this was before or after you had

5    this meeting with Mr. Gillespie and Mr. Hastings?

6                 MR. GONZALEZ:  I'm sorry.  Did you

7            state your prior answer?  I wasn't sure

8            whether you did or not.

9                 THE WITNESS:  Yes.

10           Q.    Did you hear the question, sir?  Was

11   this before or after you had this meeting with

12   Mr. Hastings, Mr. Gillespie and Mr. Harris, that you

13   read the statement that he had asked for more

14   money -- in fact, a whole pocket-full of money,

15   whatever it contains -- did you hear that before or

16   after?

17           A.    Well, during this whole --

18           Q.    Sir, this is a before or after

19   question.  I don't what to know of anything

20   else.

21           A.    It's during.

22           Q.    Sir, the meeting you had with

23   Mr. Hastings --

24           A.    But I also had about six different

25   meetings with Mr. Hastings.

1          Q.    The meeting with Mr. Harris is the

2    one I am referring to.  You had a meeting with --

3          A.    With Mr. Harris, that was done -- the

4    statement, I believe, was given prior to that

5    meeting with Mr. Harris.  However, I'm not exactly

6    sure.  But I believe it was prior.

7          Q.    Okay.  So all of you were of the

8    knowledge that he tried to turn back whatever the

9    amount of money in his pocket was to the cashier at

10   that juncture; correct?

11               MR. GONZALEZ:  Objection.  It assumes

12          unestablished facts.

13               MR. BURTON:  Noted.  Probably, you

14          shouldn't interrupt.

15               MR. GONZALEZ:  If it is a valid

16          objection, you can --

17               MR. BURTON:  Not in Federal Court.

18               MR. GONZALEZ:  Yes, it is.

19               So he can answer the question.

20               MR. BURTON:  Sir, I will make it real

21          simple, now that your objection is noted and

22          your rudeness is noted.

23               MR. GONZALEZ:  Oh, please.

24   BY MR. BURTON:

25          Q.    Sir, is it fair to state that I am

1   talking in a fairly quiet voice?

2          A.    Yes.

3          Q.    I'll try to continue that.

4                Sir, noting his objection, was it

5   known to all the persons at the meetings that you

6   had with Mr. Harris that he had tried to turn back a

7   pocket-full of money containing more than the

8   difference between what he had taken from the

9   cashier and what the bill from Shooter's would show?

10               MR. GONZALEZ:  Same objection.

11         A.    I believe that we did have the

12  statement from the girl at the time prior to the

13  conversations with Mr. Harris.

14         Q.    Okay.  Do you remember what was said

15  about that statement that indicated there was an

16  attempt to turn over that amount of money?

17         A.    Basically, all the statement said was

18  Steve handed her a handful of money; handed her the

19  receipt that she stated that Steve said that the

20  receipt was for $295 and she processed the receipt

21  as it was worth $295.

22         Q.    Did anyone talk to that person as

23  opposed to seeing a statement from her?

24         A.    Either --

25         Q.    Do you know if they did or not?

```
 1              A.      It was either Don Feinkhauser talked

 2    to her or it was myself.  One of the two of us.

 3              Q.      Do you have any recollection of

 4    personally talking to that person as you sit here

 5    today?

 6              A.      No, I do not.

 7              Q.      You said you interviewed other

 8    people.  Was one of them Clarissa Howard?

 9              A.      The name doesn't sound familiar to

10    me.

11              Q.      As you sit here today, you don't have

12    a recollection saying this to her.

13              A.      Correct.

14              Q.      How about Donna Keil?  You said you

15    interviewed her.

16              A.      I talked to her over the phone

17    several times.

18              Q.      About what?  And how did you identify

19    her?

20              A.      How did I identify her?

21              Q.      Yes.  How did you know that she was a

22    person you should be talking to in this

23    investigation?

24              A.      Basically, during the course of the

25    investigation, there was some information that came
```

1    up through one of the issues. And we followed up

2    with Donna to basically find out what she knew about

3    it.

4            Q.    When you say one of the issues, be

5    more specific, sir.

6            A.    It could have been an issue with the

7    towels. It could have been an issue with the Power

8    Wheels. It was one of those issues. So we sat down

9    with her.

10           Q.    Do you have any recollection of what

11   the issue with the Power Wheels was?

12           A.    Yes.

13           Q.    What was it?

14           A.    The issue with the Power Wheels was

15   Steve had purchased the Power Wheels. He didn't

16   actually purchase it through the registers. He had

17   one of my store -- it's called TPS, target

18   protection specialist -- actually go through the

19   register with an item that was marked down;

20   supposedly, a display item.

21                Prior to that, though, after talking

22   with Donna Keil concerning it, it was my

23   understanding that Steve had talked to Donna, and

24   asked her about it, and he had told Donna that it

25   was an old display model from last year. And,

1    typically, which is what we do on old display

2    models, we mark them down to get rid of them because

3    all they are doing is filling up space in the

4    stockroom.

5         Q.    Now, having made all of those

6    conclusions, do you remember what Donna said to you

7    exactly?

8         A.    Donna stated that Steve told her that

9    it was the old display model and Steve was asking

10   for a price for it.

11        Q.    Okay.

12        A.    So under her assumption --

13        Q.    No.  No.  I don't want to know

14   assumptions.  I want to know words.  I'm not going

15   to assume anything.  Don't assume anything --

16        A.    She told me --

17        Q.    -- that she assumed, is what you're

18   saying.  This was her assumption.

19        A.    No.  She was told by Steve that it

20   was an old display model.

21        Q.    Fine.

22        A.    So by her store manager telling her

23   it's an old display model, she marked it down

24   approximately 75 percent off for him since that's

25   typically what we do on old display models.

```
 1              Q.    Okay, period.  Now, did she do
 2     anything else to verify the price in that statement
 3     that you know?
 4              A.    At the time?
 5              Q.    Yes.
 6              A.    No.
 7              Q.    Did you ask her if she did anything
 8     else at the time to verify this price?
 9              A.    No.
10              Q.    Is it customary for people just to --
11     strike that.
12                    Miss Keil, what was her position with
13     the company?
14              A.    I believe she was the logistics team
15     leader.
16              Q.    Logistics team leader -- correct me
17     if I am wrong -- has to do with pricing of certain
18     types of goods; correct?
19              A.    Her role is basically -- one of her
20     roles is I believe she supervised the price change
21     team.  But her role is actually keeping the
22     merchandise coming into the store; making sure the
23     stock rooms are cleaned; making sure all the
24     merchandise isn't stuck in the stockroom.
25                    But as an executive with Target, she
```

1   has the ability to -- if an item is an old display

2   item, she has the ability to make the decision on

3   that to decide how much it could be marked down, as

4   long as it's within reasonable guidelines.

5         Q.    Okay.  Well, that's all wonderful.

6   Now, Miss Keil -- correct me if I am wrong -- is the

7   one who is responsible for bringing the goods,

8   marking them, getting out on the floor at some

9   point; correct?

