**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

STEVE HARRIS,            Case No. 00-6107-CIV-FERGUSON

    Plaintiff,

vs.

DAYTON HUDSON CORPORATION
d/b/a TARGET STORES,

    Defendant.
_____/

## *AMENDED* **ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

The plaintiff, Steve Harris ("Harris"), brings this action alleging that the defendant, Dayton Hudson Corporation d/b/a Target Stores ("Target"), discriminated against him in the workplace based on his race. Also included in the complaint are claims of libel and slander based on communications that Target allegedly had with Harris' potential future employers. The case is before the Court on the Defendant's Motion for Summary Judgment [D.E. 41].

### **FACTUAL BACKGROUND**

In June of 1994 Harris, an African-American male, interviewed for a position at Target. Terry Gillespie, Target's Regional Human Resource Manager, who is white, was one of the managers who interviewed Harris. Upon completing the interview process, Gillespie offered Harris a managerial position. On June 9, 1994 Harris commenced his employment as an Assistant Store Team Leader-in-Training (Assistant Store Manager in Training) at a Target store located in Boca Raton. After completing the initial training, Harris was promoted to Assistant Store Team Leader



(Assistant Store Manager) on August 1, 1994.

On December 28, 1997, Target promoted Harris to Store Team Leader (Store Manager) of a Target store located in Greenacres that was scheduled for closing. On April 1, 1998, Target transferred Harris to a Target store in Deerfield Beach as the Store Team Leader (Store Manager). As part of his job responsibilities, Harris oversaw all store funds and budgets. He was required to direct the merchandising, operation, and personnel functions of the store with an identifiable goal of attaining maximum profits, sales and returns on investments. In March of 1999, Harris was the only African-American acting as a General Store Manager in the West Palm Beach District stores. He was dismissed soon thereafter.

Target asserts several reasons for its termination of Harris including an incident where he falsified a sales receipt. In January of 1999, Harris contacted Mark Hastings, Target's District Manager, to authorize a going-away dinner party for Evan Feldman, an Executive Team Leader, who had resigned. The party was approved by Hastings who directed Harris to obtain $500 to cover the cost of the party. These funds were obtained with the approval of Don Fankhauser, the store's security manager.

Feldman's going-away dinner party was held on January 29, 1999, at Shooter's, a Fort Lauderdale restaurant, and was attended by Harris, Shannon Tetrault, Don Fankhauser, and Evan Feldman. The charge for the meal was $135.87. The Shooter's receipt showed an additional $160 charge, which Harris admits was handwritten by him.[1]

Target authorized its security manager, Don Fankhauser, to conduct an investigation. It is

---

[1] Plf. Dep. p. 78-80.

2

undisputed that he later contacted the waiter who recalled that Harris had left approximately a $25 tip.[2] Based upon the waiter's statements, the total owed for the meal should have been approximately $161 including a $25 tip. However, the total amount indicated on the receipt which Harris submitted to Target was $295.87. Harris gave the Shooter's receipt and the unspent dinner-party funds, approximately $204, to the store's service desk supervisor, Caryn Knapp. Target's investigation concluded with a finding of a $135 discrepancy between the amount actually spent and the amount claimed by Harris.

In February of 1999, Harris attended a meeting where Mark Hastings, Doug Barth (Target's District Asset Protection Team Leader), and Terry Gillespie were present. Harris requested to meet with Hastings and Barth because he had been made aware of the ongoing investigation regarding the Shooter's receipt discrepancy.[3] Gillespie questioned Harris about the Shooter's incident and asked him to explain the difference between the bill and the amount returned. Harris offered no satisfactory explanation for the discrepancy.[4]

As part of the probe into Harris' activities, charges on Harris' company-issued American-Express credit card were examined. Target's Policy Manual states "credit cards issued by Target to its team members are for business expenses only". It is undisputed, however, that Harris made non-business purchases on his Target American-Express credit card.[5] The American-Express card was

---

[2] Plf's Dep., p.114

[3] Plf's Dep., p.70.

[4] Plf's. Dep. p. 114.

[5] Plf's. Dep. p. 127-28.

3

also in arrears, in violation of Target's corporate policy requiring that business accounts be kept current. Failure to make payments when due is expressly grounds for termination of the account.[6]

Because of Harris' excessive personal charges, which he failed to pay in a timely manner, the company issued charge account was eventually closed. Target considered the credit card issue as part of Harris' delinquency problems and offered this as another reason why he was fired.

