# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

CASE NO.  00-6107-C.V.-FERGUSON/SNOW

STEVE HARRIS,

     Plaintiff,

v.

DAYTON HUDSON CORPORATION
d/b/a TARGET STORES,

     Defendant.

_____/



## DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, MOTION FOR NEW TRIAL

Defendant, **TARGET CORPORATION** ("Target"), responds to Plaintiff **STEVE HARRIS's** ("Plaintiff") Motion for Judgment as a Matter of Law or, in the Alternative, Motion for New Trial ("Plaintiff's Motion"), and states as follows:

## INTRODUCTION

Plaintiff has failed to provide a single record cite to support his spurious and untrue allegations as to why this Court should overrule the jury's verdict or mandate a new trial. Although Plaintiff bears the burden of proving his Rules 50(b) and 59 motions, he has instead simply chosen to misconstrue the events at trial and deliberately not provided a transcript that would evidence the fallacy of his arguments.

As this response demonstrates, Plaintiff's "allegations" are baseless and frivolous, and his Rules 50(b) and 59 motions should be denied.

## ARGUMENT

I.   **PLAINTIFF HAS PRESENTED NO EVIDENCE OR ARGUMENT TO OVERTURN THE JURY'S VERDICT OR ORDER A NEW TRIAL UNDER RULES 50(B) OR 59.**

A.   **Standard For Granting Judgment Or New Trial Under Rules 50(b) And 59.**

To grant judgment as a matter of law under Rule 50(b), the Court must determine that there is such overwhelming evidence in favor of Plaintiff that a reasonable and fair-minded juror could not arrive at a contrary verdict. See Carter v. City of Miami, 870 F.2d 578, 581 (11th Cir. 1989). The Court must "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence ." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 120 S.Ct. 2097, 2110 (2000). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Id. Consequently, the Court "must disregard all evidence favorable to the moving party that the jury is not required to believe." Id.

Granting a motion for new trial under Rule 59 is within the discretion of the trial court. See United States Equal Employment Opportunity Commission v. W & O, Inc., 213 F.3d 600, 610 (11th Cir. 2000). Motions for a new trial may be grounded on the claim that there were "substantial errors in ... instructions to the jury" or the "verdict is against the weight of the evidence." See Montgomery Ward & Co. v. Duncan, 311 U.S. 243, 251 (1940).

When a new trial is sought on the basis of insufficient evidence under Rule 59, this Circuit cautions that the district court should "not simply substitute [its] judgment for that of the jury, thus depriving the litigants of their right to trial by jury." Conway v. Chemical Leaman Tank Lines, 610 F.2d 360, 362-63 (5th Cir. 1980); see Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc) (the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981). Consequently, "new trials should not be granted on

-2-

evidentiary grounds unless, at a minimum, the verdict is against the great not merely the greater weight of the evidence." Conway, 610 F.2d at 362-63.

**B.    Plaintiff's Motion Under Rules 50(B) And 59 Should Be Denied Because Target Presented Ample Evidence To Support The Verdict.**

Target provided ample trial evidence supporting the jury's verdict that Plaintiff would have been terminated for his improper actions. Pursuant to the evidence, a reasonable and fair-minded juror could arrive at the verdict reached for Target. The trial evidence showed as follows:

**1.    *Plaintiff provided a false restaurant receipt in his own handwriting.***

Plaintiff testified that he improperly added $160.00 (the total dinner's cost including tip) and $135 (the dinner's cost excluding tip) to equal $295.87 on the Shooter's Receipt. Plaintiff testified that these figures are in his own handwriting. Plaintiff testified that he erroneously added these numbers. In fact, Plaintiff's Motion concedes that Plaintiff made a purported "mathematical error." When asked why he added $160 on the Shooter's Receipt, Plaintiff stated that he was trying to figure out what amount of money should go back to the store so he was calculating.

Clearly, Plaintiff's nonsensical response shows that he had no explanation why the Shooter's Receipt erroneously reflected $295.87. Pursuant to Target policies, an employee who falsifies documents relied upon by Target may be immediately terminated. (Target Executive Team Member Handbook, at 48) (immediate termination if employee engages in "Falsifying company documents or documents relied upon by the company – for example ... reimbursement forms.").

