UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 00-6107-CIV-FERGUSON/SNOW

STEVE HARRIS,

    Plaintiff,

v.

DAYTON HUDSON CORPORATION
d/b/a TARGET STORES,

    Defendant.
_____/

**DEFENDANT'S MOTION TO RECONSIDER AND VACATE ORDER GRANTING
NEW TRIAL AND INCORPORATED MEMORANDUM OF LAW**

Defendant, **TARGET CORPORATION** ("Target"), moves the Court to reconsider its February 20, 2002 Order (the "Order") granting Plaintiff **STEVE HARRIS's** ("Plaintiff") Motion for New Trial, vacate the Order, and reinstate the jury's verdict for Target. In support, Target states as follows:

**INTRODUCTION**

The Court has reversed a jury verdict for Target on the grounds that Target introduced "inflammatory" and inadmissible evidence at trial. (Order at 5.) According to the Court, the "inflammatory" and inadmissible evidence included the following:

- Plaintiff borrowed money from employees and failed to repay them.
- Plaintiff used employees to do his personal chores.
- Plaintiff purchased store merchandise through misrepresentation and deceit.
- Plaintiff's financial problems rendered him a security threat. Order at 2, 3.

The Court stated that the above-referenced evidence was obtained after the adverse action (Plaintiff's termination) was taken and that Target "failed to demonstrate that some of the proffered reasons for [Plaintiff's] discharge were known by it before the termination decision was made." Order at 3. The Court also commented that the evidence was "unrelated to the reason given for the employee discharge." Id. at 4. The Court concluded that because such evidence was presented, a "reasonable juror may have found that not only was race a motivating factor in [Plaintiff's] termination, but that there were no legitimate reasons for the termination." Id. at 6.

The Court has misconstrued both the facts and the law. The Court should reconsider and vacate its Order for three reasons.

*First,* the Order sets forth the wrong legal standard for granting a motion for new trial. The Court used a reasonable person standard (what a "reasonable juror may have found") to grant a new trial based on the evidence introduced. However, the general legal standard for granting a motion for new trial is, at the very least, that the verdict is against the clear weight of the evidence. Moreover, in cases where the Court grants a new trial based on the evidence presented at trial (like the instant case), the Eleventh Circuit exceeds this general legal standard and mandates an even higher standard: "the great – not merely the greater – weight of the evidence." The Eleventh Circuit requires this higher standard to ensure that a judge does not merely substitute his judgment for that of the jury, the very matter that occurred here.

*Second,* as a practical matter, the Order has granted a directed verdict to Plaintiff. Since the Court has concluded that Target's legitimate, nondiscriminatory reasons presented are "inflammatory" and inadmissible, Target will be unable to litigate this case because the Court has eliminated Target's defenses. The Court's Order muzzles Target's attorneys from presenting Target's legitimate, nondiscriminatory reasons for terminating Plaintiff to the jury. Consequently,

in effect, the Court has granted a directed verdict for Plaintiff by determining that Target's reasons to terminate Plaintiff are not legitimate. Thus, the Court has improperly invaded the province of the jury.

*Third,* the Court's findings of fact are erroneous and not supported by the record. The evidence identified in the Order was acquired *immediately before* Plaintiff's termination and during Defendant's investigation of Plaintiff, including while Plaintiff was placed on suspension with pay. In addition, the evidence set forth in the Order was fully proven at trial, was related to Plaintiff's discharge, was admittedly discussed with Plaintiff *before* his termination on March 5, 1999 at several meetings with Plaintiff, and was indisputably *not* known to Target before the Plaintiff was promoted to a store manager position in December, 1997.

## ARGUMENT

### I. THE COURT USED THE WRONG LEGAL STANDARD TO REVERSE THE JURY'S VERDICT AND GRANT A NEW TRIAL.

The Court used a "reasonable juror" legal standard to grant a new trial. The Court stated that, "Had such inflammatory, inadmissible evidence not been presented, a reasonable jury may have found that not only was race a motivating factor in [Plaintiff's] termination but that there were not legitimate reasons for the termination." Order at 5-6.

