# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### FT. LAUDERDALE DIVISION

STEVE HARRIS,
      Plaintiff,          Case No. 00-6107-CIV-FERGURSON

vs.

**NIGHT BOX FILED**

TARGET CORPORATION f/k/a
DAYTON HUDSON CORPORATION
d/b/a TARGET STORES

MAY 3 1 2002

CLARENCE MADDOX
CLERK, USDC / SDFL / FTL

_____/

## PLAINTIFF'S RENEWED MOTION FOR JUDGEMENT AS A MATTER OF LAW, MOTION FOR MISTRIAL OR IN THE ALTERNATIVE FOR NEW TRIAL AND SUPPORTING MEMORANDUM OF LAW.

      COMES NOW, the Plaintiff, Steve Harris, hereinafter, "Harris or Plaintiff", and sets forth Plaintiff's Motion For Judgment As A Matter Of Law or, in the alternative, Motion For New Trial and Supporting Memorandum Of Law, wherein Plaintiff timely moved for a Rule 50 motion, on liability, at the close of Defendant's evidence (hereinafter called "Target") pursuant to Fed. R. Civ. P. 50 (a).  Plaintiff, further, in the alternative, respectfully requests that the Court grant a Motion for a New Trial, pursuant to Fed. R. Civ P 50(b) and that the Court direct the verdict to reflect judgment in favor of Plaintiff's and that in the alternative the court grant the motion for new trial pursuant to Rule 59(e) based on the grounds supported herein.  The grounds for the Rule 50 and 59 motion(s) are set forth in the following, incorporated, memorandum of law:

## PROCEDURAL HISTORY

      This action was commenced in the United States District Court in the Southern District of Florida, Ft. Lauderdale Division and a jury trial was held before the Honorable Wilkie Ferguson on October 10-October 22, 2001.  The Jury returned a verdict on October 22, 2001 finding that Defendant Target discriminated against Plaintiff based on race and that Defendant would have terminated Plaintiff despite the discrimination.

      Plaintiff moved the Court to strike Defendant's Affirmative defenses and for a Rule 50(a) directed verdict and a motion for new trial under Rule 59 in the alternative on the grounds that Defendant had not proven affirmative defenses and had actually

surrendered by conceding the reasons they promulgated as grounds for termination of Plaintiff.

On February 20, 2002 the Court granted a new trial on the grounds that "Target's opening statement and other comments made throughout the trial were not substantiated in part because the evidence relied upon was ruled inadmissible" and the Court's repeated warnings did not prevent the error, and that without the presentation of the inadmissible evidence the jury may have found that race was a motivating factor in the termination. Similarly, in this Trial, Target, once more argued that there was an *investigation* of Harris, which was clearly fictitious.

Pursuant to a motion by the Defendant, the Court bifurcated the trial into an initial liability determination.  If liability was found then the jury would proceed into testimony on damages. The Defendant then brought a renewed motion before the Court to inquire as to the previous ruling.  The Court denied all motions including that of a change in the bifurcation.  Plaintiff timely objected.

A second jury trial was held on May 6-16, 2002 before the Honorable Wilkie Ferguson.

During trial, Plaintiff sought to have admitted the deposition testimony of Karen Knapp Lapre, the cashier that rang the voucher. Mrs. Lapre was a Target employee at the time of the trial and could not be found despite several attempts by Plaintiff.  Further Target would not produce her at trial despite repeated requests.  Plaintiff's denial of the request for the testimony was timely objected to.

On May 14, 2002, the 2nd day of deliberations, the jury requested admitted evidence that had been not delivered to the jury room, which described Plaintiff's race and made reference to the fee at the time of Plaintiff's hire with Target.  Plaintiff renewed its request to admit evidence of the reduction in fee including check and testimony of Mr. Murphy.  The request was denied. Plaintiff timely objected.

On May 15, 2002, the 3rd day of deliberations began the Jury sent a note stating they were deadlocked and unable to come to a unanimous decision as to questions 2-3 of the verdict form.  Plaintiff and Defendant both timely objected to continued deliberations. Plaintiff requested a mistrial be granted, the request was denied by the Court.  However,

the court in its discretion, read a civil version "Allen" charge based on an edited criminal instruction urging the jurors to return tomorrow with a verdict.

The Jury returned a verdict on May 16, 2002 finding Plaintiff suffered an adverse employment action that Plaintiff's race was a substantial or motivating factor that prompted Target to take the adverse employment action and that Defendant would have taken the same adverse employment action despite Plaintiff's race.

The Court issued a final judgment on May 16, 2002 in favor of the Defendant.

## Preliminary Statement and Overview

Plaintiff contends that his March 5, 1999 termination was the result of a "pre-textural, adverse employment action, guised in the cloak of a proper 'disciplinary' proceeding. The Defendant Claimed that the termination was a result of an act of negligence, on the part of Plaintiff, by mis-adding a bill for a company sponsored going away party, and then a "thorough investigation" of other possible defalcations, which cumulatively was sufficient to deem Plaintiff untrustworthy , and therefore, a *security risk*.  During the trial the Defendant's two claimed investigators, *admitted* that they performed no investigation. They merely supervised the transcription of statements, of certain employees, who had a motive to lie.  No of those events for which "statements were requested or received, were ever previously reported to Target, in a timely manner, and in a manner consistent with Target's own personnel and/or disciplinary policy(s). These statements were not even accumulated until *after* the last meeting with Harris to allow Harris a chance to explain his conduct.  The charges were *NEVER* even shown to Harris.  Those statements were then utilized, after the fact, to justify Harris' termination.

Initially, Harris was suspended from his position, based on his failure to tender what they considered a "viable explanation as to the Shooter's receipt and voucher".   Thus, he was not allowed access to the store or its employees, and therefore, Harris was unable to validate, through witness statements, of his subordinate employees, or otherwise, disprove the allegation(s), most of which had not even been obtained, prior to the last meeting Harris was granted to disprove the allegation(s).  During this meeting he was encouraged to resign.  Upon his refusal to do so, he was told not to return to Target until

contacted by the decision-makers while they continued to collect statements as to events
that happened well in advance of the Shooter's event.

The laundry list of charges were each shown to be unsubstantiated and further were
evidence of conduct were Harris was sanctioned, and other executives, including
Hastings were treated in a wholly disparate fashion.

Accordingly, Plaintiff contends that the reasons behind his suspension and termination
was actually race related and the proffered reasons for the termination and suspension
were merely a pretext to the racial motivation of Mr. Terry Gillespie, the Regional
Human Resources Director, supported by the then Regional Manager, Mark Hastings,
and the then, District Asset Protection Manager, (DAPTL) Doug Barth, in violation of
Title VII of the Civil Rights Act, and 42 U.S.C. 1981.