10         A.    No.

11         Q.    She is not responsible for that?

12         A.    Well, not on that incident.

13         Q.    No.  No.  No.  I'm not talking about

14   that specific incident, sir.

15         A.    As a general.

16         Q.    Yes.

17         A.    As a general, that's part of one of

18   her responsibilities, yes.

19         Q.    Sir, let's try to understand.  This

20   record is going to be translated verbatim.  And

21   because it is translated and transcribed verbatim,

22   we both can't talk at the same time.  You have got

23   to let me finish a question and I will answer fully.

24   And I won't argue with you.  Please don't argue with

25   me.

1              So that the record be clear,

2   Miss Keil, as the logistics leader, is the person

3   who would be the designated executive for bringing

4   goods into the store, marking them and getting them

5   on the floor, that's her responsibility as a general

6   rule; correct?

7          A.      One of her responsibilities, yes,

8   along with other executives in the building.  It is

9   part of their responsibility, too.

10         Q.      Now, correct me if I am wrong.  At a

11  certain point, Miss Gryzbak became that same role,

12  didn't she?

13         A.      I believe so, yes.

14         Q.      So both of them are responsible or in

15  series -- they weren't there together; correct?

16  Because they both different executives.  But both

17  had the team logistics responsibility.

18         A.      Correct, I believe so.

19         Q.      These are the people who take the

20  goods in, review the prices, see what's selling slow

21  or not selling slow, or open or not open, and give

22  instructions for markdowns and getting those

23  merchandise off the shelf and the new merchandise

24  in, among other responsibilities; correct?

25         A.      Part of that is incorrect.

1          Q.      Which portion?

2          A.      That is their responsibility to price

3     the stuff, identify the items that are slow-moving,

4     that's not their responsibility.

5          Q.      But once they are identified as

6     slow-moving, they are the ones responsible for the

7     markdown team; correct?

8          A.      Correct.

9          Q.      Which has the responsibility of

10    actually marking down those items; correct?

11         A.      Correct.

12         Q.      Now, assuming this wasn't

13    Mr. Harris.  Assuming that Donna Keil was asked to

14    find out about a product -- how long it's been there

15    and whether it's this year's or last year's -- what

16    is she supposed to do?  Her responsibility; not

17    Mr. Harris's, not yours.  What is her instruction to

18    do to check?  How does she do it?

19                 MR. GONZALEZ:  Objection,

20         speculation.

21         A.      Based on the person who it is --

22         Q.      Sir, a customer says, I'd like to

23    know if that's new or old stock, or an employee asks

24    the question.  What does she do to find out?

25         A.      Find out the price?

1          Q.    Yes.   What does she do to find out

2     when it arrived, the price; all the good stuff to

3     make an intelligent decision.

4          A.    To find out the price of it, all you

5     have to do is scan the item if there is a UPC code

6     on there and verify what the price says.

7          Q.    Now, if it is old or new stock, what

8     would she have to do?   Because part of her

9     responsibility is making a determination.   What is

10    she supposed to do?

11         A.    If it is an old item?

12         Q.    How does she know it's an old item?

13              MR. GONZALEZ:   Objection,

14         speculation.

15         Q.    Sir, it is not speculation.   You

16    know what she does, don't you?   You give her the

17    instructions, don't you, on loss and shortage?   How

18    does she know it is an old or new item?

19         A.    A lot of times you can look at the

20    item and, if it has been in the stockroom for a

21    while, you can assume it is an old item.   But unless

22    there is a markdown that comes from headquarters --

23    because our markdowns are, for the most part,

24    generated out of headquarters -- we don't process a

25    markdown on it unless there are some exceptions to

1    where it says an old display model or something like

2    that.

3            Q.    So you look at it and if it looks

4    old, it's old.  If it looks new, it's new.

5            A.    Based on a display model, yes.

6            Q.    Do you know if Miss Keil recognized

7    whether it looks old or new?  Did you ask her?

8            A.    No.  I did not ask her that question.

9            Q.    Do you know if she used any of her

10   own judgment before she made this decision?

11           A.    Her judgment was --

12           Q.    No.  Do you know if she used any of

13   her own judgment?

14                 MR. GONZALEZ:  Objection,

15           speculation.

16           A.    The judgment she used was information

17   that she was given based on the information from her

18   store manager.  That was her judgment.

19           Q.    I see.  So no matter what it looked

20   like or felt like or touched like, if he said it was

21   old, it was old.  If he said it was new, it was

22   new.  You don't correct it.  Is that your opinion of

23   what she said?

24                 MR. GONZALEZ:  Objection --

25           A.    That's what happened at the time.

1                Q.    Do you know if the thing wasn't

2        looking in new condition?

3                A.    I never saw the item.

4                Q.    Did you ever ask to see the item so

5        you could make that determination as to whether or

6        not it looked new or old?

7                A.    I did not ask.

8                Q.    Now, at that time you thought or had

9        a reason to believe Mr. Harris had the item; right?

10               A.    Correct.

11               Q.    Did you ever say to Mr. Harris, I'd

12       like to see what the thing looks like?  Did you ever

13       do that?

14               A.    No.   Never asked that question.

15               Q.    Did you ever ask Feinkhauser to do

16       it?

17               A.    No, I did not.

18               Q.    Now, when did you make the

19       determination that Miss Keil had made this

20       markdown?  Correct me if I am wrong.  Miss Keil had

21       been gone about five months before Miss Gryzbak

22       talked to you about the towels; right?  They weren't

23       there together at the same time.

24               A.    That is correct.  They weren't there

25       at the same time.  I don't know the exact timing of

```
 1   how everything coincided.
 2        Q.    Well, sir, do you know how much
 3   before this incident that was known as the Shooter's
 4   incident, the supposed incident regarding that the
 5   markdown occurred?  Was it five months?  A year?
 6        A.    It was never brought to my attention
 7   until the time of the investigation.
 8        Q.    Sir, how long had Miss Keil had this
 9   information before she related it to someone in
10   security or in store management?
11        A.    I would have to look at the receipt.
12   I'm not 100 percent sure of when it was.
13        Q.    How did Miss Keil's information come
14   to anyone's attention?  Why would it come to your
15   attention?  My manager said something nine months
16   ago.  I would like to find out whether it is correct
17   or not.  Is that what you guys do?
18             MR. GONZALEZ:  Objection.  It assumes
19             unestablished facts.
20             MR. BURTON:  I'm trying to find the
21             facts.
22        Q.    How did it come to your attention?
23        A.    Could you repeat the question?
24        Q.    How did it come to anyone's attention
25   that Miss Keil, some months prior, had marked down
```

1    some Power Wheels, at some previous point that may

2    or may not have been shopworn and may or may not

3    have looked shopworn, for Mr. Harris?

4              MR. GONZALEZ:  Objection.  It assumes

5              unestablished facts.