Harris alleges that other Target employees violated the same company policies that he did but were not disciplined as harshly. As an example of an inequity he points to the case of Toscano, a white store manager who violated company policy when he improperly marked down items by scanning unauthorized SKU numbers which resulted in the sale of merchandise at below authorized prices. It is alleged that Harris committed the same infraction. When confronted by Gillespie about this, Harris states that he told Gillespie that Toscano was doing the same thing in his store. Harris claims that this practice of undercharging customers resulted in revenue losses for Toscano's store but argues that Toscano was not investigated or reprimanded. Nonetheless, Harris complains, Target cited the same offense of improperly marking down items as a reason for his termination.

As another example of alleged disparate treatment, Harris asserts that Shannon Tetrault, captain of the district for guest service card applications, was involved in an IOU accounting system in violation of company policy. The system was used to account for vouchers that were outstanding. Fankhauser advised store employees against the IOU practice and Harris told his staff to discontinue it. Tetrault broke the policy by re-ringing returns at the service desk so they would not show up on risk reports. Harris claims he brought this to the attention of Fankhauser and later called Hastings

---

[6]Plf's Dep., p.120-121.

4

and asked if he should place Tetrault "in counseling" or initiate some other corrective action. Harris says he was told just to talk to her and not give her any type of warning.[7]

Besides these two examples, tendered by Harris as evidence of disparate treatment, he claims that remarks made to him and his spouse indicate that race was a motivating factor in his termination. Harris claims that on five occasions he was referred to as a "brother" and asked by Gillespie and other co-workers, "how could a brother afford a Dodge Viper?" Harris states that he considers the term "brother" derogatory. He also alleges that his wife, who is white, was subjected to prejudicial remarks such as inquiries as to what type of food black people liked. He states that he was asked by Hastings, Target's District Manager, what kind of difficulties he ran into being married to a white woman, especially since she was blond.[8] During his deposition Harris stated that he was "not sure" if some of the comments on which he based his claim were "racist" even though they were offensive.[9]

## STANDARD FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A factual dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-movant. Anderson v.

---

[7] Plf's Dep., pp. 137-157.

[8] Plaintiff Aff., ¶¶17-22; Plf's Dep., pp.170-180.

[9] Plf's Depo. p. 179.

5

Liberty Lobby, Inc., 477 U.S. 246, 248 (1986). Similarly, a fact is "material" if it might affect the outcome of the suit under the governing substantive law. Anderson, 477 U.S. at 247.

In considering this motion for summary judgment, the Court must examine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that the defendant should prevail as a matter of law." Id. at 243. The movant bears the initial burden of showing the absence of a genuine issue as to any material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). In deciding whether the movant has met this burden, the Court must view the evidence and all factual inferences in the light most favorable to the non-movant. Miranda v. B & B Cash Grocery Store, Inc., 975 F.2d 1518, 1532 (11th Cir. 1992). "If reasonable minds could differ on the inferences arising from undisputed facts, summary judgment should be denied." Id. at 1534.

Once the initial burden is met, the non-movant must come forward with specific facts showing that there is a genuine issue for trial that precludes summary judgment. Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The evidence presented cannot consist of conclusory allegations, legal conclusions or evidence which would be inadmissable at trial. Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991). Likewise, "a mere scintilla of evidence supporting a position will not suffice; there must be enough of a showing that the jury could reasonably find for the [non-movant]." Anderson, 477 U.S. at 252. Failure to make a showing sufficient to establish the existence of any essential element of a claim is fatal and requires the entry of summary judgment. Celotex Corp., 477 U.S. at 322-323.

## ISSUES PRESENTED

The issues raised are whether the plaintiff has established a prima facie case of racial

discrimination resulting in unlawful termination and 2) whether a plaintiff establishes a prima facie case of libel or slander when no factual allegations are made as to how or when the statements were disseminated or published.

## DISCUSSION

### A *Prima Facie* Case of Disparate Treatment

In order to establish a prima facie case of discrimination under both Title VII and 42 U.S.C. § 1981[10] in a disparate treatment case, a plaintiff must show that: 1) he belongs to a protected class; 2) he was subjected to an adverse job action; 3) his employer treated similarly situated employees outside his classification more favorably; and 4) he was qualified for the job. Maniccia v. Brown, 171 F.3d 1364, 1368 (11th Cir. 1999). Demonstrating a prima facie case requires only that the plaintiff establish facts adequate to permit an inference of discrimination. See Texas Dep't of Community Affairs v. Burdine, 101 S.Ct. 1089, 1093-4 (1981).