Moreover, assuming the jury believed that Plaintiff's actions were unintentional, Plaintiff was held to a higher security standard since he was responsible for a $20,000,000 store. A store manager who cannot perform simple arithmetic on a receipt is a security risk. Pursuant to Target's policies, a  manager who is a security risk may be immediately terminated since Target considers

SHUTTS & BOWEN LLP

MIAMI        FORT LAUDERDALE        WEST PALM BEACH        ORLANDO        TALLAHASSEE        AMSTERDAM        LONDON

this to be "gross misconduct." (Target's Policy on Gross Misconduct.) As to gross misconduct,
Target's policy defines detrimental behavior as:

> Personal conduct which substantially impairs the team member's ability to function
> effectively as a Target team member by reason of its detrimental effect either on the
> team member's relationship with other team members or on the business or
> reputation of the company, whether or not it occurs on the premises. It also includes
> conduct as .... becoming a security risk.

Id. See also Target Executive Team Member Handbook, at 48 (employee may be immediately
terminated if s/he undertakes "Personal behavior that has a detrimental effect on the team member's
relationship with Target, or on Target's business or reputation."). Clearly, Plaintiff's personal
conduct through his untruths and inability to follow company procedures, particularly when dealing
with company funds, demonstrates that he was a security risk and his job performance was
unsatisfactory. As such, the jury properly concluded that Plaintiff had presented a false (or incorrect)
receipt, was a security risk, and was properly terminated under Target policies.

### 2. *Plaintiff carelessly returned an incorrect amount of money owed to Target in violation of Target's policies.*

Plaintiff testified that he was "unaware" of how much money he returned to Caryn Knapp,
the service desk employee, when he provided the Shooter's Receipt and the unspent dinner-party
money. According to Plaintiff, he simply gave Knapp whatever amount of money that was in his
pocket. In fact, Plaintiff blamed Knapp (his subordinate) at trial for his mistakes and not reviewing
the restaurant receipt to inform him of his "purported" math error.

Clearly, Plaintiff's actions and inability to determine how much money he returned question
his qualifications to be a store manager and evidence that he is a security risk when handling
company funds. In this case, the jury had sufficient evidence to disbelieve Plaintiff's explanation
and conclude that Plaintiff was a security risk that was properly terminated.

-4-

3.    *Plaintiff improperly used the company-issued American Express charge card for personal purchases and failed to pay the monthly balance on the company-issued American Express charge card.*

Target issues American Express corporate charge cards for business purposes only. Target's Policy Manual states that, "Credit cards issued by Target to its team members are for business expenses only." (Target Policy Manual.) The trial evidence showed that an employee may be terminated for violating this policy.

The trial evidence showed that Plaintiff exclusively used his company-issued American Express corporate charge card for numerous personal charges. Plaintiff purchased items such as car tires on his company-issued American Express corporate charge card. In fact, Plaintiff admitted that he filled out an application for charge card in January 1998 stating that he could not use the company-issued American Express corporate charge card for personal purchases. He still did so.

Moreover, as he knew, Plaintiff was required to pay all outstanding amounts on his company-issued American Express corporate charge card on a monthly basis. Plaintiff testified that the company-issued American Express corporate charge card account was in arrears and that he had failed to make monthly payments. Plaintiff's last payment before his termination (March 5, 1999) was made in December 1998 and through a bounced check for $1,000. By the time of his termination, Plaintiff had incurred an outstanding balance of $777.50 in his company-issued American Express corporate card. For the above reasons, the jury had sufficient evidence to properly conclude that Plaintiff was terminated for violating company policy.

4.    *Plaintiff improperly borrowed money from employees.*

Plaintiff borrowed money from, at least, three store employees who testified. Paula Layne testified that Plaintiff has borrowed over $220 from her while he was her supervisor, and Plaintiff has never repaid the money he borrowed. Renee Wasco testified that Plaintiff borrowed $100 from

SHUTTS & BOWEN LLP

MIAMI        FORT LAUDERDALE        WEST PALM BEACH        ORLANDO        TALLAHASSEE        AMSTERDAM        LONDON

her while he was her supervisor, and similarly never repaid the borrowed money. Donna Keil testified that Plaintiff had borrowed money from her while he was her supervisor.

A store manager who borrows money from his subordinates and, even worse, does not repay the money owed, is clearly a security risk. In this case, the testimony of the three witnesses provided sufficient evidence to show that Plaintiff was terminated for being a security risk.