The Court has clearly used the wrong legal standard. According to the Eleventh Circuit, the Court should grant a motion for a new trial when the verdict is against the clear weight of the evidence. Lipphardt v. Durango Steakhouse of Brandon, Inc., 267 F.3d 1183, 1186 (11th Cir. 2001). However, in cases where the Court's granting of a new trial is based on the evidence introduced at trial (like the instant case), the Eleventh Circuit has mandated an even higher standard: *"the great – not merely the greater – weight of the evidence."* Id. The Eleventh Circuit explains:

-3-

> ***Because it is critical that a judge does not merely substitute his judgment for that of the jury, "new trials should not be granted on evidentiary grounds unless, at a minimum, the verdict is against the great--not merely the greater--weight of the evidence."***

<u>Id.</u>

The Court clearly erred because its Order does not involve the "the great – not merely the greater – weight of the evidence" legal standard, but rather a "reasonable juror" standard. Had the Court used the correct legal standard, the Court would not have issued a new trial, since in cases involving the "the great – not merely the greater – weight of the evidence" legal standard, the Court's discretion to set aside a jury verdict is very narrow. <u>Id.</u>; <u>see also</u> <u>Hewitt v. B.F. Goodrich Co.</u>, 732 F.2d 1554, 1559 (11th Cir. 1984) ("The trial judge's discretion to set aside a jury verdict based on the great weight of the evidence is very narrow.")

Moreover, the Order should be vacated because the Court has simply substituted its own judgment for that of the jury, which, as the Eleventh Circuit has repeatedly pointed out, is improper. Through its Order, the Court has speculated as to what a juror "may" have concluded and disregarded what the jury did find. By substituting its own judgment for that of the jury, the Court has deprived Target of its Constitutional right to trial by jury. <u>See</u> <u>Lipphardt</u>, 267 F.3d at 1186 ("[I]t is critical that a judge does not merely substitute his judgment for that of the jury"); <u>Hewitt</u>, 732 F.2d at 1559 ("Cir.1941") ("[T]o assure that the judge does not simply substitute his judgment for that of the jury, ... we have noted that new trials should not be granted on evidentiary grounds unless, at a minimum, the verdict is against the great--not merely the greater--weight of the evidence."); <u>Conway v. Chemical Leaman Tank Lines, Inc.</u>, 610 F.2d 360, 363 (5th Cir. 1980) ("Recent cases in our circuit apply a somewhat broader review, however, to orders that grant new trials, mandating the greatest degree of scrutiny where, as apparently here, a new trial is decreed on the ground that the

verdict is against the weight of the evidence. We do so to assure that the judge does not simply substitute his judgment for that of the jury, thus depriving the litigants of their right to trial by jury. In a further effort to avoid such substitutions, we have noted that new trials should not be granted on evidentiary grounds unless, at a minimum, the verdict is against the great not merely the greater weight of the evidence.").

Since the Court used the wrong legal standard in its Order, and has substituted its own judgment for that of the jury, the Court should reconsider its Order, vacate its Order, and reinstate the jury verdict.

## II.   THE COURT HAS, IN EFFECT, DIRECTED A VERDICT FOR PLAINTIFF BY PREVENTING TARGET FROM INTRODUCING AT TRIAL ITS LEGITIMATE, NON-DISCRIMINATORY REASONS FOR TERMINATING PLAINTIFF.

The Court has ordered a new trial stating that, "Target's opening statement and other comments made throughout the trial were not substantiated in part because the evidence relied upon was ruled inadmissible." Order at 5. Target is perplexed as to the Court's conclusion for two reasons.

First, the only evidence that the Court identifies throughout its Order (and which is identified above in Section I, *infra*) was discussed before the jury since the Court ruled that such evidence was admissible. Since the Court determined that such evidence was admissible, Target does not know what "inadmissible" evidence it attempted to introduce at trial jury which mandates a new trial.