### Statement of Material Facts

The testimony of the company officials, responsible for hiring Harris, made it clear that
Defendant's Director of Human Resources, Terry Gillespie, had disparaged the hiring of
Black managers in general and specifically, Harris. He then resisted and attempted to
block Harris promotion(s), from the inception. When Harris was recruited by Joe
Murphy, of Murphy Retail to interview with Target for a managerial position with Target
Stores , the District Human Resources Team Leader, Terry Gillespie, expressed
displeasure of Mr. Harris to Murphy Retail as an African-American managerial candidate
and sought to have the fee paid to Murphy Retail reduced to the fee customarily paid for
a Department manager, as opposed to an Assistant Store Team Leader, {Assistant
Manager} stating that Steve, if hired, would never make it beyond the level of an
Assistant Manager.

In February of 1996, Harris was approved for promotion to Team Leader, at a
"round-robin" by the then Regional Manager, Terry Hargrove, with the support of Harris,
then Manager, Robert VanSavage.   At the conclusion of 1998, Harris was then assigned
to the Greenacres Target Store, to act as the closing Store Team Leader, in closing T-391
in Greenacres at the Forest Hills location.

In approximately December, 1997, Mark Hastings, a young *weak* up-and-comer was
transferred to Region 300 (covering Broward and Palm Beach County) replacing the

existing manager. In February, 1998 Harris was in line to be appointed the region's next available *Managership*. He commenced his duties in April, 1998. In May, 1998, Robert Van Savage left the Target organization, and eventually became Human Resources Director for the Mid-Atlantic region of Home Depot. With Van Savage, and the other remaining "strong" team leaders absent, Harris was then at the mercy of Gillespie, who had never encouraged, nor supported the promotion of a single African-American Store Team leader, while he was the District human resources director.

 The Record was further clear, that a large number of Target's white managers said numerous race-based discriminatory remarks.

This evidence included towels purchased by Harris which were also purchased, for the same price, by the Guest Service Team Leader (GSTL), Shannon Tetrault, and purchase of a discounted Power Wheels toy, for a greater price than the same toy was purchased by Mark Hastings, the Regional Team Leader. Harris, actually "loaned" the money for Hasting's purchase.  That charge of borrowing and loaning, was an underpinning of the case to demonstrate Harris lack of trustworthiness!

It is unrebutted that Harris was being treated, in a fashion disparate from other managers, who were not African-American.  Harris was never given 'permission' to coach or discipline his subordinates.  On several occasions, Steve had difficulties with certain store executives' job performance, including, most notably, every defense witness, starting with Tetrault, and culminating  with Donna Keil ,the executive who was transferred out of Harris store, by Hastings, apparently without, consultation by Harris, nor, according to hers and Hastings testimony, without any prior request or discussion.  By that transfer, her annual review was performed by her new Store Team Leader and not Steve Harris, who would not have given her the promotion, which she received.  Hastings acknowledged that he was surreptitiously meeting with, and telephoning Harris subordinate managers and keeping 'tabs' on Harris.  When Harris had sought counseling for her or for other of those employees, with his supervisor, Mark Hastings, that approval was arbitrarily withheld. The evidence is unrefuted that, had those employees had any written notes of job deficiencies in their respective files, Hastings ability to transfer, and those specific employees ability to be promoted would be eliminated, according to Target personnel policies. The discriminatory conduct was not limited to the actual suspension

and firing, but emanated from the manner in which Plaintiff was discriminatorily prohibited in enforcing personnel policy, for his subordinates. See *Vaughn v Edel*, 918 F. 2d 517, (5 CA, La., 1990).

Plaintiff further contends that during the trial held on May 6-17, 2002 in the courtroom of the Honorable Wilkie Ferguson, the Court erred in a fashion so prejudicial and significant which requires per-se reversal and a subsequent third trial or in the alternative a directed verdict in favor of the Plaintiff, as to the issue of liability.  Those errors, included, but were not limited to; a) the improper opening remarks of the Defendant's Counsel, claiming that there had been an investigation of Harris subsequent to February 15, 1999, which was clearly erroneous and unsupportable, in fact. In fact, on February 22, 1999 Plaintiff, Steve Harris, was placed on immediate, temporary suspension, as Store Team Leader, for an incident in which he allegedly acted "negligently" in the mishandling of store funds and not following proper procedure in filling out a voucher which resulted in a discrepancy, over a tip left at a company-sponsored dinner party given.  By February 3, Doug Barth, District Asset Protection Team Leader, researched and reported findings to his superior as to the validity of the voucher and the receipt submitted by Steve Harris.  He then proceeded to take personal leave until February 15, 1999.  On that day he submitted an E-mail report to his supervisor, detailing the only known claim, to that date, against Harris, the "Shooter's" receipt. On the 22nd, in a meeting called by Steve Harris based on rumors as to an "improper voucher", Steve Harris met with the three decision-makers, the Regional Human resource manager (Terry Gillespie), the District Team Leader

During the interim from the date of the first adverse employment action, if not possibly as early as late January, Mr. Hastings called several executives and former executives, some at home, in order to collect hearsay statements alleging misdeeds committed by Steve Harris.  According to Mr. Hastings, Mr. Gillespie directed Mr. Hastings, Mr. Barth and Mr. Fankhauser in the collection of the statements.  In the process of the investigation, the head security officer made derogatory comments regarding Plaintiff, his race, and ownership of personal property to a third party.

The decision makers met with Steve thereafter on 2 other occasions, where they presented him with items that they had gathered, of which they required explanations.

On March 5, 1999, Plaintiff was terminated in a meeting with Mark Hastings for "Gross Misconduct, becoming a security risk". Following Plaintiff's termination, another non-minority manager replaced him. Plaintiff was the only minority that held such a position in the geographical area and many other non-minority managers had similar stature.

Plaintiff contends that his termination was the second adverse employment action, the first being the suspension for 2 weeks

b) the court *erred* in granting Target's Motion in Limine, which prohibited, into evidence, the correspondence between Joe Murphy and Terry Gillespie, together with the initial Murphy Retail invoice, which was rejected by Gillespie, which deprived the jury of the necessary evidence to support Joe Murphy's testimony that Gillespie refused to pay a fee for Harris, commensurate with the customary fee charged and paid for Assistant Store managers, who are entering on a promotion path to Store Team Leader. In addition, several other discriminatory incidents happened during his tenure that caused difficulties for Steve Harris – including being questioned by Mark Hastings and Don Fankhauser (T-393 Store Assets Protection Manager) as to how he could "afford" his vehicle(s) and recreational vehicles owed, their cost, and how "a brother" could them on his earnings, as a Target Store Manager,  in addition several inappropriate comments which were made about the race (Caucasian) of his wife, and 'whether he was having any problems, in that regard';

c) the Court *erred*, in excluding the reading of the Deposition of Karen Napp Lapre, f/n/a Karen Napp, the cashier who received the monies from Harris for the Shooters receipt. She was unable to be served, during the trial, and Target (for whom she still worked) had given her a "vacation" during the duration of the Trial period. Her deposition testimony stated, in direct contradiction to the GSTL, Shannon Tetrault, and to the head *Investigator*, Director of Security, Don Fankhauser, that **both** of them were present, in the store on that Saturday morning, January 30, 1999 {the day before the Superbowl} and both of them were told of the Shooter's receipt, on that day!
This is the definition of *classic* Rebuttal. Only after the testimony of Fankhauser would it be material. The Court had earlier ruled that Fankhauser and Hastings, being Target executives, residing outside of the South Florida area, would have to be examined last in

Plaintiff's, case in chief which was to be conducted both as direct testimony for the Plaintiff AND Direct testimony for the Defendant!