6              MR. BURTON:  Noted.

7         A.    During the course of the

8    investigation that came after the Shooter's receipt,

9    or in that time frame when we were talking to

10   people -- and I don't remember exactly who it was

11   that we talked to -- other issues were identified,

12   and this was one of the issues that was identified.

13   So we looked into it.

14        Q.    Who identified it?  We are talking

15   hearsay.

16        A.    I don't recall.

17        Q.    Who told you this story?

18        A.    I don't recall.

19        Q.    Well, what investigation other than

20   talking to Donna Keil did you do to make a

21   determination that this did or didn't occur or was

22   or wasn't proper?

23        A.    Can you please repeat the question?

24              MR. BURTON:  Read it back.

25              (Whereupon, the court reporter read

1                   the requested portion of the record.)

2                        THE WITNESS:  It was either myself

3                   -- someone that was part of the

4                   investigation, whether it was myself, talked

5                   to Donna concerning the information.

6                        We also identified and found where

7                   the purchase was made through the

8                   registers.  We were able to identify that it

9                   wasn't actually used with Steve's discount

10                  number.  It was used with Tim's discount

11                  number.  So we researched the actual

12                  transaction to find out when it was actually

13                  purchased.

14                       We also --

15      BY MR. BURTON:

16           Q.    I don't want to know "we."  I want to

17      know what you recall because you aren't allowed to

18      testify "we."  You are only allowed to say "I."

19                  We are in a court of law.  All you

20      are doing is hearsay.  You heard the word, hearsay,

21      haven't you?

22           A.    Yes.

23           Q.    Having said that, as a graduate of

24      police school, I would like to know what you

25      remember doing or ordering, if anything.

1              MR. GONZALEZ:   Objection as to the

2         term, "graduate of police school," and so

3         forth.

4              You may answer the question.

5         Q.    Is there something wrong?   You are a

6    graduate of police school, aren't you?

7              MR. GONZALEZ:   Objection.

8              MR. BURTON:   Please answer that.

9         A.    No.   I am not been a graduate of any

10   police school.

11        Q.    I thought you said you got a degree

12   in police studies at a school in Southern Illinois.

13        A.    That was incorrect.   It's criminal

14   justice.

15        Q.    Okay.   Sorry.   As a graduate in

16   criminal justice, what did you do other than speak

17   to Donna Keil, yourself, about Power Wheels, do you

18   recall?

19              MR. GONZALEZ:   Objection to the

20         criminal justice graduate.

21              MR. BURTON:   Noted.

22        A.    Okay.

23        Q.    What did you do?

24        A.    My job was to coordinate --

25        Q.    No.   What did you do?   I don't want

1  to know what you coordinated.  I want to know what
2  you personally did.

3          A.     I am telling you exactly what I did.
4  As a supervisor, my role is to coordinate what is
5  going on.  So I am the one that identified whose
6  statements we needed to get done, and have the
7  people that needed to go get those statements get
8  them, whether it was myself or whether it was Don,
9  and then report those findings to Mark Hastings and
10  Terry Gillespie.  That was what I did.

11         Q.     Well, slow down.  You don't recall
12  having taken the statements of anyone other than
13  Donna in this regard; correct?

14         A.     I don't recall exactly which
15  statements I took and which ones I did not.

16         Q.     With regard to Power Wheels, do you
17  recall taking any statements from any person other
18  than Donna?  You, yourself.

19         A.     I don't recall actually taking that
20  statement but I do recall talking with her on the
21  phone concerning that situation.

22         Q.     Do you recall speaking to someone
23  else on the phone about the situation?

24         A.     No, I do not.

25         Q.     Sir, you said you were responsible

```
1    for identifying the persons who would be
2    interviewed; correct?
3           A.    Correct.
4           Q.    Did you ever identify Tim Blacknik
5    as a good person who you would interview, since he
6    is the one who made the purchase under his number?
7           A.    I believe somewhere along the lines
8    we talked to Tim to find out some information of --
9           Q.    You say "we."  Was it you who talked
10   to him?
11          A.    It was either myself or Donna.
12          Q.    Do you recall as you sit here today
13   having spoken to Mr. Blacknik?  Yes or no.
14          A.    I don't recall.
15          Q.    You have no recollection as you sit
16   here, then; correct?
17          A.    Correct.
18          Q.    Do you recall Don telling you he had
19   spoken to Tim Blacknik about this specific
20   purchase?  Yes or no, as you sit here today.
21          A.    I believe he did, yes.
22          Q.    He told you he did or you believe he
23   did talk to Tim Blacknik?
24          A.    I believe he did.
25          Q.    Did he tell you he did?  Do you
```

1    recall that as you sit here today?

2         A.    I believe he told me he did, yes.

3         Q.    Did you ever ask him what it

4    consisted of, that discussion?

5         A.    Well, what I recall talking to him,

6    he stated that -- he told me, based on his research,

7    that he found the item being pushed, and I believe

8    he asked Tim about it. I don't recall exactly if he

9    sat down with Tim or not. I don't recall.

10        Q.    That's different than what you said.

11              My question is, as you said, I think

12   that he asked Tim about it. And now you said that

13   you don't recall if he asked Tim about it.

14              Did you instruct that he talk to Tim

15   Blacknik about a purchase made under the customer

16   number of Tim Blacknik, regarding certain Power

17   Wheels? Yes or I have no recollection as I sit here

18   today.

19        A.    I believe I did.

20        Q.    Do you recall having received back a

21   response from Mr. Feinkhauser as to what that

22   conversation consisted of that he had with

23   Mr. Blacknik?

24        A.    I believe, when I talked to him, he

25   stated to me that, yes, Tim remembers making a

1    purchase, and Tim's response was that he made the

2    purchase because Steve hopped on a register that was

3    backed up, and that's why he made the purchase.

4         Q.    And that's the only thing you recall

5    having been told about.

6         A.    To the best of my knowledge, yes.

7         Q.    Did you ask Tim Blacknik if, in fact,

8    the time was actually marked down properly?

9         A.    I did not ask Tim.

10        Q.    Wouldn't Tim be one of those people

11   who was in that same group working for Donna Keil?

12        A.    Tim did not work for Donna Keil.  Tim

13   worked for Don Feinkhauser which, in turn, Don works

14   for me.  So...

15        Q.    So Tim is in security and made the

16   purchase; correct?

17        A.    Correct.

18        Q.    I see.  Did anyone bother to ask Tim

19   whether or not it appeared odd that that item was

20   marked down in that fashion?