Under the burden-shifting analysis set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), once the plaintiff has proven the elements of his *prima facie* case, he is entitled to a presumption of discrimination. The burden then shifts to the employer to articulate a legitimate, non-discriminatory reason for its actions. If the employer can offer no proof to rebut the plaintiff's case, the plaintiff will prevail. If, however, the employer can show that its motives were non-discriminatory, the burden shifts back to the plaintiff to show that the defendant's proffered motive

---

[10] See Vincent v. Wells Fargo Guard Services, Inc., 3 F. Supp. 2d 1405, 1413 (S.D. Fla. 1998)(indicating a similar analytical framework between Title VII and section 1981); Turnes v. AmSouth Bank, NA, 36 F.3d 1057 (11th Cir. 1994)(stating that the same method for establishing discrimination cases under Title VII may be used for 42 U.S.C. §1981).

7

is pretextual. Id. at 802. It is important to note, though, that "[c]onclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext or intentional discrimination where [an employer] has offered... extensive evidence of legitimate, non-discriminatory reasons for its action." Elrod v. Sears, Roebuck, & Co., 939 F.2d 1466, 1471-72 (11th Cir. 1991). If the plaintiff cannot prove that the employer's motives are pretextual, the employer should prevail and summary judgment should be granted. See St. Mary's Honor Center v. Hicks, 509 U.S. 502 (1993).

It is undisputed that Harris satisfies the first two (2) prongs of his *prima facie* case as he is a black male who was terminated from Target's employ. As to the third prong, Harris has provided ample evidence from which a reasonable jury could find that Target treated similarly situated employees outside of his classification more favorably. Harris alleges that other Target employees violated company policies and suffered no adverse employment actions. For example, he contends, another store manager, Toscano, violated a specific store mandate resulting in a loss of revenue and was not investigated, reprimanded, or terminated. Tetrault, another Target employee, ignored an explicit instruction that she not use a particular voucher accounting procedure. Even after Harris brought Tetrault's actions to the attention of Target's management, she was neither counseled nor disciplined.

In both its original motion for summary judgment and its later filed motion for reconsideration of the Court's Order denying summary judgment, Target never asserts that Tetrault and Toscano did not commit these infractions. It instead urges this Court to disregard this evidence of disparate treatment arguing that Toscano and Tetrault's actions were not of the same quantity and

8

quality as Harris' and thus they are improper comparators. Target's reliance on <u>Maniccia,</u> 171 F.3d at 1368,[11] in arguing that Toscano and Tetrault are improper comparators, is unpersuasive. The actions of Harris, relied upon by Target as indicating a security risk, are sufficiently comparable to those acts committed by other managers. The comparable acts of other managers, like those of Harris, constituted violations of company policies which resulted in actual or potential monetary losses. In that sense the actions are similar in quality. As Harris argued a jury could find those actions which are unrelated to the office party incident, alone or in combination, an unreasonable basis for finding a manager to be a security risk.

Harris' examples of disparate treatment prompts the second prong of the burden shifting analysis which requires Target to proffer a legitimate, non-discriminatory reason for its termination of Harris. Target proffers eight reasons for their adverse employment action: Harris (1) presented a false receipt to Target; (2) retained funds based upon the discrepancy in the receipt; (3) could not verify how much money he had returned to Target; (4) used his corporate charge card for personal purposes; (5) allowed his corporate charge to go into arrears; (6) borrowed money from other Target employees and encouraged them to assist him in errands; (7) failed to timely submit payments for his personal Target credit card which was closed because it was in arrears; and (8) repaid his revoked Target credit card during the course of over a year. Target, alleges that based on these infractions of its company policies, Harris was a safety risk and could no longer remain in Target's employ.

---

[11] Target also improperly relies on <u>Richter v. Metro. Dade County,</u> 12 Fla.L.Weekly Fed. D570, 571, 1999 U.S. LEXIS 15952, *6-8 (S.D.Fla. Aug. 6, 1999), a decision by the undersigned. A motion for rehearing or reconsideration in that case is still pending.