### 5.    *Plaintiff used employees to do his personal chores.*

Paula Layne testified that Plaintiff asked her, while working and preparing the Store for an important visit from Target's Regional Vice President, to run a personal chore for him: drive him to the Mercedes Benz dealership to pick up his Mercedes Benz which was being "detailed." To add insult to injury, Plaintiff borrowed $60 from Layne to pay for the "detailing" expenses.

Target's policies disallow a store manager from making his subordinates do personal chores on company time. As such, the jury had sufficient evidence to show that Plaintiff was terminated for being a security risk.

### 6.    *Plaintiff's underlying financial problems made him a security risk.*

The evidence showed that Plaintiff had a history of bouncing checks. Plaintiff paid his American Express corporate card with a bounced check. Plaintiff paid his Target credit card with, at least, two bounced checks before the Target account was closed. Moreover, Plaintiff's January through February 1999 bank statement (which covered the time period of the January 29, 1999 Shooter's dinner) showed that Plaintiff had bounced 10 checks. Interestingly, on the next business day after Plaintiff pocketed the money from the Shooter's dinner, Plaintiff deposited $160 into his bank account and, thus, leading the jury to conclude that Plaintiff was fully aware he was improperly retaining Target's money. Consequently, the jury was presented with sufficient evidence to show that Plaintiff was terminated for being a security risk.

-6-

### 7.   *Plaintiff purchased a Powerwheels toy by misrepresenting the price and obtained an improper discount.*

Keil testified that Plaintiff told her a Powerwheels display model was an old toy and asked her for a discount before the toy was offered to Target's customers. Target's policy mandates that the toy be first offered to the public. Keil testified that she subsequently discovered that the toy was a new display model worth $250, and that she had been mislead by Plaintiff to give him a price of $42. When Keil approached Plaintiff about his misrepresentation, Plaintiff simply stated that he bought the toy at the price she offered him. Plaintiff made no attempt to pay the actual price.

The jury properly concluded that Plaintiff violated Target's policies by misrepresenting the toy's price, purchasing the toy before it was offered to customers, and refusing to pay the toy's correct price when his misrepresentation and the error were brought to his attention. Clearly, the jury had sufficient evidence to conclude that Plaintiff was a security risk.

### 8.   *Conclusion.*

To overturn the jury's verdict or order a new trial, the Court must conclude that there is such overwhelming evidence in favor of Plaintiff that a reasonable and fair-minded juror could not arrive at a verdict for Target. As the above evidence shows, the jury had sufficient evidence to reach its verdict. Clearly, there is sufficient evidence which, if believed, as the jury did, would authorize a verdict against Plaintiff.

Plaintiff's Motion deliberately and improperly concentrates on Plaintiff's own belief that his "evidence" is more credible. However, credibility determinations cannot be undertaken through a Rule 50(b) or Rule 59 motion. As the U.S. Supreme Court has stated:"Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Reeves, 530 U.S. at 120. The Court "must disregard all evidence favorable to the moving party that the jury is not required to believe." Id.

-7-

Moreover, the Court should note that Plaintiff's purported "evidence" in support of his Rules 50(b) and 59 motions is non-existent. For example:

- Plaintiff states that, "In the process of the investigation, the head security officer made derogatory comments regarding Plaintiff, his race, and ownership of personal property to a third party." (Plaintiff's Motion at 2.) This statement is an untruth. No such evidence was presented at trial.

- Plaintiff states that, "Plaintiff was the only minority that held such a position in the geographical area and many other non-minority managers had similar stature." (Plaintiff's Motion at 2.) This is wrong. Gillespie testified of at least 5 other African-American store managers who worked during Plaintiff's tenure under Gillespie.

- Plaintiff states that, "[V]irtually all the 'discovered information was sought and obtained by Hastings long BEFORE the discovery of the discrepancy regarding the tip!" (Plaintiff's Motion at 3.) This is a lie. The investigation occurred after February 1, 1999, when Don Fankhauser discovered the Shooter's Receipt.

- Plaintiff states that, "[D]efendant 'singled' Plaintiff out, something that was not done to other white managers." (Plaintiff's Motion at 6.) Plaintiff's statement is wrong. Plaintiff did not provide any evidence showing how white managers were treated. Plaintiff's statement is simply his speculation, unsubstantiated and uncorroborated at trial.

- Plaintiff states that, Target's policy is to counsel employees when they are a security risk. (Plaintiff's Motion at 11.) Plaintiff is wrong. The Gross Misconduct policy, which was introduced into evidence, mandates that a person who is found to be a security risk will be immediately terminated. (See Gross Misconduct Policy.) All of Target's managers so testified at trial.