Second, the Court's Order clarifies that the Court will not allow Target to present at trial its legitimate, nondiscriminatory reasons why it terminated Plaintiff. As such, the Court has completely eliminated Target's defenses and has, in fact, entered a directed verdict for Plaintiff. Since Target cannot present at trial the reasons why it terminated Plaintiff because the Court disagrees with those reasons and has found them to be inadmissible, Target cannot present a defense at trial. This is

improper because the jury – and not the Court – is the trier of fact when the facts are disputed. Through its Order, the Court has determined that there is such overwhelming evidence in favor of Plaintiff that a reasonable and fair-minded juror could not arrive at a contrary verdict. See Carter v. City of Miami, 870 F.2d 578, 581 (11th Cir. 1989). Hence, the Court has granted judgment as a matter of law as to Plaintiff on Target's defenses.

By ordering a new trial because it disagrees with the reasons Target has presented for Plaintiff's termination, the Court is establishing itself as the fact-finder, eliminating the province of the jury to decide Plaintiff's termination, and, what is even worse, second-guessing Target's personnel department's decision. The Court's actions are improper since, "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 120 S.Ct. 2097, 2110 (2000). Moreover, the Court's actions contravene the Eleventh Circuit's mandate that the Court should not adjudge the "fairness" of or second-guess personnel decisions:

> We have emphatically held that a defendant may terminate an employee for a good or bad reason without violating federal law. We are not in the business of adjudging whether employment decisions are prudent or fair. Instead, our sole concern is whether unlawful discriminatory animus motivates a challenged decision.

Damon v. Fleming Supermarkets of Fla., Inc., 196 F.3d 1354, 1361 (11th Cir. 1999); Schoenfeld v. Babbitt, 168 F.3d 1257, 1269 (11th Cir. 1999) ("As we have previously explained, it is not the role of federal courts to second-guess the hiring [or termination] decisions of business entities. The reason offered by an employer for an action does not have to be a reason that the judge or jurors would act on or approve.").

The Eleventh Circuit has held that courts do not sit "as a super-personnel department that re-examines an entity's business decisions." Alphin v. Sears, Roebuck & Co., 940 F.2d 1497, 1501

(11th Cir. 1991). Title VII is not "meant to be a shield against harsh treatment at the workplace and does not take away an employer's right to interpret its rules as it chooses, and to make determinations as it sees fit under these rules." Nix v. WLCY Radio/Rahall Communications, 738 F. 2d 1181, 1187 (11th Cir. 1984). "The employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." Id.

The Court's Order makes it clear that the Court disagrees with the reasons given by Target for terminating Plaintiff and that it has directed a verdict for Plaintiff by prohibiting Target from introducing its legitimate, nondiscriminatory reasons at trial. The Court's actions are improper. Accordingly, Target requests that the Court reconsider its decision, vacate the Order for new trial, and reinstate the jury's verdict.

## III.   THE COURT MISINTERPRETED THE EVIDENCE.

### A.   Plaintiff Borrowed Money From Employees.

The Court concluded that Target failed to demonstrate that it knew Plaintiff had borrowed money from his subordinates before it terminated Plaintiff on March 5, 1999. Order at 2, 3. The evidence (including Plaintiff's own testimony) contradicts the Court's conclusion:

- On or about February 26, 1999 (prior to Plaintiff's March 5th termination and while the investigation was on-going), Target obtained a statement from Paula Layne stating that Plaintiff "had borrowed money from me from time to time [and] that he never paid back." Ex. 85(J). (admitted into evidence). Prior to the termination date, Layne informed Target that Plaintiff had borrowed approximately $220 from her. Id.

- At trial, Layne testified that she informed several of the managers undertaking Plaintiff's investigation about the amount of money Plaintiff had borrowed from her and never repaid. Layne testified that these conversations with Target managers occurred before February 26, 1999, the date she delivered her statement to Target.

- On or about February 15, 1999 (prior to Plaintiff's March 5th termination and while the investigation was on-going), Donna Keil submitted a statement to Target stating that Plaintiff

had borrowed money from her. Ex. 85(H) (admitted into evidence). Keil stated that she had heard that Plaintiff borrowed money from other subordinate employees, such as Renee Wasco and Paula Layne, and never repaid the borrowed money. Id.