Karen Napp was clearly "unavailable", either through the active direction of Target, or through coincidence, and therefore was not available to appear "live".

d.) the Court *erred*, in not granting a directed verdict at the close of the case, on liability, in favor o Harris, on the issues surrounding pretext and disparate treatment, and it further *erred*, in the creation of the verdict form, which conflicted with the holding in *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 120 S. Ct. 2097, 147 L.Ed. 2d 105 (2000). The Verdict form, reversed the burden to be borne, by Target, of explaining away the pretext. The verdict form demanded the jurors, after the finding of pretext, contained in Question # 2, answered, in Harris favor, to then further place the burden on Harris that the decision to terminate was *not* based on pretext. The question was unnecessary and confusing. [See Verdict Form Attached hereto as (Attachment A)]. [See affidavit of Juror, Gwendolyn Thorpe, attached hereto. (Attachment B)].

A new trial is mandated based upon the Hostile, *racist* environment within the deliberation chambers of the Jury! During the second day of deliberations, in the afternoon, the jury returned a note to the Court, advising the Court, that it was hopelessly deadlocked. The Court, on its own Motion, and over the Objection of Plaintiff's Counsel, decided to give the jury an "*Allen*" charge. *Allen v. United States*, 164 U.S. 492, 17 S. Ct. 154, 41 L. Ed. 528 (1896). Plaintiff objected to such an instruction, in this civil case. The distinction between a civil and a criminal case, are apparent. In a criminal case there may not be a conviction, if reasonable doubt in any of the jurors mind can be established. In a civil case the standards are wholly different. In the case, at bar, with the shifting burdens, contained in Reeves (supra),   the jury, who resided in two opposing, *armed camps,* believed that the Allen charge instructed the jury to stay in deliberation on *in finitim ,* to deliberate, in a hostile environment. The Allen charge given to THIS jury was misleading, and hence, unfair. Even where an Allen charge may be fairly given, it must be worded in a fashion that will not remove good faith deadlock, as a possibility.

*Peter BROOKS, Jr., v. BAY STATE ABRASIVE PRODUCTS, INC.,* 516 F.2d 1003, (5 CA, LA, 1970) which wrote;

This circuit has repeatedly approved ✦the *Allen* **charge** if it makes clear to members of the jury that (1) they are duty bound to adhere to honest opinions; (2) they are doing nothing improper by maintaining a good faith opinion even though a mistrial may result. Nordmann v. National Hotel Company, 425 F.2d 1103, 1109-10 (5th Cir. 1970); United States v. Bailey, 468 F.2d 652 (5th Cir. 1972), *aff'd en banc*, 480 F.2d 518 (5th Cir. 1973); Thaggard v. United States, 354 F.2d 735, 739 (5th Cir. 1965), *cert. denied*, 383 U.S. 958, 86 S. Ct. 1222, 16 L. Ed. 2d 301 (1966). We believe the *Allen* **charge** under scrutiny, the wording of which is almost precisely the same as that employed in Wilson v. Southern Farm Bureau Casualty Co., 275 F.2d 819, 822-23 (5th Cir. 1960), fulfills the requirements articulated by this court. (at pg. 1004)

The jury members were led to believe by the instruction, actually given, that the Court would not accept a hung verdict!  The jury members threatened, each other, with 'vote with me or you'll have to keep returning to the hostile jury environment', until Harris' supporters, caved in. This is a wholly different scenario *from the scenario presented in Vichare v Ambac Inc., 106 F 3rd 457 (2 CA, NY, 1996). In Vichare,* the issue was whether the *Allen* charge unfairly forced unanimity of the Petit Jury.  In the case at bar, certain Jurors were themselves subjected to a hostile discriminatory unprotected environment.  This is akin to the prejudice, requiring a new trial exhibited in the *Heller* case.  In *U.S. v Heller,* 785 F. 2d 1524, (11 CA, FL, 1986), the Court of Appeals, for the Eleventh Circuit declared that a jury room, mired in prejudice, mandates a new trial!  As in *Heller,* the jurors, whose views prevailed, on the third question, actively made derisive comments about Harris white wife, even though she was never a witness, before the Court.  In fact, Juror Gregory Thomas gave a statement to Ms. Annelies Mourning (whose Affidavit is attached, hereto), to the effect that the remaining members of the Jury were nasty with the Jurors with whom they disagreed to the point of literally 'fighting' in the deliberation room. He describes the most hostile of environments, which in light of the *Allen* charge, created a belief by the Jurors, that without a verdict their deliberations would Never cease. Heller forms the cornerstone of many Federal Court decisions, mandating a new trial. *U. .S v. MARTINEZ,* 14 F.3d 543 (11 CA, FL , 1994), *U.S. v. Gaffney,* 676 F. Supp. 1544,  (USDC, M.D. FL, 1987).  The mandate for a new trial is equally required in a civil proceeding. *Haley v. Blue Ridge Transfer Co.,* 802 F.2d

1532, 1 (4th Cir. S.C. 1986), *JIMENEZ v. DR. EDUARDO HEYLIGER SEGUROS TRIPLE S, INC.,* 792 F. Supp. 910; (USDC, PR, 1992). It is significant, that here, as in Heller, there was a challenge to the Jury's integrity before there was a verdict. *U. S. v. CUTHEL,* 903 F.2d 1381 (11 CA, FL, 1990) at pg. 1383.

 The Verdict form together with the *Allen* charge deprived Harris of a fair unanimous, agreed to Verdict, on the liability phase of the trial.

## ISSUES PRESENTED AND DISSCUSSION

**I.          Evidence presented at trial supports a finding for directed vedict for the Plaintiff or in the alternative a new trial.**

The Plaintiff offered sufficient evidence of intentional discrimination that would satisfy Plaintiff's burden:  Plaintiff produced evidence supporting allegations of remarks made in the decision maker's presence, that the reasons of Plaintiff's suspension and termination were pretextual and Target's proffered reasons were not believable in that the decision makers worked behind plaintiff to "fabricate" a reason for the adverse employment action by never giving him a chance to redeem his mistake with the Shooter's voucher, never counseled him, and in order to build a case against plaintiff for the termination collected statements of "gossip", that the Defendant "singled" plaintiff out since his hire almost waiting for him to make a mistake, something that was not done to other white managers.