21        A.    I don't think believe Don asked him

22   that.  But it is common --

23        Q.    Sir, I just asked you.  I don't care

24   what's common.  It may be common that you are, you

25   know, driving a car or not.  I really don't care

Worldwide Reporting Service
Miami ∞ Orlando ∞ Tampa

```
 1    what's common.  I asked a question and that's what I
 2    would like you to do, to answer the question.   I
 3    don't care what people do or don't do.
 4              A.    Okay.
 5              Q.    Now, did anyone else know that you
 6    are actually aware about the Power Wheels purchase
 7    other than Donna Keil and Mr. Blacknik?
 8              A.    Not to my knowledge.
 9              Q.    How did this purported purchase come
10    to anyone's attention?  Do you recall who was the
11    rat?
12                    MR. GONZALEZ:  Objection to the word,
13          rat.
14                    MR. BURTON:  Noted.
15              A.    I believe I stated before, during
16    this part of the investigation --
17              Q.    I know.  But you said someone.  I am
18    trying to figure out who that someone is.
19              A.    I don't recall.
20              Q.    You have no recollection of who the
21    rat was.
22              A.    Correct.
23                    MR. GONZALEZ:  Objection to the word,
24          rat.
25              Q.    Now, the Gryzbak -- you said Power
```

```
 1   Wheels with Gryzbak; correct?
 2         A.    Correct.
 3         Q.    Who did you speak with regarding
 4   Power Wheels?
 5         A.    I believe I talked to Sandy on it.
 6   Sandy Gryzbak.
 7         Q.    Anyone else?
 8         A.    Not to my knowledge.
 9         Q.    What about Shannon Tetrault; did you
10   speak to her?
11         A.    I know there were statements that I
12   believe Don took from Shannon.  And it may not have
13   been Don.  You know, Terry Gillespie might have
14   taken one.  I don't recall taking any statements
15   from Shannon, myself.
16         Q.    And, purportedly, the towels were
17   marked down and shouldn't have been marked down that
18   Steve had purchased; correct?
19         A.    Correct.  That's my understanding.
20         Q.    Did you know that Shannon Tetrault
21   purchased those same towels for the same price?
22         A.    I'm not aware of that situation.
23         Q.    You were not told that virtually all
24   of those towels were sold to employees at that same
25   price before Steven even purchased one?
```

1           MR. GONZALEZ:  Objection.   It assumes

2      unestablished facts.

3           MR. BURTON:   Noted.

4      A.     Not to my knowledge.

5      Q.     It was never brought to your

6  attention that other employees purchased those

7  towels at the same price, as you sit here today?

8      A.     It was my understanding that there

9  were some of the towels that were sold at a lower

10  price at the time.

11      Q.     To employees, you are saying.

12      A.     Correct.

13      Q.     Other employees.

14      A.     Correct.

15      Q.     What are the names of those

16  employees?

17      A.     I don't know.

18      Q.     Did you identify, as the person

19  responsible for identifying witnesses, that there

20  should be any interviews of any of those other

21  purchases of other employees of the same towels at

22  the same price as Steve purchased them for?

23      A.     I didn't ask anybody, but I didn't

24  consider the towels to be that big of an incident to

25  really worry about investigating the whole store on.

```
1              Q.    I see.  But it was sufficient that it
2      be written up in his disciplinary folder; correct?
3              A.    I didn't write up his disciplinary
4      folder.  So I have no idea what they meant.
5              Q.    Who did?
6                    MR. GONZALEZ:  Objection.  It assumes
7              unestablished facts.
8              A.    I have no idea for sure.  I would
9      assume that Terry Gillespie or Mark Hastings.  I
10     have no idea.
11             Q.    Why would Terry Gillespie, and not
12     security, be responsible for this investigation?
13                   MR. GONZALEZ:  Objection.  It assumes
14             unestablished facts.
15                   MR. BURTON:  Noted.
16             A.    I have no idea.
17             Q.    Why would Mark Hastings, the overall
18     manager of the stores, be responsible for that, as
19     opposed to a security function?
20                   MR. GONZALEZ:  Objection.
21             A.    Mark is a supervisor.
22             Q.    Who was running the show, meaning the
23     the investigation of Steve harass?
24             A.    It was a coordination between Mark
25     Hastings, Terry Gillespie, and myself.
```

```
 1              Q.    Who was in charge?

 2                    MR. GONZALEZ:  Objection, asked and

 3         answered.

 4              Q.    No.  I would like to know which guy

 5    was the most senior in that group.

 6                    MR. GONZALEZ:  Same objection.

 7              A.    I would say Terry Gillespie was

 8    basically, if you had to say, running the show,

 9    yes.

10              Q.    Did he have any knowledge of the

11    incident that you didn't that he brought to your

12    attention?

13                    MR. GONZALEZ:  Objection,

14         speculation.

15              A.    Could you repeat that, please?

16              Q.    Did he know of any incident that you

17    had not initially known of that he brought to your

18    attention?

19              A.    I don't recall.

20              Q.    Did Hastings have any information

21    that he had before you did?

22                    MR. GONZALEZ:  Objection,

23         speculation.

24              A.    I actually don't recall.

25              Q.    Now, Shannon Tetrault, did you ever
```

1    speak to her about Mr. Harris?

2         A.    I don't believe  I did.

3         Q.    Okay.  What about Simone Tripp; did

4    you ever speak to her about Mr. Harris?

5         A.    I don't recall that name.  So I

6    believe I didn't talk to her.

7         Q.    Dianne Vasse, do you ever recall

8    speaking to her about this?

9         A.    Pardon me?  Who was that?

10        Q.    Dianne Vasse.

11        A.    I don't recall speaking with her.  I

12   may have, but I don't recall.

13        Q.    You have no recollection as you sit

14   here today?

15        A.    Correct.

16        Q.    And what about Laurie Wagner; do you

17   have any recollection of speaking to her before?

18        A.    I don't think I talked with her.

19        Q.    Randy Svoboda, S-V O-B-O-D-A, do you

20   have a recollection of talking to her?

21        A.    I don't recall talking to -- I don't

22   recall the name.  Put it that way.

23        Q.    What about Annette -- and I believe

24   Steinberg at the time.  It is now Duge.  Do you

25   recall having spoken to her about Mr. Harris?

60

1          A.      I don't recall.

2          Q.      Sandy Rosenberg, do you recall having

3    spoken to her about Mr. Harris?

4          A.      I may have talked to her but I'm not

5    100 percent sure.

6          Q.      Well, who do you understand Sandy

7    Rosenberg to be?

8          A.      I believe she was one of the human

9    relations people at the store at that time.  I don't

10   recall exactly.

11         Q.      Do you recall if she had any

12   involvement in any of these incidents?

13         A.      She may have, but I don't recall.

14         Q.      You have no recollection of any as

15   you sit here today?

16         A.      Correct.

17         Q.      What about Jeff Warren?  Do you have

18   any recollection of having spoken to him about

19   Mr. Harris before today?

20         A.      Jeff used to be the district team

21   leader in the district.  We talked about -- we

22   talked about, basically, all the executives at one

23   point in time.  He was there prior to Mark Hastings.

24         Q.      Okay.  So he was the person who

25   promoted Mr. Harris; correct?

1              MR. GONZALEZ:  Objection.  It assumes

2         unestablished facts, speculation.

3         A.    I don't know whether it was him or it

4    was Mark Hastings.  It was one of the two that

5    promoted him.

6         Q.    But by the time Mr. Harris was in

7    that job, then Mark Hastings took over.