9

Under the third prong of the same burden shifting analysis, Harris can survive summary judgment if he demonstrates that the above reasons are simply a pretext for Target's discriminatory motives. An indication of pretext is that other Target employees (i.e. Tetrault and Toscano) violated company policy and were not terminated.[12] Further it is undisputed that Target promoted Harris to Store Manager after it had knowledge of some of his early violations of company policies such as using the company issued American Express card for personal purchases. The evidence does not show that the infraction continued after Harris was promoted. For that reason a fact-finder could find the proffered reasons pretextual.

As further proof that his termination was racially motivated, Harris claims that he was subjected to discrimination when derogatory comments were made by Gillespie and other co-workers in reference to his marriage to a Caucasian woman, the types of food "blacks" liked, and his ability, as a "brother", to afford a Dodge Viper. Those co-workers, according to Harris, were other management level persons, some of whom participated in the investigation and interrogation of him prior to the termination decision. Racially derogatory statements can be direct evidence of discrimination if the comments were (1) made by the decision-maker responsible for the alleged discriminatory act and (2) made in the context of the challenged decision. See Wheatley v. Baptist Hosp. of Miami, Inc., 16 F.Supp.2d 1356, 1359-60, aff'd, 172 F.3d 882 (11th Cir.1999). It is undisputed that Gillespie, who made one of the racial remarks, was the decision-maker responsible

---

[12]"The plaintiff must show that his employer treated similarly situated employees outside his classification more favorably than herself." Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997) (indicating that more favorable treatment is an indication of discrimination); see also, Contu v. Martin Cty. Bd. of Cty. Commissioners, 47 F.3d 1068, 1073 (11th Cir.1995).

10

for Harris' termination. It would be significant, if proven, that the non-decision makers, who made the offensive remarks, assisted the decision-maker in the termination process.

Recently the United States Supreme Court unanimously held in <u>Reeves v. Sanderson Plumbing Prod., Inc.</u>, 530 U.S. 133, S.Ct. 2097 (2000), that an employee's prima facie case of discrimination, combined with evidence that the employer's justification for termination was a pretext for discrimination, was sufficient for a trier of fact to return a verdict in the employee's favor. After applying the <u>McDonnell Douglass</u> framework the Court stated that the employer was not entitled to judgment as a matter of law where the employee had established a prima facie case of discrimination, created a jury issue of pretext, and introduced evidence that the company director principally responsible for the firing had been motivated by a discriminatory animus. Similarly Harris has established a prima facie case of disparate treatment and racial animus. Considering the evidence in a light most favorable to him there is a material issue of fact as to whether Target's proffered reason is pretextual. For the above stated reasons summary judgment is precluded.

### A *Prima Facie* Case of Libel or Slander Claim

Harris claims that Target's wrongful termination deprived him of the ability to seek new employment. To substantiate this claim there must be some evidence of a communication between Target and potential future employers of a "false and defamatory statement concerning another." <u>Linafelt v. Beverly Enterprises-Florida, Inc.</u>, 745 So.2d 386, 388-89 (Fla 1st DCA 1999). Harris has the burden of showing that some statements made to potential employers were "knowingly false," "deliberately misleading", or "rendered with a malicious purpose." <u>Linafelt</u>, 745 So.2d at 388-89.

Target has a presumption of good faith in regards to statements made to prospective

11

employers pursuant to Florida Statute § 768.095 which states in pertinent part:

> [a]n employer who discloses information about a former or current employee to a prospective employer of . . . upon request of the prospective employer or of the former or current employee is immune from civil liability for such disclosure or its consequences unless it is shown by clear and convincing evidence that the information disclosed by the former or current employer was knowingly false or violated any civil right of the former or current employee protected under chapter 760.

Harris has failed to produce any evidence that Target knowingly disseminated false statements to prospective employers. In fact, the record is conspicuously devoid of names of the alleged prospective employers with whom Target spoke or what was said. For that reason, Harris has failed to present a *prima facie* case of either libel or slander.

Having duly considered the motions, responses, oral arguments and pertinent parts of the record, it is

**ORDERED AND ADJUDGED** that the Defendant's Motion for Summary Judgment [D.E. 41] is **GRANTED in part, DENIED in part**.

**DONE AND ORDERED** in Chambers at Ft. Lauderdale, Florida, this 10th day of August, 2001.

WILKIE D. FERGUSON, JR.
UNITED STATES DISTRICT JUDGE

copies provided:
Rene Gonzalez-Llorens, Esq.
Richard Burton, Esq.