Plaintiff complains, without providing a single iota of evidence in support, that "There was no proof to support the inflammatory opening argument, for which the Court had warned Defense Counsel that if she failed to prove her opening argument that Defendant's Counsel would be risking reversal." (Plaintiff's Motion at 3.) As the above shows, Target provided evidence supporting each and every point raised in Opening Statements. Moreover, the Court clearly recognized that Target had proven every point made in Opening Statements by denying Plaintiff's Rule 50(a) Motion. Consequently, the Court should deny Plaintiff's Rules 50(b) and 59 motions.

SHUTTS & BOWEN LLP

MIAMI          FORT LAUDERDALE          WEST PALM BEACH          ORLANDO          TALLAHASSEE          AMSTERDAM          LONDON

**C.    Plaintiff's Arguments In Support Of His Rules 50(b) And 59 Motions Are Baseless.**

Plaintiff seems to present four arguments to request that the Court should grant his Rules 50(b) and 59 motions. (Plaintiff's Motion at 7.) First, Plaintiff claims that Target only proved one of its affirmative defenses. Id. Second, Plaintiff states that Target suggested to the jury that a finding for Plaintiff would lead to a longer stay. Id. Third, Plaintiff claims that Target's counsel's arguments during Closing were overly prejudicial. Id. Fourth, Plaintiff alleges that question number 2 in the verdict form (which was taken from the jury interrogatories found in the pattern Eleventh Circuit jury instructions) was "misleading." Id. at 9-11.

**1.    A Jury Verdict Based On Only One Affirmative Defense Is Not A Ground For Reversing The Verdict Under Rules 50(b) And 59.**

Plaintiff argues that the jury verdict should be overturned because, "All but one of the affirmative defenses were never proved or offered as proof at opening and in the Answer but were abandoned by the defense at closing." (Plaintiff's Motion at 7.) According to Plaintiff, Target's success on only one affirmative defense requires judgment as a matter of law for Plaintiff. Other than this one sentence statement, Plaintiff does not address his affirmative defense argument in his Motion and does not cite a single case to support his ludicrous statement. The reason is obvious: Plaintiff's argument is frivolous.

Even assuming Plaintiff is correct that Target only presented one affirmative defense at trial (which it did not), and obtained a jury verdict on that affirmative defense, such trial strategy would not mandate disregarding a jury verdict. As Section I(B), *supra*, demonstrates, Target presented sufficient trial evidence which, if believed, as the jury did, would authorize a verdict against Plaintiff. Consequently, the Court should deny Plaintiff's Rules 50(b) and 59 motions.

SHUTTS & BOWEN LLP

MIAMI        FORT LAUDERDALE        WEST PALM BEACH        ORLANDO        TALLAHASSEE        AMSTERDAM        LONDON

2.    **Target's Counsel Did Not Argue That A Finding For Plaintiff Would Lead To A Longer Stay For The Jury.**

At no point at trial did Target's counsel state to the jury that it would have to stay longer should it decide for Plaintiff. In fact, the first time any reference is made to a bifurcated trial was when the Court provided a limiting instruction as a result of Plaintiff's counsel's repeated and improper arguments about damages during ***Plaintiff's*** Opening Statement:

> MR. BURTON:  You don't have Illinois. Something happened but my map is missing a piece. The evidence will show that my client suffered damages exceeding three million dollars because he can't get employed anywhere.
>
> MS. CESARANO:  Objection, Your Honor. No damages at this point in the case.
>
> THE COURT:  Sustained.
>
> MR. BURTON:  The evidence will show my client has been hurt and that in this proceeding we're going to decide that first, whether or not there has been a legal wrong. The evidence clearly will show that Mr. Murphy nor all the King's horses or all the King's men can't get him employed in this field again.
>
> MS. CESARANO:  Objection. Same objection, Your Honor.
>
> THE COURT:  Let me give the jury an instruction here. A pretrial decision has been made to separate this case into the issues of liability and damages. That is you will first decide whether there's been a violation of rights. Only if you decide there's been a violation will you proceed to the second part of the trial that is to assess damages. The purpose of this opening statement and this part of the trial you are not to be concerned about any damages, only liability.  Keep your opening statements consistent with that.

Ex. A, Plaintiff's Opening Statement at 9-10. Again, during Closing Arguments, it was Plaintiff's Counsel who mentioned the continuation of the proceedings:

> If you feel there was any the slightest bit of difference between the way he was treated and other people simply say, yes, it was affected by his race and then we will go on from there.