- Keil testified at trial that on or about February 15, 1999 (the date she memorialized her conversation), she discussed with Target managers her concern that Plaintiff borrowed money from her and other subordinates, such as Renee Wasco and Paula Layne, and had not repaid the borrowed money.

- At trial, Rene Wasco testified that she informed Target managers during the February investigation that Plaintiff had borrowed $100 from her. Plaintiff had asked Wasco to write and cash a $100 check at the store. Plaintiff's actions in cashing a $100 check violated Target's policies since an employee could only cash, at a maximum, a $25 check.

- Plaintiff testified in his deposition that he was asked by Terry Gillespie during the investigation (and before his termination) about whether he had borrowed money from Paula Layne. Plaintiff Dep. at 104-7.

- Plaintiff testified in his deposition that he was asked by Terry Gillespie during the investigation (and before his termination) whether he had borrowed money from Renee Wasco. Plaintiff Dep. at 107-08.

As the evidence at trial clearly showed, Target investigated whether Plaintiff had borrowed money from his subordinates *before* Plaintiff's termination. As testified by Terry Gillespie, Mark Hasting, and Doug Barth, such evidence was considered in making their decision whether to terminate Plaintiff. As also testified by Terry Gillespie, Mark Hasting, and Doug Barth, the first time Target learned of Plaintiff's actions was after the Shooter's incident (January 29, 1999).

Plaintiff's improper act of borrowing money from subordinate employees was a reason why Target terminated Plaintiff for being a security risk. These reasons were discussed with Plaintiff during the several meetings he held with management prior to his termination. In fact, Plaintiff's deposition testimony shows that he discussed this issue with Target prior to his termination:

Q.  What was the next topic?
A.  Mr. Gillespie asked me if I had borrowed any money from another team member.
Q.  Who was that?
A.  Renee. She changed her last name, but I think it was Wasco.
Q.  That was her prior name?

A. Yeah.
Q. What did you say?
A. I had said, "No. I did not borrow any money from her."
Q. Did they tell you or Terry or anyone else tell you why they thought you had borrowed money from Terry Wasco?
A. At that point, that was basically the last question, and Mr. Gillespie went on to say that, "There seems to be a lot of things going on here, and that you may want to consider another form of" -- I can't remember exactly how he put it, but to resign. At that point I said, "Resign? Resign for what?" And no answer was given, but I was told that, "Well, do you want us to continue this investigation?" And I said, "I didn't realize there was an investigation going on, but if you want to look into any other matters, that's fine. I have nothing to hide." Mr. Gillespie said, "Then, give me your keys and your American Express card and don't return to the store or call the store, and we'll get back to you."
Q. The meeting you just described, that was the first time you had met with Terry Gillespie about the toy, and, you know, the borrowing the money from other employees, and all these questions he asked you?
A. Yeah. Yes.

Id. at 107-09.

Clearly, the Court erred when it concluded that the testimony about Plaintiff's borrowing money from subordinates involved after-acquired evidence, was unrelated to Plaintiff's discharge, and was known to Target before the Plaintiff was promoted to a store manager position.

**B.     Plaintiff Used Subordinate Employees To Do Personal Chores.**

The Court concluded that Target failed to demonstrate that it knew Plaintiff had used his subordinate employees to do personal chores before it terminated Plaintiff on March 5, 1999, and failed to demonstrate that this was a reason for the termination. Order at 2, 3. The evidence (including Plaintiff's testimony) contradicts the Court's conclusion:

- On or about February 26, 1999 (prior to Plaintiff's March 5th termination and while the investigation was on-going), Target obtained a statement from Paula Layne stating that Plaintiff had ordered her to drive to the Mercedes Benz dealership in Delray Beach before a store inspection visit by Target's regional vice president, because "he had his car detailed and needed to pick it up." Ex. 85(J) (admitted into evidence).

- At trial, Layne testified that she informed several of the managers undertaking the investigation that Plaintiff had ordered her to drive to the Mercedes Benz dealership in

-9-

       Delray Beach before a store inspection visit so that Plaintiff could pick up his car which was being detailed.