The Plaintiff produced sufficient evidence to support a verdict that it did meet its burden of showing by a preponderance of the evidence that the company would not have discharged Plaintiff even if it had not considered his race.  Plaintiff showed that the decisions to terminate were a mere "smokescreen" or pretext to the reasons offered by Defendant.  Instead the instant case involved "pretext" which Plaintiff has clearly shown by the testimony of Mr. Van Savage, Mr. Barth and Mr. Hastings were no one, in that district, had EVER been terminated for reasons of being a "security risk" and that in similar situations, persons were counseled not terminated, as per company policy. Further, the decision makers sought to "pad the file" with statements to show that they were terminating plaintiff for legitimate business reasons that were never relied upon during termination and most were collected after February 3, when the decision makers concluded research into the Shooter's receipt.   Further, testimony of Doug Barth, Mark

Hastings, and several subordinates such as Shannon Tetrault, Donna Kiel, Paula Layne, Don Fankhauser, Annette Steinberg, Rene Wasco, and Tim Blacknik, showed that the collected "statements" only showed that an "investigation" was never conducted and that the authors of the statements wrote them down incidents after being contacted and told to do so by Mark Hastings based on gossip he heard LONG prior to the Shooter's incident.

It appears that in the case at bar that the decision-making panel had or could have made their decision to terminate well in advance of the Shooter's incident at the direction of Terry Gillespie, based on his dislike of Steve Harris's race, setting him up to fail. This fact alone would be a sufficient basis for directed verdict for the Plaintiff in that a finding that the influence of the person with the discriminatory attitude may well have been decisive in the employment decision and not the proffered reasons of the employer.  The Supreme Court has built a strong foundation of Title VII decisions with the most recent *Reeves vs. Sanderson Plumbing*, 530 US 133, 147 L.Ed.2d 105 (2000) and within the framework in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  The Supreme Court in *Reeves* recounts the McDonnell Douglas framework requirements as:  The Plaintiff must establish a prima facie case of discrimination by establishing that the plaintiff was at the time of the adverse action was (i)a member of a protected class (ii)he suffered from an adverse employment action.  The burden then shifts to the Defendant to "produce evidence of the non-discriminatory for the firing".  Thereafter, the Plaintiff must only "cast doubt" on the preferred reason offered by the employer in order support a finding of liability.  "In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." *Ibid* at 12.

In the instant case, Plaintiff has presented evidence sufficient to show the falsity of the explanation offered by Target, as required for a directed verdict under *Reeves* and *McDonnell Douglas*.  First, Plaintiff produced evidence that the decision makers did not conduct an "investigation" but rather collected statements and that the "termination" or adverse actions taken against Plaintiff were a mere smokescreen to the discrimination by Gillespie of Steve Harris.

The 8th Cir. Court in *Kientzy v. McDonnell Douglas Corp*, 990 F.2d 1051 (8th Cir. 1993) upheld a directed verdict for an employee where a committee formed the termination

committee that appeared facial neutral, where the employee's admitted errors but supported a finding of discrimination where a decision maker made a different termination decision for errors made by the employee where others had been counseled or warned.   In upholding the lower court's directed verdict they state, quoting the 7th Circuit: "In *Shager v. Upjohn Co.*, 913 F.2d 398, 405 (7th Cir. 1990), a young supervisor set up an older employee when he presented a neutral career path committee with plausible evidence that the older employee should be discharged. The committee, unaware of any age animus on the supervisor's part, voted to terminate the employee. Id.

The Seventh Circuit reversed the district court's grant of summary judgment, noting that even though a neutral committee made the ultimate decision to discharge the employee, the committee was likely "to defer to the judgment of the man on the spot." Id. The court stated that when a committee has "acted as the conduit of [a supervisor's] prejudice--his cat's paw--the innocence of its members would not spare the company from liability." This was case cited, with approval in Clark v Coats & Clark, Inc., 990 F.2d 1217, (11 CA, GA, 1993).  See also *Jiles v. Ingram*, 944 F.2d 409 (8 CA, 1991), *Vaughn v. Edel,*  918 F.2d 517 (5 CA, 1990) (In focusing only on the final act of firing and in disregarding appellee's discrimination in not counseling or criticizing her, the magistrate committed clear error), *Russell v. McKinney Hospital Venture,* 235 F.3d 219, 235 F.3d 219 (5 CA, 2000) (change in management style reason for alleged job performance issue for termination was pretextual of discrimination) *Haas v. Advo Sys., Inc.*, 168 F.3d 732 (5 CA, 1999) (rejecting defendant's argument that subordinate exerted no influence over ultimate decision maker).

Plaintiff admitted to making a mistake in the calculation of the receipt but Target did not seek counseling as stated in its employee manuals and did not seek any recourse like deducting the monies from Plaintiff's paycheck despite opportunity to do so.

A motion for a judgment n. o. v. or directed verdict pursuant to FRCP Rule 50(a) tests the sufficiency of the evidence to support a jury verdict. *Boeing Co. v. Shipman,* 411 F.2d 365, 373-74 (5 CA, 1969) (en banc). The Court should consider all of the evidence including that evidence which supports the non-mover's case but in the light and with all reasonable inferences most favorable to the party opposed to the motion If there is substantial evidence opposed to the motions evidence of such quality and weight that

"reasonable and fair-minded" men in the exercise of impartial judgment might reach different conclusions. Further, the Court may reweigh the evidence, it may set aside the verdict because it is against the clear weight of the evidence, the damages are excessive or excessive or substantial trial errors have occurred.  See *National Car Rental Sys. v. Better Monkey Grip Co.,* 511 F.2d, 724, 730 (5 CA, 1975).

FRCP 50 states:

Rule 50. Judgment as a Matter of Law in Jury Trials; Alternative Motion for New Trial; Conditional Rulings
**(a) Judgment as a Matter of Law.**
(1) If during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion for judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue.
(2) Motions for judgment as a matter of law may be made at any time before submission of the case to the jury. Such a motion shall specify the judgment sought and the law and the facts on which the moving party is entitled to the judgment.
**(b) Renewing Motion for Judgment After Trial; Alternative Motion for New Trial; Conditional Rulings.**
If, for any reason, the court does not grant a motion for judgment as a matter of law made at the close of all the evidence, the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. The movant may renew its request for judgment as a matter of law by filing a motion no later than 10 days after entry of judgment -- and may alternatively request a new trial or join a motion for a new trial under Rule 59 . In ruling on a renewed motion, the court may:
(1) if a verdict was returned:
(A) allow the judgment to stand,
(B) order a new trial, or
(C) direct entry of judgment as a matter of law; or
(2) if no verdict was returned:
(A) order a new trial, or
(B) direct entry of judgment as a matter of law.
**(c) Granting Renewed Motion for Judgment as a Matter of Law; Conditional Rulings; New Trial Motion.**
(1) If the renewed motion for judgment as a matter of law is granted, the court shall also rule on the motion for a new trial, if any, by determining whether it should be granted if the judgment is thereafter vacated or reversed, and shall specify the grounds for granting or denying the motion

for the new trial. If the motion for a new trial is thus conditionally granted, the order thereon does not affect the finality of the judgment. In case the motion for a new trial has been conditionally granted and the judgment is reversed on appeal, the new trial shall proceed unless the appellate court has otherwise ordered. In case the motion for a new trial has been conditionally denied, the appellee on appeal may assert error in that denial; and if the judgment is reversed on appeal, subsequent proceedings shall be in accordance with the order of the appellate court.