8         A.    I don't recall the exact timing.

9         Q.    What about Rene Wasco?  Did you ever

10   speak to Rene Wasco about Mr. Harris?

11        A.    No.  I don't believe I have.

12        Q.    And a Colleen Robbins; do you ever

13   recall speaking to her about that?

14        A.    I don't recall.

15        Q.    You have no recollection as you sit

16   here today?

17        A.    Correct.

18        Q.    What about Howard Raplee?

19        A.    I don't believe -- his name is Howard

20   Raplee.  We called him Ron.

21              I don't know if Ron was still working

22   with the company at the time or if Ron left soon

23   after Steve.  So I don't recall if I talked to Ron

24   about Steve or not.  I don't recall.

25        Q.    What position did Ron leave the

1    company from?

2          A.    He was an asset protection team

3    leader.  He worked for me.

4          Q.    In what store?

5          A.    At the time when he left, he was at

6    the Green Acres store, which was No. 1110, I

7    believe.

8          Q.    When he left the company, was it for

9    working at a different company or was he terminated?

10          A.    He was terminated.

11          Q.    For what?

12          A.    Not paying for his coffee.

13          Q.    Not paying for his coffee.

14          A.    Correct.

15          Q.    Anything else?

16          A.    That was it.

17          Q.    How many times did he not pay for his

18    coffee?

19          A.    I don't recall the specifics but it

20    was a few times, yes.

21          Q.    Had he been warned about that?

22          A.    No, he was not -- besides being

23    taught and trained in orientation, and through the

24    job that he has; that is, as an employee of the

25    store, he's not supposed to take things without

63

1   paying for it, whether it was food items or

2   merchandise. And that was part of his orientation

3   and his training.

4           Q.    And how long had he been working

5   there?

6           A.    At that store or with the company?

7           Q.    The company.

8           A.    I believe it was at least about six

9   years.

10          Q.    Was there any other thing other than

11  not paying for coffee that was alleged about Ron

12  Raplee?

13          A.    Not to my knowledge.

14          Q.    Were you responsible for making the

15  decision to fire Ron Raplee?

16          A.    Yes, I was.

17          Q.    Patricia Morris, do you recall her

18  having any conversation with you regarding

19  Mr. Harris?

20          A.    I don't recall having a conversation

21  with Patricia Morris.

22          Q.    What about Natalie McKenna; do you

23  recall having a conversation with her at any time

24  about Mr. Harris?

25          A.    Yes, I do.

1           Q.      What was that?

2           A.      I had talked about Natalie about the

3    process because she was the one that gave Mr. Harris

4    the money for that night that they went out, for

5    Mr. Evans' going away party.

6           Q.      That was the Shooter's incident.

7           A.      Correct.

8           Q.      What do you recall her saying about

9    that problem?

10          A.      Basically, she just walked me through

11   what she said or what her involvement was in that

12   from the point of processing the voucher --

13          Q.      Tell me what she said.  I don't want

14   to know what, hypothetically, she could have said.

15   I want to know what you recall her saying.

16          A.      I recall her saying that she

17   processed the voucher for the money that Steve asked

18   her for, which was $500, and then, in turn, I

19   believe that she, after it was processed, she got

20   the money out of the register.  She didn't -- she

21   then, I believe, gave it to Steve at that time.  Or

22   she gave it to Don, and Don gave it to Steve.  But

23   it was one of those two.

24          Q.      You don't even recall who she said

25   she recalled giving it to.

1          A.      It was one of the two --
2          Q.      Sir, you don't recall who it was, do
3   you?
4          A.      I'd have to look at her statement to
5   see what she wrote.
6          Q.      You have no independent memory of it
7   now as you sit here today; correct?
8          A.      I remember not everything.  But
9   that's why we take statements; to make sure we keep
10  track of what happened and what was done.
11         Q.      Sir, I'll try again.  Please answer
12  my question.
13                 As you sit here today, you have no
14  independent memory as to who it was she said she
15  even gave the money to; is that not correct?
16         A.      The memory that I have is she either
17  gave it to Don or Steve, but it ended up to Steve.
18         Q.      I'll try it again.  Sir, when I reach
19  a portion of the question you don't understand, stop
20  me.  As you sit here today, you don't recall the
21  specific person who she said she supposedly gave it
22  to.
23         A.      Correct.
24         Q.      What else did she have to say other
25  than that?  You said she gave $500 to what she

    1    believed was Don or Steve for the purpose of the

    2    party.  Anything else?

    3            A.    That's all I recall.

    4            Q.    Did you speak to her for any other

    5    purpose?

    6            A.    I don't believe so.

    7            Q.    Did she say that it was customary and

    8    normal, the process that was the requesting the

    9    money?  Was there anything extraordinary about it?

   10            A.    No.

   11            Q.    So as you sit here today, that was

   12    the sole extent.  That she was the provider of this

   13    fund of money; correct?

   14            A.    Correct.

   15            Q.    Did you ever perform what was in the

   16    nature of a theft investigation before it was

   17    referred to the police?

   18            A.    Yes.

   19            Q.    Can you tell me?

   20            A.    There's been a lot of them.

   21            Q.    Can you give me an example of one?

   22            A.    I'll give you an example of Ron

   23    Raplee, where he was not referred to the police even

   24    though it was a theft-related issue.

   25            Q.    Other than Ron Raplee and his

67

```
 1   stealing coffee -- strike that.
 2                Isn't there a swing room with coffee;
 3   that there is coffee there?  There's coffee for the
 4   executives in the back?
 5        A.    No.  Some stores do have a break room
 6   that might have a coffee maker or is possibly in the
 7   stockroom.  But in this specific situation, he was
 8   taking it from the food out of the counter.
 9        Q.    I see.  Other than Ron Raplee and the
10   coffee, can you give me other instances in which it
11   would be a felony, rather than a misdemeanor,
12   involving more than $100?  I don't think coffee is
13   more than $100.
14        A.    No.  Well, do you want to give me a
15   second so I can think of a specific incident.
16        Q.    Sure.
17                It is now approximately 90 seconds
18   since I asked the question.  Are you still thinking?
19        A.    I am trying to think of an actual
20   felony to the extent which is over $300 and I am
21   trying to remember most of the situations.  It is
22   common for us not to call the police based on the
23   information --
24        Q.    Sir, that's not my question.  I
25   didn't ask you what was common.
```

```
 1          A.      I can't recall any.

 2          Q.      That's all I need.

 3          A.      I can't recall a situation that's a

 4   felony for at least $300, or more, that I haven't

 5   called the police on.  I can give you specific

 6   instances that are under $300.  I can give you

 7   those.

 8          Q.      Sir, I am not asking you that

 9   question.

10          A.      Okay.

11          Q.      If he wants to ask you that question,

12   he'll ask you that question.

13          A.      Okay.

14          Q.      Sir, to the best of your knowledge --

15   let me ask you a question.  Mr. Blacknik's using his

16   employee number, versus Mr. Harris using his, is

17   there something inherently illegal about that,

18   assuming it was going from one employee to another

19   employee?

20          A.      Inherently illegal?

21          Q.      Yes.

22          A.      No.

23          Q.      So there was nothing that would tip

24   Mr. Blacknik off that this is an illegal conduct

25   being taken.
```

1        A.      Illegally, no.

2        Q.      Is there anything prohibiting that in

3   the manual at Target's?  Specifically.  Not

4   typically.  I don't want to know what your practice

5   is --

6        A.      Specifically, if you are going to

7   make a purchase, you use your own discount card for

8   the discount.