Ex. B, Plaintiff's Closing Argument at 18.

Plaintiff cannot complain about any error caused by any reference to the second stage of a bifurcated proceedings since he created the error during Opening Statements and referred to the

-10-

damages trial stage again during his Closing Argument. ***It is a cardinal rule of appellate review that a party may not challenge as error any ruling or other trial proceeding invited by that party.*** In re Carbon Dioxide Industry Antitrust Litigation, 229 F.3d 1321, 1327 (11th Cir. 2000) (citing U.S. v. Ross, 131 F.3d 970, 988 (11th Cir. 1997)); U.S. v. Thayer, 204 F.3d 1352, 1355 (11th Cir. 2000).

Target's counsel did mention a bifurcated trial during her Closing when she ***directly quoted this Court's instruction*** to the jury:

> The Court has advised you that a pretrial decision has been made to separate this case into liability and damages. If you first -- that is you will first decide whether there's been a violation of rights. Only if you decide there's been a violation will you proceed to the second part of the trial that is to assess damages.

Ex. C, Target's Closing Argument, at 30. As the above shows, Target's counsel simply restated *verbatim* the Court's prior instruction given to the jury during Plaintiff's Opening Statement. More importantly, Plaintiff's counsel ***failed to object*** when Target's counsel quoted the Court's instruction. Plaintiff's counsel's failure to object bars any claim for new trial that he may have on this ground. Accordingly, the Court should deny Plaintiff's Rules 50(b) and 59 motions.

### 3. Any Purported Attack On Plaintiff's Counsel's Credibility Is Not A Ground For A New Trial Or Vacating The Jury Verdict.

Plaintiff argues that Target's counsel attacked his credibility during Closing Arguments. Plaintiff's counsel objected twice to the following arguments made by Target's counsel:

> MS. CESARANO: She [Shannon Tetrault] didn't report the Shooter's receipt, Don Feinkhauser [sic] did. She wasn't even there even there when the receipt came in. You remember another time Mr. Burden [sic] jumped up and asked the Court to sanction me - -
> MR. BURTON: Objection, this is not proper.
> THE COURT: It is improper. Sustained.

Target's Closing Arguments at 24. The second time was immediately thereafter when Target's counsel briefly mentioned that Plaintiff's counsel had mocked one of the witness's concern about the Store's welfare. Id.

SHUTTS & BOWEN LLP

MIAMI          FORT LAUDERDALE          WEST PALM BEACH          ORLANDO          TALLAHASSEE          AMSTERDAM          LONDON

Should Target's counsel's statements be improper, which they are not, the statements do not require a reversal of the jury verdict or a new trial since there was no prejudice of a substantial right. See U.S. v. Boyd, 131 F.3d 951, 955 (11th Cir. 1997); United States v. Blakey, 14 F.3d 1557, 1560 (11th Cir. 1994). In Boyd,, although the prosecutor made improper and highly inflammatory comments, the Eleventh Circuit found that the error was harmless since the remarks did not prejudice the defendants' rights when viewed in the context of the entire record, the district court's jury instructions rectified the erroneous statements, and that any injury to the defendants was harmless in view of the overwhelming evidence of their guilt. Like Boyd, any improper remarks made at closing did not prejudice Plaintiff's rights when viewed in the context of the entire record and the Court's jury instructions rectified any erroneous statements.

In U.S. v. Hernandez, 145 F.3d 1433, 1439 (11th Cir. 1998), the defendant argued that the prosecutor's closing arguments were improper because they contained an impermissible attack on defense counsel in her role as advocate. Defense counsel had argued that there was no evidence at trial of fingerprint analysis of a gun and film canister, and that it was possible that the reason no tests were run on these items is that the government was afraid of what they would find. Id. The prosecution responded in rebuttal that if the government had produced fingerprint evidence, defense counsel would be "singing a different tune." Id. The Eleventh Circuit found that casting such an aspersion on defense counsel was probably improper, but considered the prejudice from such a comment in the context of the trial. Id. The Eleventh Circuit affirmed the conviction and stated:

> We note that defense counsel immediately objected to the improper comment and that the trial court sustained the objection. We note that the trial court instructed the jury both before closing arguments and after the closing arguments that the arguments were not evidence and that the jury was to decide Hernandez's guilt based solely on the evidence. Under such circumstances, the statement by the prosecutor is not sufficiently egregious so as to mandate a reversal of Hernandez's conviction.