- Plaintiff testified in his deposition that Target managers discussed with him his use of Layne to do personal chores before his termination and during the investigation meetings:

    Q.     What was the other question they went to?
    A.     Mr. Gillespie then asked me -- and, again, I'm trying to remember in this particular first meeting -- about getting an executive to drop me to pick up my car, to pick up my Mercedes.
    Q.     Tell me about that. What was said about that?
    A.     He asked me to tell him the situation with that, and I said I can't remember. The only thing that came to my mind was my car was in the shop, and that I asked an executive around lunchtime to go to take me to go pick up my car. It wasn't being detailed which is what Mr. Gillespie said that the person said it was. It was being fixed for air conditioning problems.

Id. at 104.

Plaintiff's improper act of having a subordinate employee undertake personal chores for him during company time was a reason why Target terminated Plaintiff for being a security risk. As Plaintiff admitted in his deposition, this reason was discussed with him during the investigation meetings management held ***prior*** to Plaintiff's termination. The Court erred when it concluded that such testimony involved after-acquired evidence, was unrelated to Plaintiff's discharge, and was known to the employer before the Plaintiff was promoted to a store manager position.

**C.**    **Plaintiff Purchased Store Merchandise Through Misrepresentation And Deceit.**

       The Court concluded that Target failed to demonstrate that it knew Plaintiff had purchased store merchandise through misrepresentation and deceit before it terminated Plaintiff on March 5, 1999, and failed to demonstrate that this was a reason for the termination. Order at 2, 3. Again, the evidence (including Plaintiff's testimony) contradicts the Court's conclusion:

- On or about February 15, 1999 (prior to Plaintiff's March 5th termination and while the investigation was on-going), Target obtained a statement from Keil regarding Plaintiff's improper purchase of a Powerwheels display model. Ex. 85(H) (admitted into evidence). According to the statement, Plaintiff misrepresented to Keil that it was an old toy and asked

-10-

- her for a discount before the toy was offered to Target's customers. Plaintiff paid $42.00 for a toy that was worth $250.

- At the trial, Keil testified as to the Powerwheels incident. Keil testified that Target's policy mandates that the toy be first offered to the public, which Plaintiff disregarded. Keil testified that she subsequently discovered that the toy was a new display model worth $250, and that she had been mislead by Plaintiff to give him a price of $42. Keil testified that when she approached Plaintiff about his misrepresentation, Plaintiff simply stated that he bought the toy at the price she offered him. Plaintiff made no attempt to pay the actual price.

- On or about February 26, 1999 (prior to Plaintiff's March 5th termination and while the investigation was on-going), Target obtained a statement from Paula Layne stating the underlying facts involving Plaintiff's purchase of a Powerwheels toy. Ex. 85(J) (admitted into evidence).

- At trial, Layne testified about the underlying facts involving Plaintiff's purchase of a Powerwheels toy.

- At trial, Tim Blacknick testified that he was asked questions about the toy by Target management. Blacknick also provided a written statement to Target that was dated March 1, 1999. Ex. 85(C).

- In his deposition, Plaintiff testified that Target managers discussed with him his improper purchase of a Powerwheels toy during the investigation and before his termination:

    Q.   Once you explained what had happened with the towels, were any other questions asked by anybody --
    A.   Yes.
    Q.   -- at the meeting?
    A.   Yes.
    Q.   What were those questions?
    A.   I didn't get -- the next question, there was no answer to that particular markdown, but then I was asked about a markdown on a -- I think it was at that meeting -- a toy, a bike riding toy.
    Q.   And describe this toy we're talking about.
    A.   It's a remote control. It's four wheels like a little Jeep that a young kid would drive. It's battery operated.
    Q.   Had you bought this toy?
    A.   Yes, I did.
    Q.   What was -- what did Terry Gillespie or anyone else in management discuss with you about this toy?
    A.   He just asked me to tell him about what took place with this purchase of this toy. What happened, what events took place.

Id. at 95-96.