The standard the Court must apply in deciding whether there has been reversible error sufficient for the granting of a new trial "is when [the Court] is left with a substantial and ineradicable doubt as to whether the jury was properly guided in its deliberations. *Pate v. Seaboard RR Inc.*  819 F.2d 1078 (11 CA, 1982). See also *Uhl v. Echols Transfer Company,* 238 F.2d 760 (5 CA, 1956).

FRCP Rule 59 allows for the granting of a new trial:

> Rule 59. New Trials; Amendment of Judgments
> **(a) Grounds.**
> A new trial may be granted to all or any of the parties and on all or part of the issues (1) in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States; and (2) in an action tried without a jury, for any of the reasons for which rehearings have heretofore been granted in suits in equity in the courts of the United States. On a motion for a new trial in an action tried without a jury, the court may open the judgment if one has been entered, take additional testimony, amend findings of fact and conclusions of law or make new findings and conclusions, and direct the entry of a new judgment.
> **(d) On Initiative of Court.**
> No later than 10 days after entry of judgment the court, on its own may order a new trial for any reason that would justify granting one on a party's motion. After giving the parties notice and an opportunity to be heard, the court may grant a timely motion for a new trial for a reason not stated in the motion. When granting a new trial on its own initiative or for a reason not stated in a motion, the court shall specify the grounds in its order.

Pursuant to Rule 50 and 59, the Plaintiff produced sufficient evidence to support a verdict that it did meet its burden of showing by a preponderance of the evidence that the company would not have discharged Plaintiff even if it had not considered his race.  Plaintiff showed that the decisions to terminate were a mere "smokescreen" or pretext to the reasons offered by Defendant.  Thus

**II.**     **Racial inferences made by members of the jury during trial and during deliberations created prejudice to the Plaintiff and Predisposed Racial opinions of members of the jury which allowed jurors to consider extrinsic opinions further resulted in extreme prejudice to the Plaintiff.**

Members of the jury panel made racial inferences and exhibited racial bias and predisposed racial opinions towards the African American jurors.  Biased jurors including the juror foreman, Niles Tagliamonte, and juror Ana Flinchum created a hostile environment for the jury and thus created an air of prejudice to the Plaintiff that heavily impeded on a Plaintiff's right to a fair impartial jury with the only remaining remedy to be a new trial. (see Affidavit of Gwen Thorpe, juror)  The impartiality created by the predisposed racial bias could not have been cured by the Court's instructions and were not brought to the court's attention by the jurors in fear of a mistrial.  Predisposed bias that "brother" was not racially charged created impartiality in reaching a decision (see Affidavit of Gregory Thomas, juror).  Had the biased jurors prejudice been determined during voir dire, those jurors could have been challenged for cause.

In *United States v. Heller,* 785 F.2d 1524 (11th Cir. 1986), the 11th Circuit granted a motion for new trial stating racial slurs strongly suggested bias and was reversible error thus sufficient grounds for a new trial.  Other Circuits have come to similar conclusions holding that a mistrial was the *only* available remedy to the Court. See citations, above, in addition to *Thorpe v. Mutual of Omaha Insurance Company,*   984 F.2d 541 (1st Cir. 1993) (comments of suggested bias lead to mistrial or a voir dire inquiry).

When jury bias is identified, the Supreme Court held in *Arizona v. Washington*, 434 U.S. 497; 98 S. Ct. 824; 54 L. Ed. 2d 717 (1977).  the "trial judge is in the best position to assess the prejudicial impact of trial events on the jury".  When the trial judge has identified possible jury bias as the ground for his mistrial order, his "determination is entitled to special respect." Id. at 505.

Therefore, the racial bias created by the biased jurors created an unfair advantage for the Defendant Target and thus should not be allowed to avoid liability based on jury misconduct. A new trial is the only remedy available at this juncture to avoid prejudice

The period of jury deliberation is the time of highest risk of improper outside influence. See, e.g., *United States v. Richardson*, 817 F.2d 886, at pg 889 (1987). "We hold that to obtain a new trial in such a situation, a party must first demonstrate that a juror failed to answer honestly a material question on voir dire, and then further show that a correct response would have provided a valid basis for a challenge for cause. The motives for concealing information may vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial" of *McDonough Power Equipment Inc. v. Greenwood*, 464 U.S. 548, 104 S. Ct. 845, 78 L. Ed. 2d 663 (1984).

**III.**      **The "Allen charge" instruction given the jurors created turmoil, a hostile environment and forced a prejudicial decision against Plaintiff and further not declaring a mistrial after the jury's announcement of deadlock resulted in a reversible error**

The jurors in this case felt that they would be not permitted to leave until a decision would be reached. (See juror affidavit of Gwen Thorpe and Gregory Thomas) After delivery of their announcement of deadlock, the Court delivered an civil "Allen" charge instructing the jurors to return the next day and continue to "try and come to a verdict". When the jurors returned the next day, the jury foreman convinced jurors that they would not be "permitted to leave and return to their lives until a verdict was reached". However, erroneous this belief was the jury believed its effect after they were not recalled after several hours of fighting and feuding. Gwen Thorpe was called big-headed and bullheaded for not wishing to conform to the opinion of the foreman, which caused considerable strain on members of the panel.

In *McWhorter v. City of Birmingham*, 906 F. 2d 674 (11 CA, AL, 1990) the juror's confusion in Court's instructions resulted in reversible error and grounds for new trial). See also *United States v. Scott*, 547 F.2d 334 (6 CA, 1977)

(new trial granted when charge omitted necessary limitations and included additional comments which probably heightened the coercive effect).

The Supreme Court held in *Illinois v. Somerville*, 410 U.S. 458; 93 S. Ct. 1066; 35 L. Ed. 2d 425 (1973) that a trial judge properly exercises his discretion to declare a mistrial if an impartial verdict cannot be reached, or if a verdict of conviction could be reached but would have to be reversed on appeal due to an obvious procedural error in the trial, even after a final judgment has been reached. *McWhorter v. City of Birmingham*, 906 F. 2d 674 (11th Cir. 1990) (confusion in Court's instructions resulted in reversible error and grounds for new trial).

A similar condition to the case at bar occurred in the case of *U.S. v. United States Gypsum Co*, 550 F.2d 115 (3rd Cir 1977). The jury informed the Court by a note that they were "seriously deadlocked" and that if forced to continue would require members of the panel to " he would only change due to compassion for his fellow jurors." The judge instructed the jurors formally giving an instruction approved by the Supreme Court. The next day, the foreman asked for a conference with the judge. The foreman then reported that some of the jurors were "sick and distraught" After some discussion, the court instructed the foreman to "tell [the jury] to keep deliberating and see if they can come to a verdict". The discussion was not disclosed to counsel until after the jury reached a verdict. In a concurring opinion, the 3rd Cir addressed the subject of the jury turmoil, "Such encroachment on jury authority, and the concomitant proscription of a possible "no verdict" outcome, requires reversal…".