9        Q.      Sir, is there anything specifically

10  that makes it illegal in the Target's regulations or

11  rules of a specific transaction, identified as such,

12  that you know of?

13       A.      There is a policy and procedure of

14  discounts.

15       Q.      For employees.

16       A.      Correct.

17       Q.      Both of them would have been

18  employees that would have qualified; correct?

19       A.      Correct.

20       Q.      So my question is, not to give it to

21  a third party, not like a customer.  But is there

22  anything specific about it?

23       A.      I don't recall.

24       Q.      Nothing as you sit here and you can

25  think of right now?

1          A.      I don't recall the exact wording of

2     the discount policy.  So I can't tell you

3     specifically whether or not it says that.

4          Q.      Sir, am I correct in stating that

5     there have been other instances where other

6     employees have bought one or the other something for

7     each other and paid each other back?

8          A.      There may have been those things

9     happen.

10         Q.      You wouldn't be investigating that it

11    was a crime or, let's say, improper conduct unless

12    it was something that was -- typed something;

13    correct?

14         A.      Correct.

15         Q.      That's all I need to know.

16                 So we have the Power Wheels.  We have

17    the towels.  The towels, you said, weren't a very

18    significant issue.

19         A.      Correct.

20         Q.      What else was there?

21         A.      I don't recall anything else

22    specific.  But the whole issue was identified based

23    on the Shooter's receipt.  So that's what really

24    stands in my mind as being the issue.

25         Q.      Okay.  Had anyone spoken to

1    Mr. Harris before the general inquiry of other

2    events and after the Shooter's receipt so they could

3    find out what had happened, if anything?

4              A.    Prior to --

5              Q.    Prior to calling him in and telling

6    him that he was considered a security risk and

7    barred from the premises, did anyone specifically

8    talk with him about the Shooter's receipt that you

9    are aware of?

10             A.    Prior to the incident where he was

11   basically let go, there were at least two meetings

12   that I was involved with that Steve was talked to

13   with myself, Mark Hastings and Terry Gillespie, and

14   that's when we tried to find out exactly what

15   happened.

16             Q.    At these meetings with Mark, Terry

17   and yourself -- do you recall, first of all, how the

18   first meeting was called, who called it?

19             A.    It was the same time we were planning

20   on having a meeting with Steve.  However, through

21   the rumor mill, we had heard that Steve had found

22   out about it.  And that's when Steve had called, I

23   believe, myself and Mark, and wanted a meeting with

24   us to talk about this investigation that he had

25   said that Donna was looking into it.

1           Q.      Okay.  So he called you initially.

2           A.      But prior to the call, we were

3    already investigating it.

4           Q.      Yes.  I'm trying to figure out at

5    what time after the Shooter's receipt you had this

6    flurry of other charges.  How were you able to come

7    up with it in such a period of time if no one -- it

8    is like a virgin birth.  Where did it come from?

9                   MR. GONZALEZ:  Objection.

10          A.      All these evidences?

11          Q.      Yes.

12          A.      Part of the investigation, we sit

13   down and talk to one person.  You find something

14   else.  So you go and investigate that.

15          Q.      Who were you talking to?  You have

16   just told me -- everyone you told me, you said you

17   talked to her because they knew about it.  I'm

18   trying to find out how you knew about something.

19          A.      Give me a specific of --

20          Q.      Well, I asked you about the towels

21   and you said you didn't recall who told you that;

22   right?

23          A.      It came through one of the statements

24   where we talked to somebody and they said we heard

25   about this.  So, from there, we went on and talked

1   to him about that.

2          Q.    So it is all gossip is what you are

3   saying.  Is it?

4                MR. GONZALEZ:  Objection.

5          Q.    Using your term, in one of the

6   statements, if one says they heard about something,

7   so then you investigate it; correct?

8          A.    Correct.

9          Q.    What people sometimes use the term as

10  gossip; correct?

11         A.    That may be a term, yes.

12         Q.    That's also how you heard about the

13  Power Wheels, because that had occurred many months

14  before; correct?

15         A.    Correct.

16               MR. GONZALEZ:  Objection.

17         Q.    And whatever else you heard, you

18  heard through gossip; correct?

19               MR. GONZALEZ:  Objection.

20         A.    Through the course of investigation.

21         Q.    Is that yes, through the course of

22  the investigation?  You shook your head.  You have

23  to say yes or no.

24         A.    Yes.  If the term that you are using

25  is gossip, it is equivalent to the term of part of

1   my investigation.  When you talk to somebody, you

2   hear something.  So you go investigate it.

3          Q.      Even if that person wasn't personally

4   involved and you just heard it from someone else?

5          A.      Correct.  You still have to track

6   down all the leads.

7          Q.      When did it become a formal

8   investigation?  You certainly knew about the

9   Shooter's receipt.  When did someone make the

10  determination they were was going to try to make a

11  case against Steve Harris, is the question.

12         A.      I don't know the exact time of

13  someone saying, okay, this is now a case.  But it

14  was, we have a Shooter's incident.  Let's go talk to

15  these people.  And all of a sudden, for this whole

16  thing, was to identify what else may or may not

17  be -- may have happened.

18         Q.      I see.  Aren't you aware that, in

19  fact, Shannon Tetrault has spoken to Terry Gillespie

20  and to Mr. Hastings on a personal level, and that

21  Shannon Tetrault was an incompetent manager?  Was

22  she criticized for that, sir?

23              MR. GONZALEZ:  Objection.  Assuming

24         unestablished facts.

25         A.      She didn't talk to me about it.  So I

1    have no recollection about it.

2         Q.    You have never been told that

3    Miss Tetrault was talking directly with Mr. Hastings

4    and Mr. Gillespie, reporting her feelings about

5    Mr. Harris and --

6         A.    No.

7              MR. GONZALEZ:  Objection.  Assuming

8         unestablished facts.

9         Q.    Didn't Mr. Feinkhauser tell you that

10   he was told by Hastings and Gillespie to speak to

11   Tetrault because she had information?

12        A.    Did Mr. Feinkhauser -- clarify the

13   question.

14        Q.    Feinkhauser said I got a call from

15   Hastings and Gillespie to talk to Shannon Tetrault

16   about what she knew.  And he said -- and this is

17   quotes -- that he doesn't know how they knew it

18   before he did, but they clearly knew that they had

19   spoken to Shannon Tetrault.  Are you aware of that,

20   if it occurred?