Id.

SHUTTS & BOWEN LLP
MIAMI          FORT LAUDERDALE          WEST PALM BEACH          ORLANDO          TALLAHASSEE          AMSTERDAM          LONDON

Should Target's counsel's comments be improper, which they were not since they were true and based on the Trial Record, the effect would be harmless.  Consequently, the Court should deny Plaintiff's Rules 50(b) and 59 motions.

**D.      The Pattern Verdict Form Was Proper.**

Plaintiff complains that the verdict form "led to jury confusion and undermines the framework for <u>McDonnell Douglas</u> and its progeny in the answering of question #2." (Plaintiff's Motion at 9.)  Plaintiff complains of the second jury question which states:

> Mr. Harris would have been discharged from employment for other reasons even in the absence of his race?

(Question Number 2.)  Plaintiff is clearly wrong.

First, Plaintiff cannot complain of question number 2 because Plaintiff even proposed this disputed question to the Court *in his proposed verdict form*, which a true and correct copy is attached as Exhibit "D."  At trial, Plaintiff presented the following proposed verdict question to the Court:

> Mr. Harris would have been discharged from employment for other reasons even in the absence of his race?

(Ex. D, Plaintiff's Proposed Verdict Form, Question Number 3.)  As the Court can clearly see, Plaintiff conceded to question number 2.  Consequently, Plaintiff cannot complain about a verdict question which he himself proposed pursuant to the "invited error" doctrine.

Second, the trial judge has "wide discretion as to the style and wording employed" in jury instructions and verdict forms. <u>Farley v. Nationwide Mut. Ins. Co.</u>, 197 F.3d 1322, 1329 (11th Cir. 1999); <u>Carter v. DecisionOne Corp.</u>, 122 F.3d 997, 1005 (11th Cir.1997).  The Eleventh Circuit reviews jury instructions and verdict forms together rather than separately for reversible error.  <u>See</u> <u>Carter</u>, 122 F.3d at 1005; <u>McNely v. Ocala Star-Banner Corp.</u>, 99 F.3d 1068, 1072 (11th Cir. 1996).

SHUTTS & BOWEN LLP

MIAMI          FORT LAUDERDALE          WEST PALM BEACH          ORLANDO          TALLAHASSEE          AMSTERDAM          LONDON

The reversal for plain error in the jury instructions and verdict form will occur "only in exceptional cases where the error is 'so fundamental as to result in a miscarriage of justice.'" Montgomery v. Noga, 168 F.3d 1282, 1294 (11th Cir. 1999) (citing Iervolino v. Delta Air Lines, Inc., 796 F.2d 1408, 1414 (11th Cir. 1986). To meet this stringent standard, a party must prove that the "challenged instruction or verdict form was an incorrect statement of the law and [that] it was probably responsible for an incorrect verdict, leading to substantial injustice." Noga, 168 F.3d at 1294.

*In this case, the verdict form was taken verbatim from page 62-63 of the Eleventh Circuit's Pattern Jury Instructions.* Plaintiff has not presented a single case which supports the proposition that the verdict question, approved by the Eleventh Circuit (and presented in Plaintiff's proposed verdict form), is an incorrect statement of the law. As stated above, the verdict form cannot be considered by the Court without considering the jury instructions. Farley, 197 F.3d at 1330-31. In this case, the jury instructions – which were taken from the Eleventh Circuit's Pattern Jury Instructions – properly restate the law.

Third, Plaintiff's argument that the verdict form undermines McDonnell Douglas and its progeny is incorrect, since the tests set forth in these cases are inapplicable at trial. As the Eleventh Circuit explained:

> The McDonnell Douglas stages are simply a method of analysis for organizing a discrimination case in its initial stages to determine if a case has enough evidence to reach a jury in the first place. As the Supreme Court has explained, this framework is "'merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination.'" United States Postal Serv. Bd. v. Aikens, 460 U.S. 711, 715, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983) (quoting Furnco Construction Corp. v. Waters, 438 U.S. 567, 577, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978)). The Supreme Court reiterated this instruction recently in Hicks, directing that once the McDonnell Douglas framework has been met by both parties in the pretrial stages, it "simply drops out of the picture" when the jury begins its deliberations. St. Mary's Honor Center v. Hicks, 509 U.S. 502, 511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).
>
> This approach is well-founded since the McDonnell Douglas framework has become a complicated legal doctrine, and there is a strong likelihood of jury confusion over