-11-

Plaintiff's improper act of purchasing merchandise through misrepresentation and deceit was a reason why Target terminated Plaintiff. As Plaintiff admitted in his deposition, this reason was discussed with him during the investigation meetings management held ***prior*** to Plaintiff's termination. The Court erred when it concluded that such testimony involved after-acquired evidence, was unrelated to Plaintiff's discharge, and was known to the employer before the Plaintiff was promoted to a store manager position.

D.  **Plaintiff's Financial Problems Rendered Him A Security Threat.**

The Court concluded that Target failed to demonstrate that it knew Plaintiff had financial problems which rendered him a security threat before it terminated Plaintiff on March 5, 1999, and failed to demonstrate that this was a reason for the termination. Order at 2, 3. The evidence (including Plaintiff's testimony) contradicts the Court's conclusion:

- Plaintiff testified that the company-issued American Express corporate charge card account was in arrears and that he had failed to make monthly payments. Plaintiff's last payment before his termination (March 5, 1999) was made in December 1998 and through a bounced check for $1,000. By the time of his termination, Plaintiff had incurred an outstanding balance of $777.50 in his company-issued American Express corporate card.

- On February 8, 1999, Plaintiff' supervisor received a memorandum showing that Plaintiff had bounced a check at the store.

- The evidence at trial showed that Plaintiff had a history of bouncing checks. Plaintiff paid his Target credit card with, at least, two bounced checks before the Target account was closed. At trial, Doug Barth stated that he learned of this evidence when they were investigating Plaintiff for being a security risk.

- The evidence at trial showed that Plaintiff's January through February 1999 bank statement (which covered the time period of the January 29, 1999 Shooter's dinner) revealed that Plaintiff had bounced 10 checks. Ex. 85(X) (admitted into evidence). Interestingly, on the next business day after Plaintiff pocketed the money from the Shooter's dinner, Plaintiff deposited $160 into his bank account and, thus, leading the jury to conclude that Plaintiff was fully aware he was improperly retaining Target's money. Plaintiff provided Target with this information in February 1999, ***before*** his termination.

- In his deposition, Plaintiff testified that Target managers discussed with him the bounced check before his termination:

   Q. Then what was the next topic?
   A. Okay. And before I say anything more, I may be jumping around with all the issues. ... Okay. The next one was a check, a bounced check, from Target. Mr. Gillespie asked me about that bounced check from Target. He asked me if I bounced a check at Target, and I replied yes.

Id. at 114-15.

The evidence clearly showed that Target first learned that Plaintiff was a security risk after the January 29, 1999 Shooter's dinner, and such conclusion was reinforced through Plaintiff's bank statements revealing a history of bouncing checks with insufficient funds. This reason was discussed with Plaintiff during the meetings management held *prior* to Plaintiff's termination. The Court erred when it concluded that such testimony involved after-acquired evidence, was unrelated to Plaintiff's discharge, and was known to Target before Plaintiff was promoted to a store manager position.

As the above shows, the Court erroneously concluded that the reasons given were obtained *after* Plaintiff's termination. Consequently, the Court should not order a new trial based on misinterpreted evidence. Rather, the Court should find that the reasons given were related to the termination decision since these were discussed with Plaintiff before the termination and before he was placed on suspension.

## CONCLUSION

Defendant, TARGET CORPORATION, respectfully requests that the Court reconsider its February 20, 2002 Order, vacate the Order, and reinstate the jury's verdict for Target.

<div style="margin-left:40%">

SHUTTS & BOWEN LLP
Attorneys for Defendant
201 South Biscayne Boulevard
1500 Miami Center
Miami, Florida 33131
(305) 358-6300
(305) 347-7386 (facsimile)

By: _____
Sheila M. Cesarano
Florida Bar Number 708364
Rene Gonzalez-LLorens
Florida Bar Number 0053790
Sidney C. Calloway
Florida Bar Number 790982

</div>

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was mailed on this 6th day of March 2002 to:

Richard J. Burton, Esq.
Richard J. Burton & Associates, P.A.
18305 Biscayne Boulevard, Suite 300
Miami, Florida 33160.
Tel: (305) 705-0888
Fax: (305) 935-9542
Attorney for Plaintiff

_____
OF COUNSEL

MIADOCS 491291.1 RGL