The 9th Cir. Approached a jury deadlock and subsequent reversal in *United States v. Frazin*, 780 F.2d 1461 (9th Cir. 1986) by stating "Certain jury deadlock situations require the calling of mistrial…[the parties] should be given the opportunity to analyze the particular circumstances and assess whether a mistrial is appropriate. Furthermore, minority members of a deadlocked jury are especially susceptible to pressure from the majority to change their views."

## IV. The Verdict Form as to Questions 2 and 3 created juror confusion and was not in conformity with the case law under *Reeves v. Sanderson Plumbing*.

The verdict form proposed the following questions to the jury:

1.  That the Plaintiff suffered an adverse employment action.

2.  That the plaintiff's race was a substantial or motivating factor that prompted Target to take the adverse employment action?

3.  That Target would have taken the same adverse employment action against Harris for other reasons even in the absence of consideration of his race?

The jury interrogatories/ verdict form led to jury confusion and undermines the framework of _Reeves_,  and _McDonnell Douglas Corp_ (supra) and its progeny in the answering of questions #2 and #3.

Plaintiff objected to question 3 prior to its delivery to the jury in that it would lead to confusion and as worded would deliver an inconsistent verdict. The purpose of Question 3 as stated leads the jurors to believe that they would have fired the Plaintiff even with the discrimination.  However, pursuant to _Reeves,_ the fact finder must be able to support an inference that the reasons offered by the Defendant were valid or invalid and not the actual reason.  Thus the jury must be asked if they reasons proffered by the employer is believable, persuasive, not obviously contrived.   However, the question instead misleads the jury into answering the question in a manner not consistent with question 2 because then could not find merely discrimination in terminating Plaintiff, if Plaintiff had not already met its prima facie burden and presented evidence "casting doubt" on the reasons.  This question misleads the jury to think that there are no other explanations and that racial discrimination and the other reasons co-exist and offers them no outlet to show they disbelief the proffered reasons of the Defendant.  Therefore, under _Reeves_ in order to have a showing of intentional discrimination, the jury must be able unanimously support a finding of the prima facie elements and a "belief" or "disbelief" of the reasons offered by Defendant to support liability.  Question #2 and #3 conflict with each other because they only offer the jury a "correctness" standard to weigh the reasons offered by Defendant, and not a means to disbelieve the reasons offered and still show that race was a substantial factor.  Under the _Reeves_ analysis a finding of intentional discrimination like Question #2 can not co-exist with conclusions that the jury

must determine in Question #3 asking for "termination anyway". (see Affidavit of Annelies Mourning regarding the statement of Gregory Thomas, juror) This is not mere "disbelief" of the reasons offered by Target but asks the jury to draw a conclusion.  See also *Kientzy supra* at 1060 (supervisor took an "intense" interest in Kientzy's investigation, but "never followed up or investigated rumors about male employees who had gone home while on duty"); *Brown v. East Miss. Elec. Power Ass'n,* 989 F.2d at 863 (black employee discharged because of customer complaint but white employee only given warning); *Jiles v. Ingram,* Supra (black firefighter discharged for insubordination but white firefighter not discharged based on mayor's decision to terminate rather than panel was sufficient pretext); See also *Damon v. Fleming Supermarkets,* 196 F.3d 1354 (11CA, 1999) (pattern of firing older managers and replacing them with younger employees by the relevant decision-maker evidence of discrimination, where a reasonable jury might find a pretextual reason for the termination.)

## V.     <u>Affirmative defenses and opening statement not supported in evidence presented at trial.</u>

During the second trial, Defendant's Counsel again stated that it would demonstrate alleged "misdoings" that made Plaintiff a "security risk" that was discovered during an "investigation" after the Shooter's incident was brought to light.  These incidents included the submitting a false receipt, keeping $135, use of the corporate American Express for personal expenses, the purchasing of a Power wheels toy, mishandling of money, borrowing over $200 from subordinate employees.  Counsel stated that they would prove that the discrimination was a result of a direction by the Terry Gillespie and Mark Hastings, both managers and supervisors of Plaintiff.

Defendant's counsel opened their case and continued to assert throughout the second trial with statements that Target would prove that Plaintiff mishandled cash, bought a toy against company policy, used his corporate American Express card to make personal purchases, borrowed money from other employees and did not repay them. Plaintiff timely objected to all these statements.  The Court again issued an instruction holding the defense to these evidence.

The remedy available to the court is to again grant a new trial.  A party should not benefit from assumption of validity by the alleging of outrageous charges, and then not be able to support their validity by failing to produce substantial competent evidence to support those charges, either by admissibility or impeachment. *McWhorter v. City of Birmingham*, 906 F. 2d 674 (11th Cir. 1990) (cumulative effect of errors of counsel's mention of unsupported evidence not admitted, reference to inflammatory evidence, repeated reference to evidence to create an emotional response from the jury rather than evidence supporting their claims was highly improper, led to jury confusion of the court's instructions and grounds for a new trial), *Adams Laboratories Inc. v. Jacobs Engineering Co.* (cumulative effects of improper presentation of evidence, prejudicial argument and confusion led to jury confusion and was grounds for new trial). *Blossom v. CSX Transportation*, 13 F. 3d 1477 (11th Cir. 1994) (record clearly indicated disposition of a defense case at pretrial conference and further at trial and thus improper), *Edwards v. Sears, Roebuck & Co.,* 512 F.2d 276 (5th Cir. 1975). (reference to evidence to create an emotional response from the jury rather than evidence supporting their claims was highly improper).

Virtually all the other "incidents" sought to be introduced at trial by the Defense were non-existent.  The only "incident" supported by evidence was that a receipt was submitted and a voucher was filled out and that the tip was applied incorrectly.  However, this to goes more to the issue of racial discrimination, in that Target never took the avenues available to it, by counseling Steve Harris, taking the $135 discrepancy from Steve's paycheck or asking for repayment of the money.   Without discrimination or had Steve been white, Steve would have been given the chance to be counseled, not suspended or terminated.

When considering errors of this nature, the Court may grant a new trial when an improper cause invades the trial.  *O'Neil v. W.R. Grace & Co,.* 410 F. 2d 908 at 913-915.(5th Cir. 1969).  In addition, counsel should have been on warning as to the sufficiency of the evidence since the first trial was reversed on just these very grounds!

Further, the Court may reweigh the evidence, it may set aside the verdict because it is against the clear weight of the evidence, the damages are excessive or excessive or

substantial trial errors have occurred.  See *National Car Rental Sys. v. Better Monkey Grip Co.,* 511 F.2d, 724, 730 (5 CA, 1975).

The standard the Court must apply in deciding whether there has been reversible error sufficient for the granting of a new trial "is when [the Court] is left with a substantial and ineradicable doubt as to whether the jury was properly guided in its deliberations. *Pate v. Seaboard RR Inc.* 819 F.2d 1078 (11th Cir. 1982) See also *Uhl v. Echols Transfer Company,* 238 F.2d 760 (5th Cir. 1956),

### VI.    Evidentiary rulings of limiting the testimony of Mr. Murphy in reference to a reduction of a fee created an unexplainable gap in evidence which led to jury confusion.  The exclusion of the relevant deposition testimony of Karen Napp Lapre created an unfair prejudice for Plaintiff.