21             MR. GONZALEZ:  Objection.  Assumes

22        unestablished facts.

23             MR. BURTON:  Noted.  Come on.

24        A.    That may have happened.  He may have

25   said that.  But I don't recall specific wording like

1    that.

2         Q.    Do you recall if Shannon Tetrault had

3    spoken to Gillespie and Hastings before Feinkhauser

4    had about the incident that Shannon Tetrault related

5    to them directly?

6              MR. GONZALEZ:   Objection.

7         A.    I don't recall.

8         Q.    You don't recall one way or the other

9    or you have never heard that?

10        A.    I never have heard that term,

11   specifically.

12        Q.    Is it your understanding that that

13   occurred?

14        A.    I do know that she was talked to, and

15   she was talked to by Mr. Feinkhauser.   And I don't

16   know all the details, and I don't know whether or

17   not she was talked to specifically by Mr. Gillespie

18   or Mr. Hastings.

19        Q.    Are you aware that Miss Tetrault had

20   been criticized by Mr. Harris for the performance of

21   her work?

22        A.    I'm not aware of that.

23        Q.    So you were never told that there was

24   any animosity involved?

25        A.    I'm not aware of that.

```
 1            Q.    Are you aware that Miss Tetrault was
 2   unaware of how the reconciliation was done and when
 3   it was done?
 4            A.    Reconciliation of what process?
 5            Q.    The book in the front with the cash
 6   receipts.  She was unaware of how it was supposed to
 7   be reconciled.
 8                  MR. GONZALEZ:  Objection.  It assumes
 9            unestablished facts.
10                  MR. BURTON:  That's not a valid
11            objection, counselor.
12                  MR. GONZALEZ:  That's fine.
13            A.    I'm not aware of --
14                  MR. BURTON:  Have you tried a case in
15            Federal Court, Rene?
16                  MR. GONZALEZ:  Actually, we are
17            trying to move this deposition here.
18                  MR. BURTON:  I'm just curious --
19                  MR. GONZALEZ:  I don't want to answer
20            those questions, sir.  Please ask your
21            questions to Mr. Barth.
22                  MR. BURTON:  I will try it again and
23            keeping and preserving your objection,
24            although it shouldn't have been spoken to.
25   BY MR. BURTON:
```

1        Q.     Are you aware if Shannon Tetrault had

2    knowledge of how she was supposed to oversee the

3    front cashiers at that time?

4        A.     Yes.  I have knowledge that part of

5    her -- you know, that she was put through a training

6    program to basically teach her how the front is

7    supposed to operate.  Basically, yes.

8        Q.     How long had she been on the job at

9    this time in charge of these people as a young

10   trainee?

11       A.     I have no idea.

12       Q.     And do you know if there was -- well,

13   is it -- at the time that this occurred, was

14   Mr. Harris the only African American general store

15   manager in that district that you are aware of?

16       A.     In that district, yes.

17       Q.     Certainly, the only one who had a

18   white wife; correct?

19       A.     Correct.

20       Q.     Didn't Mr. Harris initially state

21   that the reason he was being targeted was because it

22   was racial, and he'd been saying it all along, from

23   the first meeting with Gillespie, forward?

24       A.     That is incorrect.

25       Q.     When was the first time you have

1   heard that he had a racial claim against Target's

2   for taking this action?

3          A.     I heard months later, through gossip.

4          Q.     Sir, you don't have knowledge through

5   working with Mr. Gillespie that he filed an EEO

6   claim within a couple of days of his dismissal?

7          A.     No.   I don't know that.

8          Q.     No one ever told you that that was an

9   immediate charge filed within, certainly, 60 days of

10  his termination?

11         A.     No.

12         Q.     And you didn't hear it through the

13  same grapevine about any class action by Mr. --

14         A.     Well, I did say that I heard that

15  Steve had filed a claim, you know, later on through

16  the rumor mill, but I never specifically heard it

17  from Terry Gillespie or Mark Hastings.   I don't

18  recall.

19         Q.     So they never told you that he had

20  filed it at any point; correct?

21         A.     Correct.

22         Q.     What did he say was the explanation

23  of the Shooter's receipt that you recall him saying?

24         A.     As in Mr. Harris?

25         Q.     Yes.

1          A.     Basically, we asked him about the

2    receipt and asked him --

3          Q.     No.   I don't want a "we."

4                 What do you remember being said, the

5    words spoken, and by whom? I don't want to know

6    group participation.

7          A.     I don't recall the exact wording.

8          Q.     So you have no recollection of what

9    was specifically said by Mr. Harris; is that

10   correct?

11         A.     I recall what came out of me and I

12   recall -- I don't recall exact specific statements.

13   I recall some of the things that he was asked.  I

14   recall, you know, comments and things like that.

15   But I don't recall the exact wording.

16         Q.     What do you recall of the general

17   position he took? You said you don't recall

18   specifics.  Tell me what you do recall.  What did he

19   say, in substance?

20         A.     Steve was asked about the receipt.

21         Q.     By whom?

22         A.     Mr. Gillespie.

23         Q.     And what did he say, the best you can

24   recall?

25         A.     That, basically, here is the receipt,

81

```
 1    and he explained this to us.

 2              Q.    And what did he say?

 3              A.    And Steve said it's a receipt from

 4    Shooter's from the other night, taking Evan for his

 5    going away party.

 6              Q.    Anything else?

 7              A.    Mr. Gillespie or myself asked Steve

 8    why is the total here $295; why is that $160 extra

 9    added in.

10              Q.    And what did he say?

11              A.    Steve said, "I don't know.  I don't

12    know why he did that."

13              Q.    Okay.  Anything else?

14              A.    (No response.)

15              Q.    Did he tell you that he was standing

16    next to Feinkhauser when he gave you the change in

17    his coat and in his pocket?

18                    MR. GONZALEZ:  Objection.  It assumes

19              unestablished facts.

20              A.    I don't recall that.

21              Q.    You don't recall, one way or the

22    other?

23              A.    I don't recall ever hearing that

24    basically until now.

25              Q.    Did he tell you that Feinkhauser was
```

1    there when he made out that slip in question,

2    sitting right next to him, and ask him why he wasn't

3    using his Target credit card?

4         A.    I don't recall that.

5         Q.    Do you recall any incidents regarding

6    the credit card that came up, as you are sit here

7    today, Target or otherwise?

8         A.    Part of the investigation, we looked

9    into his account history of his Target card that was

10   issued by the corporation for business expenses, and

11   we also looked at his personal credit card.

12        Q.    What right do you have to look at his

13   personal credit card?  What legal right do you have

14   to invade that privacy?

15             MR. GONZALEZ:  Objection.

16             MR. BURTON:  Noted.

17        A.    That's common practice, when you do

18   an investigation, that we can look at that

19   information based on that -- basically, Target's,

20   you know, proprietary card.  And also with the

21   expense card because it's issued by Target.