-14-

> its individual components.  As we have observed, "[a]lthough statements [like 'prima
> facie case' and 'burden of production'] faithfully endeavor[ ] to track the three-step
> formulation of McDonnell Douglas..., they create[ ] a distinct risk of confusing the
> jury." Dudley v. Wal-Mart Stores, Inc., 166 F.3d 1317, 1322 (11th Cir. 1999). . . .
> For this reason, we clearly have directed that juries should not be instructed on the
> McDonnell Douglas framework.  See Dudley, 166 F.3d at 1322 (observing that it is
> "unnecessary and inappropriate to instruct the jury on McDonnell Douglas analysis").
> Three of our sister circuits have adopted a similar position. . . .  The trial court's
> decision to not instruct the jury on McDonnell Douglas therefore was proper.

Farley, 197 F.3d at 1333.  Hence, Plaintiff's suggestion that the McDonnell Douglas framework

should have been used instead of the questions found in the Eleventh Circuit's Pattern Jury

Instructions is patently wrong.

For the above reasons, the Court should deny Plaintiff's Rules 50(b) and 59 motions since

question number 2 properly restated the law.

## II.    PLAINTIFF'S   RULE 50(A) MOTION SHOULD BE DENIED BECAUSE IT CANNOT BE MADE IN A POST-TRIAL MOTION.

Rule 50(a) is inapplicable in a post-trial motion. Fed. R. Civ. P. 50(a).  Plaintiff requests that

the Court grant judgment as a matter of law under Fed. R. Civ. . P. 50(a).  (Plaintiff's Motion at 1,

4-5.)  Assuming, *arguendo*, that Plaintiff did move for judgment as a matter of law at trial under

Rule 50(a) and complied with the Rule's procedural requirements (the trial transcript is unavailable

at this time), Plaintiff cannot present a Rule 50(a) motion through a post-trial motion because such

motion can only be made "at any time before submission of the case to the jury." Fed. R. Civ. . P.

50(a)(2). Rule 50(a)(2) states in pertinent part:

> Motions for judgment as a matter of law may be made at any time ***before submission
> of the case to the jury.*** Such a motion shall specify the judgment sought and the law
> and the facts on which the moving party is entitled to the judgment.

Id. (emphasis added).  Consequently, the Court should deny Plaintiff's request for a new trial under

Rule 50(a).

SHUTTS & BOWEN LLP

MIAMI        FORT LAUDERDALE        WEST PALM BEACH        ORLANDO        TALLAHASSEE        AMSTERDAM        LONDON

## CONCLUSION

Defendant, TARGET CORPORATION, respectfully requests that the Court deny Plaintiff's

Motion for Judgment as a Matter of Law or, in the Alternative, Motion for New Trial.

> SHUTTS & BOWEN LLP
> Attorneys for Defendant
> 201 South Biscayne Boulevard
> 1500 Miami Center
> Miami, Florida 33131
> (305) 358-6300
> (305) 347-7386 (facsimile)

By: _____

> Sheila M. Cesarano
> Florida Bar Number 708364
> Rene Gonzalez-LLorens
> Florida Bar Number 0053790

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was

mailed on this _27_ day of November 2001, to

> Richard J. Burton, Esq.
> Richard J. Burton & Associates, P.A.
> 18305 Biscayne Boulevard, Suite 300
> Miami, Florida 33160.
> Tel: (305) 705-0888
> Fax: (305) 935-9542
> Attorney for Plaintiff

OF COUNSEL _____

MIADOCS 470450.1 RGL

-16-



1   will show often they don't reconcile.  You will hear within

2   one to two hours of that happening Steve was effectively

3   fired.  That Shannon called Gillespie to tell Feinkhauser to

4   do an investigation.

5        Shannon is in charge of customer service in charge

6   of the cashiers in the front.  You will hear she did not

7   understand how to do her job or how to reconcile.  She'll

8   say that herself.

9        Somehow or other this was seized upon.  What they

10  did was they tried to find as many people as they could to

11  say bad things about Steve as they could ever find.  Then

12  they came in and said, we were just worried about him as a

13  security risk.

14       Again, I don't know how to defend against that

15  because I don't know what we did.  Certainly most of the

16  things -- virtually everything you will hear has been -- to

17  the level it's been brought it's negligent.

18       Everything that has been done has been done by

19  everyone else.  There's no indication of malice.  These are

20  things that happen in the course of working for a company.