The Plaintiff should be granted a new trial based on the error of not allowing the testimony of Karen Napp Lapre and limiting the testimony of Mr. Murphy.

Ms. Napp's testimony was relevant under FRE 803(3), 608(b) and 804(b)(1). FRE states in relevant part:

608 Evidence of Character and Conduct of Witness,

> b) Specific instances of conduct. Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility, other than conviction of crime as provided in rule 609 , may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness' character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.

Rule 803. Hearsay Exceptions; Availability of Declarant Immaterial
The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
> (1) **Present sense impression**. A statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter.

Rule 804. Hearsay Exceptions; Declarant Unavailable

**(b) Hearsay exceptions.**

The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

(1) *Former testimony*. Testimony given as a witness at another hearing of the same or a different proceeding, or in a deposition taken in compliance with law in the course of the same or another proceeding, if the party against whom the testimony is now offered, or, in a civil action or proceeding, a predecessor in interest, had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.

   The evidence sought to be produced at trial by Plaintiff of Mr. Murphy's reduced fee was admissible because it showed the link and the extent of the discrimination of Mr. Gillespie, as well as rebutted Mr. Gillaspie's own testimony that the Target diversity programs were not uniformly applied.  Mr. Van Savage and Mr. Murphy both testified as to remarks made by the decision-makers or in their presence that showed Mr Gillespie's discrimination of Steve Harris is not "seeing Steve" in a managerially role from the outset of Steve's career with Target.  The check or testimony of Mr. Murphy would have explored this.  The jury noticed its exclusion and questioned its exclusion, not aware of the judge's ruling to the contrary. Thus the jury was forced to make inferences, it should have not made had the evidence been allowed. (See affidavit of Gwen Thorpe).  This testimony was crucial to Plaintiff's case and should not have been excluded and the jury's own request should have allowed its admittance. Pursuant to FRE 403 the prejudice of admitting such evidence does not outweigh its probative value. Excluding this evidence under FRE 403 resulted in prejudicial error to the Plaintiff.

   Further, Plaintiff sought to admit Karen Napp (Lapre)'s testimony, given at deposition on October 13,2000, page 22 line 24 through page 28 line 21 as part of his case and as rebuttal.  Ms. Napp, a Target employee, was not available at trial, although subpoenaed by Plaintiff.  She was purposefully made unavailable by the defense in an effort to not allow her to testify on a crucial point of Plaintiff's case and as a rebuttal witness.  As part of Plaintiff's case, the Defense agreed to have her available and then stated they would have her available since she could not be served.  Plaintiff then sought to call her at the end of his case and

was given instruction by the Court to only call Don Fankhauser and Mark Hastings.  When Plaintiff sought to admit the deposition on rebuttal due to Ms. Napp's unavailability pursuant to FRE 804(b)(1), the motion was denied after the proffer of the testimony as cumulative.  However, Plaintiff contends that Ms. Napp's present sense impression of the reasons that the voucher was voided would show that Plaintiff did not submit a false receipt in order to purposely commit a shortage.  This point was a crucial to Plaintiff's case that the receipt was pretextual and that Shannon Tetrault knew of the shortage and had the receipt voided to avoid the shortage so that Steve Harris would appear guilty.

In *United States v. Ethridge*, 948 F.2d 1215 (11th Cir. 1991) at 1218, the 11th Cir. States Court quoting United States v. Cohen, 888 F.2d 770, 776 (11th Cir. 1989) "Although the trial court has discretion to exclude testimony and will not be reversed absent an abuse of discretion, the trial court's discretion does not extend to exclusion of crucial relevant evidence."  Karen Napp's testimony was crucial to Plaintiff's case and should not have been excluded not allowing it to rebut evidence of the Plaintiff's alleged misdeeds.  Excluding this evidence results in reversible error where the only cure is a new trial.

## VII. Bifurcation of trial created reversible prejudice for Plaintiff

FRCP Rule 42(b) affords a district court discretion to order separate trials where such order would further convenience, avoid prejudice, or promote efficiency. In *Griffin v. City of Opa-Locka*, 261 F.3d 1295 (11th Cir. 2001), the 11th Cir upheld its conclusion that *bifurcation* would "result in the Court essentially trying the same case twice." In that case, the Court held there was clearly "substantial overlap in the issues, facts, evidence, and witnesses required for Griffin's claims against both Neal and the City." The bifurcation in this case, resulted in a disadvantage to Plaintiff as the issues of damages and liability would have shown the egregious nature of the Defendant's preferred reasons for the adverse employment action against Plaintiff thus resulting in prejudice to Plaintiff by creating an unfair burden on his burden of production.

## Conclusion

Wherefore, Plaintiff prays that this Court will direct the verdict in favor of Plaintiff on liability so that the case may be tried as to actual and punitive damages, or that in the

alternative grant a motion for new trial pursuant to Rule 59(e)  and such other relief be granted as is just and equitable.

Respectfully submitted this 31st day of May, 2002.

RICHARD J. BURTON & ASSOCIATES, P.A.
Attorney for PLAINTIFF
18305 Biscayne Blvd, Suite 300
Miami, FL 33106
(305)705-0888  Fax (305)935-9542

by: _____
        Richard J. Burton
        Florida Bar No.  179337

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of the foregoing has been furnished to: Sheila Ceasarano, Esq., Shutts & Bowen LLP., 1500 Miami Center, 201 South Biscayne Blvd., Miami, FL 33131 by mail 31st day of May, 2002.

by: _____
　　　　　Richard J. Burton
　　　　　Florida Bar No. 179337



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 00-6107-CIV-FERGUSON

STEVE HARRIS,

     Plaintiff,

vs.

DAYTON HUDSON CORPORATION.

     Defendant.

_____/

## **VERDICT FORM**

**Do you find from a preponderance of the evidence:**

1. That the plaintiff suffered an adverse employment action?

     YES ✓          NO _____

[If your answer is "YES" then proceed to question no. 2]

2. That the plaintiff's race was a substantial or motivating factor that prompted Target to take the adverse employment action?

     YES ✓          NO _____

[If your answer is "YES" then proceed to question no. 3]

*A*

CASE NO. 00-6107-CIV-FERGUSON
**Verdict Form**
**Page 2**

3. That Target would have taken the same adverse employment action against Harris for other reasons even in the absence of consideration of his race?

YES ✓                              NO_____

[If your answer is "YES" your verdict is for the defendant Target. If your answer is "NO" your verdict is for the plaintiff Harris on the issue of liability.]

**SO SAY WE ALL** this ___16___ day of May, 2002.

FOREPERSON

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### FT. LAUDERDALE DIVISION

STEVE HARRIS,
      Plaintiff,           Case No. 00-6107-CIV-FERGURSON

vs.