22        Q.    I understand the expense card.  But

23   you are saying, if a person has a VISA card from the

24   company, you would feel free to go into his records

25   of his purchases and medical charges?

```
 1              A.      Not a VISA card.

 2                      MR. GONZALEZ:  Objection.

 3              Q.      Or a Target card.  Excuse me.  A card

 4    that has pharmacy products at Target.  At certain

 5    Targets, they have pharmacies.

 6              A.      Correct.

 7              Q.      And you feel free in going into the

 8    person's medicals --

 9              A.      We would never look at a medical

10    issue.

11                      MR. GONZALEZ:  Objection.  It assumes

12              facts.

13              Q.      So you are saying that that's somehow

14    or other redacted or it comes up and you just close

15    your eyes and you don't see that?

16                      MR. GONZALEZ:  Objection.

17                      MR. BURTON:  Noted.

18              A.      I need a clarification here.  Are

19    you talking about medical records or are you talking

20    about --

21              Q.      I'm talking about the charges that

22    are made, including charges for the pharmacy.  Do

23    you look at them, and under what basis?

24                      MR. GONZALEZ:  Objection, improper

25              hypothetical.
```

1              A.     The other information that we would

2     receive through a Target card would be to see,

3     basically, the balance; whether the purchases were

4     made, but not looking at specific details.

5              Now, I could get that, if I wanted

6     to, based on the information.  But there was no need

7     to look at that.

8              Q.     I will ask you one last question and

9     it will be real simple, and we can leave.

10             Sir, did you ever receive his

11    permission in writing to obtain his personal credit

12    information before you looked at it?

13             A.     No.

14             Q.     I will follow with one simple other

15    question.

16             Sir, at the time that you looked at

17    these cards, is it not a fact that one of the cards

18    was closed voluntarily by Steve, and the other card

19    was being paid off and no charges were being placed

20    on them?

21             A.     I found that out during the course of

22    the investigation, yes.

23             Q.     So before you got involved, he had

24    already taken those steps, correct, to the best of

25    your understanding?

1              MR. GONZALEZ:  Objection to form.

2         A.    I believe, during the course of the

3    investigation, it was identified that the Target

4    credit card, the account was closed, in that his

5    statements -- he paid everything off on that.

6              The American Express Card, which was

7    the card for expenses, I don't believe that was paid

8    off at the time.  I don't recall --

9         Q.    It was in the process of being closed

10   and there hadn't been any charges from any --

11             MR. GONZALEZ:  Objection --

12        A.    I don't know the time frame of

13   exactly when the last charge was paid.

14        Q.    Your understanding was he was paying

15   it off and it was being closed out.

16             MR. GONZALEZ:  Same objection.

17        A.    That may or may not have happened.  I

18   don't recall.

19        Q.    Do you have any recollection?

20        A.    I recall that I know that it still

21   had a balance on it and it still had to be paid off.

22        Q.    And it was.

23             MR. GONZALEZ:  Objection.

24        A.    I don't know the exact time frame of

25   when it was closed out.

1              MR. BURTON:  I have no further

2         questions of this witness.

3              MR. GONZALEZ:  We will waive.

4              MR. BURTON:  We will go to the Court

5         regarding --

6              MR. GONZALEZ:  We waive the reading.

7    BY MR. BURTON:

8         Q.    One other question.  How many times

9    did you speak with Mr. Gonzalez?

10             MR. GONZALEZ:  Objection to form.

11        A.    Just once.

12        Q.    When?

13        A.    Last Friday.

14        Q.    Where?

15             MR. GONZALEZ:  Objection.  That's

16        irrelevant what you spoke to him about.

17             MR. BURTON:  I don't believe there is

18        privilege involved.

19             MR. GONZALEZ:  I am directing you not

20        to answer any more questions regarding what

21        you and I spoke about.

22             MR. BURTON:  I'll certify that.

23        Nothing further.

24             (Whereupon, the deposition was

25        concluded at 3 o'clock p.m.)

```
 1                    CERTIFICATE OF REPORTER

 2   STATE OF FLORIDA :
                      :  SS.
 3   COUNTY OF DADE   :

 4                    I, PHILLIP S. STORCH, being a Notary
     Public in and for the State of Florida at Large, do
 5   hereby certify that I reported the deposition of
     DOUGLAS S. BARTH, a witness called by the Plaintiff
 6   in the above-styled cause; that the said witness was
     duly sworn by me; that the reading and subscribing
 7   of said deposition were waived by the witness and by
     counsel for the respective parties; and that the
 8   foregoing pages, numbered from 1 to 87, inclusive,
     constitute a true and correct transcription of my
 9   shorthand report of the deposition by said witness.

10                    I further certify that I am not an
     attorney or counsel of any of the parties, nor
11   relative or employee of any attorney or counsel
     connected with the action, nor financially
12   interested in the action.

13                    WITNESS my hand and official seal in
     the City of Miami, County of Dade, State of Florida,
14   this 23rd day of March, 2001.

15

16   _____
     PHILLIP S. STORCH
     Notary Public
17

18                        Phillip S. Storch
                 MY COMMISSION # CC943309  EXPIRES
19                        June 10, 2004
                 BONDED THRU TROY FAIN INSURANCE, INC.

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

STEVE HARRIS,
        Plaintiff,

                                    CASE NO. 00-6107-CIV-FERGUSON
V.                                  MAGISTRATE JUDGE SNOW
DAYTON HUDSON CORPORATION
d/b/a TARGET STORES,
        Defendant.
_____/

## Re-NOTICE OF TAKING DEPOSITION-NEW LOCATION

TO: Sheila Ceasarano

**PLEASE TAKE NOTICE** that the undersigned counsel will take the deposition of the individual named below shall be conducted on the following date and time:

Mark Hastings

ON:         WEDNESDAY, March 14, 2000, AT 9:00 A.M.
PLACE:      Moore, Henderson, Allen & Phomas- Court Reporters
            621 SW Morrison St. #1145
            Portland, OR 97205
            503-226-3313 / 503-273-0109 fax

upon oral examination before a certified court reporter, a Notary Public in and for the State of Oregon, or some other officer duly authorized by law to take depositions. The deposition will continue from day to day until completed. The deposition is being taken for the purpose of discovery, for use at trial, or both of the foregoing, or for such other purposes as are permitted under the applicable and governing rules.

I HEREBY CERTIFY that a true copy of the within was faxed and mailed, this 12TH day of March, 2001, to Sheila Caesarano, Esq., SHUTTS & BOWEN LLP, 1500 Miami Center, 201 South Biscayne Blvd., Miami, FL 33131.

                        RICHARD J. BURTON & ASSOCIATES, P.A.
                        Attorney for Plaintiff
                        18305 Biscayne Blvd., Suite 300
                        No. Miami Bch., FL 33180
                        Ph:(305)705-0888-Fax: (305) 935/9542


                        BY_____
                            RICHARD J. BURTON, FBN 179337

**cc: client,**
**Johnson, Moore, via fax**


PLAINTIFF'S
EXHIBIT
4

1