21       We believe that the firing of Steve Harris was set

22  up by Mr. Gillespie with Mr. Feinkhauser being sent in.

23  With Shannon if you will being his Girl Friday.  And

24  everyone else that works there says the least competent

25  employee was Shannon Tetrault.  You will hear he could not

1   report her because she would report him back to Gillespie,

2   get him in trouble. Everyone in there will say Mr. Gillespie

3   on numerous occasions made remarks that were at best in bad

4   taste or certainly racist and inappropriate.

5          Mr. Gillespie has been the person who was

6   responsible.  He did this in cooperation with a young guy

7   Mark Hastings.  A young guy that has been up the corporate

8   ladder, very young.  Now he's a vice president.

9          He did that in conjunction with the security

10  officer Mr. Feinkhauser who will say this is performed

11  different than any former investigation he has done and he

12  being a former police officer, he would not have done any of

13  the things he was ordered to do.

14         Mr. Barth does not remember what he did, does not

15  remember who he interviewed, does not remember what

16  statements he took.  He said he was not responsible for it

17  in any way, looked to the other guys.

18         You don't have Illinois.  Something happened but

19  my map is missing a piece.  The evidence will show that my

20  client suffered damages exceeding three million dollars

21  because he can't get employed anywhere.

22         MS. CESARANO:  Objection, Your Honor.  No damages

23  at this point in the case --

24         THE COURT:  Sustained.

25         MR. BURTON:  The evidence will show my client has



```
 1   do with their work.  And then they would create these
 2   stories to get rid of them and I guess if you can, get away
 3   with it as long as you do.
 4           This jury will be asked one question, was Steve
 5   treated differently and was the discipline based on in any
 6   way or affected by his race, and the way it was administered
 7   whether it was objective or not.
 8           If you feel there was any the slightest bit of
 9   difference between the way he was treated and other people
10   simply say, yes, it was affected by his race and then we'll
11   go on from there.
12           That's all I am asking you to do is understand
13   maybe he was just not completely but maybe it entered into
14   it.  If it entered into it then the answer is, yes, it was.
15   Thank you very much for your attention, ladies and
16   gentlemen.
17           THE COURT:  I have added ten minutes to your time.
18           MR. BURTON:  Thank you, Your Honor.
19           MS. CESARANO:  Ladies and gentlemen of the jury,
20   thank you so much for your patience throughout this trial.
21   You should realize that plaintiff took five days to put on
22   his case and essentially we put on our case in five hours.
23           Why?  Because we think the facts are crystal
24   clear.  You are the fact finders here and only you.  The
25   jury finds the facts.  The jury decides if Mr. Harris has
```



1    they did not trust Mr. Harris to continue running a 20

2    million dollar store.  They had lost faith in him.  They

3    could not do it.

4          Target's position is that if a white manager had

5    done what he did they too would not have been trusted, they

6    too would have been terminated.

7          I'm not going to go through every single item you

8    have heard about.  You heard the testimony.  But the bottom

9    line is we are here to show you we acted fairly.  We had

10   business reasons for doing what we did.

11         Those business reasons had nothing to do with

12   race.  There is not a shred of evidence this was based on

13   his race.  You will be asked on the verdict form if Harris'

14   race was a substantial or motivating factor that prompted

15   Target to terminate him.

16         The answer to that is clearly no.  The Court has

17   advised you that a pretrial decision had been made to

18   separate this case into liability and damages.

19         If you first -- that is you will first decide

20   whether there's been a violation of rights.  Only if you

21   decide there's been a violation will you proceed to the

22   second part of this trial, which is to assess damages.

23         Target's position is there is absolutely no need

24   for a second part of the trial because there are no --

25   there's no liability here.  Target did nothing wrong.



*PL's*

## VERDICT FORM

Do you find from a preponderance of the evidence that:

1.  Target's claimed reasons for termination of Mr. Harris were a pretext or a smokescreen?

_____ yes            _____ no


**If yes, proceed to question 2.**


2.  Mr. Harris' race was a substantial or motivating factor that prompted Target to discharge Mr. Harris?

_____ yes            _____ no


**If yes, proceed to Question 3.**


3.  Mr. Harris would have been discharged from employment for other reasons even in the absence of consideration of his race?

_____ yes            _____ no

SO SAY WE ALL

Please sign and date the Verdict Form and return to the Court.


_____

FOREPERSON

_____

DATED