TARGET CORPORATION f/k/a
DAYTON HUDSON CORPORATION
d/b/a TARGET STORES

_____/

## AFFIDAVIT OF GWEN THORPE, JUROR

STATE OF FLORIDA
COUNTY OF BROWARD

      Before me, the undersigned authority, personally appeared Gwen Thorpe, who was sworn and says:

      I, Gwen Thorpe was a juror in the above-styled trial held in Broward County, Florida in the court of the Honorable Wilkie Ferguson May 6-17, 2002. During the trial, after the close of evidence, I felt that Plaintiff's case had merit. My unwillingness to stray from that opinion resulted in the jury foreman's announcement as to the jury's lack of a unanimous decision. However, other members of the jury including the Foreman forced my decision as part of the unanimous jury panel upon me, so that he especially could return to his normal business.

      I felt in a very difficult position, members of the panel yelled at me, called me names such as "bullheaded" and "pigheaded" and made me feel uneasy since I refused to listen to their point of view. I final seceded in my opinion because the panel convinced me that that Judge Ferguson would not let the panel leave until we reached a decision. They very aggravated when I refused to change my opinion and "ganged up" on me. If I knew that I could change my decision, or could have informed the judge, I would have.

      I believe that the firing was a pretext and myself and at least one other juror continued to believe that Mr. Harris should prevail throughout the entire deliberation. I was told by the foreperson and other jurors that the judge would not let us deadlock, in light of the instruction he

B

gave us on the second day.

I inferred from the way that I was spoken to that because Mr. Harris was black and I was black that I was hurting the other jurors when I did not agree with them. I still believe that the verdict should have been in Mr. Harris' favor. Other jurors made comments to me during the trial that tried to justify their not being "prejudice".

During the trial, several members of the panel made me feel very uncomfortable because I was African American. I also heard comments as to the Plaintiff's wife as to her race that made me wonder as to their impartiality. In as much as Mrs. Harris' did not testify, I was surprised to hear of comments as to Mrs. Harris and her race that was what made me question their impartiality. Initially, the evidence did not contain the fax about Mr. Harris' race. I raised with the foreman its exclusion, and he had it brought into the room.

The whole panel may have very well been persuaded had full details of the recruiters reduction of fees been presented to the jury. It was on the issue of motive and pretext that the jury was split. However, several other members of the panel did try and come to an informed decision, and we felt at that time that vital pieces of evidence were missing.

Had I known that I did not have to agree to terminate my service as a juror and the Court would have allowed me to vote in Mr., Harris' favor, I would have done that.

I have been made no promises and give this statement freely and voluntarily.

The Affiant sayth further naught.

_Gwen Thorpe_
Gwen Thorpe

Sworn to and subscribed before me on May 22, 2002 by Gwen Thorpe, who ___ is personally known to me OR _X_ produced identification.

Type of identification produced: _FL D/L_

_C. Annelies Mouring_
Notary Public – State of Florida

C. ANNELIES MOURING
Notary Public - State of Florida
My Commission Expires May 9, 2005
Commission # DD024263

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FT. LAUDERDALE DIVISION

STEVE HARRIS,
         Plaintiff,           Case No. 00-6107-CIV-FERGURSON

vs.

TARGET CORPORATION f/k/a
DAYTON HUDSON CORPORATION
d/b/a TARGET STORES

_____/

**AFFIDAVIT OF ANNELIES MOURING,
STATEMENT OF GREGORY THOMAS, JUROR**

STATE OF FLORIDA
COUNTY OF PALM BEACH

       Before me, the undersigned authority, personally appeared Annelies Mouring, who was sworn and says:

       I, Annelies Mouring, took the telephone Statement of Gregory Thomas, a juror in the above-styled trial held in Broward County, Florida in the court of the Honorable Wilkie Ferguson May 6-17,2002. I have at Mr. Thomas' request typed the following statement and have mailed same to him for his notarized signature. In the interest of time for filling, I affirm his statement recorded by me on May 23, 2002 to be as follows:

"During the trial, after the close of evidence, I felt that Mt. Harris had been clearly discriminated against. I was unwilling to stray from my opinion resulted in the jury foreman's announcement as to the jury's lack of a unanimous decision. However, I firmly believe that this panel should have remained a "hung jury".

       Several of the jurors refused to alter their opinion on race discrimination because they have never experienced discrimination in a manner such as Mr. Harris and used that outside experience to affirm their conclusions. I have experienced it but tried to open my mind with only the evidence I was presented. A person does not commit race



discrimination overtly. In this regard I felt that the other jurors would not look at the termination as a substantial factor in his termination. They did not feel that the word "Brother" was derogatory, even though they believe it was said. It is my opinion that not anything less than the "N" word that could have been said to Mr. Harris would not have constituted sufficient evidence of racial basis. It is my belief based upon my participation in the deliberations that certain members of this panel WOULD NOT have considered race as a factor in Mr. Harris' termination if Mr. Gillespie would have called him "boy" in an executive meeting before his peers.

By the last day of deliberation, I felt in a very difficult position. Other jurors were yelling at each other, calling names and causing fights. During the trial we socialized, spoke about our lives. During the deliberation, after we could not come to a unanimous decision, we were pitted against each other. No one left that room on pleasant terms. I have been a juror in a criminal case before and I have not had an experience such as this.

I still believe that Steve Harris was discriminated against. I believe that the evidence against him was weak and we as jurors unanimously disregarded the statements, evidence of the power wheels, evidence of the borrowing of money and the American Express. We agreed that Hastings was a weak manager. The defendant's representative had it in for Mr. Harris before he was hired. I believe that the entire jury panel agreed that those executives who testified as part of the Defense's case were all just advancing their career. I believe that Target should have applied their policies and procedures unilaterally to Hastings and the other managers. This is all evidence to me of **DISCRIMINATION!** Brother is meant as a derogatory comment when said to a black person by a white person.

In my opinion, the verdict form did not give me a chance to express those opinions. Questions 2 and 3 confused the entire panel. Those questions are in direct conflict with each other and caused great confusion and debate. The questions did not let the panel show there was discrimination as we did agree.

I believe, as well as the other jurors, that the judge would not let us deadlock; in light of the instruction he gave us on the second day. Had I believed that I did not have to agree to terminate my service as a juror and the Court would have allowed me to vote in Mr., Harris' favor, I would have done that. I would have never endorsed the verdict except that I

was told that the judge would have kept us there for days based upon his last instruction, neither myself nor several other jurors could have financially afforded that burden, and accordingly to end that service we let those other jurors prevail.   To avoid having to continue in that horrible condition, I agreed.

I have been made no promises and give this statement freely and voluntarily."

The Affiant sayth further naught.

_C. Annelies Mouring_

Annelies Mouring
4276 Pine Hollow Cir.
Greenacres, FL 33463

Sworn to and subscribed before me on _____5\31_____ 2002 by Annelies Mouring, who ____is personally known to me OR ____produced identification.

Type of identification produced:_____FL DL_____

_____
Notary Public - State of Florida
Palm Beach County

JUDY E.H. TONA
MY COMMISSION # CC 758701
EXPIRES: July 12, 2002
Bonded Thru Notary Public Underwriters